IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

Wisconsin Resources Protection Council,
Center for Biological Diversity, and Laura
Gauger,

                Plaintiffs,

                v.

Flambeau Mining Company,

                Defendant.

Case No. 11-cv-45

## COMPLAINT

Plaintiffs Wisconsin Resources Protection Council, Center for Biological Diversity, and Laura Gauger ("Plaintiffs"), by and through their undersigned attorneys, complain and allege as follows:

## INTRODUCTION

1.     Plaintiffs file this civil action pursuant to the citizen suit provision of the Federal Water Pollution Control Act, commonly known as the Clean Water Act ("CWA" or "the Act"), 33 U.S.C. §§ 1251 et seq., to abate numerous ongoing violations of the Act caused by Defendant Flambeau Mining Company ("FMC" or "Defendant"), including FMC's unlawful discharge of pollutants to waters of the United States without a discharge permit issued under the CWA.

2.     FMC has violated and continues to violate the CWA at its property near Ladysmith, Wisconsin. Since at least 1998, FMC has unlawfully discharged toxic pollutants including copper, zinc, and iron to surface waters that are tributary to the Flambeau River without complying with the explicit permitting and other substantive requirements of the Act.

3.      Defendant's ongoing violations of the CWA have caused and, unless abated, will continue to cause harm to a stream known as "Stream C" and the Flambeau River, in Rusk County, Wisconsin, and have added and continue to add to existing pollution levels in those surface waters.

4.      Plaintiffs seek a declaratory judgment, injunctive relief, remedial relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the claims specified in this compliant pursuant to the CWA's "citizen suit" provision, 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331.

6.      The relief requested is authorized by 33 U.S.C. §§ 1365(a) and 1319, and 28 U.S.C. §§ 2201 and 2202.

7.      Pursuant to section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), venue lies in the Western District of Wisconsin because Defendant's property from which the unlawful discharge occurs lies within this District.

8.      As required by 33 U.S.C. §1365(b)(1)(A) and 40 C.F.R. § 135.2, Plaintiffs gave notice of the violations alleged in this complaint and of Plaintiffs' intent to file suit to address those violations to Defendant by letter dated November 16, 2010 ("Notice Letter").  Plaintiffs also gave notice to the Administrator of the United States Environmental Protection Agency ("USEPA"); the Regional Administrator of the USEPA; and the Secretary of the Wisconsin Department of Natural Resources ("WDNR").   A true and correct copy of the Notice Letter is attached to this complaint as Exhibit 1.

9.      To Plaintiffs' knowledge, neither USEPA nor the State of Wisconsin has commenced or is diligently prosecuting a civil or criminal action against Defendant to abate the statutory, regulatory, or permit violations that form the basis for this complaint.

## PARTIES

10.      Plaintiff Wisconsin Resources Protection Council ("WRPC") is a statewide, non-profit membership organization concerned with educating the public about the consequences of allowing international mining corporations to develop a new mining district in the Lake Superior region under the present legal and regulatory framework.  WRPC strives to protect the land and water resources of Wisconsin from the negative environmental impacts of metallic mining. WRPC has an address care of Al Gedicks, Executive Secretary, and 210 Avon Street #4, La Crosse, Wisconsin 54603.

11.      Plaintiff Center for Biological Diversity ("the Center") is a national, non-profit membership organization with over 40,000 members including hundreds of members in Wisconsin.  The Center has an office in Duluth, Minnesota.  The Center works through science, law and creative media to secure a future for all species, great or small, hovering on the brink of extinction.

12.      Several of WRPC's and the Center's members live, own property, or enjoy participating in recreational activities near Defendant's property and facilities that are in violation of the CWA, and on or near the waters that receive Defendant's polluted discharges (namely, Stream C and the Flambeau River near Ladysmith, Wisconsin).  These members enjoy canoeing, kayaking, fishing, hiking, wildlife and bird watching, and the study of wildlife and aquatic life for personal and professional purposes on or near Stream C and the Flambeau River.

13.     Several of WRPC's and the Center's members have aesthetic, economic, professional, or recreational interests in the waters that receive the pollutants discharged by Defendant, and they are adversely affected and injured by Defendant's discharges of pollutants because their use and enjoyment of the receiving waters and the natural resources of the area surrounding Defendant's facility is impaired.

