UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

Wisconsin Resources Protection
Council, Center for Biological
Diversity, and Laura Gauger,

    Plaintiffs,

v.

Flambeau Mining Company,

    Defendant.

Case No: 11-cv-45

AFFIDAVIT OF LAWRENCE J. LYNCH

STATE OF WISCONSIN  )
                              ) ss.
COUNTY OF DANE      )

Lawrence J. Lynch, first being duly sworn, deposes and states:

### BACKGROUND

1. My name is Lawrence J. Lynch.

2. I have a Bachelor of Science degree in Geology/Geophysics from the University of Wisconsin – Madison and a Master of Science degree in Geology from Northern Illinois University.

3. I have worked for the Wisconsin Department of Natural Resources ("WDNR") since 1980. From 1980 until 2006 I worked in the WDNR's Mine Reclamation program under various job titles and descriptions, ultimately becoming the Mining Team Leader in the mid-1990s. In 2006, I became a

hydrogeologist in the Water Use Section within the Bureau of Drinking and Groundwater of WDNR and remain there today.

4. My main responsibilities in the WDNR's Mine Reclamation program were to implement the Metallic Mining Reclamation Act, sections 293.01 to 293.95 (formerly 144.80 to 144.94) of the Wisconsin Statutes, and the administrative codes which implement those statutes, mainly Ch. NR 130 through NR 134; and Ch. NR 182. I was also responsible for coordinating the geologic and hydrogeologic aspects of the Mine Reclamation program with other Department programs and governmental agencies and drafting and revising the administrative codes related to metallic mineral mining.

5. I was deeply involved in the review, permitting and monitoring of the Flambeau Mining Company's metallic mine ("Mine"). My primary responsibility related to reviewing Flambeau's mining permit application and supporting documents ("Application") and ultimately drafting the proposed mining permit. Throughout the three year permitting time period I was involved in numerous meetings with Flambeau and its consultants, other government agencies, WDNR staff and interested members of the public relative to various aspects of the proposed mining operation and also conducted several site visits to familiarize myself with the proposed mining site. Finally, I testified at the contested case hearing on the Application. I also had overall responsibility for ensuring that the Mine was in compliance with applicable laws, regulations, permits and approvals when the Mine was in operation.

6. After active mining ceased in 1996, as the Mining Team Leader, I had overall responsibility for ensuring that the Mine was in compliance with applicable closure and reclamation laws, regulations, permits and approvals. I was also responsible for reviewing environmental monitoring of the mine to ensure compliance with applicable permits. I reviewed Flambeau's and the public's submittals on these matters including Flambeau's Annual Reports and Annual Reclamation Reports. I also dealt with the public when they had inquiries regarding reclamation of the Mine or monitoring results.

7. Simply put, I was the WDNR's "point person" on the Mine from essentially 1991 through 2006.

## REGULATORY APPROVALS FOR THE FLAMBEAU MINE

8. In accordance with Wisconsin's statutes, rules and regulations, and after public and contested case hearings, Flambeau was issued the necessary permits by the WDNR to operate a metallic mine on January 14, 1991. The key permit was the Mining Permit issued pursuant to Section 144.85, Wis. Stats. (since renumbered to 293.49). The Mining Permit provided the overall regulatory framework for the Mine including provisions for storm water management. Other permits issued on January 14, 1991 included a Wisconsin Pollutant Discharge Elimination System ("WPDES") permit and various water regulatory permits. I have attached as Exhibit A the entire Decision, Findings of Fact, Conclusions of Law and permits that were issued on January 14, 1991.

9. The WPDES permit (WI-0047376-1) authorized three discharge points, including storm water discharges, identified as Outfalls 1, 2 and 3. Outfall 1 was the discharge point from the wastewater treatment plant to the Flambeau River; Outfall 2 was the discharge point from the settling ponds to the Flambeau River; Outfall 3 was an alternative discharge point from the settling ponds to nearby wetlands. The WPDES permit provided in part:

> 50. Type I waste rock, with less than 1% sulfur, would be expected to leach very little of its mineral content to rainwater. Runoff from the Type I stockpile will be treated by allowing any suspended particles to settle out in two settling ponds prior to discharge through Outfall 002. Small amounts of lime and polymer may be added to improve settling. Solids would be returned to the Type I storage area. As an alternative to discharging through Outfall 002, said wastewater may also be discharged through outfall 003 to wetlands adjacent to the Flambeau River. Discharge to the wetlands is authorized to augment the water flow to this area if the natural deposition of water to these wetlands is inadequate.
> 51. Leachate and runoff from the Type II stockpile, runoff from the crushing facility, Type II stockpile access road, the yard and equipment parking areas outside the maintenance shops and the water treatment plant and water which is collected in the lower sump of the pit will be treated at the water treatment plant. Discharges from the treatment plant to the Flambeau River are through Outfall 001.

