UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

Wisconsin Resources Protection Council,
Center for Biological Diversity and
Laura Gauger,

        Plaintiffs,

    v.

Flambeau Mining Company,               Case No:  11-CV-45

        Defendant.

**DEFENDANT'S ADDITIONAL PROPOSED FINDINGS OF FACT IN
OPPOSITION TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

## I.    OVERVIEW

1.    Plaintiffs allege that Defendant Flambeau Mining Company ("FMC") discharged pollutants from a "biofilter" onsite to an alleged water of the United States without a permit, allegedly in violation of the Clean Water Act.  D.E. No. 1 (Complaint).[1]

2.    The Wisconsin Department of Natural Resources ("WDNR"), the Wisconsin agency delegated authority by the EPA to issue storm water permits, has repeatedly stated that FMC has the correct permit to discharge any polluted storm water on site.  The Wisconsin Department of Justice ("WDOJ") has also stated that FMC has the correct permit to discharge storm water on site.  D.E. No. 63, 63-1 (11/18/2011 Affidavit of Thomas J. Dawson ("Dawson Aff.") at p. 1, ¶ 3, Ex. A); D.E. No. 66 (4/26/2011 Affidavit of Lawrence J. Lynch ("Lynch Aff.") at pp. 6-10, ¶¶ 18-20, 27-29); 12/06/2011 Supplemental Affidavit of James Bertolacini ("Supp. Bertolacini Aff.") at pp. 1-2 ¶¶ 4-10; 12/6/2011 Affidavit of Thomas Jerow ("Jerow Aff.") at p. 2, ¶¶ 7-9;

---

[1] "D.E. No. __" refers to the docketed entry for Case #: 3:11-cv-00045-bbc.

Deposition of Lawrence J. Lynch, December 2, 2011 ("Lynch 12/2/2011 Dep.") 15:23-16:5, 20:16-21:6, 21:7-9, 23:2-6, Ex. 21.

3.      According to WDNR and WDOJ, the permit held by FMC to discharge storm water—titled a mining permit—falls under § NR 216.21(4), one section of the Wisconsin regulations implementing the Clean Water Act permit program.  D.E. No. 63, 63-1 (Dawson Aff. at p.1, ¶ 3, Ex. A); D.E. No. 66 (Lynch Aff. at pp. 6-10, ¶¶ 18-20, 27-29); D.E. No. 62 (4/15/2011 Affidavit of James Bertolacini ("Bertolacini Aff.") at p. 4, ¶¶ 13, 20); Jerow Aff. at p. 2 ¶ 9.

4.      FMC's permit to discharge storm water onsite through a biofilter dates back to 1998, when WDNR—through a lengthy public review process—approved a modification to FMC's mining permit.   D.E. No. 66, 66-7 (Lynch Aff. p. 9-10, ¶¶ 26, 28, Ex. G); Lynch 12/2/2011 Dep. 15:23-16:5, 20:16-21:6, 21:7-9, 23:2-6, Ex. 21.

5.      As recently as last week, WDNR rejected any suggestion that it had ever disavowed the notion that defendant's 1998 modification authorizes storm water discharges from the Flambeau Mine site, including the Biofilter.  Lynch 12/2/2011 Dep. 15:23-16:5, 20:16-21:6, 21:7-9, 23:2-6, Ex. 21.

6.      WDNR has confirmed that FMC is in full compliance with all storm water requirements, and has been in full compliance since 1998.  D.E. No. 66 (Lynch Aff. at p. 11 , ¶ 30); D.E. No. 64 (4/25/2011 Affidavit of Philip N. Fauble ("Fauble Aff.") at p. 3, ¶ 10); D.E. No. 65 (11/16/2011 Supplemental Affidavit of Philip N. Fauble ("Supp. Fauble Aff.") at pp. 1-2, ¶¶ 4-5); Jerow Aff. at p. 2 ¶¶ 7-9.

## II.     BACKGROUND

### A.     The Flambeau Mine

7.      FMC owned and operated a metallic mine known as the FMC Mine ("Mine"), along with related facilities, on its property located at N4100 Highway 27, Ladysmith, Wisconsin.  D.E. No. 67 (11/21/2011 Declaration of Stephen V. Donohue ("Donohue Dec.") at pp. 2-3 ¶ 7).

8.      Mining of the site was undertaken and completed pursuant to a mining permit ("the Mining Permit") issued by WDNR in 1991.  D.E. No. 67 (Donohue Dec. at pp. 2-3 ¶ 7).

9.      The Mine was an open pit mine from which FMC extracted gold, silver, and copper from 1993 to 1997.  D.E. No. 67 (Donohue Dec. at p. 3 ¶ 8).

10.      FMC constructed and operated a "Surge Pond" approximately 0.9 acres in size.  D.E. No. 67 (Donohue Dec. at p. 3 ¶ 9).

11.      The Surge Pond was part of FMC's on-site wastewater treatment system that was in place and operational from 1993 to 1998.  D.E. No. 67 (Donohue Dec. at p. 3 ¶ 9).

12.      In 1997 active mining operations ceased.  D.E. No. 67 (Donohue Dec. at p. 3 ¶ 8).

13.      Beginning in 1996, the Mine's open pit was backfilled, and this was completed in 1997.  D.E. No. 67 (Donohue Dec. at p. 3 ¶ 8).

14.      The Mine has been reclaimed pursuant to the Mining Permit as modified on July 30, 1998, and FMC received a Certificate of Completion ("COC") pursuant to Wis. Stat. § 293.63 for all of the Mine except for approximately 32 acres that includes 28

acres known as the "Industrial Outlot" or "Copper Park Business and Recreation Area." D.E. No. 67 (Donohue Dec. at pp. 2-3 ¶ 7).

15.     A COC signifies that the Mine operator has fulfilled its duties under the reclamation plan as to that area.  D.E. No. 67 (Donohue Dec. at pp. 2-3 ¶ 7).

16.     Photographs of the FMC Mine site before mining began, during mining and after reclamation are available as Exhibits.   D.E. No. 67, 67-1 through 67-5 (Donohue Dec. at pp. 2-4 ¶¶ 7, 11-12, Exs. 1-5).

17.     FMC continues to own the former Mine site, including the Industrial Outlot.  D.E. No. 67 (Donohue Dec. at pp. 2-3 ¶ 7).

18.     The Industrial Outlot is leased by Ladysmith Community Industrial Development Corporation.  D.E. No. 67 (Donohue Dec. at pp. 2-3 ¶ 7).

### B.     The Disputed Industrial Outlot Biofilter

19.     In 1998, following the cessation of active mining operations and as part of the reclamation of the facility, FMC created a storm water detention basin called a "Biofilter" approximately 0.9 acres in size in the area of the former Surge Pond.  D.E. No. 67 (Donohue Dec. at p. 3 ¶ 10).

20.     The Biofilter is located in the Industrial Outlot.  D.E. No. 67 (Donohue Dec. at pp. 3-4 ¶ 11).

21.     The Industrial Outlot is located immediately to the south of the backfilled mine, and includes various buildings, facilities, and structures including an administrative office and laboratory; recreational facilities; FMC's former wastewater treatment building; and a parking area.  D.E. No. 67 (Donohue Dec. at pp. 3-4 ¶ 11).

22.     The Biofilter's "watershed" is approximately 21 acres and lies entirely within the Industrial Outlot.  D.E. No. 67 (Donohue Dec. at p. 4 ¶ 12).

23.     The Biofilter was designed to collect storm water from single rainfall events ranging from one to 100 years in occurrence and was seeded and planted with specific native vegetation intended to filter sediment and nutrients in storm water runoff. D.E. No. 67 (Donohue Dec. at p. 4 ¶ 12).

24.     Runoff from rainfall that lands within the watershed of the Biofilter is directed to flow into the Biofilter where it is collected, filtered and detained.  D.E. No. 67 (Donohue Dec. at p. 4 ¶ 12).

25.     The Biofilter has an area approximately 30 feet long that is lower than the surrounding berm and allows storm water runoff to overflow when it exceeds the holding capacity of the Biofilter.  This area is known as the "Biofilter Outlet."  D.E. No. 67 (Donohue Dec. at p. 4 ¶ 13).  D.E. No. 67 (Donohue Dec. at p. 4 ¶ 13).

26.     When storm water runoff and rainwater collected in the Biofilter overflows through the Biofilter Outlet it goes into an adjacent wetland.  D.E. No. 67 (Donohue Dec. at p. 4 ¶ 13).

27.     The Biofilter was not designed nor intended to discharge water from the Biofilter directly to Stream C.  Rather, it was designed and intended to allow water to overflow from the Biofilter on occasion to an adjacent wetland.  12/6/2011 Declaration of James B. Hutchison in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Hutchison Opp. Dec.") p. 3 ¶ 12.

## III.     WISCONSIN'S CLEAN WATER ACT AUTHORITY

28.     Authority to issue National Pollutant Discharge Elimination System ("NPDES") permits in Wisconsin has been delegated by U.S. EPA to WDNR, pursuant to

CWA § 402(b), 33 U.S.C. § 1342(b).  D.E. No. 1 (Complaint ¶ 20); D.E. No. 6 (Answer ¶ 20).

29.     Under this delegated authority and authority of state law, WDNR operates the NPDES permitting program within Wisconsin but calls it the Wisconsin Pollutant Discharge Elimination System ("WPDES").  *See generally* Wis. Stat. § 283.  D.E. No. 1 (Complaint ¶ 20); D.E. No. 6 (Answer ¶ 20).

30.     WDNR administers its WPDES storm water program through Wis. Admin. Code ch. NR 216, which was created in 1994 in order to comply with the storm water provisions of the CWA as amended by the Water Quality Act of 1987.  D.E. No. 62 (Bertolacini Aff. at p. 3 ¶ 11).

31.     The NR 216 WPDES regulatory framework also allows WDNR to provide WPDES coverage through permits issued pursuant to other environmental programs. Wis. Admin. Code § NR 216.21(3) provided in part:

> (3) OTHER ENVIRONMENTAL PROGRAMS. If one of the following conditions is met, the department may deem that a facility is in compliance with coverage required under s. 147.021, Stats., and will not be required to hold a separate permit under s. 147.021, Stats.:
>
> (a) The storm water discharge is in compliance with a department permit or approval which includes control requirements that are at least as stringent as regulations under this subchapter; or…

D.E. No. 62 (Bertolacini Aff. at p.4 ¶ 13); D.E. No. 66 (Lynch Aff. at pp. 7-8 ¶ 20); Supp. Bertolacini Aff. at p. 2 ¶ 4; Jerow Aff. at p. 2 ¶ 9.

32.     The provision has essentially remained unchanged since its adoption in 1994.  D.E. No. 62 (Bertolacini Aff. at p. 6 ¶ 20).

33.     NR 216.21(3) was renumbered as 216.21(4) in 2004 when WDNR repealed and recreated NR 216.  D.E. No. 62 (Bertolacini Aff. at p. 6 ¶ 20).

34.     Region 5 of the U.S. EPA reviewed NR 216 and WDNR's use of NR 216.21 to regulate storm water discharges both when the framework was created in 1994 as NR 216.21(3)(a) and as it currently exists in 216.21(4)(a). Supp. Bertolacini Aff. at p. 2 ¶ 6.

35.     U.S. EPA's most recent review concluded July 18, 2011 and comprehensively addressed NR 216's omissions or deviations from federal requirements. Supp. Bertolacini Aff. at p. 2 ¶¶ 6-7.

36.     U.S. EPA did not identify any concerns related to WDNR's use of NR 216.21(4)(a) to regulate its WPDES storm water program.  Supp. Bertolacini Aff. at p. 2 ¶ 8.

## IV.   FMC RECEIVED ALL NECESSARY PERMITS FROM WDNR DURING ACTIVE MINING

37.     In 1991, WDNR issued all necessary permits to FMC to operate a metallic mine.  D.E. No. 66 (Lynch Aff. at p. 3 ¶ 8).

38.     The permits were granted after extensive scrutiny including four days of public hearings and 12 days of contested case hearings.  D.E. No. 66, 66-3 (Lynch Aff. at p. 3 ¶ 8, Ex. A at p. 3).

39.     As noted by the Administrative Law Judge who conducted the hearings and issued the permits:

> I believe it is fair to say that this project has been the subject of as much public scrutiny as any other project pending before a state agency in the history of the State of Wisconsin.

D.E. No. 66, 66-1 (Lynch Aff. at p. 3 ¶ 8, Ex. A at p. 3).

40.     Among the necessary permits were a Mining Permit and a WPDES permit. D.E. No. 66 (Lynch Aff. at p. 3 ¶ 8).

41.     The Mining Permit provided the overall regulatory framework for the operation of the mine including provisions for storm water management.  D.E. No. 66 (Lynch Aff. at p. 3 ¶ 8).

42.     The Mining Permit also includes a requirement for a contingency plan for addressing surface water quality issues in the event that remedial measures are required. D.E. No. 66, 66-1 (Lynch Aff. at p. 3 ¶ 8, Ex. A at p. 98).

43.     FMC also held a Tier 2 General WPDES Permit for Storm Water Associated with Industrial Activity (WI-505678507-1).  D.E. No. 62, 62-3 (Bertolacini Aff. at pp. 4-5 ¶ 14, Ex. C).

44.     The WPDES permit authorized various discharges, including storm water discharges, during the active phases of mining and reclamation.  D.E. No. 66 (Lynch Aff. at pp. 3-4 ¶¶ 8, 9 and 10).

45.     The WPDES permit (WI-0047376-1) authorized three discharge points, identified as Outfalls 1, 2 and 3.  D.E. No. 66 (Lynch Aff. at p. 3 ¶ 9).

46.     Outfall 1 was the discharge point from the wastewater treatment plant to the Flambeau River; Outfall 2 was the discharge point from settling ponds on the Mine site to the Flambeau River; Outfall 3 was an alternative discharge point from the settling ponds to nearby wetlands.  D.E. No. 66 (Lynch Aff. at p. 3 ¶ 9).

47.     The WPDES permit was reissued on March 29, 1996, as WI-0047376-2. D.E. No. 66 (Lynch Aff. at p. 5 ¶ 13).

48.     Among other things, the Mining Permit provided for a reclamation plan that returned the site to approximate pre-mining site grades and removed all facilities and infrastructure.  D.E. No. 66 (Lynch Aff. at p. 5 ¶ 14).

49.     Before active reclamation began, the City of Ladysmith specifically requested that FMC retain the facilities and infrastructure for future economic development opportunities.   D.E. No. 61, 61-1 through 61-3 (11/21/11 Declaration of David Cline ("Cline Dec.") at p. 2 ¶ 5, Exs. A, B, C).

## V.     WDNR APPROVED A MODIFICATION TO THE RECLAMATION PLAN

### A.     FMC Sought A Modification To Reclamation Plan

50.     On January 8, 1998, FMC submitted a request for modification of the Mining Permit.  D.E. No. 66 (Lynch Aff. at pp. 5-6 ¶ 15).

