

McGILLIVRAY
WESTERBERG
& BENDER LLC
A T T O R N E Y S

August 8, 2011

Susan Hedman
Regional Administrator
U.S. EPA, Region 5
77 West Jackson Boulevard
Chicago, IL 60604-3590

Re:   *Comments on your July 18, 2011 Letter to Cathy Stepp, WDNR, concerning the*
      *WPDES permit program; identification of additional legal deficiencies*

Dear Ms. Hedman:

On behalf of the Midwest Environmental Defense Center, Sierra Club – John
Muir Chapter, and the Wisconsin Resources Protection Council (collectively, "MEDC"),
we write in regard to the letter dated July 18, 2011 from you to Cathy Stepp, Secretary of
the Wisconsin Department of Natural Resources ("WDNR"), concerning the WDNR's
legal authorities to implement the National Pollutant Discharge Elimination System
("NPDES") (hereinafter, the "July 18 Letter").

At the outset, we applaud the completion of Region 5's legal review of
Wisconsin's NPDES statutory and regulatory authorities, which we understand has
been in progress since at least 2009. MEDC and others have long had concerns about
the clear and significant deviations between WDNR's authorities and the minimum
federal standards contained in the Clean Water Act ("CWA") and EPA's implementing
regulations. EPA's July 18 Letter, with its detailed Enclosure identifying 75 separate
deficiencies in the Wisconsin NPDES permit program and deadlines for legislative or
regulatory action, represents a critically important step towards cleaner water in
Wisconsin. Our sincere thanks go to you and your staff for their work leading up to the
July 18 Letter.

Our purpose for writing you is to identify additional statutory and regulatory
deficiencies in Wisconsin's NPDES program that were omitted from the July 18 Letter to
Secretary Stepp. We urge EPA to incorporate these comments into its ongoing review

211 S. Paterson St., Suite 320 • Madison, WI 53703 • P: 608.310.3560 • F: 608.310.3561 • www.mwbattorn[...].com

EXHIBIT

A

of Wisconsin's NPDES program, bring these legal deficiencies to the attention of the WDNR, and require legislative or regulatory amendments to bring the identified permitting provisions into compliance with the CWA as quickly as possible.

> **A.   Wisconsin's statutory and regulatory authorities for "storm water discharge permits" do not comply with basic Clean Water Act requirements applicable to discharges of stormwater associated with industrial activity under CWA § 402(p).**

Under the Clean Water Act, discharges of stormwater associated with industrial activity must be permitted in largely the same way as other point-source pollutant discharges under the NPDES program. Most importantly, permits issued for such discharges must comply with <u>all requirements</u> of sections 301 and 402 of the CWA. *See* CWA § 402(p)(3)(A); *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1164-1165 (9th Cir. 1999). This means that NPDES permits for industrial stormwater must include technology-based effluent limitations ("TBELs") under CWA § 301(b)(2) for toxic, conventional, and non-conventional pollutants (including, where necessary, TBELs based on the application of the permitting agency's best professional judgment ("BPJ")), as well as water quality-based effluent limitations ("WQBELs") under CWA § 301(b)(1)(C) as necessary to ensure compliance with water quality standards.

Wisconsin law sidesteps these clear requirements by creating what is apparently a dual permit program: the EPA-approved WPDES permit program established under Wis. Stat. § 283.31, and a <u>separate, state-law</u> "storm water discharge permit" program established under Wis. Stat. § 283.33.[1] The latter statutory provision, which appears to govern all point-source storm water discharges including discharges of stormwater associated with industrial activity,[2] falls far short of the requirements of the CWA in at least three critical ways:

- There is no general requirement in Wisconsin law that "rules concerning storm water discharges for which permits are issued under s. 283.33" comply with, and be no less stringent than, the requirements of the CWA and EPA's implementing

[1] A more detailed examination of Wisconsin statutes and regulations as compared to CWA requirements for discharges of stormwater associated with industrial activity may be found in MEDC's comments on WDNR's recently re-issued General WPDES Permits for Discharges of Stormwater Associated with Industrial Activity, dated January 7, 2011, attached hereto as **Exhibit A**.

[2] In this section we focus on the specific context of discharges of industrial stormwater, as municipal stormwater discharges are treated differently under the CWA and generally do not have to comply with section 301's effluent limitations. *See* CWA § 402(p)(3)(B).

regulations.  *See* Wis. Stat. § 283.11(2)(a).  This conflicts with, *inter alia*, CWA § 402(b)(1)(A) and 40 C.F.R. § 123.25(a).[3]

- Wisconsin does not require that "a source of storm water permitted under Wis. Stat. § 283.33" comply with the CWA's technology-based limits established under § 301(b)(2).  *See* Wis. Stat. § 283.13(2).  This conflicts with, *inter alia*, CWA §§ 402(p)(3)(A) and 301(b)(2), and 40 C.F.R. §§ 125.3(a) and 122.44(a)(1).[4]

- Wisconsin does not explicitly require that permits for the discharge of stormwater associated with industrial activity include limitations necessary to ensure compliance with applicable water quality standards.  *See generally* Wis. Stat. § 283.33; Wis. Admin. Code § NR 216, subchapter II (non-stormwater WPDES permits, by contrast, do have such a requirement.  *See* Wis. Stat. § 283.13(5).)  This conflicts with, *inter alia*, CWA §§ 402(p)(3)(A) and 301(b)(1)(C), and 40 C.F.R. § 122.44(d)(1).[5]

Applicable Wisconsin statutes and WDNR regulations clearly recognize, and differentiate, between "true" NPDES permits issued under section 402 of the CWA and

---

[3] WDNR has recently confirmed its interpretation of state law as excluding stormwater discharges from basic CWA effluent limitations by stating as follows: "Not all of the effluent limitations or standards of performance contained in Chapter 283, Wis. Stats., necessarily apply to storm water discharges, as indicated in s. 283.11(2)(a), Wis. Stats." *See* WDNR, Response to Public Comments (May 2011) at 9, attached hereto as **Exhibit B.**

[4] This precise issue was recently raised by MEDC in the context of the reissued Industrial Stormwater General Permits, but was essentially ignored by WDNR:

MEDC, CWAC, WRPC Comment 7: The Department must document in the permit record the basis for its conclusion that the provisions identified as technology-based effluent limitations reflect best available technology/best conventional pollutant control technology and therefore comply with 33 U.S.C. § 1311(b)(2) and Wis. Stat. §§ 283.13(2) and 283.31(3).

Response: The general permits are consistent with the requirements of Subchapter II of 216, Wis. Adm. Code. The USEPA has stated that it will not object to the general permits as drafted.

*See* Exhibit B, WDNR, Response to Public Comments (May 2011) at 8.  As discussed below, WDNR's reference to NR 216 is insufficient, as that regulation contains no mention of TBELs or the application of BAT/BCT to individual or general WPDES permits.

[5] EPA has already identified Wisconsin's lack of authority implementing 40 C.F.R. § 122.44(d), specifically referencing the "general statement" of authority "providing that the Department shall establish more stringent limitations if necessary to meet water quality standards." *See* July 18 Letter, Enclosure, ¶11. EPA incorrectly cited Wis. Stat. § 283.31(5) for this authority; the correct reference is Wis. Stat. § 283.31(3)(d)1. In any event, by its own terms this "general authority" does not apply to stormwater permits issued under Wis. Stat. § 283.33.

Wis. Stat. § 283.31 on the one hand, and "storm water discharge permits" issued under non-CWA, state law authorities contained in Wis. Stat. § 283.33 on the other. First, as outlined above, statutory references throughout Wis. Stat. ch. 283 exempt "storm water discharges under Wis. Stat. § 283.33" from the most basic provisions of the NPDES program that otherwise apply to the WPDES program under Wis. Stat. § 283.31.

Second, WDNR has the discretion to regulate industrial stormwater discharges under <u>either</u> the EPA-approved portion of the WPDES program (Wis. Stat. § 283.31) <u>or</u> the state law stormwater program (Wis. Stat. § 283.33). *See* Wis. Stat. § 283.31(1) ("The discharge of any pollutant into any waters of the state . . . is unlawful unless . . . done under a permit issued by the department under this section *or s. 283.33*) (emphasis added); *id.* § 283.33(6)(b) ("The department *may* include coverage of a storm water discharge in a permit issued under Wis. Stat. § 283.31 [i.e., an NPDES permit]. For purposes of this chapter, the portion of a permit issued under s. 283.31 that covers a storm water discharge is considered a permit issued under this section.") (emphasis added); Wis. Admin. Code § NR 216.22(5)(a) ("The Department shall . . . determine whether a facility should be covered under a general or individual storm water discharge permit under s. 283.31 *or 283.33*, Stats.") (emphasis added); *id.* § NR 216.22(5)(c) ("If a facility has a WPDES permit, the department *may* choose to regulate storm water discharges under that permit.") (emphasis added). Critically, WDNR is <u>not required</u> to issue true NPDES permits to industrial stormwater discharges under Wis. Stat. § 283.31 – and, in fact, has not done so in its recently-reissued "Tier I" and "Tier II" General WPDES Permits for Discharges Associated with Industrial Activity. *See generally* Exhibits A and B.

Third, a review of NR 216 subchapter II reveals almost zero references to core NPDES elements required by CWA § 402(p)(3)(A). That regulation does appear to apply to facilities "subject to storm water effluent limitations . . . performance standards or toxic pollutant effluent standards under" the CWA, *see* Wis. Admin. Code § NR 216.21(2)(b)4., but <u>compliance</u> with such national effluent standards is not required by NR 216 (or, for that matter, Wis. Stat. § 283.13(2)). There are no further references to TBELs, WQBELs, conditions applicable to all NPDES permits under 40 C.F.R. § 122.41 or Wis. Stat. § 283.31(4), or other key elements in the NPDES permit program anywhere in NR 216, subchapter II. In fact, the only authorities referenced and relied upon in NR 216 are Wis. Stat. § 283.33 and the Wisconsin nonpoint source pollution abatement program established under authority of Wis. Stat. § 281.16 (regulatory standards for

4

which are codified at Wis. Admin. Code § NR 151). *See* Wis. Admin. Code § NR 216.001.[6]

Thus a holistic reading of existing Wisconsin authorities makes clear that Wis. Stat. § 283.33 and Wis. Admin. Code § NR 216, subchapter II do not implement Wisconsin's EPA-approved NPDES program; instead, they create and implement a wholly separate, state-law storm water permit program that falls far short of what is required under CWA § 402.   This remains true even though WDNR typically captions and describes its industrial stormwater permits as "WPDES permits;" they are in fact issued under Wisconsin's non-NPDES storm water permit program under Wis. Stat. § 283.33. *See* Wis. Admin. Code § NR 216.20 ("This subchapter establishes criteria for identifying industrial discharges that require a WPDES storm water permit, application requirements, permit requirements and permit fees, *as required by Wis. Stat. § 283.33*.") (emphasis added).[7]

Finally, we note that these crucial failings of the Wisconsin storm water discharge permit program (including WDNR's failure to implement and follow an EPA-approved NPDES permit program for industrial stormwater that is consistent with CWA § 402(p)(3)(A) and EPA's implementing regulations) is grounds for program dedelegation under 40 C.F.R. § 123.63(a)(2).

**B.     Wisconsin's definition of "point source" excludes certain stormwater discharges, and is therefore inconsistent with the federal regulation with respect to conveyances of stormwater.**

Wisconsin defines "point source" as follows:

---

[6] EPA might reasonably assume that so long as WDNR has the *authority and discretion* to issue WPDES permits to industrial stormwater discharges that comply with §§ 301 and 402 of the CWA, express statutory or regulatory *requirements* to do are not necessary.  This would be incorrect, however, as WDNR has recently avoided addressing many of these same concerns (presented in MEDC's comments on the Draft Tier I and Tier II General WPDES Permits for Industrial Stormwater) by simply responding that "The general permits are consistent with the requirements of Subchapter II of 216, Wis. Adm. Code. The USEPA has stated that it will not object to the general permits as drafted." *See* Exhibit B, WDNR, Response to Public Comments (May 2011) at 7-10.  Clearly, additional EPA oversight is needed on the question of whether Wisconsin's industrial stormwater permits must comply with basic CWA requirements.

[7] Additionally, it is MEDC's understanding that EPA has not approved either Wis. Stat. § 283.33 or Wis. Admin. Code § NR 216 subchapter II as a modification to Wisconsin's EPA-approved NPDES program pursuant to 40 C.F.R. § 123.62.  See further discussion in Part F, below.

(a) A discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation or vessel or other floating craft from which pollutants may be discharged either into the waters of the state or into a publicly owned treatment works *except for a conveyance that conveys only storm water.*

(b) A discernible, confined and discrete *conveyance of storm water for which a permit is required under s. 283.33 (1).*

Wis. Stat. § 283.01(12) (emphasis added). The federal definition contains no such language of limitation applicable to specifically stormwater discharges. *See* CWA § 502(14); 40 C.F.R. § 122.2. The result is that the Wisconsin definition is impermissibly narrow in that conveyances of stormwater that are (unlawfully) exempted from permit requirements under Wis. Stat. § 283.33 are deemed not to be point sources – even though they may meet the federal definition of point source.

**C.   Wisconsin regulations provide an illegal NPDES permit exemption by using non-NPDES permits to regulate certain point-source discharges of industrial stormwater.**

In its legal review, EPA noted the problems with a number of regulatory provisions (mostly found in Wis. Admin. Code § NR 216) that appear to create unlawful NPDES permit exemptions, unapproved divisions of NPDES permitting authority among multiple state agencies, or dubious "permit by rule" mechanisms. *See* July 18 Letter, Enclosure, at ¶¶ 23-26. Specifically, EPA noted that state agency approvals under these provisions:

(1) are not subject to EPA review and potential objection under 40 C.F.R. § 123.44, (2) are likely not subject to reissuance proceedings (including notice and the opportunity for the public to comment) once every five years, (3) likely do not require terms and conditions that are standard to all NPDES permits, and (4) may not be subject to judicial review as required for NPDES permits by 40 C.F.R. § 123.30 . . . . In addition, we are concerned that [these provisions] may not conform to 40 C.F.R. 123.1(g)(1) and 123.25(a)(4).

