IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WISCONSIN RESOURCES PROTECTION
COUNCIL, CENTER FOR BIOLOGICAL
DIVERSITY and LAURA GAUGER,

                      Plaintiffs,

       v.

FLAMBEAU MINING COMPANY,

                      Defendant.

                                       OPINION and ORDER

                                            11-cv-45-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiffs Wisconsin Resources Protection Council, Center for Biological Diversity and Laura Gauger bring this action for declaratory and injunctive relief and civil penalties under the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365(a)(1). Plaintiffs contend that defendant Flambeau Mining Company is violating the Clean Water Act by discharging pollutants without a Wisconsin or National Pollutant Discharge Elimination System permit issued under the Act.

Now before the court are plaintiffs' motion for partial summary judgment; defendant's motion for summary judgment on all of plaintiffs' claims; defendant's motion to dismiss the case for plaintiffs' failure to join the Wisconsin Department of Natural Resources as an indispensable party; plaintiffs' motion for leave to file supplemental

1

proposed findings of fact; defendant's motion to strike plaintiffs' supplemental facts; and the state of Wisconsin's motion to file an amicus curiae brief.

In their motion for partial summary judgment, plaintiffs seek a declaration that they have standing to bring this suit and a determination that defendant violated the Clean Water Act on 23 days by discharging pollutants without a permit.  In its motion for summary judgment, defendant seeks judgment on all of plaintiffs claims, contending that plaintiffs lack standing to bring this suit.  On the merits, defendant contends that it did not discharge pollutants into navigable waters that are protected by the Act and that even if it did, it was complying with a permit issued under the Act.  Defendant also raises several affirmative defenses, contending that plaintiffs' claims should be dismissed because plaintiffs failed to exhaust their administrative remedies and waived their claims.  Additionally, defendant contends that plaintiff's claims are barred by the statute of limitations, the doctrines of issue and claims preclusion, various forms of estoppel and laches and their failure to exhaust their administrative remedies.

With respect to the threshold jurisdictional and procedural questions, I conclude that plaintiffs have Article III standing to bring this suit and that the Department of Natural Resources is not a necessary or indispensable party under Fed. R. Civ. P. 19.  Therefore, I am granting plaintiffs' motion for summary judgment on the issue of standing and am denying defendant's motion to dismiss the case under Rule 19.  I am granting the state's motion to file an amicus curiae brief.  The brief sets forth the state's interpretation of state

statutes and regulations relating to mining and storm water discharge permits and provides useful background on issues relevant to the case.  In addition, I am denying defendant's motion for summary judgment on its contentions that plaintiffs are barred from bringing this suit by their failure to exhaust their administrative remedies, by the running of the statute of limitations, by laches or by the doctrines of issue and claims preclusion.

With respect to the merits of plaintiffs' claims, plaintiffs have shown that defendant discharged pollutants from the biofilter located on its former mine site, that Stream C is a navigable water that is protected by the Clean Water Act and that defendant did not have a permit under the Act authorizing the discharges.  Therefore, I am granting plaintiffs' motion for summary judgment on those issues.  However, there are disputed issues of fact regarding whether the discharges from defendant's biofilter entered Stream C or a grassy wetland.  Because plaintiffs have not shown that the grassy wetland qualifies as navigable waters under the Act, I am denying plaintiffs' motion for summary judgment with respect to defendant's ultimate liability under the Act for the discharges.  Before defendant can be held liable for its umpermitted discharges, plaintiffs must prove that defendant discharged pollutants into Stream C or that the wetland area near the biofilter outlet has a "significant nexus" to the Flambeau River.

As for the remaining motions, I am denying plaintiffs' motion for leave to file supplemental proposed findings of fact because the proposed findings were not necessary to the decisions on the parties' substantive motions.  Consequently, I am denying defendant's

3

motion to strike the supplemental facts as moot.

From the findings of fact proposed by the parties, I find that the following facts are material and undisputed.

UNDISPUTED FACTS

A.  Defendant Flambeau Mining Company

From 1993 to 1997, defendant Flambeau Mining Company owned and operated an open pit metallic mine, along with related facilities, on property in Ladysmith, Wisconsin. The mine has been partially reclaimed but several industrial buildings and structures remain in place and in use.  One of these remaining structures is a "biofilter" that is used to detain and partially treat runoff from a 32-acre business and industrial park on defendant's property, known as the "industrial outlot." The biofilter collects, stores and periodically discharges storm water.  The industrial outlot contains various buildings and structures, including an administrative office and laboratory, recreational facilities, defendant's former wastewater treatment building and a parking area.  Defendant still owns the former mine site, including the industrial outlot, which is leased by the Ladysmith Community Industrial Development Corporation.

B.  Stream C

The Flambeau mine site is bordered on the east by State Highway 27 and on the west

4

and southwestern sides by the Flambeau River. Several intermittent streams flow on the mine site. The only stream relevant to this case is a seasonally-flowing intermittent stream known as Stream C that flows in a generally southwesterly direction on the east side of the property. During various stages of mining and reclamation, defendant manipulated the channel of Stream C by re-routing segments of it, installing culverts underneath the former access road and rail spur and performing significant grading of the lands on its property that drain to Stream C.

C.  Plaintiffs

Plaintiff Wisconsin Resources Protection Council is a Wisconsin nonprofit environmental organization headquartered in La Crosse, Wisconsin, with approximately 225 members in Wisconsin and Minnesota. One of its primary purposes is to educate citizens about the effects of large scale metallic mining on Wisconsin's water supplies, the tourism and dairy industries and the Native American communities located near potential mine sites. Since at least 1991, the Council has worked with the Wisconsin Department of Natural Resources on issues relating to the Flambeau mine, including the development of defendant's 1991 mining permit; advocating the passage of Wisconsin's Metallic Mining Moratorium in 1998; and tracking defendant's compliance with its mining permit and monitoring requirements.

Plaintiff Center for Biological Diversity is a nonprofit environmental membership

5

organization headquartered in Tucson, Arizona, with a regional office in Duluth, Minnesota and approximately 320 members in Wisconsin. The Center's mission is preservation, protection and restoration of biodiversity, native species, ecosystems and public lands, with an emphasis on protecting the habitats of threatened and endangered species. It also promotes the ability of its members to engage in recreational activities and study the habitat of species that are or may become imperiled.

One of the Council's members, Harold Flater, lives approximately 15 miles downstream from the Flambeau mine site and owns Flater's Flambeau Point Resort, which provides guided fishing trips on the Flambeau River. Flater enjoys boating and fishing on the river near and downstream from the Flambeau mine. He is familiar with the mine and has attended several public hearings and meetings concerning defendant's permit applications over the years. Flater knows that both copper and zinc are considered toxic pollutants and can be harmful to human health and aquatic life at elevated concentrations. He is concerned that discharges from defendant's industrial outlot and biofilter will harm fish and other aquatic wildlife and will decrease his enjoyment of fishing and boating on the river.

Plaintiff Laura Gauger lived in Wisconsin from September 1991 to February 2010 and is now a citizen and resident of Duluth, Minnesota. She is a member of plaintiff Center for Biological Diversity and plaintiff Wisconsin Resources Protection Council. Gauger is an outdoor enthusiast who enjoys hiking, bird and animal watching, canoeing, fishing and

camping, among other activities.  On multiple occasions, she has canoed and hiked near the Flambeau River and Flambeau mine site.  Between May 2007 and October 2011, Gauger visited the Flambeau mine site at least 12 times.  She has co-authored a 1,200 page book documenting the history of the Flambeau Mine and its effects on the surrounding area.

Lori Andresen is a member of plaintiffs Center for Biological Diversity and Wisconsin Resource Protection Council and enjoys outdoor activities.  She has been involved in mining issues in Minnesota and Wisconsin for many years and has been interested in reclamation of the Flambeau mine since 2006.  Andresen visited the Flambeau River for the first time in 2009 with plaintiff Gauger, and has visited twice since then to observe and photograph wildlife and birds.

Andresen and plaintiff Gauger are aware that metallic mining can lead to soil contamination and water pollution.  They also know that the sediments and soils in the area around the Flambeau mine site contain copper and zinc, that these metals have been listed by the United States Environmental Protection Agency and the State of Wisconsin as toxic pollutants and that at certain concentrations they can be harmful to human health and aquatic life.  Gauger and Andresen have read reports and reviewed toxicity data for discharges from defendant's biofilter, the Flambeau River and Stream C and know that the Wisconsin Department of Natural Resources has recorded concentrations of copper from the defendant's discharges that exceed Wisconsin's acute toxicity criteria for copper.

Andresen and plaintiff Gauger are concerned that elevated levels of copper and zinc

are being carried from defendant's industrial outlot by Stream C to the Flambeau River and will cause harm to the aquatic life in the stream and river. They are worried that the discharges will reduce their enjoyment of those waters for canoeing, fishing, wildlife observation and other recreational and aesthetic pursuits and will harm their health by exposing them to toxic pollutants. During Gauger's most recent canoe trip to the Flambeau River in October 2011, she did not wade in the waters near Stream C because of her concern about exposure to copper, zinc and other pollutants. Her enjoyment of the experience was lessened. Gauger intends to return to the river in the spring or summer of 2012, but is less likely to do so near the mouth of Stream C.

### D.  <u>Defendant's Permits</u>

Defendant operated the mine pursuant to a 1991 mining permit issued by the Wisconsin Department of Natural Resources that governed both active mining operations and the reclamation phase. The mining permit provided the general framework for the operation of the mine, including provisions for storm water management, and required defendant to submit annual chemical monitoring results to the Department, including the results of copper and zinc monitoring. Also, the permit required a surface water management plan, a risk assessment, a contingency plan and a reclamation plan that required defendants to return the site to approximate pre-mining site grades and remove all facilities and infrastructure.

The mining permit states that it was issued under Wis. Stat. §§ 144.80–144.94 and 144.43–144.47, which are Wisconsin's mining laws.  1991 Mining Permit, Part I, Cond. 5, dkt. #40-20.  (These statutes were renumbered by 1995 Wis. Act 227 and are now found in Wis. Stat. ch. 293.)  The permit also states that "Flambeau shall obtain any and all other permits, licenses and approvals necessary from federal, state and local authorities."  Id.  The administrative law judge who approved the 1991 mining permit stated in his decision that:

> [T]he authority of the Mining Permit issued by the Department is limited to the authority vested in the Department by ss. 144.80 to 144.94, Stats. and 144.43 to 144.47, Stats., relative to mining waste disposal. If another state or federal rule specifically regulates an activity, also regulated under ss. 144.80 to 144.94, Stats., the other statute or rule shall be the controlling standard to the extent applicable.

Dkt. #66-1 at 87.

During the active phase of mining, defendant held a wastewater discharge permit issued in 1991 by the Department under the Wisconsin Pollutant Discharge Elimination System program.  The 1991 wastewater discharge permit authorized various discharges, including storm water discharges, during the active phases of mining and reclamation.  In particular, the permit authorized three discharge points, identified as outfalls 1, 2 and 3.  Outfall 1 was the discharge point from the wastewater treatment plant to the Flambeau River; outfall 2 was the discharge point from settling ponds on the mine site to the Flambeau River; and outfall 3 was an alternative discharge point from the settling ponds to nearby wetlands.  The wastewater discharge permit was reissued on March 29, 1996.

