UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

WISCONSIN RESOURCES
PROTECTION COUNCIL, CENTER
FOR BIOLOGICAL DIVERSITY,
AND LAURA GAUGER,

        Plaintiffs,

    v.

FLAMBEAU MINING COMPANY,

        Defendant.

Case No. 11-cv-45

---

**DEFENDANT FLAMBEAU MINING COMPANY'S
BRIEF IN SUPPORT OF MOTION TO STRIKE THE DECLARATION OF
HAROLD FLATER FROM THE RECORD**

---

Defendant Flambeau Mining Company ("FMC") respectfully moves the Court to strike the Declaration of Harold Flater ("Flater"), (D.E. No. 44), from the record. Plaintiffs Wisconsin Resources Protection Council, Center for Biological Diversity, and Laura Gauger (hereinafter collectively referred to as "Plaintiffs"), submitted Flater's Declaration in support of their summary judgment pleadings. However, as just recently revealed at Flater's April 26, 2012 deposition, Flater's personal knowledge does not serve as the basis for such Declaration. Rather, the Declaration is based on hearsay as well as misleading and unsupported sworn statements.

**INTRODUCTION AND FACTUAL BACKGROUND**

On November 16, 2011, in support of their argument to establish standing in their Motion for Partial Summary Judgment, Plaintiffs filed the Declaration of Harold Flater (hereinafter referred to as the "Declaration"), made upon penalty of

perjury pursuant to 28 U.S.C. § 1746.  (D.E. No. 44).  To further support their Motion, Plaintiffs cited the Declaration in 12 of Plaintiffs' Proposed Findings of Fact.  *See* (D.E. No. 52, ¶¶ 42-52, 169).  Plaintiffs also relied on the Declaration in their brief in support of their Motion for Partial Summary Judgment, and cited to Flater's alleged familiarity with the Flambeau Mine and the Biofilter discharge:

> Ms. Andresen and Mr. Flater are familiar with the Flambeau Mine and its Biofilter discharge, and are aware that the copper and zinc discharged to Stream C and the Flambeau River have on occasion exceeded Wisconsin's toxicity criteria designed to protect aquatic life and human health.

(D.E. No. 53, p. 17).

Additionally, the Court cited certain facts contained in the Declaration at pages 6, 25, 26, and 27 of the Court's Opinion and Order Granting Partial Summary to Plaintiffs.  (D.E. No. 137).

The Declaration contains sixteen sworn statements and a verification that the statements were true and correct and based upon Flater's personal knowledge. (D.E. No. 44).  Moreover, the very first statement in the Declaration indicates:

"1.  I make these statements based on personal knowledge."

*Id.*

However, contrary to these two affirmations, at least eight of the statements in the Declaration are not based upon personal knowledge, but instead are based upon outright hearsay and speculation as demonstrated by Flater's Deposition, taken on April 26, 2012.

Plaintiffs long delayed and then vigorously opposed the taking of the Flater Deposition.  FMC first attempted to schedule the deposition of Flater in mid-

October, 2011.  *See* (D.E. No. 140).[1]  The parties were unable to schedule the deposition, and FMC was advised that Flater was spending the winter in Texas. *Id.*

Counsel for FMC again made efforts to schedule Flater's deposition in January, 2012.  *Id.*  On February 1, 2012, Plaintiffs responded that Flater was still in Texas and not scheduled to return to Wisconsin until April 2, 2012.  (D.E. No. 140; D.E. No. 141, Van Camp Aff. ¶ 2, Ex. A; D.E. No. 141-1).  Plaintiffs stated that they could make Flater available for deposition in Texas in early March, but indicated "more preferably, we suggest his deposition be scheduled sometime during the first two weeks of April in either Holcombe or Madison, Wisconsin." *Id.*  In reference to a document request made by Defendants pertaining to Flater, Plaintiffs also indicated that, "it will be difficult for us to respond to this request until Flater has returned from Texas, since all potentially responsive documents are located in Wisconsin."  *Id.*

Defendant acceded to Plaintiffs' request and agreed to take Flater's deposition during the first week of April, 2012.  (D.E. No. 140).  After exchange of further correspondence, Plaintiffs committed to make Flater available for deposition on April 6, 2012, in Madison, Wisconsin.  *Id.; see also* (D.E. No. 141, Van Camp Aff. ¶ 3, Ex. B; D.E. No. 141-2).

