UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

WISCONSIN RESOURCES
PROTECTION COUNCIL, CENTER
FOR BIOLOGICAL DIVERSITY,
AND LAURA GAUGER,

        Plaintiffs,                    Case No. 11-cv-45

    v.

FLAMBEAU MINING COMPANY,

        Defendant.

## DEFENDANT FLAMBEAU MINING COMPANY'S
## PROPOSED FINDINGS OF FACT - LIABILITIES

Defendant, Flambeau Mining Company ("FMC"), respectfully requests the Court make the following findings of fact as to liability based on the evidence presented at trial in this matter:

**A.**     **The Biofilter.**

1.     Between 1998 and April 2012, storm water runoff within a 28-acre Industrial Outlot on FMC's property was directed to flow into a 0.9 acre Biofilter ("Biofilter"). [1]

2.     The Biofilter collected, filtered, and retained the storm water.

3.     The Biofilter had an area approximately 30 feet long that was lower than the surrounding berm which allowed storm water runoff to overflow when it

---

[1] Any stipulated facts are marked with the postscript ("s").

exceeded the holding capacity of the Biofilter.  This 30-foot long area was known as the "Biofilter Outlet."

**B.     The Wetland Area Adjacent To The Biofilter.**

4.      A 1.42 acre wetland is located immediately adjacent to the Biofilter.

5.      Adjacent to the former Biofilter was "hummock-and-hollow" microtopography typical of many types of wetlands, with standing water in some of the hollows.

6.      The Wisconsin Department of Natural Resources ("WDNR") does not consider the wetland area east of the Biofilter and north of Copper Park Lane to be a stream or to contain a stream.

7.      WDNR has concluded that no part of the area north of Copper Park Lane and adjacent to the Biofilter is navigable.

8.      There was nothing resembling a continuous stream channel north of Copper Park Lane, nor was there a channel or gully erosion in the wetland near the former Biofilter.

9.      No tributary of any kind has existed north of Copper Park Lane.

**C.     Stream C.**

10.     Stream C exists south of Copper Park Lane.

11.     "Stream C" is not identified on the U.S. Army Corp of Engineers ("ACOE") listing of Traditional Navigable Waters in Wisconsin.

12.     Stream C south of Copper Park Lane is an intermittent stream likely to contain a continuous flow of surface water for less than three months at a time.

2

13.     Stream C south of Copper Park Lane is a declining stream that is consistently losing water to the shallow aquifer and is of limited hydrologic significance.

14.     Stream C south of Copper Park Lane is marked by no flow over extended periods of the year and can only support limited aquatic life.

15.     North of Copper Park Lane there is no defined bed and bank or perceptible stream channel.

16.     North of Copper Park Lane, Stream C does not exist.

17.     North of Copper Park Lane there is only a wetland.

**D.     Alleged Discharges From The Biofilter.**

18.     During the Biofilter operation, the storm water runoff and rainwater collected in the Biofilter infrequently overflowed through the Biofilter Outlet into the adjacent wetland.

19.     The Biofilter was not designed nor intended to discharge water from the Biofilter directly to a stream.  Rather, it was designed and intended to allow water to overflow into the adjacent wetland.

20.     When the Biofilter infrequently overflowed, the overflow trickled down the face of the berm and discharged to a wetland located at the base of the berm.

21.     Any overflow from the Biofilter was infrequent and of very low volume.

22.     The water that overflowed from the Biofilter into the adjacent wetland went both northward and southward and some was absorbed into the ground and surrounding vegetation.

23.     There exists no discrete, continuous surface connection between the Biofilter Outlet and the wetland area north of Copper Park Lane.

24.     The point of overflow from the Biofilter was more than 30 feet away from the lowest point in the surrounding topography.

25.     There is not a continuous physical channel from the base of the berm of the Biofilter through the wetland to a stream.

26.     The label "Stream C" used on Flambeau project-related materials for many years was a convenient means of referring to a general area in a delineated wetland.

27.     The Biofilter did not discharge directly to a stream.

**E.      Defendant's Wetland Expert.**

28.     Elizabeth Day ("Day") is a Professional Wetland Scientist with 30 years of experience in water resources policy and regulation, inventory and evaluation, impact assessment, and restoration.

29.     Day is a Wisconsin licensed-Professional Hydrologist.

30.     Day is a peer-reviewed Professional Wetland Scientist.  Day worked as a wetland mapping technician for WDNR and a Clean Water Act regulator for ACOE.

4

31.     Day has made hundreds of preliminary regulatory jurisdictional determinations under the Clean Water Act and WDNR Chapter 30 regulations that subsequently gained concurrence from regulatory agency personnel.

32.     Day's experience includes performing a number of detailed "significant nexus" tests utilizing applicable joint guidance by the United States Environmental Protection Agency (U.S. E.P.A.) and the ACOE.

