UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * *

WISCONSIN RESOURCES PROTECTION
COUNCIL, CENTER FOR BIOLOGICAL
DIVERSITY and LAURA GAUGER,


      Plaintiffs,
  -vs-                   Case No. 11-CV-45-BBC

FLAMBEAU MINING COMPANY, INC.,  Madison, Wisconsin
                            May 21, 2012
      Defendant.         9:00 a.m.

* * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF FIRST DAY OF COURT TRIAL
MORNING SESSION
HELD BEFORE DISTRICT JUDGE BARBARA B. CRABB,


APPEARANCES:

For the Plaintiffs:  McGillivay, Westerberg & Bender
                      BY:  ATTORNEYS PAMELA MCGILLIVAY,
                      JAMES SAUL and DAVID BENDER
                      211 South Paterson Street, Ste. 320
                      Madison, Wisconsin  53703

                      Pacific Environmental Advocacy
                      Center - East
                      BY:  ATTORNEY KEVIN CASSIDY
                      P.O. Box 445
                      Norwell, Massachusetts  02061

                      Pacific Environmental Advocacy
                      Center - West
                      BY:  ATTORNEY DANIEL MENSHER
                      10015 SW Terwilliger Blvd.
                      Portland, Oregon  97219

Lynette Swenson   RMR, CRR, CBC
Federal Court Reporter
U.S. District Court   120 N. Henry St., Rm. 520
Madison, WI  53703   (608) 255-3821

```
 1   For the Plaintiffs:   Center for Biological Diversity
                           BY:  ATTORNEY MARC FINK
 2                         209 East Seventh Street
                           Duluth, Minnesota  55805
 3
     For the Defendant:    DeWitt Ross & Stevens, S.C.
 4                         BY:  ATTORNEYS HARRY VAN CAMP
                           and SCOTT PALER
 5                         Two East Mifflin Street, Ste. 600
                           Madison, Wisconsin  53703
 6
 7                         Susan George - Paralegal

     For the State        Wisconsin Department of Justice
 8    of Wisconsin:        BY:  AAG THOMAS J. DAWSON
                           17 West Main Street
 9                         Madison, Wisconsin  53703

10   Also present:         Fred Fox

11                              * * * * *

12                         I-N-D-E-X
```

PLAINTIFFS' WITNESSES          EXAMINATION          PAGES

DR. JOHN COLEMAN        Direct by Ms. McGillivay    32-80
                       Cross by Mr. Van Camp        80-118

                         E-X-H-I-B-I-T-S

| EXHIBITS | | IDENTIFIED/RECEIVED | |
|---|---|---|---|
| Exhibit 11 | Photo - culvert | 53 | 66 |
| 12 | Photo - CPL | 74 | 75 |
| 15 | Photo - CPL | 75 | 76 |
| 16 | Photo - CPL | 77 | 77 |
| 74 | Photo - biofilter | 63 | --- |
| 76 | Photo - biofilter | 64 | 71 |
| 80 | Photo - biofilter | 69 | 71 |
| 81 | Photo - biofilter | 70 | 71 |
| 82 | Photo - Stream C | 72 | 73 |
| 1002 | Work Plan | 43 | 66 |
| 1015 | Figure-Work Plan | 46 | 66 |
| 1016 | Figures | 43 | 66 |
| 1024 | Figures | 54 | 66 |

Requests for Admissions:  (Received)  34, 56, 284, 473,
     479, 481, 485, 489, 493, 495, 497, 508 and 528

1       (Call to order)

2           THE CLERK:  Case Number 11-CV-45-BBC.

3   *Wisconsin Resources Protection Council, et al. v.*

4   *Flambeau Mining Company* is called for court trial.  May

5   we have the appearances, please.

6           MS. MCGILLIVAY:  Good morning, Your Honor.  On

7   behalf of Wisconsin Resources Protection Council, The

8   Center for Biological Diversity and Laura Gauger, I'm

9   Pam McGillivay.  With me is David Bender and James Saul

10  of McGillivray, Westerberg & Bender.  Also with me is

11  Kevin Cassidy of the Pacific Environmental Advocacy

12  Center at the Lewis & Clark Law School.  Also with us

13  today are co-counsel Dan Mensher and our law clerk Liz

14  Brumfeld, also from the Lewis & Clark Law School.  And

15  co-counsel Marc Fink from The Center of Biological

16  Diversity.  And with us is Laura Gauger, plaintiff and a

17  member of CBD and WRPC.

18          THE COURT:  Thank you.  If you would just

19  remember to stay seated in the future.  I know it's hard

20  not to stand up; that you have drilled into you the fact

21  that you should be standing when you're in court.  But

22  we ask you to stay seated, use the microphone because we

23  have streaming audio throughout the courthouse and there

24  are a lot of interested people.

25      Mr. Van Camp.

1          MR. VAN CAMP:  That's nearly impossible, Your

2     Honor.

3          THE COURT:  You can do it.

4          MR. VAN CAMP:  I will try to remain seated.  It

5     has -- I've had many years of standing at every

6     opportunity.  So good morning, Your Honor.  My name is

7     Harry Van Camp and I represent the defendant in this

8     case, Flambeau Mining Company.  Flambeau is represented

9     by Mr. Fred Fox.  And also from DeWitt Ross and Stevens,

10    representing Flambeau Mining Company, is Attorney Scott

11    Paler.  And we're assisted by Susan George.

12         I would also like to note that Attorney Tom Dawson

13    is here representing the State.

14         THE COURT:  Thank you.

15         MR. DAWSON:  May I address the Court?

16         THE COURT:  You may.

17         MR. DAWSON:  Should I come to the microphone?

18         THE COURT:  Sure.

19         MR. DAWSON:  I'm Assistant Attorney General

20    Thomas Dawson.  I'm here solely for the purpose of

21    representing the Department of Natural Resources

22    witnesses who have been called in this case.  I don't

23    envision an active role here; however, if there is an

24    issue such as the attorney/client privilege that may

25    come up, I may want to object.  But I am hoping that my

1   involvement in this case will be minimal.

2           THE COURT:  Okay.  Thank you.

3           MR. DAWSON:  Thank you.

4           THE COURT:  All right.  Now Ms. McGillivay and

5   Mr. Van Camp, do you wish to make any kind of opening

6   statements?  You certainly don't need to, but if there's

7   something you want to say before you start, that's fine.

8           MS. MCGILLIVAY:  Your Honor, we have a few

9   preliminary matters.  First, if you don't -- by your

10  leave, since we filed a motion on -- to supplement our

11  exhibit list on Friday, late in the day on Friday, we've

12  had an opportunity to discuss that motion with defense

13  counsel and we've reached a stipulation as to those late

14  identified exhibits, that they would be stipulated to as

15  admissible into evidence in exchange for defendant's

16  exhibits, some other photographs which are Exhibits No.

17  633 to 641, which we've also stipulated to admissibility

18  on.

19          THE COURT:  All right.

20          MS. MCGILLIVAY:  And one other -- I guess a

21  couple other matters, Your Honor.  When defendants

22  refiled their exhibit lists on the 16th, the numbering

23  was off one for most of the exhibit numbers, so our

24  objections that we filed on the 15th are off by one up

25  to a certain number.  Does the Court prefer us to refile

1    our objections or just go with our objections as we read

2    them --

3              THE COURT:  I'll try to adjust.

4              MS. MCGILLIVAY:  Okay.  And we also would like

5    to move in the stipulated facts into the trial record

6    that were filed by the parties in the pretrial statement

7    and we would like the Court's guidance on two matters.

8         The first is we have Requests for Admissions, 13 of

9    them, that we would like entered into the trial record

10   and would ask for guidance whether you would like us to

11   have those read into the record or just to identify the

12   numbers that we'd like moved into evidence?

13             THE COURT:  Okay.  First of all, I assume

14   there's no objection to the stipulation of facts being

15   part of the record.

16             MR. VAN CAMP:  Correct.

17             THE COURT:  Okay.  Then as to the admissions,

18   is there any objection to those admissions?

19             MR. VAN CAMP:  No, there's not an objection,

20   but I do believe that it might be helpful if they're

21   read into the record simply so that at the point in time

22   that they are material, they become a part of the record

23   rather than being extraneous.

24             THE COURT:  Would you be willing to do that,

25   just read them in as they become relevant?  Or I assume

1  you wanted to put them all in as a group right away.

2        MS. MCGILLIVAY:  Yes.  They're -- because of

3  the stipulations, they don't actually flow in a concise

4  way.  So I guess what we thought we would do is read

5  them into the record, either all at once at the

6  beginning of the trial or at the end.

7        THE COURT:  Why don't we do it this way:  I'll

8  assume they're all part of the record.  If at any point

9  you think it would be helpful to the flow of your

10  narrative or your questioning if you want to read in an

11  admission at that point, go ahead.

12        MS. MCGILLIVAY:  Okay.  Thank you.  And Your

13  Honor, one further matter and that is the plaintiffs

14  have designated portions of the deposition transcripts

15  of defendant's expert Elizabeth Day.  We've talked to

16  defendant's counsel about taking Ms. Day out of order so

17  that the Court would have the full context of her

18  testimony prior to us closing our case-in-chief.  I

19  believe that the defendants would prefer us to have our

20  snippets from those depositions read in first and then

21  close our case.  But we'd like the Court's guidance on

22  that matter.

23        THE COURT:  Well, she's not available for trial

24  at all, is she?

25        MS. MCGILLIVAY:  That's correct, she is only by

1   video deposition.

2          THE COURT:  So the question is whether you'd be

3   putting in her entire videotape deposition.

4          MS. MCGILLIVAY:  Plaintiffs are not moving in

5   the entire videotape deposition.  Defendant's counsel

6   has designated the entire transcript.  But there are two

7   transcripts.  Plaintiff had designated portions of an

8   earlier transcript as well and they're -- both in their

9   designations and counterdesignations.

10         THE COURT:  So you want to put in the earlier

11  deposition portions that you had marked --

12         MS. MCGILLIVAY:  Correct.

13         THE COURT:  -- as part of your case-in-chief,

14  and you also want to put in some parts of the deposition

15  that she gave more recently.

16         MS. MCGILLIVAY:  That's correct.

17         THE COURT:  During your case.

18         MS. MCGILLIVAY:  That's correct.

19         THE COURT:  That would be all right with me.

20  And Mr. Van Camp, after you've put in those portions of

21  the deposition, we can argue about whether you want any

22  other portions for the sake of completeness or if you

23  want to set it off and do the whole thing as part of

24  your case.

25         MR. VAN CAMP:  Okay.

1        MS. MCGILLIVAY:  I think we'll introduce those

2   at the end of our live witnesses.

3        THE COURT:  Okay.

4        MS. MCGILLIVAY:  And with that, James Saul is

5   prepared to give a short opening statement.

6        THE COURT:  All right.

7        MR. VAN CAMP:  May I address one of the issues

8   that was just discussed?

9        THE COURT:  Oh, sure.

10        MR. VAN CAMP:  There are literally hundreds of

11   admissions or Requests for Admissions in this case and

12   it would be, I think, helpful for the record if a single

13   exhibit was admitted that had the admissions that were

14   -- that are being moved in by the plaintiffs, and if

15   they're willing to do that, if we can just consolidate

16   that into one short exhibit.

17        THE COURT:  That would probably be very

18   helpful.

19        MR. VAN CAMP:  I would certainly stipulate.

20        THE COURT:  It doesn't have to be today that

21   you do that.

22        MS. MCGILLIVAY:  Your Honor, I'm prepared to

23   just list off the numbers right now if that would make

24   it easier, just to make it complete on this record, or

25   if you prefer a separate filing, we can do that as well.

1        THE COURT:  Well, if you want to put in the

2   numbers, I'll take the numbers now and then you'll put

3   in an exhibit that will include all of the admissions

4   that correspond to those numbers?

5        MS. MCGILLIVAY:  Yes.  So defendants will have

6   this information as well.  The numbers that we will be

7   moving into the record are No. 34, 56, 284, 473, 479,

8   481, 485, 489, 493, 495, 497, 508, and 528.

9        THE COURT:  All right.

10        MS. MCGILLIVAY:  Thank you.

11        THE COURT:  Anything else then, Mr. Van Camp?

12        MR. VAN CAMP:  No, I think that's all.  Thank

13   you.

14        THE COURT:  Then Mr. Saul.

15        MR. SAUL:  Thank you, Your Honor.  Your Honor,

16   this case boils down to--

17        THE COURT:  If you want to, you can use the

18   lecturn if you'd prefer that.  Whichever is more

19   comfortable.

20        MR. SAUL:  It is.  Thank you.

21        THE COURT:  And I should say Mr. Van Camp, you

22   can stand up any time if you use the lectern.

23        MR. VAN CAMP:  Thank you very much.

24        THE COURT:  If that makes you feel better.

25        MR. VAN CAMP:  Thank you.

1          MR. SAUL:  Your Honor, this case boils down to

2    20 feet.  That is the distance from the biofilter berm

3    to the channel of the waterway that defendant has long

4    identified as *Intermittent Stream C*.

5          As will become apparent over the next several days,

6    this intermittent stream channel provides a conveyance

7    of polluted stormwater and a chemical, physical and

8    biological nexus between those waters and wetlands

9    upstream of Copper Park Lane and Stream C and the

10   Flambeau River below Copper Park Lane.  Plaintiffs will

11   prove defendant's Clean Water Act liability under

12   several overlapping but independent theories.

13         First, plaintiffs will show that defendant's

14   biofilter discharges flowed through that narrow strip of

15   wetland identified as Wetland 7 into the channel of

16   Intermittent Stream C and into that portion of Stream C

17   south of Copper Park Lane that the Court has already

18   found to be a water of the United States.

19         This discharge and flow path has been observed on a

20   number of indications by eyewitnesses who will testify

21   today and tomorrow.  Defendant has admitted this flow

22   path for over a decade in almost every conceivable form,

23   include permit applications, annual reports,

24   communications with members of the public, internal

25   memoranda to and from contractors, and private email

1  messages.

2      Testimony from plaintiffs' retained hydrologist,

3  Robert Nauta, will confirm that polluted discharges from

4  the biofilter travel the short flow path from the

5  biofilter to Stream C, south of Copper Park Lane,

6  thereby establishing liability.

7      Plaintiffs will also show that the waterway north

8  of Copper Park Lane is itself a water of the United

9  States for three reasons.  The first is that the stream

10 north of Copper Park Lane is a natural extension of

11 Stream C, south of Copper Park Lane, and is

12 jurisdictional for the same reasons that the Court found

13 Lower Stream C to be jurisdictional.  It is a tributary

14 to the Flambeau River.  It has defined bed and banks,

15 seasonal flow, and delivers both water and pollutants to

16 the Flambeau River.

17     Next plaintiffs will show that Wetland 7 is

18 adjacent to Stream C because it has a continuous surface

19 connection with the stream.  That connection is provided

20 by the culvert underneath Copper Park Lane, which

21 enables flow to pass under the lane and into Lower

22 Stream C.  As argued by plaintiffs in our trial brief,

23 that adjacency pulls Wetland 7 into the scope of the

24 significant nexus determination the Court has already

25 made.

1      And finally, plaintiffs will prove that Wetland 7,

2  alone and in combination with other wetlands and

3  drainage ways in the Stream C watershed, affects the

4  physical, chemical and biological characteristics of

5  Stream C and the Flambeau River such that even if the

6  discharges from the biofilter were able to overcome the

7  pull of gravity and get no further than Wetland 7,

8  liability would still be established.

9      Testimony from several witnesses will show that

10  Wetland 7, much like Intermittent Stream C, contributes

11  both water and pollutants to Stream C and the Flambeau

12  River creating both a physical and chemical nexus.

13  Testimony from other witnesses will establish the

14  biological relationships between the wetlands and the

15  Stream C watershed, including Wetland 7, Stream C, and

16  the Flambeau River through the delivery of various

17  constituents that affect the health and composition of

18  aquatic life in Stream C.

19      Over the next several days, defendant's Clean Water

20  Act liability will become crystal clear.  Thank you.

21          THE COURT:  Thank you.  Mr. Van Camp, did you

22  want to say anything?

23          MR. VAN CAMP:  Yes, I will.  Thank you.  Good

24  morning, Your Honor.  Counsel.  It is absolutely an

25  honor for me to represent Flambeau Mining Company before

1  this court in this case.  What's begun here today is a

2  search for what has happened in a very, very small

3  wetland at the Flambeau Mining site.

4       Before I address that particular wetland and the

5  facts that will be proven, I'd like to give the Court a

6  short few-minute background of the facts that led

7  Flambeau Mining Company to the defendant's table in this

8  courtroom.  When Flambeau Mining Company came to the

9  State of Wisconsin, they came to mine central metals,

10 metals that are used by every one of us every day all

11 the time.  Copper.  Zinc.  Metals that we rely on for

12 various activities:  The wiring in our home, and so

13 forth.

