UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * *

WISCONSIN RESOURCES PROTECTION
COUNCIL, CENTER FOR BIOLOGICAL
DIVERSITY and LAURA GAUGER,

       Plaintiffs,
  -vs-                     Case No. 11-CV-45-BBC

FLAMBEAU MINING COMPANY, INC.,  Madison, Wisconsin
                          May 23, 2012
       Defendant.         9:03 a.m.

* * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF THIRD DAY OF COURT TRIAL
MORNING SESSION
HELD BEFORE DISTRICT JUDGE BARBARA B. CRABB,


APPEARANCES:

For the Plaintiffs:  McGillivay, Westerberg & Bender
                       BY:  ATTORNEYS PAMELA MCGILLIVAY,
                       JAMES SAUL and DAVID BENDER
                       211 South Paterson Street, Ste. 320
                       Madison, Wisconsin  53703

                       Pacific Environmental Advocacy
                       Center - East
                       BY:  ATTORNEY KEVIN CASSIDY
                       P.O. Box 445
                       Norwell, Massachusetts  02061

                       Pacific Environmental Advocacy
                       Center - West
                       BY:  ATTORNEY DANIEL MENSHER
                       10015 SW Terwilliger Blvd.
                       Portland, Oregon  97219

Lynette Swenson   RMR, CRR, CBC
Federal Court Reporter
U.S. District Court   120 N. Henry St., Rm. 520
Madison, WI  53703   (608) 255-3821

1  Continued appearances:

2  For the Plaintiffs:   Center for Biological Diversity
                         BY:  ATTORNEY MARC FINK
3                        209 East Seventh Street
                         Duluth, Minnesota  55805

4
   For the Defendant:    DeWitt Ross & Stevens, S.C.
5                        BY:  ATTORNEYS HARRY VAN CAMP
                         and SCOTT PALER
6                        Two East Mifflin Street, Ste. 600
                         Madison, Wisconsin  53703

7
                         Susan George - Paralegal
8
   For the State         Wisconsin Department of Justice
9   of Wisconsin:        BY:  AAG THOMAS J. DAWSON
                         17 West Main Street
10                       Madison, Wisconsin  53703

11 Also present:         Fred Fox

12                         * * * * *

13                      **I-N-D-E-X**

14 PLAINTIFFS' WITNESSES          EXAMINATION          PAGES

15 ROBERT NAUTA          Cont'd cross by Mr. Cassidy    9-22
                         Cross by Mr. Van Camp         22-46
16                       Redirect by Mr. Cassidy       46-54
                         Recross by Mr. Van Camp       54-55
17 ELIZABETH DAY         Deposition excerpts read

18 Motion to dismiss                                   68-72
   ELIZABETH DAY         Deposition played               80
19

20                   **E-X-H-I-B-I-T-S**

21 EXHIBITS                           IDENTIFIED/RECEIVED

22 Exhibit 8    Logbook entries            5          ---
          9B    Day designations          56          ---
23        70    4-13 Day depo excerpts     56          ---
          83    Photo                       5            8
24        86    Photo                      53           54
          89    Stipulated facts            4            4
25        91    4-18 Day depo excerpts     65          ---
         553    Diagram                    39           54

1        (Call to order)

2            THE CLERK:  Case Number 11-CV-45-BBC.

3    *Wisconsin Resources Protection Council et al. v.*

4    *Flambeau Mining Company* is called for third day court

5    trial.  May we have the appearances, please.

6            MS. MCGILLIVAY:  Good morning, Your Honor.  Pam

7    McGillivray, James Saul, David Bender from McGillivray,

8    Westerberg & Bender.  Kevin Cassidy from Lewis & Clark

9    Law School.  At counsel table also with us on behalf of

10   plaintiffs is Attorney Christa Westerberg of

11   McGillivray, Westerberg & Bender.  And Dan Mensher, also

12   from the Lewis & Clark Law School.  And Marc Fink from

13   CBD, Center for Biological Diversity here for

14   plaintiffs.

15           THE COURT:  Thank you.

16           MR. VAN CAMP:  Good morning, Your Honor.  Harry

17   Van Camp appearing on behalf of the defendant, Flambeau

18   Mining Company.  Also appearing on behalf of the

19   defendant Flambeau Mining is Attorney Scott Paler.

20   Mr. Fred Fox appears on behalf of the mining company,

21   and we're assisted by Susan George.

22           THE COURT:  Thank you.

23           MR. VAN CAMP:  Yes.  Thank you.

24           MS. MCGILLIVAY:  Your Honor, before we call our

25   witness back, there's a preliminary matter that if we

1    could address, the fact stip.  I've marked it as an

2    exhibit and provided defendants a copy.  May I approach?

3            THE COURT:  Um-hmm.

4            MS. MCGILLIVAY:  This is a copy of the

5    stipulation and facts that was filed earlier by the

6    parties and I just marked it as Exhibit 89 and we would

7    offer it.

8            THE COURT:  It will be received.

9            MS. MCGILLIVAY:  Your Honor, I have one other

10   preliminary matter.  Yesterday -- I guess I would ask

11   for reconsideration on offer of Exhibits No. 8 and No.

12   83, and I believe the Court's ruling on those went to

13   their relevance because they're documents that were from

14   2004.  In the factual stipulation that the parties

15   agreed to, paragraphs 5-12 -- 5-15, excuse me, address

16   matters related to flow from the biofilter -- occasions

17   of flow from the biofilter and the exceedances or higher

18   than measuring of concentration of copper from the

19   biofilter outlet in that same time period.

20       The parties stipulated or plaintiffs proposed the

21   stipulated facts that were then agreed to by defendants

22   to show that the flow occurs, the surface water

23   connection of the water, and also the pollutant

24   transport.  It was not for the purpose of showing dates

25   of liability.  We understand the Court's ruling on

1   statute of limitation, but the flow of the water in that

2   area has not changed in the relevant time period for

3   this case.  So we had proposed these stipulated facts.

4        Additionally, defendant's counsel had stipulated to

5   Exhibit 83's authenticity and admissibility on the first

6   day of trial and then yesterday moved on relevance

7   grounds to exclude it.  Because we do believe that these

8   are relevant and that counsel had prior to yesterday

9   agreed to the relevance of these matters, would ask for

10  -- we ask to reoffer those two exhibits.

11           THE COURT:  So that's 8 and 83?

12           MS. MCGILLIVAY:  I think I might have

13  misspoken.  I think it's 6, which is -- which were the

14  logs from Jana Murphy that were dated 10-15-02 to

15  9-15-04, and then a photograph which is dated April

16  19th, 2004, which is Exhibit 83, which coincides with

17  stipulated fact 5 and 6 which has to do with flow from

18  the biofilter on 4-19-04.

19           THE COURT:  Mr. Van Camp.

20           MR. VAN CAMP:  Yes.  The stipulated facts

21  contain very specific limited amounts of information.

22  They talk about flow out of the biofilter on a

23  particular date and they talk about the concentration.

24  We stipulated to those facts.  We did not stipulate to

25  all of the facts and information that was contained in

1   Exhibit 6.  We didn't stipulate to the things

2   demonstrated by Exhibit 8.

3       And as far as the relevance of 83, at the time that

4   it was offered the witness hadn't presented evidence

5   that would make it relevant and we objected.

6           MS. MCGILLIVAY:  Your Honor, if I may, I

7   believe 8 is already in evidence.  That was Exhibit 6.

8           MR. VAN CAMP:  I'm sorry if I said 8.

9           MS. MCGILLIVAY:  I think I misspoke the first

10  time, I said 8.  And Exhibit 83 is the stipulated

11  photograph on admissibility and authenticity that we

12  presented by stipulation the first day of trial.

13          MR. VAN CAMP:  Okay.

14          THE COURT:  8 is in evidence.  6 are the field

15  logs for 2002 through 2004.

16          MS. MCGILLIVAY:  Yes, Your Honor.

17          THE COURT:  And why would all of those be

18  relevant?

19          MS. MCGILLIVAY:  Your Honor, the time period

20  that we were discussing, I believe Mr. Cassidy was

21  discussing with Ms. Murphy during the examination,

22  coincided with the stipulated dates in 2004.  And it

23  shows the flow and that she observed flow on that date

24  and that the flow patterns in the biofilter region have

25  not changed.  And so we believe, because there has been

1   no change in the flow patterns at any time --

2            THE COURT:  And where does the information that

3   there's been no change in the flow patterns come from?

4            MS. MCGILLIVAY:  Well, I believe Dr. Coleman

5   testified to that and I believe that the documents that

6   post-date the Foth documents and other documents --

7            THE COURT:  But that doesn't have anything to

8   do with her logs.  The only thing in her logs that I

9   understand that would be relevant is the -- included in

10  the stipulation of facts at this time.

11           MS. MCGILLIVAY:  I understood Ms. Murphy's

12  testimony to be that she observed flow on certain dates,

13  which would corroborate the surface water connection

14  throughout the region by her own personal observations

15  where she indicated high flow from various -- high flow,

16  medium flow or relative amounts of flow from various

17  monitoring locations we believe further substantiates

18  that there is a physical connection and a chemical

19  connection based on the results of the monitoring to

20  that area.

21           THE COURT:  And the link is that you're saying

22  Dr. Coleman said that has not changed.

23           MS. MCGILLIVAY:  Correct.  And I believe that

24  the other admissions in documentary form from Foth and

25  the other witnesses for the company also indicate that

 1   the flow patterns have not changed between 2004 and the

 2   -- up until 2012.  And it may or may not have changed

 3   now, but I don't believe we have presented any evidence

 4   anyway since 2012.  The dates of the allegations of

 5   violations go up through 2011.

 6            THE COURT:  Mr. Van Camp, anything else?

 7            MR. VAN CAMP:  I did not realize at the time I

 8   objected to -- is it 83?

 9            MS. MCGILLIVAY:  Correct.

10            MR. VAN CAMP:  I'll accept counsel's memory as

11   to whether that was among the photographs that was

12   discussed and stipulated to, and if Counsel represents

13   that that was one of them, then I would agree to its

14   admission.

15            THE COURT:  All right.  83 then is received.

16   So that just leaves the field logs from 2002 to 2009 of

17   Ms. Murphy.

18            MR. VAN CAMP:  Right.  I don't believe any

19   comments by Dr. Coleman, he did not comment on her

20   logbooks.  He didn't make any statement regarding

21   statements that she made, and I don't believe that he

22   testified that nothing had changed since the time of the

23   entry in that logbook.  So I don't believe that that

24   helps and it certainly wasn't among the facts that we

25   were agreeing to stipulate to.

1        THE COURT:  At this point I won't receive it.

2   If you can show me more information such as

3   Dr. Coleman's explicit reliance on her logbooks, I might

4   reconsider it, but not at this point.

5        MS. MCGILLIVAY:  Thank you, Your Honor.  Then

6   we will call Mr. Nauta back to the stand.

7        THE COURT:  Thank you.

8   **ROBERT NAUTA, PLAINTIFFS' WITNESS, RESUMES S**TAND,

9        MR. CASSIDY:  Good morning, Your Honor.

10        THE COURT:  Good morning.

11             CONTINUED DIRECT EXAMINATION

12   BY MR. CASSIDY:

13   Q    Good morning, Mr. Nauta.

14   A    Morning.

15   Q    Yesterday during your testimony you talked about or

16   we had a discussion about topographic lines and topo

17   maps.  Do you remember that?  Do you recall that?

18   A    Yes, I do.

19   Q    And I believe you testified that some of the

20   evidence you reviewed as part of your investigation

21   included USGS maps as well as maps or diagrams produced

22   or generated by Foth; is that correct?