14.     Plaintiff Laura Gauger resides at 1321 E. 1st Street #210, Duluth, Minnesota 55805.  Ms. Gauger lived in Spooner, Wisconsin until 2010.  Ms. Gauger presently enjoys, and in the past has frequently enjoyed, hiking, canoeing, wildlife watching, and other recreational and aesthetic activities near the Flambeau Mine, including near Stream C and on the Flambeau River adjacent to the Flambeau Mine, and her recreational and aesthetic interests in Stream C and the Flambeau River have been adversely affected and injured by Defendant's unlawful discharge of pollutants to those surface waters.  Ms. Gauger is a member of both WRPC and the Center.

15.     Defendant Flambeau Mining Company owns property located at N4100 Highway 27, Ladysmith, WI 54848.  This property contains an abandoned and partially reclaimed metallic mine and several related industrial facilities and structures.  One such structure, described alternately by Defendant as a "surge pond" or "biofilter," holds, treats, and then discharges pollutants known to the USEPA and WDNR to be toxic to aquatic life and a threat to human health.  Defendant has owned and operated this property and all relevant facilities at all times relevant to the claims asserted in this complaint.

## LEGAL BACKGROUND

16.     Congress passed the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the nation's waters."  CWA § 101(a), 33 U.S.C. §

1251(a).  In the CWA Congress set a national goal of eliminating "the discharge of pollutants into navigable waters" by 1985.  Id.  To advance this goal the CWA provides a comprehensive approach for the regulation of pollution discharges to waters of the United States.

17.     Section 301(a) of the Act prohibits the "discharge of any pollutant by any person" unless such discharge is in compliance with the substantive requirements of the CWA, including the requirement to obtain a permit issued under section 402 (33 U.S.C. § 1342) or 404 (33 U.S.C. § 1344) of the Act.  33 U.S.C. § 1311(a).

18.     The "discharge of any pollutant" means "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12)(A).  The term "point source" is further defined to mean "any discernible, confined and discrete conveyance, including but not limited to any . . . channel . . . [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

19.     The centerpiece of the CWA's regulatory programs is the National Pollutant Discharge Elimination System ("NPDES"), which authorizes EPA to issue discharge permits to persons seeking to discharge pollutants into waters of the United States.  CWA § 402, 33 U.S.C. § 1342.  NPDES Permits may only be issued upon condition that the permitted discharge will comply with all applicable CWA regulatory requirements, including compliance with effluent limitations and water quality standards established under section 301.  CWA § 402(a)(1), 33 U.S.C. § 1342(a)(1).

20.     Under section 402(b)-(c) of the CWA, 33 U.S.C. § 1342(b)-(c), USEPA may delegate its NPDES permit authority to States that have an EPA-approved permit program. Authority to issue NPDES permits in Wisconsin has been delegated by USEPA to WDNR, pursuant to CWA § 402(b), 33 U.S.C. § 1342(b).  Under this delegated authority and authority of

state law, WDNR operates the NPDES permitting program within Wisconsin but calls it the Wisconsin Pollutant Discharge Elimination System ("WPDES"). *See generally* Wis. Stat. § 283.

21.     State NPDES programs must be operated at all times "in accordance with" the substantive NPDES requirements of section 402 of the CWA, and the guidelines for monitoring, reporting, enforcement, funding, personnel, and manpower established by USEPA under section 304(i) of the CWA. 33 U.S.C. § 1342(c)(2).

22.     Congress also provided for the enforcement of certain CWA requirements by citizens. The Act's citizen suit provision, § 505, states that "any citizen may commence a civil action on his own behalf . . . against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under" the Act. 33 U.S.C. § 1365(a)(1). The discharge of pollutants without an NPDES permit (or, in Wisconsin, a WPDES permit), is a violation of section 301(a) of the CWA, and therefore is among the enumerated CWA violations that fall within the scope of the citizen suit provision. 33 U.S.C. § 1365(f)(1).

23.     The Act's citizen suit provision authorizes the district courts to enforce the applicable effluent standards and limitations; to apply civil penalties, as appropriate; and to award litigation costs including attorneys' fees to prevailing or substantially prevailing parties. 33 U.S.C. § 1365(a) and (d).

## FACTUAL BACKGROUND

24.     Defendant's property near Ladysmith, Wisconsin includes the Flambeau Mine site and various industrial or administrative buildings, facilities, and structures. Defendant actively mined the site for gold, silver, and copper during the years 1993 to 1997. Mining operations ceased in early 1997, and that same year FMC began reclamation activities that continue to this day.