10. During the active phase of mining, storm water from the yard and equipment parking areas outside the maintenance shops and water treatment plant, and the rail loading area was routed through the treatment plant and discharged to the Flambeau River through Outfall 1. This approximate area was included in the area which subsequently became known as the Industrial Outlot.

11. The WPDES permit included effluent limitations based upon NR 270; specifically § 270.104 which establishes the new source performance standards for discharges from copper mines under the WPDES program (*See*

4

Conclusion of Law #5 on page 129 of Exhibit A). The WPDES permit also included water quality based effluent limitations (*See* Conclusion of Law #6 on page 129 of Exhibit A).

12. NR 270 was applicable to the active mining area which is defined at NR 270.002(1):

> (1) "Active mining area" is a place where work or other activity related to the extraction, removal, or recovery of metal ore is being conducted, except, with respect to surface mines, any area of land on or in which grading has been completed to return the earth to desired contour and reclamation work has begun.

NR 270 is not applicable to "…any area of land on or in which grading has been completed to return the earth to desired contour and reclamation work has begun."

13. The WPDES permit was reissued on March 29, 1996 (WI-0047376-2). The reissued permit was modified in part to address the management of storm water during the active phase of reclamation such as site grading.

14. Among other activities, the Mining Permit covered reclamation of the mine and also addressed storm water management. The Mining Permit approved a reclamation plan which provided for the removal of all facilities and pavement and a return to the approximate pre-mining site grades. Simply put, there would have been no Industrial Outlot under the Mining Permit, Part 3—Reclamation Plan Approval.

## REQUESTED MINING PERMIT MODIFICATION

15. On January 8, 1998 Flambeau submitted a request for modification of the Mining Permit. The most significant aspect of this request was the retention

of certain existing facilities to accommodate the local communities' desire to use the Industrial Outlot.

16. The requested modification was detailed in a document entitled "Supplement to the Surface Reclamation Plan for the Flambeau Mining Company, Ladysmith, Wisconsin," dated December 18, 1997 ("Supplement").

17. The Supplement provided detailed grading plans and identified that storm water from nearly all of the Industrial Outlot would be routed through a biofilter located in the area of the former surge pond:

> - <u>Industrial Outlot</u>
> An approximately 28-acre outlot is proposed to be located west of State Trunk Highway (STH) 27 on the southern portion of the site. Ancillary facilities such as the administration building, wastewater treatment plant, utilities, and railroad spur not underlain with HDPE liner will be left in place to service the planned industrial park. The decision to leave these facilities in-place and incorporate the industrial park into the reclamation plan is based on the desire of local officials.
>
> In addition, storm water from the industrial outlot would be directed to a constructed biofilter located in the area of the former surge pond. Flow from the biofilter would be directed to Stream C. (Supplement at pages 1 and 2)
>
> ***
>
> Drainage from the future industrial area of the Flambeau Mine property (south of the reclaimed area) will be conveyed to the existing surge pond at the east side of the site. This surge pond will be reconstructed as a biofilter/detention basin, to improve the water quality and decrease the peak flow rates of runoff from the developed area prior to its discharge into Stream C. (Supplement at Appendix B)

18. The Supplement was reviewed by WDNR staff, including myself, particularly with regard to storm water management. It was determined that the WPDES permit would continue to govern storm water discharges through the existing identified outfalls until all permanent water management structures such as the biofilter were constructed and pumping was no longer ncessary. At that time, storm water management would be handled through the regulatory authority

6

of the Mining Permit and its associated plans. That determination was memorialized in my March 20, 1998 letter, a copy of which is attached hereto as Exhibit B. The letter stated in part:

> Flambeau Mining Company personnel and department staff have recently had several conversations concerning surface water management at the Flambeau mining site. This letter is to clarify how the department intends to regulate surface water management at the site.
>
> ***
>
> The current water handling procedures are acceptable to the department and are consistent with the Mining Permit, including the Surface Water Management Plan, and the Wisconsin Pollutant Discharge Elimination System (WPDES) Permit. It is our intent that the WPDES permit will continue to regulate discharges from the site through outfalls 001 and 002 as long as water is being pumped from one location to another on the site. Any discharge through those outfalls must comply with the effluent limits and monitoring requirements specified in the WPDES permit, including conditions A.13 and 14, as long as the WPDES permit remains in force. Once all permanent water management structures and facilities are in place and pumping is no longer necessary, discharges through outfall 002 will cease to be covered under the WPDES permit. At that time, storm water management will fall under the regulatory authority of the Mining Permit and its associated plans.