51.     FMC would not have sought the modification if not for the aforementioned request by the local community.  D.E. No. 61 (Cline Dec. at p. 2 ¶ 6).

52.     The most significant aspect of FMC's request was the retention of certain existing facilities to accommodate the local communities' desire to use the Industrial Outlot.  D.E. No. 66 (Lynch Aff. at pp. 5-6 ¶ 15).

53.     The requested modification was detailed in a document entitled "Supplement to the Surface Reclamation Plan for the Flambeau Mining Company, Ladysmith, Wisconsin," dated December 18, 1997 ("Supplement").  D.E. No. 66 (Lynch Aff. at p. 6 ¶ 16).

54.     The Supplement provided detailed grading plans and identified that storm water from nearly all of the Industrial Outlot would be routed through a biofilter located in the area of the former surge pond:

- Industrial Outlot

An approximately 28-acre outlot is proposed to be located west of State Trunk Highway (STH) 27 on the southern portion of the site.  Ancillary facilities such as the administration building, wastewater treatment plant, utilities, and railroad spur not underlain with HDPE liner will be left in place to service the planned

industrial park.  The decision to leave these facilities in-place and incorporate the industrial park into the reclamation plan is based on the desire of local officials.

In addition, storm water from the industrial outlot would be directed to a constructed biofilter located in the area of the former surge pond.  Flow from the biofilter would be directed to Stream C.  (Supplement at pages 1 and 2)

*** 

Drainage from the future industrial area of the Flambeau Mine property (south of the reclaimed area) will be conveyed to the existing surge pond at the east side of the site.  This surge pond will be reconstructed as a biofilter/detention basin, to improve the water quality and decrease the peak flow rates of runoff from the developed area prior to its discharge into Stream C.  (Supplement at Appendix B)

D.E. No. 66 (Lynch Aff. at p. 6 ¶ 17).

55. WDNR issued the Modification on July 30, 1998.  D.E. No. 66 (Lynch Aff. at 9 ¶ 26, Ex. G); D.E. No. 60, 60-9 (11/21/2011 Affidavit of Harry E. Van Camp ("Van Camp Aff.") at p. 2 ¶ 10, Ex. I).

## B. WDNR Determined That Storm Water Management At The FMC Site Would Be Handled Through A Mining Permit Under § NR 216.21(3)

56. WDNR staff, including Lawrence Lynch ("Lynch"), reviewed the Supplement, particularly with regard to storm water management.  D.E. No. 66 (Lynch Aff. at 6 ¶ 18); Lynch 12/2/2011 Dep. 13:5-16.

57. WDNR determined that the WPDES permit would continue to govern storm water discharges through the existing identified outfalls until all permanent water management structures such as the Biofilter were constructed and pumping was no longer necessary.  D.E. No. 66 (Lynch Aff. at pp. 6-7 ¶ 18).

58. However, following discussion between mining staff and waste water staff, WDNR determined that once the Biofilter was constructed, storm water management would be handled through the regulatory authority of the Mining Permit and

its associated plans.  D.E. No. 66 (Lynch Aff. at pp. 6-7 ¶ 18); Lynch 12/2/2011 Dep.

13:5-16, 22:25-24:16.

59.     WDNR's determination to manage storm water through the Mining Permit

was set forth in a March 20, 1998, letter which stated, in part:

> Flambeau Mining Company personnel and department staff have recently had
> several conversations concerning surface water management at the Flambeau
> mining site. This letter is to clarify how the department intends to regulate
> surface water management at the site.
>
> ***
>
> … Once all permanent water management structures and facilities are in place
> and pumping is no longer necessary, discharges through outfall 002 will cease to
> be covered under the WPDES permit.  At that time, storm water management
> will fall under the regulatory authority of the Mining Permit and its associated
> plans.

D.E. No. 66, 66-2 (Lynch Aff. at pp. 6-7 ¶ 18, Ex. B); D.E. No. 60, 60-7 (Van Camp Aff.

at p. 2 ¶ 8, Ex. G, Deposition of Lawrence J. Lynch, July 29, 2011 ("Lynch Dep.") 53:3-

25).

60.     As to the 1998 Modification, WDNR made a determination that all storm

water management on the site would be handled through the Mining Permit, including the

.9 acre Biofilter.  WDNR did so after a discussion between mining staff and waste water

staff who implemented the storm water program.  Lynch 12/2/2011 Dep. 13:5-16; Jerow

Aff. at p. 2 ¶ 9.

61.     WDNR's determination to regulate storm water discharges through the

Mining Permit by utilizing NR 216.21(3) was a deliberate choice.  D.E. No. 66 (Lynch

Aff. at pp. 7-8 ¶ 20).

62.     In 1998, the decision to regulate FMC storm water through the mining

permit was made pursuant to NR 216.21(4)(a) because WDNR believed that the mining

staff was best positioned to conduct site inspections and ensure compliance.  Storm water

implementation relies on site inspections.  Mining staff could be on the site regularly, even weekly.  In contrast, storm water staff was unlikely that they were going to be at the site more than two or three times a year.  Lynch 12/2/2011 Dep. 13:16-14:9.

63.    Pursuant to NR 216.21(4)(a), the WDNR storm water program has a long standing policy of cooperating with other WDNR programs, if appropriate, to avoid unnecessary duplication of regulatory requirements.  Supp. Bertolacini Aff. at p. 2 ¶ 9.

64.    WDNR determined that the surface water management plan, as modified by the 1998 Modification, met best management practices.  Lynch 12/2/2011 Dep. 13:16-14:9.

65.    Once the decision was made to regulate storm water with the Mining Permit, inspections were made and FMC complied with WDNR's requirements.  Lynch 12/2/2011 Dep. 14:10-17.

## C.    WDNR Approved Storm Water Discharge Through Biofilter

66.    On July 30, 1998, WDNR issued its Findings of Fact, Conclusions of Law and Mining Permit Modification ("Modification") and formally approved the Supplement.  D.E. No. 66, 66-7 (Lynch Aff. at p. 9 ¶ 26, Ex. G); D.E. No. 60, 60-9 (Van Camp Aff. at p. 2 ¶ 10, Ex. I).

67.    WDNR stated in the Modification:

The Department has completed its review of the mining permit modification request submitted by Flambeau Mining Company on January 8, 1998 pertaining to various aspects of the Reclamation Plan for the Flambeau mine. As detailed below, Flambeau Mining Company sought to change the final land use for a limited portion of the mining site, retain certain project facilities for future alternative uses, and modify other specific elements of the Reclamation Plan. This letter constitutes approval and issuance of the modification to the Mining Permit.

*** 

12

> Flambeau Mining Company is hereby issued a modification, under s. 293.55, Stats., to its Mining Permit for its mining operation in Rusk County.  All other provisions of the Mining Permit remain in full force.  **Under this modification, the proposed changes as outlined in the request from January 9, 1998 and the above mentioned supplement are approved with the following conditions: . . .** [Emphasis added.]

D.E. No. 66, 66-7 (Lynch Aff. at p. 9 ¶ 26, Ex. G); D.E. No. 60, 60-9 (Van Camp Aff. at p. 2 ¶ 10, Ex. I).

68.     The Modification approved the creation of the Industrial Outlot and the management of storm water from the Industrial Outlot through the Biofilter.  D.E. No. 66 (Lynch Aff. at pp. 9-10 ¶¶ 26, 28).

69.     Additionally, the Modification authorized the discharge from the 0.9 acre biofilter and made it subject to all of the applicable Mining Permit terms and conditions.  D.E. No. 66 (Lynch Aff. at pp. 9-10 ¶¶ 26, 28).

70.     In accord with the Modification, site grading was completed, the Biofilter was constructed, and the wastewater treatment plant was decommissioned.  D.E. No. 66 (Lynch Aff. at p. 9 ¶ 27).

71.     On September 8, 1998, WDNR once again confirmed in writing that storm water discharges would be regulated under the Mining Permit which included the Modification.  D.E. No. 66 (Lynch Aff. at p. 9 ¶ 27).

72.     The September 8, 1998, letter from WDNR provided:

> With the permanent shutdown of the wastewater treatment plant and related facilities on August 13, 1998 and completion of construction of the permanent stormwater facilities on the site, stormwater management and discharges through outfall 002 will be regulated under the Mining Permit.  As such, Flambeau must continue to exercise a stormwater management and erosion control program that meets or exceeds current best management practices.

D.E. No. 66, 66-8 (Lynch Aff. at p. 10 ¶ 27, Ex. H).

73.     After grading was completed, WDNR formally terminated WPDES Permit No. WI-0047376-2 by letter dated September 23, 1998.  D.E. No. 66 (Lynch Aff. at p. 10 ¶ 29.)

74.     A follow-up letter from WDNR on September 23, 1998 reiterated that storm water will be regulated under the Mining Permit:

> We understand the wastewater treatment system serving the Flambeau Mine in Ladysmith has permanently shut down as of August 13, 1998.  Therefore, the Department has decided to close the wastewater permit for the discharge described in the Wisconsin Pollutant Discharge Elimination System Permit No. WI-0047376-2, issued on March 29, 1996.
>
> ***
>
> All exiting wastewater discharge points from the wastewater treatment system must be abandoned, with the exception of Outfall 002 which may discharge storm water runoff through the biofilter overflow regulated under the Mining Permit.

D.E. No. 66, 66-9 (Lynch Aff. at p. 10 ¶ 29, Ex. I).

75.     Contrary to the assertion in an excerpt from Plaintiffs' Motion for Summary Judgment Brief (Lynch Dep. Ex. 115) that WDNR "disavowed  any notion that defendant's … 1998 modification . . . authorized storm water discharges from the Flambeau mine site, including from the Biofilter," Lynch testified that he is not aware of anybody at WDNR that has disavowed that defendant's 1998 modification authorizes storm water discharges from the Flambeau Mine site, including the Biofilter.  Lynch 12/2/2011 Dep. 15:23-16:5.

76.     The 1998 modification authorized storm water discharges from the Biofilter on the Flambeau Mine site.  Lynch 12/2/2011 Dep. 20:16-21:6, 21:7-9, 23:2-6, Ex. 21.

77.     The 1998 Modification authorized storm water discharge from the Biofilter by approving and referencing the supplement to the FMC surface reclamation

plan that included the discharge from the Biofilter.  Lynch 12/2/2011 Dep. 23:7-17, 26:15-23.

## VI.    PLAINTIFFS PARTICIPATED IN THE MODIFICATION PROCESS

### A.    WDNR Provided Public Notice Of The Requested Modification

78.    WDNR determined that the requested modifications constituted a substantial change to the Mining Permit.  D.E. No. 66 (Lynch Aff. at p. 8 ¶ 21).

79.    Accordingly, WDNR followed the Wis. Stat. § 293.55 modification process and published public notices of the request.  D.E. No. 66 (Lynch Aff. at p. 8 ¶ 22).

80.    In an April 2, 1998, newspaper publication, WDNR published notification of the proposed modification of the mining permit and reclamation plan, and of the right of interested persons to request a public hearing.  D.E. No. 60, 60-2 (Van Camp Aff. at p. 1 ¶ 3, Ex. B at p. 31, No. 80).

### B.    Plaintiffs Gauger And WRPC Received Information Regarding The Supplement

81.    Plaintiff Laura Gauger ("Gauger") was in possession of portions of the Supplement which showed a map of storm water from the proposed Industrial Outlot flowing into and out of the .9 acre Biofilter as well as text indicating the same.  D.E. No. 74 (Videotape Deposition of Laura J. Gauger, November 15, 2011 ("Gauger Dep.") 49:13-51:14); D.E. No. 60, 60-10 (Van Camp Aff. at p. 2 ¶ 11, Ex. J at pp. 14 (WRPC 015578), 16 (WRPC 015580)).

82.    Shortly before the June 1998 hearing, Plaintiff Wisconsin Resources Protection Council ("WRPC") was in possession of portions of the Supplement which

showed a map of storm water from the proposed Industrial Outlot flowing into and out of the .9 acre Biofilter as well as text indicating the same.  D.E. No. 77 (Videotape Deposition of Albert J. Gedicks, November 16, 2011 ("Gedicks Dep.") 34:14-35:18); D.E. No. 60, 60-10 (Van Camp Aff. at p. 2 ¶ 11, Ex. J at pp. 14 (WRPC 015578), 16 (WRPC 015580)).

83.     Albert Gedicks ("Gedicks") testified that what WRPC knew about the Supplement was what Churchill, Gauger, and an individual named Tom Wilson ("Wilson") read and brought to people's attention.  D.E. No. 77 (Gedicks Dep. 47:17-22).

84.     In 1998, Gauger understood that WRPC wanted to challenge the approved reclamation plan and that the modifications were significant.  D.E. No. 74 (Gauger Dep. 55:2-6).

### C.     Petitioners Filed Requests For A Hearing

85.     WDNR received 12 requests for a public hearing, including requests from Gauger and Gedicks.  D.E. No. 66, 66-3, 66-4 (Lynch Aff. at p. 8 ¶ 23, Exs. C and D).

86.     Gedicks frequently communicated with Gauger from 1996 through 1998.  D.E. No. 77 (Gedicks Dep. 29:1-20).

87.     Wilson solicited both Gauger and Gedicks to file for a contested case hearing.  D.E. No. 78 (Videotape Deposition of Thomas E. Wilson, November 15, 2011 ("Wilson Dep.") 68:17-69:3).

88.     On April 28, 1998 Wilson filed a request for a formal hearing on FMC's modification request.  D.E. No. 78 (Wilson Dep. 66:22-67:9); D.E. No. 60, 60-42 (Van Camp Aff. at p. 5 ¶ 42, Ex. OO ).

89.     Gedicks, on behalf of WRPC, filed a request for a contested case hearing concerning the Modification on April 28, 1998.  D.E. No. 60, 60-2 (Van Camp Aff. at p. 1 ¶ 2, Ex. B at p. 32, No. 82); D.E. No. 77 (Gedicks Dep. 41:21-42:2); D.E. No. 60, 60-43 (Van Camp Aff. at p. 5 ¶ 43, Ex. PP).

90.     Gauger, then known as Laura Furtman, filed a request for a formal hearing concerning the Modification on April 28, 1998.  D.E. No. 60, 60-12 (Van Camp Aff. at p. 2 ¶ 12, Ex. K); D.E. No. 74 (Gauger Dep. 51:24-52:14, 59:4-17); D.E. No. 60, 60-2 (Van Camp Aff. at p. 1 ¶ 2, Ex. B at p. 33, No. 84).

91.     In her request, she raises "serious questions and challenges to this proposal."  She specifically referred to the items outlined by Wilson as the challenges to the proposal.  D.E. No. 74 (Gauger Dep. 59:25-60:11).

92.     At the point Wilson filed a request for formal hearing, he was aware that the Supplement proposed that storm water from the Industrial Outlot area would be going into a .9 acre Biofilter [to be] constructed in the area of the former surge pond.  D.E. No. 78 (Wilson Dep. 69:23-70:5).

93.     Wilson testified that he was aware that previously, storm water from the area which became the Industrial Outlot had been going first to the surge pond and then to the wastewater treatment plant.  D.E. No. 78 (Wilson Dep. 70:6-11).