6

*Id.* at ¶¶ 23-24.  MEDC fully agrees with EPA's statement in this regard.  However, EPA did not specifically refer to the Wisconsin industrial stormwater regulation at NR 216.21(4), which states as follows:

> **(4)** OTHER ENVIRONMENTAL PROGRAMS. If one of the following conditions is met, the department may determine that a facility is in compliance with permit coverage required under s. 283.33, Stats., and will not be required to hold a separate permit under s. 283.33, Stats.:
> (a) The storm water discharge is in compliance with a department permit or approval, which includes storm water control requirements that are at least as stringent as those required under this subchapter.
> (b) The storm water discharge is in compliance with a memorandum of understanding with another agency of the state that implements rules including storm water control requirements that are at least as stringent as those required under this subchapter.

This provision is analogous to the permit exclusions provided in Wis. Admin. Code § NR 216.42(4)-(6), (9), which were found deficient by EPA.  By its clear language, this WDNR regulation creates an impermissible exemption from the NPDES permit program.  *See Natural Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369, 1374, 1377 (D.C. Cir. 1977) ("Congress intended the NPDES permit to be the only means by which a discharger from a point source may escape the total prohibition of [S] 301(a).").

WDNR "permits and approvals" take many forms, and most of them do not track basic CWA and NPDES program requirements under EPA regulations.  And while "storm water control requirements" are obviously a critical part of NPDES permits for industrial stormwater discharges, other WDNR "permits and approvals" may not include the myriad substantive and procedural provisions of the NPDES program as outlined by EPA for the similar exemptions at Wis. Admin. Code § NR 216.42(4)-(6), (9).  Moreover, a permit with stormwater controls "at least as stringent as those required under" NR 216 subchapter II will not necessarily meet the substantive requirements of the CWA because NR 216 subchapter II <u>itself</u> does not meet the minimum requirements of the CWA.[8]

---

[8] *See generally* Exhibit A and discussion herein at Parts A, D, and E.

EPA should instruct WDNR to either rescind NR 216.21(4) or clarify that non-NPDES permits may not be used to authorize and regulate the point-source discharge of stormwater associated with industrial facilities for which NPDES permits are required by CWA § 402(p) and 40 C.F.R. § 122.26.

**D.     Permits for discharges of stormwater associated with industrial activity, regulated by NR 216, do not contain, and are not required to contain, numeric effluent limitations.**

WDNR has to date refused to include, or even consider including, numeric effluent limitations in permits issued to discharges of stormwater associated with industrial activity.[9]  While we recognize that stormwater discharges are variable and that numeric effluent limitations may be difficult to calculate, Wisconsin's position is inconsistent with current EPA guidance on the use of numeric WQBELs in stormwater permits:

> Numeric WQBELs in storm water permits can clarify permit requirements and improve accountability and enforceability. . . . When the permitting authority determines, using the procedures specified at 40 CFR 122.44(d)(I)(ii) that the discharge causes or has the reasonable potential to cause or contribute to an in-stream excursion of the water quality standards, the permit must contain effluent limits for that pollutant. EPA recommends that NPDES permitting authorities use numeric effluent limitations where feasible as these types of effluent limitations create objective and accountable means for controlling stormwater discharges. . . .

---

[9] With the recent reissuance of the "Tier I" and "Tier II" General WPDES Permits for Discharges Associated with Industrial Activity, WDNR sidestepped this issue:

MEDC, CWAC, WRPC Comment 12: The Department should determine whether numeric water quality-based effluent limitations are feasible for discharges of industrial stormwater and, if so, include such water quality-based effluent limitations in the general permits.
Response: The general permits are consistent with the requirements of Subchapter II of 216, Wis. Adm. Code.
MEDC, CWAC, WRPC Comment 13: The Department should include numeric benchmarks for pollutants commonly discharged in stormwater from industrial facilities; without them, the general permits are incapable of ensuring compliance with water quality standards.
Response: The general permits are consistent with the requirements of Subchapter II of 216, Wis. Adm. Code.

*See* Exhibit B, WDNR, Response to Public Comments (May 2011) at 9-10.

> Permitting authorities should consider including numeric benchmarks for BMPs and associated monitoring protocols or specific protocols for estimating BMP effectiveness in stormwater permits. These benchmarks could be used as thresholds that would require the permittee to take additional action specified in the permit, such as evaluating the effectiveness of the BMPs, implementing and/or modifying BMPs, or providing additional measures to protect water quality.

U.S. EPA, *Memorandum from James Hanlon and Denise Keehner to Water Management Division Directors, Regions I-X* (Nov. 12, 2010) (hereinafter, "2010 Hanlon Stormwater Memo").

Consistent with the 2010 Hanlon Stormwater Memo, EPA must instruct WDNR to consider the use of numeric WQBELs and/or benchmarks when issuing WPDES permits for discharges associated with industrial activity.

      **E.**      **In the absence of EPA-promulgated effluent limitation guidelines ("ELGs"), WDNR lacks explicit authority to develop permit-specific TBELs as necessary to meet the requirements of CWA § 301(b)(2) on a case-by-case basis based on its best professional judgment.**

As EPA has explained, even where nationally-applicable ELGs have not been promulgated, NPDES permit authorities must ensure that the technology-based requirements of CWA §§ 301(b)(2) and 402(a)(1)(B) are met in each permit. *See* 40 C.F.R. §§ 122.44(a)(1); 125.3(a). This typically involves the use of the permit writer's "best professional judgment" ("BPJ") in order to establish permit-specific TBELs that reflect BAT and/or BCT levels of pollution control. U.S. EPA, *NPDES Permit Writer's Manual (2010)* at pp. 5-44 to 49 (hereinafter, "*Permit Writer's Manual*"). The permitting agency must consider, at a minimum, "(i) The appropriate technology for the category or class of point sources of which the applicant is a member, based upon all available information; and (ii) Any unique factors relating to the applicant." 40 C.F.R. § 125.3(c)(2)(i). Furthermore, when establishing TBELs on a case-by-case basis, the permit drafter must consider six specific factors, as outlined in 40 C.F.R. § 125.3(d)(3); *see also* 40 C.F.R. § 125.3(c), Comment ("These factors must be considered in all cases, regardless of whether the permit is being issued by EPA or an approved State.").

Indeed, EPA has recently reiterated the importance of the BPJ analysis in instances where no national ELGs exist, or where the ELGs are outdated or unreliable:

> Where EPA has not promulgated technology-based effluent guidelines for a particular class or category of industrial discharger, *or where the technology-based effluent guidelines do not address all wastestreams or pollutants discharged by the industrial discharger,* EPA must establish technology-based effluent limitations on a case-by-case basis in individual NPDES permits, based on its best professional judgment or "BPJ." . . . Because Section 301 of the CWA requires technology-based effluent limitations as a minimum level of control, such case-by-case technology limitations are "necessary to carry out the provision of this chapter" prior to the development of an applicable effluent guidelines and therefore must be included in any NPDES permit issued under section 402(a), as provided in EPA's implementing regulations. *See* 40 CFR 125.3(a) . . . *[A]n authorized state must include technology-based effluent limitations in its permits for pollutants not addressed by the effluent guidelines for that industry.* 33 USC § 1314(b); 40 CFR 122.44(a)(1), 123.25,, 125.3. In the absence of an effluent guideline for those pollutants, the CWA requires permitting authorities to conduct the "BPJ" analysis discussed above on a case-by-case basis for those pollutants in each permit.

U.S. EPA, *Memorandum from James A Hanlon to Water Division Directors, Regions 1-10,* (June 7, 2010), Attachment A, at 1-2 (emphasis added).

WDNR's regulatory equivalent is Wis. Admin. Code § NR 220.21, which is not only too vague to provide useful direction to the agency, it is less stringent than (and otherwise inconsistent with) 40 C.F.R. § 125.3(c) and (d) in at least the following ways:

- It is permissive, not mandatory: the regulation states that WDNR "may" specify case-by-case effluent limitations in WPDES permits for point source categories for which effluent limitations have not been promulgated. *See* Wis. Admin. Code § NR 220.21(1). This conflicts with 40 C.F.R. § 125.3, which (while giving EPA discretion to use promulgated ELGs, a case-specific BPJ determination, or both when setting TBELs in a given permit) explicitly requires TBELs be established in each NPDES permit.

- It refers only to the establishment of TBELs in the absence of effluent limitations codified in Wisconsin law (i.e., at NR 221-229) and provides no direction to WDNR in the case where: (i) the state ELGs are inconsistent with federal ELGs; or (ii) the state ELGs are incomplete or outdated and no longer represent BAT/BCT.[10]

- It does not include the specific considerations of 40 C.F.R. § 125.3(d), and generally fails to specify how WDNR will conduct its BPJ analysis.

WDNR needs to revise NR 220.21, and possibly create new authorities, so that the BPJ process is mandatory (in the absence of applicable ELGs), consistent with EPA regulations, and predictable for the public and regulated entities.

F.    **EPA should clarify which Wisconsin statutes and regulations are part of the EPA-approved NPDES permit program authorized under CWA § 402, and which are state permit provisions outside the scope of the NPDES program.**

In the July 18 Letter, EPA states that "we emphasize that EPA has not approved those elements of the State's program that are less stringent or comprehensive than federally required." July 18 Letter at 2. However, EPA provides no further detail beyond noting that "EPA approved Wisconsin's base program in 1974" and subsequently "approved the State to regulate discharges from federal facilities, administer the pretreatment program, issue general permits, and implement the biosolids program." *Id.* at 1.

EPA's regulation for the modification of approved state NPDES programs at 40 C.F.R. § 123.62 states in part as follows:

> Revision of a State program shall be accomplished as follows:
> (1) The State shall submit a modified program description, Attorney General's statement, Memorandum of Agreement, or such other documents as EPA determines to be necessary under the circumstances.

---

[10] We recognize there is some overlap with the concerns raised by EPA regarding implementation of federal NSPS and ELGs into state NPDES permits. *See* July 18 Letter, Enclosure, at ¶7. These same concerns extend to Wisconsin's apparent inability to undertake a BJP analysis where state and federal ELGs differ.

***

    (3) The Administrator will approve or disapprove program revisions based on the requirements of this part (or, in the case of a sewage sludge management program, 40 CFR part 501) and of the CWA.

    (4) *A program revision shall become effective upon the approval of the Administrator.* Notice of approval of any substantial revision shall be published in the Federal Register. Notice of approval of non-substantial program revisions may be given by a letter from the Administrator to the State Governor or his designee.

*Id.* at § 123.62(b) (emphasis added). Besides the four NPDES program modifications identified by EPA in the July 18 Letter (i.e., Wisconsin provisions for federal facilities, pretreatment, biosolids, and general permits), MEDC is not aware of any EPA approvals under 40 C.F.R. § 123.62 of any program modifications since Wisconsin became authorized to issue NPDES permits in 1974.[11]

    We ask that EPA clarify exactly which provisions in Wisconsin law have been approved by EPA – and, therefore, may be deemed as implementing section 402 of the CWA. This clarification is important, as Wisconsin clearly operates the WPDES program under dual authority of state and federal law, and only those permit terms based on federal (i.e., EPA-approved NPDES) statutory and regulatory provisions are able to provide an enforcement shield under CWA § 402(k) and form the basis for EPA and citizen enforcement under CWA §§ 309 or 505.

## G.    Conclusion

    As detailed above, additional legal deficiencies exist in Wisconsin's NPDES program beyond those identified in the July 18, 2011 letter to WDNR. We ask that EPA take the following steps:

(1)    Instruct Wisconsin to amend Wis. Stat. § 283 and Wis. Admin. Code § NR 216 as necessary to ensure that permits issued to discharges of stormwater associated

---

[11] This was recently confirmed by MEDC through a recent FOIA request to EPA Region 5, dated May 16, 2011, with responses from Region 5 on June 16 and June 30, 2011 (FOIA Request No. 05-FOI-00896-11). Additionally, MEDC is aware that EPA commented upon (but did not approve under 40 C.F.R. § 123.62) various iterations of NR 216, and that EPA partially disapproved portions of Wisconsin's mercury rule at Wis. Admin. Code § NR 106.145.

with industrial activity are true NPDES permits that comply with the requirements of CWA §§ 301 and 402 and EPA's implementing regulations;

(2)     Instruct Wisconsin to amend its definition of "point source" so that it is consistent with the federal definition with respect to stormwater discharges;

(3)     Instruct Wisconsin to amend Wis. Admin. Code § NR 216.21(4), which (like the provisions already identified by EPA at NR 216.42(4)-(6) and (9)) creates an unlawful NPDES permit exemption or "permit by rule" mechanism for certain stormwater discharges;

(4)     Instruct WDNR that it must consider the use of numeric WQBELs and benchmarks when issuing stormwater NPDES permits, consistent with current EPA guidance;

(5)     Instruct WDNR to amend NR 220.21 (and other authorities, as necessary) to be consistent with 40 C.F.R. § 125.3(c) and (d) and to provide for the mandatory imposition of TBELs in WPDES permits based on a BPJ analysis where necessary to comply with CWA § 301(b)(2);

(6)     Identify which provisions in Wisconsin law are considered by EPA to be part of the EPA-approved NPDES program under CWA § 402 and 40 C.F.R. § 123.62.

These steps will be extremely helpful in bringing Wisconsin's NPDES program into full and complete compliance with the Clean Water Act and EPA regulations.

MEDC looks forward to your response, and to contributing to EPA and WDNR efforts as the identified WPDES program inconsistencies are addressed in the months ahead.  Please contact Jamie Saul at (608) 310-3568 or saul@mwbattorneys.com with any questions or concerns regarding this letter.