9

E.  1998 Permit Modification

In 1997, defendant ceased active mining operations and began the reclamation phase. Before active reclamation began, the City of Ladysmith requested that defendant retain the facilities and infrastructure located in the industrial outlot for future development opportunities.  On January 8, 1998, defendant submitted a request for modification of the mining permit.  The request was contained in a document titled "Supplement to the Surface Reclamation Plan for the Flambeau Mining Company, Ladysmith, Wisconsin," dated December 18, 1997.

In the request, defendant sought, among other things, to modify its original reclamation plan to allow it to (a) retain approximately 32 acres of facilities for reuse as the industrial outlot; (b) establish an 8.5 acre wetland in the northeast corner of the mine site; (c) redirect a portion of intermittent Stream B north of the former mine pit; (d) make adjustments to the success criteria for monitoring of vegetation and wildlife; (e) leave a concrete diaphragm in place as part of the mine pit west wall; and (f) construct a storm water biofilter system for the proposed industrial outlot and the 0.9 acre biofilter.

The supplement provided detailed grading plans for routing storm water from nearly all of the industrial outlot through a biofilter located in the area of the former surge pond as follows:

• Industrial Outlot

An approximately 28-acre outlot is proposed to be located west of State Trunk Highway (STH) 27 on the southern portion of the site.  Ancillary facilities

10

such as the administration building, wastewater treatment plant, utilities, and railroad spur not underlain with HDPE liner will be left in place to service the planned industrial park. The decision to leave these facilities in-place and incorporate the industrial park into the reclamation plan is based on the desire of local officials.

In addition, storm water from the industrial outlot would be directed to a constructed biofilter located in the area of the former surge pond. Flow from the biofilter would be directed to Stream C.

* * *

Drainage from the future industrial area of the Flambeau Mine property (south of the reclaimed area) will be conveyed to the existing surge pond at the east side of the site. This surge pond will be reconstructed as a biofilter/detention basin, to improve the water quality and decrease the peak flow rates of runoff from the developed area prior to its discharge into Stream C.

Dkt. #60-10. The modification request did not include an application for a discharge permit under the National or Wisconsin Pollutant Discharge Elimination System permit program or make any reference to one.

The supplement was reviewed by staff at Wisconsin's Department of Natural Resources, including Lawrence Lynch. Lynch had worked for the Department's mine reclamation program since 1980, was the mining team leader beginning in the mid-1990s and had been involved heavily in the review, permitting and monitoring of defendant's mine.

On March 20, 1998, Lynch wrote defendant, stating, in part:

Flambeau Mining Company personnel and department staff have recently had several conversations concerning surface water management at the Flambeau mining site. This letter is to clarify how the department intends to regulate surface water management at the site.

The current water handling procedures are acceptable to the department and

11

are consistent with the Mining Permit, including the Surface Water Management Plan, and the Wisconsin Pollutant Discharge Elimination System (WPDES) Permit. It is our intent that the WPDES permit will continue to regulate discharges from the site through outfalls 001 and 002 as long as water is being pumped from one location to another on the site. Any discharge through those outfalls must comply with the effluent limits and monitoring requirements specified in the WPDES permit . . . as long as the WPDES permit remains in force. Once all permanent water management structures and facilities are in place and pumping is no longer necessary, discharges through outfall 002 will cease to be covered under the WPDES permit. At that time, storm water management will fall under the regulatory authority of the Mining Permit and its associated plans.

* * *

. . . I hope this clarifies the department's position concerning our regulatory oversight of stormwater management at the Flambeau site.

Dkt. #66-2.

The Department determined that defendant's requested modification of its mining permit constituted a substantial change to the mining permit under Wis. Stat. § 293.55. On March 26, 1998, the Department issued a public notice titled "Notice of Proposed Modification Mining Permit and Reclamation Plan" and noted that interested persons had the right to request a public hearing. The public notice did not mention the Clean Water Act, permitting under the National or Wisconsin Pollutant Discharge Elimination System or discharge of pollutants from the biofilter.

The Department received 12 requests for a public hearing regarding the proposed modification, including requests from plaintiff Gauger and other members of plaintiff Wisconsin Resources Protection Council. Thomas Wilson, a long-time member of the

12

Council, also filed a request for a formal hearing regarding defendant's proposed supplement and modification.  Wilson, Gauger and the Council believed that defendant's proposed modifications were violations of the conditions of the mining permit and state mining laws and regulations and wanted a scientific review of the proposed modifications.

On May 9, 1998, Wilson wrote to the Department, stating that he was willing to withdraw his request for a formal hearing if the Department would organize an "informal informational hearing" where he could express his concerns and receive written responses to those concerns.  Dkt. #60-45.  On June 2, 1998, Lawrence Lynch wrote to Wilson, confirming that the Department had agreed to proceed with an "informational meeting" to discuss the proposed modifications to defendant's reclamation plan.  Dkt. #60-46.

In preparation for the meeting, Wilson drafted a document titled "Issues of Concern to Petitioners on the Revised Flambeau Mine Reclamation Plan" and provided a copy to the Department.  Dkt. #60-13.  Wilson raised more than 40 issues of concern, including whether the modification had "been reviewed with reference to the original . . . [Wisconsin Pollutant Discharge Elimination System] Permit Application"; how "surface and groundwater runoff [would be] monitored before it seeps into the Flambeau River where it will be diluted to a point that it becomes a non-point source"; and how the "revised plan [would] meet the original . . . [Wisconsin Pollutant Discharge Elimination System] Permit Application . . . and the flow and transport modeling reports."  Id.  Approximately one week before the informational meeting was held, plaintiff Gauger and other members of

13

Wisconsin Resources Protection Council held a meeting to discuss defendant's proposed modification and Wilson's list of concerns.

On June 16, 1998, the Department convened the informational meeting in Ladysmith, Wisconsin, to discuss the proposed modification to defendant's plan. Plaintiff Gauger and other attendees asked whether defendant's existing wastewater treatment plant could be decommissioned under the modification. There was no discussion about Clean Water Act permits and requirements, potential overflows from the biofilter, discharges into Stream C or the scope of copper contamination in the industrial outlot. Neither the Department nor any persons attending the meeting called witnesses, offered evidence, made oral arguments or filed legal briefs. No hearing examiner or administrative law judge was present, no administrative record or transcript was prepared and only defendant and the Department were represented by legal counsel.

On June 26, 1998, Wilson sent a letter to the Department regarding issues that were raised at the informational meeting, including the wastewater treatment plant. He stated that it would be acceptable to keep the plant, so long as the wastewater treatment system was decommissioned and the discharge pipeline was removed. On July 7, 1998, Lynch responded to Wilson, saying that the Department intended to require defendant to decommission the wastewater treatment plant as a condition of its approval of defendant's modification. Dkt. #60-19. After reviewing Lynch's July 7 letter, plaintiff Gauger and the other petitioners withdrew their request for a formal contested hearing on the proposed

14

modification.

On July 30, 1998, the Department formally approved defendant's supplement, citing Wis. Stat. § 293.55 (modifications to metallic mining permits), and issuing findings of fact, conclusions of law and a "Mining Permit Modification." Dkt. #66-7. The modification states that "[a]ll other provisions of the Mining Permit remain in full force. Under this modification, the proposed changes as outlined in the request from January 9, 1998 and the above mentioned supplement are approved with [certain] conditions. . .," including the dismantling of the wastewater treatment plant. Id. The modification included 13 findings of fact, none related to the biofilter, Stream C, the Flambeau River or defendant's intent to discharge pollutants from the biofilter. Also, the modification included three conclusions of law, each made under Wis. Stat. § 293.55, the state mining laws and a general notice of appeal rights.

The modification did not cite the Clean Water Act, Wis. Stat. ch. 283 (Wisconsin Pollutant Discharge Elimination System permitting program) or Wis. Admin. Code ch. NR 216 (Wisconsin's storm water permitting program) and was not submitted to the Environmental Protection Agency for review. The Department sent a copy of the modification to all those who had petitioned for a hearing, including plaintiffs Gauger and the Council. No person or entity sought judicial review of the modification.

After the modification was approved, defendant completed site grading, constructed the biofilter and decommissioned its wastewater treatment plant. On September 8, 1998,

15

Lynch wrote to defendant, saying:

> This letter is to acknowledge that surface water management and related discharges through outfall 002 at the Flambeau mining site are no longer subject to the provisions of the Wisconsin Pollutant Discharge Elimination System (WPDES) Permit. This is consistent with the regulatory approach outlined in my letter to you dated March 20, 1998.
>
> With the permanent shutdown of the wastewater treatment plant and related facilities on August 13, 1998 and completion of construction of the permanent stormwater facilities on the site, stormwater management and discharges through outfall 002 will be regulated under the Mining Permit. As such, Flambeau must continue to exercise a stormwater management and erosion control program that meets or exceeds current best management practices. Particular care should be taken to provide additional protection to the area that flows to the southwest biofilter until the area is completely stabilized. Further, we suggest that, until the drainage area is fully revegetated and stabilized, Flambeau maintains the capability to pump water from the biofilter to the abandoned gravel pit in the event of an extreme precipitation event.

Dkt. #66-8.

On September 23, 1998, the Department formally terminated defendant's Wisconsin

Pollutant Discharge Elimination System permit by letter, stating:

> We understand the wastewater treatment system serving the Flambeau Mine in Ladysmith has permanently shut down as of August 13, 1998. Therefore, the Department has decided to close the wastewater permit for the discharge described in the Wisconsin Pollutant Discharge Elimination System Permit No. WI-0047376-2, issued on March 29, 1996.
>
> * * *
>
> No further discharges to waters of the State of Wisconsin will be allowed under the WPDES permit. All existing wastewater discharge points from the wastewater treatment system must be abandoned, with the exception of Outfall 002 which may discharge storm water runoff through the biofilter overflow regulated under the Mining Permit.

16

Dkt. #66-9.


F.  The Biofilter

After the modification was approved, defendant created a 0.9 acre storm water detention basin called a "biofilter" in the industrial outlot.  The biofilter was created in the area of the former surge pond on the east side of the property and approximately 75 yards from Copper Park Lane.  It was designed to collect and detain rain and storm water runoff from the industrial outlot and was seeded and planted with specific native vegetation intended to filter sediment and nutrients from the runoff.  The biofilter has only one outlet, located near the northeast corner of the biofilter.  The outlet is lower than the surrounding berm and has an "apron" of crushed rock that extends down the side of the biofilter. Whenever the biofilter's water storage capacity is exceeded, water flows through the biofilter's outlet.

The water flowing out of the biofilter contains copper and zinc.  On several occasions, defendant and the Wisconsin Department of Natural Resources have recorded water flowing out of the biofilter's outlet that contained levels of copper exceeding Wisconsin's acute toxicity criterion for copper.  PPFOF ¶¶ 101-130, dkt. #52.  ("Acutely toxic" concentrations of copper are copper concentrations that are believed to be likely to cause fairly rapid damage to biological organisms.)  On another occasion, sampling showed that the water flowing into the biofilter had copper levels at less than half the level of water flowing out of

17

the biofilter.  Id. at ¶ 131.