---

[1] References to Docket Entry No. 140 refer to Defendant's Response to Plaintiffs' Motion for Protective Order and Motion to Stay the Deposition of Plaintiffs' Witness Harold Flater, where FMC previously presented the timeline of the Flater deposition to the Court.  References to Docket Entry No. 141 refer to the Affidavit of Harry E. Van Camp submitted in support of that response, with corresponding exhibits.

On April 5, 2012, the day before Flater's scheduled deposition, Plaintiffs unilaterally cancelled the deposition, stating "Harold Flater has had a conflict arise and won't be able to make it to Madison tomorrow….we would like to reschedule his deposition for April 9 – 12 or 16 – 17, in Madison."  (D.E. No. 140; D.E. No. 141, Van Camp Aff. ¶ 4, Ex. C; D.E. No. 141-3).

In response, counsel for FMC asked for alternative dates for Flater's deposition, and ultimately the parties agreed to April 17, 2012.  (D.E. No. 140). Consistent with this agreement, on April 11, 2012, FMC issued an Amended Notice of Deposition.  (D.E. No. 140; D.E. No. 141, Van Camp Aff. ¶ 5, Ex. D; D.E. No. 141-4).

Despite this agreement, on April 16, 2012, Plaintiffs filed an Emergency Motion for Protective Order and Motion to Stay Flater's Deposition, which was then scheduled for the following day.  (D.E. No. 138).

On April 20, 2012, the Court granted in part and denied in part Plaintiffs' Motion for a Protective Order and Motion to Stay, and ordered the deposition take place.  (D.E. No. 142, 4/20/2012 Text Only Order).[2]  During the hearing on the motion, Plaintiffs vigorously opposed the taking of Flater's Deposition.  Given what Flater's deposition revealed, it is no surprise that Plaintiffs did not want the deposition to happen.

---

[2] The Court placed the following conditions on the deposition: "Defendant may depose Flater in Holcombe, Wisconsin for three hours, preferably within the next week."  (D.E. No. 142, 4/20/2012 Text Only Order).

A comparison of Flater's Deposition testimony against his Declaration reveals that the Declaration was not based on personal knowledge, and did not set out facts admissible in evidence.  Rather, such statements were based on pure hearsay.

| Statement in 11/16/2011 Declaration | 4/26/2012 Deposition |
|---|---|
| 2.  I am a member of the Wisconsin Resources Protection Council ("WRPC") and have been a member since at least January 12, 2011. Prior to becoming a WRPC member on January 12, 2011, I was a long-time supporter of and contributor (both financially and in-kind) to the ongoing efforts of WRPC to protect the environment of Northern Wisconsin from the impacts of mining.[3] | Q  Do you know a person by the name of Al Geddicks [sic]?[4]<br><br>A  **I don't believe so.** [5]<br><br>Q  How were you approached to become involved in this lawsuit?<br><br>A  Well, I was -- joined our -- our association, and -- and what was -- I can't think of her name, the gal?<br><br>Q  He -- unfortunately, he's not --<br><br>A  Well --<br><br>Q  -- to testify.<br><br>A  Well, I -- if you could tell me the gal's name and I -- would help to --<br><br>Q  Yeah.  And I'm afraid I don't know who it is.<br><br>A  Yeah.<br><br>Q  And we're asking you from your memory.<br><br>A  Yeah.  And -- and she asked me if I would write this statement and a -- a -- a statement as to what I felt about the pollution in the Flambeau River.  And that is what you have in front of you here.<br><br>Q  Okay.  Do you know where this woman was from?<br><br>A  Originally from, I think, Duluth.  I --<br><br>Q  Does the name **Laura Furtman** ring a |

---

[3] These statements are all contained in the 11/16/2011 Declaration (D.E. No. 44).
[4] Al Gedicks is the Executive Secretary of WRPC and has been associated with WRPC since 1982.  (D.E. No. 77, Gedicks Dep. 14:23-15:7); (D.E. No. 45, Gedicks Decl. ¶ 3).
[5] Emphasis has been added, demonstrated with bolded text.

bell?