33.     Day has concluded Plaintiffs' experts have not analyzed the factors necessary to assess whether the wetland adjacent to the Biofilter has a relationship with Stream C.

34.     Plaintiffs have stipulated to Day's expertise.

**F.     The Relationship Between The Wetland Adjacent To The Biofilter And Stream C Or The Flambeau River.**

35.     Plaintiffs' experts, Robert Nauta ("Nauta") and David Chambers ("Chambers"), have not conducted a test or scientific analysis on whether a relationship exists between the wetland adjacent to the former Biofilter and Stream C.

36.     WDNR employee Craig Roesler has not conducted a test or scientific analysis on whether a relationship exists between the wetland adjacent to the former Biofilter and Stream C.

37.     John Coleman has not conducted a test or scientific analysis on whether a relationship exists between the wetland adjacent to the former Biofilter and Stream C.

38.     Plaintiffs' experts Nauta and Chambers have not conducted a test or scientific analysis on whether a relationship exists between the wetland adjacent to the former Biofilter and the Flambeau River.

39.     WDNR employee Craig Roesler has not conducted a test or scientific analysis on whether a relationship exists between the wetland adjacent to the former Biofilter and the Flambeau River.

40.     John Coleman has not conducted a test or scientific analysis on whether a relationship exists between the wetland adjacent to the former Biofilter and the Flambeau River.

41.     Plaintiffs' experts — Nauta and Chambers — have not prepared a report analyzing whether any relationship exists between the wetland adjacent to the former Biofilter and Stream C.

42.     Roesler has not prepared a report analyzing whether any relationship exists between the wetland adjacent to the former Biofilter and Stream C.

43.     Coleman has not prepared a report analyzing whether a relationship exists between the wetland adjacent to the former Biofilter and Stream C.

44.     Plaintiffs' experts — Nauta and Chambers — have not prepared a report analyzing whether any relationship exists between the wetland adjacent to the former Biofilter and the Flambeau River.

45.     Roesler has not prepared a report analyzing whether any relationship exists between the wetland adjacent to the former Biofilter and the Flambeau River.

6

46.     Coleman has not prepared a report analyzing whether a relationship exists between the wetland adjacent to the former Biofilter and the Flambeau River.

47.     Plaintiff's expert, Chambers, does not have the expertise to determine whether or how a wetland has a relationship with a separate body of water.

48.     Plaintiff's expert, Nauta, does not have the expertise to determine whether or how a wetland has a relationship with a separate body of water.

49.     WDNR employee Craig Roesler does not have the expertise to determine whether or how a wetland has a relationship with a separate body of water.

50.     John Coleman does not have the expertise to determine whether or how a wetland has a relationship with a separate body of water.

**G.     The Composition of Stream C.**

51.     Metals found in Stream C are not attributable to outflows from the Biofilter.

52.     There were no background (historic) levels of copper, zinc or iron measured in Stream C prior to mining or in 1998 when the Biofilter was constructed.

53.     The concentration of metals in storm water at the Biofilter Outlet was routinely similar or lower in concentration than storm water in areas away from the Biofilter.

54.     The concentration of copper and zinc in water collected along Highway 27 north and south of the former mine site was typically higher than what was measured at the Biofilter Outlet.

55.     On October 26, 2010, the concentration of copper at the mouth of Stream C, where it meets the Flambeau River, was more than twice the concentration of copper measured at the Biofilter Outlet.

56.     On June 19, 2011, the concentration of copper at the mouth of Stream C, where it meets the Flambeau River, was nearly three times higher than that measured at the Biofilter Outlet.

57.     The concentration of metals in soil samples collected at the former mine site is similar to the concentration of those metals in soil samples collected off site, including along Highway 27 at sample sites north and south of the former mine site.

58.     Metals such as copper, iron and zinc in the soils at the Flambeau mine site are comparable to naturally occurring levels of those substances in nearby areas outside the former Flambeau mine site.

59.     The copper levels in Stream C have not caused or contributed to a measureable increase in the copper levels in the Flambeau River.

60.     The zinc levels in Stream C have not caused or contributed to a measureable increase in the zinc levels in the Flambeau River.

**H.    Defendant's Additional Hydrologist Expert.**

61.    Steve Donohue, P.H. ("Donohue"), is a licensed Professional Hydrologist in the State of Wisconsin with more than 20 years of professional experience.

62.    Donohue obtained a B.S. in Natural Science and an M.S. in Soil Science (Soil Physics), both from the University of Wisconsin – Madison.

63.    Donohue serves as a Director of Mining Sector Services at Foth Infrastructure & Environment, and holds expertise in permitting complex metallic mining projects.

64.    Donohue has managed projects integrating environmental permitting, mine closure, engineering feasibility studies, and environmental impact analyses.

65.    Donohue's expertise in his profession has been recognized through his two appointments by Wisconsin Governors Thompson and Doyle to the Wisconsin Examining Board of Professional Geologists, Hydrologists, and Soil Scientists.  Donohue is a past Chairperson of the Hydrology Section and the Joint Board.