14      But they also came to the State of Wisconsin to be

15 a good partner.  They came to the State of Wisconsin to

16 be a good neighbor.  And as the evidence will

17 demonstrate throughout this trial, it was their effort

18 to be a good neighbor that has brought them into this

19 courtroom.  Flambeau understood before they came to the

20 State of Wisconsin that Wisconsin was a very carefully

21 regulated state.  The citizens of the State of Wisconsin

22 were very concerned about their environment.  Flambeau

23 Mining Company knew, when it came to the State of

24 Wisconsin, that a concerned, capable, vigilent

25 regulatory agency, the Wisconsin DNR, would carefully

1  monitor their activities.

2      You will hear in this trial testimony from many

3  WDNR employees who did, in fact, vigilantly oversight or

4  did vigilant oversight for this mining operation.  They

5  received permits.  Flambeau Mining Company originally

6  received permits of many kinds:  Air permits, water

7  permits, discharge permits, mining permits, and so

8  forth.

9      The evidence in this case will show that they did

10 not violate those permits.  It's interesting that this

11 case is not a dispute in a highly regulated state

12 between the regulated and the regulator.  They're on the

13 same side in this case.  The facts that they will

14 present to this Court will be the same.

15     From the beginning, Flambeau Mining Company has

16 complied with the stringent requirements of its permits.

17 If and when minor problems were identified, they were

18 addressed readily by FMC.  They were fixed.  This is

19 true both during the mining operation and reclamation.

20     FMC was a good neighbor.  The plaintiff in this

21 case is not a local community.  The plaintiff in this

22 case is not a local citizen.  This is not a case about

23 local complaints where the evidence will show that there

24 are problems with the local water or resources.  In

25 fact, the community witnesses in this case will testify

1  about how Flambeau Mining Company helped the community,

2  how they provided good high paying jobs, provided money

3  for local schools, libraries, fire departments, and

4  recreation.

5      Interestingly, Your Honor, the only truly local

6  witness who has an interest in the outcome of this case

7  will be testifying in this case as a result of a

8  subpoena sent to them by Flambeau Mining Company.  This

9  is Mr. Harold Flater.  Mr. Harold Flater signed an

10  affidavit or a declaration for standing in this case.  I

11  think the evidence will show that he didn't have

12  personal knowledge about the matters in that, but he did

13  absolutely have personal knowledge about some matters

14  very relevant to this case.

15      He is a resort owner.  He owns a resort on the

16  Flambeau River at the confluance of the Flambeau River

17  and the Chippewa River.  He has lived there for 70

18  years.  That resort is just downstream from the Flambeau

19  Mine site.  And what he will tell you is he has been

20  fishing on that river all his life.  He will tell you

21  that the river has been cleaned up and that fishing

22  today is as good as it was in the 40s.  He's very proud

23  of the Flambeau River and the fishing that he provides

24  for both himself, his friends and his clients.

25      What the facts will show or will not show is any

1    local damage.  There will be no evidence of any local

2    damage whatsoever.  Plaintiffs will not be able to show

3    any damage to any living things, from micro or

4    macroinvertebrates, to fish, to birds, to amphibians,

5    nothing.  In fact, the plaintiffs hired no experts in

6    this case to demonstrate damage.  They have no witnesses

7    that they will present to demonstrate any damage

8    whatsoever.

9        Even though Flambeau doesn't have the burden of

10   proof in this case, it will prove the opposite.  It did

11   hire experts to examine the situation, both biological

12   and chemical, and determine that no damage occurred.  So

13   if Flambeau was a good neighbor --

14       THE COURT:  Excuse me, Mr. Van Camp.  You will

15   have the burden of proof because those things go to

16   mitigation, whether there should be a large fine or a

17   small fine or any fine at all.

18       MR. VAN CAMP:  You're absolutely correct.  I

19   was thinking about the liability phase and we're not

20   going to present those witnesses in the liability phase

21   and so I retract that; that we will have the burden of

22   proof and we will demonstrate through experts that, in

23   fact, there was no damage to any sort of biota or

24   anything.

25       If this is the case, why is Flambeau here in this

1   courtroom as a defendant?  Flambeau is here because they

2   desperately tried and worked hard at being a good

3   neighbor to the Ladysmith community.  It was Flambeau's

4   willingness to modify their original Reclamation Plan in

5   order to contribute to the community that brought about

6   the problems that we're here in this court to decide.

7        In the original Reclamation Plan, the entire mine

8   site was going to be reclaimed.  It would once again

9   become forests, wetlands, prairies, trails, and so

10  forth.  There would be no buildings that they used for

11  the mining operations remaining.

12       Before I get into the agreement that was reached

13  between the community, environmental interests, the DNR,

14  and Flambeau Mining Company, I'd like to draw the

15  Court's attention to three photographs that I think at

16  least demonstrate where we've come since they began

17  their mining operations.  Can you pull up 633.  Can you

18  see this over here?

19            THE COURT:  It's just as good on the screen,

20  but yes, I can see it.

21            MR. VAN CAMP:  The photograph in Exhibit 633 is

22  a photograph, an aerial photograph of the area that

23  became the Flambeau Mine site just south of Ladysmith.

24  The highway that you see crossing the lower left-hand

25  corner of the photograph is Highway 27.  As it goes up

1    in this photograph, it's headed directly south, and what

2    you see in the upper left-hand corner and then winding

3    across the top of the photograph is the Flambeau River.

4    This is the way the location of the Flambeau Mine site

5    appeared before mining began.

6         Can we go to 634.  Exhibit 634 is a photograph,

7    once again an aerial photograph.  Once again, you can

8    see Highway 27 crossing the lower left-hand corner of

9    that photograph.  This is looking essentially south,

10   probably south and slightly west.  You can see the

11   Flambeau River at the top of the picture and you can see

12   the mining pit where the incredibly rich ores were mined

13   and removed by Flambeau Mining Company.

14        During mining operations, the ore was not processed

15   at this location, it was taken by rail.  And the rail

16   spur is right under the buildings at the upper left-hand

17   corner.  And the rail cars you can actually -- I don't

18   know if you can actually see them in the photograph

19   before you, but there are rail cars that were loaded

20   with ore and I think taken to Canada for processing.

21        Above that, just before the property turns to woods

22   again, are some buildings, and those buildings were the

23   buildings utilized by Flambeau Mining Company for the

24   operation of the Flambeau mine.  I will -- I think I can

25   draw on this.  Is there a red circle?  Okay.

1          THE COURT:  Um-hmm.

2          MR. VAN CAMP:  I've put a red circle around

3   what was a surge pond during the mining operation, and

4   that surge pond collected runoff and wastewater from the

5   mining operation and then it piped it back to the

6   furthest building on the right, which was a water

7   treatment facility.

8          So during the mining operation when there was a

9   PDES permit, Flambeau Mine had a permit to discharge

10  water after it was treated at the treatment plant

11  directly into the Flambeau River.  And as the evidence

12  will show, the copper and so forth that could be

13  discharged pursuant to that PDES permit far exceeded

14  anything that is at issue in this case.

15         It is those buildings and the area where that surge

16  pond is located that are at issue in this case.  And as

17  you'll see in the next photograph, the rest of that

18  site, the entire site was reclaimed after the mining

19  operation was completed.

20         THE COURT:  And that -- the mine was in

21  operation what, five years?  Four years?

22         MR. VAN CAMP:  Right.  In the '93-'96, -7

23  period.

24         THE COURT:  And that was sufficient to take out

25  all of the ore that was available?

1          MR. VAN CAMP:  Well, I think there is probably

2     some more ore there.  That was the plan.  This was the

3     size of the site.  That was plenty of time to remove the

4     ore that they intended to remove and that was permitted

5     for removal.

6          635 is a photograph, again an aerial photograph,

7     taken of the Flambeau mining site, again just south of

8     Ladysmith.  For reference, Ladysmith would be a mile or

9     so off to the lower right-hand corner.  Again, you can

10    see the Flambeau Mining Company -- I'm sorry, the

11    Flambeau River crossing the upper right-hand part of the

12    photograph.  And the area that is at issue in this case,

13    even on the photograph that is -- the large photograph

14    that I have on the easel, I can literally cover the area

15    with my finger.  And because my -- oops -- because my

16    finger is a little too large for the photograph, I'm

17    going to show you on this larger photograph where it is

18    that I'm looking.  (Indicating)

19         I will -- now I'm going to draw a circle around the

20    area that basically has become known as the Industrial

21    Outlot and discuss that.  (Indicating)  It's not on the

22    photograph, but it should be on your screen.  Again, a

23    red circle that shows the Industrial Outlot.

24         As mining operations were coming to a close and the

25    plans and so forth for the reclamation were beginning,

1    the local Ladysmith community recognized there were some

2    valuable buildings in the area that had been used or

3    were at the time being used by the mine, and the

4    community approached Flambeau Mining Company requesting

5    the use of those buildings, asking them not to tear

6    those buildings down and instead leave them so that they

7    could be used as an Industrial Outlot for future

8    development.

9         It was, in fact, to become and did, in fact, become

10   a source of local revenue.  It is rented, I believe, for

11   $10 a year by the Flambeau Mining Company to a

12   development corporation, which then rents it out.  One

13   of the major tenants -- if you look at those buildings,

14   one the major tenants in one of the significant

15   buildings on that property is the DNR.  And I think

16   that's important because I think it demonstrates not

17   only the openness that Flambeau Mining Company operated

18   under during the mining operation, but also the openness

19   with which they operate even today.

20        Originally when the Plan was modified in order to

21   allow these buildings to be used by the local community

22   for an industrial park, the water treatment plant was

23   going to be retained so that there would be a plant

24   through which any water treatment that was required

25   could be done.  For some reason, the plaintiffs in this

1  case, Laura Gauger, members of the WRPC, didn't want

2  that water treatment facility to remain.  They went to

3  hearings about the modification; that is, the

4  modification that would allow this property to be used

5  by the local community, and they objected to the

6  retension of that water treatment facility.

7      In an agreement that was reached between the

8  community, environmental interests, the DNR, and

9  Flambeau Mining Company, the water treatment plant --

10  the building was retained so that they could use it, but

11  all of the water treatment facilities were plugged up

12  and removed.

13      Water treatment then for runoff was shifted under a

14  plan approved by the DNR to a biofilter system.  And you

15  can see on Photograph 635 there is a dark square in the

16  upper left-hand portion of that area and that's the .9

17  acre biofilter.

18      Now, the only thing directed to that would be the

19  stormwater runoff from the Industrial Outlot, from the

20  roofs of the buildings there, from the parking lots of

21  the buildings, and from the area around there, a few

22  ditches and so forth.  Those were to go into the

23  biofilter.  The biofilter was intended to allow anything

24  in the water that went in there to drain to the bottom

25  or to settle.  And then on occasion in very heavy rains

1  or snow melt situations, there would be a little bit of

2  a discharge.

3      Stormwater management, the DNR indicated, would be

4  handled under the mining permit.  As the evidence will

5  show, the mining permit issued was more stringent than a

6  PDES permit would have been.  The DNR elected to do it

7  under the mining permit because they had more resources

8  to monitor it and because they had a more powerful tool

9  to regulate it.  Flambeau complied.  There were some

10  concerns that arose after the area was designated as an

11  Industrial Outlot, and as each of those concerns of a

12  particular area or something indicated that there was

13  more copper or zinc than they had anticipated, it was

14  studied by both Flambeau and the mining company,

15  discussions were had, decisions were reached about what

16  to do about it, and FMC then enhanced the reclamation

17  they had already done by doing such things as removing a

18  rail spur, taking all of the dirt out of ditches close

19  to roads and replacing them, they paved the parking lots

20  so that -- I mean after excavating, taking away

21  materials in the parking lots.  They put down crushed

22  limestone.  They put down asphalt and so forth to

23  correct it.

24      The evidence that you will see in this case even

25  presented by the plaintiffs in this case is that

1   throughout this period, as the DNR and as Flambeau

2   learned, less and less and less stormwater runoff

3   contributed copper or zinc to the biofilter.

4        Just momentarily I'd like to talk or just for a

5   moment I'd like to talk about permits.  By the time the

6   modification that allowed the change from total

7   reclamation of this property to the operation of the

8   Industrial Outlot for the local community, DNR and

9   Flambeau Mining Company had been working together for

10  over ten years.  After meetings and discussions, it was

11  determined that the modification would be acceptable and

12  that permits under the mining -- I mean permits that

13  would involve wastewater treatment or runoff, stormwater

14  runoff, would be handled under the DNR mining permit.

15       Throughout this time, WDNR was the agency in

16  Wisconsin authorized to issue both mining permits and

17  PDES permits.  They were a fully delegated regulatory

18  agency under the Clean Water Act.  Flambeau Mining

19  Company believed they had the permit for the stormwater

20  runoff that they needed.  WDNR still believes that.

21       Since there will be no evidence of harm, the WDNR

22  employees that will testify will testify that the reason

23  the mining permit was the better permit is because of

24  staffing, regulatory authority, monitoring ability, and

25  control.

1        The summary judgment order in this case determined

2   that Flambeau had the wrong permit.  It determined that

3   Flambeau Mining Company needed a PDES permit if there's

4   federal jurisdiction under the Clean Water Act.  And

5   what that comes down to is evidence in this trial of an

6   infrequent discharge of a unknown amount of water, but

7   at best very little.  The discharge was infrequent.  And

8   the question becomes whether or not the wetland into

9   which any of that discharge might have gone has a

10  significant nexus to the Flambeau River.  The Flambeau

11  River is the closest traditional navigable water.

12       In the decision there will be two words: *nexus* and

13  *significant*.  The testimony in this case will

14  demonstrate that out of thousands of days over many

15  years, there were maybe a dozen or two overflows from

16  the biofilter.  There were less than ten observed by

17  anybody from the plaintiffs and maybe two dozen observed

18  by any witnesses in this case.

19       Flambeau Mining Company has been an open book.

20  They are the ones that have done most of the monitoring.

21  They have published their monitoring results to the DNR

22  and to the public and to the plaintiffs.  The DNR has

23  done some testing and they have published their test

24  results to Flambeau, to the plaintiffs, to the public.

25       The plaintiffs in this case retained two experts.

1   The two experts were retained to review the results from

2   the samples that were taken by Flambeau Mining Company

3   and the DNR.  That's what they did; to determine the

4   level of toxicity, and they will be able to testify

5   about those samples.  What they were not retained for,

6   what they're not qualified for and what they will not be

7   able to testify about is the connection between the

8   biofilter, the wetland, Stream C, or the Flambeau River.

9   Neither will they be able to identify any tests that

10  they took to determine that; any measurements that they

11  took to determine that; the volume of flow in any of

12  these locations, whether it be between the biofilter and

13  the wetland, the wetland and other parts of the wetland,

14  the wetland and Stream C, whether it be above or below

15  Copper Park Lane, and certainly the Flambeau River are

16  unknown; the effect of the fact that Stream C is what's

17  known as a *losing* or *declining river*, which you will

18  hear testimony about, meaning that there are places in

19  Stream C where there is flow and then it goes into

20  groundwater where there is no flow and then reappears

21  later as surface flow.  There are no tests, there are no

22  measurements, and there are no expert witnesses that can

23  testify about the transport of anything from the

24  biofilter of the wetland to Stream C or the Flambeau

25  River.  There are no dye tests that follow flow from one

1   place to another, and there are no other tests or

2   studies that study that.

3        The plaintiffs won't be able to prove where the

4   water in photographs you're looking at comes from or

5   where it goes.  Neither did the experts for the

6   plaintiff do any groundwater level testing.  So whether

7   the water coming out of the biofilter infiltrates into

8   the ground or whether groundwater percolates up and the

9   effects of that are entirely unknown.

10       Neither are there any tests to determine the effect

11  of this small wetland on anything.  There are no tests

12  conducted to determine whether it removes metals, adds

13  metals, filters metals, does anything to them.  Because

14  the plaintiffs didn't hire experts to testify about

15  this, I think they will put on evidence that is a

16  smattering of observations over a few occasions by

17  people who are probably qualified to do the tests that

18  were never done.  So they won't testify as scientists

19  about tests that they performed and the results of tests

20  and studies.

21       You will hear about dissolved oxygen and dissolved

22  organic matter.  And you will hear speculation about

23  whether or not that dissolved oxygen or dissolved

24  organic matter originated in this wetland.  But nobody

25  did any tests to determine whether the dissolved oxygen

1    in the wetland was the same or similar to the dissolved

2    oxygen in Stream C south of Copper Park Lane.

3        The same goes for the dissolved organic matter.

4    Nobody did any tests to determine whether that matter

5    was the same.

6        You heard about Mr. Nauta and what he will testify

7    to.  He prepared his expert report before he ever went

8    to the property.  He took no samples.  He studied the

9    data about the toxicity and wrote a report.