23   A    Correct.

24   Q    Do you still have a copy of your report?

25   A    No.  I gave that back to you at the end of the day.
                    ROBERT NAUTA - DIRECT

1  Thank you.

2  Q    I handed you a copy of Exhibit 18, which is your

3  supplemental report in this case?

4  A    Yes.

5  Q    I put up on the screen figure -- is that figure --

6  was that figure included in your report?

7  A    Yes, it was.

8  Q    And why did you include it?

9  A    It shows the -- it shows the slope from the

10  biofilter and it clearly identifies the channel of

11  Intermittent Stream C on it.

12  Q    And can you show us what you're referring to?  You

13  can -- if you touch the screen --

14  A    Right.

15  Q    -- and press firmly you can draw on it.

16  A    Okay.

17          MR. VAN CAMP:  Your Honor, I'm going to object

18  to this testimony.  The figure that the witness is about

19  to testify about is a figure that comes from the post --

20  the proposed east Copper Park infiltration basins work

21  product, and this is again addressing the infiltration

22  -- the product that was excluded in our Rule 19 motion

23  related to the infiltration basins.  This motion.  And I

24  would ask that if the witness can testify about this,

25  that we be permitted to put our witnesses on to testify

                    ROBERT NAUTA - DIRECT

1   about what it shows as well, which will have to get into

2   the infiltration basins.  This is not a cross section of

3   the biofilter.

4          MR. CASSIDY:  Your Honor, proposed east -- this

5   document indicates existing conditions as of May of '08,

6   May of 2008, October 2009.  The document does appear in

7   the May 2011 report.  But all I'm asking -- and this is

8   something that Mr. Nauta relied on -- and all I'm asking

9   him about, I'm not asking him about infiltration, I'm

10  asking him about the slope, which is indicated here as

11  existing conditions during 2008 and 2009.

12         THE COURT:  So you're suggesting this is what

13  Foth observed when it began to think about the

14  infiltration system that was later implemented.

15         MR. CASSIDY:  Your Honor, I wouldn't speculate

16  as to what Foth observed.  All -- this is a document

17  that Mr. Nauta relied on to show the slope coming out of

18  the biofilter.

19         THE COURT:  But where did -- we have to talk

20  about Foth because apparently that's who drew up the

21  diagram and don't we need to know whether this was

22  exactly what was existing before Foth started the

23  project?

24         MR. CASSIDY:  Well --

25         THE COURT:  Otherwise why is it relevant?
                    ROBERT NAUTA - DIRECT

1        MR. CASSIDY:  Well, it is relevant to the slope

2   coming out of the biofilter.  We had a discussion about

3   topographic slopes yesterday.

4        THE COURT:  I understand that this is an

5   accurate depiction of the conditions existing before any

6   work was done to change the existing situation.  That

7   would be relevant.  But I'm not sure this witness is the

8   one to supply that important link.

9        MR. CASSIDY:  Well, Your Honor, maybe I'll ask

10  him if he knows.  I don't know what his answer will be.

11  BY MR. CASSIDY:

12  Q    Do you know if this figure represents conditions

13  that were existent at the biofilter basin before the

14  proposed infiltration basin was --

15       MR. VAN CAMP:  Object -- sorry.

16  Q    Before the proposed infiltration basin was begun?

17       MR. VAN CAMP:  Objection.  Foundation.

18       THE COURT:  You have to show me that he has a

19  reason to know that.

20  BY MR. CASSIDY:

21  Q    Okay.  I'm going to move on in your report,

22  Mr. Nauta, to the next figure, which is Figure 1.  Do

23  you see that?

24  A    I do.

25  Q    Is this a figure that you created?
                    ROBERT NAUTA - DIRECT

1   A    Yes, it is.

2   Q    And what are you or how are the sample -- what are

3   you generally illustrating in this figure?

4   A    What I did was I reviewed the analytical data from

5   the -- from both Flambeau Mining Company and the DNR

6   that were collected.  There were numerous other points,

7   but I was looking for points that had a good history of

8   frequent sampling, and so these points were selected.  I

9   selected three points on the Flambeau River as well to

10  get an idea of natural background concentrations in the

11  surface water.

12  Q    So where are the -- can you just tell us where the

13  sample points that you were talking about are reflected

14  on this figure, if you could identify them by number.

15  A    Yes.  I'll start at the upstream end of

16  Intermittent Stream C.  SW-C3 is on the east side of

17  Highway 27 adjacent to the former rail spur.  SW-C8 is

18  on the west side of Highway 27 in the -- in kind of a

19  drainage ditch area near where some excavated soil had

20  been stockpiled.  BFSW-C2 is at the outfall of the

21  biofilter.  SW-C5 is at the former farm culvert.  SW-C1

22  is immediately south of Copper Park Lane.

23       Then on the Flambeau River up off the top of the

24  map is SW-1.  There you go.  And then farther downstream

25  is SW-2.  And then SW-3 is where the intermittent stream

                    ROBERT NAUTA - DIRECT

1  discharges into the Flambeau River.

2  Q    Now were these sample points that you picked to do

3  samples there?

4  A    No.

5  Q    How did you arrive at looking at this sampling

6  data?

7  A    As I said, there were other points that only would

8  have a couple samples collected or maybe were -- they

9  discontinued sampling from them.  I was looking for

10  sample points that had a long history of sample events,

11  of fairly regular sample events so that I could do a

12  better comparison from point to point.

13  Q    In terms of where this data came from, again, where

14  did you get it?

15  A    Most of it came from the Stipulation Monitoring

16  Program conducted by FMC.  A few of the data came from

17  sampling that was done by the DNR.

18  Q    And there are some graphs connected to those

19  samples.  Can you describe what they are?  They're sort

20  of small to read on the screen.

21  A    Right.  These are -- the vertical scale on the

22  graphs are concentrations of zinc and copper.  Copper is

23  represented by a blue line and zinc by a red line.

24  Those concentrations are in micrograms per liter or

25  parts per billion.  And then the horizontal axis is

ROBERT NAUTA - DIRECT

1  dates of sample collection.

2  Q     If we go to the next appendix in your report, I

3  believe it's Appendix C, you testified yesterday about a

4  site visit that you took when you were out there?

5  A     Yes, I did.

6  Q     And did you take photos while you were there?

7  A     Yes, I did.

8  Q     Did you include some of those photos in your

9  report?

10  A     Yes.

11  Q     Is that what we're looking at on the screen right

12  now?

13  A     That's one of the photos; correct.

14  Q     What photo is -- what is depicted in photo one?

15  A     Photo one is taken from the southwest edge of the

16  biofilter looking north.

17  Q     And --

18  A     I mean southeast corner.  I'm sorry.

19  Q     And remind us what time of year you were out there

20  again?

21  A     This is February.

22  Q     Photo two.  What are we looking at there?

23  A     This is looking south along the eastern edge of the

24  biofilter, again standing at the southeast corner.

25  Q     Photo three has a notation on it.  Do you recognize

ROBERT NAUTA - DIRECT

1    that?

2    A      Yes.

3    Q      When was that notation put on that photo?

4    A      I believe during my deposition.

5    Q      So what are we looking at in photo three?

6    A      The red circle is the arrow or the area where the

7    discharge is from the biofilter at the northeast corner.

8    The lines that I draw on there are going to spots that

9    were rocks that were put along the slope as riprap for

10   erosion control.

11   Q      And what are the lines indicating?

12   A      It's that there are -- the downward end of those

13   lines end at the points that were rocks that were in the

14   picture, but not very well recognized.

15   Q      So what vantage point are you taking that photo

16   from?

17   A      I'm standing to the east of the biofilter or to the

18   -- yeah, to the east of the biofilter pointing west.

19   Q      What are we looking at in photo four?

20   A      In photo four I'm standing at the northwest corner

21   of the biofilter taking a picture toward the northwest

22   to --

23              THE COURT:  Away from the biofilter?

24              THE WITNESS:  Pardon me?

25              THE COURT:  Away from the biofilter?
                ROBERT NAUTA - DIRECT

1          THE WITNESS:  Yes, Ma'am.  That is just looking

2  at the portion of the FMC site that drains into the

3  biofilter.

4  BY MR. CASSIDY:

5  Q    And you attached two more photos to your report.

6  What are we looking at in photo five?

7  A    This is one of the two culverts under the rail

8  spur.  The photo, I'm standing just northeast of the

9  biofilter and I'm taking the photo toward the northeast.

10 This is where Stream C, one of the two culverts for

11 Stream C can cross the rail spur.

12 Q    And when you say *cross*, what do you mean by that?

13 A    Pass underneath it.

14 Q    And you said there were two culverts.  How large

15 are these culverts?

16 A    They're fairly large.  I think they are probably on

17 the order of 36 inches or more.

18 Q    Is that diameter?

19 A    Yes.  Sorry.

20 Q    So this is a picture of one of them.  Is there

21 another one?

22 A    Yes.  I think to the left, I think that they were

23 probably sized and spaced for flow conditions and for

24 being structurally supportive of a train passing over.

25 Q    And finally we have a picture, photo six.  What are

               ROBERT NAUTA - DIRECT

1  we looking at there?

2  A    This is kind of unfortunate for the -- all the

3  photos I took with the snow cover and the overcast

4  conditions, it's hard to see exactly what's going on

5  here.  This is Stream C south of Copper Park Lane where

6  the tributary from the east, the intermittent tributary

7  from the east flows into it.  Stream C goes from lower

8  left to upper right and the tributary is right about in

9  the center left and goes off to the upper left.

10 Q    And I believe you testified -- well, you had walked

11 down to that point during your visit?

12 A    Yes, I did.

13         THE COURT:  Was this stream ice or was it

14 moving?

15         THE WITNESS:  There was one location in the

16 stream where I could -- where it was open and I could

17 see flowing water.

18 BY MR. CASSIDY:

19 Q    Back to Figure 1, did you do anything else to

20 illustrate this data in your report?

21 A    I had two other figures where I compared all sample

22 points for copper and zinc respectively.

23 Q    Is this one of those figures?

24 A    Yes, it is.

25 Q    And we're looking at Figure 2; is that correct?

                    ROBERT NAUTA - DIRECT

1    A    Yes.

2    Q    And what are you plotting in this figure?

3    A    I'm plotting the copper concentrations versus time

4    at seven of the sampling locations.

5    Q    And it doesn't show up too well on the screen, but

6    are those plots in color?

7    A    Yes.

8    Q    And what are the different colors designed to

9    illustrate?

10   A    So that you can identify which sample point you're

11   viewing for the individual lines.

12   Q    So can you describe to us what the different sample

13   points, how they are plotted on this figure?

14   A    What I did was I made it into an Excel spreadsheet

15   and then plotted them on a single graph.  I plotted the

16   concentrations on a logarithmic scale because of the

17   wide range of concentrations at different points so that

18   you can identify -- if it would have been an arithmetic

19   scale; for example, the lower concentrations wouldn't

20   have -- they would just have shown up as being on the

21   bottom line.

22   Q    Okay.  And can you describe the differences between

23   the two sample points on your figure or between the

24   various sample points?

25   A    Yeah.

                    ROBERT NAUTA - DIRECT

1  Q     Sorry.

2  A     The highest concentrations are attributed to SW-C8,

3  which is adjacent to where a large stockpile had been

4  stored onsite.  The next highest is -- well, comparable

5  concentrations at SW-C5 and BFSW-C2.  They are slightly

6  lower than at SW-C8.