25.     During active mining operations, Defendant's property included an approximately 0.9-acre "Surge Pond" that received acid mine drainage from the mine's high sulfur waste rock stockpile; drainage from the mine's open pit; and overflow from an on-site wastewater treatment plant, among other wastewater streams.

26.     Following the cessation of mining activities in 1997, FMC created an approximately 32-acre industrial park (called by FMC the "Industrial Outlot") at the southern edge of the mine site.  As part of its reclamation activities at the Industrial Outlot, FMC reconstructed the Surge Pond into a stormwater detention basin or "Biofilter" in order to collect runoff from the Industrial Outlot prior to discharge to Stream C.

27.     During periods of significant precipitation, the water level in the Biofilter rises to the point where some of the water contained in the Biofilter is discharged from an outlet that connects the Biofilter to Stream C.

28.     The Biofilter and its outlet to Stream C is a "point source" under 33 U.S.C. § 1362(14).

29.     When water flows from the Biofilter through the outlet to Stream C, it is the "discharge of a pollutant" under 33 U.S.C. § 1362(12).

30.     FMC knows of this discharge from the Biofilter to Stream C, and intended for it to occur at least occasionally as a result of the reconstruction of the Biofilter.

31.     In 1997 FMC submitted to WDNR a document entitled "Supplement to the Surface Reclamation Plan for the Flambeau Mine."  In that document, which was prepared by FMC's consultants Applied Ecological Services, Inc., FMC stated that "stormwater from the industrial outlot would be directed to a constructed biofilter located in the area of the former surge pond.  Flow from the biofilter would be directed to Stream C."

32.     In the Surface Water Analysis included by FMC in the Supplement to the Surface

Reclamation Plan for the Flambeau Mine, FMC stated that "[d]rainage from the future industrial

area of the Flambeau Mine property (south of the reclaimed area) will be conveyed to the

existing surge pond at the east side of the site.  This surge pond will be reconstructed as a

biofilter/detention basin, to improve the water quality and decrease the peak flow rates of runoff

from the developed area prior to its discharge into Stream C."

33.     In January 2007, FMC submitted to WDNR a report entitled "Biofilter

Management Plan: Copper Park Business & Recreation Area – Formerly the Flambeau Industrial

Outlot" ("Biofilter Management Plan").  A true and correct copy of the Biofilter Management

Plan accompanied Plaintiffs' Notice Letter, and is attached to this compliant as part of Exhibit 1.

34.     In the Biofilter Management Plan, which was prepared by FMC's consultants

Foth Infrastructure and Environment, LLC, FMC stated that "[t]he purpose of the biofilter is to

capture particulates in the surface water from the site prior to discharge to Intermittent Stream

C."

35.     At least twice per year since 1998, FMC has collected water samples from the

Biofilter outlet to Stream C, at a surface water monitoring point identified by FMC and WDNR

as "BFSW-C2."  FMC has reported the results of laboratory analysis of each of these water

samples to WDNR.

36.     The pollutants discharged by FMC from the Biofilter to Stream C and the

Flambeau River include the metals copper, iron, and zinc.  These three pollutants are subject to

state water quality standards established by WDNR, national recommended water quality criteria

established by USEPA, or both.  These pollutants can be toxic to aquatic life and human health,

and can impair the uses of Stream C and the Flambeau River.

37.     Between November 1999 and September 17, 2010, at least 28 water samples have been collected at monitoring point BFSW-C2 (the Biofilter outlet to Stream C) by either FMC or WDNR and analyzed for copper concentrations.  The reported copper concentrations at the Biofilter outlet to Stream C have ranged from 4.8 µg/L to 91 µg/L.

38.     Between November 1999 and September 17, 2010, at least 17 water samples have been collected at monitoring point BFSW-C2 (the Biofilter outlet to Stream C) by either FMC or WDNR and analyzed for iron concentrations.  The reported iron concentrations at the Biofilter outlet to Stream C have ranged from 0.036 mg/L to 2.4 mg/L.

39.     Between November 1999 and September 17, 2010, at least 28 water samples have been collected at monitoring point BFSW-C2 (the Biofilter outlet to Stream C) by either FMC or WDNR and analyzed for zinc concentrations.  The reported zinc concentrations at the Biofilter outlet to Stream C have ranged from <5 µg/L to 53 µg/L.