19. While I was aware of the storm water discharge from the Industrial Outlot biofilter when I wrote the letter dated March 20, 1998 (Exhibit B), the letter does not specifically reference that discharge since the discharge and its corresponding outfall did not exist when the WPDES permit was issued in 1991 and reissued in 1996. The intent of the March 20, 1998 letter was to clarify that storm water on the entire mining site including the discharge from the Industrial Outlot biofilter would "...fall under the regulatory authority of the Mining Permit and its associated plans."

20. The determination to regulate storm water discharges through the Mining Permit was a deliberate choice by the WDNR. I had conversations with

WDNR staff, including WPDES staff, as to how storm water would be managed after site grading was completed, pumping ceased, and installation of such features as the biofilter. I was aware that there had been some recent regulatory developments on storm water including the adoption of NR 216 in 1994 and the issuance of general permits for storm water discharges associated with industrial activities. I was aware of the provision in NR 216.21(3) that allowed for storm water discharges to be authorized through another permit if the other permit includes storm water control requirements that are at least as stringent as those required under NR 216. WDNR made the decision to regulate storm water discharges under the Mining Permit pursuant to NR 216.21(3) (now numbered NR 216.21(4)).

## MINING PERMIT MODIFICATION PROCESS

21. The WDNR determined that while the environmental impacts of the requested modifications were not significant, the modification nevertheless constituted a substantial change to the Mining Permit.

22. Accordingly, and pursuant to Section 293.55, Wis. Stats., WDNR published a public notice describing the requested modifications in various newspapers in and around the Ladysmith area the weeks of April 22 and April 28, 1998.

23. The Department received 12 requests for a hearing including requests from Laura Furtman (now Gauger) and Al Gedicks. A copy of each of their respective requests is attached as Exhibits C and D.

8

24. After consulting with the various petitioners, it was decided that an informational meeting should be held prior to a formal hearing. An informational meeting was held on June 16, 1998 at which the modification to the Mining Permit was discussed. I presided over that meeting.

25. As a result of the discussions at that meeting and the agreements that were reached at that meeting, 8 petitioners (including Al Gedicks and Laura Furtman) withdrew their request for a hearing. Copies of their respective withdrawals are attached as Exhibits E and F. One of the agreements reached at the meeting was that the wastewater treatment plant had to be decommissioned and the discharge pipe plugged. This was done specifically at the request of the petitioners.

26. Accordingly, on July 30, 1998, the Mining Permit modification ("Modification") was approved, including the aspect that resulted in the creation of the Industrial Outlot and the management of storm water from the Industrial Outlot through the biofilter. A copy of the Modification, including the Notice of Appeal Rights, is attached hereto as Exhibit G.

## POST-MODIFICATION STORM WATER MANAGEMENT

27. In accord with the Modification, reclamation site grading was completed, the Industrial Outlot biofilter was constructed, and the wastewater treatment plant was decommissioned. On September 8, 1998, I once again confirmed in writing that storm water discharges would now be regulated under the Mining Permit.

9

> With the permanent shutdown of the wastewater treatment plant and related facilities on August 13, 1998 and completion of construction of the permanent storm water facilities on the site, storm water management and discharges through outfall 002 will be regulated under the Mining Permit. As such, Flambeau must continue to exercise a storm water management and erosion control program that meets or exceeds current best management practices.

A copy of the letter is attached hereto as Exhibit H.

28. The letter does not specifically reference the storm water discharges from the Industrial Outlot biofilter since that discharge did not exist when the WPDES permit was issued (*See* paragraph 19, *supra*). Nonetheless, the Modification authorized the discharges and it became subject to all of the applicable Mining Permit terms and conditions. The letter does reference Outfall 2 since it continued to exist even after the Modification:

- Modification of the drainage basin for intermittent stream "B" so that the upper portion would become part of the drainage basin for intermittent stream "A" and flow into the reclaimed wetland area. Additionally, the lower part of stream "B" would discharge to the Flambeau River through the existing rip-rapped channel (Outfall 002).

29. Additionally, the then-existing WPDES Permit No. WI-0047376-2 was formally terminated by the DNR by letter dated September 23, 1998. A copy of the letter is attached hereto as Exhibit I. The letter specifically provided as follows:

> We understand the wastewater treatment system serving the Flambeau Mine in Ladysmith has permanently shut down as of August 13, 1998. Therefore, the Department has decided to close the wastewater permit for the discharge described in the Wisconsin Pollutant Discharge Elimination System Permit No. WI-0047376-2, issued on March 29, 1996.
>
> \*\*\*
>
> All exiting wastewater discharge points from the wastewater treatment system must be abandoned, with the exception of Outfall 002 which may discharge storm water runoff through the biofilter overflow regulated under the Mining Permit.

30. With regard to storm water discharges, Flambeau has remained in compliance with the Mining Permit and the Modification during my period of oversight which ended in 2006.

_____
Lawrence I. Lynch

Subscribed and sworn to before me
this 26th day of April, 2011.

_____
Notary Public

My commission: is permanent