94.     A press release dated April 30, 1998, issued on behalf of WRPC and Northern Thunder, among others, called for a public hearing and scientific review of FMC's proposed Modification.  D.E. No. 60, 60-44 (Van Camp Aff. at p. 5 ¶ 44, Ex. QQ).

### D.   Other Members Of The Community Also Participated In The Administrative Review Process For The Supplement

95.   Wilson is associated with an "environmental social justice group" known as Northern Thunder.  D.E. No. 78 (Wilson Dep. 34:24-36:11).

96.   Wilson has been a long-time contributor, member, and participant with WRPC for 25 years.  D.E. No. 78 (Wilson Dep. 17:14-19).

97.   Wilson considers himself "very much aligned" with WRPC.  D.E. No. 78 (Wilson Dep. 18:24-19:1).

98.   Gauger testified that Wilson was "our primary voice at the time in terms of talking to the Wisconsin DNR about this, that we wanted to have a public hearing, and I supported that."  D.E. No. 74 (Gauger Dep. 52:4-14).

99.   Gauger testified that Wilson and Churchill did not tell her to "do anything" but she took her lead from them as she respected them and their opinions.  D.E. No. 74 (Gauger Dep. 111:7-13).

100.   Gedicks indicated that WRPC's primary source of information for the FMC reclamation plan changes was Wilson with whom WRPC worked closely on the same.  D.E. No. 77 (Gedicks Dep. 33:3-21).

101.   The leadership role of WRPC on the modification was taken by Churchill.  D.E. No. 77 (Gedicks Dep. 33:22-24).

102.   There was a "continuity of interest" between Wilson, Gauger, and Gedicks in terms of what they were requesting in filing for a contested case hearing.  D.E. No. 78 (Wilson Dep. 77:19-78:1).

**E.**      **Petitioners Requested An Informal Hearing With WDNR**

103.   Wilson wrote a letter to WDNR, dated May 9, 1998, indicating that petitioners were willing to withdraw their request for a formal hearing on two conditions. D.E. No. 60, 60-45 (Van Camp Aff. at p. 5 ¶ 45, Ex. RR); D.E. No. 78 (Wilson Dep. 82:21-83:18).

104.   The first condition noted in the WDNR May 9, 1998, letter was that there would be an informal hearing where petitioners could express their concerns and receive written responses to those concerns.  D.E. No. 60, 60-45 (Van Camp Aff. at p. 5 ¶ 45, Ex. RR); D.E. No. 78 (Wilson Dep. 83:10-18).

105.   The second condition noted in the WDNR May 9, 1998, letter was that if petitioners were not convinced that the responses after the informal hearing were consistent with Wisconsin State law and the original intent and purpose of the reclamation plan, then they would have the opportunity to re-submit their requests for a contested case hearing.  D.E. No. 60, 60-45 (Van Camp Aff. at p. 5 ¶ 45, Ex. RR); D.E. No. 78 (Wilson Dep. 83:19-84:2).

106.   A June 2, 1998, letter from WDNR to Wilson indicated that WDNR agreed to proceed with an informal hearing.  D.E. No. 60, 60-46 (Van Camp Aff. at p. 6 ¶ 45, Ex. SS); D.E. No. 78 (Wilson Dep. 88:19-89:23).

**F.**      **Petitioners Identified Their Concerns With The Modification, Including The Issue Of A WPDES Permit Application**

107.   On May 29, 1998, Wilson sent the petitioners, including Gauger and Gedicks, an email that included the statement, "You should already have received a copy of the revised reclamation plan from Dave Blouin."  D.E. No. 74 (Gauger Dep. 92:1-23); D.E. No. 60, 60-14 (Van Camp Aff. at p. 2 ¶ 14, Ex. M).

108. Wilson repeated this fact in another email to petitioners, including Gauger and Gedicks, dated June 5, 1998. D.E. No. 74 (Gauger Dep. 95:9-96:1); D.E. No. 60, 60-16 (Van Camp Aff. at p. 2 ¶ 16, Ex. O).

109. Gauger testified that a document entitled "Issues of Concern to Petitioners on the Revised Flambeau Mine Reclamation Plan (Draft 6/10/98)," includes information that she received from Wilson regarding concerns with FMC to change the reclamation plan in 1998. D.E. No. 60, 60-13 (Van Camp Aff. at p. 2 ¶ 13, Ex. L); D.E. No. 74 (Gauger Dep. 61:16-61:24).

110. Wilson authored the "Issues of Concern" document which had 41 points. D.E. No. 60, 60-47 (Van Camp Aff. at p. 6 ¶ 47, Ex. TT); D.E. No. 78 (Wilson Dep. 89:24-90:18).

111. Gauger indicated that she added her handwritten notes to the "Issues of Concern" document sometime between June 10, 1998 and when the informal hearing was held, possibly on June 16, 1998. D.E. No. 74 (Gauger Dep. 66:6-12).

112. Paragraph 4 of the "Issues of Concern" document references a WPDES Permit Application:

> 4. Has the revised plan been reviewed with reference to the original Water Regulatory Permit Applications, Groundwater Withdrawal Permit Application, WPDES Permit Application, Air Pollution Control Permit Application and have the flow and transport modeling reports been appropriately modified?

D.E. No. 60, 60-13 (Van Camp Aff. at p. 2 ¶ 13, Ex. L at ¶ 4); D.E. No. 60, 60-47 (Van Camp Aff. at p. 6 ¶ 47, Ex. TT); D.E. No. 78 (Wilson Dep. 92:4-93:24).

113. Paragraph 33 of the "Issues of Concern" document states:

> 33. How is surface and groundwater runoff being monitored before it seeps into the Flambeau River where it will be diluted to a point that it becomes a non-point source?

D.E. No. 60, 60-13 (Van Camp Aff. at p. 2 ¶ 13, Ex. L at ¶ 33).

114.    Paragraph 36 of the "Issues of Concern" document also references a WPDES Permit Application:

> 36.    How does the revised plan meet the original Water Regulatory Permit Applications, Groundwater Withdrawal Permit Application, WPDES Permit Application, Air Pollution Control Permit Application and the flow and transport modeling reports?

D.E. No. 60, 60-13 (Van Camp Aff. at p. 2 ¶ 13, Ex. L at ¶ 36); D.E. No. 60, 60-47 (Van Camp Aff. at p. 6 ¶ 47, Ex. TT); D.E. No. 78 (Wilson Dep. 92:4-93:24).

115.    Wilson provided the "Issues of Concern" document to WDNR.  D.E. No. 78 (Wilson Dep. 93:3-8).

## G.    Petitioners Prepared For The Informal Hearing

116.    Churchill from WRPC reviewed the Supplement in conjunction with a meeting wherein Wilson's list of concerns was addressed.  D.E. No. 77 (Gedicks Dep. 35:19-36:24).

117.    Gauger was present at the meeting as well as Gedicks.  D.E. No. 77 (Gedicks Dep. 35:19-36:24).

118.    The Supplement was referred to at that meeting, including by Churchill. D.E. No. 77 (Gedicks Dep. 37:18-38:4).

119.    The purpose of the meeting was to address what FMC was intending to do pursuant to the Supplement.  D.E. No. 77 (Gedicks Dep. 38:22-39:1).

120.    Wilson's list of issues had been distributed to people who were going to attend the meeting.  D.E. No. 77 (Gedicks Dep. 38:15-21).

121.    To the extent that the list was addressed, people had an interest in what FMC was saying about those things and what they intended to do.  D.E. No. 77 (Gedicks Dep. 39:2-7).

122.    Gedicks testified that, in order to determine what FMC was planning to do, people would have to refer to the Supplement.  D.E. No. 77 (Gedicks Dep. 39:8-11).

123.    Gedicks testified that, to determine what on Wilson's list mattered, people would have to look at the Supplement.  D.E. No. 77 (Gedicks Dep. 39:15-19).

124.    The meeting took place less than a week before the informal hearing with WDNR on June 16, 1998.  D.E. No. 77 (Gedicks Dep. 39:20-40:4).

**H.    Petitioners Attended The June 16, 1998 Informal Hearing**

125.    WDNR convened and conducted an informal hearing on June 16, 1998, at which the Modification was discussed. D.E. No. 66 (Lynch Aff. at p. 9 ¶ 24); D.E. No. 74 (Gauger Dep. 94:8-21).

126.    Gedicks and Gauger, among others, both attended and participated in the June 16, 1998, WDNR informal hearing regarding the Supplement.  D.E. No. 60, 60-2 (Van Camp Aff. at p. 1 ¶ 3, Ex. B at pp. 33-34, Nos. 87-88); D.E. No. 74 (Gauger Dep. 89:11-16, 94:17-95:6, 98:24-99:17); D.E. No. 60, 60-17 (Van Camp Aff. at p. 3 ¶ 17, Ex. P); D.E. No. 78 (Wilson Dep. 111:2-6).

127.    Gauger, Gedicks and Churchill attended the June 16, 1998, informal hearing on behalf of WRPC.  D.E. No. 77 (Gedicks Dep. 39:24-40:20).

128.    WRPC was involved in the modification of the reclamation plan for the Flambeau Mining site in 1998.  D.E. No. 77 (Gedicks Dep. 32:18-33:2).

129.    WRPC filed a request for a hearing involving the Supplement filed by FMC in 1998 to address concerns WRPC had regarding whether it complied with the Mining Permit.  D.E. No. 77 (Gedicks Dep. 41:17-42:10).

130.    WRPC requested a hearing on the issues in the Supplement.  D.E. No. 77 (Gedicks Dep. 50:3-5).

131.    Once WRPC withdrew its request for a hearing, WRPC had no further administrative issues pending with the WDNR regarding the Supplement filed by FMC. D.E. No. 77 (Gedicks Dep. 50:6-13).

132.    At the informal hearing, Gedicks personally signed an attendance listing identifying himself from "Wisconsin Resources Protection Council."  D.E. No. 60, 60-17 (Van Camp Aff. at p. 3 ¶ 17, Ex. P); D.E. No. 74 (Gauger Dep. 98:24-99:23); D.E. No. 77 (Gedicks Dep. 41:2-14).

133.    The Supplement was addressed at the informal hearing. D.E. No. 74 (Gauger Dep. 94:17-95:6).

134.    At the informal hearing, maps of the mining site were shown to the attendees.  D.E. No. 78 (Wilson Dep. 109:1-4).

135.    There was a demonstration and display on the maps of the storm water flow intended.  D.E. No. 78 (Wilson Dep. 109:5-8).

136.    Gauger admits that at the informal hearing, elements of the proposal advanced by FMC to modify its reclamation plan were discussed as were things that were part of the Supplement.  D.E. No. 74 (Gauger Dep. 94:8-95:6).

137.    Wilson identified the WPDES permit issue as being on his list of topics that were being raised at the informal hearing.  D.E. No. 78 (Wilson Dep. 63:2-64:21).

138.    Wilson's notes from the informal hearing question whether a WPDES permit had been applied for and whether there even was a WPDES permit.  D.E. No. 78 (Wilson Dep. 64:18-25).

139.    Wilson could not recall what the response was to the question concerning the WPDES permit, or what explanation occurred.  D.E. No. 78 (Wilson Dep. 64:18-25).

140.    Wilson believed he raised the issue, although he was not sure concerning the WPDES permit, and that it was in his notes of concern.  D.E. No. 78 (Wilson Dep. 65:1-66:16).

141.    Wilson indicated that he probably had the opportunity to ask the question about the status of the WPDES permit at the informal hearing.  D.E. No. 78 (Wilson Dep. 66:17-21).

142.    Pursuant to discussions at the time of the informal hearing and before he withdrew his request for a formal hearing, Wilson was aware that if there was a heavy rain or other runoff into the Biofilter located in the Industrial Outlot, that the Biofilter overflow would be going into the adjacent wetland.  D.E. No. 78 (Wilson Dep. 109:9-110:10).

143.    The wetland adjacent to the Biofilter is "the one that feeds into Stream C."  D.E. No. 78 (Wilson Dep. 109:9-110:10).

144.    In the negotiations regarding the concerns with the Supplement, Gauger and Gedicks both requested that FMC's existing wastewater treatment plant be decommissioned.  D.E. No. 60, 60-2 (Van Camp Aff. at p. 1 ¶ 3, Ex. B at pp. 35-36, Nos. 92, 93); D.E. No. 60, 60-18 (Van Camp Aff. at p. 3 ¶ 18, Ex. Q); D.E. No. 60, 60-51 (Van Camp Aff. at p. 6 ¶ 51, Ex. XX).

24

**I.    WDNR And The Petitioners Reached A Compromise Following The Informal Hearing**

145.    A letter dated June 26, 1998 to WDNR, signed by Wilson, concerning the Supplement outlined the issues that were raised at the informal hearing.  D.E. No. 60, 60-18 (Van Camp Aff. at p. 3 ¶ 18, Ex. Q); D.E. No. 74 (Gauger Dep. 100:13-101:5); D.E. No. 60, 60-48 (Van Camp Aff. at p. 6 ¶ 48, Ex. UU); D.E. No. 78 (Wilson Dep. 99:6-101:7).

146.    The June 26, 1998, letter indicated that, "[w]e have circulated a draft of this letter to all twelve petitioners and to date all but one (who is unavailable) have responded indicated it fairly reflects a modification of the plan revision that would be acceptable to us."  D.E. No. 60, 60-18 (Van Camp Aff. at p. 3 ¶ 18, Ex. Q).

147.    Gauger and Gedicks were petitioners, and were listed as copy addressees of the June 26, 1998 letter.  D.E. No. 60, 60-18 (Van Camp Aff. at p. 3 ¶ 18, Ex. Q); D.E. No. 74 (Gauger Dep. 100:13-24, 101:13-18).

148.    One of the items addressed in the June 26, 1998, letter was to leave the wastewater treatment plant building in place, but decommission the wastewater treatment system.  D.E. No. 60, 60-18 (Van Camp Aff. at p. 3 ¶ 18, Ex. Q).

149.    A letter dated July 9, 1998, from WDNR to Wilson, indicated that the requests outlined in Wilson's letter dated June 26, 1998, would be incorporated into WDNR's approval of the Supplement.  D.E. No. 60, 60-19 (Van Camp Aff. at p. 3 ¶ 19, Ex. R).

150.    One of the items requested by the petitioners that WDNR agreed to adopt and incorporate as a condition to the Modification was that "[t]he interior workings of the water treatment plant building will be removed and the discharge pipeline plugged as part

of site reclamation."  D.E. No. 60, 60-19 (Van Camp Aff. at p. 3 ¶ 19, Ex. R); D.E. No. 66 (Lynch Aff. at p. 9 ¶ 25).

151.   The wastewater treatment plant was "removed" from the modification plan at Wilson's request, and at the request of others, including Gauger and Gedicks. D.E. No. 78 (Wilson Dep. 62:12-63:1); D.E. No. 66 (Lynch Aff. at p. 9 ¶ 25).