Sincerely,

McGILLIVRAY WESTERBERG & BENDER LLC

James N. Saul

13

*On behalf of the Midwest Environmental Defense Center, Sierra Club – John Muir Chapter, and Wisconsin Resources Protection Council*

Encl.

cc (*via email*):   Shahla Werner, Sierra Club – John Muir Chapter
Al Gedicks, Wisconsin Resources Protection Council
Betsy Lawton, Midwest Environmental Advocates
Kevin Pierard, U.S. EPA Region 5
Barbara Wester, U.S. EPA Region 5
Cathy Stepp, WDNR

14

EXHIBIT A



**James N. Saul**
Attorney at Law LLC

January 7, 2011

**VIA ELECTRONIC AND U.S. MAIL**

Mr. Jim Bertolacini
Wisconsin Dept. of Natural Resources
101 S. Webster Street
P.O. Box 7921
Madison, WI 53707

Re:    **Comments on Four Draft WPDES Permits for Discharges of
Stormwater Associated with Industrial Activity (WPDES Permit Nos.
WI-S067849-3; WI-S067857-3; WI-S058831-2; and WI-S059145-2).**

Dear Mr. Bertolacini:

On behalf of the Midwest Environmental Defense Center ("MEDC"), Clean
Water Action Council of Northeastern Wisconsin ("CWAC"), and the Wisconsin
Resources Protection Council ("WRPC") (collectively, "MEDC"), please accept these
comments on the four Draft Wisconsin Pollutant Discharge Elimination System
("WPDES") Permits referenced above. MEDC is a Wisconsin nonprofit corporation
dedicated to the protection of the environment and natural resources of the upper
Midwest through the proper implementation and enforcement of environmental laws.
CWAC is a Wisconsin nonprofit corporation that works to protect public health and the
environment in Northeast Wisconsin, to increase public awareness of the many threats to
water quality, and to build support for improved management. WRPC is a statewide,
non-profit organization concerned with educating the public about the consequences of
allowing international mining corporations to develop a new mining district in the Lake
Superior region under the present legal and regulatory framework. We appreciate your
effort in drafting the permits and your consideration of our comments.

With these four draft General WPDES Permits ("GPs") the Wisconsin
Department of Natural Resources ("DNR") is proposing to regulate the stormwater
discharge of pollutants associated with industrial activity. Two of the permits, Nos. WI-
S067849-3 ("Tier I GP") and WI-S067857-3 ("Tier II GP"), apply broadly to stormwater
discharges from "heavy" and "light" industry, respectively; and the other two permits
apply more specifically to two identified industry sectors: No. WI-S058831-2 applies to
Recycling of Scrap and Waste Materials; and No. WI-S059145-2 applies to Dismantling

of Vehicles for Parts Selling and Salvage. The Draft Permits are similar in most respects, and MEDC intends for these comments to apply to each of the four draft GPs.

## I.   **Introduction**

We are pleased to see that DNR has made some improvements to the GPs to incorporate TMDL-driven requirements and address state antidegradation procedures, and we appreciate DNRs efforts to update the industrial stormwater program. However, we are concerned that the draft GPs fall far short of Clean Water Act standards and, if issued, would fail to protect Wisconsin's surface waters from excessive pollution from industrial facilities. We are disappointed to see that DNR has tentatively chosen not to follow the lead of the U.S. Environmental Protection Agency ("EPA") and a number of other states that have recently revised their NPDES permits for industrial stormwater to bring them in line with current knowledge and stormwater management techniques.

We strongly urge DNR to shelve the Draft GPs; convene interested stakeholders; and actively solicit input from EPA prior to reissuing the Industrial Stormwater GPs. We believe DNR needs to re-write the Draft GPs from the ground up in order to:

  ➢ Include, and clearly identify, technology-based effluent limitations that either reflect EPA-developed effluent limitation guidelines or involve a rational and defensible application of BAT/BCT based on DNR's best professional judgment;

  ➢ Include all additional limitations necessary to ensure compliance with applicable water quality standards, and provide some defensible basis in the permit record as to how those limitations will, in fact, achieve compliance;

  ➢ Follow the example set by the U.S. EPA and a number of states, which have recently revised their industrial stormwater NPDES permits to include:

    o Numeric "benchmarks" for a number of conventional and toxic pollutants known to be included in stormwater discharges from industrial facilities;

    o An "adaptive management" scheme that requires increasingly aggressive pollution control measures when exceedences of a pollutant benchmark occur;

    o Sector-specific effluent limitations, SWPPP requirements, benchmarks, and other requirements that taken into account the unique aspects of vastly different industry sectors; and

  ➢ Include basic permit conditions that make it meaningful and enforceable, such as a prohibition on any discharge that violates applicable water quality standards and a requirement to comply with the SWPPP; and sufficient

monitoring and reporting requirements to enable DNR and the public to determine if individual facilities are in compliance.

DNR's draft GPs fall short of the minimum permitting standards set by EPA in its 2008 Multi-Sector General Permit for Discharges Associated with Industrial Activity ("2008 MSGP"),[1] and as significantly weaker than recent industrial stormwater general NPDES permits issued by other Midwestern states (including Minnesota, Illinois, Michigan, and Indiana) as well as states such as Oregon, Washington, and New York that have decided to seriously tackle the problem of industrial stormwater pollution.

II.     **The Draft GPs, Permit Fact Sheets, and Department Regulations Are Not Clear As to Whether DNR Intends to Regulate Industrial Stormwater Through the WPDES Program or through a non-NPDES "Storm Water Permit Program."**

A.      Legal and Regulatory Background

As an initial matter, it is not clear whether DNR intends to regulate discharges of industrial stormwater though the EPA-approved WPDES program or through other provisions of state law that do not fully comply with applicable Clean Water Act requirements. Wisconsin's bifurcated discharge permit scheme differentiates between point source discharges of pollutants regulated by the WPDES program under Wis. Stat. § 283.31 and "storm water discharge permits" issued under Wis. Stat. § 283.33. The latter statutory provision and other provisions in chapter 283 include a number of possibly illegal NPDES exemptions that, if used to regulate point source discharges of stormwater, would not comply with minimum NPDES requirements under the CWA.

For example, Wis. Stat. § 283.13(2) appears to waive the requirement to include technology-based effluent limitations in permits for point-source discharges of stormwater issued under section 283.33, even though such effluent limitations are clearly required by sections 301(b)(2) and 402(p)(3)(A) of the CWA. Furthermore, Wis. Stat. § 283.11(2)(a) and (b) seem to provide authority for DNR to promulgate rules (and, possible, issue NPDES permits) that are less stringent than applicable federal standards for stormwater discharges.

It is clear, however, that DNR has authority to regulate discharges of industrial stormwater under the WPDES program (i.e., Wis. Stat. § 283.31). DNR "may include coverage of a storm water discharge in a permit issued under s. 283.31." *Id.* § 283.33(6)(b). Even though Wisconsin's statutory language is less than precise, the federal CWA (and regulatory provisions of the federally delegated NPDES program) requires the use of NPDES permits for industrial stormwater that comply with all applicable Clean Water Act provisions.

---

[1] The 2008 MSGP was issued by EPA on September 29, 2008. It may be found online at http://www.epa.gov/npdes/pubs/msgp2008_finalpermit.pdf, and is hereby incorporated by reference into

3

B.   Specific Comments / Requests

**COMMENT 1:  DNR should clarify whether the Draft GPs are considered true NPDES permits (i.e., issued under section 402 of the CWA, 33 U.S.C. § 1342, and Wis. Stat. § 283.31) or are considered non-NPDES "storm water discharge permits" (i.e., issued under Wis. Stat. § 283.33).**

*Comment 1 Discussion*:

MEDC has serious concerns about the use of Wis. Stat. § 283.33 to regulate point-source discharges of stormwater, and requests clarification that the Draft GPs are issued under Wis. Stat. § 283.31. Although the Draft GPs are titled "General Permit to Discharge under the Wisconsin Pollutant Discharge Elimination System," they only reference Wis. Stat. ch. 283 generally, and there is no further indication as to whether DNR believes it must comply with Wis. Stat. § 283.31 (and associated regulations) when issuing the Industrial Stormwater GPs.

MEDC is concerned that DNR may take the position that the GPs are developed under specific authority of Wis. Stat. § 283.33, and that the requirements of Wis. Stat. § 283.31 do not apply.  Such an interpretation runs counter to the clear requirements of the CWA, which requires all NPDES permits (including permits for point-source discharges of industrial stormwater) to assure compliance with, *inter alia*, applicable effluent limitations, performance standards, and water quality standards.  *See* 33 U.S.C. §§ 1342(a)(1).  Additionally, NPDES permits authorizing point source discharges of industrial stormwater must comply with "all applicable provisions" of CWA section 402.  *Id.* § 1342(p)(3)(A).  We request that DNR clarify its intent to follow, and be bound by, all NPDES/WPDES statutory requirements and regulations.

**COMMENT 2:  If DNR intends to issue the GPs solely under authority of Wis. Stat. 283.33, it should modify the permits to include the following language:  "This General Permit is issued under Wisconsin law that is not fully consistent with the Clean Water Act, 33 U.S.C. § 1342, or Wisconsin's EPA-approved NPDES permitting program, and therefore facilities discharging pursuant to this Permit may not enjoy the permit shield provided by 33 U.S.C. § 1342(k)."**

*Comment 2 Discussion:*

MEDC emphasizes that DNR may not regulate point source discharges of pollutants through any permit, rule, or program other than the EPA-approved NPDES program developed under section 402 of the CWA.  *See* 33 U.S.C. § 1342(p)(3)(A); *U.S. Envtl. Prot. Agency v. Cal. State Water Res. Control Bd.*, 426 U.S. 200, 205 (1976); *Froebel v. Meyer*, 217 F.3d 928, 936 (7th Cir., 2000).  This permitting program must be consistent with, and no less stringent than, EPA's NPDES Program at all times. 33 U.S.C. § 1342(b)(1)(A); Wis. Stat. §§ 283.001(2) and 283.31(3)(d)2.  If DNR were to attempt to authorize the discharge of pollutants under a non-NPDES "storm water

4

discharge permit" that fails to include basic and essential NPDES components, the discharger would not enjoy the benefit of the CWA's permit shield and would be subject to enforcement liability. *See* 33 U.S.C. § 1342(k); *Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934, 946 (7th Cir., 2004).

### III.   The Draft GPs Do Not Include Sufficient Technology-Based Effluent Limitations And Therefore Do Not Comply with 33 U.S.C. § 1311(b)(2) and Wis. Stat. §§ 283.13(2) and 283.31(3).

A.   Legal and Regulatory Background

The following legal framework applies to all NPDES permits issued under section 402 of the Clean Water Act and its implementing regulations under both federal and state law.  NPDES requirements apply equally to all permitting entities (whether EPA or a delegated state); to all permit types (whether Individual or General); and to all point-source discharge types (whether stormwater or traditional industrial or municipal discharges).

The CWA prohibits the point source discharge of pollutants to waters of the United States unless the discharge is in compliance with the CWA.  33 U.S.C. § 1311(a); Wis. Stat. § 283.31(1).  The CWA established the National Pollutant Discharge Elimination System ("NPDES") permit program to regulate the discharge of pollutants from point sources into waters of the United States and to ensure the water quality goals of the CWA will be attained.  States with permit programs that have been approved by the Administrator of the United States Environmental Protection Agency ("EPA") may issue NPDES permits in lieu of the EPA, *see* 33 U.S.C. § 1342(b), but at all times state NPDES programs must be in accordance with the federal NPDES program and must comply with EPA's minimum regulatory requirements. *Id.* § 1342(c)(2); 40 C.F.R. § 123.25(a).  Wisconsin has an EPA-approved NPDES program, and Wisconsin law requires that all rules relating to point source discharges "comply with" the requirements of the CWA and that all permits issued by DNR include all applicable effluent limitations and other limitations "necessary to comply with any applicable federal law or regulation[.]" Wis. Stat. §§ 283.11(2)(a); 283.31(3)(a), (d)(1).  *See also id.* § 283.31(4) ("DNR shall prescribe conditions for permits issued under this section to assure compliance with" effluent limitations, water quality standards, and any applicable federal law or regulation).

Stormwater discharges, including discharges of stormwater associated with industrial activities, were drawn into the CWA regulatory scheme with the CWA Amendments of 1987, and as a matter of federal law they must be regulated under the NPDES program. 33 U.S.C. 33 U.S.C. § 1342(p)(3)(A) (requiring permits for industrial stormwater discharges to comply with sections 301 and 402 of the CWA).  All of the NPDES (and, in Wisconsin's case, WPDES) regulatory requirements must therefore be extended to discharges of industrial stormwater.

The most basic function of an NPDES permit is to ensure compliance with the substantive requirements of the CWA and the attainment of the applicable water quality

standards for the receiving water. To accomplish this, the CWA establishes two levels of pollution control that must be incorporated into NPDES permits. First, each permit must require dischargers to use the best available technology economically achievable ("BAT") for all toxic and non-conventional pollutants; 33 U.S.C. § 1311(b)(2)(A); Wis. Stat. § 283.13(2)(b); or the best conventional pollutant control technology ("BCT") for all conventional pollutants. 33 U.S.C. § 1311(b)(2)(E); Wis. Stat. § 283.13(2)(e). Application of BAT/BCT must be reflected in an NPDES permit through the imposition of technology-based effluent limitations ("TBELs"). 33 U.S.C. § 1342(a)(1); 40 C.F.R. §§ 122.44(a)(1); 125.3(a); Wis. Stat. § 283.31(2)(a)-(c). These controls set a regulatory "floor," establishing the minimum level of pollution reduction required by specific categories or classes of point sources.

To facilitate NPDES permitting requirements, EPA is required to publish, and from time to time revise, nationally-applicable effluent limitation guidelines ("ELGs") that identify the effluent limitations achievable through application of BAT/BCT for identified categories and classes of point sources. 33 U.S.C. §§ 1311(b)(2) and 1314(b). Where ELGs have been developed, all NPDES permitting agencies (whether federal or state) must include them in any applicable permit. 33 U.S.C. § 1311(b)(2)(A); 40 C.F.R. § 125.3(c)(1); Wis. Stat. §§ 283.11(1)-(2); 283.31(3)(a), (d)2.

Pursuant to its authority under sections 301(b)(2) and 304(b) of the CWA, 33 U.S.C. §§ 1311(b)(2) and 1314(b), EPA has promulgated at least eight nationally-applicable ELGs for discharges of industrial stormwater from a number of industry categories. They include:

| Table 2-1. Applicable Effluent Limitations Guidelines | | |
|---|---|---|
| **Regulated Activity** | **40 CFR Part/Subpart** | **Effluent Limit** |
| Discharges resulting from spray down or intentional wetting of logs at wet deck storage areas | Part 429, Subpart I | See Part 8.A.7 |
| Runoff from phosphate fertilizer manufacturing facilities that comes into contact with any raw materials, finished product, by-products or waste products (SIC 2874) | Part 418, Subpart A | See Part 8.C.4 |
| Runoff from asphalt emulsion facilities | Part 443, Subpart A | See Part 8.D.4 |
| Runoff from material storage piles at cement manufacturing facilities | Part 411, Subpart C | See Part 8.E.5 |
| Mine dewatering discharges at crushed stone, construction sand and gravel, or industrial sand mining facilities | Part 436, Subparts B, C, or D | See Part 8.J.9 |
| Runoff from hazardous waste landfills | Part 445, Subpart A | See Part 8.K.6 |
| Runoff from non-hazardous waste landfills | Part 445, Subpart B | See Part 8.L.10 |
| Runoff from coal storage piles at steam electric generating facilities | Part 423 | See Part 8.O.8 |

*See* 2008 MSGP at Section 2.1.3, Table 2-1.