The parties dispute whether the water and pollutants flowing out of the biofilter reach Stream C.  Plaintiffs state that overflow from the biofilter flows approximately 10 feet down a broad, rock-lined outlet that slopes directly into Stream C.  Plaintiffs rely on the testimony of John Coleman, who stated that he observed the biofilter discharging into Stream C on several occasions.  Dkt. #51.  Additionally, plaintiffs rely on the expert opinion of David Chambers, dkt. #50, who analyzed data collected from defendant and the Department regarding levels of copper and zinc in the biofilter, Stream C and the Flambeau River. Chambers concluded that water from the biofilter is discharged to Stream C and that copper and zinc from the biofilter ultimately reach the river.  An employee from the Department of Natural Resources who conducted sampling of the biofilter, Stream C and the river also concluded that at least some water and pollutants from the biofilter reach the river.  Finally, plaintiff cites documents prepared by defendant over the years stating that water from the biofilter flows into or discharges into Stream C and ultimately reaches the Flambeau River.

Defendant says that although it stated in various documents and reports that the biofilter discharges into Stream C, defendant was using the label "Stream C" as a convenient means for referring to the wetland area around the biofilter.  Defendant states that overflow from the biofilter does not flow into Stream C; rather, it enters a grassy wetland that is approximately 30 feet from anything that could be considered a channel of Stream C.  After examining the area, defendant's expert, Elizabeth Day, concluded that there is no surface

18

connection between biofilter discharges and Stream C and that discharges from the biofilter spread out into the ground of the wetland, do not enter a channel of Stream C and do not reach the river.  Dkt. #84, at ¶ 11.

### G.   Monitoring Reports and Mediation Projects

In approximately 2003, defendant determined that the soils in the industrial outlot contributed to elevated copper and zinc concentrations in storm water runoff delivered to the biofilter.  Beginning in 2003, defendant undertook remediation projects on the site to address the elevated levels of copper found in the soils of the industrial outlot, including the removal of contaminated materials from the area.

In 2004, defendant proposed a monitoring plan for Stream C to address concerns about copper discharged from the biofilter to Stream C.  As part of the plan, defendant established several monitoring points in Stream C's watershed.  In 2004 and 2005, defendant discovered that certain areas of the industrial outlot may be contributing "elevated levels" of copper to runoff discharged from the biofilter.  ("Elevated levels" means concentrations above background levels determined from samples taken in areas not affected by mining.)  In 2005, defendant discovered "[r]elatively high copper concentrations" in the industrial outlot soils where track washing of the haul trucks during mine operations was performed.  Also in 2005, defendant noted elevated concentrations of copper and zinc in storm water runoff from the industrial outlot and raised concerns about whether mitigation

19

measures could achieve water quality criteria for copper and zinc.  In 2006, defendant undertook additional activities in the industrial outlot to reduce particulate and dissolved solids entering the biofilter, including excavation and offsite landfilling of soils and ditch material and placement of limestone and paving over the parking areas.

In 2007, defendant requested and was issued a certificate of completion for reclamation under Wis. Admin. Code. § NR 132 for the mine site, with the exception of the industrial outlot.  Defendant agreed to withdraw its request for a certificate of completion for the industrial outlot and to commit to further environmental monitoring of the area, including monitoring of the sediments in the biofilter and Stream C.

Since 2007, the Department has continued to collect surface water samples from the biofilter outlet, several locations along Stream C, several locations along the Flambeau River and from three nearby streams (Stream A, Stream B and an unnamed stream).  On October 26, 2010, April 27, 2011 and June 19, 2011, the water samples taken at the biofilter's outlet, Stream C below Copper Park Lane and the mouth of Stream C contained copper at levels that exceeded Wisconsin's acute toxicity criteria.  The three nearby streams contained copper concentrations lower than in Stream C and below Wisconsin's acute toxicity criteria for copper.

H.  2009 Notice of Intent to Sue

In 2009, plaintiffs filed a notice of intent to sue with defendant and the Wisconsin

20

Department of Natural Resources under the state's mining laws.  Assistant Attorney General Thomas Dawson, Director of the Environmental Protection Unit of the Wisconsin Department of Justice, sent a letter dated November 10, 2009 to Glenn M. Stoddard, one of plaintiffs' counsel, regarding the notice of intent to file citizen suit.  Dawson stated, in part, that although "[s]tormwater discharge from the Flambeau mine site would ordinarily be subject to one of the [Department's] Wis. Admin. Code ch. NR 216 storm water permits and requirements and issued pursuant to Wis. Stat. § 283.33," the Department had decided in 1998 to regulate defendant's storm water discharges "under the runoff management provisions of [defendant's] revised mining permit."  Dawson also stated that "[t]o date the storm water discharges from the Flambeau Mine have met the relevant requirements in the mining permit, so under Wis. Admin. Code § NR 216.21(4)(a), separate storm water permit coverage is not required."  Dkt. #63-1.  This letter was the first time the Department explained to plaintiffs that it was relying solely on Wis. Admin. Code § NR 216.21(4) and defendant's mining permit as the basis for its regulatory determinations regarding defendant's biofilter discharges.

I.  2010 Notice of Intent to Sue

On November 16, 2010, plaintiffs gave notice to the administrator and regional administrator of the Environmental Protection Agency, the Secretary of the Wisconsin Department of Natural Resources and defendant of its intent to sue defendant for violations

of the Clean Water Act.  Plaintiffs filed this case on January 18, 2011, at which time neither the state of Wisconsin nor the United States had commenced or was diligently prosecuting any civil or criminal action against defendant for any Clean Water Act violations.

## DISPUTED FACTS

The parties disagree about the length and nature of Stream C.  Plaintiffs have produced maps and eyewitness testimony indicating that Stream C flows on the mine site from the east of Highway 27 near Ladysmith, across the southeast corner of defendant's industrial outlot and adjacent to the biofilter, under a road called Copper Park Lane and through a wooded area south of the outlot to the Flambeau River, with a total length of approximately 0.6 miles.  Plaintiffs point to evidence that there are water lines in the four culverts between Highway 27 and Copper Park Lane and that below Copper Park Lane, there is obvious water flow.  In addition, plaintiffs rely on the eyewitness testimony of John Coleman, an Environmental Section Leader for the Great Lakes Indian Fish and Wildlife Commission, who states that he has observed Stream C on several occasions and that there is an obvious channel along the entire length of Stream C.

Defendant agrees that Stream C between Copper Park Lake and the Flambeau River is a navigable waterway and tributary that contributes its flow to the Flambeau River.  In this region, Stream C has several pools with flowing water that is 16-18 inches deep.  Also, the Department of Natural Resources has counted 146 fish of six different species in Stream C

22

south of the lane.  However, it is defendant's position that there is no channel that would qualify as a waterway north of Copper Park Lane.  Defendant's expert, Elizabeth Day, states that the section of Stream C north of the Lane is merely a grassy wetland, with some "channel-like segments" at each culvert.

OPINION

The Clean Water Act prohibits the "discharge of any pollutant by any person" without proper authorization, such as a permit.  33 U.S.C. § 1311(a); Sackett v. EPA,132 S. Ct.1367, 1369 (2012).  In the absence of federal or state enforcement, private citizens may enforce this provision by filing a citizen suit in federal court under 33 U.S.C. § 1365(a)(1).  Sixty days before initiating a citizen suit, the would-be plaintiff must give notice of the alleged violation to the Environmental Protection Agency, the state in which the alleged violation occurred and the alleged violator.  Id. § 1365(b)(1)(A).  If the plaintiff prevails in a citizen suit, the court may order injunctive relief, civil penalties payable to the United States Treasury and legal costs and fees.

Plaintiffs are bringing this suit under § 1365(a), alleging that defendant discharged pollutants into Stream C and the Flambeau River without a permit issued under the Clean Water Act.  In their motion for partial summary judgment, plaintiffs seek to establish standing and defendant's liability for discharges on 23 days.

Defendant does not deny that plaintiffs have complied with the requirements of §

23

1365(b)(1)(A) by giving adequate notice more than 60 days before filing this suit. However, it contests plaintiffs' standing to sue and raises several other defenses to plaintiffs' claims.

### A. Article III Standing

In any case brought in federal court, the plaintiffs' first hurdle is showing that the court has jurisdiction to decide the merits of the case. DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341-42 (2006). Jurisdiction requires plaintiffs who have standing to argue the claims they are advancing. Sprint Communications Co. v. APCC Services, Inc., 554 U.S. 269, 273-74 (2008). Under the Supreme Court's interpretation of the "cases" and "controversies" limitation on federal court jurisdiction in Article III of the Constitution, plaintiffs have standing if they have suffered an "injury in fact" that is "concrete and particularized," "actual or imminent," "fairly traceable to the challenged action of the defendant" and "likely" to be remedied by a decision favoring plaintiffs. Id.; Summers v. Earth Island Institute, 555 U.S. 488, 493 (2009); Friends of the Earth, Inc. v. Laidlaw Environmental Service, 528 U.S. 167, 180-81 (2000). Organizations like plaintiffs Wisconsin Resources Protection Council and Center for Biological Diversity have standing to bring suit on behalf of their members if (1) their members would have standing to sue in their own right; (2) the interests they seeks to protect are germane to their purpose as associations; and (3) neither the claim they assert, nor the relief they request, requires the participation of individual members. Laidlaw, 528 U.S. at 181. (The parties agree that the

24

organizational plaintiffs can satisfy the second and third requirements for organizational standing.  Thus, the only issue is whether plaintiffs' members would have standing to sue in their own right.)

Both plaintiffs and defendant have moved for summary judgment on the issue of standing.  Plaintiffs request that the court find as a matter of law that they have standing under Article III of the Constitution, while defendant contends that this case must be dismissed because plaintiffs lack standing.  To prove standing at the summary judgment stage, plaintiffs may not rest on mere allegations to support standing, but must set forth specific facts, that, if true, establish an injury in fact.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

1.  Injury in fact

Plaintiffs Wisconsin Resources Protection Council and Center for Biological Diversity rely on two of their members, plaintiff Gauger and Lori Andresen, to establish standing.  The Council relies on injuries to Harold Flater.  Plaintiffs in environmental suits may satisfy the injury in fact requirement of standing by proving that they use the affected area and are persons "for whom the aesthetic and recreational values of the area will be lessened" by the challenged activity.  Sierra Club v. Morton, 405 U.S. 727, 735 (1972).  See also Lujan, 504 U.S. at 562-63 (holding that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing").

25

Additionally, injury in fact can be established by "likely exposure" to pollutants.  Sierra Club v. Franklin County Power of Illinois, LLC, 546 F.3d 918, 927 (7th Cir. 2008).  See also Sierra Club v. Johnson, 436 F.3d 1269, 1279 (11th Cir. 2006) ("injury in fact exists as a result of concerns about pollution"); New York Public Interest Research Group v. Whitman, 321 F.3d 316, 325 (2d Cir. 2003) ("allegations about the health effects of air pollution and of uncertainty as to whether the EPA's actions expose them to excess air pollution are sufficient to establish injury-in-fact"); Texans United for a Safe Economy Education Fund v. Crown Central Petroleum Corp., 207 F.3d 789, 792 (5th Cir. 2000) ("breathing and smelling polluted air is sufficient to demonstrate injury-in-fact and thus confer standing under the [Clean Air Act]").

Plaintiff Gauger enjoys recreational activities near the Flambeau River and Stream C adjacent to defendant's mine.  The copper and zinc discharged from defendant's biofilter have diminished her enjoyment of the area and make her concerned for her health and the health of the fish and wildlife in the waterways.  She has intentionally avoided venturing near the waters at the mouth of Stream C because of concern about the harmful effects of discharged pollutants.  Similarly, Lori Andresen and Harold Flater have enjoyed recreational activities in the area near defendant's mine, have plans to visit the area in the future and are concerned that discharges from defendant's biofilter will have a negative impact on the fish and wildlife in the river and their own enjoyment of the area.  Flater is also concerned that pollutants from the biofilter will cause economic harm to his fishing guide business.