A   What's the first name?

Q   Laura.

A   **Yeah, Laura.**

Q   Laura?

A   Uh-hum.

Q   And have you ever met her, actually?

A   Not -- not -- just by talking to her on the phone.

Q   When was the first time you remember talking to her on the telephone?

A   It would be an estimate of probably year and a half, two years.

Q   Did she call you the first time?

A   Yes.

Q   What did she say to you over the phone?

A   Well, the -- as I was involved with the negotiation of the mining when they started, I was on the -- the Rusk County Board of Supervisors at the time and knew Roscoe Churchill and was a very good friend of Roscoe Churchill. And -- and that's how she had got my name and wanted to talk to me.

Q   Was this after Roscoe passed away?

A   Yes.

Q   Did she ask you to become involved in the organization, the Wisconsin Resource Protection Council?

A   **Yes, she did.**

Q   And how did you get in contact with the Wisconsin Resource Protection Council?

A   **She gave me an address and I contacted them and joined the organization.**

Q   When did you do that?

A   Oh, first part of -- a year ago last January.  I think it was somewhere --

Q   **Like January 2011?**

6

| | |
|---|---|
| | A   Yes.<br><br>(D.E. No. 188, Flater Dep. 12:18-15:2).[6]<br><br>* * *<br><br>Q   Had you ever been a member of that organization before she asked you to become one?<br><br>A   **No.**<br><br>(D.E. No. 188, Flater Dep. 15:5-7). |
| 9.   I am aware that a portion of the Flambeau Mine has not yet been fully reclaimed because it is still in use as an industrial park. I am also aware that this portion of the site, known as the "Industrial Outlot," contains a stormwater detention basin described by FMC as a "Biofilter" that receives stormwater runoff from the industrial area and then discharges to the adjacent stream known as "Stream C." | Q   Did you ever get out of your vehicle and actually walk around the biofilter?<br><br>A   **No.**<br><br>(D.E. No. 188, Flater Dep. 22:3-5).<br><br>* * *<br><br>Q   Do you know anything about its construction?<br><br>A   **No.**<br><br>(D.E. No. 188, Flater Dep. 23:1-2).<br><br>* * *<br><br>Q   Okay.  What -- what is a biofilter as far as you know, what is it?<br><br>A   I -- I gathered it was a **screen type** deal, and -- to keep particles from going through, and that's what I would think it would be.  I -- **I've never seen it, so I can't -- could not really tell you.**<br><br>(D.E. No. 188, Flater Dep. 23:13-19).<br><br>* * *<br><br>Q   Okay.  Now, let me ask you, with regard to this biofilter, how often does anything come out of the biofilter?<br><br>A   **That, I could not tell you.** |

---

[6] References to "D.E. No. 188, Flater Dep." refer to the transcript of the April 26, 2012 Deposition of Harold H. Flater, which FMC has filed in conjunction with this motion.

Q   Do you know whether it's once a year?

A   I -- I would gather.  I -- because I don't go there that often, but when we'd get heavy rains, I'm sure that there would be water that would be running out of that.

Q   Have you ever seen any water coming out of it?

A   **No, I have not.**

Q   Okay.  So you don't personally know whether it flows out of the biofilter?

A   **No.**

Q   Do you know where, what side of the biofilter has an outlet of any kind?

A   **No, I don't.**

(D.E. No. 188, Flater Dep. 29:15-30:6).

\* \* \*

Q   Okay, that's your word.  Describe what the exit is.

A   It's a place where water comes out and could go towards the river. **And, like I said, I've never been there when they've had heavy rains or anything to see if it did flow or not,** but I understand it does according to the **Ladysmith News** and -- and **other people saying** that water does flow out there in -- into Stream C.

(D.E. No. 188, Flater Dep. 30:23-31:7).

\* \* \*

Q   Okay.  And where do you understand the industrial outlot drains to when it has a heavy rain?