66.    Plaintiffs have stipulated to Donohue's expertise.

**I.    New Infiltration Basin System.**

67.    The Biofilter identified in the Complaint no longer exists.

68.     FMC started the process for removing the Biofilter in 2009 when it initiated discussions with the WDNR regarding changes that could improve storm water management in the Industrial Outlot.

69.     In August 2010 Defendant submitted a proposal to WDNR that called for the use of an infiltration basin system and the permanent elimination of the Biofilter to manage storm water.

70.     On May 17, 2011, FMC submitted a final plan titled "Copper Park Business and Recreation Area Work Plan" ("Work Plan") to WDNR to address storm water management on the site.

71.     The Work Plan proposed a series of changes to storm water management, including removal of the rail spur and culverts west of Highway 27, removal and disposal of sediment from the Biofilter, conversion of the Biofilter into an infiltration basin, and creation of two additional infiltration basins to improve surface water management.

72.     WDNR held a public hearing on the Work Plan on August 31, 2011, including the proposal to remove the Biofilter and rely on infiltration basins for storm water management.

73.     In September and October 2011, WDNR approved the Work Plan.

74.     Neither Plaintiffs nor any other members of the public appealed WDNR's decision to approve the Work Plan.

75.     Construction pursuant to the Work Plan began in the fall of 2011 and ceased on November 14, 2011 because of winter conditions.

76.    On March 5, 2012, the work recommenced and on March 8, 2012, the Biofilter was modified to prevent any further discharges.

77.    The Biofilter was excavated and sediment was removed and disposed of in a municipal solid waste landfill.

78.    From March 5, 2012 until April 13, 2012, FMC continued to work on removing the Biofilter, ultimately eliminating it completely.

79.    The Biofilter was replaced with a series of "state-of-the-art" infiltration basins that were designed to capture and infiltrate storm water into the ground, rather than overflow from an outlet.

80.    The new Infiltration Basin System is comprised of the East, West, and North Infiltration Basins.

81.    The new Infiltration Basin System is fundamentally different from the former Biofilter.   The chart below reflects some of the most critical differences:

| FORMER BIOFILTER | NEW INFILTRATION BASIN SYSTEM |
|---|---|
| Designed to overflow through an Outlet. | Designed to <u>prevent</u> overflow.  The infiltration basins have no outlets and no discharge points. |
| Designed to collect and retain water. | Designed <u>not</u> to retain water.  Rather, designed to allow water to infiltrate the ground. |
| Had a polyethylene liner as a floor to collect water and prevent infiltration. | Has no liner or other floor. |
| Contained sediment that accumulated since its construction in 1998. | Does not contain sediment containing high copper concentrations. |
| Not intended to contain water in a 100-year storm. | Will contain water in a 100-year storm. |

82.     The Biofilter was designed as a flow-through system and was never meant to contain water in a significant storm.

83.     The Infiltration Basin System is designed to capture and contain rainfalls up to the size of a 100-year storm event.  In fact, the basins were built 25 to 50 percent larger than that required to withstand a 100-yearm storm event.

84.     As constructed, each infiltration basin will retain all water in a storm up to 6.6 inches in a 24-hour period.  In the 106 years of recorded weather history in Ladysmith, Wisconsin, no storm has ever eclipsed even six inches of rain in 24 hours and only one storm has ever eclipsed five inches of rain in 24 hours (5.64 inches in 1960).

85.     There is evidence of the effectiveness of the new basins.  For example, the West Infiltration Basin has operated as designed since being constructed last fall and contained surface water during freezing and thawing conditions and performed without overtopping.

86.     In addition, on May 6, 2012, Ladysmith, Wisconsin received 3.0 inches of rainfall in a 24-hour period and runoff from the former Industrial Outlot for this storm was fully contained within the Infiltration Basin System, with no overflow from the basins.

87.     The infiltration basins installed at the former mine site are not the type that E.P.A.'s website cites as having a "relatively high rate of failure."

88.     FMC has a maintenance plan to maintain the infiltration basins that will be enforced through the Mining Permit Long Term Care program.

12

89.     Any storm water that reaches the North, East or West Infiltration Basins will not be contaminated by contact with nor come into contact with any overburden, raw material, intermediate product, finished product, by-product or waste product located on the site of the former Flambeau Mine.

Respectfully submitted this 14th day of May, 2012.

**DEWITT ROSS & STEVENS S.C.**

_____/s/ Harry E. Van Camp_____
By:     Harry E. Van Camp (#1018568)
Henry J. Handzel, Jr. (#1014587)
Two East Mifflin Street, Suite 600
Madison, WI  53703-2865
608-255-8891

**ATTORNEYS FOR DEFENDANT,
FLAMBEAU MINING COMPANY**