10       You will hear from unretained experts called by the

11   plaintiffs, Mr. Coleman and Mr. Roesler.  They will tell

12   you that on certain occasions they saw flow.  Once

13   again, significant is a key.  This visual inspection

14   occurred on very few days over very few years.  There

15   were no tests associated with those other than tests

16   that were taken by Mr. Roesler related to a report on

17   the quality of the water, and you will see that report

18   and you will learn that the purpose of the report had

19   nothing to do with determining a significant nexus, it

20   had to do with determining the effects of toxicity.  And

21   even in his executive summary at the very beginning he

22   will inform the Court that there was no apparent damage

23   or harm caused by any of this.

24       Also Mr. Coleman -- Dr. Coleman, I'm sorry, viewed

25   the same thing.  You've seen it a number of times.

1   There apparently was some confusion at his deposition

2   about what he would testify about, but he has visited

3   the site.  But many of the visits you will hear were

4   prior to the five years preceding the filing of the

5   complaint.  And in addition, his observations were the

6   type of observation that are not reliable because they

7   aren't based on scientific evidence or tests.

8        Now I think I've run a little long.  Rather than

9   going through Mr. Roesler's report at this point in

10  time, we will look at that, but I would ask you to look

11  for it.  It's Joint Exhibit 1028.  It's called a *Surface*

12  *Water Quality Assessment* done by Mr. Roesler in 2012.

13  In that report, while he studies the toxicity and water

14  quality and various things, he didn't study the wetland.

15  He basically ignored the wetland.  He did tests in the

16  biofilter south of Copper Park Lane, but not in between.

17  There is no study anyplace of the wetlands' effect on

18  copper or zinc.

19       This Court is going to be charged with determining

20  what was going on in that wetland.  The evidence will

21  not demonstrate that anything was going on because there

22  isn't evidence about it, and as a result, the Court, I

23  don't believe, will be able to determine that there is

24  any nexus, much less a significant nexus, between the

25  biofilter, the wetland, Stream C or the Flambeau River.

1   They didn't study those relationships.

2       Very briefly:  If this Court proceeds to a penalty

3   phase, I think the evidence will be overwhelmingly in

4   Flambeau Mining Company's favor.  There will be no

5   evidence of harm.  There will be evidence of a good

6   neighbor.  It's a beautiful facility.  It provides

7   recreation, equestrian facilities, hiking.

8       Flambeau has throughout been open with all its

9   testing and operations.  It has provided monitoring.  It

10  has provided remediation repeatedly.  Where there have

11  been problems found, it has corrected them.  Up to now

12  it has eliminated the discharges completely.  There are

13  infiltration basins, three of them.  They're all

14  oversized.  They are all over the capacity required to

15  handle any storm in Ladysmith's recorded area history.

16      Flambeau Mining Company has been a model partner

17  for the State of Wisconsin.  They have demonstrated

18  repeatedly concern about the environmental interests for

19  the State of Wisconsin.  We believe that the testimony

20  from the DNR will agree with that.  And if there is any

21  sort of penalty in this case, it should be minimal to

22  reflect the truth about Flambeau's operations in the

23  State of Wisconsin, Flambeau's efforts to protect

24  Wisconsin's environment, and plaintiffs' efforts to be

25  the good neighbor that brought them to this courtroom by

1   agreeing to change their Reclamation Plan to the

2   Reclamation Plan that left those buildings for the

3   people in Ladysmith.  Thank you.

4          THE COURT:  Thank you.  Ms. McGillivay, you may

5   call your first witness.

6          MS. MCGILLIVAY:  Thank you, Your Honor.

7   Plaintiffs call Dr. John Coleman.

8          **JOHN COLEMAN, PLAINTIFFS' WITNESS, SWORN,**

9                      DIRECT EXAMINATION

10  BY MS. MCGILLIVAY:

11  Q    Good morning, Dr. Coleman.  Can you please state

12  your full name.

13  A    John Samuel Coleman.

14  Q    And by whom are you currently employed?

15  A    Great Lakes Indian Fish and Wildlife Commission.

16  Q    Does that go by the acronym GLIFWC?

17  A    Yes, it does.

18  Q    And can you just describe generally what GLIFWC?

19  A    GLIFWC is a natural resource agency.  It has eleven

20  member tribes, Chippewa tribes, in Michigan, Wisconsin

21  and Minnesota.  GLIFWC serves to assist those member

22  tribes in monitoring and managing natural resources in

23  what's called the *ceded territories* which are

24  territories that were ceded to the U.S. government in

25  1836, 1842, 1837 and 1854.
                     JOHN COLEMAN - DIRECT

1   Q     Ceded by the tribes?

2   A     Ceded by the tribes under a variety of treaties.

3   Q     And what is your current position with GLIFWC?

4   A     My current position is I'm the environmental

5   section leader and I direct a small number of employees

6   in the environmental section.

7   Q     What does the environmental section do?

8   A     The environmental section looks at environmental

9   quality.  We have a program looking at mercury

10  contamination in a variety of tissues that are of

11  interest to the tribes, particularly fish tissues.  We

12  have a mercury and other toxicants program; an employee

13  working on that.  We monitor environmental quality such

14  as water quality; contaminants in plants and animals.

15  We also review mine projects, significant mining in the

16  region, particularly in Michigan and Minnesota.  And we

17  review mine projects looking at potential environmental

18  impacts.

19        We are the section that works mostly with our

20  member tribes that are -- we have some member tribes

21  that are cooperating agencies on environmental impact

22  statements for mining projects, and so the environmental

23  section works with those member tribes to assist them on

24  technical issues related to environmental impacts and

25  proposed mining projects.
                    JOHN COLEMAN - DIRECT

1   Q    How long have you had the position of environmental

2   section leader at GLIFWC?

3   A    I started working for GLIFWC in 1994 and I think it

4   was in '96 or '97 that I became environmental section

5   leader.  My position did not change substantially at

6   that point.

7   Q    Let me refer you to your monitor and there should

8   be an Exhibit 73 displayed.

9   A    Yes.

10  Q    And do you recognize that document?

11  A    I do, although I may have to put on my glasses to

12  read some of the print.  But...

13  Q    Do you have your glasses with you?

14  A    I do.  I think I can handle it at this point.  I'll

15  see.

16  Q    Okay.  Looking at this document, does it refresh

17  your recollection when you became the --

18  A    Environmental section leader?

19  Q    Correct.

20  A    Yeah.

21  Q    I'll withdraw my question, Dr. Coleman, because it

22  looks like you just have 1994 to present that you

23  maintain this position.

24  A    Yes.

25  Q    Some time in the late 90s you switched over to the

JOHN COLEMAN - DIRECT

1   environmental section?

2   A     Leader, yes.

3   Q     Okay.

4   A     I acquired those additional responsibilities,

5   running the section, as I say, though my day-to-day

6   responsibilities did not change substantially.

7   Q     Okay.  Then let's move back in time to when you got

8   your bachelor's degree.  What is your bachelor's degree

9   in?

10  A     My bachelor's degree was in Wildlife Ecology at the

11  University of Maine.

12  Q     Okay.  And you have a master's degree?

13  A     I have a master's degree in Wildlife and Fishery

14  Science from VPI and SU in Virginia.

15  Q     In between your -- receiving your master's degree

16  and your doctorate, did you have occasion to work

17  professionally?

18  A     I had one professional -- well, two jobs actually:

19  one was working for the Florida Fish and Gaming

20  Commission on the Kissimmee River looking at --

21  Kissimmee River had been channelized by the Army Corps

22  of Engineers and there was an effort to revitalize that

23  river valley by redirecting water into abandoned river

24  channels.  And so we were doing studies of fish

25  populations and vegetation as those channels were
                    JOHN COLEMAN - DIRECT

1  receiving fresh influxes of water from the redirected

2  canal.

3      Also worked at a research lab in France for a short

4  period of time looking at the use of molecular

5  techniques to do wildlife research.

6  Q   And when did you receive your doctorate?

7  A   I received my doctorate from the University of

8  Wisconsin and that would have been in 1994.

9  Q   What do you hold a Ph.D. in?

10  A   My Ph.D. is in Wildlife Science.  I had a minor in

11  Statistics.

12  Q   Can you just briefly describe what wildlife

13  science -- what the field is?

14  A   It's a pretty broad field.  Some of it involves --

15  at this point there's -- in that department there's a

16  significant toxicology aspect to that, to that field.

17  Traditionally it's game management.  Sometimes wildlife

18  ecology can involve fisheries management.  And so in the

19  department, similar department in Virginia, they had a

20  fisheries department.  It's also often combined with

21  forestry departments, so there's a significant

22  vegetation management and manipulation aspect.

23      It can -- as I said, traditionally it's very much

24  wildlife management, but has evolved to wildlife

25  conservation and study, endangered species restoration,

1  and a number of DNR employees have come through that

2  department and they work in a variety of fields.  The

3  Mercury Program at the DNR is staffed partly by my

4  graduates from that department.

5  Q    Okay.  Now I want to speak specifically to your

6  experience professionally with the Flambeau Mining site.

7  When did you first become involved with issues related

8  to the Flambeau Mine?

9  A    I would say that I was aware of the Flambeau Mine

10 since the time of permitting, but I didn't become

11 professionally involved until the time that the project

12 came close to closure.  In 1997/'98, I was asked to look

13 at that project and look at the environmental data that

14 was coming out of that project, and so I began reviewing

15 reports and documents coming from the DNR and from the

16 mining company.

17 Q    When you say you were asked to look at the Flambeau

18 Mining Company's reports, by whom were you working on --

19 A    My employer.  It became one of my tasks as part of

20 my job.

21 Q    Okay.  And in your professional capacity, have you

22 had occasion to visit the Flambeau Mine site?

23 A    I have, on a number of occasions, I have visited

24 the Flambeau Mine site, both on my own and in the

25 company of the DNR and then once during a contested case

                    JOHN COLEMAN - DIRECT

1  field trip.

2  Q    What do you mean by a *contested case field trip*?

3  A    There was a certificate, I think it was a contested

4  case, exactly the legal standing of that I'm not sure,

5  but it was an application for a certificate of

6  completion by Flambeau Mining Company and there was, I

7  believe, what was a contested case related to that and

8  there was a field trip with the parties and the hearing

9  examiner to the mine site in 2007.

10 Q    Okay.  I'm going to direct you back to your

11 monitor.  Do you recall preparing a declaration for the

12 plaintiffs in November of 2011 for this case?

13 A    I do.

14 Q    And what is on your monitor?  Is this a copy of

15 that declaration?  I'll scroll down.

16 A    It certainly looks like it.  It's going by very

17 quickly.

18 Q    I just wanted to show you --

19        THE COURT:  Don't look at it.

20 Q    -- your signature.

21 A    I may get sea sick here.

22 Q    Is that your signature?

23 A    Yes, that is my declaration.

24 Q    Okay.  I'm going to direct you to paragraph 6 of

25 that declaration.
              JOHN COLEMAN - DIRECT

1  A    I have a hard copy here.  It would be easier for me

2  to look at this than the screen.

3  Q    Okay.  Thank you.

4          MR. VAN CAMP:  Your Honor, may I approach just

5  to look at the document the witness is looking at?

6          THE COURT:  You may.

7          MR. VAN CAMP:  I certainly don't object to this

8  witness using a paper copy of the document, but this

9  particular paper copy has changes and writings and

10 things on it and unless it's going to be introduced and

11 we're given copies of it, I don't believe it should be

12 used.

13         THE COURT:  I agree.  You better get your

14 glasses out.

15         THE WITNESS:  Okay.

16         THE COURT:  And if you're going to be scrolling

17 through the document, give us advance warning so we can

18 look away.

19         MS. MCGILLIVAY:  Getting used to the

20 technology, Your Honor.  Your Honor, plaintiffs have no

21 objection to marking Dr. Coleman's paper copy as an

22 exhibit, if that's preferable.

23         MR. VAN CAMP:  I don't have a copy.  The Court

24 doesn't have a copy.  I guess I would prefer to have him

25 testify either from -- I mean there are copies within

                    JOHN COLEMAN - DIRECT

1   the binders of documents, so they can provide him with a

2   paper copy if they want.

3           THE COURT:  I agree.

4           MS. MCGILLIVAY:  Your Honor, may I approach

5   with that paper copy?

6           THE COURT:  You may.

7           MS. MCGILLIVAY:  Your Honor, do you need a

8   copy, too, or for the witness?  I wasn't planning on --

9           THE COURT:  I'll just look at the screen.

10  BY MS. MCGILLIVAY:

11  Q   Okay.  Dr. Coleman, looking at paragraph 6, you can

12  review it to yourself.  Does there refresh your

13  recollection of what the agency proceeding was in 2007?

14          MR. VAN CAMP:  Your Honor, I'm going to object

15  to this form of question.  Apparently she's trying to

16  refresh the memory about something that hasn't yet been

17  asked.  Sorry.

18          THE COURT:  You have to -- you have to set the

19  framework for that.

20          MS. MCGILLIVAY:  I'm sorry, Your Honor, I

21  thought I had when --

22  BY MS. MCGILLIVAY:

23  Q   Dr. Coleman, do you recall the certificate of

24  completion of reclamation proceedings in 2007?

25  A   Yes.  In reading through paragraph 6, I don't see

                    JOHN COLEMAN - DIRECT

1    that it is any different than what I said earlier

2    related to the certificate of completion.

3    Q    Is the certificate of completion of reclamation the

4    agency proceeding that you were referring to?

5    A    Yes, it is.

6    Q    Okay.  And did you file testimony on behalf of

7    GLIFWC for that proceeding?

8    A    Yes, we did.

9    Q    In -- I'm going to back up to your visits to the

10   mine site.  Do you recall when your most recent visit

11   was to the Flambeau Mine site?

12   A    My most recent was in 2010.

13   Q    Do you recall whether it was in June of 2010?

14        MR. VAN CAMP:  Your Honor, I'm going to object

15   to counsel leading the witness.

16        THE COURT:  Sustained.

17   BY MS. MCGILLIVAY:

18   Q    Do you recall when in 2010 the -- your most recent

19   inspection took place?

20   A    I believe it was in the spring of 2010, yes.

21   Q    Okay.  In your declaration, if you look to

22   paragraph 7 --

23        THE COURT:  You're asking him to refresh his

24   recollection as to the month in which he visited?

25        MS. MCGILLIVAY:  Correct, Your Honor.
              JOHN COLEMAN - DIRECT

1   Q     Does that refresh your recollection the date of

2   your most recent visit?

3   A     Well, paragraph 8 makes it clear that it was June

4   10th.

5   Q     You said that you reviewed reports for the Flambeau

6   Mine Company as part of your professional -- as part of

7   your professional work; is that right?

8   A     Yes.

9   Q     Can you describe what type of reports that you

10  reviewed?

11  A     They're quite a variety.  Probably the most

12  extensive reports were annual reports produced by

13  Flambeau Mining Company, but there are also reclamation

14  reports.  There are quarterly water quality reports.

15  That probably covers most of it.

16  Q     And are those the types of documents that you

17  typically review in your professional work?

18  A     Yes, they are, depending on the stage of the mining

19  project that we're looking at or the industrial project

20  that we're looking at, but those are fairly typical for

21  an operating or closing mining project.

22  Q     Are you familiar with the Copper Park Business and

23  Recreation Area Work Plan report from May of 2011?

24  A     I am familiar with it.  I'm not intimately.  I did

25  not study that report as closely as some of the other

                    JOHN COLEMAN - DIRECT

1  reports that we've written -- written summary documents

2  related to.

3  Q   Is that a report that you reviewed as part of your

4  professional work for GLIFWC?

5  A   Yes, it is.

6  Q   And I'm going to show you on your screen what has

7  been marked as Exhibit 1002.  It's 269 pages, so I won't

8  scroll through it.  But just going through the table of

9  contents, is this the May 2011 Work Plan that you

10 reviewed?

11 A   Yes, it is.

12 Q   Okay.  And attached to, at least according to the

13 table of contents, are a number of figures.  Did you

14 review the figures that were attached to this May 2011

15 Work Plan?

16 A   I reviewed at least the majority of those figures.

17 Q   Okay.  I'm going to turn to one of those figures

18 which has been marked as Exhibit 1016.  Do you recognize

19 this figure as one of the documents from the May 2011

20 Work Plan that you reviewed?

21 A   Yes, I do.  It's very similar to other figures

22 generated for annual reports and other reports by

23 Flambeau Mining Company.

24 Q   Okay.  Based on your familiarity with the Flambeau

25 Mine sites from your prior visits, does the aerial

                    JOHN COLEMAN - DIRECT

1   photograph, the underlying aerial photograph, fairly and

2   accurately depict the Flambeau Mine site?

3   A     At this scale, I wouldn't want to talk about

4   details, but at this scale, yes, it appears to.