7  Q     And just so we know where those are --

8  A     SW-C8 is on the west side of Highway 27.  SW-C5 is

9  near the farm culvert downstream from the biofilter, and

10 the BFSW-C2 is the biofilter sample.  SW-C3 is a bit

11 elevated as well.  It's adjacent to the rail spur, which

12 I think it probably impacted, that location.  The SW-1,

13 SW-2 and SW-3 are on the Flambeau River and they're

14 significantly lower than the others ranging from maybe

15 four parts per billion down to nondetect.

16      The most significant thing -- two points from that.

17 One is they are lower.  It indicates that the background

18 concentrations are lower than those on Stream C-3.

19 However, SW -- or yeah, SW-3 is where Stream 3 -- Stream

20 C discharges into the Flambeau River.  Now we can see

21 that there's not a lot of change in concentration

22 between it and SW-1 and 2.  It is consistently higher,

23 there's no point other than where they were nondetected.

24 There's no point on the graph where the other two points

25 are higher than SW-3.
                 ROBERT NAUTA - DIRECT

1    Q    And how did that information inform your opinion

2    regarding the connection between Stream C and the

3    Flambeau River?

4              MR. VAN CAMP:  Objection.  Foundation.

5              THE COURT:  Overruled.

6              THE WITNESS:  Well, when analyzing any data,

7    you incorporate what's called the *scientific method*.

8    You observe your data and develop a hypothesis for --

9    that will fit the data set and my hypothesis here is

10   that concentration at SW-3 is higher because of the

11   impact from Stream C.

12   BY MR. CASSIDY:

13   Q    And your opinion, which you testified to yesterday,

14   was that due to the direct hydrologic connection, that

15   pollutants were flowing from the biofilter to Stream C

16   to the Flambeau River; is that correct?

17             MR. VAN CAMP:  Objection.  Leading.  And asked

18   and answered.

19             THE COURT:  Sustained.

20   BY MR. CASSIDY:

21   Q    What was your opinion with relation to the

22   contaminant portion of your report?

23             MR. VAN CAMP:  Objection.  Asked and answered.

24             THE COURT:  Overruled.

25             THE WITNESS:  My opinion is that copper and
                        ROBERT NAUTA - DIRECT

1  zinc are entering Stream C, both near where the

2  stockpile soil had been up near SW-C8 and from the

3  biofilter and that that -- those contaminants enter

4  Stream C and are carried down to the Flambeau River.

5          MR. CASSIDY:  Court's indulgence, Your Honor.

6  (Pause)  No further questions, Your Honor.  (9:34 a.m.)

7          THE COURT:  All right.  Mr. Van Camp.

8          MR. VAN CAMP:  Thank you, Your Honor.

9                    CROSS-EXAMINATION

10  BY MR. VAN CAMP:

11  Q   Did I hear you correctly yesterday that the

12  distance from the biofilter to the Flambeau River was a

13  short distance?

14  A   No.

15  Q   How far is it from the biofilter to the Flambeau

16  River?

17  A   Probably several hundred feet.

18  Q   How many hundred feet?

19  A   I don't know, maybe it's closer to a thousand.  I

20  didn't have -- haven't measured it.

21  Q   Is it over half a mile?

22  A   I don't think so.

23  Q   So you have no idea what the distance is between

24  the biofilter and the Flambeau River; true?

25  A   I don't have an exact idea, no.
                    ROBERT NAUTA - CROSS

1    Q    You think it's somewhere between 200 and a thousand

2    feet?

3    A    I think that's exaggerating my point.  I think it's

4    probably closer to a thousand feet.

5    Q    In February when you visited the Flambeau Mine

6    site, you walked 200 feet south of Copper Park Lane on

7    Stream C; correct?

8    A    Approximately, yes.

9    Q    The one thing you added to your supplemental report

10   after you visited the property was -- is on page eight

11   of your report; correct?

12   A    Yes.

13   Q    In the middle of the page do you see a paragraph

14   that begins with "My interpretation of these plans was

15   confirmed."  Do you see that?

16   A    Yes.

17   Q    That's talking about your visit on February 28th;

18   correct?

19   A    Yes, it is.

20   Q    The next sentence you say that "the conditions were

21   snow-covered and frozen"?

22   A    Yes.

23   Q    And then you say that "the channel of Stream C was

24   very evident"?

25   A    Yes.
                           ROBERT NAUTA - CROSS

1    Q     Are you speaking of south of Copper Park Lane

2    there?

3    A     No, I'm not.   North.

4    Q     Okay.   Let's go to your photographs, beginning on

5    -- this would be 28.   First of all, before we blow it up

6    any larger, your description here is a view of the 0.9

7    acre biofilter from the southeast corner; correct?

8    A     Yes.

9    Q     So you're looking northwest.

10   A     Yes, I am.

11         MR. VAN CAMP:   Can you blow that up a little

12   more.   And move it over to the center so we can see more

13   of the photograph.

14   Q     Where in photograph one is this very obvious

15   channel of Stream C?

16   A     It's not in this photo.

17   Q     Okay.   Let's take a look at your second photo.

18         MR. VAN CAMP:   Can you move over so we can see

19   his description first.   Okay.

20   Q     This is your second photograph and the description

21   is a view looking south along the eastern edge of the

22   biofilter.

23   A     Yes.

24   Q     That was correct; right?

25   A     Yes.

                    ROBERT NAUTA - CROSS

1    Q    Okay.  Let's look at that photograph.  Okay.  Now

2    the large white area on the right is a frozen portion,

3    frozen snow-covered portion of the biofilter; correct?

4    A    Yes.

5    Q    Show me in this photograph where the very obvious

6    Stream C path is.

7    A    It's not in this or any of my photos that I

8    included.

9    Q    So you were up there looking for a stream path and

10   you didn't put it in any of your photographs?

11   A    I took a lot of photos, but because of the snow

12   cover and the lighting conditions, we couldn't always

13   see what I was trying to put in there.  So I selected

14   photos that just gave a general understanding of the

15   site.

16   Q    Okay.  While we're looking at Exhibit 2 or your

17   Photograph No. 2, where is the biofilter outlet?

18   A    It's approximately where I'm standing.

19   Q    Okay.  Then let's look at Photograph 3.  Let's look

20   at the description.  Photo 3 says it's a picture of the

21   discharge location of the biofilter.  Pockets in the

22   topography and between the rocks are filled with ice.

23   Do you see that?

24   A    Yes.

25   Q    Now we'll look at the photograph.  It's fair to say

                    ROBERT NAUTA - CROSS

1  that the discharge point is choked with grasses and

2  plants; correct?

3  A    There was vegetation present, yes.

4  Q    And again, there are no clear channels in that

5  photograph coming out of the biofilter; correct?

6  A    Correct.

7  Q    But that is a photograph looking directly at the

8  discharge point of the biofilter looking from east to

9  west?

10 A    Yes, it is.

11 Q    So you are actually standing directly in front of

12 the biofilter outlet when you took this photograph

13 looking directly at it; correct?

14 A    I believe I was standing in the channel for Stream

15 3 -- Stream C.

16 Q    Okay.  And if you were standing in that channel,

17 you don't have a photograph of that, do you?

18 A    I think I answered that.  I don't.

19 Q    Okay.  And let's look at the fourth photograph.

20 The description for the fourth photograph is "area

21 northwest of the biofilter."  Is that north of the

22 railroad spur?

23 A    I think that it probably looks over an area where

24 the railroad spur had crossed.

25 Q    Okay.  And do you see that very obvious channel

                    ROBERT NAUTA - CROSS

1    anywhere in that photograph?

2    A     Northwest of the biofilter, no.

3    Q     Okay.  Then we'll go to the next photograph.  Let's

4    look at the description.  The description for Photograph

5    No. 5 is that it's a photograph of the culvert from

6    wetland area northeast of the biofilter.

7         So would you say that you were standing in the

8    wetland, Wetland 7, at the time you took this

9    photograph?

10   A     No.  And actually in this one you may actually be

11   able to see where Stream C is because I followed the

12   Stream C channel to that culvert and took a picture of

13   it.

14   Q     Tell us where you're standing when you took this

15   photograph.  Is this standing looking north?

16   A     I'm standing looking northeast.

17   Q     So you're on the south side of those culverts?

18   A     Yes.

19   Q     And you're standing in grassland at that point?

20   A     I'm standing in the channel for Stream C.  It was

21   covered with snow, but I didn't see any grass or

22   vegetation coming out of it.

23   Q     Did you take a photograph of it?

24   A     I think I said that already.  No.

25   Q     Okay.  Let's look at the next photograph.

                    ROBERT NAUTA - CROSS

1  Photograph 8, which is the -- I'm sorry, Photo 6, which

2  is the last photograph that you included in your report,

3  is a photograph taken south of Copper Park Lane;

4  correct?

5  A    Yes.

6  Q    How far south of Copper Park Lane are you when this

7  photograph is taken?

8  A    I believe a couple hundred feet.

9  Q    And that's as far as you went down; correct?

10 A    Yes.

11 Q    And you have no idea how far it is from that point

12 to the Flambeau River, do you?

13 A    I think it's about the same distance.  I think that

14 intermittent stream is about halfway.

15 Q    Are you sure this is the intermittent stream that's

16 halfway down?

17 A    It was pretty clear to see the channel going

18 straight to the east like the intermittent stream.

19 Q    What test did you take on that channel?

20 A    None.

21 Q    What was the copper concentration in that channel?

22 A    I didn't take any tests while I was there.  I know

23 the copper concentrations based on what samples had been

24 done by FMC and DNR.

25 Q    What was the copper concentration in that tributary

                    ROBERT NAUTA - CROSS

1   to Stream C?

2   A     It's tabulated in the documents I reviewed.  I

3   didn't memorize it.

4   Q     Is it approximately the same as the biofilter?

5   A     I don't remember.  I don't think so.

6   Q     And that's not influenced at all by Flambeau Mining

7   Company property, is it?

8   A     Not that I'm aware of.

9   Q     You turned around at that point in the Stream C

10  walk because you concluded to yourself that it was

11  gaining at that point and you didn't need to walk any

12  further; correct?

13  A     Well, the conditions were such that it was

14  difficult to walk through there in the winter with all

15  the fallen branches.  But yes, it was clear that that

16  stream was growing larger.

17  Q     And so you concluded that Stream C below that point

18  was gaining; correct?

19  A     I believe it was, yes.

20          THE COURT:  By gaining you mean increasing in

21  size?

22          THE WITNESS:  Well, typically it's gaining

23  groundwater at this time of the year if it's going to be

24  gaining.

25  BY MR. VAN CAMP:

                    ROBERT NAUTA - CROSS

1    Q    So yesterday when you testified that there was a

2    linear drainage channel north of the stub road culvert

3    and east of the biofilter outlet, you were unable to

4    take a photograph of that linear drainage channel that

5    you described.

6            MR. CASSIDY:  Your Honor, form of the question.

7    Asked and answered.

8            MR. VAN CAMP:  Well, he --

9            THE COURT:  Overruled.

10           THE WITNESS:  You know, unfortunately in this

11   business sometimes the conditions aren't such that you

12   can get -- walk away with the information that you had

13   hoped to.  No, I didn't get a photo where you could pick

14   out, easily pick out that feature, and so I didn't

15   include any in there.

16   BY MR. VAN CAMP:

17   Q    You took no soil samples of anything related to the

18   Flambeau Mine site, did you?

19   A    No.

20   Q    When you were there, the ground was frozen;

21   correct?

22   A    Yes.

23   Q    When you were there, you couldn't tell how long a

24   period of time the soil in the area you walked to the

25   east of the biofilter was saturated with water, could
                    ROBERT NAUTA - CROSS

1   you?

2   A    Well, there's plenty of ice visible, so it appears

3   that it's probably saturated fairly regularly.