40.     FMC does not presently hold, nor has it held at any time since December 31, 2000, a "permit issued pursuant to" section 402 of the CWA, *see* 33 U.S.C. § 1342(k), including a WPDES permit issued by WDNR or an NPDES permit issued by USEPA for any discharge of pollutants from any point source at the Flambeau Mine site, including the Biofilter.

<u>The Receiving Waters</u>

41.     Stream C is an intermittent stream that flows along the southeastern corner of Defendant's property.

42.     Stream C is a water of the United States, and has been identified by WDNR as navigable water.

43.     Approximately one-quarter mile from the Biofilter outlet (monitoring point BFSW-C2), Stream C joins the Flambeau River.

44.     The Flambeau River is a water of the United States and a navigable water.

## CLAIM FOR RELIEF:
## DEFENDANT'S CLEAN WATER ACT VIOLATION

45.     Paragraphs 1 through 44 are incorporated as if set forth fully herein.

46.     On numerous occasions since 1998, FMC violated section 301(a) of the CWA, 33 U.S.C. § 1311(a), by discharging pollutants including copper, iron, and zinc from the Biofilter to Stream C and the Flambeau River without a permit issued under section 402 of the CWA, and without complying with the substantive requirements of sections 301 of the CWA.

47.     Each time FMC discharges pollutants from the Biofilter into Stream C without an NPDES or WPDES permit, it violates the CWA.

48.     FMC's CWA violations occurred on at least the 28 dates upon which FMC or the WDNR conducted water quality monitoring at Sampling Point BFSW-2.  These specific dates are identified in Exhibit 1 (*See* Attachment D, "Discharges from Biofilter to Stream C and Sampling Results").

49.     FMC violated section 301(a) of the CWA by discharging pollutants without complying with the requirements of CWA sections 301 and 402 of the on each of the additional dates identified in Exhibit 1 (*See* Attachment C, "Flambeau Mine / Industrial Outlot Rainfall Data") and on all other dates upon which precipitation-induced discharges from the Biofilter to Stream C and the Flambeau River occurred.

50.     As of the date of this Complaint, FMC's CWA violations are ongoing because FMC has not taken action to eliminate its discharge, nor has it obtained the requisite permit authorizing the discharge of pollutants under section 402 of the CWA.

51.     Unless abated by an order of this Court, FMC will continue to violate the CWA every time a discharge from the Biofilter to Stream C and the Flambeau River occurs.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs Wisconsin Resources Protection Council, Center for Biological Diversity, and Laura Gauger respectfully request that this Court grant it the following relief:

(1)     A declaration that Defendant FMC violated and continues to violate the Clean Water Act as described above;

(2)     An injunction requiring the Defendant to take all actions necessary to prevent future violations of the CWA, including the cessation of all discharges of pollutants unless authorized by an NPDES permit issued under section 402 of the CWA and in compliance with applicable requirements under section 301 of the CWA;

(3)     An order requiring Defendant to remediate the harm caused by its CWA violations, to the extent possible;

(4)     An order requiring Defendant to pay civil penalties in the appropriate amount for each day that Defendant violated the CWA;

(5)     An order requiring Defendant to pay an appropriate sum for a Supplemental Environmental Project ("SEP") to benefit the water quality of Stream C and the Flambeau River and to further the economic, recreational, and aesthetic use of Flambeau River by the public;

(6)     An order requiring Defendant to pay the costs of litigation, including Plaintiffs' reasonable attorneys fees and expert witness fees, as provided by 33 U.S.C. § 1365(d); and

(7)     Such other relief the Court may find just and proper.

Respectfully submitted this 18th day of January, 2011.


James N. Saul, Esq.
Wis. Bar No. 1067236

JAMES N. SAUL, ATTORNEY AT LAW LLC
2422 Commonwealth Ave.
Madison, WI 53711
(608) 628-2420 – PH
(608) 234-5964 – FAX
jamie@jsaulattorney.com

Marc D. Fink, Attorney
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th St.
Duluth, MN  55805
 (218) 525-3884
mfink@biologicaldiversity.org

Daniel Mensher
PACIFIC ENVIRONMENTAL ADVOCACY CENTER
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR 97219
(503) 768-6926
dmensher@lclark.edu


*Attorneys for Plaintiffs Wisconsin Resources
 Protection Council, Center for Biological
 Diversity, and Laura Gauger*