152.   Gauger testified that it was important to her to honor the original reclamation plan that the waste water treatment plant be decommissioned.  D.E. No. 74 (Gauger Dep. 56:14-17).

153.   Gauger was concerned about leaving the wastewater treatment plant intact. D.E. No. 74 (Gauger Dep. 56:8-13).

154.   Gauger agreed that one of the things that the petitioners for hearing wanted was the decommissioning of the water treatment facility, and that it was her understanding that as part of the agreed settlement, FMC agreed to decommission the facility.  D.E. No. 74 (Gauger Dep. 111:16-112:5).

155.   Gedicks testified that this was a concession by FMC and part of a compromise on Petitioners' concerns.  D.E. No. 77 (Gedicks Dep. 47:23-48:21).

156.   With regard to reaching a settlement with WDNR following the informal hearing, Gauger stated that "we got almost everything we wanted."  D.E. No. 60, 60-51 (Van Camp Aff. at p. 6 ¶ 51, Ex. XX).  She made this statement in a book co-authored with Churchill.  *Id.*

157.   The book that Gauger co-authored with Churchill was entitled The Buzzards Have Landed, The Real Story of the Flambeau Mine ("The Buzzards").  D.E.

No. 74 (Gauger Dep. 40:13-19, 75:6-76:18, 85:11-17); D.E. No. 41 (11/16/11 Declaration of Laura Gauger ("Gauger Dec.") ¶ 10, p. 3).

158.    Gauger helped create the entire book, read the book prior to it being published, and was satisfied that the statements in the book were true to the best of her knowledge.  D.E. No. 74 (Gauger Dep. 76:9-77:5).

159.    Gauger testified that she wanted the book to be highly factual and went to great lengths to make sure the statements were accurate.  D.E. No. 74 (Gauger Dep. 76:9-16).

160.    Gauger satisfied herself before the statements in the book were published that they were true.  D.E. No. 74 (Gauger Dep. 76:23-77:1).

## J.    Plaintiffs Gauger And WRPC, Among Others, Withdrew Their Requests For Hearing

161.    After the informal hearing the petitioners came to an agreement with WDNR, and a number of petitioners who had filed for the contested hearing agreed to drop the claims.  D.E. No. 78 (Wilson Dep. 58:17-59:15).

162.    On or about July 10, 1998, Gedicks withdrew his request for a contested case hearing concerning the Supplement.  D.E. No. 60, 60-20 (Van Camp Aff. at p. 3 ¶ 20, Ex. S); D.E. No. 60, 60-2 (Van Camp Aff. at p. 1 ¶ 3, Ex. B at p. 36, No. 94).

163.    Gedicks' letter withdrawing his request for a contested case hearing provided:

> Thank you for the copy of your letter to Tom Wilson.  Since all of the concerns that we raised in the Ladysmith meeting appear to have been addressed in your letter to Tom Wilson, I would like to officially withdraw my earlier request for a hearing on the proposed modifications to the Flambeau Mining Company Reclamation Plan.
>
> I appreciate the DNR's facilitation of the process that satisfied all parties without having to go through a contested case hearing.

27

D.E. No. 60, 60-20 (Van Camp Aff. at p. 3 ¶ 20, Ex. S); D.E. No. 60, 60-2 (Van Camp Aff. at p. 1 ¶ 3, Ex. B at p. 36, No. 94).

164.    At his deposition, Gedicks confirmed that WRPC did not appeal WDNR's order approving the Supplement with the agreed-to modifications.  D.E. No. 77 (Gedicks Dep. 50:3-24).

165.    On July 15, 1998, Gauger wrote WDNR and withdrew her contested case hearing request concerning the Supplement.  D.E. No. 60, 60-21 (Van Camp Aff. at p. 3 ¶ 21, Ex. T); D.E. No. 74 (Gauger Dep. 110:17-22, 113:18-115:4); D.E. No. 60, 60-2 (Van Camp Aff. at p. 1 ¶ 3, Ex. B at p. 36, No. 95).

166.    Gauger's letter withdrawing her request for a contested case hearing stated:

> I do hereby withdraw my request for a formal hearing on the matter of the proposed changes in the Flambeau mining site reclamation plan.

D.E. No. 60, 60-21 (Van Camp Aff. at p. 3 ¶ 21, Ex. T); D.E. No. 74 (Gauger Dep. 110:17-22, 113:18-115:4); D.E. No. 60, 60-2 (Van Camp Aff. at p. 1 ¶ 3, Ex. B at p. 36, No. 95).

167.    Gauger's decision to withdraw her request for hearing was based in part on concessions that had been made by FMC at the time.  D.E. No. 74 (Gauger Dep. 112:2-5).

168.    Gauger testified that she withdrew her request for a hearing based on Wilson and Churchill's satisfaction with what had transpired.  D.E. No. 74 (Gauger Dep. 112:2-18).

169.    Wilson and Churchill both withdrew their hearing requests.  D.E. No. 74 (Gauger Dep. 111:7-15).

170.    Wilson found the compromise reached with WDNR sufficient to the extent necessary for him to withdraw his request for a contested case hearing.  D.E. No. 78 (Wilson Dep. 111:19-112:18, 115:17-116:9); D.E. No. 60, 60-49 (Van Camp Aff. at p. 6 ¶ 49, Ex. VV).

### K.    A Copy Of The Modification Was Sent To Petitioners Upon Final Approval By WDNR

171.    The Modification includes Findings of Facts, Conclusions of Law, the terms of the Modification, and a Notice of Appeal Rights.  D.E. No. 60, 60-9 (Van Camp Aff. at p. 2 ¶ 10, Ex. I).

172.    By issuing the Modification, WDNR specifically approved and incorporated the Supplement.  D.E. No. 60, 60-9 (Van Camp Aff. at p. 2 ¶ 10, Ex. I); Lynch 12/2/11 Dep. 22:25-24:16.

173.    WDNR specifically referred to the Supplement in the Modification and stated in the Modification that, "[u]nder this modification, the proposed changes as outlined in the request from January 8, 1998 and the abovementioned supplement are approved with the following conditions…" D.E. No. 60, 60-9 (Van Camp Aff. at p. 2 ¶ 10, Ex. I); Lynch 12/2/11 Dep. 22:25-24:16.

174.    WDNR's approval of the Supplement included approving the creation of the Industrial Outlot and the management of storm water from the Industrial Outlot through the Biofilter.  D.E. No. 66, 66-7 (Lynch Aff. at p. 9 ¶ 26, Ex. G).

175.    The Modification included a specific provision concerning dismantling of the wastewater treatment plant:

> 3.    The interior workings of the water treatment plant shall be dismantled and removed and the discharge pipeline will be plugged as part of site reclamation.  The water treatment building may be left in place for possible alternative use.

D.E. No. 66, 66-7 (Lynch Aff. at p. 9 ¶ 26, Ex. G); D.E. No. 60, 60-9 (Van Camp Aff. at p. 2 ¶ 10, Ex. I at p. 3 ¶ 3).

176.    The Modification also contained a formal Notice of Appeal Rights ("Notice"), which included a 30 day deadline to appeal:

<u>NOTICE OF APPEAL RIGHTS</u>

If you believe that you have a right to challenge this decision, you should know that Wisconsin Statutes establish time periods within which requests to review Department decisions must be filed.

For judicial review of a decision pursuant to sections 227.52 and 227.53, Stats., you have 30 days after the decision is mailed, or otherwise served by the Department, to file your petition with the appropriate circuit court and serve the petition on the Department.  Such a petition for judicial review shall name the Department of Natural Resources as the respondent.

This notice is provided pursuant to section 227.48(2), Stats.

D.E. No. 60, 60-9 (Van Camp Aff. at p. 2 ¶ 10, Ex. I); D.E. No. 60, 60-2 (Van Camp Aff. at p. 1 ¶ 3, Ex. B at p. 42, No. 112).

177.    A copy of the Modification was sent to the "Petitioners for Hearing."  D.E. No. 60, 60-9 (Van Camp Aff. at p. 2 ¶ 10, Ex. I).

178.    Gauger admitted that she received a copy of the Modification.  D.E. No. 74 (Gauger Dep. 117:9-118:6).

179.    Gedicks admitted that WRPC received a copy of the Modification.  D.E. No. 77 (Gedicks Dep. 50:14-22).

180.    Plaintiffs admit that the Modification constitutes a state agency administrative decision.  D.E. No. 60, 60-2 (Van Camp Aff. at p. 1 ¶ 3, Ex. B at p. 42, No. 111).

### L.     No One Requested Judicial Review Of The Modification

181.     No person, Plaintiffs included, filed a judicial review action within thirty (30) days (or at any time) of the date of the Modification.  D.E. No. 60, 60-2 (Van Camp Aff. at p. 1 ¶ 3, Ex. B at pp. 42-43, Nos. 113-116); D.E. No. 78 (Wilson Dep. 122:3-123:6); D.E. No. 77 (Gedicks Dep. 50:20-24).

### M.     Plaintiff Gauger And Others Lauded Public Input Into The Modification

182.     In a September 10, 2011 formal statement submitted by Wilson to WDNR, Wilson indicated as to FMC's 1998 Modification request that "a special meeting was set up, agreed upon compromises were reached and a contested case was avoided…there was opportunity for full disclosure, full public input, agreed-upon refinements in the reclamation plan and satisfactory resolution of WDNR's obligation to oversee this project."  D.E. No. 60, 60-50 (Van Camp Aff. at p. 6 ¶ 50, Ex. WW).

183.     Wilson intended that everything he put in his September 10, 2011 letter to be true and correct.  D.E. No. 78 (Wilson Dep. 126:7-127:2).

184.     Gauger told him "there was a lot of interest in issues that were raised at the contested hearing in 1998 and some components of what we either raised or didn't raise regarding the proposed changes in the reclamation plan…"  D.E. No. 78 (Wilson Dep. 20:22-21:10).

185.     At his deposition, Wilson agreed that the parties did reach an agreed-to compromise.  D.E. No. 78 (Wilson Dep. 128:17-23).

186.     Wilson also agreed that there had been "a lot of public input, a lot of good public input."  D.E. No. 78 (Wilson Dep. 130:16-21).

## VII.    FMC ACTIVELY COMPLIED WITH REQUIREMENTS OF THE MINING PERMIT

187.    WDNR agrees that FMC is in compliance with the terms and conditions of the Mining Permit and the Modification with regard to storm water management. D.E. No. 66 (Lynch Aff. at p. 11 ¶ 30); D.E. No. 64 (Fauble Aff. at p. 3 ¶ 10); D.E. No. 65 (Supp. Fauble Aff. at pp. 2-3 ¶¶ 4-5).

188.    Pursuant to the Mining Permit, Flambeau completed additional extensive remediation projects on the site in 2004 and 2006 to address environmental issues identified as a result of monitoring at the site, including the monitoring of the Biofilter system.  D.E. No. 67 (Donohue Dec. at p. 5 ¶ 15).

189.    Since completion of the remedial actions, all storm water flowing to the inlet of the Biofilter is derived from storm water contact with natural materials such as vegetated native topsoil, the paved parking lot and roads, or limestone drainage ditch. D.E. No. 67 (Donohue Dec. at p. 5 ¶ 16).

190.    Documented remediation activities substantiate that storm water flowing into and from the Biofilter does not contact any overburden raw material, intermediate product (such as crushed ore), finished product, by-product or waste material at the FMC mine.  D.E. No. 67 (Donohue Dec. at p. 5 ¶ 16).

191.    All of these materials were either removed, isolated from contact with storm water, or never existed at the site.  D.E. No. 67 (Donohue Dec. at p. 5 ¶ 16).

192.    Under Title V of the Clean Water Act, the definition of "pollutant" is described as Section 502 (33 U.S.C. 1362) to mean:

> … dredge spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial municipal and agricultural waste discharged into water.

Those materials either do not exit at the site or have been isolated from contact with storm water as a result of documented reclamation and remediation activities.  Therefore, since the completion of remediation activities, storm water does not contain copper and zinc added from any of the materials described in the statutory definition of a pollutant. As such any occurrence of metals such as copper, iron and zinc in storm water runoff from the Industrial Outlot cannot be considered to be a pollutant.  D.E. No. 67 (Donohue Dec. at p. 5 ¶ 17).

## VIII.   WDOJ AGREED THAT FMC WAS FULLY COMPLIANT AND REJECTED THE BASIS FOR PLAINTIFFS' NOTICE OF INTENT TO SUE

193.    In Plaintiffs' Notice of Intent letter issued in 2010, the parties noticed were FMC and Kennecott Minerals.  D.E. No. 74 (Gauger Dep. 28:13-19).

194.    The Notice of Intent letter issued in 2010 does not identify or allege Stream C as a "point source."  D.E. No. 3 (11/16/2010 60-Day Notice Letter).

195.    In a prior Notice letter issued June 16, 2009, the parties noticed were FMC and WDNR.  D.E. No. 74 (Gauger Dep. 27:1-30:7); D.E. No. 77 (Gedicks Dep. 52:17-54:13).

196.    Gauger's prior counsel sent the prior Notice on her behalf.  D.E. No. 74 (Gauger Dep. 28:18-29:24).

197.    Assistant Attorney General Thomas Dawson, Director of the Environmental Protection Unit of the Wisconsin Department of Justice ("WDOJ") sent a letter, dated November 10, 2009, to Attorney Glenn M. Stoddard regarding his Notice of Intent to File Citizen Suit under Wis. Stat. § 293.89, as it pertains to FMC.  D.E. No. 63, 63-1 (Dawson Aff. at p. 1 ¶ 3, Ex. A).

198.    The November 10, 2009 letter from WDOJ provided, in part:

Storm water discharges from mine sites are industrial storm water flows that are subject to subchapter II of Wis. Admin. Code ch. NR 216.  **This subchapter deems stormwater discharges in compliance with the requirements of the storm water permit program and not required to hold a separate storm water permit if that "…storm water discharge is in compliance with a department permit or approval which includes storm water control requirements that are at least as stringent as those required under this subchapter."**  In 1998, the Department sent a letter to FMC when the biofilter was constructed, allowing discharges from the future biofilter to be regulated under the runoff management provisions of FMC's revised mining permit.  See letter to FMC's Jana Murphy from DNR's Paul Luebke dated September 23, 1998, a copy of which is enclosed.

FMC's mining permit, as amended in 1998, includes measures to meet the requirements of Wis. Stat. § 293.13(2)(c)3. for the "[m]anagement, impoundment or treatment of all underground or **surface runoff waters** from open pits or underground prospecting or mining sites so as to prevent . . . pollution of surface or subsurface waters or damage to public health or safety."  (Emphasis on surface runoff waters in original.) (Other emphasis added.)

D.E. No. 63, 63-1 (Dawson Aff. at p. 1 ¶ 3, Ex. A at pp. 3-4).

199.    In a letter dated January 26, 2010, Attorney Stoddard responded to WDOJ's November 10, 2009 letter.  D.E. No. 63 (Dawson Aff. at p. 2 ¶ 4).