6

DNR regulations also recognize that ELGs may apply to certain categories of industrial stormwater. Wis. Admin. Code § NR 216.21(2)(b)4 automatically requires coverage under the Tier II GP (or the Tier I GP, for certain listed industry sectors) for facilities "subject to storm water effluent limitation guidelines[.]" *See also* Wis. Admin. Code § NR 216.25(2) (recognizing that industrial stormwater discharges subject to an individual WPDES permit "may be subject to an effluent limitation . . . for storm water discharge.")

Permitting agencies must include BAT/BCT limits developed under section 301(b)(2) of the CWA in NPDES permits even if applicable, promulgated ELGs do not exist. 33 U.S.C. § 1342(a)(1); *see generally* U.S. Environmental Protection Agency, *NPDES Permit Writer's Manual (2010)* at pp. 5-44 to 4-49 (hereinafter, "*Permit Writer's Manual*").[2] If ELGs have yet to be promulgated for a particular category or class of point source, or if existing ELGs are inapplicable to a particular waste stream or to particular pollutants, the permitting agency must include such conditions as "are necessary to carry out the provisions of" the CWA. *Id.* § 1342(a)(1)(B). This includes the establishment of BAT/BCT limits on a case-by case basis using its best professional judgment ("BPJ"). The permitting agency must consider, at a minimum, "(i) The appropriate technology for the category or class of point sources of which the applicant is a member, based upon all available information; and (ii) Any unique factors relating to the applicant." 40 C.F.R. § 125.3(c)(2)(i). Furthermore, when establishing TBELs on a case-by-case basis, the permit drafter must consider six specific factors:

> (i) The age of equipment and facilities involved;
> (ii) The process employed;
> (iii) The engineering aspects of the application of various types of control techniques;
> (iv) Process changes;
> (v) The cost of achieving such effluent reduction; and
> (vi) Non-water quality environmental impact (including energy requirements).

*Id.* § 125.3(d)(3); *see also* 40 C.F.R. § 125.3(c), Comment ("These factors must be considered in all cases, regardless of whether the permit is being issued by EPA or an approved State."). Thus, as a matter of both federal and state law, no NPDES permit may be issued unless the discharges authorized by it are capable of meeting these TBELs. 40 C.F.R. § 122.44(a)(1); Wis. Stat. § 283.31(3)(a).

B.    Specific Comments / Requests:

**COMMENT 3: The GPs should be amended to include all appropriate TBELs or, in the alternative, to clearly indicate which provisions in the current drafts are considered by DNR to be TBELs (whether numeric or non-numeric).**

---

[2] The 2010 NPDES Permit Writer's Manual is available at http://www.epa.gov/npdes/pubs/pwm_2010.pdf, and is hereby incorporated by reference into these comments.

7

*Comment 3 Discussion*:

DNR, in the Fact Sheet to the Tier I GP, seems recognizes that TBELs must be included. The Fact Sheet states:

> Although the federal general storm water permit is not directly applicable to Wisconsin, provisions of the permit are being considered as Best Available Technology (BAT) and Best Conventional Technology (BCT) for storm water management. Since the Clean Water Act amendments require that storm water discharges meet BAT/BCT, the federal permit had important implications for states like Wisconsin as they developed their own rules concerning storm water permitting.

Tier I GP Fact Sheet at pages 1-2. The Fact Sheet to the Tier 1 GP at pages 1-2 also states that "provisions of the permit are being considered as Best Available Technology (BAT) and Best Conventional Technology (BCT) for storm water management." It appears that DNR is referring to EPA's 2008 MSGP. DNR should clarify which specific provisions in the Tier 1 GP are considered BAT and BCT; the Draft GP itself does not clearly identify which provisions, if any, are considered by DNR to be TBELs or other numeric or non-numeric provisions that represent BAT/BCT-derived limitations. Neither the Fact Sheet nor the GPs explain what "important implications" the 2008 MSGP has for Wisconsin's stormwater permits, and in fact the GPs fail to include many BAT/BCT requirements found in the 2008 MSGP.

**COMMENT 4:  The GPs should either be amended to include all federally-promulgated ELGs that apply to specific categories and classes of industrial stormwater discharges (*see* 2008 MSGP at Section 2.1.3, Table 2-1) or, in the alternative, to clarify that dischargers subject to industrial stormwater ELGs are not eligible for coverage under the GPs and must instead obtain individual permits.**

*Comment 4 Discussion*:

DNR apparently intends for its Tier I or Tier II GP to potentially be used by sources within the eight industrial categories for which EPA has promulgated stormwater-specific ELGs, yet DNR has not incorporated the applicable ELGs into the permits. *See* Draft Tier I GP at Section 2.1.  For example, Tier I GP coverage clearly extends to sources in the "Lumber & Wood Products" category, which may include discharges to which the ELGs at 40 C.F.R. Part 429, Subpart I would apply.[3]

The Draft Tier I GP at Section 2.4.7.3 states that DNR <u>may</u> require facilities subject to "numeric effluent limitations or standards" for industrial stormwater to obtain coverage under an Individual WPDES Permit, but does not require it – and, in fact, use of

---

[3] The ELGs at 40 C.F.R. Part 429, Subpart I, apply to "discharges . . . from the storage of unprocessed wood, *i.e.* , the storage of logs or roundwood before or after removal of bark in self-contained bodies of water (mill ponds or log ponds) or the storage of logs or roundwood on land during which water is sprayed or deposited intentionally on the logs (wet decking)." 40 C.F.R. § 429.100.

individual permits in those circumstances appears to hinge on a DNR "determination." But DNR does not require it.

If DNR intents for the GPs to apply to the eight industry categories identified above for which stormwater-specific ELGs have been promulgated, it must incorporate the ELGs into the GPs. EPA's 2008 MSGP and many state industrial stormwater general NPDES permits provide an example of how this may be accomplished. *See, e.g.,* 2008 MSGP at Section 8; Minnesota MSGP at Part VII; etc. Otherwise, DNR cannot issue permit coverage under the GPs to those industry sectors for which ELGs have been promulgated.

**COMMENT 5: The GPs should be amended to include the non-numeric TBELs found at Section 2.1.2 of EPA's 2008 MSGP (which have been determined by EPA to represent BAT/BCT for discharges of stormwater associated with industrial activity), or to include similar provisions capable of achieving the same or better pollution reductions.**

*Comment 5 Discussion*:

In the 2008 MSGP, EPA determined the minimum conditions that it considered to represent BAT/BCT for discharges of industrial stormwater. DNRs draft GPs, however, do not include these provisions, and do not even indicate what provisions of the permits DNR considers to be the BAT/BCT limitations.

EPA's 2008 MSGP gives a good example of how incorporation of TBELs can be accomplished in an industrial stormwater general permit. Section 2.1.2 explicitly identifies "Non-Numeric Technology-Based Effluent Limits (BPT/BAT/BCT)" and includes the following provisions:

- o   Minimization of exposure of industrial processes to precipitation or runoff (2.1.2.1)
- o   Good Housekeeping requirements (2.1.2.2)
- o   Maintenance requirements (2.1.2.3)
- o   Spill Prevention and Response Procedures (2.1.2.4)
- o   Erosion and Sediment Controls (2.1.2.5)
- o   Management of Runoff (2.1.2.6)
- o   Covering or Enclosure of Salt Storage Piles (2.1.2.7)
- o   Additional sector-specific non-numeric TBELs (2.1.2.8)
- o   Elimination of Non-Stormwater Discharges (2.1.2.10)
- o   Control of Waste, Garbage, and Floatable Debris (2.1.2.11)
- o   Minimization of Dust and Off-site Tracking of Materials (2.1.2.12)

We also note that in the 2008 MSGP these TBELs apply <u>independently of</u> the SWPPP requirements.

DNR should either explicitly include the BAT/BCT limits from the 2008 MSGP in its GPs (and identify them as "non-numeric TBELs"), or include (and clearly identify) alternate BAT/BCT limits after preparing its own independent BPJ analysis. *See* 33 U.S.C. § 1342(a)(1)(B); *Permit Writer's Manual* at pp. 5-44 to 4-49.

**COMMENT 6:  The GPs should be amended to include all of the other sector-specific TBELs found in Section 8 of EPA's 2008 MSGP (which have been determined by EPA to represent additional BAT/BCT requirements for those specific industry sectors), or to include similar provisions capable of achieving the same or better pollution reductions.**

*Comment 6 Discussion*:

EPA has determined that additional stormwater-specific TBELs apply to specific categories and classes of industrial point sources.  Without identifying each TBEL individually, we refer DNR to Section 8 of the 2008 MSGP, where the additional TBELs for each industry sector are clearly identified.  DNR should either include these additional sector-specific TBELs in its GPs, or include (and clearly identify) alternate BAT/BCT limits for those sectors identified by EPA after preparing its own independent BPJ analysis

**COMMENT 7:  DNR must document in the permit record the basis for its conclusion that the provisions identified as TBELs reflect BAT/BCT and therefore comply with 33 U.S.C. § 1311(b)(2) and Wis. Stat. §§ 283.13(2) and 283.31(3).**

*Comment 7 Discussion*:

DNR's determination of the appropriate level of technology-based controls in any NPDES permit must be based either on (a) promulgated ELGs, or on (b) case-by-case application of BAT/BCT, using DNR's Best Professional Judgment.  If DNR is relying on promulgated ELGs, it should make this clear in the permit and the Fact Sheet.  As the Permit Writer's Manual at pages 5-45 to 5-47 explains:

> Permit writers need to document their application of effluent guidelines in the NPDES permit fact sheet. The permit writer should clearly identify the data and information used to determine the applicable effluent guidelines and how that information was used to derive effluent limitations for the permit. The information in the fact sheet should provide the NPDES permit applicant and the public a transparent, reproducible, and defensible description of how the NPDES permit properly incorporates effluent guidelines.

Alternatively, if the case-by-case BPJ approach is used, DNR must create a record of its decision that documents its analysis and explains how the requirements of 33 U.S.C. § 1311(b)(2) have been satisfied.  The *Permit Writer's Manual* at page 5-48 explains further:

Permit writers will need to document the development of case-by-case limitations in the NPDES permit fact sheet. The permit writer should clearly identify the data and information used in developing these effluent limitations and how that information was used. The permit writer also should document the rationale for concluding that there are no applicable effluent guidelines for the industrial wastewater or pollutant discharge. The information in the fact sheet should provide the NPDES permit applicant and the public a transparent, reproducible, and defensible description of how the BPJ limitations comply with the CWA and EPA regulations.

It is not apparent from documentation in the public record (including the Draft Permits, Permit Fact Sheets, or Public Notice) that DNR conducted any analysis to determine what the appropriate TBELs should be, or whether they reflect BAT/BCT, or whether it was reasonable not to include the TBELs found in EPA's 2008 MSGP, or whether any of the permit limits were based on a BPJ analysis. MEDC requests that DNR document its analysis and prepare a comprehensive record of its permitting decisions for these GPs.

**COMMENT 8:  DNR should clarify whether it intends the preparation and implementation of the SWPPP to be a TBEL, or whether the final TBELs apply independently of the SWPPP requirements.**

*Comment 8 Discussion*

Although DNR includes the requirement to prepare a SWPPP in its Draft GPs, it is not clear whether this requirement is considered a non-numeric TBEL.  In the 2008 MSGP EPA clarifies that the development and implementation of the SWPPP is not a TBEL, but rather a tool for assisting the facility to meet the TBELs.  DNR should clarify its GPs and make them consistent with the 2008 MSGP.

**IV.**     **<u>The Draft GPs Do Not Include Additional Requirements and Limitations Needed to Ensure Compliance with Water Quality Standards, and Therefore Do Not Comply with 33 U.S.C. § 1311(b)(1)(C) and Wis. Stat. § 283.31(3)(d)1.</u>**

    A.     <u>Legal and Regulatory Background</u>

Where the TBELs alone are insufficient to protect water quality and ensure compliance with applicable water quality standards ("WQS"), NPDES permits must also include "any more stringent limitation . . . required to implement any applicable water quality standard established pursuant to this chapter." 33 U.S.C. § 1311(b)(1)(C); *see also* 40 C.F.R. § 122.44(d)(1)(i); Wis. Stat. §§ 283.13(5) and 283.31(3)(d)1; Wis. Admin. Code § NR 106.04(1); *Permit Writer's Manual* at p. 6-1. Such standards are commonly called water quality-based effluent limitations ("WQBELs"). Wisconsin regulations applicable to point-source discharges of toxic substances (which include industrial stormwater discharges) require DNR to "establish water quality based effluent limitations for point source dischargers whenever the discharges from those point sources contain(s) toxic or organoleptic substances at concentrations or loadings which do not, as

11

determined by any method in this section, meet applicable water quality standards[.]" Wis. Admin. Code § NR 106.05(1)(a). *See also Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1165 (9th Cir. 1999) (explaining that "Congress expressly required industrial storm-water discharges to comply with the requirements of 33 U.S.C. § 1311").

It is not sufficient merely to hope or assume that NPDES permits will lead to compliance with WQS. Rather, NPDES permits must <u>ensure</u> that WQS will be attained. Section 301(b) of the CWA required the achievement of "any more stringent limitation, including those necessary to meet water quality standards" by 1977. 33 U.S.C. § 311(b)(1)(C). Section 402 of the Act authorizes the issuance of NPDES permits only where they will meet, *inter alia,* "all applicable requirements under" section 301 of the CWA (such as the attainment of WQS). *Id.* § 1342(a)(1). Similarly, state permitting agencies must "apply, and insure compliance with, any applicable [effluent limitations and standards]." *Id.* § 1342(b); 40 C.F.R. § 122.44(d)(1); Wis. Stat. §§ 283.13(5) and 283.31(3)(d)1.;[4] *see also Waterkeeper Alliance v. Envtl. Prot. Agency*, 399 F.3d 486, 498 (2d Cir. 2005).