Defendant contends that the injuries alleged by plaintiff Gauger, Andresen and Flater are insubstantial and insufficient to confer standing.  It contends that if these individuals were genuinely worried about pollutants or had been injured by defendant's discharges, they would no longer visit the Flambeau River.  However, the "injury-in-fact necessary for standing 'need not be large, an identifiable trifle will suffice.'" Franklin County Power, 546 F.3d at 925 (citations omitted).  If defendant is discharging pollutants into Stream C and the Flambeau River, Gauger, Andresen and Flater will be exposed to those pollutants.  Additionally, plaintiffs need not abandon the river completely in order to establish injury for standing purposes.  "[I]t is enough the confer standing that their pleasure is diminished even if not to the point that they abandon the site." American Bottom Conservancy v. United States Army Corps of Engineers, 650 F.3d 652, 658 (7th Cir. 2011).  If these individuals avoid Stream C or certain areas of the river, or if their pleasure from their visits to those areas is diminished by the presence of pollutants, that constitutes an injury in fact. Laidlaw, 528 U.S. at 183-84 (individual's affidavit stating that he avoids canoeing near discharge point because of pollution concerns was sufficient to show injury in fact).

Defendant also argues that because Andresen and plaintiff Gauger do not live near the mine site and visit the area infrequently, their injuries are speculative and not personal or imminent.  However, even a threatened injury can satisfy the Article III standing requirements. MainStreet Organization of Realtors v. Calumet City, 505 F.3d 742, 744 (7th Cir. 2007) ("[S]tanding in the Article III sense does not require a certainty or even a

very high probability that the plaintiff is complaining about a real injury, suffered or threatened."); Village of Elk Grove Village v. Evans, 997 F.2d 328, 329 (7th Cir. 1993) ("even a small probability of injury is sufficient to create a case or controversy—to take a suit out of the category of the hypothetical").  Andresen has visited the area three times, Gauger has visited at least a dozen times; they both live within a few hours drive; and they have plans to visit in the spring or summer of 2012.  These allegations are sufficient to show that Andresen and Gauger have a personal stake in this lawsuit and are threatened by pollutants in Stream C and the Flambeau River.  Franklin County Power, 546 F.3d at 925–26 (finding standing for individual who visited affected area "every other year");  Bensman v. United States Forest Service, 408 F.3d 945, 963 (7th Cir. 2005) (finding standing for plaintiff who had visited affected area "about a half-dozen times"); Ecological Rights Foundation v. Pacific Lumber Co., 230 F.3d 1141, 1149-50 (9th Cir. 2000) ("Repeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of the area is injurious to that person. . . An individual who visits Yosemite National Park once a year to hike or rock climb and regards that visit as the highlight of his year is not precluded from litigating to protect the environmental quality of Yosemite Valley simply because he cannot visit more often.") (internal quotation and citations omitted).  See also Buono v. Norton, 371 F.3d 543, 547 (9th Cir. 2004) ("We have repeatedly held that inability to unreservedly use public land suffices as injury-in-fact.").

28

Finally, defendant contends that plaintiffs cannot establish injury in fact because plaintiffs have not proven that defendant discharged copper, zinc or any other pollutant directly into Stream C or the Flambeau River.  This argument conflates the question of standing with whether defendant has violated the Clean Water Act.  The relevant inquiry for standing purposes is not whether defendant has violated the Clean Water Act by discharging pollutants without a permit, but "whether [defendant's] actions have caused 'reasonable concern' of injury" to plaintiffs.  Covington v. Jefferson County, 358 F.3d 626, 639 (9th Cir. 2004).  See also Booker-El v. Superintendent, Indiana State Prison, 668 F.3d 896, 899 (7th Cir. 2012) (courts should not "conflate[] standing with the merits of the case"); Arreola v. Godinez, 546 F.3d 788, 794–95 (7th Cir. 2008) ( "Although the two concepts unfortunately are blurred at times, standing and entitlement to relief are not the same thing.  Standing is a prerequisite to *filing suit*, while the underlying merits of a claim . . . determine whether the plaintiff is *entitled to relief*.") (emphasis in original).

To meet the injury in fact requirement for standing, plaintiffs need not show that they will prevail on their Clean Water Act claims, or even that defendant's actions have caused an adverse environmental impact.  American Canoe Association v. Murphy Farms, Inc., 326 F.3d 505, 517-18 (4th Cir. 2003) (plaintiffs need not show harm to river to establish standing to assert Clean Water Act claims); Ecological Rights Foundation, 230 F.3d at 1152 (plaintiffs "need not prove to a scientific certainty that Pacific Lumber has, in fact, discharged pollutants in violation of its permits *in order to obtain standing*; this, as just

explained, is one of the merits questions in the case.") (emphasis in original).  Plaintiffs need

show only that the conduct they challenge causes sufficient injury to them.  As explained,

plaintiffs have introduced sufficient evidence to satisfy this requirement.


2.  Traceability

Defendant contends that plaintiffs have failed to demonstrate that their asserted

injuries are fairly traceable to any conduct by defendant.  I disagree.  The question for the

traceability inquiry is "whether the alleged injury can be traced to the defendant's challenged

conduct, rather than to that of some other actor not before the court."  Ecological Rights

Foundation, 230 F.3d at 1152.  In Clean Water Act cases, this means that the plaintiffs

must show that the pollutants discharged cause or contribute to the kinds of injuries alleged.

Texas Independent Producers & Royalty Owners Association v. EPA, 410 F.3d 964, 973-74

(7th Cir. 2005); American Canoe Association, Inc. v. Louisa Water & Sewer Commission,

389 F.3d 536, 543 (6th Cir. 2004); Domino v. Didion Ethanol, LLC, 670 F. Supp. 2d 901,

917 (W.D. Wis. 2009).  Plaintiffs do not need to prove causation with scientific certainty

to establish traceability.  Texas Independent Producers, 410 F.3d at 973-74; Public Interest

Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 72 (3d

Cir. 1990).  Rather, plaintiffs can establish traceability if the plaintiffs have a rational belief

that the defendant's discharge of pollutants will adversely affect their enjoyment of the

surrounding area.  Franklin County Power, 546 F.3d at 927.

30

Plaintiffs have adduced sufficient evidence to link defendant's alleged illegal conduct to their diminished enjoyment of the Flambeau River and Stream C and their concerns regarding pollution in those areas. The EPA has listed copper and zinc as toxic pollutants under § 307(a)(1) of the Clean Water Act and the EPA and Wisconsin Department of Natural Resources regulate these metals as pollutants. Defendant owns the Flambeau Mine site, operates the biofilter and is responsible for discharges from it. Thus, discharges of copper or zinc from the biofilter and any injuries caused by those discharges are traceable to defendant. Ecological Rights Foundation, 230 F.3d at 1152 ("It requires no attenuated chain of conjecture . . . to link [defendant's] alleged illegal conduct [of discharging pollutants in violation of its permit] to [plaintiffs'] diminished enjoyment of Yager Creek.").

3. Redressability

Finally, defendant challenges plaintiffs' ability to establish the redressability prong of standing, which requires plaintiffs to show that a favorable decision would redress their injuries. In this case, plaintiffs are requesting injunctive relief as well as imposition of civil penalties. Specifically, plaintiffs request that this court order defendant to cease all discharges from the biofilter that are not authorized by a Clean Water Act permit and to remediate the harm caused by its violations. Plaintiffs contend that such injunctive relief would improve water quality, recreation and fish and wildlife health. Also, civil penalties would deter defendant from future violations.

Defendant contends that plaintiffs' injuries cannot be redressed through this lawsuit because defendant cannot stop any discharges from the biofilter, it cannot obtain a permit from the Wisconsin Department of Natural Resources that would limit or control the discharges and civil penalties are not appropriate because it has been complying with its mining permit.  Defendant's arguments are not persuasive.  Plaintiffs' request for relief is not that defendant obtain a particular permit from the Department; rather, plaintiffs ask that defendant be enjoined from discharging from the biofilter in violation of the Act.  Defendant has adduced no evidence showing that it would be impossible to stop discharges from the biofilter.  (Defendant also has adduced no evidence that the Department would deny a request from defendant for a permit if the court ordered defendant to apply for one.) Defendant's arguments regarding civil penalties are arguments about the merits of plaintiffs' claims and about the amount of civil penalties that may be appropriate.  33 U.S.C. § 1319(d) ("In determining the amount of a civil penalty the court shall consider . . . any good-faith efforts to comply with the applicable requirements").

If plaintiffs establish that defendant violated the Clean Water Act by discharging pollutants without a permit, plaintiffs' injuries can be redressed by requiring defendant's compliance with the Act, requiring remediation efforts or by creating a credible deterrent against future violations through the imposition of fines.   Therefore, plaintiffs have established redressability and have satisfied all of the elements necessary to show standing. Accordingly, I will grant plaintiffs' motion for summary judgment and deny defendant's

motion on the issue of standing.

B. Indispensability of the Wisconsin Department of Natural Resources

The next threshold issue is whether this case may proceed without the Wisconsin Department of Natural Resources.  Defendant has moved to dismiss plaintiffs' complaint, contending that the Department is an indispensable party under Fed. R. Civ. P. 19. Although defendant filed its motion to dismiss several months after the dispositive motion deadline, the issue is sufficiently important that it can be raised at any stage of the proceedings, even sua sponte.  Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 111 (1968) (instructing courts to take steps on their own initiative to protect an absentee party).  See also MasterCard International Inc. v. Visa International Service Association, Inc., 471 F.3d 377, 382-83 (2d Cir. 2006) ("Because Rule 19 protects the rights of an absentee party, both trial courts and appellate courts may consider this issue sua sponte even if it is not raised by the parties to the action."); 7 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice and Procedure § 1609 (3d ed. 2011) ("[B]oth the trial court and the appellate court may take note of the nonjoinder of an indispensable party sua sponte.").

In deciding a motion under Rule 19, a court must first determine whether the absent party is "necessary" under the terms of Rule 19(a).  If the party is necessary, the court considers whether it is "feasible" to join the party.  If the absent party is necessary to the

33

action but cannot be joined, the court must determine whether the absent party is "indispensable" as defined by Rule 19(b), which requires the court to conduct a multifactor analysis to "determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."

Defendant contends that the Department is a necessary party under Rule 19(a)(1)(B), which requires joinder of a party that "claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest."  Defendant contends that the Department is a necessary party because plaintiff has attacked the Department's storm water permitting regulations and its decision to use only a mining permit to regulate defendant.  According to defendant, plaintiffs' real dispute is with the Department, not defendant, and the disposition of the action without the Department would impair or impede the Department's ability to protect its interests in administering its storm water and mining permit programs.  Additionally, defendant contends that because the Department is not a proper party in a citizen suit under 33 U.S.C. § 1365 and is entitled to sovereign immunity, it cannot be joined and this case must be dismissed.

I am not persuaded that the Department has an interest in this lawsuit that can be protected only by it is joined as a party.  Plaintiffs' complaint does not allege wrongdoing by the Department; rather, it alleges that defendant discharged pollutants without a permit required by federal law.  Such allegations are the proper subject of a citizen suit under the

34

Clean Water Act, 33 U.S.C. § 1365. Congress's purpose in allowing such suits was to insure enforcement of federal environmental requirements "irrespective of the failings of agency participation." Friends of the Earth v. Carey, 535 F.2d 165, 173 (2d Cir. 1976). See also Sierra Club v. Young Life Campaign, Inc., 176 F. Supp. 2d 1070, 1078 (D. Colo. 2001) ("[I]t has long been settled that federal and state agencies that administer federal environmental programs are not necessary, let alone indispensable, parties to citizen suits to enforce permitting and other federal environmental requirements against alleged violators.").