A   **I never was there after rain -- with heavy rains, so I could not tell you where.**

Q   Have you ever seen Stream C anyplace in the vicinity of Copper Park Lane?

A   **No.**

| | (D.E. No. 188, Flater Dep. 40:21-41:2). |
|---|---|
| 10. I am aware that FMC has had ongoing water quality problems at the mine site since at least 2004. I am aware that there are elevated levels of copper, iron, and zinc flowing into the Biofilter, and that these pollutants are discharged from the Biofilter into Stream C, which is a tributary to the Flambeau River. I am aware that copper, iron, and zinc are carried downstream by the waters of Stream C and ultimately enter the Flambeau River. | Q   Okay.  How far would water have to go if it came out of the biofilter before it ever reached Stream C?<br><br>A   You'd asked that question before, and I said I did not -- could not tell you the exact amount.<br><br>Q   Have you ever seen Stream C yourself?<br><br>A   Well, from the -- the Flambeau River, yes, **where it enters the Flambeau River.**<br><br>Q   Okay.  Describe what you see when you see Stream C from the Flambeau River.<br><br>A   It's a -- a stream that will dry up, pretty much dry up in the dry weather and be quite a creek otherwise.<br><br>Q   Okay.  Have you ever determined how much or how many days a year it flows when it reaches the Flambeau River?<br><br>A   **No way for me to tell.**<br><br>(D.E. No. 188, Flater Dep. 32:21-33:12).<br><br>          * * *<br><br>Q   Do you have any idea how much of the water in Stream C ever came out of the biofilter?<br><br>A   **No way for me to know.**<br><br>(D.E. No. 188, Flater Dep. 34:15-17).<br><br>          * * *<br><br>Q   Did Laura tell you anything that suggested that pollution was happening from the mine site?<br><br>A   The -- **she had made a statement** that the DNR had find -- found high -- higher than normal copper and zinc in -- in the ponds.<br><br>(D.E. No. 188, Flater Dep. 35:16-20).<br><br>          * * * |

A   … But 20 years and 30 years afterwards, which is proving, according to the DNR, that copper and zinc level is high, higher than should be on -- on Seam Stri (sic) -- I mean Stream C, and -- and that is **according to the Ladysmith News**, which I read about stating that the high levels and -- are occurring now.

Q   Have you ever requested records from the DNR about pollution --

A   **No.**

Q   And you've never read any DNR reports about the Flambeau Mine?

A   **No, not other than what was released at our -- or at the Ladysmith News and was put in, in an article, a couple, three articles --**

Q   Okay.

A   **-- in the Ladysmith News.**

(D.E. No. 188, Flater Dep. 37:25-38:17).

* * *

Q   In Paragraph 10 you say, I am aware that FMC, that's Flambeau Mining Company --

A   Okay.

Q   -- has had ongoing water quality problems.  Do you see that?

A   Yes.

Q   What is the source of that information?

A   Mostly with the en -- maybe environmentalists **that wrote articles in the Ladysmith News, or I have received it through some environmentalist magazine** that sometimes I get …

Q   Uh-hum.  Have you ever personally seen any tests that were performed on water around the mine site?

A   **No.**

Q   So other than reading about water quality problems in the local newspaper or in environmental magazines or articles, do you have any other personal knowledge of the water quality at the Flambeau Mine site?

A   **No.**

Q   The next sentence says, I am aware that there are elevated levels of copper, iron, and zinc flowing into the biofilter. What's the source of that information?

A   (Witness reviews document.)  I believe that that was -- **came through the Ladysmith News** that the -- the levels were high and -- and **presumed that they ran into Stream C.  And I -- I never tested them and no way that I'm capable of testing or doing that.**

Q   Okay.  And -- and so is it fair to say that when you say that you're aware that there are elevated levels of copper, iron, and zinc flowing into the biofilter, that that's, again, something that you read about someplace --

A   **Yes.** …

(D.E. No. 188, Flater Dep. 41:3-42:25).

* * *

Q   Okay.  Okay.  The next phrase in Paragraph 10 after talks about flowing into the biofilter, says, and that these pollutants are discharged from the biofilter into Stream C.  Do you see that?