5   Q     And I want to talk to you about some of the bigger

6   features on this figure.  Are you familiar with this

7   section, with the part I just indicated, what that

8   represents?  (Indicating)

9   A     That line appears to be along Highway 27.

10  Q     Okay.  And this water body, is that --

11  A     Yeah, is the Flambeau River.

12        THE COURT:  If you want him to mark things, he

13  can just do it with his finger on his screen.

14  BY MS. MCGILLIVAY:

15  Q     Okay.  Can you indicate where the Flambeau River is

16  on Exhibit 1016?

17  A     It's that -- is that working?

18  Q     Yes.  And how about are you familiar where Copper

19  Park Lane is as it would appear on this figure?

20  A     Yes.  (Indicating)

21  Q     I think you have to push a little harder.

22  A     (Indicating)

23  Q     Thank you.  This section on this figure noted as

24  the 0.9 acre biofilter, based on your indications where

25  is the biofilter?
                    JOHN COLEMAN - DIRECT

1    A    This square area right here.  (Indicating)

2    Q    And can you identify on this diagram where

3    Intermittent Stream C is?

4    A    Well, starting at the --

5         MR. VAN CAMP:  Your Honor, I'm going to object

6    to the form of the question.  It needs to be a little

7    more precise as we have determined so far --

8         THE COURT:  Sustained.

9         MR. VAN CAMP:  -- in this case.

10        THE COURT:  Sustained.

11   BY MS. MCGILLIVAY:

12   Q    Dr. Coleman, beginning south of Copper Park Lane,

13   can you identify where Intermittent Stream C is on this

14   diagram based on your observations of the Flambeau Mine

15   site?

16   A    I want to make sure I understand the question.

17   Starting south of Copper Park Lane and going upstream or

18   downstream?

19   Q    Downstream.

20   A    Okay.  At Copper Park Lane, Intermittent Stream

21   flows through the woods here and exits the Flambeau

22   River next to another creek.

23   Q    Okay.  Before discussing this section south of

24   Copper Park Lane, can you identify where the Industrial

25   Outlot is on this figure?

                    JOHN COLEMAN - DIRECT

1   A    The Industrial Outlot is this area enclosed and

2   marked on the map which I have just outlined.

3   (Indicating)

4   Q    And the marking then on the figure which is in

5   orange is fairly accurately represented as the

6   Industrial Outlot?

7   A    I believe that to be the case.

8   Q    I'm going to focus now on that Industrial Outlot

9   section.  Show you what's been marked as Exhibit 1015.

10            THE COURT:  You can remove -- good.

11  Q    Have you seen -- have you reviewed before today the

12  exhibit that's been marked as 1015?

13  A    Yes, I have.

14  Q    Do you recognize it as a figure representing the

15  Industrial Outlot?

16  A    Yes.

17  Q    And I'm going to focus further in on this section

18  of the Industrial Outlot, the southeast corner of the

19  Industrial Outlot.  I think that there is another figure

20  with just that section.  If I show you Exhibit 1024, can

21  you identify that figure?

22  A    Could you repeat the question?  With the changing

23  of figures, I'm getting a little confused about --

24  Q    Sure.  I'm going to turn back to Exhibit 1015 and I

25  want you to focus on the southeast corner of the

                    JOHN COLEMAN - DIRECT

1    Industrial Outlot.

2    A    Yes.

3    Q    I think there's a clearer figure that is marked as

4    Exhibit 1024.

5    A    Okay.  So I see several different numbers here.

6    You got me confused.  1024, yes.

7    Q    Do you recognize this section of the Industrial

8    Outlot?

9    A    Yes, I do.

10   Q    Okay.  And have you seen this Figure 2 of the Foth

11   Work Plan --

12   A    Yes.

13   Q    -- for today?  So now I'd like to talk about the

14   features that are on this figure.  Starting with --

15   starting with the section that is at Highway 27, can you

16   identify -- have you observed culverts along this

17   section during your visits?

18            MR. VAN CAMP:  Objection.  Leading.

19            THE COURT:  Overruled.

20            THE WITNESS:  Starting at Highway 27 did you

21   say?  At Highway 27, there's a culvert under the road.

22   There's double culverts that go under what used to be

23   the rail spur for the mine site.  There's a small old

24   rusted-out culvert here that I believe was called the

25   *farm road culvert* during a visit and apparently was
                  JOHN COLEMAN - DIRECT

1    associated with an earlier farm, and there's a culvert

2    under Copper Park Lane here.

3    BY MS. MCGILLIVAY:

4    Q    Are your markings of those culverts on Figure 2

5    based on your observation of those features during your

6    site visits to the Flambeau Mine?

7    A    Yes.

8    Q    Starting with the culvert that you identified at

9    Highway 27 and -- at Highway 27, can you describe what

10   features are between that culvert and the culvert at the

11   railroad corridor?

12   A    This culvert at Highway 27, I believe, is a

13   concrete culvert.  It discharges into a small open pool

14   at that corner between Highway 27 and the rail spur.

15   That water then flows along a channel parallel with the

16   rail spur.  I believe that area was probably modified

17   during mine construction, but then passes the water --

18   then passes through the culverts under the rail spur

19   where it exits on the south.

20   Q    Okay.  And so on the south side of the culvert

21   under the railroad spur, could you mark what you're

22   referring to?

23   A    This area water exits right here from those

24   culverts.

25   Q    And then continue on, please, where -- and describe

                     JOHN COLEMAN - DIRECT

1   the area between that south end of the culvert at the

2   railroad spur to the farm road culvert.

3   A    Well --

4              MR. VAN CAMP:  Objection.  Foundation.

5              THE COURT:  Sustained.

6   BY MS. MCGILLIVAY:

7   Q    Have you observed the area, the portion of the

8   Industrial Outlot that lies between the culvert at the

9   railroad corridor and the farm road culvert?

10  A    Yes, I have.

11  Q    Based on your observation, can you describe the

12  features in that area?

13  A    We're talking about this area between these

14  culverts here (indicating) and down to the farm culvert,

15  and in that area the --

16             THE COURT:  I'm sorry, Dr. Coleman.  I'm not

17  sure which culvert you're talking about at this point.

18  BY MS. MCGILLIVAY:

19  Q    Would you mark the culverts with maybe an "X," the

20  railroad corridor?

21             THE COURT:  You could change the color.  That

22  might be good.

23  Q    There.  Pink?

24  A    Fuchsia.

25  Q    Fuchsia.
                    JOHN COLEMAN - DIRECT

1   A    I think the question you're asking me is about the

2   culverts, they exit -- I'm going to put an "X" right

3   there.  Right at that point the culverts exit.  And then

4   the other culvert that you're talking about is down

5   here, the old farm road culvert, and you're talking

6   about the section in here.  (Indicating)  That is the

7   section that is generally a grassy area.  The stream has

8   --

9        THE COURT:  You're talking about the lower of

10  the two X's that you put up?  Is that what you're --

11       THE WITNESS:  I'm talking about this entire

12  area between the culverts under the rail spur and the

13  culvert under the old farm road.  So this area where the

14  stream runs parallel to the biofilter.

15       THE COURT:  I'm sorry, that's not going to work

16  for the record.  So if you're talking about the "X" at

17  the top that you marked in, and I'm looking now at the

18  -- if you assume that we're looking north, it would be

19  at the northwest -- closest to the west -- the northwest

20  corner.  And then you come down and you put another "X"

21  farther south.  Is that the area you're talking about?

22       THE WITNESS:  I'm not sure -- I'm not sure

23  about your question.  Northwest corner -- why don't we

24  start over.

25       MS. MCGILLIVAY:  Why don't I start with a clear
                    JOHN COLEMAN - DIRECT

1    screen.

2            THE COURT:  Let's clear the screen.  That's a

3    very good idea.

4    BY MS. MCGILLIVAY:

5    Q    I'll ask you if you can identify -- and I think

6    that you have a color change option on yours.  Whatever

7    color comes up, it's clear now.  Can you identify where

8    the south end of the railroad spur culvert is?

9    A    Okay.  Right here.  (Indicating)

10   Q    And where the culvert is at the old farm access

11   road?

12   A    (Witness indicates)

13   Q    And can you describe the features between those two

14   points?

15   A    In this area between these two culverts the -- it's

16   a grassy area.  There's a gentle, relatively gentle

17   swale that the stream passes along.  It's not extremely

18   channelized in that area, but there's a swale that the

19   water flows along, a channel, and that area is maybe 100

20   feet long, not terribly extensive.  I'm not exactly

21   sure, a grassy swale where the stream passes.

22   Q    Okay.  And have you personally observed water

23   flowing between those two points that you've just

24   indicated as the south end of the railroad corridor

25   culvert and the farm access road culvert?
                    JOHN COLEMAN - DIRECT

1           MR. VAN CAMP:  Objection.  Leading.

2           THE COURT:  Overruled.

3           THE WITNESS:  I have observed water flowing in

4    the stream in that area, yes.

5    BY MS. MCGILLIVAY:

6    Q    To continue down along this waterway, starting at

7    the farm access road culvert, can you identify where the

8    culvert is at Copper Park Lane?

9    A    That culvert is -- passes under Copper Park Lane in

10   that area there.  (Indicating)

11   Q    And have you observed that area between the culvert

12   at the farm access road and Copper Park Lane in your --

13   A    Yes, I have.

14   Q    Can you describe that section between the farm

15   access road culvert and the Copper Park Lane culvert?

16   A    On the stream channel, there's a stream channel

17   there that's somewhat incised into the ground.  There is

18   -- it's also grassy in that area, but that stream

19   channel has some bare rock and soil in that location.

20   It's more incised, the stream is more incised in that

21   section than it is farther about the farm culvert.

22   Q    And have you personally observed water flowing

23   between those two culverts?

24   A    Yes, I have.

25   Q    Okay.
                     JOHN COLEMAN - DIRECT

1          THE COURT:  The lower two you're talking about.

2          MS. MCGILLIVAY:  The lower two.  Thank you.

3          THE WITNESS:  Yes.

4    BY MS. MCGILLIVAY:

5    Q    Have you personally observed each of the four

6    culverts themselves?

7    A    The four being -- there are actually five;

8    including Highway 27, would be five.  I think they're

9    double culverts underneath the railroad spur.  So yes, I

10   have.

11   Q    Thank you for that clarification.  So what I wanted

12   to ask you was whether you have observed each of the

13   culverts:  At Highway 27, at the railroad corridor, at

14   the farm road, and at Copper Park Lane?

15   A    Yes, I have.

16   Q    And have you on occasion taken photos of the

17   culverts?

18   A    Of some of those culverts.  I have many photos of

19   the culvert under Copper Park Lane.  I have -- yeah, the

20   culverts I probably have photos of, too, but...

21   Q    I'm going to direct you to your screen and show you

22   what's been marked as Exhibit 11.

23   A    Yes.

24   Q    Is this a photograph that you took?

25   A    Yes.  This is a photograph of the culvert going
                    JOHN COLEMAN - DIRECT

1  under Copper Park Lane.  This is from the north side.

2  Q    Okay.  And why did you take this photograph?

3  A    I was struck by the amount of corrosion on the

4  bottom of the culvert.

5  Q    What did you find that was interesting about

6  corrosion of the culvert?

7            MR. VAN CAMP:  Objection.  Foundation.

8            THE COURT:  Sustained.

9  BY MS. MCGILLIVAY:

10 Q    What do you -- Dr. Coleman, what do you mean by

11 corrosion at this culvert?

12 A    I noticed that there was a lot of rust on the

13 bottom of this culvert, and in fact, there's -- in this

14 photo, you can see a little fountain of water coming up

15 through one of the holes in the bottom of the culvert;

16 that the culvert is rusted through on the bottom and the

17 water from the stream appears to be getting underneath

18 the culvert and then coming back up through the hole in

19 the culvert.

20     I didn't think it was a big deal, but it looked a

21 little curious to me that it had rusted through.  I

22 started wondering about the life of culverts, how long

23 culverts last.  I take photos of a lot of things and

24 this struck me as a little more rusted than some

25 culverts I had seen.
                JOHN COLEMAN - DIRECT

1  Q    In looking at this photograph, it appears as though

2  those markings continue up above the water line.

3         MR. VAN CAMP:  Objection.  Leading.

4         THE COURT:  Sustained.

5  BY MS. MCGILLIVAY:

6  Q    Dr. Coleman, can you describe what the portion of

7  the culvert -- the culvert above the water line?

8  A    Well, I'll try to describe what I see in this

9  photograph.  There's the water flowing through the

10 culvert, about two inches of water possibly.  Further up

11 on the side of the culvert it's moist.  It appeared to

12 me that the water had, not too long previously, had been

13 a little bit higher.  That's stained with a lot of rust.

14 So it looked to me like there was -- that was kind of a

15 level -- I'll mark it here -- a level where the water

16 may come up to on a fairly regular basis.  And then

17 there's a higher water line that looked like a less

18 frequent water level in that culvert.

19        MR. VAN CAMP:  I'm going to move to strike.

20 This witness hasn't been qualified as an expert in this

21 area.

22        THE COURT:  But he can certainly talk about

23 what he saw.  The objection is overruled.

24 BY MS. MCGILLIVAY:

25 Q    Dr. Coleman, in your review of the other set -- the
                    JOHN COLEMAN - DIRECT

1  other four culverts in the section of the Industrial

2  Outlot that you identified in Exhibit 1024, did you

3  witness any similar water markings on those culverts?

4  A    There were water markings on those culverts.  I

5  would not articulate them as similar because I observed

6  them much less often.  I did notice the farm road

7  culvert was a much older culvert.  That culvert, when I

8  saw it, I think that was in 2007, was pretty much rusted

9  all the way through the bottom half of it.  But it was

10 an older culvert, so I wasn't particularly surprised.

11     The other culverts had water staining on them.  The

12 amount and extent of staining I wouldn't want to make

13 any statement about.

14 Q    Okay.  I'm going to show you -- go back to Exhibit

15 1024.  Can you describe the biofilter basin?

16 A    Biofilter basin.  It looks like a square pond with

17 cattails coming out of it.

18 Q    All right.  And are you familiar with the biofilter

19 outlet?

20 A    Yes, I am.

21 Q    Can you describe the biofilter outlet?

22 A    The biofilter outlet is maybe 15 feet across along

23 the berm and extends from the biofilter to where it

24 reaches the level of -- approximately the level of

25 Stream C.  That's maybe a 40 or 50 foot distance; sort

                    JOHN COLEMAN - DIRECT

1  of a broad rocky swale cut in the berm of the biofilter

2  for water to overflow out of the water filter.  It's a

3  pretty standard type of overflow outlet for some sort of

4  a retention basin like this.

5  Q    In fact, on Exhibit 1024 can you indicate by where

6  the berm is that you just described or the outlet

7  rather?

8  A    Well, the berm is this around the biofilter, and

9  the outlet of the biofilter is in that area there.

10 (Indicating)

11 Q    Okay.  And have you observed that area?

12 A    Yes, I have.

13 Q    And is the biofilter outlet on the northeast corner

14 of the biofilter basin?

15 A    Yes.

16        MR. VAN CAMP:  Objection.  Leading.

17 BY MS. MCGILLIVAY:

18 Q    Can you describe where, in relation to the

19 biofilter, the outlet is?

20 A    The outlet is at the northeast corner of the

21 biofilter.  It forms a low portion of the berm.  It's

22 been lined with riprap or rocks to prevent erosion, I

23 assume.

24 Q    Looking at Exhibit 1024, do you see that there are

25 blue arrows on that figure?

                    JOHN COLEMAN - DIRECT

1  A     Yes.

2  Q     Starting with the blue arrow that is alongside the

3  railroad corridor culvert --

4  A     Yes.

5  Q     -- does that accurately represent the flow

6  direction of water as you observed it?

7            MR. VAN CAMP:  Objection, Your Honor.  Leading.

8            THE COURT:  Sustained.

9  BY MS. MCGILLIVAY:

10  Q     Can you describe the direction of flow of water as

11  you observed it at the location of the railroad

12  corridor?

13            MR. VAN CAMP:  Objection.  Foundation.

14            THE COURT:  Sustained.

15  BY MS. MCGILLIVAY:

16  Q     You observed water flowing at the railroad

17  corridor?

18            MR. VAN CAMP:  Objection.  Leading.

19            THE COURT:  Overruled.

20            THE WITNESS:  I observed water flowing at all

21  these culverts.

22  BY MS. MCGILLIVAY:

23  Q     And what direction was that flow, since you

24  observed it at all the culverts, if you could indicate

25  it by drawing a line.

                    JOHN COLEMAN - DIRECT

1   A    Okay.  At the Highway 27 culvert, the flow was east

2   to west.  At the railroad spur culverts, it was flowing

3   from the northeast to the southwest.  At the farm

4   culvert it was flowing south.  And at the Copper Park

5   Lane it was flowing south.

6   Q    And in between those culverts, did you also observe

7   flow of water?