4   Q    Could you tell how long the soil had been

5   saturated?

6   A    No.

7   Q    You took no water samples at all from anything

8   related to the Flambeau Mine site, did you?

9   A    No.

10  Q    You took no soil samples related to anything about

11  the Flambeau Mine site, did you?

12  A    No.

13  Q    You took no tests to determine water flow at the

14  Flambeau Mine site, did you?

15  A    Well, I observed it in one location on Stream C

16  south of Copper Park Lane.

17  Q    How big an area are you talking about?

18  A    It was probably several feet across.

19  Q    So the only place that you saw water flowing was

20  not on Flambeau's mine property; correct?

21  A    Correct.

22  Q    And it was only a couple of feet.

23  A    Well, there was an opening in the ice that was a

24  couple feet wide.

25  Q    Did you take any tests regarding the direction of

                    ROBERT NAUTA - CROSS

1  flow coming out of the biofilter?

2  A    Well, I could observe the topography.  Water flows

3  downhill and it was downhill from the biofilter.

4  Q    That wasn't my question.

5  A    I didn't take any tests.  Well, yeah, I observed.

6  Q    Well, are there tests that people like you can

7  perform to determine the direction of water flow?

8  A    Sure.

9  Q    Did you do any of those?

10  A    There was no flowing water to test, so I couldn't.

11  Q    Okay.  But those tests could have been done; right?

12  A    Sure.

13  Q    Are you aware of anything you read that

14  demonstrated that anybody did any test to determine the

15  direction of flow outside the biofilter outlet?

16  A    Well, it's how you define test.  I know that it's

17  common practice to observe the topography and from that

18  you conclude the direction of flow.  So yes, we could

19  conclude the direction of flow based on topography.

20  Q    Okay.  My question was whether or not you did any

21  tests to determine the direction of water flowing east

22  of the biofilter outlet.

23  A    I would -- I would define observing the topography

24  as a test, yes.

25  Q    All right.  Okay.  Didn't mean to cut you off.
                    ROBERT NAUTA - CROSS

1  Sorry.  Other than observing, did you take any dye

2  tests?

3  A    No.

4  Q    Are there other tests than dye tests that can be

5  used to determine the direction of water flow?

6  A    I suppose you could put a log in it and watch which

7  way it floats.  But my experience with surface water is

8  that they're readily observable and so the dye test or

9  some other test wouldn't be necessary.  You take

10 measurements for flow quantities, but you can easily see

11 which way it's flowing.

12 Q    Let's start talking about quantities.  How much

13 water flowed out of the biofilter?

14 A    When?

15 Q    Any time.

16 A    I don't think anybody measured it.

17 Q    Ever.  Correct?

18 A    Not that I'm aware of.

19 Q    So you don't know how much water flowed out of the

20 biofilter; correct?

21 A    Well, I'm aware of qualitative citations like heavy

22 flow, moderate flow, low flow.

23 Q    Okay.  But in terms of how much, you don't know.

24 A    No.

25 Q    And you don't know how much water flowed out of the

ROBERT NAUTA - CROSS

1  wetland under Copper Park Lane at any time, do you?

2  A    No.

3  Q    You don't know how frequently water flowed out of

4  the wetland under Copper Park Lane, do you?

5  A    No.

6  Q    Are you aware of any tests that showed how

7  frequently that occurred?

8  A    No.  It would probably be easy enough to calculate

9  based on rainfall, along with notations in Ms. Murphy's

10 logbook, you could get an estimate of how often.

11 Q    If it was easy enough to do, did you do it?

12 A    I didn't have the logbook when I was doing my

13 report.  I probably would have if I had it.

14 Q    But you didn't do it.

15 A    Correct.

16 Q    Did you take any elevations?

17 A    No.

18 Q    Did you take any measurements?

19 A    No.

20 Q    Did you measure the depth of water at any place?

21 A    No.

22 Q    Did you measure the width of any channel at any

23 place?

24 A    No.

25 Q    Did you measure the depth of any channel at any

                    ROBERT NAUTA - CROSS

1    place?

2    A      No.

3    Q      You took no measurements at all; correct?

4    A      I wasn't there to do that.   Correct.

5    Q      And you took no chemical tests of anything;

6    correct?

7    A      Again, I wasn't there to do that so I didn't.

8    Q      You took no pH tests; correct?

9    A      Same answer.

10   Q      Now you believe that much of the water coming from

11   Stream C and the wetland are to a large extent

12   groundwater discharges; correct?

13   A      Correct.

14   Q      So what you mean by that is that groundwater is

15   discharging into Wetland 7; correct?

16   A      I believe that's why it's a wetland is because of

17   the groundwater component.

18   Q      All right.   Have you ever heard of a sand point?

19   A      Yes, I have.

20   Q      What is a sand point?

21   A      It's a point that you -- it's an item that you buy

22   off the shelf at Farm & Fleet or Home Depot and you

23   drive it into the ground.   It's got a screen at the end

24   and you drive it in and you can -- some people actually

25   use them for water supply purposes.

                     ROBERT NAUTA - CROSS

1    Q    Okay.  Are they used to determine the difference

2    between surface water and groundwater levels?

3    A    Can be.

4    Q    Did you use a sand point in the wetland to the east

5    of the biofilter to determine the groundwater level?

6    A    No.

7    Q    Did you do anything else to determine the

8    groundwater level in the wetland to the east of the

9    biofilter?

10   A    No.

11   Q    How much of the water that discharged from the

12   Wetland 7 was groundwater?

13   A    I don't know.

14   Q    How much of the water that discharged from Wetland

15   7 came from the biofilter?

16   A    I don't know.

17   Q    How much of the water that discharged from that

18   wetland came from upstream or up elevation, upgrade of

19   the biofilter?

20   A    Probably not a lot because you're getting into an

21   area that is probably towards the headwaters of Stream

22   C, but it's going to increase as you go downstream.

23   Q    What measurements did you take to determine that it

24   was probably not a lot?

25   A    My experience in working with wetlands and streams.
                    ROBERT NAUTA – CROSS

1  Q    Did you ever walk the headwater wetlands?

2  A    Not on February 28th.

3  Q    Okay.  Did you do any studies to determine the

4  amount of runoff from those headwater wetlands?

5  A    No.

6  Q    Did you do any studies to determine the copper

7  concentrations in those headwater wetlands?

8  A    Personally, no.

9  Q    So the only tests that you're aware of would be the

10 tests that Flambeau Mining Company did or the DNR did;

11 correct?

12 A    Yeah.  They were fairly significant.

13 Q    Okay.  You didn't do any sort of wetland

14 determination in terms of where the wetland was,

15 correct, to the east of the biofilter?

16 A    No.  One had recently been done because the flags

17 were still evident.

18 Q    And you have no reason to disagree with that

19 wetland delineation; correct?

20 A    I'm assuming it was done by a professional.

21 Q    You don't know?

22 A    Well, I think that yesterday the person who did it

23 testified and I believe it sounded like he was

24 qualified.

25 Q    Now you would agree that there are tests that could

                    ROBERT NAUTA - CROSS

1    be performed to determine whether the water coming out

2    of the biofilter entered Stream C; correct?

3            MR. CASSIDY:  Your Honor, objection.  Asked and

4    answered.

5            THE COURT:  Overruled.

6            THE WITNESS:  You can make observations.  I'm

7    not sure -- I mean testing, it's such a short pathway

8    that, you know, you've got -- it's been tested what was

9    in the biofilter and it's been tested what was in Stream

10   C.  I think that is probably a fairly good test right

11   there.

12   BY MR. VAN CAMP:

13   Q    Are you aware of any other tests than observation

14   that could be performed to determine that?

15   A    Possibly a dye test.

16   Q    And you've already testified that you didn't do

17   that.

18   A    I did.

19           THE COURT:  You did testify that you didn't do

20   that.

21           THE WITNESS:  Yes.  Sorry.

22           MR. VAN CAMP:  Thank you.

23   BY MR. VAN CAMP:

24   Q    You would agree that if some water came out of the

25   biofilter, some of it could be taken up by plants?
                    ROBERT NAUTA - CROSS

1   A    Yes.

2   Q    You would agree that if some water came out of the

3   biofilter, the soil could absorb some of it?

4   A    Yes.

5   Q    You would agree that if some water came out of the

6   biofilter, animals could drink it?

7   A    Yes.

8   Q    You would agree that if some water came out of the

9   biofilter, it could evaporate?

10  A    Not the metals in it, but the water, yes.

11  Q    Okay.  Could we look at Defendant's Exhibit 553.

12  On Defendant's Exhibit 553, do you see the sticker Nauta

13  exhibit or deposition Exhibit 119?

14  A    Yes.

15  Q    Do you recall looking at this exhibit at your

16  deposition?

17  A    Yes, I do.

18  Q    Okay.  And it's been marked now for trial purposes

19  as Exhibit 553.  This is a somewhat difficult photocopy,

20  but this was -- okay.  Do you see the faint blue lines

21  -- actually it's a reference point.  Why don't we first

22  begin by indicating where the biofilter is.  Do you see

23  that?

24  A    Yes.

25  Q    And that's that square just above the center of the
                    ROBERT NAUTA - CROSS

1  screen and to -- slightly to the left?

2  A    Yes.

3  Q    Why don't you go ahead and circle it just so we

4  know that we're talking about the same thing.

5  A    (Witness complies)

6  Q    Okay.  And then just below that, do you see a blue

7  line that goes down toward the Flambeau River?

8  A    Yes, I do.

9  Q    And do you know what that blue line south of Copper

10  Park Lane depicts?

11  A    Stream C.

12  Q    Okay.  Now can you point out on this exhibit where

13  you walked 200 feet south of Copper Park Lane?

14  A    Again, 200 feet was an estimate.  I believe it was

15  down in this path here.  (Indicating)

16  Q    So you're saying that what you just drew, the blue

17  line, is only 200 feet long?

18  A    It was a guess.

19  Q    Well, do you recall at your deposition you were

20  asked how far you walked down Stream C south of Copper

21  Park Lane?

22  A    Yeah.  It was a guess then too.

23  Q    Okay.  But 200 feet though was your guess; correct?

24  A    Correct.

25  Q    Do you have any idea how long the blue line is that
                    ROBERT NAUTA - CROSS

1    you drew in this --

2    A    It appears a bit longer than that.

3    Q    Would you believe 2,500 feet?

4    A    No.

5    Q    Would you believe 2,000 feet?

6    A    That might be stretching it as well.

7    Q    Okay.  Well, let's talk about things on this

8    exhibit that are marked on the exhibit.  Do you see the

9    other blue line coming in from the right that appears to

10   be a tributary to Stream C?

11   A    Yes.

12   Q    And then do you see the white outline that sort of

13   makes an oval around that blue tributary?

14   A    Yes.

15          MR. VAN CAMP:  And Susan, can you reduce the

16   size of this for a moment so we can see that entire

17   area?

18   Q    Do you see that entire long oval that is outlined

19   with a light line around that tributary?

20   A    Yes.

21   Q    What is that?

22   A    I believe that that's the defined watershed for

23   that tributary.

24   Q    What testing did you do in that defined watershed?

25   A    None.
                    ROBERT NAUTA - CROSS

1   Q    What results from testing did you review and

2   incorporate in your expert report from that area?

3   A    None.  I think that was one of the spots where

4   there had been minimal sampling done, so I couldn't

5   compare.  So I didn't use it.

6   Q    Okay.  Let's talk about this minimally sampling

7   thing for a minute.  Basically you selected the samples

8   that you wanted to use for your statistical analysis;

9   correct?

10  A    Yes.

11  Q    And there were a lot of sample points that you

12  didn't include in that; correct?