200.    WDOJ sent a letter dated April 23, 2010 to Attorney Stoddard in response to Attorney Stoddard's January 26, 2010 letter to WDOJ.  D.E. No. 63, 63-2 (Dawson Aff. at p. 2 ¶ 4, Ex. B).

201.    In the April 23, 2010 letter, WDOJ stated:

However, as previously explained in our November 10, 2009 letter at 3-4, storm water discharges from the mine are governed by the mine permit in the manner there described.  See Wis. Admin. Code § NR 216.21(4)(a).

D.E. No. 63, 63-2 (Dawson Aff. at p. 1 ¶ 4, Ex. B at p. 6).

202.    No lawsuit has yet to be brought as a result of the prior Notice.  D.E. No. 74 (Gauger Dep. 28:25-29:4).

203.    Gauger testified that she "factored into the decision" not to pursue that litigation.  D.E. No. 74 (Gauger Dep. 29:18-24).

204.    In an email from Gauger to Andresen dated February 28, 2011, Gauger forwarded an "OP-ED" Gauger wrote on February 14, 2011, in which Gauger stated the reason she decided to sue in federal court was because she "finally got tired of the failure of the Wisconsin Department of Natural Resources to ticket Kennecott for the violations and properly regulate the pollution at the Flambeau Mine site."  D.E. No. 74 (Gauger Dep. 173:2-174:25); D.E. No. 60, 60-40 (Van Camp Aff. at p. 5 ¶ 40, Ex. MM).

## IX.    MONITORING RESULTS WERE WIDELY AVAILABLE AFTER THE BIOFILTER COMMENCES OPERATION

205.    On or about May 21, 2007, Gauger submitted pre-filed sworn testimony to an Administrative Law Judge in connection with a contested case hearing on FMC's Certificate of Completion request.  D.E. No. 60, 60-39 (Van Camp Aff. at p. 5 ¶ 39, Ex. LL).

206.    In that pre-filed sworn testimony, Gauger gave the following testimony to the following question:

> **Q.    What is the likely source of the copper and zinc in the 0.9-acre "biofilter" and Stream-C at the reclaimed Flambeau Mine site?**
>
> A.    To learn more about the problem, I did several open records requests of the DNR's Larry Lynch in late 2003 and 2004.  Lynch responded by sending me a letter in December 2003 in which he stated that the rail spur west of Highway 27 had been identified as a "possible problem area" (EXHIBIT 215).  Lynch also provided me with a copy of an email he had sent to Thomas Boerner, a gentleman from Michigan who had inquired about the development of acid mine drainage problems at the Flambeau Mine site (EXHIBIT 216).  Here is an excerpt of what Lynch wrote to Boerner in January 2004:
>
> After cessation of mining, we noticed that there was a fair amount of sulfide minerals present near the surface and intermixed with the rail ballast material.  Over time, we also began to observe copper "blooms" forming on the surface, particularly during the warm and dry summer months.  In addition, we noted that

the rails themselves started to show signs of accelerated corrosion, to the point
that material was actually spilling off of the tracks.

Also, beginning in late 1999, the company began sampling the wetlands and
biofilters that were created on the site as part of final reclamation. The small
biofilter adjacent to the rail spur showed much higher levels of copper than all of
the other areas sampled. Copper levels in the biofilter ranged from 25- 91
[mcg/l] while the highest concentration in any of the other wetlands was 12
[mcg/l]. The biofilter flows to a small intermittent stream that eventually flows
into the Flambeau River.

The combination of the visual observations of the spur area and the water quality
information for the biofilter provided compelling evidence that a problem was
developing…

D.E. No. 60, 60-39 (Van Camp Aff. at p. 5 ¶ 39, Ex. LL at pp. 8:11-9:11).

207.     WDNR consistently received monitoring reports about elevated levels of

alleged pollutants at the FMC biofilter from 1999 through 2003. D.E. No. 74 (Gauger

Dep. 166:1-22); D.E. No. 60, 60-39 (Van Camp Aff. at p. 5 ¶ 39, Ex. LL at p. 10).

208.     Starting in December 2003, Gauger began asking WDNR, through open

records requests, for data on the water quality monitoring at FMC. D.E. No. 60, 60-22

(Van Camp Aff. at p. 3 ¶ 22, Ex. U); D.E. No. 74 (Gauger Dep. 84:6-85:3, 127:22-

129:1); D.E. No. 41 (Gauger Dec. at p. 5 ¶ 18).

209.     Gauger stated, "…monitoring data has always been available to me." D.E.

No. 60, 60-41 (Van Camp Aff. at p. 5 ¶ 41, Ex. NN); D.E. No. 74 (Gauger Dep. 175:1-

176:20).

210.     Gauger explained that "always been available" meant that when she

requested things of WDNR (going back to December of 2003), WDNR always sent them

to her. D.E. No. 74 (Gauger Dep. 175:25-176:8).

211.     Gauger testified that WDNR "was always good at responding and sending

what I requested," and "always" goes back to when she first started requesting. D.E.

74 (Gauger Dep. 176:11-20).

212. On December 9, 2003, Gauger made an open records request of WDNR related to the FMC mine site. D.E. No. 74 (Gauger Dep. 127:25-128:13); D.E. No. 60, 60-22 (Van Camp Aff. at p. 3 ¶ 22, Ex. U).

213. On December 17, 2003, FMC provided WDNR with "analytical results from samples collected on May 5, 2003 and June 23, 2003 from wetlands and biofilters on and adjacent to the reclaimed mine site." D.E. No. 60, 60-24 (Van Camp Aff. at p. 3 ¶ 24, Ex. W).

214. Among other things, these results provided information regarding copper, zinc, and iron levels from both the inlet and outlet of the FMC biofilter. D.E. No. 74 (Gauger Dep. 131:13-16, 132:6-134:7).

215. WDNR responded to Gauger's December 9, 2003 open records request on December 18, 2003. D.E. No. 60, 60-23 (Van Camp Aff. at p. 3 ¶ 23, Ex. V).

216. Gauger received "quite a bit of data" from WDNR about the FMC mine site, including monitoring data and water quality results for the reclaimed mine site. D.E. No. 74 (Gauger Dep. 128:3-13, 131:13-16); D.E. No. 60, 60-23 (Van Camp Aff. at p. 3 ¶ 23, Ex. V).

217. In WDNR's December 18, 2003 response, Lynch stated:

5. I have enclosed water quality results for the wetland areas on the reclaimed mine sit. As will be discussed below, the only results that concerned us were those reported for the .9 acre biofilter . . .

D.E. No. 60, 60-23 (Van Camp Aff. at p. 3 ¶ 23, Ex. V).

218. Gauger testified that she believed Lynch sent her a "data table that was created" in response to her open records request to which Lynch responded to on December 18, 2003. D.E. No. 74 (Gauger Dep. 136:11-19).

219.    By December 20, 2003, Gauger had in her possession information regarding the copper, zinc and iron levels in the vicinity of the .9 acre biofilter.  D.E. No. 74 (Gauger Dep. 136:3-10, 141:11-15); D.E. No. 60, 60-24 (Van Camp Aff. at p. 3 ¶ 24, Ex. W).

220.    Gauger sent Coleman an email dated December 20, 2003 because she "knew that John Coleman was aware of water pollution issues at the Flambeau Mine Site."  D.E. No. 74 (Gauger Dep. 138:25-139:1); D.E. No. 60, 60-25 (Van Camp Aff. at p. 3 ¶ 25, Ex. X).

221.    In her December 20, 2003 email to Coleman Gauger stated:

> Lynch also confirmed to me that elevated levels of copper are showing up in the .9 acre biofilter outlet "on the industrial outlot . . . He also sent me a copy of correspondence dated December 17, 2003 from FMC to the DNR regarding wetland and biofilter baseline monitoring."

D.E. No. 60, 60-25 (Van Camp Aff. at p. 3 ¶ 25, Ex. X).

222.    Gauger also testified she was aware of copper flowing out of the Biofilter when she received the data from Lynch "in 2004."  D.E. No. 74 (Gauger Dep. 157:17-158:3).

223.    Gauger made a second request for information to WDNR in December 2003 for a large amount of additional information regarding the FMC mine waters.  D.E. No. 74 (Gauger Dep. 142:11-17); D.E. No. 60, 60-26 (Van Camp Aff. at p. 3 ¶ 26, Ex. Y).

224.    On January 9, 2004, WDNR provided Gauger with results of samples of intermittent stream C from 2002, groundwater quality monitoring data from the fourth quarter of 2003, and downstream surface water sampling, among other things.  D.E. No.

74 (Gauger Dep. 143:19-145:22); D.E. No. 60, 60-27 (Van Camp Aff. at p. 3 ¶ 27, Ex. Z).

225.    In August 2004, Gauger sought additional water sampling data for the FMC site from WDNR, as well as a variety of other data.  D.E. No. 74 (Gauger Dep. 152:22-153:16); D.E. No. 60, 60-31 (Van Camp Aff. at p.4 ¶ 31, Ex. DD).

226.    Gauger admits that she was "concerned" about alleged pollutants and "monitoring results" in 2003 and 2004.  D.E. No. 74 (Gauger Dep. 154:21-155:14).

227.    Gauger "was concerned" as to whether WDNR had failed to take any enforcement action that Gauger felt WNDR should be following with regard to FMC in the summer of 2004.  D.E. No. 74 (Gauger Dep. 155:3-8).

228.    In addition, Gauger was aware of alleged pollutants flowing out of the FMC biofilter and into Stream C in 2003 or 2004.  D.E. No. 74 (Gauger Dep. 157:8-158:6); D.E. No. 60, 60-39 (Van Camp Aff. at p.5 ¶ 39, Exhibit LL at pp. 8-9); D.E. No. 41 (Gauger Dec. at pp. 5-6 ¶ 19).

229.    Gauger made another open records request of WDNR in March 2005. D.E. No. 74 (Gauger Dep. 159:19-160:1); D.E. No. 60, 60-34 (Van Camp Aff. at p.4 ¶ 34, Ex. GG).

230.    WDNR responded the very same month to Gauger's open records request of March 2005 with additional monitoring results for the FMC site, and a vast amount of other data.  D.E. No. 74 (Gauger Dep. 160:9-21); D.E. No. 60, 60-35 (Van Camp Aff. at p.4 ¶ 35, Ex. HH).

231.    Gauger received a response to a March 21, 2005 information request to WDNR in which she requested all surface water quality results for 2004 and 2005

including Intermittent Stream C, biofilter and wetlands from WDNR on March 25, 2005. D.E. No. 60, 60-35 (Van Camp Aff. at p. 4 ¶ 35, Ex. HH).

232.    WDNR's March 25, 2005 response provided Gauger results of surface water monitoring conducted in 2004 included in FMC's annual report.  D.E. No. 60, 60-35 (Van Camp Aff. at p. 4 ¶ 35, Ex. HH).

233.    Gauger believes she already had the 2002 and 2003 annual FMC reports to WDNR before March 2005.  D.E. No. 74 (Gauger Dep. 161:6-15).

234.    Gauger made an additional request for information from WDNR in July 2005.  D.E. No. 74 (Gauger Dep. 161:18-162:9); D.E. No. 60, 60-36 (Van Camp Aff. at p.4 ¶ 36, Ex. II).

235.    On July 26, 2005, WDNR responded to Gauger's July 2005 request with results of sampling in Stream C in 2005, as well as other data about the FMC site.  D.E. No. 74 (Gauger Dep. 162:17-19); D.E. No. 60, 60-37 (Van Camp Aff. at p. 4 ¶ 37, Ex. JJ).

236.    In December 2005, Gauger requested additional information from WDNR about the FMC site, and such information was provided in December 2005.  D.E. No. 74 (Gauger Dep. 162:22-163:4); D.E. No. 60, 60-38 (Van Camp Aff. at p. 5 ¶ 38, Ex. KK).

237.    The additional information Gauger requested included Stream C monitoring results for October 2005.  D.E. No. 74 (Gauger Dep. 163:7-11); D.E. No. 60, 60-38 (Van Camp Aff. at p. 5 ¶ 38, Ex. KK).

238.    Gedicks recalls Gauger and Churchill making open records requests to WDNR in 2004.  D.E. No. 77 (Gedicks Dep. 25:5-11, 26:1-3).

239.     Gedicks testified at his deposition that if Churchill was making document requests with Furtman (Gauger) then that would be an official request of WRPC and that Churchill would be making them on behalf of WRPC.  D.E. No. 77 (Gedicks Dep. 28:17-25).

240.     Gedicks' source of memory was that this was around the same time a leader of an environmental organization, John Coleman ("Coleman"), was issuing reports of contamination at the mine site.  D.E. No. 77 (Gedicks Dep. 26:4-8).

241.     In addition to Gauger, other individuals received information about the FMC mine water samples.  D.E. No. 74 (Gauger Dep. 150:2-12); D.E. No. 60, 60-28 (Van Camp Aff. at p. 4 ¶ 28, Ex. AA).

242.     For example, in March 2004, Coleman emailed WDNR to say that "it looks like there has been elevated copper at the outlot where the 0.9 acre wetland discharges to Stream C in all samples since sampling began there in 1999." D.E. No. 60, 60-28 (Van Camp Aff. at p. 4 ¶ 28, Ex. AA).

243.     In April 2004, another organization, the Voigt Intertribal Task Force, expressed concern about monitoring and potential contamination at the FMC site, and requested Lawrence Lynch, Mining Team Leader at WDNR, attend its next meeting. D.E. No. 74 (Gauger Dep. 150:23-151:3); D.E. No. 60, 60-29 (Van Camp Aff. at p. 4 ¶ 29, Ex. BB).

244.     In May 2004, John Coleman wrote to WDNR expressing concerning about "elevated metals in the public waters of Steam C," including copper and zinc.  D.E. No. 74 (Gauger Dep. 151:7-16); D.E. No. 60, 60-30 (Van Camp Aff. at p. 4 ¶ 30, Ex. CC).

245.    Coleman's above-referenced concern was premised on water sample results.  D.E. No. 74 (Gauger Dep. 151:7-13); D.E. No. 60, 60-30 (Van Camp Aff. at p. 4 ¶ 30, Ex. CC).

246.    In September 2004, the Voigt Intertribal Task Force wrote a letter to WDNR registering its "strong disagree[ment] with the department's decision not to seek an enforcement action against [FMC]."  D.E. No. 74 (Gauger Dep. 153:19-154:15); D.E. No. 60, 60-32 (Van Camp Aff. at p. 4 ¶ 32, Ex. EE ).

247.    The Voigt Intertribal Task Force expressed the need to hold FMC "responsible for what are clear and perhaps continuing violations of state standards."  D.E. No. 74 (Gauger Dep. 153:19-154:15); D.E. No. 60, 60-32 (Van Camp Aff. at p. 4 ¶ 32, Ex. EE).

248.    In October 2004, WDNR responded to the Voigt Intertribal Task Force letter regarding an alleged lack of appropriate enforcement.  D.E. No. 74 (Gauger Dep. 156:16-157:7); D.E. No. 60, 60-33 (Van Camp Aff. at p. 4 ¶ 33, Ex. FF).