Although industrial stormwater discharges may be less consistent than traditional point-source discharges, there is no reason why numeric effluent limitations cannot be incorporated into stormwater permits where necessary to comply with applicable WQS. As explained in a recent Memorandum from James Hanlon, Director of EPA's Office of Wastewater Management:

> Since 2002, many NPDES authorities have documented the contributions of storm water discharges to water quality impairment and have identified the need to include clearer permit requirements in order to address these impairments. <u>Numeric WQBELs in storm water permits can clarify permit requirements and improve accountability and enforceability. . . . The Clean Water Act (CWA) requires that permits for stormwater discharges associated with industrial activity comply with section 301 of the Act, including the requirement under section 301(b)(l)(C) to contain WQBELs for any discharge that the permitting authority determines has the reasonable potential to cause or contribute to a water quality standard excursion. CWA section 402(p)(3)(A), 40 CFR 122.44(d)(I)(iii).</u> When the permitting authority determines, using the procedures specified at 40 CFR 122.44(d)(I)(ii) that the discharge causes or has the reasonable potential to cause or contribute to an in-stream excursion of the water quality standards, the permit must contain effluent limits for that pollutant. EPA recommends that NPDES permitting authorities use numeric effluent limitations where feasible as these types of effluent limitations create objective and accountable means for controlling stormwater discharges.

---

[4] As discussed above, DNR may take the position that the Industrial Stormwater General WPDES Permits are developed under specific authority of Wis. Stat. § 283.33, and that the requirements of Wis. Stat. § 283.31 do not apply. Such an interpretation runs counter to the clear requirements of the Clean Water Act, which requires <u>all NPDES permits</u> (including permits for point-source discharges of industrial stormwater) to assure compliance with, *inter alia,* applicable effluent limitations, performance standards, and water quality standards. *See* 33 U.S.C. §§ 1342(a)(1). Additionally, NPDES permits authorizing point source discharges of industrial stormwater must comply with "all applicable provisions" of CWA section 402. *Id.* § 1342(p)(3)(A).

U.S. Environmental Protection Agency, *Memorandum from James Hanlon and Denise Keehner to Water Management Division Directors: Revisions to the November 22, 2002 Memorandum "Establishing Total Maximum Daily Load (TMDL) Wasteload Allocations (WLAs) for Storm Water Sources and NPDES Requirements Based on Those WLAs"* (November 12, 2010) (hereinafter, "Hanlon Memo").[5] (emphasis added).

Even though the emerging regulatory standard for industrial stormwater NPDES permits is the use of numeric WQBELs, many permitting authorities use non-binding numeric "benchmarks" to track progress at reducing pollutant discharges and achieving WQS through SWPPP and BMP implementation.  Often, these benchmarks are combined with an adaptive management program designed to trigger responsive action on the part of the discharger where the benchmark has been exceeded.  EPA and a number of State NPDES authorities have incorporated numeric benchmarks into their industrial stormwater general permits as a means of determining the effectiveness of a permittee's SWPPP.   The Hanlon Memo continues:

> Where WQBELs in permits for storm water discharges from MS4s, small construction sites or industrial sites are expressed in the form of BMPs, the permit should contain objective and measurable elements (e.g., schedule for BMP installation or level of BMP performance). The objective and measureable elements should be included in permits as enforceable provisions. Permitting authorities should consider including numeric benchmarks for BMPs and associated monitoring protocols or specific protocols for estimating BMP effectiveness in stormwater permits. These benchmarks could be used as thresholds that would require the permittee to take additional action specified in the permit, such as evaluating the effectiveness of the BMPs, implementing and/or modifying BMPs, or providing additional measures to protect water quality. . . .

> The permitting authority's decision as to how to express the WQBEL(s), either as numeric effluent limitations or BMPs, including BMPs accompanied by numeric benchmarks, should be based on an analysis of the specific facts and circumstances surrounding the permit, and/or the underlying WLA, including the nature of the stormwater discharge, available data, modeling results or other relevant information. As discussed in the 2002 memorandum, the permit's administrative record needs to provide an adequate demonstration that, where a BMP-based approach to permit limitations is selected, the BMPs required by the permit will be sufficient to implement applicable WLAs. Improved knowledge of BMP effectiveness gained since 2002 should be reflected in the demonstration and supporting rationale that implementation of the BMPs will attain water quality standards and WLAs.

*Id.* (Emphasis added).

B.   Specific Comments / Requests

**COMMENT 9:  DNR must conduct a reasonable potential analysis ("RPA") to determine if the GPs will be capable of ensuring compliance with WQS.**

---

[5] The Hanlon Memo may be found at http://www.epa.gov/npdes/pubs/establishingtmdlwla_revision.pdf, and is hereby incorporated by reference into these comments.

*Comment 9 Discussion:*

DNR has stated, in both the Fact Sheets and the GPs themselves, that it intends to address WQS through narrative permit provisions and use of a SWPPP. The draft GPs states:

> [C]ompliance with water quality standards will be addressed by adherence to general narrative-type storm water discharge limitations and implementation of a storm water pollution prevention plan[.]

Draft Tier I GP at part 2.5.1. However, to MEDC's knowledge there is nothing in the permit record to support DNR's assertion that such "general narrative-type" limitations will, in fact, ensure that WQS are attained and maintained around the state. Additionally, section 2.5 of the Tier I GP discusses WQS, and appears to prohibit discharges that DNR <u>determines</u> may cause or contribute to a WQS violation – but it is not clear when DNR may undertake such a determination or conduct a Reasonable Potential Analysis. To MEDC's knowledge, DNR has never undertaken an RPA for a specific discharge of industrial stormwater. DNR must analyze whether the discharges of pollutants authorized by the GPs will cause or contribute, or have a reasonable potential to cause or contribute, to any violation of water quality standards. If so, then additional WQBELs must be included in the GPs.

**COMMENT 10: The GPs should be amended to expressly prohibit any discharge that causes or contributes to a violation of water quality standards.**

*Comment 10 Discussion:*

It is axiomatic that NPDES permits may only be issued where they are capable of ensuring compliance with WQS. 33 U.S.C. § 1311(b)(1)(C). Because there is room for error in any BMP-based permitting system, as a catch-all provision the GPs should expressly prohibit discharges that cause or contribute to a violation of water quality standards.

Examples abound: see EPA's 2008 MSGP at Section 2.2.1 ("Your discharge must be controlled as necessary to meet applicable water quality standards."); State of Washington, Department of Ecology, Industrial Stormwater General Permit at Section S10 ("Discharges shall not cause or contribute to a violation of Surface Water Quality Standards, Ground Water Quality Standards, Sediment Management Standards, and human health-based criteria in the National Toxics Rule (40 *CFR* 131.36). Discharges that are not in compliance with these standards are prohibited.").

**COMMENT 11: The GPs should be amended to clarify that each facility's SWPPP must be (a) submitted to, and reviewed by, DNR in its entirety; (b) made available to the public for notice and comment; and (c) explicitly incorporated by reference into the permit as an enforceable permit requirement.**

*Comment 11 Discussion:*

Under the plain language of the GPs, the SWPPP is a WQBEL and therefore must be reviewed by DNR; made available to the public like other essential permit terms and conditions; and explicitly incorporated as a binding and enforceable permit condition. DNR states:

> "[T]he Department may authorize coverage under this permit where the storm water pollution prevention plan required under this permit will include appropriate controls and implementation procedures designed to bring the storm water discharge into compliance with water quality standards."

Draft Tier I GP at section 2.5.2. Any such "controls and implementation procedures" which are deemed by DNR to be necessary to "bring the storm water discharge into compliance with water quality standards" are, by definition, water-quality based effluent limitations and thus must be included in the draft permit and made available for public notice and comment. *See, e.g., Waterkeeper Alliance,* 399 F.3d at 499-502 (holding that CAFO Nutrient Management Plans, which are considered by EPA to be effluent limitations, must be submitted to EPA for review).

In the current draft GPs, DNR has created an impermissible self-regulatory scheme comparable to the type that has been explicitly rejected by several federal courts under the CWA. As the Ninth Circuit has explained in the context of a challenge to EPA's General NPDES Permit for Municipal Separate Storm Sewer Systems ("Small MS4 Permit"),

> [I]n order to receive the protection of a general permit, the operator of a small MS4 needs to do nothing more than decide for itself what reduction in discharges would be the maximum practical reduction. No one will review that operator's decision to make sure that it was reasonable, or even good faith. Therefore, as the Phase II Rule stands, EPA would allow permits to issue that would do less than *require* controls to reduce the discharge of pollutants to the maximum extent practicable. *See* 64 Fed. Reg. at 68753 (explaining that the minimum control measures will protect water quality if they are "properly implemented"). We therefore must reject this aspect of the Phase II Rule as contrary to the clear intent of Congress. *Cf. Natural Res. Def. Council,* 966 F.2d at 1305 (rejecting as arbitrary and capricious a permitting system that allowed regulated industrial stormwater dischargers to "self-report" whether they needed permit coverage).

*Envtl. Def. Ctr. v. Envtl. Prot. Agency,* 344 F.3d 832, 855-56 (9th Cir. 2003).

The GPs are only capable of fulfilling section 301(b)(1)(C) of the CWA if they require compliance with all "appropriate controls and implementation procedures" developed by DNR or the permittee. It is not sufficient to merely "design" a SWPPP and other stormwater controls to comply with WQS – the CWA requires WQS to actually be achieved and maintained in practice. The Draft Permit fails to explicitly require compliance with the SWPPP as an enforceable component of the permit. DNR states its intent to ensure compliance with water quality standards "by adherence to general

narrative-type stormwater discharge limitations and implementation of a storm water pollution prevention plan." Draft Permit at 2.5.1. (emphasis added). Additionally, the Fact Sheet for the Tier I GP at page 2 states that permittees must "[i]mplement a Storm Water Pollution Prevention Plan," and DNR regulations explicitly require industrial stormwater dischargers to "prepare and implement" a SWPPP. Wis. Admin. Code § NR 216.27(1). However, the GPs themselves are not clear on this point and should be revised to require compliance at all times with the DNR-approved SWPPP.

Several provisions get close to this but are vague and ambiguous. For example, see the following:

> Part 5.1.1 of the Tier I GP, which requires an "existing facility that previously operated without required permit coverage" to "immediately develop . . . and implement" a SWPPP;

> Part 5.1.6 of the Tier I GP, which states that "the SWPPP shall be implemented in accordance with the implementation schedule" developed under the GP.

MEDC requests that DNR clarify that a DNR-approved SWPPP must be complied with at all times if it is considered to be necessary to ensure compliance with WQS. In addition, DNR should revise the draft GPs to ensure that any condition or limitation necessary to compliance with applicable WQS is clearly identified as such in the GPs, and is subject to review and approval by DNR and available for review and comment by the public.

**COMMENT 12: DNR should determine whether numeric water quality-based effluent limitations are feasible for discharges of industrial stormwater and, if so, include such WQBELs in the GPs.**

*Comment 12 Discussion:*

As stated in the Hanlon Memo, "EPA recommends that NPDES permitting authorities use numeric effluent limitations where feasible as these types of effluent limitations create objective and accountable means for controlling stormwater discharges." DNR apparently did not consider whether numeric WQBELs are feasible. Given the pollutants known to be discharged by facilities to be covered under the GPs, and the impact of those pollutants on receiving waters, DNR should determine whether numeric WQBELs are appropriate.

**COMMENT 13: DNR should include numeric benchmarks for pollutants commonly discharged in stormwater from industrial facilities; without them, the GPs are incapable of ensuring compliance with WQS.**

16

*Comment 13 Discussion:*

As EPA and a number of states with their own NPDES programs have realized, without clear numeric objectives and adequate monitoring and reporting requirements, industrial stormwater permits cannot reasonably be expected to ensure compliance with WQS. These permitting entities use numeric benchmarks as a reference point, and exceedence of such benchmarks leads to additional actions of increasing stringency in order to maintain compliance with WQS (i.e., an adaptive management program). DNR should follow suit, and include numeric benchmarks in the GPs.

EPA's 2008 MSGP gives an example of how benchmarks can be used appropriately to track water quality and WQS compliance over time. The MSGP includes a number of sector-specific benchmarks for a number of pollutants commonly discharged by those industry sectors; depending on the industry, those benchmarked pollutants may include arsenic; zinc; TSS; COD; pH; oil & grease; and others. See 2008 MSGP, Section 8.

Without benchmarks, the GPs are largely meaningless and unenforceable. While a benchmark exceedence under the 2008 MSGP and other similar state NPDES permits results in clear and mandatory follow-up actions (such as the amendment of the SWPPP and the deployment of additional and more effective BMPs), the Tier I GP only requires amendment of the SWPPP whenever "[t]he comprehensive annual facility site compliance inspection, quarterly visual inspection of storm water quality, or other information reveals that the provisions of the SWPPP are ineffective in controlling storm water pollutants discharged to waters of the state." *See* Tier I GP at section 3.4.2. Similarly, the Tier I GP requires an SWPPP to include "appropriate storm water treatment practices as needed to reduce the pollutants in contaminated storm water prior to discharge" whenever source area control BMPs "are not practicable or are inadequate to control storm water pollution[.]" *See* Tier I GP at section 3.3.2.9.

MEDC believes that without numeric benchmarks, these and similar provisions in the GPs are rendered practically unenforceable and incapable of ensuring compliance with WQS. There is no indication as to what level of pollution reduction achieved by the practices included in the SWPPP may be "ineffective" or "inadequate." This problem is exactly why other NPDES permitting entities, including the EPA, used numeric benchmarks – they are the only way to determine if the SWPPP is achieving the goals of the permit and the Clean Water Act.

**COMMENT 14:  Monitoring and reporting requirements are insufficient; DNR should require quarterly water quality sampling and reporting of laboratory results for the duration of the permit term.**

*Comment 14 Discussion:*

The monitoring and reporting requirements in the Draft GP is insufficient and will neither yield water quality data representative of the typical discharges regulated by the permit nor assure compliance with the requirements of the permit and the CWA.