Defendant has cited no citizen environment suit in which a court has held that the government agency providing oversight was a necessary party because disposition of the action in the agency's absence could impair or impede its ability to protect its interests in the federal environmental program or state permit program at issue. Instead, defendant cites Boles v. Greeneville Housing Authority, 468 F.2d 476 (6th Cir. 1972), McCowen v. Jamieson, 724 F.2d 1421 (9th Cir. 1984) and Aztec Minerals Corp. v. Romer, 940 P.2d 1025, 1033-34 (Colo. App. 1997), but these cases are distinguishable. In Boles, the court held that the federal Department of Housing and Urban Development was an indispensable party in a case that indirectly attacked the Department's administrative decision approving a plan for an urban renewal project. In McCowen, the court determined that the Department of Agriculture was an indispensable party because the district court's judgment rested on a determination that the Department had erred in a decision concerning the

35

issuance of replacement food stamp coupons by a state agency.  In <u>Aztec</u>, the court held that the Environmental Protection Agency was a necessary party in an action in which the plaintiffs were challenging the agency's response the under Comprehensive Environmental Response, Compensation, and Liability Act.

Each of these cases involved an attack on an order or decision by a federal agency, or some degree of involvement on the part of the federal agency that made its appearance in the action necessary.  In this case, plaintiffs are challenging the actions of a private company, not an action taken by the Wisconsin Department of Natural Resources.  <u>M.B. Guran Company, Inc. v. City of Akron</u>, 546 F.2d 201, 204, n.3 (6th Cir. 1976) (no need to determine whether Department of Housing and Urban Development was indispensable party where plaintiff alleged that defendant was violating Department rule, not that Department was violating its own rule); <u>Dorsey v. Tompkins</u>, 917 F. Supp. 1195, 1200 (S.D. Ohio 1996) (distinguishing <u>Boles</u> and holding that agency is not necessary party where plaintiff is contending that defendant acted in violation of statute, not that agency acted in violation of statute).

Further, although defendant has asserted a "permit shield" defense that relies on a state mining permit issued by the Department, resolution of this issue will not require the court to "invalidate" the Department's state mining and storm water permit programs, as defendant suggests.  Rather, the court will be required to determine whether defendant's particular metallic mining permit protects it from suit under the Clean Water Act.  That the

36

Department has offered an opinion on this issue does not change the nature of plaintiffs'
claims or make the Department a necessary party.  Young Life, 176 F. Supp. 2d at 1078-79
("That [the state agency] has taken actions or positions relating to the terms of [defendant'
wastewater discharge] permit does not change this rule or convert this citizen suit to enforce
the Permit into a challenge to the validity of [the agency's] post-Permit actions.  The subject
of this action is [defendant's] compliance with the Permit . . . not the validity of [the
agency's] post-Permit representations to [defendant] regarding" permit requirements).  This
case is about whether defendant's alleged discharges violate federal law or whether they are
authorized by defendant's specific mining permit.  It is not about the Department's state
storm water or mining regulations generally and the case does not require the court to
consider whether any other entity's particular storm water permit would act as a shield to
Clean Water Act claims.

As plaintiffs point out, courts frequently interpret state and federal regulations and
agency actions in the context of environmental suits.  In United States v. Cinergy Corp, 623
F.3d 455, 457-59 (7th Cir. 2010), the court of appeals considered whether the United States
could enforce particular state regulations against a power plant under the Clean Air Act.  The
court concluded that although the state of Indiana had adopted certain regulations, the
regulations were not part of the state's implementation of the Clean Air Act because the EPA
had not approved them at the time of the challenged action.  Thus, the United States could
not enforce them under the Clean Air Act.  Id.  Neither the court nor the parties suggested

that the state of Indiana should have been joined as a necessary or indispensable party to protect any interest it had in the court's determination whether its regulations had been approved by the EPA as part of its state implementation plan of the Clean Air Act.

Similarly, in United States v. Murphy Oil USA, Inc., 143 F. Supp. 2d 1054, 1093, 1100-01 (W.D. Wis. 2001), this court determined whether state statutes and regulations had been approved by the EPA as part of Wisconsin's implementation of the Clean Air Act and whether they were enforceable against the defendant under the Act.  Neither the Department of Natural Resources nor the state of Wisconsin was joined as a party.  See also Domino, 670 F. Supp. 2d at 912 (concluding, without input from Department, that email from Wisconsin Department of Natural Resources to defendant was not sufficient authorization for defendant to amend its permit requirements).  As the court explained in Dorsey, 917 F. Supp. at 1200, "[c]ourts are called upon daily to interpret federal laws and regulations.  An agency does not become an indispensable party merely because . . . its interpretation of a federal statute becomes an issue in a case.  The fact that an agency may be able to lend its expertise to the interpretation of laws or regulations does not mandate its joinder as an indispensable party."

Moreover, even if the Department does have an interest in this lawsuit, its absence from this case will not impair or impede its ability to protect its interests "as a practical matter."  The Department has presented its position and supporting legal arguments regarding the regulatory framework and the actions it took related to defendant's storm

38

water discharges in the amicus curiae brief filed by the state of Wisconsin.  Dkt. #116-1.

In the state's brief, it notes that employees of the Department "have provided affidavits and

have been deposed regarding [the Department's] regulatory decisions, [defendant's]

compliance with its [Department]-issued permits, and the history of [the Department's]

storm water program and regulations.  The testimony and statements have been filed with

the Court and cited by both parties in their proposed findings of fact."  Id. at 2.  Although

defendant argues that the Department should be allowed to conduct discovery or obtain trial

testimony, defendant does not explain how discovery or trial testimony would be relevant

to the court's legal interpretation of the state and federal Clean Water Act regulations at

issue.  Because the Department has had an opportunity to present its position, any interest

it has in this legal issue has been adequately protected.

In sum, plaintiffs have filed this citizen suit to challenge defendant's alleged unlawful

discharges.  Plaintiffs do not seek to invalidate any permit issued by the Department or

challenge the Department's authority to regulate mining or storm water discharges under

state law.  Although plaintiffs disagree with the Department's interpretation of state and

federal law, that is not a sufficient reason to join the Department as a party in this case.

Thus, the Department is not a necessary party under Rule 19.

### C.  Defendant's Need for a Permit under § 402 of the Clean Water Act

Section 301 of the Clean Water Act prohibits the "discharge of any pollutant by any

person," with some exceptions.  33 U.S.C. § 1311(a).  One of these exceptions is a point source discharge authorized by a permit granted under § 402 of the Act, which sets forth the National Pollutant Discharge Elimination System.  33 U.S.C. § 1342.  The combined effect of §§ 301 and 402 is that the Act prohibits the discharge of any pollutant from a "point source" into "navigable waters" of the United States without a § 402 discharge permit.  Thus, to establish a violation of § 301, plaintiffs must prove that (1) defendant (2) added a pollutant (3) from a point source (4) into navigable waters of the United States (5) without a permit.

Plaintiffs allege that defendant discharged copper and zinc (pollutants) from its biofilter (a point source) into Stream C (a navigable waterway), without a permit issued under § 402 of the Clean Water Act.  Defendant concedes that the biofilter qualifies as a "point source" under the Act.  However, defendant contests every other element of plaintiffs' claims, denying that it discharged any pollutants from its biofilter, denying that any pollutants reached a navigable water and contending that any discharges were authorized by a § 402 permit.

1.  Discharge of pollutants

The Clean Water Act defines "pollutant" as including "solid waste," "chemical wastes" and "industrial wastes," among other things.  33 U.S.C. § 1362(6).  A point source discharges pollutants by conveying, releasing, spilling, overflowing, seeping or leaching the

40

pollutants into navigable waters.  This includes discharges that begin as storm water runoff from industrial activities and are collected and channelized before discharge.  33 U.S.C. § 1342(p); 40 C.F.R. § 122.2 ("Discharge of a pollutant means . . . surface runoff which is collected or channelled by man"); Northwest Environmental Defense Center v. Brown, 640 F.3d 1063, 1070-71 (9th Cir. 2011) ("[W]hen stormwater runoff is collected in a system of ditches, culverts, and channels and is then discharged into a stream or river, there is a 'discernable, confined and discrete conveyance' of pollutants, and there is therefore a discharge from a point source.").  See also Committee to Save Mokelumne River v. East Bay Municipal Utility District, 13 F.3d 305, 306, 308 (9th Cir. 1993) (finding channelized stormwater runoff from abandoned copper mine was "discharge of pollutants"); Sierra Club v. Abston Construction Co., 620 F.2d 41, 45 (5th Cir. 1980) (surface runoff collected or channeled by owner of inactive mine site constitutes point source discharge of pollutants if it overflows sediment basin); United States v. Earth Sciences, Inc., 599 F.2d 368, 373–74 (10th Cir. 1979) (holding that unintentional overflow of mining drainage systems designed to catch runoff was point source discharge of pollutants).

In its brief in opposition to plaintiffs' motion for summary judgment, defendant contends that there are genuine issues of material fact about whether it discharged pollutants from the biofilter.  However, defendant makes little effort to explain what the "disputed issues of fact" are.  In particular, defendant makes only two brief and undeveloped arguments on this issue.

First, defendant contends that copper and zinc occur naturally in the area around the mine and thus, they cannot be considered pollutants. This argument lacks merit. The definition of "pollutant" under the Clean Water Act expressly includes substances that are "naturally occurring," including dredged spoil, rock, sand and cellar dirt, 33 U.S.C. § 1362(6), and the EPA's list of toxic pollutants includes several naturally occurring elements that can nonetheless be harmful to human health or aquatic life. 40 C.F.R. § 401.15 (listing arsenic, copper, lead, mercury and zinc, among others). Additionally, many courts have found naturally occurring substances associated with a past or present industrial process to be "pollutants" under the Act. E.g., Northern Plains Resource Council v. Fidelity Exploration & Development Co., 325 F.3d 1155, 1161 (9th Cir. 2003) (holding that unaltered, natural byproduct of methane gas extraction was industrial waste and pollutant under Clean Water Act); Reynolds v. Rick's Mushroom Service, Inc., 246 F. Supp. 2d 449, 451, 455 (E.D. Pa. 2003) (runoff from natural mushroom farming residue could be pollutant); Beartooth Alliance v. Crown Butte Mines, 904 F. Supp. 1168, 1172 (D. Mont. 1995) (concluding that mine runoff was pollutant and rejecting defendant's argument that discharges were "result of naturally occurring conditions which predate any historic mining activities"). See also United State EPA, Abandoned Mine Site Characterization and Cleanup Handbook (Aug. 2000) at 3-3, 3-4 (noting that "[d]issolved pollutants at a mine site are primarily metals . . . [including] lead, copper, silver, manganese, cadminium, iron, arsenic, and zinc; and that "[n]aturally occurring substances in the site area are the major source of

these pollutants"), dkt. #95-12.