A   Yes.

Q   What's the source of that information?

A   This is probably **my own conception**, seeing that there was an outlet from the stream to the -- which would eventually lead into Stream C.

Q   Okay.  Have you ever walked the area between the biofilter and Stream C personally?

11

A  **No, I have not.**

Q  Below that, in Paragraph 10, it says, I am aware that copper, iron, and zinc are carried downstream by the waters of Stream C and ultimately enter the Flambeau River.  Do you see that?

A  Yes.

Q  How are you aware of that?

A  That was in **the Ladysmith News** with a release from the DNR.

Q  Okay.  So, basically, you're just saying here that you have read about that in the Ladysmith News?

A  **The Ladysmith News, with information given by the DNR to them.**

Q  Okay.  And I think from earlier questions it's obvious, but I'll ask you anyway.  You have not done any testing to determine whether something that came out of the biofilter actually got into Stream C, correct?

A  **No, I'm not qualified for that.**

Q  And you also haven't done anything to test whether something in Stream C actually made it to the Flambeau River?

A  **No.**

(D.E. No. 188, Flater Dep. 44:14-45:25).

\* \* \*

Q  You would not be in a position to say whether the copper level in Stream C was higher or lower than the copper level already found in the Flambeau River, correct?

A  **No way I could tell you that.**

Q  And you would not be in a position to determine how much or how little copper was contributed to the Flambeau River by something flowing out of the biofilter, correct?

A  **No.**

| | |
|---|---|
| | (D.E. No. 188, Flater Dep. 46:17-47:1). |
| 12. I am aware that the WDNR has established water quality standards for copper and zinc, in order to protect human health and the health of fish and other aquatic life. I know that FMC and the WDNR have routinely measured the concentrations of copper and zinc in the Biofilter, at the Biofilter outlet to Stream C, and at various points in Stream C between the Biofilter and the Flambeau River, and that on many occasions these concentrations have exceeded the applicable water quality standards for copper and zinc. | Q   How are you aware that the DNR has established water quality standards for copper and zinc? <br><br> A   This -- this was stated in the Lady -- **Ladysmith News.** <br><br>        * * * <br><br> Q   -- in -- at the very top, it says I know that FMC and WDNR have routinely measured the concentrations of copper and zinc in the biofilter, at the biofilter outlet into Stream C, and at various points in Stream C.  First of all, how are you aware of that? <br><br> A   There **again**, by the – **in the Ladysmith News, I -- I think.  Now, I don't know if I ever got anything.  I didn't get anything from the DNR**, but it's pretty well a known fact that they work -- work together in test -- testing. <br> (D.E. No. 188, Flater Dep. 48:6-49:6). <br><br>        * * * <br><br> Q   Okay.  Then it goes on and it says at the very end of that paragraph, On many occasions, these concentrations have exceeded the applicable water quality standards for copper and zinc.  How many occasions? <br><br> A   **That, I could not answer,** but I -- I -- the -- the DNR had -- had **different articles,** up to probably six, seven months ago, that there was concern of the high level, and -- and then up until this spring now that they came and said that there is -- that is a high concentration and -- and that's how come they're putting these rearing ponds in to -- to curtail that. |

|  | Q | When you say that the DNR had different articles, are those in the local paper?  Where are those articles? |

Q   When you say that the DNR had different articles, are those in the local paper?  Where are those articles?

A   Yes, in the **Ladysmith News**, … .

Q   So when you talk later in that sentence about exceeding applicable water quality standards, what are the applicable water quality standards that you're referring to?

A   **That, I couldn't tell you**, because that's -- some chemist would have to tell you that.

(D.E. No. 188, Flater Dep. 49:19-51:2).

* * *

---

11. I am aware that in certain concentrations, copper, iron, and zinc can be toxic to fish and other aquatic life. I know that these metals, when present in toxic amounts, can harm the reproductive and spawning abilities of fish and other aquatic life.