8   A    Yes, I did.

9   Q    And can you indicate on Exhibit 1024 the direction

10   of the flow of the water between the culverts?

11   A    Would you like me to try to draw an arrow?  Is

12   that --

13   Q    Sure.

14   A    Here the flow between the culverts was in this

15   direction, to the west.  In this area here, the flow was

16   to the south.  And in this area the flow was to the

17   south, identical to the arrow that's already on the map.

18   Those arrows represent better than I can do with my

19   drawing the flow of water.

20   Q    Have you observed flow of water from the biofilter

21   to the -- through the outlet of the biofilter?

22   A    Yes, I have.

23   Q    Have you observed water flowing from the outlet to

24   what you described as Stream C just east of the

25   biofilter?

                 JOHN COLEMAN - DIRECT

1        MR. VAN CAMP:  Object to the form of the

2   question.

3        THE COURT:  Overruled.

4        THE WITNESS:  Can you repeat the question?

5   BY MS. MCGILLIVAY:

6   Q    Have you observed the flow of water from the outlet

7   into Stream C as you indicated it on 1024?

8   A    Yes, I have.

9   Q    And what is the direction, if you could indicate on

10  your screen, the direction of flow of water from the

11  biofilter basin to Stream C east of where -- just east

12  of the biofilter?

13  A    The water flow was flowing from the biofilter to

14  the east towards Stream C.

15  Q    And what distance does -- what is the distance

16  between the biofilter outlet and what you've identified

17  as Stream C at that location?

18  A    In my statement, I said ten feet and I think that

19  is fairly close to accurate.  A lot depends on where you

20  measure the outlet.  I was referring to the lower toe of

21  the outlet to Stream C was approximately ten feet.

22  Q    What do you mean by *lower toe*?

23  A    As the outlet slopes down to reach the level of the

24  surrounding ground, where that slope of the outlet

25  reaches the level of the surrounding ground I would call

JOHN COLEMAN - DIRECT

1    the toe.  It would be the toe of the berm.  So from that

2    lower slope of the outlet to Stream C I would say it was

3    approximately ten feet.

4    Q    Where you just drew your line, your directional

5    line from the biofilter basin to Stream C, there is

6    another blue arrow that had been on the figure.  Do you

7    see that arrow?

8    A    Yes.  I can't see where the head of the arrow is on

9    the screen here.  I can see that there's a dark blue

10   line there at the biofilter outlet, but I can't see

11   which direction that arrow is pointed.

12   Q    I'm trying to touch my own screen which doesn't

13   work.

14   A    It appears that that arrow is pointing to the east

15   and that is the direction that I saw water flowing.

16        THE COURT:  So which direction -- I thought

17   this was pointing north.  Is the top of the screen north

18   or south?

19   Q    Dr. Coleman, do you know the direction -- and I can

20   refer you to -- back to Joint Exhibit 1016, which I

21   believe has a directional notation on it.

22   A    Yes.  Is there a question?

23   Q    The Judge asked a question --

24   A    Oh.  I thought of you.  North on the map -- the top

25   of the map is to the north.

                    JOHN COLEMAN - DIRECT

1          THE COURT:  Okay.  And then I'm confused.  You

2     had an arrow and you said it was pointing to the east,

3     and it looked to me like it was pointing to the west if

4     the top of the map was north.

5          THE WITNESS:  Okay.  I think -- an arrow that I

6     drew?

7          THE COURT:  Well, there's a squiggly arrow.

8     The highest blue thing on the screen.  And --

9          THE WITNESS:  Yes.  That is water flowing on

10    the north side of the rail spur.  Water flows to the

11    west --

12         THE COURT:  Now to the west.  Okay.

13         THE WITNESS:  -- in Stream C.  So all my arrows

14    -- is there a way for me to erase a particular line?

15    BY MS. MCGILLIVAY:

16    Q    I think you can hit clear last on the upper

17    right-hand corner.

18         MR. VAN CAMP:  Your Honor, I don't think

19    there's a question pending.

20         THE COURT:  You may ask one.

21         THE WITNESS:  The arrow I --

22         THE COURT:  Wait, Dr. Coleman.  Ms. McGillivay

23    has to ask you another question.

24    BY MS. MCGILLIVAY:

25    Q    Can you clarify the flow direction at the railroad
                    JOHN COLEMAN - DIRECT

1  spur?

2          MR. VAN CAMP:  Object to the form of the

3  question.

4          THE COURT:  Sustained.

5  BY MS. MCGILLIVAY:

6  Q    Do you know what the flow direction is or the water

7  flow is at the north part of the railroad spur?

8  A    On the north side of the railroad spur water flows

9  from east to west --

10 Q    Okay.

11 A    -- in Stream C.

12 Q    Okay.  And can you describe then the water flow

13 throughout the rest of this section as it travels down

14 to Copper Park Lane?

15          MR. VAN CAMP:  Objection.  Asked and answered.

16          THE COURT:  I think you've covered it.  I was

17 -- I think that the witness said the arrow was pointing

18 east and I think that's where we got into all that

19 discussion.  But you've clarified that the arrow was

20 pointing west.

21 BY MS. MCGILLIVAY:

22 Q    Have you -- pull your attention back to the monitor

23 and Exhibit 74.  Do you recognize this photograph?

24 A    Yes, I do.

25 Q    Did you take this photograph?
                    JOHN COLEMAN - DIRECT

1   A     Yes, I did.

2   Q     What is it a photograph of?

3   A     That's the biofilter basin, with the berm of the

4   basin in the foreground.

5   Q     What date was this photograph taken?

6   A     That was in 2004.

7   Q     Okay.  Looking at the lower right-hand corner --

8   A     Yes.

9   Q     -- is that the correct date?

10  A     That is the correct date.

11  Q     June 3rd, 2004?

12  A     Yes.

13  Q     Okay.  You just -- you said you could -- the berm

14  of the biofilter was visible in this picture.  Can you

15  indicate what you're referring to on the figure?

16  A     In the foreground here the soil is somewhat built

17  up.  This is, I believe, a corner of the biofilter, so

18  there's a berm where I've drawn this blue line and then

19  the berm continues to the right.  And off to the right

20  here, off to the right-hand side of the photograph is

21  where the outlet would be or is.

22  Q     Show you what's been marked as Exhibit 76.  Do you

23  recognize this photograph?

24  A     Yes, I do.

25  Q     Did you take it?
                    JOHN COLEMAN - DIRECT

1    A    Yes, I did.

2    Q    Did you -- what date did you take it?

3    A    June 3rd, 2004.

4         THE COURT:  I'm sorry, Ms. McGillivay.  My

5    exhibit list stopped at 73.

6         MS. MCGILLIVAY:  Your Honor, that was one of

7    the other issues I meant to raise.  The late exhibits --

8    we have not yet updated our exhibit list.  Would you

9    like us to refile --

10        THE COURT:  We'll take a break right now, not

11   that you -- but no.  I do not want you to refile it, but

12   I would like you to file a piece of paper that starts

13   with 74 and goes up.  But don't -- do not, whatever you

14   do, reproduce the other pages because then all my notes

15   will be -- will have to be transposed.

16        MS. MCGILLIVAY:  Okay.  Thank you.

17        THE COURT:  I don't want to do that.  All

18   right.  We'll take 15 minutes.  And for everybody's

19   planning, we'll break for lunch at 12:30.

20        (Recess                10:45-11:00 a.m.)

21        THE COURT:  You may proceed.

22        MS. MCGILLIVAY:  Thank you, Your Honor.  I was

23   reminded during the break I forgot to move into evidence

24   Exhibit No. 11 and I move that into evidence.

25        THE COURT:  Any objection?
                 JOHN COLEMAN - DIRECT

1          MR. VAN CAMP:  No objection.

2          THE COURT:  Received.

3          MS. MCGILLIVAY:  And similarly Exhibit 1002.  I

4    show those --

5          THE COURT:  Those are the joint exhibits,

6    aren't they?

7          MS. MCGILLIVAY:  Correct.

8          THE COURT:  I'm assuming they're all received.

9          MR. VAN CAMP:  We reserved objection to some of

10   them on the basis of who the witness was and whether

11   they had foundation and so forth.

12         THE COURT:  Oh, okay.

13         MR. VAN CAMP:  But I don't have an objection to

14   introduction of the joint exhibits that have been

15   discussed so far.

16         THE COURT:  Okay.  And that would be 1002.

17         MS. MCGILLIVAY:  1016.  1015 and 1024.

18         THE COURT:  All right.

19         MS. MCGILLIVAY:  Thank you, Your Honor.

20         THE COURT:  They're all received.

21   BY MS. MCGILLIVAY:

22   Q    Dr. Coleman, I have Exhibit 1024 back up on the

23   screen and I want to make sure that I heard you

24   correctly.  Can you please tell me the direction of flow

25   from the biofilter to Stream C at that point in which
                JOHN COLEMAN - DIRECT

1 Stream C is adjacent to the biofilter?

2          MR. VAN CAMP:  Objection, Your Honor, to

3 reference of a stream in an area where the witness has

4 clearly testified that it's a grassy swale.

5          THE COURT:  Sustained.

6 BY MS. MCGILLIVAY:

7 Q    Dr. Coleman, can you describe the direction of flow

8 from the biofilter basin to the waterway that is

9 adjacent to the biofilter?

10          MR. VAN CAMP:  Your Honor, I'm going to object

11 once again to the form of the question.  The witness

12 hasn't testify there's a waterway adjacent to the

13 biofilter.

14          THE COURT:  Perhaps you can just ask it in a

15 more neutral way.

16 BY MS. MCGILLIVAY:

17 Q    Dr. Coleman, can you describe the direction of flow

18 from the biofilter basin?

19 A    The water flow from the biofilter here is going

20 from west to east to Stream C through the outlet.

21 Q    You just used the term *Stream C*.  Can you describe

22 what you mean by that term?

23 A    I mean the water flowing -- continuation of the

24 stream that passes under the rail spur, exits those

25 culverts, flows along in a channel parallel with the
                    JOHN COLEMAN - DIRECT

1  berm of the biofilter that passes under the farm road

2  culvert.

3  Q    Does Stream C, as you just described it, stop at

4  the farm road culvert?

5           MR. VAN CAMP:  Objection.  Leading.

6           THE COURT:  Sustained.

7  BY MS. MCGILLIVAY:

8  Q    Can you describe Stream C as you understand that

9  term *downgradient of the biofilter basin*?

10 A    Stream C passes to the east of the biofilter down

11 underneath the farm culvert here in this area and then

12 farther south and it passes underneath Copper Park Lane

13 here in a culvert.

14 Q    When you use the term Stream C, can you describe

15 what area on Exhibit 1024 you're referring to?

16 A    When I use the term Stream C, I -- this whole area

17 starting at the southwest of the photograph here up

18 under Copper Park Lane.  I'm traveling upstream here up

19 under the farm culvert, past the biofilter outlet and

20 underneath the culverts under the rail spur, then along

21 the north side of the rail spur to where the culvert at

22 Highway 27 is.  That is the area I would describe as

23 Stream C.

24 Q    What is the direction of flow of water in Stream C

25 as you defined it?

                    JOHN COLEMAN - DIRECT

1    A    Exactly opposite from the path of my finger.  So it

2    is from the northeast to the southwest generally across

3    the site.

4    Q    Show you Exhibit 76.  I think when we went on break

5    we were discussing that.  Do you recognize Exhibit 76?

6    A    Yes.  This is a picture I took.

7    Q    Now you may have identified this already so I

8    apologize for being redundant, but what was the date the

9    photograph was taken?

10   A    June 3rd, 2004.

11   Q    And what is it a picture of?

12   A    This is the lower portion of the outlet of the

13   biofilter.  You can see some of the rock riprap that was

14   in the biofilter outlet.  This is the outlet, probably

15   the -- this here I'm marking is actually the berm of the

16   biofilter.  Right here is a portion of the biofilter

17   outlet.  This is -- the water is flowing in this picture

18   from the lower left to the center of the photo in this

19   direction, and so there's water moving out of the

20   biofilter across the biofilter outlet to Stream C which

21   passes through this grassy area here.

22   Q    Let me show you another photograph that's been

23   marked as Exhibit 80.  Do you recognize that photograph?

24   A    Can I clear the --

25   Q    Oh, yes.  Thank you.
                    JOHN COLEMAN - DIRECT

1    A    Yes.  This is another picture that I took on June

2    3rd, 2004 of the same area.  In fact, a very similar

3    picture.  I think this same rock shows up in both

4    pictures.  Again, water coming out of the biofilter off

5    to the left side of the photograph, passing through the

6    outlet, and exiting to the east.

7    Q    Where in relation to this photograph is the

8    biofilter outlet?

9    A    This picture is the biofilter outlet.

10   Q    And the flow direction is in -- can you indicate

11   the flow direction?

12   A    The flow direction is from the bottom left side of

13   the photo here and flows to the center of the photo or

14   the top right of the photo.

15   Q    What was your vantage point when you took this

16   photograph?

17   A    I was standing on some of these rocks in the

18   biofilter.  There was water, so I was trying to keep my

19   feet dry.

20   Q    I'm going to show you what's been marked as Exhibit

21   81.  Do you recognize this photograph?

22   A    Yes.  This is also a photograph I took on June 3rd,

23   2004, from the same location as the previous two.

24   Q    Can you describe what this photograph represents?

25   A    On the top left-hand area is standing water in the

                    JOHN COLEMAN - DIRECT

1    biofilter.  This is the entrance to the biofilter.  You

2    can see some of the rock riprap that's in the biofilter,

3    and the water is moving from the biofilter through the

4    outlet and passing from the top left of the photo to the

5    bottom right of the photo.

6    Q    And that photograph was taken on what date?

7    A    June 3rd, 2004.

8         MS. MCGILLIVAY:  I'm going to move Exhibits 76,

9    80 and 81, those three photographs, into evidence.

10        THE COURT:  Any objection?

11        MR. VAN CAMP:  No objections.

12        THE COURT:  Received.

13   BY MS. MCGILLIVAY:

14   Q    Turn your attention back to 1024.  Can you indicate

15   on this figure the area that you just described in

16   Exhibits 76, 80 and 81, the three photographs?

17   A    The area -- those three photographs represent the

18   outlet to the biofilter that I circled in the photo.

19   Q    And they were taken -- on the day they were taken,

20   June 3rd, 2004, did you observe flow of water from the

21   biofilter to Stream C?

22   A    Yes, I did.

23        MR. VAN CAMP:  Objection.  Leading.

24        THE COURT:  Overruled.

25   BY MS. MCGILLIVAY:
                    JOHN COLEMAN - DIRECT

1  Q     I'm going to show you what's been marked as Exhibit

2  82.  Do you recognize this photograph?

3  A     Yes, I do.

4  Q     What is this a photograph of?

5  A     This is a photo I took on June 3rd, the same day.

6  It is Stream C immediately below Copper Park Lane.

7  There is -- and it's part of the construction of Copper

8  Park Lane.  There was a lot of riprap placed in Stream C

9  immediately adjacent to the road.  So I'm standing

10 approximately on the top of a culvert under Copper Park

11 Lane; the water is flowing in this direction, and then

12 it enters the natural channel here and flows into the

13 woods.  So the flow direction is as I've indicated on

14 the photograph.

15 Q     Looking back to Figure 1024, can you indicate on

16 that figure where that photograph was taken, the

17 photograph which is Exhibit 82.

18 A     It was taken right here looking in this direction,

19 (indicating) looking to the southwest from Copper Park

20 Lane.

21 Q     And that was also on June 3rd, 2004?

22 A     Yes, it was.

23 Q     On Exhibit 24 then, on June 4th -- excuse me, June

24 3rd, 2004, can you indicate a complete line where you

25 observed flow of water on that date?
                    JOHN COLEMAN - DIRECT

1  A    I observed --

2           MR. VAN CAMP:  Your Honor, I'm going to object.

3  I think the reference was to Exhibit 24 and for purposes

4  of clarifying the record --

5           THE COURT:  It's 1024.

6           MR. VAN CAMP:  1024.  Thank you.

7           THE WITNESS:  I observed water passing out of

8  this culvert here at Highway 27.  I observed water

9  passing out of here and into this channel.  On that day

10  I observed water flowing here and flowing in Stream C

11  along this section, and then I observed water flowing in

12  Stream C here and on the southern end of Copper Park

13  Lane.

14  BY MS. MCGILLIVAY:

15  Q    In between the -- did you observe any dry areas in

16  Stream C on the figure indicated in Exhibit 1024 on June

17  3rd, 2004?

18  A    I did not.

19           MS. MCGILLIVAY:  Your Honor, I move Exhibit 82

20  into the record.