13  A    Yep.

14  Q    And many of those sample points had significantly

15  greater copper concentrations than the ones that you

16  used; correct?

17  A    Not necessarily, because if you look at the early

18  sampling, the concentrations were pretty much all high,

19  and these are points where there would have been like

20  maybe one or two samples very early on and nothing after

21  that.  So I don't necessarily agree with that statement.

22  Q    Okay.  Well, certainly when you picked your sites,

23  you picked them because of the level of copper

24  concentration; correct?

25  A    No.

                    ROBERT NAUTA - CROSS

1   Q    Well, you certainly ignored some that had different

2   levels of copper concentrations; correct?

3   A    No, I didn't ignore anything.

4   Q    Well, you certainly didn't include them in your

5   calculations; correct?

6   A    In my report I did not include them.

7   Q    All right.  Now let's go back to this drainage

8   area.  If you look at the dark box in the middle of that

9   drainage area --

10        MR. VAN CAMP:  And Susan, if you'll enlarge it,

11   I think we can read it more easily.  Keep going.  Okay.

12   Q    Can you read now how many acres that drainage area

13   involves?

14   A    Looks like 40.2.

15   Q    Okay.  And then below that oval there is sort of a

16   triangle area that goes down to the Flambeau area -- I'm

17   sorry -- to the Flambeau River.  And can you read the

18   number of acres involved in that?

19   A    I think it's 18.3.

20   Q    In addition to the acres, do you see farms and

21   other buildings in that drainage area?

22   A    Well, this is a pretty poor quality.  I'll take

23   your word for it that they are farms.  I can see there

24   are buildings and other activities, but, you know, if

25   they're farms, they are.  Okay.
                    ROBERT NAUTA - CROSS

1   Q    What influence did those two places have on the

2   watershed of Stream C?

3   A    What two places?

4   Q    The oval-shaped drainage area and the

5   triangular-shaped drainage area.

6   A    Well, they would be contributing water to that

7   lower portion of Stream C.

8   Q    Okay.  And some of the points that you included in

9   your statistical analysis are points on Stream C down by

10  the Flambeau River; correct?

11  A    I reviewed some.  But again, there were -- those

12  were ones that didn't have enough data to be viable to

13  compare with other points.

14  Q    Did you take any tests to determine what the copper

15  concentration going into Stream C was from either that

16  triangular-shaped watershed or that long oval-shaped

17  watershed?

18  A    Can I just add I didn't take any tests?  That could

19  save us some time.

20  Q    Just so we're clear, when you determined to turn

21  around about 200 feet south of Copper Park Lane and you

22  determined that Stream C at that point was gaining, tell

23  us exactly what you mean by *it was gaining*.

24  A    It was clearly a larger streambed.

25  Q    And are you familiar with the term *gaining* meaning

                         ROBERT NAUTA - CROSS

1  that it is also receiving groundwater?

2  A    Yes, I am.

3  Q    Were you concluding that that was the case all the

4  way down to the Flambeau River?

5  A    It was certainly the case to the point where I

6  walked.  I didn't observe the rest of it, but I'm

7  assuming that because the Flambeau River is such a large

8  and -- such a large recharge feature, it's my experience

9  that the vertical gradients in groundwater are carried

10  through beyond the river itself.

11  Q    Okay.  Now, in your report you use two sample sites

12  from the Flambeau River for what you call background;

13  correct?

14  A    I did.

15  Q    How large an area is drained by the Flambeau River?

16  A    I think you asked that in my deposition.  I don't

17  know how big of an area it is.  I think it is fairly

18  narrow extending to the north/northeast, but I don't

19  know how large it is.

20  Q    And you did no -- put nothing in your report

21  indicating that there was, in fact, background data

22  involving tests of Stream C prior to mining; correct?

23  A    Correct.

24  Q    So what you're trying to do is compare the Flambeau

25  River water to Stream C using the Flambeau River water

             ROBERT NAUTA - CROSS

1    as background and testing it against Stream C; correct?

2    A    Yes.

3    Q    Flambeau River is not an intermittent stream, is

4    it?

5    A    No, it isn't.

6    Q    Do you know how many gallons a second flow down the

7    Flambeau River in the area of the Flambeau Mine site?

8    A    No.

9    Q    Is it comparable to Stream C?

10   A    I don't think so.

11        MR. VAN CAMP:  Just one moment, Your Honor.

12   (Pause)  No further questions.  Thank you.  (10:10 a.m.)

13        MR. CASSIDY:  Thank you, Your Honor.

14                   REDIRECT EXAMINATION

15   BY MR. CASSIDY:

16   Q    Mr. Nauta, Mr. Van Camp just asked you a couple

17   questions about the Flambeau River and why you chose

18   certain points in the Flambeau River.

19   A    Yes.

20   Q    And again, you didn't choose those points, did you,

21   in terms of where the samples were taken?

22   A    No, I didn't.

23   Q    Where did that data come from?

24   A    That was from the -- that was from -- I think the

25   DNR collected those data.
                   ROBERT NAUTA - REDIRECT

1   Q    And Mr. Van Camp asked you about the number of

2   gallons of water that come down the Flambeau River.  Do

3   you remember that question?

4   A    Yes.

5   Q    And then he asked you do you think it's comparable

6   to Stream C and you said I don't think so.  Do you

7   remember that?

8   A    Yes.

9   Q    Were you suggesting in your report that the volume

10  of water in the Flambeau River was comparable to the

11  volume of water in Stream C?

12  A    No, I wasn't.

13  Q    Is that why you answered that question that way?

14  A    Yes.

15  Q    So how are they comparable?  Why did you choose

16  those facts?

17  A    Well, in reviewing documents from my report, one of

18  the documents that I reviewed was -- excuse me, if I can

19  turn the page here.  It was Surface Water Quality

20  Assessment of the Flambeau Mine site prepared by Craig

21  Roesler of the DNR, and in that document he looked at

22  water quality from the Flambeau River, Stream A and

23  Stream B, which are both on the Flambeau property to the

24  north, and from a reference stream, which I think was

25  about two-and-a-half miles away.  And they all had

                    ROBERT NAUTA - REDIRECT

1   comparable water quality, so he concluded that the water

2   quality in those streams were representative of

3   background quality.  And so because we had data over

4   time from the Flambeau River, I chose that.

5   Q    You were asked a lot about tests and I think you

6   said you didn't take any tests.

7   A    Correct.

8   Q    And why didn't you take any tests yourself?

9   A    Well, I've done many projects where I haven't taken

10  any tests myself where I've relied on other people to do

11  the work, whether they're people working for me or like

12  in this case where sampling had already been done in a

13  professional manner that were sufficient for me to reach

14  my conclusions.

15  Q    And again, you mentioned samples you relied on from

16  the DNR.  But were most of the samples you relied on

17  from Flambeau?

18  A    Yes.

19  Q    How does this database compare to some of the other

20  projects you work on in terms of its scope and

21  completeness?

22          MR. VAN CAMP:  Objection.  Improper cross.

23          THE COURT:  I'm sorry, I couldn't hear you.

24          MR. VAN CAMP:  Improper cross.  I didn't ask

25  about other projects he worked on.
                    ROBERT NAUTA - REDIRECT

1          MR. CASSIDY:  He asked --

2          THE COURT:  Sustained.

3  BY MR. CASSIDY:

4  Q    In your opinion, was this data set sufficient for

5  coming to the conclusions you came to?

6  A    Yes.

7  Q    And why is that?

8  A    You've -- basically you have to work with what you

9  have, and in this case, there was a long history of

10  sample collection.  And at the points that I utilized,

11  it was actually -- it was also fairly frequent sample

12  collection and so it seemed suitable.

13  Q    And that was -- we're talking about concentrations

14  right now.  And Mr. Van Camp also asked you about flow.

15  Did you feel it was necessary to take a test to

16  determine which way the water was flowing?

17  A    No.

18  Q    Why not?

19  A    Because it was pretty clear just based on the

20  observable topography.

21  Q    Have you ever heard anyone dispute when you're

22  talking to -- have you ever -- in the course of your

23  investigation, have you seen any dispute in any document

24  that you reviewed about which direction Stream C flows?

25          MR. VAN CAMP:  Objection.  Relevance.
                ROBERT NAUTA - REDIRECT

1        THE COURT:  Overruled.

2        THE WITNESS:  No, I haven't.

3   BY MR. CASSIDY:

4   Q    Yesterday Mr. Van Camp asked you also about dye

5   tests.  Do you remember that?

6   A    Yes.

7   Q    I believe yesterday you testified that -- when he

8   asked you about a dye test from the biofilter?

9   A    Yes.

10  Q    And you didn't perform a dye test from the

11  biofilter?

12  A    Correct.

13  Q    Yesterday you testified that the distance from the

14  toe or the bottom of the biofilter outlet to Stream C

15  was about from you to me?

16  A    Yes.

17        MR. VAN CAMP:  Objection.  Leading.

18        THE COURT:  Sustained.

19  BY MR. CASSIDY:

20  Q    What did you testify the distance was between the

21  biofilter outlet and Stream C?

22        MR. VAN CAMP:  Objection.  Improper cross.

23        THE COURT:  Overruled.

24        THE WITNESS:  You were standing at the podium

25  and I said it was from me to you.
                    ROBERT NAUTA - REDIRECT

1  BY MR. CASSIDY:

2  Q     Did you need to do a dye test to determine the

3  water flow that amount of distance?

4  A     No.

5  Q     Mr. Van Camp asked you about information or samples

6  that you didn't include in your figures.  Do you

7  remember that?

8  A     Yes.

9  Q     And you answered -- he asked you -- he suggested

10  that you ignore them and you said you didn't ignore

11  them.  What did you mean by that?

12  A     Well, I reviewed and considered all of the data

13  that was available to me, but I selected locations where

14  I was looking for two things:  One is to try to get

15  representative locations from the headwaters of Stream C

16  to the Flambeau River, but I was also looking for sample

17  points where there had been a long and frequent history

18  of sampling and that's why those sites were chosen.

19  Q     And then again, you were asked questions about the

20  dye tests.  Have you -- when do you normally perform dye

21  tests during the course of your work?

22  A     Well, I've never done it for surface water because

23  I've never seen it as necessary because you can observe

24  surface water.  I've done it for groundwater where you

25  can't observe it like that, where you've only got

                    ROBERT NAUTA - REDIRECT

1  discrete points, and so there I've done dye tests.

2  Q    Mr. Van Camp also asked you some questions about

3  Wetland 7 and the headwaters.  Do you have an opinion

4  about where the headwaters to Wetland 7 are?

5  A    Yeah.  I believe that they're in the area of -- I

6  concur with Craig Roesler that it's in the area of

7  Highway 27.

8  Q    And speaking of Mr. Roesler, Mr. Van Camp asked you

9  a lot of questions about the flow and Stream C's flow to

10 the Flambeau River.  Do you remember those questions?

11 A    Yes.

12 Q    And I'm going to put on the screen your report

13 again.  This is page eight.  And if you look here --

14 sorry.

15 A    I can see it.

16 Q    You talk about flow from Stream C from Highway 27

17 to the Flambeau River and you indicate that this was

18 substantiated by Craig Roesler in a deposition.  You

19 gave a footnote there; right?

20 A    Yes.

21 Q    Is that one -- some of the information you relied

22 on to reach your conclusion?

23 A    Yeah, it was -- it's one of the things I relied on.

24 It also refers to a report by Roger Jasinski, I think he

25 was with the DNR, that confirmed it.  And I also looked

                 ROBERT NAUTA - REDIRECT

1   at the -- I think it's called the *Surface Water Data*

2   *Viewer* on the DNR website where they've mapped wetlands

3   and other surface waters and it shows a line going all

4   the way to the Flambeau River.