249.    WDNR stated, "in the case of the FMC Mine situations, we have not been able to attribute the copper exceedances to a violations of a statute, administrative code, permit, or plan approval.  Thus we have no basis upon which we could allege a violation or seek penalties."  D.E. No. 74 (Gauger Dep. 156:16-157:7); D.E. No. 60, 60-33 (Van Camp Aff. at p. 4 ¶ 33, Ex. FF).

## X.    FMC RELIED UPON THE MODIFICATION

250.    FMC has relied upon the Modification for more than 13 years.  D.E. No. 61 (Cline Dec. at pp. 2-4 ¶ 9).

251.    FMC has undertaken substantial work in reliance on the Modification, including the decommissioning of the water treatment plant in 1998.  D.E. No. 61 (Cline Dec. at p. 2 ¶ 9(a)).

252.    FMC developed and submitted a Revised Reclamation Plan to WDNR to keep the Industrial Outlot at the FMC Mine Site in 1997.  D.E. No. 61 (Cline Dec. at p. 2 ¶ 9(b)).

253.    In reliance on the Modification, FMC constructed the Biofilter, re-graded portions of the Industrial Outlot area, and seeded the site using approved seed mix, in 1998.  D.E. No. 61 (Cline Cline Dec. at p. 3 ¶ 9(c)).

254.    In reliance on the Modification, FMC completed a Phase I Site Assessment of the Industrial Outlot in 1998.  D.E. No. 61 (Cline Dec. at p. 3 ¶ 9(d)).

255.    In reliance on the Modification, FMC prepared and submitted to WDNR the Biofilter Management Plan in 1998, which described the management and monitoring FMC would continue to undertake as to the Biofilter.  D.E. No. 61 (Cline Dec. at p. 3 ¶ 9(e)).

256.    In reliance on the Modification, FMC completed fall and spring surface water sampling of the 0.9-acre biofilter, pursuant to the Biofilter Management Plan, from 1999 through present.  D.E. No. 61 (Cline Dec. at p. 3 ¶ 9(f)).

257.    In reliance on the Modification, FMC completed inspections of the Industrial Outlot to monitor for surface water issues, from 1999 through the present.  D.E. No. 61 (Cline Dec. at p. 3 ¶ 9(g)).

258.    In reliance on the Modification, FMC performed vegetation maintenance in 1999.  D.E. No. 61 (Cline Dec. at p. 3 ¶ 9(h)).

259.    In reliance on the Modification, FMC conducted soil sampling prior to the rail spur excavation, including work plans and documentation, in 2003.  D.E. No. 61 (Cline Dec. at p. 3 ¶ 9(i)).

260.    In reliance on the Modification, FMC completed a rail spur excavation between 2003 and 2004.  D.E. No. 61 (Cline Dec. at p. 3 ¶ 9(j)).

261.    In reliance on the Modification, FMC sampled surface water and sediment, and developed a work plan and results, in 2005.  D.E. No. 61 (Cline Dec. at p. 3 ¶ 9(k)).

262.    In reliance on the Modification, FMC developed a remediation plan of the Industrial Outlot in 2005 and 2006.  D.E. No. 61 (Cline Dec. at p. 3 ¶ 9(l)).

263.    In reliance on the Modification, FMC performed reclamation activities in the Industrial Outlot area, including plan and documentation of work, in 2006.  D.E. No. 61 (Cline Dec. at p. 3 ¶ 9(m)).

264.    In reliance on the Modification, FMC completed sampling in the area of the equestrian trailhead in 2008.  D.E. No. 61 (Cline Dec. at p. 3 ¶ 9(n)).

265.    In reliance on the Modification, FMC developed the Copper Park Business and Recreation Area Work Plan, including a Chapter 30 permit application and hearing, in 2011.  D.E. No. 61 (Cline Dec. ¶ at p. 3 9(p)).

266.    In reliance on the Modification, FMC constructed an infiltration basin on the Industrial Outlot to manage storm water on the western-portion of the Industrial Outlot, in 2011.  D.E. No. 61 (Cline Dec. at p. 4 ¶ 9(q)).

267.    In reliance on the Modification, FMC improved drainage swale draining into the west infiltration basin in 2011.  D.E. No. 61 (Cline Dec. at p. 4 ¶ 9(r)).

268.    In reliance on the Modification, FMC seeded the infiltration basin, stockpiles, and drainage swale using approved seed mix, in 2011. D.E. No. 61 (Cline Dec. at p. 4 ¶ 9(s)).

269.    The costs to FMC for remediation, reclamation and other activities required to comply with the Mining Permit and modification since 1998 have been substantial. D.E. No. 61 (Cline Dec. at p. 4 ¶ 10).

270.    Between 1999 and 2009 FMC incurred at least the following yearly reclamation costs: $809,142 (1999); $404,833 (2000); $415,664 (2001); $253,302 (2002); $747,788 (2003); $644,963 (2004); $710,248 (2005); $1,285,994 (2006); $1,050,392 (2007); $521,697 (2008); and $478,008 (2009). The total amount during these years is approximately $7,322,030. D.E. No. 61 (Cline Dec. at p. 4 ¶ 10).

271.    Had WDNR or the U.S. EPA required FMC to apply for and comply with any permit other than those outlined in the Mine Permit and the modification, FMC would have strictly complied with those requirements. D.E. No. 61 (Cline Dec. at p. 4 ¶ 11).

272.    Plaintiffs' failure to object to WDNR's manner of permitting of the Biofilter induced reasonable reliance by FMC that Plaintiffs did not take issue with WDNR regulating the discharge through the Mine Permit. D.E. No. 61 (Cline Dec. at p. 4 ¶ 12).

273.    Jana Murphy ("Murphy") is the Environmental & Reclamation Manager at the Flambeau Mine. D.E. No. 61 (Cline Dec. at p. 4 ¶ 13).

274.    Murphy is the only individual working at the mine site. D.E. No. 61 (Cline Dec. at p. 4 ¶ 13).

275.    Murphy has been the only individual working at the Flambeau Mine for approximately the past ten years.  D.E. No. 61 (Cline Dec. at p. 4 ¶ 13).

276.    No other employees with knowledge of the events at issue in this suite besides Murphy have been employed by FMC at the FMC mine site since the mine closed in 1998.  D.E. No. 61 (Cline Dec. at p. 5 ¶ 14).

277.    Other former employees of FMC who may have personal knowledge concerning the allegations set forth in the Plaintiffs' complaint, the facts supporting the Defendant's affirmative defenses; permits and approvals for the FMC Mine Site; construction, reclamation and remediation activities at the FMC Mine Site; interaction with the local communities and citizen groups; uses of the FMC Mine Site; or, environmental sampling activities concerning the FMC Mine Site, are no longer employed by FMC or have retired.  D.E. No. 61 (Cline Dec. at p. 5 ¶ 14).

278.    Tom Myatt, the former General Manager for the FMC Mine, retired on or around February 2, 2006.  D.E. No. 61 (Cline Dec. at p. 5 ¶ 14).

279.    Jeff Earnshaw, the former Mine Manager for the FMC Mine Site and former General Manager for the FMC Mine site, retired on or around April 16, 2002. D.E. No. 61 (Cline Dec. at p. 5 ¶ 14).

280.    Fred Fox, the former Director of Health Safety & Environment and Reclamation for Kennecott Minerals, retired on or around January 7, 2008.  D.E. No. 61 (Cline Dec. at p. 5 ¶ 14).

281.    Richard Dachel, the former Environmental Supervisor for FMC, retired on or around May 1, 1999.  D.E. No. 61 (Cline Dec. at p. 5 ¶ 14).

282.     Ivan Shanks, a former employee of FMC, retired on or around August 23, 2004.  D.E. No. 61 (Cline Dec. at p. 5 ¶ 14).

## XI.     THE PARTIES AND PLAINTIFFS' "STANDING" WITNESSES

### A.     WRPC

283.     Gedicks is the current Executive Secretary of WRPC.   D.E. No. 77 (Gedicks Dep. 55:2-3).

284.     Gedicks was identified in the Complaint as the contact person at WRPC.  D.E. No. 1 (Complaint ¶ 10).

285.     Gedicks testified at a deposition in this matter as WRPC's Federal Rule of Civil Procedure 30(b)(6) corporate designee.  D.E. No. 77 (Gedicks Dep. 14:25-15:2).

286.     Gedicks executed a verification attached to Plaintiffs' Responses to Interrogatories in this matter, and signed on behalf of and as Executive Secretary of WRPC.  D.E. No. 60, 60-1 (Van Camp Aff. at p. 1 ¶ 2, Ex. A at p. 16).

287.     Gedicks was one of the individuals that formed WRPC.  D.E. No. 60, 60-2 (Van Camp Aff. at p. 1 ¶ 3, Ex. B at p.11, No. 25).

288.     Gedicks is one of the individuals who manage WRPC.  D.E. No. 60, 60-2 (Van Camp Aff. at p. 1 ¶ 3, Ex. B at p.12, No. 27).

289.     Gedicks admitted that he gave a recent radio interview in which he characterized Wisconsin's Mining Law as "existing legislation that is now on the books that was the product of a decade-long environmental battle to set a world class standard for protecting Wisconsin groundwater and surface water from the hazards of metallic sulfide mining."  D.E. No. 77 (Gedicks Dep. 64:3-19).

**B.     CBD**

290.    CBD only became involved in this matter after Gauger contacted CBD in August 2010.  D.E. No. 76 (Videotape Deposition of John T. Buse, October 21, 2011 ("CBD 30b6/Buse Dep.") 17:14-18:12).

291.    John Buse ("Buse"), CBD's Federal Rule of Civil Procedure 30(b)(6) corporate designee, testified that the conversation between Gauger and CBD, "…involved a request that the Center become involved in this issue and provided information about the mine and requested assistance with that issue."  D.E. No. 76 (CBD 30b6/Buse Dep. 26:4-12).

292.    Gauger became a member of CBD in October 2010, after she initially contacted CBD to get involved in this matter.  D.E. No. 74 (Gauger Dep. 21:12-22:2); D.E. No. 76 (CBD 30b6/Buse Dep. 31:11-21).

293.    That contact ultimately resulted in CBD considering whether to join the notice of intent to sue letter, which preceded the present litigation.  D.E. No. 76 (CBD 30b6/Buse Dep. 17:14-19:16).

294.    Buse testified for CBD in his deposition that the interests of CBD was in the interests relayed by its only two standing declarants, one of which was Gauger:

|   |   |   |
|---|---|---|
| 5 | Q | Well, then why don't you identify the professional |
| 6 |   | interests that have been adversely affected or |
| 7 |   | injured by defendant's discharge of pollutants in |
| 8 |   | this case? |
| 9 | A | Because our interest was in the interests |
| 10 |   | relayed -- specifically relayed by our standing |
| 11 |   | declarants to our counsel. |
|   |   | *** |
| 14 | Q | And are the members that you're referring to also |
| 15 |   | Just the two that we've discussed before? |
| 16 | A | Yes. |
| 17 | Q | Gauger and -- |
| 18 | A | Yes. |

19    Q       -- Andresen; is that correct?
20    A       Yes.

D.E. No. 76 (CBD 30b6/Buse Dep. 96:5-20).

295.    Buse testified that, "[Gauger's] membership in the Center forms the basis for [CBD's] organizational interest."  D.E. No. 76 (CBD 30b6/Buse Dep. 123:16-23).

296.    Buse testified that CBD does not know how Gauger's individual interests differ from her interests expressed as a CBD member.  D.E. No. 76 (CBD 30b6/Buse Dep. 125:11-18).

### C.    Gauger

297.    Gauger was previously known as Laura Furtman, from September 1991 until June 2010.  D.E. No. 74 (Gauger Dep. 10:3-11).

298.    Gauger is a member of both CBD and WRPC.  D.E. No. 1 (Complaint ¶ 14); D.E. No. 60, 60-2 (Van Camp Aff. at p. 1 ¶ 3, Ex. B at p.4, No. 4); D.E. No. 60, 60-1 (Van Camp Aff. at p. 1 ¶ 2, Ex. A at pp. 4-12, Nos. 1-5); D.E. No. 76 (CBD 30b6/Buse Dep. 31:11-21); D.E. No. 74 (Gauger Dep. 21:12-22:2, 38:24-39:5).

299.    Gauger became a member of WRPC in 1998.  D.E. No. 74 (Gauger Dep. 38:24-39:3).

300.    Gauger has responsibility for keeping WRPC informed on issues regarding the FMC Mine.  D.E. No. 77 (Gedicks Dep. 56:4-10).

301.    Gauger is a resident of Minnesota, does not pay Wisconsin income taxes, and does not pay Wisconsin real estate taxes.  D.E. No. 60, 60-2 (Van Camp Aff. at p. 1 ¶ 3, Ex. B at pp. 9-10, Nos. 17-20).

302.    In a declaration dated November 16, 2011, Gauger stated that she is "highly knowledgeable about the history of the Flambeau Mine and its impacts on the

surrounding environment." D.E. No. 41 (11/16/11 Declaration of Laura Gauger ("Gauger Dec.") at p. 3 ¶ 9).

303.   In the November 16, 2011 declaration, Gauger further stated that, "[s]ince 1998 I have been deeply involved in tracking, monitoring, and observing the mine's reclamation activities, both on my own behalf and as a member of WRPC." D.E. No. 41 (Gauger Dec. at p. 3 ¶ 9).

304.   In the November 16, 2011 declaration, Gauger further noted:

> I have participated in several meetings and public hearings with the Wisconsin Department of Natural Resources ("WDNR") and FMC staff concerning mine reclamation and related activities, and I have delivered presentations to others (including WDNR and Wisconsin Department of Justice officials) regarding the environmental and water quality impacts of the Flambeau Mine.

D.E. No. 41 (Gauger Dec. at p. 3 ¶ 9).

305.   While Gauger may have visited the FMC site on several occasions as part of her environmental advocacy over the years, she identifies only one time she engaged in recreational activities on the Flambeau River near the FMC Mine site before a notice of intent was filed against FMC in June 2009 (and only one additional time before the lawsuit was filed in January 2011). D.E. No. 41 (Gauger Dec. at p. 4 ¶ 13); D.E. No. 74 (Gauger Dep. 180:17-21).

306.   Gauger has expressed only a general intention to return to the area (with Andresen) in Spring or Summer 2012. D.E. No. 41 (Gauger Dec. at p. 9 ¶ 31).

## D.   Andresen

307.   Andresen first became a member of WRPC in 2009. D.E. No. 77 (Gedicks Dep. 54:1-2).

308.   Gedicks, WRPC's Executive Secretary, is not aware of any official WRPC activities that Andresen has participated in. D.E. No. 77 (Gedicks Dep. 54:18-21).

309.     Andresen is not a resident of Wisconsin.   D.E. No. 75 (Videotape Deposition of Lori B. Andresen, November 15, 2011 ("Andresen Dep.") 22:16-21).