DNR must proscribe conditions for WPDES permits that are sufficient to assure compliance with applicable effluent limitations and water quality standards. Wis. Stat. § 283.31(4). Monitoring requirements must be capable of determining compliance with permit requirements; assessing treatment or pollutant reduction efficiency; and characterizing effluents or the receiving waters. *See, e.g., Permit Writer's Manual* at 8-2. As one U.S. Court of Appeals has explained, "[t]he effectiveness of the permitting process is heavily dependent on permit holder compliance with the CWA's monitoring and reporting requirements. *See* 33 U.S.C. § 1318." *Piney Run Pres. Ass'n v. County Comm'rs*, 268 F.3d 255, 266 (4th Cir. 2001).

Factors that DNR should consider when establishing monitoring frequency are identified in the *Permit Writer's Manual* at pages 8-6 to 8-6. When assessed in the specific context of DNR's selected approach to control industrial stormwater, these factors suggest that additional monitoring is warranted in the GP. For example, the structural or operational BMPs to be used by permitted dischargers under the GPs are inherently unpredictable in their selection, application, and efficacy. Research performed by Oregon's Department of Environmental Quality shows that the ability of various industrial stormwater BMPs to effectively control concentrations of metals and other toxic pollutants varies widely.[6]

For existing dischargers that have already conducted two rounds of annual chemical sampling, the Draft Tier I GP only requires additional sampling where (a) there is a "reasonable potential that a storm water discharge from the facility will exceed a water quality standard" based on prior sampling; (b) DNR determines that "a storm water discharge from the facility may be a significant contributor of a pollutant to a water of the state;" (c) additional sampling "is needed to determine the effectiveness of the permittee's SWPPP;" or (d) DNR determines that "the sampling is needed to assess compliance with the permit." See Draft Tier I GP at section 4.3.3.2. Thus, for some dischargers, only two samples are required over a 5-year permit cycle.

Every other industrial stormwater NPDES permit we are aware of requires a minimum of 4, but more commonly 20 (and, in one case, 60) samples over the 5 year permit term. DNR should increase the sampling requirements to at least quarterly (20 times per 5-year permit cycle) and should also coordinate the sampling with the applicable benchmark levels set on an industry-specific basis.

---

[6] *See* Oregon Department of Environmental Quality, BMP Capabilities in Reducing Stormwater Concentrations Relative to Benchmarks and Water Quality Criteria (November 16, 2010); available at http://www.deq.state.or.us/wq/stormwater/docs/Advisory/isac12tableBMPcapabilities.pdf.

## V.    Additional Comments or Requests for Clarification

**COMMENT 15: The GP should not authorize the discharge of commingled stormwater and process wastewater.**

*Comment 15 Discussion:*

Process wastewater discharged from industrial facilities through stormwater outfalls is likely to include a number of pollutants untreated by stormwater BMPs and unaffected by the implementation of a SWPPP. The draft GPs are therefore not capable of ensuring compliance with WQS for those discharges. EPA's 2008 MSGP at Section 1.1.4.1 and 2.1.2.10 prohibits the discharge of process wastewater, and DNR should do the same in its GPs.

**COMMENT 16:  Part 3.3.2.8.5 of the Tier I GP requires monitoring for five listed pollutants only if they "might be present in significant concentrations."  DNR should define what "significant" means in this context.**

## VI.    Conclusion

While MEDC appreciates the effort made by DNR to prepare the Draft GPs, we would like to see a number of significant changes made so that the GPs comply with Clean Water Act requirements and ensure that water quality in Wisconsin is protected. We look forward to your response, and to working with DNR staff on the development of meaningful and enforceable permit conditions that address the water quality threats posed by industrial stormwater.

Sincerely,

James N. Saul, Esq.

On behalf of Midwest Environmental Defense
Center, Clean Water Action Council of
Northeastern Wisconsin, and Wisconsin Resources
Protection Council

cc:    Rebecca Katers, Clean Water Action Council
Al Geddicks, Wisconsin Resources Protection Council
Kevin Pierard, Chief, NPDES Programs Branch, EPA Region 5
Brian Bell, Regional Stormwater Coordinator, EPA Region 5

EXHIBIT B

# State of Wisconsin
# Department of Natural Resources

## Responses to Public Comments on Wisconsin Pollutant Discharge Elimination System (WPDES) General Industrial Storm Water Discharge Permits
## May 2011

**Tier 1 General Permit to Discharge Storm Water Associated with Industrial Activity, Permit No. WI-S067849-3 ("Tier 1 general permit")**

**Tier 2 General Permit to Discharge Storm Water Associated with Industrial Activity, Permit No. WI-S067857-3 ("Tier 2 general permit")**

**Recycling of Scrap and Waste Materials, Permit No. WI-S058831-2 ("scrap recycling general permit")**

**Dismantling of Vehicles for Parts Selling and Salvage, Permit No. WI-S059145-2 ("vehicle dismantling general permit")**

On November 12, 2010, the Wisconsin Department of Natural Resources (Department) public noticed the four proposed WPDES general industrial storm water discharge permits listed above. In addition, the Department held three public hearings on the general permits: December 14, 2010, in Madison; December 15, 2010, in Wausau; and December 16, 2010, in Milwaukee. The public comment period closed on January 7, 2011.

In addition to oral comments made at the public hearings, the Department received several written comments on the proposed general permits. The Department received written comments from the Automotive Recyclers Cooperative Compliance Program of Wis., Inc.; Concerned Automotive Recyclers of Wisconsin; Cooperative Compliance Program, Inc.; Clean Water Action Council of Northeastern Wisconsin; Midwest Environmental Advocates; Midwest Environmental Defense Center; Milwaukee Riverkeeper; United States Environmental Protection Agency; Wisconsin Institute of Scrap Recycling Industries; Wisconsin Paper Council; Wisconsin Resources Protection Council; and Wisconsin Transportation Builders Association. Since oral comments made at the hearings were on behalf of several of these same organizations and were identical to their written comments, only the written comments are addressed in this response. In this document, the Department may have paraphrased or edited comments to capture the main point or to clarify a comment. A few minor corrections are not included in this summary document. The acronyms below used in this document have the meaning indicated:

| | |
|---|---|
| ARCCP | Automotive Recyclers Cooperative Compliance Program of Wis., Inc. |
| CARS | Concerned Automotive Recyclers of Wisconsin |
| CCP | Cooperative Compliance Program, Inc. |
| CWAC | Clean Water Action Council of Northeastern Wisconsin |
| MEA | Midwest Environmental Advocates |
| MEDC | Midwest Environmental Defense Center |
| MR | Milwaukee Riverkeeper |
| USEPA | United States Environmental Protection Agency |
| WISRI | Wisconsin Institute of Scrap Recycling Industries |
| WPC | Wisconsin Paper Council |
| WRPC | Wisconsin Resources Protection Council |
| WTBA | Wisconsin Transportation Builders Association |

Wisconsin DNR - Response to Public Comments
WPDES Permit Nos. WI-S067849-3, WI-S067857-3, WI-S058831-2, and WI-S059145-2
May 2011

**Changes Initiated by the Department of Natural Resources**
Due to an oversight by the Department, the following changes have been made to the scrap recycling general permit and vehicle dismantling general permit (these provisions are the same as those contained in the Tier 1 and Tier 2 general permits):

- **In Part A, added as (3):**

(3) <u>Initial Permit Coverage</u>: The owner or operator of a industrial facility meeting the permit applicability criteria of Part A.(1) of this permit shall submit a Notice of Intent (NOI) to the Department to apply for coverage under an industrial storm water discharge permit in accordance with s. NR 216.22, Wis. Adm. Code. The Department will evaluate the information submitted in the NOI to determine whether a facility will be covered under this permit or an individual permit, or whether coverage under a permit will be denied. If coverage under this permit is appropriate, the Department will transmit a cover letter to the owner or operator indicating the date upon which permit coverage becomes effective at the facility with instructions on where to download the permit from the Department's Internet website. In the alternative, a hard copy of the permit will be mailed to the owner or operator of the facility upon request.

Note: The Notice of Intent form and general permit are available for download from the Department's Internet website at: http://dnr.wi.gov/runoff/stormwater/industrialforms.htm
If, for any reason, you are unable to access the permit over the Internet, please telephone the Department at (608) 267-7694 for assistance.

- **In Part A, changed numbering of section titled "Continuation of Existing Permit Coverage" from (3) to (4).**

- **In Part A, added as (5):**

(5) <u>No Exposure Certification</u>: The owner or operator of a facility not currently covered under this permit that has submitted a Conditional No Exposure Certification to the Department in accordance with s. NR 216.21 (3), Wis. Adm. Code, but that has been denied a No Exposure Exclusion by the Department shall apply for permit coverage in accordance with Part A.(3) of this permit within 14-working days of being notified by the Department of the denial. The owner or operator of a facility that has previously been granted a No Exposure Exclusion by the Department but that has had that exclusion revoked shall apply for permit coverage in accordance with Part A.(3) of this permit within 14-working days of being notified by the Department of the revocation.

- **Renumbered each remaining section in Part A accordingly.**

- **Part B.(2) did not specify a timeframe for amending a storm water pollution prevention plan.  See response to WPC Comment 2.**

**Response to Comments by USEPA**
The USEPA has stated that it will not object to the general permits as drafted.  However, the USEPA made several recommendations for revisions.

<u>USEPA Comment 1</u>:  Section 2.4.7 of the Tier 1 general permit and Section 2.5.7 of the Tier 2 general permit do not allow the permittee to request coverage under an individual permit.  USEPA recommends that the permits include a provision that allow permittees to request coverage under an individual permit.
<u>Response</u>:  The Department does not believe that it is necessary to include such a provision in the general permits since s. 283.35(2), Wis. Stats., already allows the owner or operator of a point source to withdraw from coverage under a general permit and request coverage under an individual permit.

Wisconsin DNR - Response to Public Comments
WPDES Permit Nos. WI-S067849-3, WI-S067857-3, WI-S058831-2, and WI-S059145-2
May 2011

USEPA Comment 2: According to the fact sheets for the permits, if a new facility requests permit coverage to discharge a pollutant of concern to a receiving water impaired by that pollutant, the Department will evaluate the new pollutant discharge and the receiving water to determine if the requirements of 40 CFR 122.4 are met. USEPA recommends that Section 2.7.3 of the Tier 1 general permit, Section 2.8.3 of the Tier 2 general permit, and Part A.(7)(c) of the scrap recycling and vehicle dismantling general permits include language summarizing the notification and evaluation process.
Response: The Department believes that the general permits address impaired waters and Total Maximum Daily Loads to the extent that they can until further direction is established through administrative code development and program guidance. Also, the impaired waters and Total Maximum Daily Loads language in these general permits is consistent with other storm water general permits previously issued by the Department (Municipal Separate Storm Sewer System, Permit No. WI-S050075-1, Construction Site Storm Water Runoff, Permit No. WI-S067831-3).

USEPA Comment 3: According to the fact sheets for the permits, if an existing facility proposes an increased discharge of a pollutant of concern to a receiving water impaired by that pollutant, an evaluation of the proposal would start via facility notification to the Department. The Department and the facility will evaluate the increased pollutant discharge and the receiving water to determine if the discharge would cause or contribute to a violation of a water quality standard. USEPA recommends that Section 2.7.4 of the Tier 1 general permit, Section 2.8.4 of the Tier 2 general permit, and Part A.(7)(e) of the scrap recycling and vehicle dismantling general permits include language summarizing the notification and evaluation process.
Response: The Department believes that the general permits address impaired waters and Total Maximum Daily Loads to the extent that they can until further direction is established through administrative code development and program guidance. Also, the impaired waters and Total Maximum Daily Loads language in these general permits is consistent with other storm water general permits previously issued by the Department (Municipal Separate Storm Sewer System, Permit No. WI-S050075-1, Construction Site Storm Water Runoff, Permit No. WI-S067831-3).

USEPA Comment 4: Section 4.3 of the Tier 1 and Tier 2 general permits only require annual facility site compliance inspections but no routine facility inspections (e.g., on a quarterly basis or more frequently, as needed). Annual site inspections may not be frequent enough to address changing conditions of best management practices and the resulting discharge at the facility. USEPA recommends that a provision requiring routine facility inspections similar to part 4.1 of the USEPA's Multi-Sector General Permit be included in these permits.
Response: The annual site inspection requirements in the general permits are consistent with the requirements of s. NR 216.28(2), Wis. Adm. Code. Additionally, Section 4.3.2 of the Tier 1 and Tier 2 general permits requires quarterly visual monitoring, and Section 3.4.2 of the Tier 1 and Tier 2 general permits requires amendment of the storm water pollution prevention plan if the annual site inspection, a quarterly visual inspection, or other information reveals that the storm water pollution prevention plan is ineffective.

USEPA Comment 5: For both Tier 1 and Tier 2 facilities, the USEPA recommends that all facilities conduct USEPA benchmark monitoring to determine the effectiveness of the storm water pollution prevention plan. For scrap recycling and vehicle dismantling facilities that do not participate in a Cooperative Compliance Program, USEPA recommends that all facilities conduct USEPA benchmark monitoring for the parameters listed to determine the effectiveness of the storm water pollution prevention plan.
Response: The annual chemical storm water sampling requirements in the general permits are consistent with the requirements of s. NR 216.28(4), Wis. Adm. Code. However, the proposed Tier 1 general permit does include reference to USEPA's benchmark monitoring in Section 3.3.2.10.3. The list of chemical

parameters to sample for in Part D.(2)(c)1. of the scrap recycling and vehicle dismantling general permits has been amended to include aluminum, iron, and oil and grease.  Naphthalene has been eliminated.

USEPA Comment 6:  Section 5.1.3 of the Tier 1 and Tier 2 general permits and Part D.(3)(a)2. of the scrap recycling and vehicle dismantling general permits do not allow non-Confidential Business Information portions of the storm water pollution prevention plan to be made available to the public upon request.  The USEPA recommends that non-Confidential Business Information portions of the storm water pollution prevention plan be available to the public upon request similar to Part 5.3 of the USEPA's Multi-Sector General Permit.
Response:  The Department believes that the proposed general permits are consistent with Part 5.3 of the USEPA's Multi-Sector General Permit.  Under Section 6.12 of the Tier 1 and Tier 2 general permits, Part F.(10) of the scrap recycling and vehicle dismantling general permits, and s. NR 216.29(7), Wis. Adm. Code, the storm water pollution prevention plan (as well as other records required by the general permits) must be made available to the Department by the permittee upon request.  Furthermore, records submitted to the Department are subject to the public records laws of Chapter 19, Wis. Stats.