Defendant's second argument relies on 40 C.F.R. § 122.26, which states that § 402 Clean Water Act permits are not required for discharges from mine operations that consist solely of runoff that is "not contaminated by contact with or that ha[s] not come into contact with any overburden, raw material, intermediate product, finished product, by-product or waste material located on the site of the operations." Dft.'s Br., dkt. #79, at 18-19. Defendant contends that there are disputed issues of fact regarding whether runoff from the industrial outlot and biofilter comes into contact with any overburden, raw materials, byproduct or waste. Defendant relies primarily on the affidavit from a consultant, Stephen Donohue, who says that remediation efforts at the mine removed all such materials from the site.

Donohue's conclusory assertions do not create a genuine issue of fact regarding whether runoff into the biofilter is contaminated by overburden, waste, byproduct or other materials listed under the regulations. During active mining, activities such as ore crushing, hauling and byproduct storage and disposal took place on the industrial outlot. The industrial outlot has not been reclaimed, industrial activities continue to take place on the property and defendant's sampling has shown elevated levels of copper in the soils and sediments on the outlot. Thus, plaintiffs have adduced sufficient evidence to show that the outlot contains pollutants that are carried by runoff to the biofilter.

Moreover, even if runoff no longer comes into contact with pollutants in the outlot,

43

plaintiffs have adduced evidence showing that the biofilter itself contains pollutants from overburden, raw material, byproduct or other waste.  Defendant designed the biofilter to collect and treat storm water runoff and sediments from the outlot and the evidence shows that the biofilter itself, as well as discharges from the biofilter, contain levels of copper significantly higher than in nearby soil.  Thus, even if storm water runoff entering the biofilter did not contain copper-laden sediment, there is ample evidence showing that the runoff came into contact with pollutants from defendant's former mining activities when it enters the biofilter.  Therefore, plaintiff has shown as a matter of law that defendant's biofilter discharged "pollutants" within the meaning of the Clean Water Act.

2.  Navigable waterway

Next, defendant contends that even if its biofilter releases pollutants, the pollutants do not enter "navigable waters," as required for liability under the statute.  The Clean Water Act defines "navigable waters" as the "waters of the United States, including territorial seas." 33 U.S.C. § 1362(7).  The United States EPA and Army Corps of Engineers historically interpreted "the waters of the United States" expansively to include not only traditional navigable waters that are "navigable in fact," but also tributaries of such waters and wetlands adjacent to such waters and tributaries.  33 C.F.R. § 328.3.

The parties agree that the Flambeau River is a navigable water covered by the Clean Water Act.  In addition, the parties agree that Stream C south of Copper Park Lane is a

44

navigable waterway.  However, defendant's biofilter does not discharge directly into the river or into Stream C south of Copper Park Lane.  Rather, defendant discharges either into wetlands, as defendant contends, or into a channel of Stream C north of the lane, as plaintiffs contend.  Defendant contends that neither the northern section Stream C or the surrounding wetlands are "navigable waters" covered by the Clean Water Act.  Plaintiffs disagree, contending that the biofilter discharges into Stream C and that Stream C is covered by the Clean Water Act because it is navigable in fact, a tributary to a navigable water and has a "significant nexus" to a navigable water.

a.  Navigable in fact

In support of their argument that Stream C is "navigable in fact," plaintiffs cite statements made by the Wisconsin Department of Natural Resources during field investigations in 1988 that the stream "could be navigable" depending on weather conditions.  Plaintiffs also point to a statement made by an administrative law judge during 1991 hearings on defendant's mining permit that Stream C has "been determined to be navigable."  These statements are not sufficient evidence to establish that the stream is "navigable in fact" for purposes of the Clean Water Act.  Under federal law, waterways are navigable in fact if they can be used, or are susceptible of being used "'as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.'"  PPL Montana, LLC v. Montana, 132 S. Ct. 1215, 1228 (Feb.

22, 2012) (quoting <u>The Daniel Ball</u>, 10 Wall. 557, 563, 19 L. Ed. 999 (1870)).  Plaintiffs

have presented no evidence that Stream C north of Copper Park Lane fits this definition.

Rather, the evidence in the record shows that Stream C is an intermittent stream that runs

on a seasonal basis and cannot be "navigated" in the traditional sense above Copper Park

Lane.

b.  Tributary to the Flambeau River

Plaintiffs' second argument is that Stream C qualifies as navigable waters under the

EPA's regulatory guidelines because it is a tributary to the Flambeau River.  As relevant here,

the EPA's current regulations protect not only navigable-in-fact waters but also tributaries

of such waters and "wetlands" adjacent to waters otherwise covered by the Act.  40 C.F.R.

§ 122.2(e), (g).  The EPA's inclusion of tributaries as waters of the United States is based

on the idea that "any pollutant . . . that degrades water quality in a tributary of navigable

waters has the potential to move downstream and degrade the quality of the navigable waters

themselves."  <u>United States v. Deaton</u>, 332 F.3d 698, 707 (4th Cir. 2003).

Plaintiffs have submitted evidence that Stream C falls within the EPA's definition of

"waters of the United States" as a tributary of the Flambeau River.  40 C.F.R. § 122.2(e).

In particular, the undisputed facts show that for at least part of the year, Stream C has a

direct surface connection with the river and contributes its flow to the river.  <u>Headwaters,</u>

46

Inc. v. Talent Irrigation District, 243 F.3d 526, 533 (9th Cir. 2001) (tributary is "stream which contributes its flow to a larger stream or other body of water") (citation omitted). Further, defendant does not dispute that Stream C is a tributary to the Flambeau River, at least as it exists below Copper Park Lane.

However, defendant contends that reliance on the EPA's regulatory definitions for "navigable waters" is foreclosed by the United States Supreme Court's decision in Rapanos v. United States, 547 U.S. 715 (2006), and that regardless whether Stream C is a tributary or a wetland, it qualifies as navigable waters of the United States only if it has a "significant nexus" to the Flambeau River.


c.  Significant nexus

In Rapanos, the Court considered whether certain wetlands could be regulated by the Army Corps of Engineers under § 404 of the Clean Water Act.  It was unable to garner a majority for any holding.  A plurality of the justices concluded that "the waters of the United States includes only those relatively permanent, standing or continuously flowing bodies of water forming geographic features that are described in ordinary parlance as streams, oceans, rivers, [and] lakes."  Id. at 739 (citation and internal quotation marks omitted).  The plurality then articulated a two-part test for determining when adjacent wetlands are covered by the Clean Water Act:  "First, that the adjacent channel contains a 'wate[r] of the United States,' . . . and second, that the wetland has a continuous surface connection with that

water, making it difficult to determine where the 'water' ends and the 'wetland' begins." Id. at 742.

In his concurring opinion, Justice Kennedy rejected the two-part test, instead adopting the significant nexus test outlined in Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers, 531 U.S. 159 (2001), to determine whether wetlands adjacent to non-navigable waterways are subject to regulation by the Clean Water Act.  Id. at 779.  Justice Kennedy stated that

> wetlands possess the requisite nexus, and thus come within the statutory phrase 'navigable waters,' if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'  When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'

Id. at 780.  The dissenting justices would have deferred to the Army Corps of Engineers and the EPA.  Id. at 2252.

In United States v. Gerke Excavating, Inc., 464 F.3d 723 (7th Cir. 2006), the Court of Appeals for the Seventh Circuit held that Justice Kennedy's "significant nexus" test was the narrowest and therefore, the controlling test to determine whether wetlands are subject to federal authority.  However, there is a disagreement among the circuits whether Justice Kennedy's significant nexus test applies outside the context of wetlands.  E.g., San Francisco Baykeeper v. Cargill Salt Division, 481 F.3d 700, 707 (9th Cir. 2007) (holding that J. Kennedy's test applies only to scope of Corps' authority to regulate wetlands); Benjamin v.

48

Douglas Ridge Rifle Club, 673 F. Supp. 2d 1210, 1215 n.2 (D. Or. 2009) (holding that "Justice Kennedy's significant nexus test is inapplicable to determining the jurisdictionality of tributaries to waters of the United States. . . . Justice Kennedy limits the applicability of his legal standard to wetlands adjacent to jurisdictional waters"); but see United States v. Robison, 505 F.3d 1208, 1222-23 (11th Cir. 2007) (using significant nexus test to analyze Clean Water Act jurisdiction over non-navigable tributary); Environmental Protection Information Center v. Pacific Lumber Co., 469 F. Supp. 2d 803, 823 (N.D. Cal. 2007) (same); United States v. Vierstra, 803 F. Supp. 2d 1166, 1171 (D. Idaho 2011) (analyzing status of non-navigable tributary under EPA's regulatory guidance, as well as J. Kennedy's and plurality's tests in Rapanos).

Assuming for the purpose of this case that the significant nexus test applies to tributaries, there is no genuine factual dispute regarding whether Stream C has a significant nexus with the Flambeau River.  Plaintiffs have adduced evidence showing that the stream contributes its flow to the river, delivers water containing pollutants to the river and provides habitat for at least six species of fish that move between Stream C and the river.  In addition, although the stream runs only intermittently and seasonally, the short length of the stream suggests that most of its flow reaches the river.  Thus, there is a physical, chemical and biological connection between Stream C and the river.

Defendant proposes no facts to put the issue into dispute.  Instead, it attempts to poke holes in plaintiffs' facts, contending that plaintiffs have not provided sufficient data

regarding stream flow, duration or a measurable impact of the copper and zinc from Stream C on the water quality of the Flambeau River.  However, as Justice Kennedy explained, the significant nexus test is a flexible inquiry into the ecological relationship between the wetlands (or in this case, the waterway) at issue and traditional navigable waters.  Rapanos, 547 U.S. at 779–80.  "The required nexus must be assessed in terms of the statute's goals and purposes.  Id.  The significant nexus test does not require quantitative, physical evidence or "'laboratory analysis of soil samples, water samples, or . . . other tests,'" Precon Development Corp., Inc. v. United States Army Corps of Engineers, 633 F.3d 278, 293 (4th Cir. 2011), and defendant cites no cases in which a court required a plaintiff to quantify the impact of a pollutant carried by a tributary to establish significant nexus.  See also United States v. Cundiff, 555 F.3d 200, 211 (6th Cir. 2009).

Several courts both before and after Rapanos have found evidence of downstream pollutant transport, or even *potential* for such transport, to be dispositive of a finding that a tributary to a navigable river is itself a water of the United States.  Cundiff, 555 F.3d at 211 n.4 ("if one dropped a poison into the [defendants'] wetlands . . . it would find its way to the two creeks and the Green River, therefore indicating a significant chemical, physical, or biological connection" with the river); Northern California River Watch v. City of Healdsburg, 496 F.3d 993, 1001 (9th Cir. 2007) (finding significant nexus in part because pond delivered chloride and other pollutants to navigable water); United States v. Hubenka, 438 F.3d 1026, 1034 (10th Cir. 2006) ("[T]he potential for pollutants to migrate from a

tributary to navigable waters downstream constitutes a 'significant nexus' between those waters."); Vierstra, 803 F. Supp. 2d at 1172 (tributaries were "significant contributors of total suspended solids (sediment) and coliform bacteria to the Snake River").

Further, the seasonal and intermittent flow of Stream C does not mean it lacks a significant nexus with the Flambeau River. As the Court of Appeals for the Ninth Circuit has explained:

> [T]here is no reason to suspect that Congress intended to exclude from 'waters of the United States' tributaries that flow only intermittently. Pollutants need not reach interstate bodies of water immediately or continuously in order to inflict serious environmental damage . . . . Rather, as long as the tributary would flow into the navigable body of water 'during significant rainfall,' it is capable of spreading environmental damage and is thus a 'water of the United States' under the Act.