13. I am concerned that, unless abated, the release of copper, iron, and zinc into Stream C and the Flambeau River from FMC's stormwater and Biofilter discharge will cause harm, or increase the risk of harm, to the fish that depend on the river for habitat, thereby negatively impacting the quality fishing opportunities that Flater's Resort provides for its guests.

14.  Aside from owning Flater's Resort, I personally enjoy fishing alone or with friends along the Flambeau River from the Dairyland Reservoir to the Holcombe Flowage and in the immediate vicinity of the Flambeau Mine. For several decades I have historically fished this section of the Flambeau River about 15 days per year.

15. I fear that the copper, iron, and zinc that is entering Stream C and the Flambeau River from the Biofilter has impacted, and will continue to impact, the life

---

Q   Okay.  So you've never made a determination any time in your life as to whether or not the Flambeau River has copper in it?

A   **No.**

Q   What about zinc, same thing?

A   **Same thing.**

Q   What about iron?

A   Well, we all pretty well know you can see iron on -- on rocks, and what.  And you know that there's iron in -- in the river -- river.  And mostly where the creek will come out, you can see extra sediment from the rocks and -- but to say I tested for iron, no.

(D.E. No. 188, Flater Dep. 25:6-18).

* * *

A   Well, I -- I tell you what, it's -- I was just talking the other day about that when I first was -- probably in 1941, '42, I was a young fellow, and used to row boat for people from Chicago. And -- and there was a tremendous amount of Small Mouth and -- and Muskies at that time.  And -- and **today, we're probably back because**

14

cycles of the species that I enjoy fishing for, including pike, bass, and sturgeon, as well as the life cycles of the aquatic species that those fish depend upon for food. I am concerned that these pollutants will cause or contribute to the reduction in the numbers of fish available for me to catch while fishing or will impact the health of fish, thereby negatively impacting the quality of my fishing experience.

**of** -- mostly because of cleaning the river up, **we're back to where we were, and putting the size limits on fish and conservation by the people that do fish that turn them back, and stuff, that our fishing is probably as good as it was in 1940.**

We did have a very bad spell in the '70s, that there was a lot of pollution, and -- and that did get cleaned up.

Q   And that was primarily paper-related, correct?

A   Yes.

Q   Yeah, okay.  Well, that's terrific, isn't it --

A   **Yes.**

Q   -- that it's back where it was?

A   **Yes.**

Q   Okay.  How many -- how many fish do you think you've caught on the Flambeau River?

A   Oh, how many stars are in the sky, I guess.

Q   Thou -- thousands?

A   **Yes.**

Q   Okay, okay.  And you eat them, correct?

A   Very few.  We -- we practice turning back --

Q   Uh-hum.

A   -- and if you're going to tell John Doe from Chicago that we like to turn the fish back, you better practice what you preach.

Q   Yeah, okay.  But you're not afraid to eat them --

A   **No.**

(D.E. No. 188, Flater Dep. 26:14-27:23).

* * *

Q   And other than the period of time

15

where there was a lot of paper-related pollution, has the guiding been fairly consistent on the Flambeau River?

A  **Yes.**

Q  And that's still true today, correct?

A  **Yes.**

Q  And you would say that you're proud of the fishing on the Flambeau River, wouldn't you, today?

A  **Yes.**

(D.E. No. 188, Flater Dep. 36:15-24).

\* \* \*

Q  Paragraph 11 asks -- or says, I am aware that in certain concentrations copper, iron, and zinc can be toxic to fish and other aquatic life.  Do you see that?

A  Yes.

Q  Do you know what those concentrations are?

A  Are you saying amount of copper and --

Q  Right.

A  **No way that I would know that.**  The only thing I've read on that is that these chemicals could -- can cause the lowering of oxygen in the  -- in the Flambeau River and would cause a -- a slow down of reproduction of the fish.

Q  Where did you read that?

A  On the **Internet someplace**.  My wife brought it up and I -- I read it on the Internet.

(D.E. No. 188, Flater Dep. 46:1-16).

\* \* \*

Q  Paragraph 11 keeps going saying, I know that these metals, when present in toxic amounts, can harm the reproductive and spawning abilities of fish and other aquatic life, correct?  It

16

says that?

A   You had already asked that question.