21           MR. VAN CAMP:  No objection.

22           THE COURT:  Received.

23  BY MS. MCGILLIVAY:

24  Q    Dr. Coleman, I'm going to direct your attention

25  back to the screen.  Exhibit 12 should be showing.  Do

                    JOHN COLEMAN - DIRECT

1    you recognize this photograph?

2    A    Yes.  This is a photograph I also took in 2004 in

3    April.

4    Q    On the lower right-hand corner of the photograph it

5    says 4-19-2004.  Is that a correct date?

6    A    That is.

7    Q    And what is this a photograph of?

8    A    This is -- I'm standing on the edge of Copper Park

9    Lane looking north.  You can see the upper lip of the

10   culvert that goes underneath Copper Park Lane.  Stream C

11   is flowing towards me from the north.  In the background

12   you can see the reclamation effort for the rail spur had

13   been completed.  There's still some erosion control

14   fabric along the rail spur, and you can see Stream C

15   coming down here through the photograph -- passing under

16   the --

17   Q    Do it again.

18   A    Stream C coming down through the photograph,

19   passing under the farm road culvert right here -- you

20   can see the mouth of that culvert -- and entering the

21   culvert under Copper Park Lane.

22        On the upper left of the photo is the berm of the

23   biofilter in this area right here.  (Indicating)

24   Q    In relation to this photograph where would the

25   biofilter outlet be?
                    JOHN COLEMAN - DIRECT

1  A    The biofilter outlet is right in this area here,

2  obscured by tall dead grass.  (Indicating)

3       MS. MCGILLIVAY:  I'm going to move Exhibit 12

4  into the record.

5       MR. VAN CAMP:  No objection.

6       THE COURT:  Received.

7  BY MS. MCGILLIVAY:

8  Q    I'm going to show you what's been marked as Exhibit

9  15, which it should be on your screen.  Do you recognize

10 this document?

11 A    Yes.  This is a photograph I took that same day,

12 April 19th, 2004.

13 Q    And what is this a photograph of?

14 A    It's a photograph of my daughter.  Setting her

15 aside, it is the biofilter in the background and you can

16 see in the very back is one of the inlets to the

17 biofilter, riprap area.  But the biofilter, pond, the

18 water and Stream C flowing down into the culvert under

19 Copper Park Lane.  In this area right here where the

20 tall vegetation is is where the biofilter outlet is.

21 Q    Was this photograph taken at approximately the same

22 time as Exhibit 12?

23 A    Yes.

24       MS. MCGILLIVAY:  Move Exhibit 15 into the

25 record.

                    JOHN COLEMAN - DIRECT

1          MR. VAN CAMP:  No objection.

2          THE COURT:  Received.

3   BY MS. MCGILLIVAY:

4   Q    Turning back now to Exhibit 1024, can you indicate

5   on Exhibit 1024 the area that was depicted in Exhibits

6   12 and 15?

7          MR. VAN CAMP:  Object to the form of the

8   question.  I believe he has already answered as well.

9          THE COURT:  I don't think he needs to answer

10  this.

11  BY MS. MCGILLIVAY:

12  Q    On April 19th, 2004, did you observe water flowing

13  in Stream C?

14  A    April -- I'm sorry.  These dates are --

15  Q    I can refer you back to Exhibit 15.

16  A    On this date I do not believe I went actually right

17  up to the outlet of the biofilter.

18  Q    On the date that Exhibits 12 and 15 were taken, can

19  you indicate on Exhibit 1024 where you observed water

20  flowing?

21  A    I observed water flowing from roughly a little bit

22  south of the culverts exiting the rail spur area down

23  through -- so underneath the farm road culvert and then

24  down into the culvert under Copper Park Lane.  And then

25  I also observed water flowing out of that culvert down

                    JOHN COLEMAN - DIRECT

1  towards the Flambeau River.

2  Q    Do you recognize Exhibit 16, which appears on your

3  screen?

4  A    Yes.

5  Q    Did you take that photograph?

6  A    Yes.  I took that photograph April 19th, 2004.

7  Q    And was this during the same visit or approximately

8  the same time that the photographs taken that are

9  Exhibit 12 and 15 were taken?

10  A    Yes, it is.

11  Q    And can you describe what is depicted in Exhibit

12  16?

13  A    This is looking northeast towards Copper Park Lane.

14  Copper Park Lane is along the top of this grassy area.

15  I'm standing in the natural channel of Stream C and

16  looking up towards the culvert underneath Copper Park

17  Lane.  The culvert is right in this area here.

18  (Indicating)  The water is flowing towards me from the

19  north or northeast.

20          MS. MCGILLIVAY:  I move Exhibit 16 into

21  evidence.

22          MR. VAN CAMP:  No objection.

23          THE COURT:  Received.

24

25  BY MS. MCGILLIVAY:

                JOHN COLEMAN - DIRECT

1   Q    Have you observed Stream C where it intersects with

2   the Flambeau River?

3   A    Yes, I have.

4   Q    And have you observed water flowing in Intermittent

5   Stream C to the Flambeau River?

6   A    I've observed water flowing exiting Stream C into

7   the Flambeau River, yes.

8   Q    Have you observed water in Stream C -- flowing

9   water north of Copper Park Lane in Stream C flowing

10  under Copper Park Lane to the Flambeau River?

11        MR. VAN CAMP:  Objection.  Object to the form

12  of the question.  Objection.  Leading.

13        THE COURT:  Sustained.

14  BY MS. MCGILLIVAY:

15  Q    Looking at Exhibit 1016, can you indicate where you

16  have in the past seen flow of water along Stream C?

17        MR. VAN CAMP:  Object to the form of the

18  question.

19        THE COURT:  Overruled.

20        THE WITNESS:  Can you repeat the question?

21  BY MS. MCGILLIVAY:

22  Q    Can you indicate on Exhibit 1016 the -- based on

23  your past observations, the extent of flow that you

24  observed in Intermittent Stream C?

25  A    Can you zoom in a little bit?  It's hard to draw on
                    JOHN COLEMAN - DIRECT

1  something that small.

2  Q    Sure.

3  A    I observed water in Stream C from Highway 27 along

4  its entire length to this point.

5        THE COURT:  When you say this point, what are

6  you --

7        THE WITNESS:  This point south of Copper Park

8  Lane.

9        THE COURT:  Oh.

10        THE WITNESS:  On many occasions.  And then on

11  two occasions walked the length of Stream C and saw

12  water in that streambed.  And on one occasion there were

13  occasional sandy areas where the stream had soaked into

14  the sand on one occasion.

15     On another occasion there was what appeared to be

16  continuous surface water connection down to the outlet

17  at the Flambeau River.

18  BY MS. MCGILLIVAY:

19  Q    Have you observed continuous surface water

20  connection from Stream C at Highway 27 to the Flambeau

21  River?

22  A    I believe I have.

23        MS. MCGILLIVAY:  No further questions.

24        THE COURT:  Mr. Van Camp.

25        MR. VAN CAMP:  Thank you very much.  I do not

                    JOHN COLEMAN - DIRECT

1  have copies of the recently identified exhibits.

2        MS. MCGILLIVAY:  Yes, you do.  I gave them to

3  you this morning.

4        MR. VAN CAMP:  Okay.  Oh, okay.  Well then I

5  think I'll have to use the ELMO.  Judge, it might be

6  easier if counsel would agree to pull up the photographs

7  electronically since I didn't get electronic copies of

8  them before today.  So if they're willing to do that, I

9  think that might be easier for everybody.

10       MS. MCGILLIVAY:  Yes.

11       MR. VAN CAMP:  Okay.

12                  CROSS-EXAMINATION

13 BY MR. VAN CAMP:

14 Q   Dr. Coleman, it's my understanding that you visited

15 the mine site eleven times; correct?

16 A   Yes.

17 Q   When were those visits?

18 A   You want the dates for every visit?  I can read

19 from my statement, otherwise I'm not going to be able to

20 tell you the exact dates for those eleven visits.

21 Q   Okay.  Well, feel free to take a look at your

22 declaration.  I believe you set them out in paragraph 8.

23 A   Yes.

24 Q   You had four visits in 2004; correct?

25 A   That is correct.
                  JOHN COLEMAN - CROSS

1   Q    And those four visits were more than five years

2   before this lawsuit was filed; correct?

3   A    Yes.

4   Q    You visited in 2004 on April 18th, April 19th, June

5   3rd, and August 18th; correct?

6   A    Yes.

7   Q    When you visited on those dates, I believe you saw

8   the -- you looked at the biofilter outlet closely.

9   A    On some of the dates that I visited, I did look at

10  the biofilter closely, yes.

11  Q    Which of those dates?

12  A    Okay.  I think in a further paragraph, I can give

13  you those dates if we --

14  Q    Look at paragraph 14, page 5.

15  A    Yes.  Well, April 19, June 3rd, August 18th, and

16  the fourth occasion would be -- in 2007 during the COC

17  hearing, that would have been, I think, April 17th,

18  2007.

19  Q    When you say that you observed the biofilter outlet

20  closely, what do you mean by that?

21  A    I was with -- close enough to see the biofilter to

22  see if there was water flowing in the biofilter.

23  Q    What do you mean by *water flowing in the biofilter*?

24  A    Some water moving in the biofilter.

25  Q    Okay.  You said the biofilter looks like --
                    JOHN COLEMAN - CROSS

1    A    Not biofilter, I mean biofilter outlet.  So I was

2    close enough to see if there was water in the outlet.

3    Q    Okay.  How many occasions were you close enough to

4    the biofilter outlet to see whether water was coming out

5    of it?

6    A    On four occasions.

7    Q    Would you take a look at paragraph 15 on page 5 of

8    your declaration.

9    A    Um-hmm.

10   Q    You say that "on three of the four occasions, I

11   observed the biofilter's outlet.  I saw water

12   discharging from the biofilter."

13   A    Yes.

14   Q    Is that an accurate statement?

15   A    I believe it is.

16   Q    So which three occasions is that referring to?

17   A    That would be April 19th, I think -- April 19th,

18   June 3rd, and August 18th.

19   Q    All in 2004.

20   A    Yes.

21   Q    Did you see water flowing out of the biofilter when

22   you were closely observing the biofilter at any other

23   time?

24   A    One other time during the COC field trip I may or I

25   may not have.  I cannot definitely say whether there was

                    JOHN COLEMAN - CROSS

1  water exiting through the outlet at that time or not.

2  Q    Well, if there was, you didn't put it in your

3  declaration, did you?

4  A    I did not because I could not definitely determine

5  that.

6  Q    On any of the three occasions:  April 19th, 2004;

7  June 3rd, 2004; August 18th, 2004, was anybody else with

8  you?

9  A    Let's see, I'm trying to remember when these -- I

10  believe on August 18th, 2004, was when the DNR and

11  Flambeau Mining Company had a field trip to look at

12  Stream C.

13  Q    Any other occasion in 2004 when anybody else was

14  with you?

15  A    Well, my daughter was with me in the photograph

16  that's on the screen.

17  Q    I'm sorry, I was asking you about times when you

18  were observing the biofilter outlet closely.

19  A    I believe April 19th, 2004, was one of those times.

20  Q    And who was with you?

21  A    My daughter.

22  Q    Okay.  Are you aware of any tests of the water

23  coming out of the biofilter on the occasions that you

24  claim it was coming out on April 19th, 2004; June 3rd,

25  2004; or April 18th, 2004 -- August.  Sorry --
                    JOHN COLEMAN - CROSS

1          MS. MCGILLIVAY:  Objection.

2          MR. VAN CAMP:  -- August 18, 2004.

3          MS. MCGILLIVAY:  Outside the scope of cross.

4          THE COURT:  Overruled.

5          THE WITNESS:  Can you repeat the question?

6   BY MR. VAN CAMP:

7   Q    Are you aware of any tests of the water that came

8   out -- that you claim came out of the biofilter outlet

9   on April 19th, 2004; June 3rd, 2004; and August 18th,

10  2004?

11  A    Off the top of my head, I believe that there was a

12  sample taken on April 19th, 2004, but my recollection of

13  that is fairly sketchy.

14  Q    You would agree, would you not, that standing on

15  Copper Park Lane you cannot see whether or not water is

16  coming out of the biofilter outlet?

17  A    I would say in these photographs you cannot.  I

18  think when the water is high enough, it can be seen from

19  Copper Park Lane, I believe.

20  Q    How far away is Copper Park Lane from the biofilter

21  outlet?

22  A    Seventy-five/one hundred feet.

23  Q    Seventy-five or a hundred feet?

24  A    Maybe a hundred feet, yeah.

25  Q    Well, other than the four occasions when you
                      JOHN COLEMAN - CROSS

1  closely observed the biofilter, which were all in 2004

2  -- I'm sorry, were in 2004 except one in 2007, all of

3  your observations were from Copper Park Lane; correct?

4  A    That is correct.

5  Q    So at best from that vantage point you would be

6  trying to determine whether water was flowing out of the

7  biofilter outlet from 75 or 100 feet or more; correct?

8  A    On other occasions when I was not at the outlet,

9  that would be the case.  But --

10 Q    Mr. Coleman, did you ever measure the amount of

11 flow coming out of the biofilter?

12 A    No, I did not.

13 Q    Did you ever measure the flow going out of the

14 wetland into the culvert under Copper Park Lane?

15 A    You're talking about this area, the culvert, the

16 water entering the culvert under Copper Park Lane?

17 Q    Right.

18 A    No, I did not.

19 Q    Did you ever measure the flow of water anywhere

20 between what you've called Highway 27 culvert all the

21 way down to Copper Park Lane south of -- I'm sorry,

22 Stream C south of Copper Park Lane?

23 A    By flow, you mean installation of a flow or using

24 Doppler radar or some such technique to measure flow?

25 Q    Yes.

                    JOHN COLEMAN - CROSS

1    A     No, I did not.

2    Q     Do you know in any of the years that you were out

3    there -- you were out there in 2004; correct?

4    A     Correct.  Yes.

5    Q     You were not out there in 2005?

6    A     Not to my recollection, no.

7    Q     You were out there once in 2006; correct?

8    A     I believe that to be the case, yes.

9    Q     You were out there twice in 2007?

10   A     Yes.

11   Q     You were out there once in 2008?

12   A     Yes.

13   Q     On any of those occasions, were you aware of how

14   many days during the years 2004, 2005, 2006, 2007, 2008

15   to present, how many days there was flow in what you

16   have referred to as Stream C north of Copper Park Lane?

17   A     Can you repeat the question?

18   Q     Sure.  How many days did Copper Park -- I'm sorry.

19   How many days did Stream C in the area you've identified

20   north of Copper Park Lane flow?

21   A     When I was there it flowed every time.  When I

22   wasn't there I wouldn't know.

23   Q     Okay.  So four times in 2004; correct?

24   A     Yes.

25   Q     No times in 2005?
                    JOHN COLEMAN - CROSS

1   A    Is the question about no times I was there or no

2   times it was flowing?

3   Q    Well, do you have any personal observations of any

4   flow in 2005?

5   A    I have no observations in 2005 whether it was

6   flowing or not flowing.

7   Q    Do you have any observations in 2006 whether it was

8   flowing or not?

9   A    I have no observations.

10  Q    Do you have any observations in 2007 whether it was

11  flowing?

12  A    Yes, I do.

13  Q    How many?

14  A    Sorry, can you repeat your previous -- I think I

15  might have misanswered your previous question.

16  Q    Sure.  My question is you have claimed that Stream

17  C exists north of Copper Park Lane; correct?

18  A    I have observed flow north of Copper Park Lane,

19  yes.

20  Q    Okay.  And in some of the places where you observed

21  flow, you observed flow over a grassy area; correct?

22  A    Yes.

23  Q    That was sheetflow; correct?

24  A    Can you define sheetflow.

25  Q    Have you ever used the term *sheetflow*?

                    JOHN COLEMAN - CROSS

1   A    Personally probably not, but I'm not sure.

2   Q    Okay.  I'm talking about water flowing over a

3   grassy area.

4   A    When I observed that water flowing over the grassy

5   area, it was in a defined flow; not spread out across a

6   broad area.  So I would not -- I would not describe that

7   as sheetflow.  I worked in Florida and they have

8   sheetflow across the Everglades, which is broad

9   expansive flat areas.  Sheetflow requires really flat

10  topography.

11      Next to the biofilter is an area that has a channel

12  that's slightly depressed, and so the water is funneled

13  into that channeled area.  So I would not call that

14  sheetflow.

15  Q    All right.  Let's talk about the channel.  Did you

16  have any pictures of a channel north of the stub road

17  A    No.

18  Q    When you refer to a channel north of the stub road

19  culvert, you're referring to a grassy swale; correct?

20  A    I think it could be called also grassy swale, yes.

21  Q    I believe you called it a grassy swale.

22  A    I did, yes.

23  Q    Okay.

24      THE COURT:  Well, I think he called it a swale.

25  I'm not sure he called it grassy.

                    JOHN COLEMAN - CROSS

1  Q    Okay.  It is a swale covered with grass, is it not?

2  A    I mentioned it has grass in the area and also I

3  think I called it a swale, so...