5   Q    I'm going to show you -- we talked a lot about or

6   Mr. Van Camp asked you a lot of questions about channels

7   and whether or not you took a photograph of them or not.

8   A    Yeah.

9   Q    Do you remember those?  I'm going to show you a

10  photograph that's marked Exhibit 12.  It's already in

11  evidence.  Do you recognize the view in that photograph?

12  A    Yeah.  It looks like somebody was standing probably

13  on Copper Park Lane looking to the north.  I recognize

14  the farm culvert and the stand of evergreens just beyond

15  that.

16  Q    Okay.  And you were out there during the

17  wintertime --

18  A    Yes.

19  Q    -- when you visited when there was snow on the

20  ground?

21  A    Yes.

22  Q    I'm going to show you another photo.  It's marked

23  Exhibit 86.  Do you recognize the view in that photo?

24  A    Yeah, it's the same as the previous one.

25  Q    Do you see a channel there?

                  ROBERT NAUTA - REDIRECT

1   A    Yes, I do.

2          MR. CASSIDY:  Your Honor, we move Exhibit 86.

3   I believe the defendants have already stipulated to its

4   admission.

5          MR. VAN CAMP:  No objection.

6          THE COURT:  Received.

7          MR. CASSIDY:  No further questions, Your Honor.

8          THE COURT:  Mr. Van Camp.  (10:23 a.m.)

9          MR. VAN CAMP:  Before I forget, move to admit

10  Exhibit 553.

11         THE COURT:  Any objection?

12         MR. CASSIDY:  No objection, Your Honor.

13         THE COURT:  It's received.

14                    RECROSS-EXAMINATION

15  BY MR. VAN CAMP:

16  Q    Now you indicated -- we've been talking about trial

17  Exhibit 18 as your supplemental report.  The initial

18  report that you did that had the same opinions in it was

19  done on October 10th; correct?

20  A    Correct.

21  Q    In your redirect, you testified that one of the

22  things you relied on was a water assessment done by

23  Mr. Roesler; correct?

24  A    Yes.

25  Q    That report was done after you wrote your report,
                     ROBERT NAUTA - RECROSS

1   wasn't it?

2   A    Yes, it was.

3         MR. CASSIDY:  Objection.  Which report?

4   BY MR. VAN CAMP:

5   Q    The October 10th, 2011, report that had the same

6   opinions as the supplemental report; correct?

7   A    Correct.

8   Q    Now you were asked some questions about dye tests.

9   If Stream C south of Copper Park Lane is a losing stream

10  and you wanted to know where the water went after it

11  went down into the ground, wouldn't a dye test be an

12  appropriate test to determine where it went?

13        MR. CASSIDY:  Your Honor, I'm going to object.

14  Facts not in evidence.  And I didn't ask him --

15        THE COURT:  Overruled.

16        MR. CASSIDY:  -- about gaining or losing.

17        THE COURT:  Overruled.

18        THE WITNESS:  If, in fact, you had a dry

19  stretch of the stream, it would be a feasible use of it

20  there.

21        MR. VAN CAMP:  Nothing further.  Thank you.

22        THE COURT:  You may step down.

23        THE WITNESS:  Thank you.

24        THE COURT:  Is Mr. Nauta free to leave?

25        MR. VAN CAMP:  Yes.
                ROBERT NAUTA - RECROSS

1          MR. CASSIDY:  Yes, Your Honor.

2       (Witness excused at 10:24 a.m.)

3          MS. MCGILLIVAY:  Your Honor, plaintiffs will

4  now by designation introduce testimony of Elizabeth Day.

5          THE COURT:  That's fine.

6          MS. MCGILLIVAY:  And to facilitate this,

7  Attorney Christa Westerberg will take the stand.

8          THE COURT:  All right.

9          MS. MCGILLIVAY:  I have prepared and marked, if

10  I may approach, a revised list of the designations that

11  we've altered a bit since we --

12          THE COURT:  Okay.

13          MS. MCGILLIVAY:  -- filed it on ECF.  I marked

14  it for convenience as Exhibit 9B.

15          THE COURT:  Thank you.

16          MS. MCGILLIVAY:  I also have -- the Day

17  transcript is already marked as Exhibit 70 from April

18  13th.  The April 18th deposition transcript has not yet

19  been marked, so I marked that as Exhibit 91.

20       We're going to begin on Exhibit 70, which is the

21  April 13th, 2012, deposition.  Are you there,

22  Ms. Westerberg?  Starting at page four, line 4 to 9.

23       **ELIZABETH DAY, DEPOSITION EXCERPTS READ,**

24  Q    " Good morning, Ms. Day.  My name, as we stated off

25  the record, is Pam McGillivay and I'm one of the

1   attorneys for the plaintiffs" --

2           THE COURT:  Could you get a microphone near

3   you?  That's a good idea.

4           MS. MCGILLIVAY:  At page four, line 4 to 9.

5   BY MS. MCGILLIVAY:

6   Q    "Good morning, Ms. Day.  My name, as we stated off

7   the record, is Pam McGillivray and I'm one the attorneys

8   for the plaintiffs, and I understand that we've done

9   introductions off the record, but could you please state

10  your name again.

11  A    My name is Elizabeth A. Day."

12          MS. MCGILLIVAY:  Page six, line 8 to page 8,

13  line 12.

14  Q    "Okay.  All right.  So now -- so you now work for

15  Stantec.  Stantec, Incorporated?

16  A    Stantec Consulting Services, Inc.

17  Q    Consulting Services, Inc.  And since when have you

18  worked for Stantec?

19  A    Since 2001.

20  Q    And if I use the abbreviated form Stantec, will you

21  know what I'm referring to?

22  A    Yes.

23  Q    Since 2001.  Prior to 2010 was Stantec known as

24  NRC?

25  A    That's correct.

1   Q     Okay.  So between 2001 and 2010 you worked for NRC,

2   is that --

3   A     That's correct.

4   Q     And what does NRC stand for?

5   A     Natural Resources Consulting.

6   Q     In 2010 NRC became Stantec, a part of Stantec; is

7   that right?

8   A     That's correct.  We were acquired.

9   Q     Did your job description change at all in 2010 with

10  the change of ownership?

11  A     No.

12  Q     And what is your current job or what is your

13  position?

14  A     I'm a Senior Environmental Scientist.

15  Q     Located where?

16  A     In Cottage Grove, Wisconsin.

17  Q     And have you been in Cottage Grove since 2001?

18  A     Yes.  That's been my home office.

19  Q     Okay.  How long have you held the title of Senior

20  Environmental Scientist?

21  A     Probably since I started there.

22  Q     Have your job duties been roughly the same since

23  2001?

24  A     They have evolved over time, but generally, yes.

25  Q     Okay.  So can you describe for me what a Senior

1  Environmental Scientist does at Stantec?

2  A    I put proposals together for projects that come in

3  and I manage the work teams.  I meet with agencies and I

4  meet with clients and I do some field work; much less

5  now than when I started.  I write reports and I write

6  permit applications.

7  Q    And what type of projects do you put proposals

8  together for?

9  A    It's run the gamut.  At this point, we're doing a

10  lot of utility work and that's primarily what I'm

11  involved in, but also transportation work.

12  Q    Would those be wetland delineations for utilities?

13  A    That's correct.

14  Q    Okay.  When you refer to projects, are you

15  referring to wetland delineations?

16  A    Well, like I said, I do very little field work now.

17  I'm old, you know.  I let the other people do it.  So

18  mostly at this point I'm managing the field efforts,

19  organizing them, letting people know what they need to

20  look for in the field, and putting together the permit

21  applications and doing meetings."

22        MS. MCGILLIVAY:  Page 19, line 4.

23  Q    "When you were -- when you were at the Flambeau

24  Mine site on October 18, 2011, can you describe what you

25  did while you were there?

1  A     While I was there, I walked the drainageway known

2  as Stream C from Highway 27, just above Highway 27 down

3  to the Flambeau River.

4  Q     What do you mean by drainageway?  Can you define

5  that term for me?

6  A     Define drainageway?

7  Q     Yes.

8  A     It's an area through which water collecting from a

9  watershed drains.

10  Q     And you identified a drainageway that had been

11  called Stream C; is that correct?

12  A     I didn't identify it, no.

13  Q     Okay.  How did you choose your course of inspection

14  on October 18th, 2011?

15  A     I chose it based on essentially the lowest point

16  through there and we were looking for any evidence of a

17  waterway.

18  Q     So you began upgradient of a drainageway and walked

19  the area in the lowest point of that drainageway to the

20  Flambeau River; is that --

21  A     We began upgradient of Highway 27.

22  Q     So you didn't inspect the entire drainageway, is

23  that a correct understanding?

24  A     No.

25  Q     Okay.

1    A    Well, we didn't go upgradient more than 10 or 20

2    feet of Highway 27.

3    Q    So beginning just -- so beginning around just

4    somewhere east of Highway 27, you inspected the

5    drainageway through to the Flambeau River?

6    A    That's correct."

7         MS. MCGILLIVAY:   Page 84.  Line 11.  We're on

8    8.  Thank you.

9    Q    "Actually before we leave that, that sentence, just

10   to finish up the adjacent wetlands discussion, can you

11   refer to Exhibit 165, which is the 2008 guidance.

12   A    Okay.

13   Q    And then if you turn to page five of that document,

14   the second full paragraph that begins, 'The regulations

15   define adjacent as follows:  The term *adjacent* means

16   bordering, contiguous or neighboring wetlands separated

17   from our waters of the United States by manmade dikes or

18   barriers, natural river berms, beach dunes and the like

19   are adjacent wetlands.'

20       Is that your understanding of adjacent wetlands

21   that you were just describing as far as whether or not a

22   wetland that is downgradient from a stream can be

23   adjacent to it?

24   A    Well, the one I have to clarify here is that we

25   haven't determined if this waterway right here is a

1  water of the U.S. and that's what the adjacency

2  determination is.  I would say that if this is

3  determined, if Stream C south of Copper Park Lane were

4  determined to be a water of the U.S., which has to be

5  done by doing a significant nexus test, then based on

6  this statement in here which you found for me, which I

7  should have known, then yes, Wetland 7 would be

8  adjacent.  But first you have to figure out if the

9  stream south of Copper Park Lane is a water of the U.S.

10 Q    Okay.  So if there has been a determination that

11 Stream C south of Copper Park Lane is a water of the

12 U.S --

13 A    Yes.

14 Q    -- then the wetland that is delineated on Exhibit

15 169 would be an adjacent wetland.

16 A    Yes.  But that hasn't been done."

17      MS. MCGILLIVAY:  Page 88, line 5 to page 90,

18 line 10.

19 Q    "Okay.  Back to 'Stream C.' I think we already

20 talked about this, but I just want to make sure I

21 understand your use of the term *Stream C*.  Do you agree

22 that there's a stream south of Copper Park Lane that is

23 called Stream C?

24 A    There is a drainageway south of there that flows

25 from the area that all the FMC materials have referred

1    to as Stream C.  Stream C is usually a name that is

2    provided in an area north of Copper Park Lane, but I

3    understand that it's the same drainageway.

4    Q    Okay.  So the same drainageway exists -- strike

5    that.  The drainageway that you have recognized as

6    having channelization south of Copper Park Lane exists

7    north of Copper Park Lane in the area that has been

8    known as Stream C.  Is that a correct statement of what

9    you just said?

10   A    I'm not sure really.  Why don't you try restating

11   it.