310.     The closest Andresen lives to the FMC site is Duluth, Minnesota, almost 140 miles from the site in question.  D.E. No. 75 (Andresen Dep. 22:16-21).

311.     Gauger talked to Andresen about becoming involved in the case at hand. D.E. No. 75 (Andresen Dep. 7:10-12).

312.     Andresen made her lone pre-lawsuit visit to the FMC site at the prodding of Plaintiff Gauger.   D.E. No. 75 (Andresen Dep. 34:11-14); D.E. No. 42 (11/16/11 Declaration of Lori Andresen ("Andresen Dec.") at p. 3 ¶ 9).

313.     WRPC and CBD had already filed a notice of intent to sue against FMC at the time Andresen visited the FMC site.  D.E. No. 74 (Gauger Dep. 27:1-30:7); D.E. No. 77 (Gedicks Dep. 52:17-54:13).

314.     In Plaintiffs' summary judgment materials, Ms. Andresen merely offers a generic statement that she intends to return to the area for recreational purposes in the "Spring or Summer 2012" with another Plaintiff in this lawsuit.  She does not identify a date or month of return, nor does she describe any steps taken to actually plan the trip. D.E. No. 52 (Plaintiffs' Proposed Findings of Fact ("PPFOF") ¶ 40); D.E. No. 42 (Andresen Dec. at p. 4 ¶ 13).

315.     Gauger talked to Andresen about becoming a witness in the case at hand. D.E. No. 75 (Andresen Dep. 9:21-10:15).

316.     Andresen never had any discussions with anyone from WRPC about becoming a standing witness other than with Gauger.  D.E. No. 75 (Andresen Dep. 11:7-15).

317.    Andresen had never been on the Flambeau River prior to 2009. D.E. No. 75 (Andresen Dep. 17:25-18:1).

318.    Since 2009, Andresen has been on the Flambeau River only twice, both times with Gauger, with the latest being in October 2011. D.E. No. 75 (Andresen Dep. 16:5-13, 18:2-21).

319.    Andresen does not own property near the FMC site. D.E. No. 75 (Andresen Dep. 22:22-24).

320.    Andresen has been involved in recreational activities at or near the FMC Mine Site only three times and all in the company of Gauger. D.E. No. 75 (Andresen Dep. 23:19-24:3).

321.    Andresen has never kayaked or fished the Flambeau River and has never kayaked, canoed, or fished Stream C. D.E. No. 75 (Andresen Dep. 25:10-21).

322.    Andresen has never conducted any studies of aquatic life at or near the mine site, nor does she have any professional interest in the mine site or Stream C. D.E. No. 75 (Andresen Dep. 26:13-23).

323.    Andresen does not have any economic interest in the area around the mine site. D.E. No. 75 (Andresen Dep. 28:9-11).

324.    Prior to going with Gauger in 2009, Andresen had never done any wildlife or bird watching at the mine site, and never did any canoeing on the Flambeau River. D.E. No. 75 (Andresen Dep. 33:1-17).

325.    Andresen cannot recall ever being involved in any aesthetic activities at the mine site before being asked by Gauger to do so. D.E. No. 75 (Andresen Dep. 34:11-14).

326.    As to any interest of hers that had been adversely affected, Andresen only "checked it out" after Gauger asked her to.  D.E. No. 75 (Andresen Dep. 35:16-18).

### E.    Harold Flater

327.    Flater did not join WPRC as a member until well after the organization had already filed a notice of intent to bring this lawsuit. D.E. No. 44 (11/16/2011 Declaration of Harold Flater ("Flater Dec.") at p. 1 ¶ 2); D.E. No. 40 (11/16/2011 Declaration of James N. Saul ("Saul Dec.") at p. 1 ¶ 3); D.E. No. 3 (11/16/2010 60-Day Notice Letter).

328.    Flater became a member of WRPC six days before the present lawsuit was filed.  D.E. No. 77 (Gedicks Dep. 60:14-15); D.E. No. 44 (Flater Dec. at p. 1 ¶ 2).

329.    WRPC's officer, Al Gedicks, concedes that Flater did not join WRPC until after  WRPC member (and current Plaintiff) Laura Gauger spoke to him.  D.E. No. 77 (Gedicks Dep. 61:18-62:1).

330.    Gedicks, WRPC's Executive Secretary, is not aware of Flater being active in activities of WRPC since Flater joined.  D.E. No. 77 (Gedicks Dep. 61:10-17).

331.    Although Flater's testimony indicates he has lived and owned a business in the area of the FMC site for 15 years, he gives no indication that he experienced any diminished enjoyment (or lessened his activities) throughout the years that Flambeau has used the Biofilter.  D.E. No. 44 (Flater Dec. at p. 4 ¶ 15).

## XII.   EVIDENCE DOES NOT SUGGEST THAT THE BIOFILTER DISCHARGES METALS TO EITHER STREAM C OR THE FLAMBEAU RIVER

### A.   The Biofilter Does Not Discharge To Either Stream C Or The Flambeau River

332.    The use of a Biofilter to manage storm water at a metallic mine is a recognized best managed practice of the United States Environmental Protection Agency. 12/6/2011 Declaration of James B. Hutchison in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Hutchison Opp. Dec.") at p. 3 ¶ 15.

333.    The outlet of the Biofilter is into a grassy wetland area.   12/6/2011 Declaration of Stephen V. Donohue in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Donohue Opp. Dec.") at p. 2 ¶ 5.

334.    The Biofilter was not designed nor intended to discharge water from the Biofilter directly into Stream C.   Rather it was designed and intended to allow water to overflow from the Biofilter on occasion to an adjacent wetland.   Hutchison Opp. Dec. at p. 3 ¶ 12.

335.    FMC's expert, Elizabeth Day ("Day"), is a Professional Wetland Scientist with 30 years of experience in water resources policy and regulation, inventory and evaluation, impact assessment, and restoration.   12/6/2011 Declaration of Elizabeth A. Day in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Day Opp. Dec.") at p. 1 ¶ 2.

336.    Day has concluded that the Biofilter may intermittently discharge directly to a wetland, but does not discharge directly to Stream C.   Day Opp. Dec. at pp. 3-6 ¶¶ 5-12.

337.    Day could not find a continuous physical channel from the base of the berm of the Biofilter through the wetland.  Day Opp. Dec. at pp. 5-6 ¶ 10.

338.    No tributary of any kind exists north of Copper Park Lane.  Day Opp. Dec. at p. 9 ¶ 19.

339.    Though materials prepared by FMC or its consultants note that the Biofilter would discharge to Stream C, this is not the case in fact; rather, the Biofilter discharges to a wetland adjacent to Stream C.   Day Opp. Dec. at p. 5 ¶ 9.

340.    The point of overflow in the Biofilter is more than 33 feet away from the lowest point in the surrounding topography where it has been argued by others that a channel from Stream C exists.  Hutchison Opp. Dec. at p. 3 ¶ 13.

341.    There exists no discrete, continuous surface connection between the Biofilter Outlet and the drainageway known as "Stream C," regardless of whether one would consider "Stream C" to arise at Hwy 27 or at Copper Park Lane.  Day Opp. Dec. at pp. 5-6 ¶ 10.

342.    When the Biofilter intermittently overflows, the discharge trickles down the face of the berm, as indicated by the lack of a channel or any gully erosion, and discharges to a wetland located at the base of the berm.  Day Opp. Dec. at p. 6 ¶ 11.

343.    The closest any alleged Stream C channel comes to the Biofilter Outlet is 33 feet.  Day Opp. Dec. at p. 6 ¶ 12.

344.    Ground surface elevations allow surface water to flow northward (away from the direction toward Stream C) from the Biofilter when conditions allow. Hutchison Opp. Dec. at p. 3 ¶ 14.

345.   No definitive test has been completed demonstrating 1) that intermittent overflow from the Biofilter that may flow into the wetland area reaches the visible occurrence of Stream C south of Copper Park Lane; or 2) that even if one accepts that a Stream C channel exists east of the Biofilter, that overflow from the Biofilter reaches that channel.  Donohue Opp. Dec. at p. 2 ¶ 6.

346.   There has been no definitive test or documentation demonstrating that the intermittent overflow from the Biofilter has ever reached the Flambeau River.  Donohue Opp. Dec. at p. 2 ¶ 6.

347.   There has been no hydrologic study such as a dye test to determine where the overflow from the Biofilter moves to once it reaches the wetland.  Donohue Opp. Dec. at p. 2 ¶ 6.

## B.   Alleged Pollutants In Stream C Do Not Originate From The Biofilter

348.   The copper concentration on any given day at the Biofilter inlet is not an indication of how much copper flows out of the Biofilter outlet on the next day. Donohue Opp. Dec. at p. 5 ¶ 20.

349.   According to test data, copper from the Biofilter does not enter Stream C. Donohue Opp. Dec. at p. 5 ¶ 21.

350.   According to test data, zinc from the Biofilter does not enter Stream C. Donohue Opp. Dec. at p. 5 ¶ 22.

### C.   It Is Unclear What, If Any, Metals Stream C Is Contributing To The Flambeau River

351.   In response to the question of whether Stream C is contributing a measurable amount of copper to the Flambeau River, Craig Roesler of WDNR responded in part that:

> So specifically for copper, we probably can't -- I probably couldn't say, you know, definitively.  For zinc, very, very likely there is an increase, although this does reflect just -- this is in the Flambeau River immediately and the mixing zone of Stream C, **so this represents, you know, the maximum impact, basically, to the Flambeau River in a very small area**.

D.E. No. 49 (Deposition of Craig P. Roesler, July 27, 2011 ("Roesler Dep.") 51:5-52:11) (emphasis added).

352.   According to test data, the measured copper levels in Stream C do not cause or contribute to a measureable increase in the copper levels in the Flambeau River. Donohue Opp. Dec. at p. 5 ¶ 23.

353.   According to test data, the measured zinc levels in Stream C do not cause or contribute to a measureable increase in the zinc levels in the Flambeau River. Donohue Opp. Dec. at p. 5 ¶ 24.

### D.   Concentrations Of Metals In Storm Water At The Biofilter Outlet And Other FMC Site Locations Is Similar Or Lower Than Concentrations In Surrounding Areas

354.   Based on monitoring data, the concentration of metals in storm water at the Biofilter Outlet are routinely similar or lower in concentration than storm water flowing into Stream C from the watershed upstream of the Biofilter Outlet area.  Based on this, any flow from the Biofilter cannot, and does not, cause an increase in the concentration of metals in the surface water in Stream C.  Donohue Opp. Dec. at pp. 4-5 ¶ 18.

355.    The concentration of metals in soil samples collected at the mine site are similar to the concentration of those metals in soil samples collected off site, and upstream of the Biofilter, and along Highway 27 at sample sites north and south of the former mine site.  Donohue Opp. Dec. at p. 3 ¶ 12.

356.    Metals such as copper, iron and zinc in the soils at the Flambeau mine site are comparable to naturally occurring levels of those substances in the vicinity of the Flambeau mine site.  Donohue Opp. Dec. at p. 3 ¶ 13.

357.    The concentration of metals in storm water near the Biofilter Outlet are similar or lower than concentrations in storm water in the Stream C watershed upstream of the Biofilter Outlet area.  Donohue Opp. Dec. at p. 4 ¶ 14.

358.    The concentration of copper and zinc in water collected along Highway 27 north and south of the mine site (outside of the Stream C watershed) is typically higher than what emanates from any overflow of the Biofilter.  Donohue Opp. Dec. at p. 4 ¶ 15.

359.    A significant source of metals in Stream C south of Copper Park Lane emanates from an area where drainage from the Stream C watershed flows beneath Highway 27 upstream of the Biofilter outlot area.  Donohue Opp. Dec. at p. 4 ¶ 16.

360.    Surrogate monitoring data shows that the concentration of copper and zinc along highways and in small streams receiving wetland drainage is similar to that occurring at the Flambeau mine site and similar to that which occurs in the intermittent overflow from the Biofilter.  Donohue Opp. Dec. at p. 4 ¶ 17.

361.    The concentration of metals in Stream C south of the Biofilter area would be similar to historical data due to the sources that exist along Highway 27 regardless of

whether any overflow from the Biofilter reached Stream C.  Donohue Opp. Dec. at pp. 4-5 ¶ 18.

362.   Craig Roesler of WDNR testified:

Q     Does that mean that on that date, the copper concentration at the Flambeau River below the Stream C mouth was greater than the copper concentration in the Flambeau River above C mouth?

A     Probably, but there may be some, you know, limitations to the accuracy of the, you know, lab results.  I couldn't tell you off the top of my head whether those, you know, would be considered significantly different based on the precision of the lab work.

***

Q     And that range from four to 11, is that a statistically significant range?

A     I would guess so, but again, I would have to talk to the lab to, you know, get a definitive answer, but I would guess those are likely to be statistically different.

D.E. No. 49 (Roesler Dep. 43:21-44:4, 45:21-46:1).

363.   The Biofilter is not in the same exact location as FMC's former surge pond.  Hutchison Opp. Dec. at p. 2 ¶ 10.

## XIII.   EXPERTS ESTABLISH METAL CONCENTRATIONS IN THE VICINITY OF THE FLAMBEAU RIVER DO NOT PRESENT CAUSE FOR CONCERN

### A.     FMC Has Actively Undertaken Sampling And Remediation Efforts

363.   The Industrial Outlot is approximately 28 acres and additional acreage not included in the Certificate of Completion is outside of the Industrial Outlot.  Donohue Opp. Dec. at pp. 1-2 ¶ 4.

364.   Background levels of copper concentrations in surface soils were never determined across the mine site prior to mining.  Hutchison Opp. Dec. at p. 3 ¶ 17.

365.    Following cessation of mining, there was removal of surficial soils down to and including the underlying high-density polyethylene (HDPE) liner in some areas within the Industrial Outlot.  Also, the sediment within the Surge Pond was removed after cessation of mining.  Hutchison Opp. Dec. at p. 2 ¶ 9.

366.    Flambeau undertook ongoing sampling activities within the Industrial Outlot since cessation of mining.  Based upon results of sampling, remediation events were planned and performed with regulatory oversight.  Hutchison Opp. Dec. at p. 3 ¶ 11.

367.    For example, ballast materials were removed from the Industrial Outlot for mitigation purposes during 2003.  Hutchison Opp. Dec. at p. 3 ¶ 16.

368.    Flambeau undertook remedial activity in 2008, but this activity was outside of the watershed the Biofilter serves.  Donohue Opp. Dec. at p. 2 ¶ 7.

## B.    Metal Concentrations Detected In Stream C And The Flambeau River Do Not Pose Any Environmental Risks Or Risks To Animals

369.    Copper and zinc are naturally occurring elements in soil, water, and sediment, and both have been mined for hundreds of years from areas of localized enrichment.  12/5/2011 Declaration of Anne Fairbrother in Opposition of Plaintiffs' Motion for Partial Summary Judgment ("Fairbrother Opp. Dec.") at p. 3 ¶ 9.

370.    Both copper and zinc are essential micronutrients for all plants and animals.  Fairbrother Opp. Dec. at pp. 3-4 ¶¶ 9, 10.