USEPA Comment 7:   Section 6.4 of the Tier 1 and Tier 2 general permits and Part F.(5) of the scrap recycling and vehicle dismantling general permits ("Duty to halt or reduce activity") do not appear to be consistent with 40 CFR 122.41(c) ("Duty to comply").
Response:  It appears that this comment cites the incorrect sections of the proposed general permits as a demonstration of the inconsistency.  The Department believes that Section 6.2 of the Tier 1 and Tier 2 general permits and Part F.(3) of the scrap recycling and vehicle dismantling general permits are consistent with 40 CFR 122.41(c).

USEPA Comment 8:  The USEPA recommends that a Corrective Action provision similar to Part 3 of the USEPA's Multi-Sector General Permit be included in the general permits to address what events trigger a revision to the storm water pollution prevention plan, including deadlines for storm water pollution prevention plan revisions or plans for activities requiring extended deadlines and documentation needed.
Response:  The Department believes that a combination of provisions in state statute, administrative code, and the general permits give the Department sufficient authority to require corrective action (e.g., s. 283.89, Wis. Stats.; s. NR 216.004, Wis. Adm. Code; s. NR 216.27(4), Wis. Adm. Code; Section 3.4 of the Tier 1 and Tier 2 general permits, and Part B.(2) of the scrap recycling and vehicle dismantling general permits; Section 5.1 of the Tier 1 and Tier 2 general permits, and Part D.(3) of the scrap recycling and vehicle dismantling general permits; Section 6, *Standard Requirements*, of the Tier 1 and Tier 2 general permits, and Part F., *Standard Conditions*, of the scrap recycling and vehicle dismantling general permits).

## Response to Public Comments

### Comments by ARCCP, CARS, CCP, and WISRI
ARCCP, CARS, CCP, WISRI Comment 1:  The mapping of all critical source areas as stated in Part B.(1)(c)10. of the scrap recycling and vehicle dismantling general permits is unnecessary since some no longer pose a threat to storm water.
Response:  While identification of critical source areas will remain in the permits under Part B.(1)(g), Part B(1)(c)10. has been changed as follows:

> 10.   Location of activities and materials that have the potential to contaminate storm water.

ARCCP, CARS, CCP, WISRI Comment 2:  Change Part E.(2)(b)1. of the scrap recycling and vehicle dismantling general permits so that the annual compliance reports are sent just to the storm water coordinator in the Department's Central Office for distribution rather than to the Central Office and each of the Department's regional offices.

Wisconsin DNR - Response to Public Comments
WPDES Permit Nos. WI-S067849-3, WI-S067857-3, WI-S058831-2, and WI-S059145-2
May 2011

Response: Part E.(2)(b)1. has been changed as follow:

1. An annual compliance report covering all members shall be submitted to the Department within 2 months after the end of a CCP's compliance-reporting year. If submitted in paper format, six (6) copies of the annual compliance report shall be sent to: Department of Natural Resources, Storm Water Program – WT/3, Box 7921, Madison, WI 53707-7921. If submitted electronically, one (1) CD containing the annual compliance report shall be sent to the same addressed above or the annual compliance report shall be e-mailed or transmitted by some other acceptable electronic means to the storm water program coordinator. The compliance-reporting year for a CCP, under this permit shall be [November 1 - October 31 for scrap recycling; September 1 – August 31 for vehicle dismantling] unless otherwise approved by the Department.

   Note: The Department would prefer electronic submittal of the annual compliance report in PDF format. To obtain the e-mail address of the storm water permit coordinator, please telephone the Department at (608) 267-7694 or visit the Department's website at: http://dnr.wi.gov/runoff/stormwater/contact.htm

## Comments by ARCCP and CARS

ARCCP, CARS Comment 1: Remove sodium azide airbags as a storm water pollution source from Item 9 in Table A of the vehicle dismantling general permit. There is an inadequate market for used airbags, and deploying them to neutralize the sodium azide poses a safety hazard to employees. As a result, several facilities are accumulating an excessive number of airbags. There needs to be a nationwide, industry-wide solution for airbags.

Response: Sodium azide is an inorganic compound used for the detonation of airbags in automobiles. Discarded undeployed airbags containing sodium azide are considered to be hazardous waste due to reactivity. Sodium azide is highly toxic if inhaled, ingested or absorbed by the skin and it is also highly reactive with water and acids. It is soluble in water and harmful to humans and aquatic life. Therefore, the Department believes that it is essential that sodium azide airbags be properly managed at the vehicle dismantling facility to prevent the release of this compound into the environment. Information on management of sodium azide airbags is available at the Environmental Compliance for Automotive Recyclers (ECAR) website at: http://www.ecarcenter.org. To balance the industry's concerns and allow for some flexibility if other management options develop, the vehicle dismantling general permit has been changed as follows:

- **Removed sodium azide airbags from Table A, Item 9.**

- **In table A, added Item 18 as follows:**

   18. Sodium azide airbags. Deployed air bags may be left in the vehicle or disposed of in a licensed solid waste landfill. Undeployed air bags shall be removed from the vehicle for resale, recycling, disposal in accordance with applicable hazardous waste regulations, or other management methods approved by the Department in writing.

- **The following has been added to the notes for Table A:**

   (4) Information on management of airbags is available at the Environmental Compliance for Automotive Recyclers (ECAR) website at: http://www.ecarcenter.org/resources.html. In addition, the Department of Natural Resources' guidance on airbag management (PUB-WA 1530) is available at: http://dnr.wi.gov/org/aw/wm/publications/anewpub/WA1530.pdf

Wisconsin DNR - Response to Public Comments
WPDES Permit Nos. WI-S067849-3, WI-S067857-3, WI-S058831-2, and WI-S059145-2
May 2011

## Comments by MEA and MR

**MEA, MR Comment 1:** Scrap and waste recycling and auto dismantling facilities that are discharging pollutants into our waters have the potential to cause or contribute to violations of water quality standards. The DNR should conduct a reasonable potential analysis and establish numeric effluent limits for these industrial storm water dischargers. The narrative limitations and cursory visual inspections listed in the general permits do not seem enough to adequately protect our waters from industrial pollutants or to assure that discharges are not causing violations of water quality standards. With virtually no chemical monitoring required, it is unclear how DNR staff would be able to determine if Best Management Practices and Best Conventional Technologies at these industrial facilities are even working.
**Response:** The proposed industrial storm water permits are general permits, and as such, contain language to address discharges to various types of receiving waters to the extent that can be expected of a general permit. If the DNR finds that the permittee's discharge is not meeting an applicable water quality standard, then the DNR may require amendments to the permittee's storm water pollution prevention plan or require the permittee to apply for coverage under an individual permit. Not all of the effluent limitations or standards of performance contained in Chapter 283, Wis. Stats., necessarily apply to storm water discharges, as indicated in s. 283.11(2)(a), Wis. Stats. Storm water permits are not required to contain numeric limitations but rather narrative and performance based standards are applied. The USEPA does not object to a narrative-type or BMP-based effluent limitation approach to storm water regulation, and the USEPA does not object to the general permits as drafted.

**MEA, MR Comment 2:** The monitoring requirements in the scrap recycling and vehicle dismantling general permits seem inadequate and need to be improved in order to better address the enormous threat of industrial storm water. Only individual permittees that are not part of a Cooperative Compliance Program have to do annual chemical monitoring. These industrial dischargers, whether they are in a Cooperative Compliance Program or not, should have to submit to the same monitoring regime. Chemical monitoring should occur at least quarterly for the initial year with semi-annual or annual monitoring thereafter.
**Response:** Under the respective general permits, scrap recycling and vehicle dismantling facilities that elect not to participate in a Cooperative Compliance Program are required to perform annual chemical storm water sampling. The Department may also terminate a scrap recycling or vehicle dismantling permittee's participation in a Cooperative Compliance Program if the permittee is not in substantial compliance with the permit. In that case, the facility is then required to perform the annual chemical storm water sampling. Annual chemical storm water sampling in the general permits is consistent with the requirements of s. NR 216.28(4), Wis. Adm. Code.

**MEA, MR Comment 3:** Permittees covered under the scrap recycling and vehicle dismantling general permits should be required to submit their storm water pollution prevention plans and their periodic inspection and monitoring results to a Department website which would make it easier for Department staff to monitor compliance and for the public to watchdog these facilities.
**Response:** The Department is currently investigating web-based submittal and tracking of information for a variety of programs throughout the Department. The ability to develop and implement these web-based approaches to managing information is dependent upon adequate funding and appropriate technical capabilities. These are Department-wide issues that cannot be resolved via the reissuance of the general industrial storm water discharge permits.

**MEA, MR Comment 4:** The proposed scrap recycling and vehicle dismantling general permits do not require routine submission of information to the Department, meaning that none of it will routinely be available for public review. Other than requiring submittal of summaries of storm water pollution prevention plans to the Department and the reporting of "permit noncompliance that may endanger public health or the environment", little if any reporting to the Department by permittees or their Cooperative Compliance Program consultants is required under the proposed permits. All of this information should be required to be submitted to the Department.

**Response:** The submittal requirements for facilities covered under the general permits are consistent with the requirements of s. NR 216.29, Wis. Adm. Code. Scrap recycling and vehicle dismantling facilities that elect not to participate in a Cooperative Compliance Program are required to conduct and submit Annual Facility Compliance Inspection reports to the Department. On behalf of scrap recycling and vehicle dismantling facilities that elect to participate in a Cooperative Compliance Program, the Cooperative Compliance Program consultant is required to conduct annual compliance audits and submit annual compliance reports to the Department.

## Comments by MEDC, CWAC, and WRPC

**MEDC, CWAC, WRPC First General Comment:** The Department should shelve the draft general permits, convene interested stakeholders, and actively solicit input from the USEPA prior to reissuing the industrial storm water general permits.

**Response:** USEPA and stakeholders were provided ample opportunity for input on the proposed permits per the permit promulgation process of Chapter NR 203, Wis. Adm. Code. USEPA was notified of the proposed permits on October 22, 2010, and the Department received comments from the USEPA on February 14, 2011 (see USEPA comments above). The Department public noticed the proposed permits on November 12, 2010, and provided a period of public comment until January 7, 2011. The proposed permits were posted on the Department's website during that time, and the public notice appeared in 17 published newspapers throughout the state. The Department held 3 public hearings on the proposed permits in December 2010: December 14 in Madison; December 15 in Wausau; and December 16 in Milwaukee.

**MEDC, CWAC, WRPC Comment 1:** The Department should clarify whether the draft general permits are considered true NPDES permits (i.e., issued under section 402 of the CWA, 33 U.S.C. § 1342, and Wis. Stat. § 283.31) or are considered non-NPDES "storm water discharge permits" (i.e., issued under Wis. Stat. § 283.33).

**Response:** This is not an issue to address in the reissued general permits.

**MEDC, CWAC, WRPC Comment 2:** If the Department intends to issue the general permits solely under authority of Wis. Stat. 283.33, it should modify the permits to include the following language: "This General Permit is issued under Wisconsin law that is not fully consistent with the Clean Water Act, 33 U.S.C. § 1342, or Wisconsin's USEPA-approved NPDES permitting program, and therefore facilities discharging pursuant to this Permit may not enjoy the permit shield provided by 33 U.S.C. § 1342(k)."

**Response:** The Department does not concur with this assertion and therefore, does not believe that it is appropriate to insert this language into the reissued general industrial storm water discharge permits.

**MEDC, CWAC, WRPC Comment 3:** The general permits should be amended to include all appropriate technology-based effluent limitations or, in the alternative, to clearly indicate which provisions in the current drafts are considered by the Department to be technology-based effluent limitations (whether numeric or non-numeric).

**Response:** The general permits are consistent with the requirements of Subchapter II of 216, Wis. Adm. Code.

**MEDC, CWAC, WRPC Comment 4:** The general permits should either be amended to include all federally promulgated effluent limitation guidelines that apply to specific categories and classes of industrial stormwater discharges (see 2008 USEPA's Multi-Sector General Permit at Section 2.1.3, Table 2-1) or, in the alternative, to clarify that dischargers subject to industrial stormwater effluent limitation guidelines are not eligible for coverage under the general permits and must instead obtain individual permits.

**Response:** The general permits are consistent with the requirements of Subchapter II of 216, Wis. Adm. Code. The USEPA has stated that it will not object to the general permits as drafted.

Wisconsin DNR - Response to Public Comments
WPDES Permit Nos. WI-S067849-3, WI-S067857-3, WI-S058831-2, and WI-S059145-2
May 2011

MEDC, CWAC, WRPC Comment 5:  The general permits should be amended to include the non-numeric technology-based effluent limitations found at Section 2.1.2 of the USEPA's 2008 Multi-Sector General Permit (which have been determined by the USEPA to represent best available technology/best conventional pollutant control technology for discharges of stormwater associated with industrial activity), or to include similar provisions capable of achieving the same or better pollution reductions.
Response:  The general permits are consistent with the requirements of Subchapter II of 216, Wis. Adm. Code.  The USEPA has stated that it will not object to the general permits as drafted.

MEDC, CWAC, WRPC Comment 6:  The general permits should be amended to include all of the other sector specific technology-based effluent limitations found in Section 8 of the USEPA's 2008 Multi-Sector General Permit (which have been determined by the USEPA to represent additional best available technology/best conventional pollutant control technology requirements for those specific industry sectors), or to include similar provisions capable of achieving the same or better pollution reductions.
Response:  The general permits are consistent with the requirements of Subchapter II of 216, Wis. Adm. Code.  The USEPA has stated that it will not object to the general permits as drafted.

MEDC, CWAC, WRPC Comment 7:  The Department must document in the permit record the basis for its conclusion that the provisions identified as technology-based effluent limitations reflect best available technology/best conventional pollutant control technology and therefore comply with 33 U.S.C. § 1311(b)(2) and Wis. Stat. §§ 283.13(2) and 283.31(3).
Response:  The general permits are consistent with the requirements of Subchapter II of 216, Wis. Adm. Code.  The USEPA has stated that it will not object to the general permits as drafted.

MEDC, CWAC, WRPC Comment 8:  The Department should clarify whether it intends the preparation and implementation of the storm water pollution prevention plan to be a technology-based effluent limitation, or whether the final technology-based effluent limitations apply independently of the storm water pollution prevention plan requirements.
Response:  The general permits are consistent with the requirements of Subchapter II of 216, Wis. Adm. Code.