United States v. Moses, 496 F.3d 984, 989 (9th Cir. 2007) (quoting United States v. Eidson, 108 F.3d 1336, 1342 (11th Cir. 1997)). See also Headwaters, 243 F.3d at 534 (finding intermittent tributary to be water of United States).

Finally, the Act's prohibition on discharging without a permit is not contingent on the size or background of the receiving water or whether plaintiffs are able to show environmental harm to the receiving navigable water. The Act is focused upon the discharge itself, not on its impact. Thus, the Act does not require a showing that there was "any deleterious effect on the navigable waters downstream." Hubenka, 438 F.3d at 1035. To state a violation of the Act, plaintiffs need show only that defendant discharged a pollutant into a water of the United States from a point source without a permit. Id.

51

In sum, plaintiffs have shown that Stream C qualifies as waters of the United States both because it is a tributary to the Flambeau River and because it has a significant nexus with the river. Thus, if defendant's biofilter discharged into Stream C, defendant discharged pollutants into navigable waters within the meaning of the Clean Water Act.

That is not the end of the issue because it remains disputed whether the biofilter discharged into Stream C or into a grassy wetland. This would not matter if plaintiffs had adduced evidence establishing that the grassy wetland near the biofilter outlet also satisfies the significant nexus test in <u>Rapanos</u>, but they did not. The record contains few facts regarding whether the wetland adjacent to the biofilter has a biological, chemical or physical connection to Stream C or the Flambeau River. Defendant's expert concluded that discharges from the biofilter spread into the grassy area near the outlet, that there is no surface connection between the grassy wetland area and Stream C and that discharges from the biofilter likely do not reach the stream or river. Thus, I cannot conclude as a matter of law that any wetland area near the biofilter qualifies as a navigable water.

3. <u>Nature of permits held by defendant</u>

The next issue is whether defendant held a permit issued under the National Pollutant Discharge Elimination System in § 402 of the Clean Water Act. Plaintiffs contend that defendant does not hold a § 402 permit, while defendant contends that its state mining permit qualifies as a § 402 permit. Defendant contends that because it has complied with

52

its mining permit, it is entitled to a "permit shield" defense under § 402(k) of the Act. Section 402(k) protects a Clean Water Act permit holder from facing suits challenging the adequacy of its permit. 33 U.S.C. § 1342(k) ("Compliance with a permit issued pursuant to this section shall be deemed compliance . . . with sections 1311, 1312, 1316, 1317, and 1343 of this title). However, the permit shield applies only if defendant actually held a Clean Water Act permit. Thus, the question for the court is whether defendant's mining permit qualifies as a permit issued under § 402 of the Clean Water Act. The resolution of this issue depends on whether the mining permit is equivalent to a § 402 permit and whether the EPA has approved the Department of Natural Resource's use of state mining permits as substitutes for § 402 permits.

a.  Wisconsin's Clean Water Act authority

The United States Environmental Protective Agency has delegated authority to issue National Pollutant Discharge Elimination System permits in Wisconsin to the Wisconsin Department of Natural Resources under § 402(b) of the Clean Water Act. 33 U.S.C. § 1342(b). The Department operates the permitting program under Wis. Stat. § 283, and calls it the Wisconsin Pollutant Discharge Elimination System. The EPA approved Wisconsin's program in 1974. At that time, neither state nor federal law required a pollution discharge elimination permit for storm water discharges. In 1987, Congress amended the Clean Water Act to require federal permits for storm water discharges. In

1993, Wisconsin law was amended to require discharge permits for storm water.  Wis. Stat.

§ 283.33.  In 1994, the Department proposed storm water regulations at Wis. Admin. Code

§ NR 216 and submitted them to the EPA.   One of the regulations proposed by the

Department in 1994 was Wis. Admin. Code § NR 216.21(3), which states in part:

> (3) Other environmental programs.  If one of the following conditions is met, the department may deem that a facility is in compliance with coverage required under s. 147.021, Stats., and will not be required to hold a separate permit under s. 147.021, Stats.:
>
>> (a) The storm water discharge is in compliance with a department permit or approval which includes control requirements that are at least as stringent as those required under this subchapter; or . . .

(This provision was renumbered as § NR 216.21(4) in 2004, but has remained essentially

unchanged since its adoption in 1994.)  After the Department proposed the regulations in

Wis. Admin. Code ch. NR 216, it submitted the regulations to the EPA for review.  The EPA

reviewed the submissions and made a single recommendation regarding the wording of § NR

216.21(3), which the Department accepted.   The Department formally adopted the

regulations in 1994.


b.  Defendant's mining permit

Defendant contends that its state mining permit issued under Wisconsin's metallic

mining laws, Wis. Stat. ch. 293, is the legal equivalent of a state storm water discharge

permit issued under Wis. Stat. ch. 283 because (1) the EPA has approved the use of § NR

216.21(4) as part of the permitting scheme under the Wisconsin Pollutant Discharge

54

Elimination System; (2) the state believes the mining permit is a valid § 402 permit; and (3) the permit's requirements are substantially similar to requirements under the Clean Water Act.

The threshold question is whether the EPA has approved § NR 216.21(4) as part of the state's § 402 permit program; without the EPA's approval, defendant cannot sustain a defense that the permit issued under the state's metallic mining laws meets the federal requirements under the Clean Water Act's National Pollution Discharge Elimination System program.

Federal regulations set forth a specific process by which states gain approval for permitting programs and revisions to those programs under 33 U.S.C. § 1342. As relevant to this case, any revisions to a state-approved program must be submitted to the EPA through a process set forth in 40 C.F.R. § 123.62 ("Procedure for revision of state programs"). Specifically, the state must "submit a modified program description, Attorney General's statement, Memorandum of Agreement or such other documents as EPA determines to be necessary under the circumstances." Id. § 123.62(b)(1). After the EPA reviews the submission, it will determine whether the revision is "substantial" or not. If the revision is "substantial," the EPA undertakes a process similar to notice and comment rulemaking. The EPA first publishes public notice in the Federal Register and state newspapers and allows at least 30 days for the public to comment. Id. § 123.62(b)(2). For "substantial revisions," notice of the EPA's approval of the state's program revision is

55

published in the Federal Register.  Id. § 123.62(b)(4).  If the revision is not "substantial," there is no public notice and comment process, but the revision is not effective until there is written approval through a letter from the EPA administrator to the state governor or his designee.  Id.  Under 33 U.S.C. § 1369(b)(1)(D), the EPA's determination "as to a State permit program submitted under section 1342(b)" is reviewable by petitioning the court of appeals for review within 120 days of the EPA's approval or disapproval.

The Wisconsin Department of Natural Resource's decision to use a mining permit via § NR 216.21(4) to satisfy the requirements of § 402 of the Clean Water Act post-dated the EPA's initial approval of the original Wisconsin § 402 permit program in 1974.  Thus, to qualify as part of Wisconsin's § 402 permit program and satisfy the permit shield exception in § 402(k), § NR 216.21(4) must have been submitted to the EPA and the EPA must have approved that regulation under 40 C.F.R. § 123.62(b) through either a Federal Register notice or a letter to the governor or a designee.

Defendant has adduced no evidence to support its contention that the state submitted § NR 216.21(4) in conformance with the process set forth in 40 C.F.R. § 123.62 or that the EPA has approved use of § NR 216.21(4) to allow a state mining permit stand in for a discharge permit under the Wisconsin Pollutant Discharge Elimination System permit program.  The only evidence in the record is that the state submitted ch. NR 216 to the EPA for review, the EPA made a suggestion about phrasing and the Department adopted the regulations.  However, 40 C.F.R. § 123.62 requires explicit approval, not lack of disapproval.

56

Cf. Cinergy Corp., 623 F.3d at 458 (state regulation not part of Indiana's Clean Air Act regulations until approved by EPA; thus, even though Indiana adopted regulation to comply with EPA's new interpretation of law, state regulation was not enforceable under Clean Air Act until EPA approved it 12 years later); Murphy Oil USA, 143 F. Supp. 2d at 1101 (holding that under similar provisions of Clean Air Act, approved program elements are those that existed when EPA approved program, and not changes made after the fact by state; "otherwise, the approval process would be largely meaningless because a state could change its regulations after the state implementation plan was approved").  Moreover, plaintiffs have filed an affidavit from the "custodian of the official records" of the Department of Natural Resources, in which the custodian certifies that "a diligent search" of the Department's records did not reveal any record of submission of § NR 216 to the EPA "as modifications of Wisconsin's [National Pollutant Discharge Elimination System permitting program pursuant to 40 C.F.R. § 123.62(b)."  Dkt. #40-1, at ¶ 5.  Nor are there any records relating to the EPA's "approval of the Department's use of Mining Permits issued under Wis. Stat. ch. 293 in lieu of [National Pollutant Discharge Elimination System] permits where such permits are required by section 402 of the federal Clean Water Act."  Id. at ¶ 7.

Both defendant and the state, in its amicus brief, downplay the issue whether the EPA formally approved § NR 216.21(4) to allow a state mining permit to substitute for a discharge permit under Wis. Stat. § 283.33.  They contend that defendant is entitled to a

permit shield under § 402(k) of the Clean Water Act because the Department of Natural Resources and defendant believed that the mining permit was sufficient under the Act.

It is questionable whether defendant and the Department understood at the time that defendant's mining permit was issued in 1991 or modified in 1998 that the permit was to act as a § 402 storm water discharge permit under § NR 216.21(4).  The mining permit itself suggests that it is a permit issued to comply with state mining laws, not federal law.  The mining permit states explicitly that regulatory approvals granted by the permit are "limited to the authority vested in the Department by" Wisconsin's metallic mining laws, not the Clean Water Act, Wisconsin's EPA-approved Clean Water Act provisions in Wis. Stat. ch. 283 or § NR 216.  The permit instructs defendant to "obtain any and all other permits, licenses and approvals necessary from federal, state and local authorities."  Thus, under its own terms, defendant's mining permit is issued only "pursuant to" state mining laws, not § 402 of the Clean Water Act.  (That is why defendant had a Wisconsin Pollutant Discharge Elimination System permit in the 1990s that authorized certain limited discharges of storm water to the Flambeau River, even though the mining permit contained storm water management provisions).

Further, the public notice on the proposed modification of the permit issued by the Department cited only state mining laws and did not identify a point source, pollutant discharge or receiving waters as required by 40 C.F.R. § 124.10(d) for § 402 permits.  Moreover, the Department did not submit the mining permit to the EPA for review as

58

required by § 402(d).  Additionally, although defendant and the state assert that the Department decided in 1998 to regulate discharges from the biofilter under § NR 216.21(4), neither defendant nor the state has produced documents from 1998 that mention the specific pollutant discharge from the biofilter in relation to the Clean Water Act, the national or state Pollutant Discharge Elimination System permit programs or NR 216. Although the Department discussed surface and storm water management with defendant at the time, the discussions were specific to defendant's wastewater treatment system and discharges from other locations on the property.