Q   Okay.  And that is information from the Internet that your wife got?

A   That -- that I **had her look up for me,** yes.

Q   Okay.  Do you have any idea what is meant by toxic amounts?

A   **No, I don't really.**

Q   And whether or not discharges from the biofilter are at or above toxic amounts, you don't know that, either, do you?

A   **No, I don't.**

(D.E. No. 188, Flater Dep. 47:15-48:5).

\* \* \*

Q   When's the last time you were fishing on the Flambeau River?

A   Oh, last fall.

Q   It's something you do every year?

A   Oh, yes.

Q   Do you expect to do that this year?

A   I'm hoping, yes.

Q   Yeah, okay.  And -- and you'll do some fishing on the Flambeau?

A   We fish both the Chippewa and the Flambeau.  The Flambeau is more productive for Muskies, and so if the people want to go for Muskies -- I -- I don't guide anymore.  I take my friends fishing and -- and what -- and enjoy it.

Q   Sure.  And when you take your friends fishing, where do you usually go?  I'm not looking for secrets.  I just -- I'm just -- I mean, what river do you go on and -- and what area?

A   I say, depending.  If the people want better scenery, we go on the Chippewa River because it's not as populated and -- and it's -- more bends in it and stuff like that.  So it -- it's more scenic river. And -- and -- and Small Mouth fishing

| | |
|---|---|
| | is probably a little better on -- on the Chippewa River and the Muskie fishing's better on the Flambeau.  So that's a little preference.  But the -- the Flambeau River, **that section up from Ladysmith down to -- to the Old Port Arthur Dam was -- is still my -- one of my favorites.**<br><br>(D.E. No. 188, Flater Dep. 52:12-53:15).<br><br>* * * |
| Sources of Information | Q   Okay.  What did you do to prepare for this deposition?<br><br>A   I talked to Jeremy (sic) a little bit, and I have read quite a bit on -- on the issues.<br><br>Q   Okay.  What have you read?<br><br>A   Well, **mostly what would come out of the Ladysmith paper and -- and some emails from friends of ours --**<br><br>(Overlapping conversation.)<br><br>Q   (By Mr. Van Camp, continuing)  And who were the -- the emails from?<br><br>A   **I could not tell you.**<br><br>Q   You don't know?<br><br>A   No, I -- I don't, because my wife brings them up on the -- the computer and I read them and then -- and just -- **I'm not there to figure out who did it.**  It's just the information on different prospects of the mine.<br><br>Q   Okay.  Are any of those emails written by Flambeau Mining Company?<br><br>A   **No.**<br><br>Q   Are any of those emails written by the DNR, the  -- the Wisconsin Department of Natural Resources?<br><br>A   **No,** none of them that I got from the DNR, but I've read incerpts (ph.) in the **Ladysmith paper** of the DNR findings.<br><br>Q   Okay.  So if I refer to the DNR from now on, you'll know I'm talking about |

the Wisconsin Department of Natural Resources?

A   Yes.

Q   Okay.  Are these emails from people who have opposed the Flambeau Mining Company?

A   That, I could not really tell you for sure if they did.  They -- there's facts of -- that they -- **they thought were facts, and whether they were or not, that's -- I thought they were and -- and it was about the copper and -- and zinc and things.  And -- and it's too bad I -- at that time I didn't pay much attention to it, so I -- other than reading it for information.**

Q   What time period are we talking about for these emails?

A   **Oh, probably, maybe a year, year and a half ago.**

(D.E. No. 188, Flater Dep. 10:15-12:8).

* * *

Q   Who did you receive Exhibit 187 [Flater Declaration] from?

A   I believe from Jeremy (sic) after I wrote it and sent it to him and he corrected some of my bad language and -- and put it in more reading -- and I -- after he sent it back, I sent it back to him that I didn't like certain parts of it the way he said it.  So it was negotiated for a month or so before.

Q   Okay.  So when you first received it, somebody had typed it up, and you looked it over, correct?

A   Yes, my wife typed it on the computer and -- and -- and we sent it to -- Laura told me to send it to Jeremy (sic) and --

Q   Okay.  I'm going to -- to -- just to make sure the record is clear, the attorney sitting across from me I know as Jamie Saul.

19

| | |
|---|---|
| | A   Oh, Jamie, I'm sorry.  I said Jeremy. |
| | Q   No, that's okay.  I just -- you referred to Jeremy a few times -- |
| | A   Yeah. |
| | Q   -- and I just want to make sure -- |
| | A   Yeah, right. |
| | Q   -- we're talking about the same person. |
| | A    Yes. |
| | (D.E. No. 188, Flater Dep. 18:5-19:3). |

## ARGUMENT

Counsel for Plaintiffs should have conducted a sufficient interview with Flater prior to submitting his declaration for standing purposes, to discover that the statements were not made on personal knowledge.  As made readily apparent by the above comparison, Flater did not have personal knowledge of the above-referenced statements made in his Declaration.  Accordingly, the Court should strike his Declaration.

Fed. R. Civ. P. 56(c)(4), previously codified as Rule 56(e), requires that "[a]n affidavit or declaration used to support or oppose a motion *must be made on personal knowledge*…"  (emphasis added).  This requirement "parallels Rule 602 of the Federal Rules of Evidence, which forbids a witness… to testify to matters of which he does not have personal knowledge."  *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989).

The Seventh Circuit has clarified the personal knowledge requirement, explaining:

It is true that 'personal knowledge' includes inferences—all knowledge is inferential—and therefore opinions. But the inferences and opinions must be

20

> grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.

*Visser v. Packer Eng'r Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir.1991) (internal citations omitted).

Moreover, courts have granted motions to strike where an affidavit is not made on personal knowledge. *See Manildra Mill. Corp. v. Ogilvie Mills, Inc.*, 127 F.R.D. 686, 687-88 (D. Kan. 1989) (granting motion to strike after deposition revealed the affidavit was based on the "advice of counsel" and not personal knowledge). Notably, in *Manildra*, the court also awarded Rule 11 sanctions because opposing counsel knew the affidavit was not made on personal knowledge and opposed the motion to strike. *Id.*

The evidence forming the basis of an affidavit must also be admissible in evidence. *See* Fed. R. Civ. P. 56(c)(4). Therefore, under this rule, "[a] court properly should grant a motion to strike an affidavit that does not meet the requirements of Rule 56(e)." *Roloff v. Sullivan*, 772 F. Supp. 1083, 1089 (N.D. Ind. 1991) (granting motion to strike affidavit based on inadmissible hearsay); *see also Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 570 n. 4 (7th Cir.1989)).

FMC recognizes that this Court has found motions to strike unnecessary where "affidavits not based on personal knowledge are best dealt with during the court's ruling on summary judgment rather than through motions to strike." *Alexander v. Wisconsin Dept. of Health & Family Services*, No. 99-C-0429-C,

21

2000 WL 34239243, *1 (W.D. Wis. May 23, 2000).  However, the procedural posture in the case at hand distinguishes the current situation.  The parties have briefed summary judgment, and the Court has issued its Opinion and Order.  *See* (D.E. No. 137).  In fact, the Court cited certain facts contained in the Declaration at pages 6, 25, 26, and 27 of the Court's Opinion and Order Granting Partial Summary to Plaintiffs.  (D.E. No. 137).  Accordingly, a motion to strike appears to be the only vehicle by which to exclude this improper Declaration from the record.

## CONCLUSION

A comparison of the testimony of Harold Flater versus his Declaration demonstrates that Plaintiffs submitted an unsupported and improper affidavit to the Court.  For the reasons set forth above, FMC respectfully requests the Court to strike the Declaration of Harold Flater from the record.

Respectfully submitted this 8th day of May, 2012.

DEWITT ROSS & STEVENS S.C.

By:____*/s/ Harry E. Van Camp*____
    Harry E. Van Camp (#1018568)
    Henry J. Handzel, Jr. (#1014587)
    Two East Mifflin Street, Suite 600
    Madison, WI  53703-2865
    608-255-8891
    ATTORNEYS FOR DEFENDANT,
      FLAMBEAU MINING COMPANY