4  Q    On how many occasions do you believe that you saw

5  flow north of Copper Park Lane in 2007?

6  A    In 2007 how many occasions I saw flow.  Well, it's

7  listed in my deposition on April 17th and May 17th in

8  2007 I saw flow.

9  Q    Okay.  So twice.

10  A    Yes.

11  Q    How many occasions did you see flow north of Copper

12  Park Lane in 2008?

13  A    One time.

14  Q    What about 2009?

15  A    I visited the site one time and I saw flow there,

16  yes.

17  Q    That's not in your declaration, is it?

18  A    I'm sorry.  2009.  Sorry, I thought you were --

19  sorry.  That was a misstatement.  You said 2009?

20  Q    That's correct.

21  A    I was reading ahead.  Sorry.  I did not visit the

22  site in 2009.

23  Q    What about 2010?

24  A    I visited the site one time and I saw flow.

25  Q    What about 2011?
                    JOHN COLEMAN - CROSS

1   A    I have not.  I was not at the site in 2011.

2   Q    So those are all of the occasions on which you have

3   seen flow; correct?

4   A    In paragraph 8 of my statement I listed all the

5   occasions where I observed Stream C and on those

6   occasions I observed flow.

7   Q    So what was the one occasion that you referred to

8   in your declaration when you didn't see flow?

9   A    Can you point me out where I made that statement?

10  Q    In paragraph 14 of your declaration you refer to

11  four occasions.  Do you see that?

12  A    Yes.

13         MS. MCGILLIVAY:  Objection.  Are you talking

14  about paragraph 15?

15         MR. BENDER:  15?  No, I'm talking about 14.

16         THE COURT:  Do you have an objection?

17         MS. MCGILLIVAY:  Objection.  Misstates his

18  testimony.

19         THE COURT:  I'm sorry?

20         MS. MCGILLIVAY:  Misstates his testimony.

21         MR. VAN CAMP:  I'm referring him to paragraph

22  14 of his declaration.

23  BY MR. VAN CAMP:

24  Q    Refers to four occasions; correct?

25  A    Yes.  Yes.  14, yeah.
               JOHN COLEMAN - CROSS

1   Q    And then paragraph 15 of your declaration says on

2   three of the four occasions you observed the biofilter

3   outlet; correct?

4   A    On three of the four occasions, yes.

5   Q    Were you -- when you say you didn't observe the

6   biofilter outlet, did you see flow in Stream C on that

7   date at any of the locations north of Copper Park Lane?

8   A    I want to make sure I understand your question.  On

9   this date, the one -- there's one of the four occasions

10  when I observed the outlet closely.  I did not state

11  that I saw flow and you're asking me if I saw flow in

12  Stream C.

13  Q    Correct.

14  A    Yes, I did.

15  Q    Where?

16  A    That would have been in 2007 during the visit, I

17  think it was the May 17th, 2007, visit for the COC

18  hearing, and we went to a number of places at the site

19  and there was flow at Copper Park Lane.  Without

20  reviewing photographs, I probably couldn't tell you for

21  sure where else I saw that, but...

22  Q    Maybe I'm misunderstanding your declaration, but in

23  paragraph 15 of your declaration you say on three of

24  four occasions.  Do you see that?

25  A    Yes.

                   JOHN COLEMAN - CROSS

1   Q    Okay.  Which three of the four occasions are you

2   referring to?

3   A    I'm referring to April 19th, 2004; June 3rd, 2004;

4   and August 18th, 2004, on occasions where I saw flow at

5   the biofilter outlet.

6   Q    And what is the fourth occasion you're referring to

7   there that apparently you did not?

8   A    On May 17th, 2007, I don't have definitive

9   recollection of whether I saw flow or not --

10  Q    Okay.

11  A    -- in the outlet of the biofilter.

12  Q    Okay.

13           MR. VAN CAMP:  Could we pull up 1024.

14  Q    Do you have the document 1024 before you?

15  A    I do.

16  Q    And you see the dotted line that is an odd shape to

17  the right of the biofilter that defines a wetland.  Do

18  you see that?

19  A    White line?  Yes.  White dotted line.

20  Q    I thought it was light blue.  But at any rate, it

21  is a dotted line that defines the area of the biofilter.

22  Do you agree with that?

23  A    Sorry.  Can you restate your question?  I thought

24  you were asking me about to the right of the biofilter,

25  but are you talking about the biofilter itself?
                    JOHN COLEMAN - CROSS

1   Q    Okay.  Let me just draw it on here.  (Indicating)

2   I've tried to draw a red circle around an area that

3   includes a white or very light blue dotted area that is

4   a field delineated *wetland*.  Do you see that?

5   A    I see that, yes.

6   Q    You didn't do a wetland delineation yourself, did

7   you?

8   A    No, I did not.

9   Q    Do you have any reason to disagree with the

10  delineation of the wetland as it appears on Exhibit JE

11  1024?

12  A    I don't have a reason to agree or disagree with it.

13  Q    When you were in that area, did you agree that you

14  were walking through a wetland?

15  A    Some of those areas -- I did not walk through all

16  the area delineated by that boundary.  Some of those

17  areas certainly I would describe as having wetland

18  plants.

19  Q    Now during your testimony you provided us with some

20  dimensions and one of the dimensions that you provided

21  us with was the rocky slope coming down from the

22  biofilter.  Do you recall that?

23  A    Yes.

24  Q    Can you draw a circle around the place on Exhibit

25  JE 1024 where you believe that rocky slope is.

                    JOHN COLEMAN - CROSS

1   A    In the northeast corner of the biofilter is where

2   the outlet is and that rocky slope that I described.

3   Q    Now you've drawn a pretty good-sized blue circle on

4   there.  Do you think that -- if you want to look at the

5   key in the lower right-hand corner of JE 1024, you'll

6   see the dimensions down there.  Do you see that?

7   A    Yes.

8   Q    And so the circle that you drew is what, 60 or more

9   feet wide?

10  A    Yeah.  If you want to zoom in farther, I'll try to

11  more accurately outline the area that I think is the

12  rocky slope.

13       So I believe the outlet to be roughly in this area.

14   (Indicating) I do PIS mapping and if I produced a

15  product like that and tried to claim an area or a

16  distance, I'd probably get fired.  So that is a rough

17  approximation of where that rocky slope is.

18  Q    Okay.  If we zoom out at this time, I think we can

19  determine approximately how -- well, it didn't go with

20  us.  Okay.

21       Did you study the biofilter berm construction at

22  all?

23  A    I observed -- you mean during construction?

24  Q    Yes.

25  A    No, I did not.

                    JOHN COLEMAN - CROSS

1   Q    Did you observe it after construction, after it was

2   built?

3   A    I was there on a number of occasions and saw the

4   berm after it was built, after it was vegetated with

5   grass, yes.

6   Q    How wide is the berm at the top?

7   A    Maybe 10, 12 feet.

8   Q    And how long -- how high is the berm above the

9   ground surrounding it?

10  A    Maybe eight feet.  That's a rough guess.  You're

11  asking -- I'm not even sure it's appropriate for me to

12  be making guesses based on a visual, no measurements,

13  but recollection of my observation several years ago.

14  Q    So we agree that you took no measurements about the

15  berm; correct?

16  A    That is correct.

17  Q    And you took no measurements from the lip of the

18  berm to the lowest part of the wetland depicted in JE

19  1024?

20  A    That is correct.

21  Q    Did you take any tests regarding the level of the

22  groundwater in the area east of the biofilter?

23  A    No.  There's some monitoring wells maintained by

24  Flambeau Mining Company that looked at the groundwater

25  level, but I have not done any tests which would involve

                        JOHN COLEMAN - CROSS

1  drilling wells and things.

2  Q    And is there a well that you're aware of that

3  reports the groundwater level to the east of the

4  biofilter?

5  A    I believe there's a groundwater well quite a ways

6  to the east, and at this point I wouldn't be able to

7  identify its exact location.  But my guess is several

8  hundred feet away, at least.

9  Q    You would agree though that the -- that nothing you

10  did took into account the level of the groundwater to

11  the east of the biofilter; correct?

12  A    My observations did not take into account

13  groundwater level.

14  Q    Okay.  So it's true, is it not, that on the

15  occasions that you claim you saw water going out through

16  the biofilter outlet, that you took no measurements of

17  the amount of that flow; correct?

18  A    That is correct.

19  Q    What, if any, tests did you perform when you claim

20  you saw water coming out of the biofilter to determine

21  where that water went?

22          MS. MCGILLIVAY:  Objection.  Asked and

23  answered.

24          THE COURT:  Sustained.

25  BY MR. VAN CAMP:
                    JOHN COLEMAN - CROSS

1   Q    Do you know what the construction of the biofilter

2   outlet is?

3   A    By that you mean the materials?

4   Q    Yes.

5   A    I know at the surface there's some large rocks,

6   presumably I assume to prevent erosion due to flow.  I

7   don't know the detail of the materials used for the

8   construction, no.

9   Q    Do you know what's under those rocks?

10  A    I do not.

11  Q    Is it dirt?

12          MS. MCGILLIVAY:  Objection.  Foundation.

13          THE COURT:  Sustained.

14          MR. VAN CAMP:  Okay.

15  BY MR. VAN CAMP:

16  Q    If a drop of water came out of that biofilter, what

17  would happen to it?

18  A    Sounds like a very hypothetical question.  A drop

19  of water exited the biofilter in what direction?

20  Q    Out of the outlet.

21  A    Out of the outlet.  It would tend to flow downhill.

22  Q    Okay.  It might infiltrate into the dirt?

23  A    A drop of water could infiltrate into the dirt.

24  Q    Might evaporate?

25  A    It might evaporate.
                    JOHN COLEMAN - CROSS

1  Q    The area of the biofilter outlet is choked with

2  plants; correct?

3  A    I don't think I would use the term *choked*.  There's

4  some -- there are some plants growing in that outlet as

5  could be seen in the photographs I took.

6  Q    That drop of water could be taken up by a plant?

7  A    A drop of water could be taken up by a plant, yes.

8  Q    What about two drops of water?  Same things would

9  happen; correct?

10 A    I'm not a plant physiologist, so how much water a

11 plant can absorb over a certain period of time I'm not

12 qualified to answer that.  I don't know.  And plus, is

13 that over two weeks or is that over five minutes?  I

14 would say a plant probably could not take up two drops

15 of water in five minutes, but there are a lot of

16 qualifiers.  You need to be more explicit, I guess, in

17 my mind.

18 Q    What studies did you do about any of those

19 qualifiers?

20 A    I did no studies other than observing the outlet.

21 Q    So basically all you can tell this Court is about

22 the days that you observed it.

23 A    That is correct.

24 Q    You would agree also, wouldn't you, that the volume

25 of outflow from the biofilter would impact where it

JOHN COLEMAN - CROSS

1  goes?

2  A    I would say the volume of water might impact on how

3  that water was partitioned to different fates.

4  Q    Are you aware of any studies done regarding the

5  volume of outflow from the biofilter?

6  A    No, I am not.

7  Q    Are you aware of any studies indicating how many

8  days in any year there was a flow out of the biofilter?

9        MS. MCGILLIVAY:  Objection.  Asked and

10  answered.

11        THE COURT:  Overruled.

12        THE WITNESS:  Can you repeat the question?

13  BY MR. VAN CAMP:

14  Q    Are you aware of any studies indicating how many

15  days in any year there was a flow out of the biofilter?

16  A    The only studies I'm aware of, there were water

17  samples taken by Flambeau Mining Company at the outlet.

18  And as explicit studies as to flow, I'm not aware of any

19  studies from the outlet.

20  Q    Are you aware of any studies indicating how many

21  days there is water standing in the wetland east of the

22  biofilter?

23  A    No.

24        MS. MCGILLIVAY:  Objection.  Foundation.

25  A    I'm not aware.
                    JOHN COLEMAN - CROSS

1   Q     Are you aware of any studies --

2             THE COURT:  Overruled.

3             MR. VAN CAMP:  I'm sorry.

4   BY MR. VAN CAMP:

5   Q     Are you aware of any studies of surface water

6   movement within the wetland east of the biofilter?

7   A     By surface water movement in that area, do you mean

8   flow direction, flow quantity, things like that?

9   Q     Right.

10  A     No.  I'm not aware of any study of that sort.

11  Q     Are you aware of any experiments conducted by

12  anybody to determine the direction of flow of anything

13  coming out of the biofilter?

14  A     Studies to determine the direction of flow --

15  Q     Correct.

16  A     -- of water coming out of the biofilter?  I mean,

17  well, if the water is flowing downhill, so I don't think

18  there was a need for a study of that sort.  But a study,

19  other than knowing that water flows downhill, no, there

20  was -- as far as I know there was no study.

21  Q     Well, you said that there are big rocks at the

22  biofilter outlet; correct?

23  A     Big in that, you know, size of a half loaf of bread

24  maybe, a loaf of bread.

25  Q     The water would have to go around those; correct?
                  JOHN COLEMAN - CROSS

1   A     Yes.

2   Q     Do those rocks direct the water to the north?

3   A     You're talking about as the water is flowing around

4   this loaf, half-loaf sized rock, whether some of that

5   water might have gone around to the left side and some

6   gone around to the right side and the left side being to

7   the north.  Yes, that could have happened.

8   Q     And then there are rocks below that, correct, that

9   would again direct the water?

10  A     Scattered rocks.  I think I'd be hard pressed to

11  agree that scattered rocks are going to generally direct

12  the water.  The water will flow around the rocks and

13  momentarily will go in some other direction rather than

14  to the east.  But I couldn't testify that the rocks were

15  having any kind of significant impact on the general

16  flow direction at that outlet.  I couldn't say that.

17  Q     Okay.  Are you aware of any tests done on

18  invertebrates within the marsh to the east of the

19  biofilter?

20  A     No, I am not.

21  Q     Are you aware of any tests done regarding fish in

22  the wetland to the east of the biofilter?

23  A     By tests you mean electroshocking or netting of

24  fish to look at populations or something of that sort?

25  Q     Right.

                    JOHN COLEMAN - CROSS

1    A    The only study I'm aware of that looked at -- well,

2    one study I'm aware of that looked at biotin in Stream

3    C, I think it was done about the time of the DNR -- the

4    visit, there was a report done looking at biotin in

5    Stream C, but I don't recall that it looked explicitly

6    in that area immediately adjacent to the biofilter

7    outlet.

8    Q    Are you speaking of the water quality assessment

9    that Mr. Roesler participated in?

10   A    Can you give me the date of that?

11   Q    2012.

12   A    No.  I'm talking about a study done back in -- it

13   must have been around 2004/2005.

14   Q    Okay.  But you don't believe that the study was

15   done in the wetland to the east of the biofilter?

16   A    I'm not aware that it was.  I couldn't testify one

17   way or the other.  It's been, you know, a long time

18   since I looked at that study.

19   Q    Okay.  Are you aware of any tests or experiments

20   involving insects in that wetland to the east of the

21   biofilter?

22   A    No, I'm not.

23   Q    Are you aware of any tests comparing biological

24   matter between the biofilter and the wetland to the east

25   of it?

                      JOHN COLEMAN - CROSS

1    A    Can you define what you mean by biological matter?

2    You mean living organisms or are you talking about

3    carbon particles or --

4    Q    Let's begin with living creatures.

5    A    Between the biofilter and the area to the east of

6    it, no, I'm not.

7    Q    What about any dissolved organic carbon studies

8    between the wetland and the biofilter?

9    A    No, I'm not.

10    Q    Are you aware of any other plant studies between

11    the biofilter and the wetland to the east of it?

12    A    No.

13    Q    Are you aware of any tests related to those same

14    things between the wetland to the east of the biofilter

15    and Stream C south of Copper Park Lane?

16    A    Any tests that looked at the -- can you repeat the

17    question, please.

18    Q    Certainly.  Are you aware of any tests that compare

19    the biological matter?  And we'll begin with living

20    matter between the wetland east of the biofilter and

21    Copper Park Lane south -- I'm sorry, Stream C south of

22    Copper Park Lane.

23    A    Well, my understanding -- I mean there are wetland

24    studies dealing in wetlands and looking at wetland

25    vegetation that occurred in both those areas.

                    JOHN COLEMAN - CROSS

1   Q     Relative --

2   A     But are you talking about individual aquatic

3   organisms or are you talking --

4   Q     Well, we'll take you through that.  Are you aware

5   of any studies that study the living creatures in the

6   wetland east of the biofilter and compare them with

7   water in Stream C south of Copper Park Lane?

8   A     Compare the organisms with the water in Stream C --

9   I still -- are you talking about the aquatic organisms

10  then in that area that you're calling the wetland and

11  farther down at Copper Park Lane?  I'm not aware of any

12  aquatic organisms there.  As I said, there are wetland

13  plants that occurred in both areas.

14        If you're talking about the chemistry of those

15  organisms, that's maybe a different question.

16  Q     Let's break it down further.  Are you aware of any

17  study of fish in the wetland and compare that to the

18  fish in Stream C --

19  A     No --

20  Q     -- south.

21  A     No.  I'm not aware of any.

22  Q     Are you aware of any studies conducted of

23  macroinvertebrates in the wetland and compare that to

24  the macroinvertebrates in Stream C south of Copper Park

25  Lane?

                    JOHN COLEMAN - CROSS

1   A    No.  I'm not aware.

2   Q    Are you aware of any samples of dissolved organic

3   matter taken in the wetland to the east of the

4   biofilter?

5   A    No, I am not.

6   Q    Are you aware of any tests that compare dissolved

7   organic matter from the wetland east of the biofilter to

8   dissolved organic matter in Stream C south of Copper

9   Park Lane?

10  A    No, I am not.

11  Q    Are you aware of any studies at all that were --

12  that attempt to determine what is going on in the

13  broadest sense within the wetland to the east of the

14  biofilter?

15          MS. MCGILLIVAY:  Objection.  Vague.

16          THE COURT:  Sustained.

17  BY MR. VAN CAMP:

18  Q    Well, are you aware of any tests that determine

19  whether the biofilter to the -- I'm sorry, the wetland

20  to the east of the biofilter adds silt to the flow

21  leaving it or takes silt out?

22  A    No, I am not aware of any study of that sort.

23  Q    Are you aware of any studies that determine whether

24  the wetland to the east of the biofilter adds or

25  subtracts copper to water south of Stream C?
                    JOHN COLEMAN - CROSS

1  A    No, I am not.

2  Q    Are you aware of any tests that determine whether

3  or not the biofilter adds or subtracts zinc to the water

4  south of Copper Park Lane?

5  A    I think you asked if the biofilter add or subtract

6  and I would say yes.

7  Q    I'm sorry, let me look at my question.

8  A    The biofilter was designed to remove copper and

9  other things from the stormwater.

10 Q    Right.  I misspoke in my question.  Are you aware

11 of any tests that determine whether or not the wetland

12 that's to the east of the biofilter adds or subtracts

13 zinc to the water south of Copper Park Lane?

14 A    I am not.

15 Q    You indicated that on at least two occasions you

16 walked Stream C from Copper Park Lane to the Flambeau

17 River; correct?

18 A    Large portions of it, yes.

19 Q    When you say *large portions of it*, why don't you

20 tell us what portions you didn't walk.

21 A    Well, I walked on one occasion, walked the entire

22 length.  I think that was the trip with the DNR, we

23 walked the entire length of Stream C.  On another trip,

24 we walked substantial portions of the stream but were

25 not on the stream bank the entire time.  So at times we

                    JOHN COLEMAN - CROSS

1  were maybe 30, 40, 50 -- 30 or 40 feet away from the

2  stream.

3  Q    You indicated that on one of those occasions there

4  were portions of Stream C that didn't have any flow.

5  A    The flow appeared to disappear into the gravel for

6  short periods of -- short distances, distances of maybe

7  five or ten feet, yes.

8  Q    Okay.  And in those -- on those or that occasion

9  that you saw that, you would agree that the water

10 infiltrated into the ground at those locations.

11 A    You're asking a question that's -- stream hydrology

12 is very complicated with exchange between streambed and

13 stream quite complicated.  Infiltration to -- usually

14 means something more substantial than very temporary

15 exchange with the gravels.  I would -- I would not

16 necessarily call it infiltration of the stream at that

17 point and I think that implies maybe a deeper

18 infiltration than what I observed, which seemed to be

19 rather shallow into the gravels.

20     But yes, I would say it infiltrated into the

21 gravels in the streambed.  Exactly how far it

22 infiltrated it's hard to know, but it re-emerged after

23 the gravel portions of the stream, yes.

24 Q    Okay.  In those instances when it infiltrated,

25 we'll say into the gravel as you suggest, it was below

                    JOHN COLEMAN - CROSS

1  grade; correct?

2  A    That is correct, yes.

3  Q    So there wasn't surface flow at that location?

4  A    There was not.

5  Q    And you've indicated that that hydrology is very

6  complicated; correct?

7  A    That can be with water flowing in and out of the

8  streambed gravel, yes.

9  Q    Are you aware of anyone that has done a study to

10 determine whether or not water from the biofilter passed

11 those locations or did that infiltrate into the soil as

12 well?

13       MS. MCGILLIVAY:  Objection, Your Honor.  It's

14 calling for expert opinion that this witness has not

15 prepared definitive --

16       THE COURT:  Sustained.

17       MR. VAN CAMP:  I'll accept that.

18       THE COURT:  Yes.

19       MR. VAN CAMP:  No, I meant that he doesn't.  My

20 apologies, Your Honor.

21 BY MR. VAN CAMP:

22 Q    Are you aware of any studies that have been done

23 about that?

24 A    Can you describe -- I'm a little puzzled on what

25 you're describing.  Can you describe the scenario you're

                    JOHN COLEMAN - CROSS

1  talking about?

2  Q    I am asking you if in your studies about Stream C

3  you have come across any studies related to the

4  phenomenon where water seems to go into the ground in

5  Stream C.  Have you seen any studies about that?

6  A    No.  This earlier study from 2005 I think talked

7  about some aspects of the flow of Stream C, but the

8  details of that I can't recall at this point.  I think

9  that was trying to do a general characterization of

10  Stream C, so that would be the only work that I know of

11  and I think it was rather cursory.

12  Q    I'd like to -- if we could, please, take a look at

13  Exhibit 74.  I believe you indicated that Exhibit 74 is

14  a photograph that you took.  Which direction are you

15  facing?

16  A    I'm facing to the north/northwest.

17  Q    There was a suggestion in a question you were asked

18  as to whether or not this photograph shows the biofilter

19  outlet.  It does not show the biofilter outlet, does it?

20  A    It does not.

21  Q    It does show, however, grasses and other plants

22  surrounding the biofilter?

23  A    That is correct.

24  Q    And grasses and plants continue around to the right

25  side of this photograph and on the swale of the other

JOHN COLEMAN - CROSS

1  part of the biofilter; correct?

2  A    I want to be careful.  The use of the term swale is

3  maybe --

4  Q    I'm sorry.

5  A    You mean the outlet?

6  Q    No, I'm sorry.  You're correct.  Let me restate the

7  question.  The grasses that appear in Exhibit 74

8  continue around the berm is what I meant, not the swale,

9  but the berm as it continues around off to the right of

10 this --

11 A    Yes.

12 Q    -- photograph.  And this photograph I believe you

13 indicated was taken in June; correct?

14 A    Yes.

15 Q    How tall do those grasses get later in the year?

16 A    Oh, my guess is about twice the current height.

17 But I didn't measure them.  But, yes.

18 Q    So what is the current height in Exhibit 74?

19 A    Well, my guess is, you know, maybe average height

20 of ten inches.

21 Q    Are you standing on Copper Park Lane when you took

22 Exhibit 74?

23 A    I'm standing at the edge on the slope coming down

24 from Copper Park Lane.

25 Q    You're standing below the berm outside the
                         JOHN COLEMAN - CROSS

1  biofilter; correct?

2  A    Well, I think I'm actually a little bit elevated

3  above.  My feet are below the berm, yes.

4  Q    And when you say you're *elevated above*, what are

5  you elevated --

6  A    Obviously from my photograph I had to be high

7  enough to see the water.  If my head was lower than the

8  top of the berm, I wouldn't be able to see the water

9  here.  So I think I was probably up on the bank of

10  Copper Park Lane to give me a little bit of vantage to

11  see the biofilter.

12  Q    Would you say that Exhibit 74 exhibits the height

13  of the berm around the biofilter?

14  A    I don't think that's the maximum height, but on the

15  right-hand side there that's getting probably close.  I

16  think that is close to the southeast corner of the

17  biofilter, but I think it -- and the berm is a little

18  bit higher off to the right of the photo.

19  Q    So how high is the berm that we're looking at in

20  74?

21  A    You know, I'd be reluctant to hazard a guess based

22  on memory and the photo.  I think you can probably make

23  as good a guess as I can.

24  Q    So you don't know.

25  A    I'll say it's more than four feet and less than
                    JOHN COLEMAN - CROSS

1    ten.

2    Q    Okay.  And in the area where the outlet is, it's

3    lower than the berm pictured here; correct?

4    A    The elevation of the outlet is just about the

5    elevation of the water, so yes, the elevation of the

6    outlet is lower than the berm height here.

7    Q    How high is the height of the biofilter outlet

8    above the grassy slope to the east of the outlet?

9    A    Once again you'd be asking me to speculate.  I

10   would say more than three feet and less than six.

11   Q    Okay.  Could we take a look then at Exhibit 76, if

12   you don't mind.  Exhibit 76 is also a photograph that

13   you took; correct?

14   A    Yes.

15   Q    And I believe it was taken on the same day as

16   Exhibit 74?

17   A    Yes.

18   Q    Which direction are you facing in Exhibit 76?

19   A    Facing to the east, a little bit to the north.

20   Q    Now are you standing on the top of the biofilter?

21   A    I'm --

22   Q    On the biofilter berm?

23   A    No.  I'm standing in the outlet on a couple of

24   these rocks that you can see in the photograph.

25   Q    How far from the north corner of the biofilter are

                    JOHN COLEMAN - CROSS

1 | you when you take the photograph that's Exhibit 76?

2 | A     How far from the northeast corner?

3 | Q     Correct.

4 | A     Maybe 40/50 feet.  But again, you're asking me to

5 | recall a distance from quite a few years ago.  But I

6 | think if you really want to know the distance, I think

7 | the map would show you better than my recollection from

8 | 2004.

9 | Q     Okay.  Now I believe you indicated that you thought

10 | that Stream C, as you described it, flowed through the

11 | grass in this photograph.

12 | A     Yes.

13 | Q     Is that correct?

14 | A     Yes.  That is correct.

15 | Q     How far away do you believe that is?

16 |         MS. MCGILLIVAY:  Objection.  Vague.

17 | Q     Okay.  How far is it from the water that we see in

18 | Exhibit 76 to the place where you believe Stream C would

19 | be?

20 | A     I think very approximately about ten feet.

21 | Q     Okay.  So if we were to look at Exhibit 1024 and we

22 | looked at the scale in Exhibit 1024, from the lip of the

23 | biofilter -- from the lip of the highest point?

24 | A     Okay.  The highest point?  Yes.

25 | Q     Of the outlet.

JOHN COLEMAN - CROSS

1   A    Yes.

2   Q    From the highest point of the outlet to the lowest

3   part of the wetland to the east, how many feet are we

4   talking about?

5   A    I'd say 40 or 50 feet.

6   Q    So in your declaration when you referred to Stream

7   C being ten feet away from the biofilter outlet --

8   A    Yes.

9   Q    -- you're basically saying that the biofilter

10  outlet is 40 or 50 feet wide; correct?

11  A    No.  I'm saying it's 30 to 40 feet.

12  Q    So you are saying that the biofilter outlet, which

13  you've said is three to six feet high, has a biofilter

14  outlet that is 30 or 40 feet wide?

15  A    It's a very gradual slope going out.  Yes, I would

16  say it's something like that.

17  Q    And all of that slope is covered with rock?

18  A    Well, you can see in the photographs there's some

19  rock.  There's now some mixed dead vegetation in there.

20  There's probably soil underneath that, yes.

21  Q    So at the point that we are looking at Exhibit 76,

22  and there is water there, how far is that water that we

23  see in Exhibit 76 from the highest point of the

24  biofilter outlet?

25  A    I'd say 20/25 feet.  20 feet my guess.

                  JOHN COLEMAN - CROSS

1    Q    And as I look at this photograph, I don't see any

2    flow.

3    A    Well, I think it would be very difficult to see.

4    I've tried -- it's almost impossible to get a still

5    photograph of flow.  I've gone to video camera, a video

6    camera for exactly that reason.

7    Q    Could we take a look, please, at Exhibit 76 -- I'm

8    sorry, at 80.

9            MS. MCGILLIVAY:  I'm sorry, I didn't hear you.

10            MR. VAN CAMP:  I'm sorry.  Exhibit 80.

11    Q    When you testified about Exhibit 80, I believe you

12    said you were standing on rocks in the biofilter?

13    A    Yeah.  I think that is the case, yes.

14    Q    So you are standing on a rock in the biofilter when

15    you're taking this photograph?

16    A    Yes.

17    Q    Which way are you facing?

18    A    In this photo I'm facing east/northeast.  The

19    biofilter would be to the left of this picture.

20    Q    Okay.  So then if we look at Exhibit 81, please.

21    Sorry about this.  Are you simply turning around and

22    taking a photograph a different direction than you were

23    when you were at Exhibit 80?

24    A    Pretty close to that.  I think I may have moved a

25    very small amount, but essentially I'm just doing kind

                    JOHN COLEMAN - CROSS

1    of a panorama here.

2    Q    Okay.  So you testified that Exhibit 81 showed the,

3    I think, northeast corner of the biofilter in the upper

4    left-hand corner; correct?

5    A    In this photo?

6    Q    Yes.

7    A    Yes.

8    Q    And do you see any water flowing in Exhibit 81?

9    A    As I said, you can't see flowing water in still

10   photographs.  I saw flowing water when I was at the

11   site.

12   Q    Well, you would agree that the water in the upper

13   left-hand corner is not flowing, it is in the biofilter;

14   correct?

15   A    Well, it's mostly still water, but water moves even

16   when it's in a pond or in a lake, so it may be moving.

17   It's not the sort of thing you could hope to detect in a

18   photograph and if it's -- in this upper left-hand corner

19   you wouldn't be able to detect that by sight either.

20   But when it passes past my feet where I was standing, I

21   could see water moving through the outlet.

22   Q    So to see water moving through that outlet, you had

23   to be actually standing right where you are; correct?

24   A    I don't know if I had to be standing right where I

25   was to see any movement.  I mean in some of the earlier

                    JOHN COLEMAN - CROSS

1   photos you can see the vegetation is bent because of the

2   flow of the water.  There's been dead vegetation that's

3   been moved by flowing water.  But I took the photo from

4   this location because I thought it -- particularly

5   because the grass was starting to obscure things, that

6   it was important to be close to the outlet to get a good

7   picture, so I stood right there.  Whether I could have

8   seen flow if I was back another 10/20 feet, at this

9   point it would be speculation, I think, on my part.

10  Q    Do you see in photograph 81 any of the bent-over

11  grass?

12  A    No, I don't.  I saw it in one of the earlier

13  photos.

14  Q    From the point that your camera is focused on in

15  Exhibit 81, it would be downhill over the edge of the

16  biofilter outlet; correct?

17  A    Downhill would be to the bottom right?  Is that --

18  Q    Right.

19  A    Yes.

20  Q    Correct?

21  A    That is correct.

22  Q    Do you have any photograph showing water flowing

23  down that area?

24  A    The previous photographs were of that area.

25  Q    Could we go back to 76, please.  Where is the slope

                    JOHN COLEMAN - CROSS

1    that you referred to on the biofilter outlet in Exhibit

2    76?

3    A    This is the outlet sloping from the left-hand side

4    of the photograph to the right-hand side of the

5    photograph.

6    Q    You also referenced a channel to the east of the

7    biofilter outlet.  Do you have any photographs to show

8    that channel?

9    A    No, I do not.

10   Q    That's because it's a grassy swale; correct?

11   A    The grass was tall enough that you really couldn't

12   see the topography of the ground at this point.  I mean

13   there is a photograph here that shows that area, but the

14   grass is tall enough that I'm not going to try to

15   convince people that they can see something that's very

16   difficult to see with the grass being 10 or 12 inches

17   tall here.

18           THE COURT:  We'll take our lunch break now.

19   We'll resume at 1:30.

20       (Noon recess            12:30 p.m.)

21

22                   * * * * *

23

24

25
                    JOHN COLEMAN - CROSS

1       I, LYNETTE SWENSON, Certified Realtime and Merit

2   Reporter in and for the State of Wisconsin, certify that

3   the foregoing is a true and accurate record of the

4   proceedings held on the 21st day of May 2012 before the

5   Honorable Barbara B. Crabb, District Judge for the

6   Western District of Wisconsin, in my presence and

7   reduced to writing in accordance with my stenographic

8   notes made at said time and place.

9   Dated this 7th day of September 2012.

10

11

12

13                  /s/_____

14                   Lynette Swenson, RMR, CRR, CBC
                         Federal Court Reporter

15

16

17

18  The foregoing certification of this transcript does not
    apply to any reproduction of the same by any means
19  unless under the direct control and/or direction of the
    certifying reporter.

20

21

22

23

24

25