12   Q    I'm still trying to, I think, parse out what you

13   were meaning by terms.  So when you use 'Stream C' are

14   you referring to the drainageway north of Copper Park

15   Lane that goes through the wetland and to the northeast

16   upgradient to the northeast under Highway 27?

17   A    Now wait.  Now you're going on the other side of

18   Highway 27?

19   Q    Well, okay.  When you did your inspection, you

20   inspected four culverts; correct?

21   A    One, two, three, four, yes.

22   Q    And I can point to your report where you discuss

23   the culvert if that --

24   A    Yes.  I looked at four culverts.

25   Q    Okay.  And the first culvert is the one that

1    crosses --

2    A      27.

3    Q      Right.

4    A      Um-hmm.

5    Q      The Stream C drainageway exists on the other side

6    of that culvert; do you agree?

7    A      It's all the same drainageway.  A drainageway is a

8    conveyance of -- a general location of a conveyance of

9    water within a watershed.  You know, they have chosen to

10   call it Stream C.  It's the same.  It's the same pathway

11   of drainage on, yes, on east of 27, west of 27, in the

12   area north of Copper Park Lane, and south of Copper Park

13   Lane.

14   Q      Okay.  By drainageway -- well, strike that.  The

15   drainageway that you have identified as Stream C north

16   of Copper Park Lane to the other side of Highway 27 to

17   the east of Highway 27, if I heard your testimony

18   correctly, if sufficient water is present in the

19   drainageway to flow, it will flow downgradient within

20   that drainageway towards Copper Park Lane through the

21   culvert to the other side of Copper Park Lane; true?

22   A      That's a true statement.

23   Q      In your report you use the term *headwater wetlands*.

24   A      Yes."

25           MS. MCGILLIVAY:  Okay.  And then the exhibit --

1  the designation in Exhibit 91 is the April 18th, 2012,

2  deposition of Elizabeth Day.  Starting at page 109, line

3  10 to 111, line 9.

4  Q   "Looking at Exhibit 169, it contains -- it depicts

5  an intermittent stream as a dotted blue -- as a blue

6  line along -- through the wetland; correct?

7  A   It does, yes.

8  Q   Okay.  And if I understood your testimony

9  correctly, you agree with the general path, the general

10 flow path of the drainageway as depicted on 169, but not

11 the designation of that flow path as an intermittent

12 stream north of Copper Park Lane; is that correct?

13 A   I agree with there being a conveyance of water from

14 east of Highway 27 through the outlet -- outlot and down

15 south of Copper Park Lane, yes.  But I don't agree that

16 it's an intermittent stream per se.

17 Q   An intermittent stream north of Copper Park Lane or

18 an intermittent stream at all?

19 A   North of Copper Park Lane.

20 Q   Okay.  I just wanted to make sure that -- the term

21 Stream C has been used so much, I wanted to be sure we

22 were talking about the same thing.

23 A   I know.

24 Q   We also talked about this at your deposition, but

25 there is also a directional line moving from the 0.9

1   acre biofilter basin toward the wetland.  Do you see

2   that line?

3   A    Yes.

4   Q    And you agree with the directional flow as depicted

5   by the arrow; correct?

6   A    That would be the direction of flow, yes.

7   Q    Okay.  And would you agree that the wetland drains

8   towards its lowest point in the wetland?

9   A    I'm not sure what you're asking.

10  Q    Okay.  I'll just ask you it this way:  Would

11  flow -- if there was sufficient flow from the biofilter

12  in the wetland, would it follow the path of the

13  drainageway?

14      Mr. Van Camp:  I'm going to object to the form of

15  the question.  If you understand, you can answer.

16  A    I don't.  Could you restate it?

17  Q    Sure, sure.  If there -- if there -- if there was

18  flow from the biofilter to the wetland, would that flow

19  go in the direction toward the drainageway?

20  A    It would go to the lowest -- I mean it would go

21  from the highest to the lowest point if there were

22  surface water flow.

23  Q    And the lowest point is -- in that wetland is what

24  you're referring to as the drainageway known as Stream

25  C; correct?

1    A    Generally, yes."

2            MS. MCGILLIVAY:  Thank you.  Your Honor, if the

3    witness had been here live, I would have identified Day

4    deposition Exhibit 169 that was referenced in this

5    exchange as Trial Exhibit 1024, which has been admitted.

6            THE COURT:  So are you moving it in at this

7    time?

8            MS. MCGILLIVAY:  1024 has already been

9    admitted, but she refers to it as Deposition Exhibit

10   169.  It's the same document.

11           THE COURT:  I get it.  Okay.  That's it with

12   Ms. Day?

13           MS. MCGILLIVAY:  That's it.  We will have

14   counter designations after Mr. Van Camp's case, and if

15   you would give me one moment to confer with counsel to

16   see -- I think we're about to rest, but I have to make

17   sure.

18           THE COURT:  All right.

19       (Pause)

20           MS. MCGILLIVAY:  Looks like they agree.

21   Plaintiffs rest, Your Honor.

22           THE COURT:  All right.  We'll take 15 minutes

23   and resume with the defendant's case.

24           MR. VAN CAMP:  Your Honor, we will be filing a

25   motion at this point.

1            THE COURT:  All right.  We'll take that up as

2    soon as we get back from the break.

3            MR. VAN CAMP:  Okay.  Thank you.

4            THE COURT:  Court is in recess.

5        (Recess        10:40-10:55 a.m.)

6            THE COURT:  Mr. Van Camp.

7            MR. VAN CAMP:  Yes.  Thank you, Your Honor.  At

8    this time the defendant, Flambeau Mining Company, moves

9    to dismiss all of the causes of action in this case

10    brought against it by the plaintiffs in this case.  I

11    would like to file a written motion for judgment.

12            THE COURT:  All right.  Want to just leave it

13    at that?

14            MR. VAN CAMP:  I'm sorry?

15            THE COURT:  You want to leave it at that or --

16            MR. VAN CAMP:  I have a few more things to say.

17            THE COURT:  Oh, okay.

18            MR. VAN CAMP:  While we have presented 32 pages

19    of arguments as to reasons that the case should be

20    dismissed at this point, I have provided just now copies

21    to the defendants of the motion.  But I would ask the

22    Court to additionally entertain an oral motion to

23    dismiss based on the paucity of the evidence that has

24    been provided in this case in support of significant

25    nexus between anything that occurred involving

1    discharges from the biofilter.  There is no evidence

2    whatsoever of any biological nexus.  There's no evidence

3    at all of a chemical nexus.  The evidence about

4    chemistry simply seems or simply identifies points where

5    various measurements were taken, but it does not

6    indicate any movement of those chemicals within that

7    system.

8         As far as the physical nexus, the only evidence in

9    the record is that on very, very few, perhaps seven

10   occasions, many of which are before 2004, there were

11   witnesses who claim that they viewed discharges from the

12   biofilter and that they witnessed those discharges going

13   in the direction of Stream C.  These witnesses are not

14   credible.  Their testimony was inconclusive.  And I

15   think given the absolute evidence of any experts who

16   could testify about the movement of anything occurring

17   in this system, about anything biological going on in

18   the system, no discussion about what is happening with

19   other contributors to the system or how that affects any

20   of the discharges from that system into the wetland, I

21   think it is appropriate at this time to dismiss.  Thank

22   you.

23            THE COURT:  Thank you.

24            MR. BENDER:  If I may address the Court, Your

25   Honor.

1          THE COURT:  You may.

2          MR. BENDER:  Your Honor, obviously plaintiffs

3  would like a chance to review and then respond to the

4  written motion.

5          THE COURT:  You will have a chance to do so.

6          MR. BENDER:  Just briefly in response to the, I

7  guess, supplemental oral motion here, just to review,

8  plaintiffs believe that the evidence shows three

9  different things:

10     First, it shows that Stream C exists north of

11  Copper Park Lane.  It's a continual or continuous water

12  feature from the Flambeau River north all the way to --

13  at least to Highway 27, which is northeast of the

14  biofilter outfall.  The eyewitness accounts correspond

15  to Flambeau Mining Company's own sampling programs which

16  sample locations along what they described at the time

17  as Stream C, which line up with their own documents

18  identifying the water feature.  Certainly there's

19  culverts that deliver water between pieces of what's now

20  been manipulated by Flambeau Mining Company, which is

21  that water body of Stream C, including north of Copper

22  Park Lane.

23     We heard eyewitness testimony about flow in that

24  direction.  We have photographs in the record showing

25  that body of water easily discernible in the photos.

1        While defendants predictably I guess in this case

2    take -- now take the position that there is no water

3    body there or if there is it's only a wetland, I think

4    the testimony and the photographic evidence, as well as

5    Mr. Nauta's testimony, identifies a continuous water

6    feature there that's delivering water, and with it,

7    certainly all soluble and probably many of the

8    particulate contaminates with it.

9        The other thing that the evidence shows is that

10   even if that water feature were not there and part of

11   Stream C, the gradient in the area, the slope of the

12   land delivers water, and with it, pollutants south; the

13   distance from the biofilter outfall to certainly the

14   farm road culvert, which is where channelization begins,

15   and also from there within that channelization south of

16   Copper Park Lane.  In fact, the testimony or actually

17   the stipulated facts on discharge dates from the

18   biofilter correspond to dates in Jana Murphy's own

19   logbooks recording downstream from the biofilter flows

20   in her qualitative terms and which corroborates that the

21   flow is in that direction and on the days at issue.

22       Lastly, the wetland, Wetland 7 we've been

23   discussing, is physically connected to Stream C south of

24   Copper Park Lane and therefore to the Flambeau River.

25   As we've heard testimony, there's an inlet to the north,

1   two railroad spur culverts that deliver water into that

2   area.  To the south there is that farm road culvert

3   which funnels the area into the channelization between

4   the farm road, Copper Park Lane, and from there under

5   Copper Park Lane, and as Mr. Nauta testified, delivers

6   its pollutants, especially the soluble versions of

7   metals that are dissolved in water and flow with it.

8        Mr. Nauta's testimony included his correlations of

9   biofilter outfall, including concentrations, and then

10  sample points south of there as that -- as those

11  pollutants travel south, establishing a chemical

12  connection between that area east of the biofilter and

13  south of Copper Park Lane.

14       For any one of those three reasons, we believe that

15  jurisdictional water is shown in that area into which

16  the biofilter flows and especially here where we believe

17  the evidence has shown that all three of those things

18  are true.  Thank you.

19       THE COURT:  Thank you.  I'll take the motion

20  under advisement.  Mr. Van Camp, you may proceed with

21  your case.

22       MR. VAN CAMP:  Thank you.  At this time we

23  would like to present the evidentiary deposition of

24  Elizabeth Day, beginning with page one through the end

25  of that direct examination which ends on page 86.

1          MS. MCGILLIVAY:  Your Honor, before we begin

2     the videotape, could I just have a point of

3     clarification which is I'm not quite certain how to

4     interpose objections to the taped video.  There are form

5     objections on the transcript, but we have stated other

6     objections, and they're listed on Exhibit 90 that I

7     provided this morning, including objections --

8          THE COURT:  Well, let's take them up now.  I'll

9     just get that exhibit in front of me.  Did you actually

10    give me the physical copy of the exhibit?

11         MS. MCGILLIVAY:  The exhibit for the April 18,

12    2012 deposition transcript is Exhibit 91 and I just

13    handed it to you this morning, I believe, Your Honor.

14         THE COURT:  All right.

15         MS. MCGILLIVAY:  And the objections are listed

16    on Exhibit 90.  Your Honor, I have --

17         THE COURT:  I found it.  I have 91.

18         MS. MCGILLIVAY:  91 would be the deposition

19    transcript and Exhibit 90 had our designations on it.  I

20    have another copy here.

21         THE COURT:  Good.  Thank you.

22         MS. MCGILLIVAY:  Our objections begin on page

23    three.

24         THE COURT:  Of the deposition.

25         MS. MCGILLIVAY:  Well, would you like me to go

1    through and -- okay.  They begin -- the list begins on

2    page three of Exhibit 90 and the first objection appears

3    on page eight, line 11.

4            THE COURT:  Okay.  Lines 11-19.

5            MS. MCGILLIVAY:  On the basis of hearsay that

6    deposition Exhibit 164, which is her expert report, has

7    been read into the record.

8            THE COURT:  Am I looking at the right thing?

9    This is line 11, "I'm marking your resume separately"?

10            MS. MCGILLIVAY:  The line -- Your Honor, the

11    witness at that point was reading from her expert report

12    rather than giving her testimony, so the objection was

13    based on hearsay.  Okay.

14            THE COURT:  Let's skip that one.

15            MS. MCGILLIVAY:  The next one was the subject

16    of a motion in limine that was denied which was we had

17    stipulated to her qualifications as a witness and

18    objected to their proposed facts as having the

19    qualifications listed.  That motion in limine was

20    denied.  But deposition page -- deposition at page 8 to

21    28 restate her qualifications.  Our objection is

22    relevance because it's been stipulated to by the

23    plaintiffs and cumulative.

24            MR. VAN CAMP:  I thought that had been denied.

25            THE COURT:  It had been.  It will stay in,

1    although it seems like a long time to spend on your

2    scientific knowledge.  All right.  29.

3            MS. MCGILLIVAY:  29.  29, 10 to page 30, 14, on

4    the basis of legal conclusion, and also on the basis of

5    the motion in limine, which is Docket No. 234, excluding

6    legal conclusion from Ms. Day.

7            THE COURT:  So you're saying 29, 10 through 30,

8    14 and that will not -- I will not consider that.

9            MR. VAN CAMP:  May I ask for clarification

10    about that?

11            THE COURT:  Yes.

12            MR. VAN CAMP:  We'll be playing a video.

13            THE COURT:  Don't bother --

14            MR. VAN CAMP:  Do you want me to stop it and

15    restart --

16            THE COURT:  Since there's no jury here, I'll

17    just ignore it.  And then 31, 8.

18            MS. MCGILLIVAY:  31, 8.  Form of objection

19    during the deposition as vagueness.

20            THE COURT:  Overruled.

21            MS. MCGILLIVAY:  32, 16 to 34, 4.  It was on

22    relevance given the summary judgment decision, finding

23    that the Flambeau and --

24            THE COURT:  I agree.  I don't think there's

25    anything relevant about that.  Again, I'll just ignore

1    it.

2         MS. MCGILLIVAY:  Okay.  33, 14 to 15.

3    Objection is leading.

4         THE COURT:  Wait just a minute.  33 -- well,

5    that's going out anyway.

6         MS. MCGILLIVAY:  Okay.  39, 18 through 40, 11,

7    which was a similar objection to the one before in which

8    the report was read into the record.

9         THE COURT:  I'm sorry, I'm not following this

10   objection.

11        MS. MCGILLIVAY:  Rather than testifying, she's

12   reading her out-of-court statement into the record.

13        THE COURT:  But it's her own statement.  I'll

14   overrule that.

15        MS. MCGILLIVAY:  42, 15 was again based on the

16   summary judgment decision that came out after -- strike

17   that.  It actually came out before this deposition.

18   Based on relevance as south of Stream C had been found

19   to be a water of the United States.

20        THE COURT:  I'll overrule that objection.  Then

21   47, 13.

22        MS. MCGILLIVAY:  The basis of that objection

23   was a lack of foundation and lacks probative value and

24   reliability as the witness is opining what other

25   professionals meant by using a term, the term Stream C

1   on designated documents.

2           THE COURT:  I'll sustain that objection.

3           MR. VAN CAMP:  I'm sorry, what was the basis of

4   the objection?

5           THE COURT:  That she simply is referring to

6   observations made by others about where and what Stream

7   C is.

8           MS. MCGILLIVAY:  53.  Page 53, line 18 through

9   54, 2.  Speaks to flow south of Copper Park Lane, and so

10  the objection was relevance.

11          THE COURT:  Overruled.

12          MS. MCGILLIVAY:  55, 15 to 58, 10.  Legal

13  conclusion.

14          THE COURT:  Yes, I'll take that out.

15          MS. MCGILLIVAY:  Page 60, line 14.  I'll

16  withdraw the objection based on hearsay and restate the

17  objection for relevance and legal conclusion from page

18  60, line 14.

19          THE COURT:  All right.  60, 14.  I don't think

20  that's necessary.

21          MS. MCGILLIVAY:  Through page 61, 12.

22          THE COURT:  Right.  And then 61, 13.

23          MS. MCGILLIVAY:  To 71, 2 is a continued -- for

24  the objection -- same objection.  Legal conclusion.

25          THE COURT:  Well, I'm going to leave it in.  I

1    can ignore her legal conclusions, but I think it's hard

2    to separate some of her observations from her legal

3    conclusions.  All right.  And 63, 25.

4         MS. MCGILLIVAY:  Yes, Your Honor.  I should

5    have added also the basis of the motion in limine where

6    she's opining on the sufficiency of the evidence

7    presented by plaintiffs.

8         THE COURT:  Well, I'll just ignore that.  Then

9    75, 3.

10        MS. MCGILLIVAY:  75, line 3 to 76, 14 on the

11   basis of legal conclusion.

12        THE COURT:  I think I'll just stick with the

13   same resolution.  I'll listen to what she says and

14   ignore any legal conclusions that she makes.  And the

15   same would be true for 75, 18 and 79, 20.  Then 80, 14.

16   And your objection is relevance?

17        MS. MCGILLIVAY:  The remaining portion speaks

18   to the area that had been designated as a water of the

19   United States and the objection was relevance.

20        THE COURT:  Okay.  I'll ignore that.

21        MS. MCGILLIVAY:  Thank you, Your Honor.

22        THE COURT:  Anything else?

23        MS. MCGILLIVAY:  No, Your Honor.  When

24   Mr. Van Camp is through with his designations by video,

25   Attorney Westerberg will return for our designations

1  unless Mr. Van Camp is willing to play the continuation

2  of the DVD for counter designations.

3       MR. VAN CAMP:  We're certainly willing to

4  cooperate and play whatever they want.  I don't know

5  whether they're going to be jumping around or whether it

6  will be long designations, but if it's jumping around,

7  I'm not sure that will speed things up.  But if --

8       MS. MCGILLIVAY:  I can address this.  Our

9  designations on this video --

10       THE COURT:  Why don't we take five minutes and

11  both sides confer on which portions of the deposition

12  you want shown.  I think it would be a lot better to

13  hear it directly from Ms. Day, but I agree with

14  Mr. Van Camp that we don't want to be jumping back and

15  forth.  That would be way too time consuming.  Do you

16  think you can do that?

17       MS. MCGILLIVAY:  Your Honor, our counter

18  designations to their designations was simply the

19  cross-examination from that video straight through

20  without interruption or jumping.  It was from 86, 11 to

21  130, 10.

22       MR. VAN CAMP:  I have no objection to

23  continuing to play it.

24       THE COURT:  Then we can go ahead.  I didn't

25  realize it was that straightforward.

1       (Video of Elizabeth Day played at 11:20-12:31 p.m.)

2          THE COURT:  Let's stop right there.  We'll take

3   an hour for lunch.  We'll resume at 1:30.  Mr. Van Camp,

4   are you going to be electronically docketing this

5   motion?

6          MR. VAN CAMP:  That was a question that

7   counsel, co-counsel reminded me to ask, and --

8          THE COURT:  Would you do that?

9          MR. VAN CAMP:  Yes, we will do that.  And also

10  just regarding the video, the video refers to exhibits

11  by the numbers of the exhibits at the time.  We have the

12  trial exhibit numbers which are different and we'd be

13  happy to give that to you.

14         THE COURT:  I'd like that.  Do you have a copy

15  of those too?

16         MS. MCGILLIVAY:  We have copy of the

17  defendant's exhibits marked with the trial exhibit

18  numbers and the deposition.

19         THE COURT:  Oh, okay.  Okay.

20         MR. VAN CAMP:  And so if you'd like, I can give

21  you those numbers and how they correspond, and we can

22  also provide you with a copy of her report.  I think

23  it's actually marked as an exhibit which has the

24  photographs and things that she's referring to.  One

25  other thought:  Most of them are hyperlinked on here and

1    if you want at any time, if you see a blue -- you saw

2    how some of the exhibit numbers in the transcript that

3    was -- as it was scrolling --

4           THE COURT:  Just I can click on it.

5           MR. VAN CAMP:  We can click on this and you can

6    see that at the time.  So it just --

7           THE COURT:  But if you -- do you have the

8    number of her report?

9           MR. VAN CAMP:  Right.  Can I just -- I'll give

10   it to you.  We did two things.  We marked the exhibits

11   attached to her deposition separately and those numbers

12   are D 573, 574, 575 and 576.  Those are defendant

13   exhibit numbers.  And I will provide you with a printed

14   copy of her trans -- I mean of her entire deposition.

15          THE COURT:  Well, I have that.

16          MR. VAN CAMP:  Okay.  Does that have the

17   exhibits?

18          THE COURT:  No, but let me see --

19          MS. MCGILLIVAY:  Your Honor, the one I provided

20   for you does not have the depositions attached, if

21   that's what you're looking for.

22          THE COURT:  I'm sorry?

23          MS. MCGILLIVAY:  Mine does not have the

24   depositions attached to the transcripts that I marked as

25   91.

1      THE COURT:  I thought that was going to happen.

2  Would you say that again?

3      MS. MCGILLIVAY:  The transcript that I provided

4  this morning does not have the exhibits attached to it.

5      THE COURT:  Right, right.  Yes.  So you think

6  it's 573?

7      MR. VAN CAMP:  Yes.

8      THE COURT:  That looks just like a summary.

9      MR. VAN CAMP:  Right.  And that's her -- okay.

10  I think -- is it 70?

11      THE COURT:  There's some photographs at 576.

12      MR. VAN CAMP:  Right.  The numbers I gave you

13  are her exhibits.

14      THE COURT:  At least this looks like

15  photographs October 18th, 2011.

16      MR. VAN CAMP:  Right.

17      THE COURT:  I'll look at those.  If there are

18  other things, you can show them to me at 1:30.  Anybody

19  else have anything else they want to bring up at this

20  time?

21      MR. VAN CAMP:  Your Honor, it's 629 is the

22  report with the exhibits attached.

23      THE COURT:  Oh, okay.

24      MR. VAN CAMP:  Sorry that took so long.

25      (Noon recess at 12:35 p.m.)

1         I, LYNETTE SWENSON, Certified Realtime and Merit

2    Reporter in and for the State of Wisconsin, certify that

3    the foregoing is a true and accurate record of the

4    proceedings held on the 23rd day of May 2012 before the

5    Honorable Barbara B. Crabb, District Judge for the

6    Western District of Wisconsin, in my presence and

7    reduced to writing in accordance with my stenographic

8    notes made at said time and place.

9    Dated this 9th day of September 2012.

10

11

12                    /s/_____

13                    Lynette Swenson, RMR, CRR, CBC
                           Federal Court Reporter
14

15

16

17   The foregoing certification of this transcript does not
     apply to any reproduction of the same by any means
18   unless under the direct control and/or direction of the
     certifying reporter.
19

20

21

22

23

24

25