371.    There is no influence on aquatic organisms from the discharge of copper or zinc from Stream C on the Flambeau River.  Fairbrother Opp. Dec. at p. 10 ¶ 34.

372.    The Index of Biotic Integrity (IBI) values calculated from invertebrate sampling conducted on October 13, 2010, in the Flambeau River downstream of the

mouth of Stream C were all in the "good" to "excellent" categories. Fairbrother Opp. Dec. at pp. 12-13 ¶ 40.

373.   The IBI values calculated from invertebrate sampling conducted on October 13, 2010, in the Flambeau River upstream of the mouth of Stream C, were categorized as "fair" to "good." Fairbrother Opp. Dec. at pp. 12-13 ¶ 40.

374.   The discharge from Stream C is not causing the degradation of the invertebrate community in the Flambeau River. Fairbrother Opp. Dec. at pp. 12-13 ¶ 40.

375.   Taxa in the Ephemeroptera, Plecoptera, and Trichoptera orders (EPT taxa) that are generally considered sensitive to metals were described as "fantastic" both above and below the confluence of Stream C, primarily because of the large numbers of Ephemeroptera (mayflies), which are the most sensitive to copper. Fairbrother Opp. Dec. at p. 13 ¶ 41.

376.   There are no impacts of copper or zinc on aquatic organisms in Stream C. Fairbrother Opp. Dec. at p. 13 ¶ 44.

377.   There were no acute or chronic effects seen in bioassays with the water flea (*Ceriodaphnia dubia*), fathead minnow (*Pimephales promelas*), or algae (*Selenastrum capricornutum*) using water collected from Stream C. Fairbrother Opp. Dec. at p. 13 ¶ 45.

378.   Laboratory bioassays confirm lack of toxicity in water from Stream C. Laboratory bioassays were conducted on water samples collected from Stream C and the unnamed reference stream by Mr. Craig Roesler in June 2011. The bioassays used an invertebrate known to be sensitive to metals (the water flea), a representative fish species (fathead minnow), and common algae (*Selenastrum caprcornutum*). These bioassays are

standard tests used to determine whether water is toxic to aquatic organisms. All tests results were negative, indicating that the water in Stream C is not toxic to aquatic organisms even though total recoverable copper and zinc concentrations exceed the WDNR water quality criteria values. Fairbrother Opp. Dec. at pp. 14-15 ¶ 50.

379.     The data on fish biodiversity collected by Mr. Roesler in September 2011 show that the water in Stream C is not acutely toxic to fish or the aquatic invertebrates and periphyton that they depend on for food. Fairbrother Opp. Dec. at p. 16 ¶ 55.

380.     The presence of fish in Stream C indicates that the water is not acutely toxic to fish (*i.e.,* does not kill them within 1-2 days) or to the invertebrates and periphyton that they eat. Fairbrother Opp. Dec. at p. 17 ¶ 57.

### C.     Metal Concentrations Detected In Stream C And The Flambeau River Pose No Health Risk To Humans

381.     Based upon a WDNR memo dated September 21, 2001, drinking water in Northern Region public water supplies had a median value of 370 µg/L and some values as high was 1,570 µg/L. Fairbrother Opp. Dec. at p. 19 ¶ 69.

382.     There is no reason to believe that copper or zinc levels at the mouth of Stream C, either alone or in combination, have posed a risk to human health at any time since monitoring began in 2004. Fairbrother Opp. Dec. at pp. 19-20 ¶ 71.

383.     Neither copper nor zinc are a contact poison, so skin contact with contaminated water is of no concern. Fairbrother Opp. Dec. at p. 20 ¶ 72.

384.     Accidentally drinking water from either Stream C, or the Flambeau River, will not pose any health risk as the concentrations of the metals in these waters are three orders of magnitude (*i.e.*, 1,000 times) less than the state drinking water standards. The standard for copper is 1.3 mg/L (equivalent to 1,300 µg/L), with preventive action

required at 130 μg/L. Zinc is regulated at 2 mg/L (equivalent to 2,000 μg/L), with preventive action at 1 mg/L, but this is only a "public welfare" standard intended to reduce unacceptable taste or odor and zinc is not considered a health threat at these levels. Fairbrother Opp. Dec. at p. 20 ¶ 73.

385.   By comparison, a daily vitamin and minerals supplement contains 2 mg of copper and 15 mg of zinc. This means that at the level of the state standard, a person would have to drink 2 liters (approximately one-half gallon) of water from the Flambeau River at the mouth of Stream C to achieve their required daily dose of copper. Fairbrother Opp. Dec. at p. 20 ¶ 74.

386.   State standards include a large margin of safety to ensure that lifetime ingestion of the contaminant will not cause adverse health effects which is why they are less than the daily supplement amounts. Additionally, short-term exposure to copper above the drinking water standard would only result in gastric distress (nausea) in some people; life time exposures above these levels is required to cause significant health effects such as liver or kidney damage. Fairbrother Opp. Dec. at pp. 20-21 ¶ 75.

387.   At the maximum levels that have been measured by WDNR in the Flambeau River at the mouth of Stream C (36 μg/L copper and 45 μg/L zinc), a person would need to drink over 25 gallons of water on a daily basis to reach copper intake levels equivalent to the state standard, and zinc concentrations are so low they would not influence the taste of the water. Fairbrother Opp. Dec. at p. 21 ¶ 76.

388.   There is no reason to have any concerns about possible adverse health consequences in people recreating in the Flambeau River at the mouth of Stream C. Fairbrother Opp. Dec. at p. 21 ¶ 77.

## XIV.   THE NATURE OF STREAM C

### A.   Plaintiffs Have Not Conducted A Significant Nexus Test On The Wetland Area Or Stream C

389.   Even if one determined that a channel does exist north of Copper Park Lane, a significant nexus analysis of its relationship with the Flambeau River still needs to be completed to determine whether Stream C is a Water of the United States ("WOTUS").  Day Opp. Dec. at pp. 9-10 ¶ 19.

390.   There is no tributary of any kind north of Copper Park Lane.  Day Opp. Dec. at p. 9 ¶ 19.

391.   The portion of Stream C south of Copper Park Lane that constitutes a continuous streambed with banks falls into the class of waters of non-navigable tributaries that are not relatively permanent.  Day Opp. Dec. at p. 3 ¶ 5.

392.   The portion of Stream C north of Copper Park Lane does not have a continuous streambed, and similar to the portion of Stream C south of Copper Park Lane, requires a significant nexus test to determine whether it is a WOTUS.  Day Opp. Dec. at p. 3 ¶ 5, p. 5 ¶ 8, p. 10 ¶ 19.

393.   If Stream C has no significant nexus to the Flambeau River, then the wetland cannot be considered to have a significant nexus to a traditional navigable waterway, thus excluding it from regulation under Section 402 of the CWA.  Day Opp. Dec. at pp. 9-10 ¶ 19.

394.   Plaintiffs have not conducted a sufficient significant nexus test on Stream C, or on the wetland area where the Biofilter may intermittently discharge.  Day Opp. Dec. at p. 9 ¶ 18.

395.    The types of data required to prove or disprove a significant nexus, including flow regime (volume and frequency), channel geometry, and other definitive support indicating that the "effect on the chemical, physical and/or biological integrity" of the Flambeau River is "more than speculative or insubstantial," have not been concluded by the Plaintiffs.  Day Opp. Dec. at pp. 8-9 ¶ 18.

396.    While the approximate size of the watershed of the Lower Flambeau River is over 128 square miles in extent, the watershed of Stream C has been measured as less than one-half of one square mile, or less than four-tenths of one percent of the drainage area contributing to the Lower Flambeau River.  Day Opp. Dec. at p. 10 ¶ 20.

397.    These numbers suggest that a mass balance analysis of the effect of any pollutants found in Stream C (i.e., concentration of pollutants relative to flow quantity over time), would be required as part of a significant nexus determination.  Day Opp. Dec. at p. 10 ¶ 20.

398.    Plaintiffs have presented no evidence of completing such an analysis.  Day Opp. Dec. at p. 10 ¶ 20.

399.    Plaintiffs have not expressly considered relevant volume, duration, or frequency of flow in their analysis of the effects of pollutants allegedly carried by Stream C to the Flambeau River.  Day Opp. Dec. at p. 9 ¶ 18.

400.    Plaintiffs have not determined that Stream C is a WOTUS.  Day Opp. Dec. at pp. 7-8 ¶ 16.

**B.    Stream C Is An Intermittent Stream That Has No Stream Channel North Of Copper Park Lane**

401.    A photograph depicting key features of the Industrial Outlot area at the Flambeau Mine is available.  Hutchison Opp. Dec. p. 2 ¶ 8, Ex. B.

402.    There is not a perceptible stream channel of the drainageway known as "Stream C" anywhere upgradient of Copper Park Lane.  Day Opp. Dec. at pp. 2-3 ¶ 5.

403.    FMC's expert was unable to find a reliable ordinary high water mark or a channel defined by a bed and banks in the area adjacent to the biofilter.  Day Opp. Dec. at pp. 9-10 ¶ 19.

404.    Adjacent to the Biofilter, there is "hummock-and-hollow" microtophography typical of many types of wetlands, with standing water in some of the hollows; but nothing resembling a continuous stream channel upgradient of Copper Park Lane.  Day Opp. Dec. at pp. 3-4 ¶ 5.

405.    There exists no discrete, continuous surface connection between the Biofilter Outlet and the drainageway known as "Stream C," regardless of whether one would consider "Stream C" to arise at Hwy 27 or at Copper Park Lane.  Day Opp. Dec. at p. 5 ¶ 9.

406.    The outlet of the Biofilter is into a grassy wetland area.  This area drains to the south through a culvert beneath Copper Park Lane before eventually reaching the visible occurrence of Stream C.  Donohue Opp. Dec. at p. 2 ¶ 5.

407.    When the Biofilter intermittently overflows, the discharge trickles down the face of the berm, as indicated by the lack of a channel or any gully erosion, and discharges to a wetland located at the base of the berm.  Day Opp. Dec. at p. 6 ¶ 11.

408.    The closest any alleged Stream C channel comes to the Biofilter Outlet is approximately 33 feet.  Day Opp. Dec. at p. 6 ¶ 12; Hutchison Opp. Dec. at p. 3 ¶ 13.

409.   The label "Stream C" used on Flambeau project-related materials for many years has become a convenient means for referring to a general drainage pathway through a delineated wetland.  Day Opp. Dec. at p. 5 ¶ 8.

410.   Adjacent to the Biofilter overflow, the drainageway commonly referenced as "Stream C" is physically represented by a headwaters wetland and is not actually observable as a defined waterway in that particular location.  Day Opp. Dec. at p. 5 ¶ 8.

411.   Although many materials prepared by FMC or its consultants did, in fact, note that the Biofilter would discharge to "Stream C," this is not the case, in fact.  Rather, the Biofilter discharges to a wetland.  Day Opp. Dec. at p. 5 ¶ 9.

412.   "Stream C" does not meet the definition of a federal Traditional Navigable Water (TNW) and is not identified on the U.S. Army Corps of Engineering listing of TNW in Wisconsin.  Day Opp. Dec. at p. 7 ¶ 15.

**C.   References By FMC And WDNR To "Stream C" Is A Reference To An Entire Wetland Area Adjacent To The Biofilter As Well As The Area South Of Copper Park Lane**

413.   Since the Biofilter was constructed in 1998, both WDNR and FMC referred to the entire wetland area adjacent to the Biofilter, in addition to the area south of Copper Park Lane, as "Stream C."  *See* D.E. No. 46 (Deposition of Philip Fauble, October 13, 2011 ("Fauble Dep.") 54:4-55:7, 55:22-56:2); D.E. No. 48 (Deposition of Jana Murphy, November 9, 2011 ("Murphy Dep.") 132:20-133:12, 135:17-136:5); Day Opp. Dec. at p. 5 ¶¶ 8, 9.

414.   When asked about the size or distance of the wetland area from the outfall of the Biofilter to the channel of Stream C, WDNR testified, by one of its Fed. R. Civ. P.

30(b)(6) designees, Philip Fauble ("Fauble"), that "the Stream C bed isn't very well defined there."  D.E. No. 46 (Fauble Dep. 54:4-55:7).

415.    Fauble further noted:

> I have not seen where there is any point at which Stream C either starts or stops or -- it's just kind of -- as far as I can tell it's just a term for that waterway, that drainageway.

D.E. No. 46 (Fauble Dep. 55:22-56:2).

416.    Jana Murphy ("Murphy"), the Environmental and Reclamation Manager for FMC, testified that the notations in her field journal that referenced "flow to Stream C" did not specifically refer to flow from the Biofilter's outlet to Stream C.  D.E. No. 48 (Murphy Dep. 8:16-9:14, 132:20-133:3).

417.    Murphy's notations referred "to a flow out of the biofilter into the wetland adjacent in the area of Stream C."  D.E. No. 48 (Murphy Dep. 132:20-133:6, 135:17-136:6).

418.    Murphy used the annotation "to Stream C" in her field journal as "[i]t's a type of simple shorthand reference in that whole area."  D.E. No. 48 (Murphy Dep. 133:7-10).

419.    The "whole area" that Murphy referenced referred to the "wetland area that's adjacent to the biofilter."  D.E. No. 48 (Murphy Dep. 133:11-12).

## D.    WDNR Has Not Determined That Stream C Is Navigable In Fact Or That Stream C Is A Water Of The United States

420.    In a 1988 memorandum document, a WDNR representative stated that "Stream C was not navigable during any of my site visits, however it does have a larger drainage area and higher peak measured flow (6.2 cfs) than either streams A or B."  D.E. No. 40, 40-10 (Saul Dec. at p. 3 ¶ 13, Ex. J, WRPC 01161).

421.     In the 1988 WDNR Memorandum, WDNR did not determine that Stream C is a water of the United States.  D.E. No. 40, 40-10 (Saul Dec. at p. 3 ¶ 13, Ex. J, WRPC 01161).

422.     In the context of FMC's 1991 application for a permit under Wis. Stat. ch. 30, the Hearing Examiner was careful to distinguish between the navigable in fact Flambeau River and the navigable Stream C:

> … The applicant owns the project site which abuts the Flambeau River, stream B, and stream C.  The Flambeau River is navigable in fact at the project site, and based on flow records and physical evidence at the site, stream C has also been determined to be navigable.  Stream B is not a navigable stream.

D.E. No. 40, 40-20 (Saul Dec. at p. 4 ¶ 23, Ex. T at p. 41 (WRPC 000184) ¶ 49).

Respectfully submitted this 7th day of December, 2011.

**DEWITT ROSS & STEVENS S.C.**

By:    /s/ Harry E. Van Camp
     Harry E. Van Camp (#1018568)
     Henry J. Handzel (#1014587)
     Timm P. Speerschneider (#1012525)
     Two East Mifflin Street, Suite 600
     Madison, WI  53703-2865
     608-255-8891

     **ATTORNEYS FOR DEFENDANT,**
       **FLAMBEAU MINING COMPANY**