MEDC, CWAC, WRPC Second General Comment:  The draft general permits do not include additional requirements and limitations needed to ensure compliance with water quality standards, and therefore, do not comply with 33 U.S.C. § 1311(b)(1)(C) and Wis. Stat. § 283.31(3)(d)1.
Response:  Each general permit includes a provision stating that the permit does not authorize discharges that will cause or have a reasonable potential to cause or contribute to an excursion above any applicable water quality standard (Section 2.5.2 of the Tier 1 general permit, Section 2.6.2 of the Tier 2 general permit, and Part A.(5)(b) of the scrap recycling and vehicle dismantling general permits).  Each general permit also contains provisions prohibiting a violation of a water quality standard, a significant lowering of a water quality standard, or a requirement to amend the storm water pollution prevention plan if best management practices are inadequate to achieve a water quality standard (e.g., Sections 2.6.4, 2.6.5.2, 2.8.2, 2.8.3, and 3.3.2.9 of the Tier 1 general permit; Sections 2.7.4, 2.7.5.2, 2.9.2, 2.9.3, and 3.3.2.9 of the Tier 2 general permit; Parts A.(6)(d), A.(6)(e)2., A.(8)(b), A.(8)(c), and F.(24) of the scrap recycling and vehicle dismantling general permits).  In addition, reference to Chapter NR 207, Wis. Adm. Code, *Water Quality Antidegradation*, has been added to each of the general permits in the appropriate section on water quality standards (Section 2.5.1 of the Tier 1 general permit, Section 2.6.1 of the Tier 2 general permit, and Part A.(7)(a) of the of the scrap recycling and vehicle dismantling general permits).  Also, the following language has been added as Section 3.5 of the Tier 1 and Tier 2 general permits and as Part B.(1)(k) of the scrap recycling and vehicle dismantling general permits:

**3.5  Storm Water Discharges to Outstanding and Exceptional Resource Waters**  If the permittee's industrial storm water will discharge to an outstanding resource water or exceptional resource water, the permittee shall include a written section in the SWPPP that discusses and

identifies the management practices and control measures the permittee will implement to prevent the discharge of any pollutant(s) in excess of the background level within the water body. This section of the permittee's plan shall specifically identify control measures and practices that will collectively be used to prevent the discharge of pollutants in excess of the background level within the water body.

(k)     Storm Water Discharges to Outstanding and Exceptional Resource Waters: If the permittee's industrial storm water will discharge to an outstanding resource water or exceptional resource water, the permittee shall include a written section in the SWPPP that discusses and identifies the management practices and control measures the permittee will implement to prevent the discharge of any pollutant(s) in excess of the background level within the water body. This section of the permittee's plan shall specifically identify control measures and practices that will collectively be used to prevent the discharge of pollutants in excess of the background level within the water body.

MEDC, CWAC, WRPC Comment 9:  The Department must conduct a reasonable potential analysis to determine if the general permits will be capable of ensuring compliance with water quality standards.
Response:  The proposed industrial storm water permits are general permits, and as such, contain language to address discharges to various types of receiving waters to the extent that can be expected of a general permit.  If the DNR finds that the permittee's discharge is not meeting an applicable water quality standard, then the DNR may require amendments to the permittee's storm water pollution prevention plan or require the permittee to apply for coverage under an individual permit.  Not all of the effluent limitations or standards of performance contained in Chapter 283, Wis. Stats., necessarily apply to storm water discharges, as indicated in s. 283.11(2)(a), Wis. Stats.  Storm water permits are not required to contain numeric limitations but rather narrative and performance based standards are applied.  The USEPA does not object to a narrative-type or BMP-based effluent limitation approach to storm water regulation, and the USEPA does not object to the general permits as drafted.

MEDC, CWAC, WRPC Comment 10: The general permits should be amended to expressly prohibit any discharge that causes or contributes to a violation of water quality standards.
Response:  The general permits include a provision that if the DNR finds that the permittee's discharge is not meeting an applicable water quality standard, then the DNR may require amendments to the permittee's storm water pollution prevention plan or require the permittee to apply for coverage under an individual permit.

MEDC, CWAC, WRPC Comment 11: The general permits should be amended to clarify that each facility's storm water pollution prevention plan must be (a) submitted to, and reviewed by, the Department in its entirety; (b) made available to the public for notice and MEDC Comment; and (c) explicitly incorporated by reference into the permit as an enforceable permit requirement.
Response:  The submittal requirements for the storm water pollution prevention plan are consistent with Subchapter II of NR 216, Wis. Adm. Code.

MEDC, CWAC, WRPC Comment 12:  The Department should determine whether numeric water quality-based effluent limitations are feasible for discharges of industrial stormwater and, if so, include such water quality-based effluent limitations in the general permits.
Response:  The general permits are consistent with the requirements of Subchapter II of 216, Wis. Adm. Code.

MEDC, CWAC, WRPC Comment 13:  The Department should include numeric benchmarks for pollutants commonly discharged in stormwater from industrial facilities; without them, the general permits are incapable of ensuring compliance with water quality standards.

Response:  The general permits are consistent with the requirements of Subchapter II of 216, Wis. Adm. Code.

MEDC, CWAC, WRPC Comment 14: Monitoring and reporting requirements are insufficient; the Department should require quarterly water quality sampling and reporting of laboratory results for the duration of the permit term.
Response:  The monitoring and reporting requirements are consistent with Subchapter II of NR 216, Wis. Adm. Code, and the Department has the authority to require additional monitoring or to issue an individual permit if circumstances warrant.

MEDC, CWAC, WRPC Comment 15: The general permit should not authorize the discharge of commingled stormwater and process wastewater.
Response:  The discharge of commingled stormwater with flows of process or non-process wastewater is only authorized if those flows are regulated by other WPDES permits, if required.

MEDC, CWAC, WRPC Comment 16: Part 3.3.2.8.5 of the Tier I general permit requires monitoring for five listed pollutants only if they "might be present in significant concentrations." the Department should define what "significant" means in this context.
Response:  This language is consistent with s. NR 216.27(3)(j)5., Wis. Adm. Code.

**Comments by WPC**
WPC Comment 1:  Section 2.7.3 of the Tier 1 general permit and Section 2.8.3 of the Tier 2 general permit state that within 180 days of the annual check to determine if the permittee discharges a pollutant of concern to an impaired water body, the permittee shall include a written section in the storm water pollution prevention plan to identify control measures for the pollutant.  Read literally, this could require the permittee to add a new section to the plan every year that the water body remains impaired.  WPC recommends that this requirement be changed to apply to the first annual check after the effective date of the revised general permit or to the first annual check after a water body is first listed as impaired. In subsequent years the permittee would simply continue to follow the storm water plan.
Response:  It is important that permittees routinely perform the annual check and amend the plan accordingly if additional pollutants of concern have been added, additional water bodies have been designated as impaired, or other relevant changes to the designation have occurred.  However, it is not the Department's intent that the storm water pollution prevention plan be amended after each annual check if the circumstances remain unchanged.  To clarify, the following note has been added to both Section 2.7.3 of the Tier 1 general permit and Section 2.8.3 of the Tier 2 general permit, and to Part A.(9)(c) [as renumbered in the final permits] of both the scrap recycling and vehicle dismantling general permits:

> Note:  For a permittee that discharges a pollutant of concern via storm water to an impaired water body, amending the storm water pollution prevention plan will be required after the initial annual check and if subsequent annual checks indicate additional pollutants of concern have been added, additional water bodies have been designated as impaired, or other relevant changes to the designation have occurred.

WPC Comment 2:  Section 3.4 of the Tier 1 and Tier 2 general permits states that the permittee shall amend the storm water pollution prevention plan within 30 days of changes at the facility that would significantly increase the exposure of pollutants or when the facility or Department determines that the plan is ineffective.  WPC recommends increasing the amendment deadline from 30 days to 120 days.  The 30 day timeframe may not be enough time to determine why a plan is ineffective and to implement the changes necessary to make the plan effective.
Response:  The intent of Section 3.4 of the Tier 1 and Tier 2 general permits is to compel the permittee to make necessary changes to the storm water pollution prevention plan in the course of other planning activities for facility expansion, production increases, process modifications, etc.  In that regard, the

Wisconsin DNR - Response to Public Comments
WPDES Permit Nos. WI-S067849-3, WI-S067857-3, WI-S058831-2, and WI-S059145-2
May 2011

Department believes it is reasonable to expect changes to the storm water pollution prevention plan within the 30 day timeframe for known and planned activities. Likewise, the Department believes that it is reasonable to expect that the revelation of an ineffective storm water pollution prevention plan during routine permit compliance activities be addressed within 30 days, or if the Department finds the plan to be ineffective. To provide the permittee with flexibility in those situations where more time may be appropriate, Section 3.4 of the Tier 1 and Tier 2 general permits and Part B.(2) of the scrap recycling and vehicle dismantling general permits have been amended as follows:

> **3.4  Amending a SWPPP**  Unless an alternative timeframe is specified by the Department, the permittee shall amend the SWPPP within 30 days of the occurrence of any of the following circumstances:

> (2)  <u>Amending a SWPPP</u>:  Unless an alternative timeframe is specified by the Department, the permittee shall amend the SWPPP within 30 days of the occurrence of any of the following circumstances:

<u>WPC Comment 3</u>:  In Section 4.3.4.2 of the Tier 1 general permit and Section 4.3.3.2 of the Tier 2 general permit regarding a waiver when there were no snow melt of runoff events large enough to conduct a quarterly visual inspection, rather than formally requesting a waiver from the Department, WPC recommends that the permit language be modified to make it clear that a "document and retain records" approach is acceptable and that a formal request and approval process is not necessary in this situation. From a practical standpoint, there is not much the Department can do other than approve the waiver.
<u>Response</u>:  The Department agrees that if there were no snow melt of runoff events large enough to conduct a quarterly visual inspection, then there is no other practical response for the Department other than to grant a waiver. To address this situation, Section 4.3.4.2 of the Tier 1 general permit, Section 4.3.3.2 of the Tier 2 general permit, and Part D.(2)(c)3.b) of the scrap recycling and vehicle dismantling general permits have been amended as follows:

> **4.3.4.2**  The permittee indicates that there were no snow melt or runoff events large enough to conduct a quarterly visual inspection at an outfall. A waiver is automatically granted for a quarter where the permittee sufficiently documents and retains records demonstrating that there were no snow melt or runoff events large enough to conduct a quarterly visual inspection at the facility during that quarter. Documentation and records used to qualify for an automatic waiver shall be submitted to the Department upon request.

> **4.3.3.2**  The permittee indicates that there were no snow melt or runoff events large enough to conduct a quarterly visual inspection at an outfall. A waiver is automatically granted for a quarter where the permittee sufficiently documents and retains records demonstrating that there were no snow melt or runoff events large enough to conduct a quarterly visual inspection at the facility during that quarter. Documentation and records used to qualify for an automatic waiver shall be submitted to the Department upon request.

> b)  The permittee indicates that there were no snow melt or runoff events large enough to conduct a quarterly visual inspection at an outfall. A waiver is automatically granted for a quarter where the permittee sufficiently documents and retains records demonstrating that there were no snow melt or runoff events large enough to conduct a quarterly visual inspection at the facility during that quarter. Documentation and records used to qualify for an automatic waiver shall be submitted to the Department upon request.

Wisconsin DNR - Response to Public Comments
WPDES Permit Nos. WI-S067849-3, WI-S067857-3, WI-S058831-2, and WI-S059145-2
May 2011

**Comments by WTBA**

WTBA Comment 1:  Many transportation projects involve the use of mobile asphalt and/or concrete plants that are temporarily located at a project site for less than a year, and mobile plants are likely to be at more than one project site during the course of a year.  For mobile plants, Sections 2.8.2 and 2.8.5 of the Tier 2 general permit should allow for more flexibility regarding documentation of the annual checks for impaired water status and TMDL status.  WTBA recommends the following language in Sections 2.8.2 and 2.8.5: "Results of the annual check shall be documented within the Annual Facility Site Compliance Inspection required under Section 4.3.1 of this permit or by an alternative method.  Similarly, Sections 2.8.3 and 2.8.6 of the Tier 2 general permit requiring amendment to the storm water pollution prevention plan do not fit in the context of mobile plants.

Response:  The language suggested would also offer permanent facilities an alternative method of documenting the results of the annual check other than the Annual Facility Site Compliance Inspection.  For permanent facilities, the Department does not believe that an alternative method is appropriate for routinely documenting the annual check results.  The Department agrees that mobile facilities present unique situations since the permit is aligned mainly, but not solely, with permanent facilities, whereas mobile facilities may be located at a project site for less than one year and/or at multiple locations within a year.  However, rather than addressing in the Tier 2 general permit the unique situations presented by mobile facilities, the Department believes that these issues are best dealt with through program guidance.

WTBA Comment 2:  Section 2.8.4 of the Tier 2 general permit should be amended as follows: "The permittee may not establish a new storm water discharge of a pollutant of concern to an impaired water body or significantly increase an existing discharge of a pollutant of concern to an impaired water body unless the new or increased discharge does not contribute to the receiving water impairment ~~causes the receiving water to meet applicable water quality standards~~, or the discharge is consistent with an EPA approved total maximum daily load (TMDL) allocation for the impaired water body."  Such an amendment is consistent with the Clean Water Act requirements.

Response:  The language in the proposed Tier 2 general permit (as well as the Tier 1 general permit and the scrap recycling and vehicle dismantling general permits) is consistent with the wording used in the general construction site storm water discharge permit (Permit No. WI-S067831-3) and the general municipal separate storm sewer system permit (Permit No. WI-S050075-1).  This language effectively requires progress toward compliance with the Clean Water Act.  As such, the discharger will need to demonstrate that a new or increased discharge to an impaired water will benefit the receiving water, rather than just not making the impairment worse.  Also, in its comments, the USEPA recommended more stringent requirements than what the Department proposes (see USEPA Comments 2 and 3 above).  In its response to these comments from the USEPA, the Department states that it believes that the general permits address impaired waters and Total Maximum Daily Loads to the extent that they can until further direction is established through administrative code development and program guidance.  Consequently, the Department believes that the language as proposed strikes a good balance on the issue at this time.

---

This document was prepared by Jim Bertolacini, Runoff Management Section, Wisconsin Department of Natural Resources