Thus, it appears from the record that the first time that the Department set forth its position that it was regulating point source discharges from the biofilter through the mining permit and under § NR 216.21(4) was in response to plaintiffs' notice of intent to sue in 2009.  Even if it is true that the Department and defendant believed that the mining permit qualified as a permit issued under the Clean Water Act, neither defendant nor the state has cited any cases in which a defendant was able to invoke a permit shield defense on the basis of a permit that was not clearly issued under § 402 or an EPA-approved state permit program.  In contrast, courts have reiterated in several cases the principle that only permits issued under the National Pollutant Discharge Elimination System or an approved state program constitute a § 402 permit that can create a permit shield.  E.g., Citizens for a Better Environment-California v. Union Oil, 83 F.3d 1111, 1119-20 (9th Cir. 1996) (holding that state administrative order was not legal equivalent of §402 permit and did not constitute

59

valid modification of § 402 permit); Natural Resource Defense Council, Inc. v. Costle, 568

F.2d 1369, 1374 (D.C. Cir. 1977) ("Congress intended the [National Pollutant Discharge

Elimination System Program] permit to be the only means by which a discharger from a

point source may escape the total prohibition of § 301(a)."); Oregon State Public Interest

Research Group, Inc. v. Pacific Coast Seafoods Co., 361 F. Supp. 2d 1232, 1242-43 (D. Or.

2005) (finding state consent order was not equivalent to § 402 permit and did not shield

defendant from Clean Water Act liability).

     Further, it is well established that state and federal agency efforts to work around

federal Clean Water Act requirements are invalid.  E.g., Northern Plains Resource Council

v. Fidelity Exploration & Development Co., 325 F.3d 1155, 1164, n.5 (9th Cir. 2003) (state

regulation purporting to exempt discharges from requirement to obtain § 402 permit could

not exempt discharge from federal law requirements because EPA had no authority to

approve such exemption and, in any event, had not approved state regulation at issue);

Proffitt v. Rohm & Haas, 850 F.2d 1007, 1012 (3d Cir. 1988) (defendant's stipulation with

EPA purporting to stay § 402 permit conditions was void, in part, because there was "no

adjudicatory hearing, public or otherwise, and therefore no opportunity for public

participation"); Northern Cheyenne Tribe v. Montana Department of Environmental

Quality, 234 P.3d 51, 57 (Mont. 2010) (holding that "states issuing permits under § 402

'stand in the shoes of the [EPA]' and thus must adhere to the federal requirement[s]" of

Act); Riverkeeper, Inc. v. Mirant Lovett, LLC, 675 F. Supp. 2d 337, 346 (S.D.N.Y. 2009)

(allowing Clean Water Act citizen suit to proceed where permitting agency's "attempt to modify the permit failed to comply with the necessary public participation procedures" for § 402 permit issuance"); Oregon State Public Interest, 361 F. Supp. 2d at 1243 (order issued "in lieu of permit" was "not issued in accordance with the procedures needed for the issuance or modification of [§ 402] permit [and] d[id] not have the same legal effect as [§ 402] permit"). See also Murphy Oil USA, Inc., 143 F. Supp. 2d at 1094 (finding that, under Clean Air Act, only specific types of permits issued according to specific regulations provide shield).

Finally, it is also well established that the Clean Water Act is a strict liability statute. Thus, a defendant's good faith belief that its permit authorized discharges is irrelevant to liability under the Act.  Greenfield Mills, Inc. v. Macklin, 361 F.3d 934, 946 n.14 (7th Cir. 2004) (stating liability for discharge pollutant without § 402 permit is "strict"; defendant's intent or purpose is irrelevant); Kelly v. EPA, 203 F.3d 519, 522 (7th Cir. 2000) ("nothing in the statute makes good faith or a lack of knowledge a defense . . . Civil liability under the Clean Water Act, therefore, is strict."); Association to Protect Hammersley v. Taylor Resources, Inc., 299 F.3d 1007, 1012 (9th Cir. 2002) (rejecting defendant's argument that citizen suit was barred where state determined no § 402 permit was required); Sierra Club, Lone State Chapter v. Cedar Point Oil Co., 73 F.3d 546, 561-62 (5th Cir. 1996) (noting that Clean Water Act citizen suit enforcement is proper "even if the discharger's illegal behavior results from EPA's failure to refusal to issue the necessary permit"); Vierstra, 803

61

F. Supp. 2d at 1166 (holding that defendant was not shielded from Clean Water Act for discharging into navigable waters without proper permit even though Idaho State Department of Agriculture had played active role in monitoring defendant's use of canal); Inland Empire Waterkeeper v. Uniweb, Inc., 2008 WL 6098645, *7-8 (C.D. Cal. Aug. 6, 2008) (discharger that relied in good faith on city's "offset" program to relax discharge limits did not have defense to Clean Water Act violations because program was not federally approved).

Applying these principles to the present case, I conclude that defendant is not entitled to a permit shield defense under § 402. Defendant has not shown that the EPA has approved use of state mining permits via § NR 216.21(4) as substitute for Wisconsin Pollutant Discharge Elimination System permit; defendant has not established that the Department following the required public notice and other procedural requirements for issuing a § 402 permit when it issued the mining permit; and finally, even if it is true that the Department and defendant believed the mining permit qualified as a § 402 permit, the Clean Water Act is a strict liability statute that provides a permit shield defense only for those permits that are actually § 402 permits.

However, defendant's good faith belief that it held a Clean Water Act permit is relevant to the amount of civil penalties that may be appropriate, which may be adjusted on the basis of a polluter's "good-faith efforts to comply with applicable requirements." 33 U.S.C. § 1365(d). Inland Empire, 2008 WL 6098645 at *8 ("That Uniweb may have

62

inadvertently violated the permit limits in believing its discharges were lawful under the [city's] invalid off-set program does not allow it to avoid a finding of liability, although this certainly could be a factor when measuring any civil penalties for violations."); Hawaii's Thousand Friends v. Honolulu, 821 F. Supp. 1368, 1392 (D. Hawaii 1993) (citing United States v. Ohio Edison, 725 F. Supp. 928, 934 (N.D. Ohio 1989)) ("The fact that a violator is 'without fault' in committing violations of the Clean Water Act does not absolve the violator from penalties, although it may mitigate the amount of the penalties assessed.").

### E.  Statute of Limitations

Defendant contends that plaintiffs' claims are barred by the statute of limitations. The parties agree that the five-year statute of limitations set forth in 28 U.S.C. § 2462 applies to citizen suits under the Clean Water Act.  Sierra Club v. Chevron U.S.A., Inc., 834 F.2d 1517 (9th Cir. 1987).  To support its contention that plaintiffs' Clean Water Act claims are time barred, defendant relies solely on its position that the events giving rise to this lawsuit include the Department's approval of the 1998 permit modification and authorization of defendant's use of the biofilter to discharge storm water.  Defendant contends that because plaintiffs knew in 1998 that the Department had approved the 1998 modification, plaintiffs' five-year window to challenge the regulatory approach has long since passed.

Plaintiffs do not seek relief for the 1998 permit modification, construction of the

biofilter or even the first discharges from the biofilter in 1999.  Rather, plaintiffs' claims are for those discharges from the biofilter that occurred within the statute of limitations period. As the Clean Water Act makes clear, each day upon which an unpermitted discharge occurs results in a separate and distinct violation of § 301(a).  33 U.S.C. §§ 1311(a), 1362(12), 1319(d).  See also Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York, 273 F.3d 481, 487 (2d Cir. 2001); Borden Ranch Partnership v. United States Army Corps of Engineers, 261 F.3d 810, 818 (9th Cir. 2001); United States v. Rutherford Oil Corp., 756 F. Supp. 2d 782, 791, 793 (S.D. Tex. 2010).  Thus, citizen plaintiffs may seek civil penalties for each violation that accrued within the five years preceding the notice letter.

Accordingly, plaintiffs' claims are not time barred.

## F.  Defendant's Other Affirmative Defenses

Defendant raises several additional affirmative defenses, including (1) failure to exhaust administrative remedies; (2) claim preclusion; (3) issue preclusion; (4) equitable estoppel; (5) judicial estoppel; (6) estoppel by record; (7) laches; and (8) waiver.  These defenses are all based on the same reasoning:  because plaintiffs participated in the administrative permitting process in 1998; attended a public hearing on the modification; obtained concessions from defendant and the Department; agreed to withdraw their request for a contested case hearing; and decided not to pursue administrative or judicial review of the Department's approval of the 1998 modification, they are barred by various doctrines

from pursuing their claims now.

Assuming for the sake of argument that a party's participation in the 1998 modification process and subsequent failure to appeal the permitting decision could act as a bar to an enforcement action under Clean Water Act in some situation, defendant has not adduced sufficient evidence to support a dismissal of plaintiffs' claims in this case.  In particular, the evidence does not establish that plaintiffs were aware in 1998 that defendant would be discharging copper, zinc and other pollutants from its biofilter into Stream C or that the Department intended to regulate such discharges through the mining permit and without a traditional permit under the National or Wisconsin Pollutant Discharge Elimination System.  Thus, there was no reason plaintiffs would have challenged defendant's mining permit on this basis.  Instead, as they stated in their request for a public hearing, plaintiffs were concerned that defendant's proposed supplement violated state mining laws.

The more fundamental problem with defendant's affirmative defenses is that they all rely on the faulty premise that plaintiffs' claims in this lawsuit are really a collateral challenge to the Department's decision in 1998 to modify defendant's mining permit.  This is wrong. Plaintiffs are not challenging the Department's decision to approve the modification.  It is plaintiffs' position that the Department was within its authority to modify the mining permit and regulate defendant under state mining laws.  In this lawsuit, plaintiffs are seeking direct enforcement against defendant for alleged violations of § 301 of the Clean Water Act occurring *after* 1998.  Domino, 670 F. Supp. 2d at 915 (recognizing that Clean Water Act

65

citizen suits are not cases "in which plaintiffs are alleging injury as a result of an agency action. Plaintiffs' claims are based solely on defendants' [Clean Water Act] violations . . . ."). At the time the 1998 modification was issued, the biofilter had not been constructed and it had not begun discharging the pollutants that triggered plaintiffs' Clean Water Act claims. In other words, the events that happened in 1998 involved issues different from those that triggered this lawsuit. Plaintiffs could not have raised their present Clean Water Act claims in 1998, because defendant did not begin discharging storm water from its biofilter until some time after the permit modification was approved. Thus, it is irrelevant to this lawsuit whether plaintiffs participated in the permit modification process, led defendant to believe that the mining permit satisfied state mining laws or failed to appeal the Department's approval of the permit. Accordingly, I am denying defendant's motion for summary judgment.

ORDER

IT IS ORDERED that

1. The motion for partial summary judgment filed by plaintiffs Wisconsin Resources Protection Council, Center for Biological Diversity and Laura Gauger, dkt. #39, is GRANTED IN PART and DENIED IN PART. The motion is GRANTED with respect to the following issues:

a. Plaintiffs have standing to bring this lawsuit;

66

b.  Defendant Flambeau Mining Company released water containing pollutants from the biofilter on its property;

c.  Stream C and the Flambeau River are navigable waters subject to the requirements of the Clean Water Act; and

d.  Defendant's mining permit is not a permit under § 402 of the Clean Water Act. Plaintiffs' motion is DENIED in all other respects.

2.  Plaintiffs' motion for leave to file supplemental proposed findings of fact, dkt. #102, is DENIED,

3.  Defendant's motion to strike plaintiffs' proposed findings of fact, dkt. #113, is DENIED.

4.  The State of Wisconsin's motion for leave to file an amicus curiae brief, dkt. #116, is GRANTED.

5.  Defendant's motion for summary judgment, dkt. #57, is DENIED.

6.  Defendant's motion to dismiss for failure to join an indispensable party, dkt. #123, is DENIED.

Entered this 13th day of April, 2012.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge