UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * *

WISCONSIN RESOURCES PROTECTION
COUNCIL, CENTER FOR BIOLOGICAL
DIVERSITY and LAURA GAUGER,

      Plaintiffs,
  -vs-                     Case No. 11-CV-45-BBC

FLAMBEAU MINING COMPANY, INC.,  Madison, Wisconsin
                          May 24, 2012
      Defendant.         9:00 a.m.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF FOURTH DAY OF COURT TRIAL
MORNING SESSION
HELD BEFORE DISTRICT JUDGE BARBARA B. CRABB,


APPEARANCES:

For the Plaintiffs:  McGillivay, Westerberg & Bender
                     BY:  ATTORNEYS PAMELA MCGILLIVAY,
                     JAMES SAUL and DAVID BENDER
                     211 South Paterson Street, Ste. 320
                     Madison, Wisconsin  53703

                     Pacific Environmental Advocacy
                     Center - East
                     BY:  ATTORNEY KEVIN CASSIDY
                     P.O. Box 445
                     Norwell, Massachusetts  02061

                     Pacific Environmental Advocacy
                     Center - West
                     BY:  ATTORNEY DANIEL MENSHER
                     10015 SW Terwilliger Blvd.
                     Portland, Oregon  97219

Lynette Swenson   RMR, CRR, CBC
Federal Court Reporter
U.S. District Court   120 N. Henry St., Rm. 520
Madison, WI  53703   (608) 255-3821

1  Continued appearances:

2  For the Defendant:     DeWitt Ross & Stevens, S.C.
                          BY:  ATTORNEYS HARRY VAN CAMP
3                         and SCOTT PALER
                          Two East Mifflin Street, Ste. 600
4                         Madison, Wisconsin  53703

5                         Susan George - Paralegal

6  For the State         Wisconsin Department of Justice
    of Wisconsin:         BY:  AAG THOMAS J. DAWSON
7                         17 West Main Street
                          Madison, Wisconsin  53703

8

9  Also present:          Fred Fox

10

11                         * * * * *

12

13                    **I-N-D-E-X**

14 DEFENDANT'S WITNESSES          EXAMINATION            PAGES

15 IVAN SHANKS            Direct by Mr. Van Camp        8-34
                          Cross by Mr. Mensher          34-40
16 ALAN CHRISTIANSON      Direct by Mr. Van Camp        41-63
                          Cross by Mr. Bender           63-65
17 JAMES HUTCHISON        Direct by Mr. Van Camp        67-110
                          Cross by Mr. Cassidy          110-121
18 FRED FOX               Direct by Mr. Van Camp        121-132

19

20                    **E-X-H-I-B-I-T-S**

21 EXHIBITS                            IDENTIFIED/RECEIVED

22 Exhibit 628    Photos - Basin          103        107
         642      Lease                    63         63
23       661      Burton resume             9        ---
        1004      2010 Annual report       81         83
24

25

1          THE CLERK:  Case Number 11-CV-45-BBC.

2  *Wisconsin Resources Protection Council, et al. v.*

3  *Flambeau Mining Company* is called for fourth day of

4  court trial.  May we have the appearances, please.

5          MS. MCGILLIVAY:  Good morning, Your Honor, Pam

6  McGillivray.  Dan Mensher from Lewis --

7          THE COURT:  We'll assume everybody is here.

8          MS. MCGILLIVAY:  Everybody is here.  Your

9  Honor, I should note though we've been also noting

10  appearances for Marc Fink, sorry, and he is not here

11  today.

12          THE COURT:  I'm sorry, could you use the

13  microphone?

14          MS. MCGILLIVAY:  Marc Fink from CBD is not here

15  today.

16          THE COURT:  Oh.  Mr. Van Camp.

17          MR. VAN CAMP:  Yes.  Same people are appearing

18  on behalf of Flambeau Mine today.  I'd be happy to

19  introduce them.

20          THE COURT:  We'll assume we know them.

21          MR. DAWSON:  Judge Crabb, Assistant Attorney

22  General Tom Dawson.  I'm here for the DNR witnesses that

23  I expect to be called today.

24          THE COURT:  Thank you.  Mr. Van Camp.

25          MS. MCGILLIVAY:  Your Honor, I have one

1    preliminary matter.  Yesterday Mr. Van Camp provided us

2    notice of the witnesses he intended to call and on that

3    list is a DNR witness, Bruce Moore.  Plaintiffs have

4    voiced their objection to his being listed as witness at

5    our pretrial conference on the basis that he wasn't

6    disclosed in the 26(a)(1) or the 26(a)(2) disclosures by

7    defendant or otherwise made known through the discovery

8    process.  I think his name comes up once on one document

9    that they filed in the record, but it's a CC.  He's

10   listed as a CC, that's how we know he's a DNR witness.

11   Other than that, plaintiffs have no notice of what he

12   would intend to testify to and would move to exclude him

13   as unfairly prejudicial.

14            MR. VAN CAMP:  Bruce Moore is a DNR employee.

15   He is going to be called to testify about the

16   infiltration basins that have been recently completed.

17   He wasn't listed on the Rule 26 disclosure specifically,

18   but there were Rule 26 disclosures that identified the

19   DNR employees that have been actively involved in the

20   mine or post-mining operations.  We found out just

21   literally maybe two or three weeks ago, shortly after

22   the motion for the Rule 19 issue was filed -- I'm sorry,

23   mootness.  I'm sorry, the mootness motion was filed,

24   that nobody from the DNR had yet been up to inspect the

25   infiltration basins and it turned out that the

1   individual that was involved in that inspection was

2   Bruce Moore.  And so we feel like -- I mean we haven't

3   been holding back Bruce Moore's identity.  He was the

4   defendant's -- the plaintiffs were informed prior to the

5   pretrial that we would be calling him, and so I don't

6   think it's a surprise and I think it's important

7   testimony of the DNR's awareness of the infiltration

8   basins.

9           THE COURT:  Anything further, Ms. McGillivay?

10          MS. MCGILLIVAY:  Your Honor, that's the first

11  we've heard about even the intended subject of

12  Mr. Moore's testimony, so we do think it would be

13  unfairly prejudicial.  At the time defendants learned of

14  this information, they could have shared that with us,

15  proposed to do or offered to do an out-of-time

16  deposition like -- this is the first we're learning of

17  the subject matter.

18          THE COURT:  I won't allow you to call him under

19  these circumstances.

20          MR. VAN CAMP:  May I put him on as an offer of

21  proof rather than making the offer of proof myself?

22          THE COURT:  You may do that.

23          MR. VAN CAMP:  Your Honor, we have one

24  preliminary matter, if the plaintiffs are finished.

25          MS. MCGILLIVAY:  We are.

1      THE COURT:  Okay.

2      MR. PALER:  Morning, Your Honor.

3      THE COURT:  Good morning.

4      MR. PALER:  We would like to renew our motion

5  for judgment.  With the Court's permission, I'd just

6  like to offer a couple minutes of remarks.

7      THE COURT:  You may.

8      MR. PALER:  Your Honor, the entire point of

9  Justice Kennedy's *Rapanos* concurrence is to prevent

10  federal overreach.  It's to ensure that federal laws

11  only extend to locations implicating the commerce

12  clause.  According to Justice Kennedy unless there is a

13  significant nexus between a wetland and a traditional

14  navigable water, that wetland cannot fall under the

15  purview of the Clean Water Act.

16      Significant nexus is missing here.  Plaintiffs'

17  case of significant nexus is based almost exclusively on

18  flow.  The only thing plaintiffs have shown is that

19  water can flow through the wetland to Stream C south of

20  Copper Park Lane and that given that the area contains

21  copper, it is possible for copper to go with that flow.

22  There's absolutely no evidence of how much water flows

23  from the wetland to Stream C south of Copper Park Lane.

24  There's absolutely no evidence of how often water flows

25  from the wetland to Stream C south of Copper Park Lane.

1    There's no evidence of the duration of any flows from

2    the wetland to Stream C south of Copper Park Lane.

3         At most, plaintiffs have established a hydrologic

4    connection of unclear significance.  Justice Kennedy

5    made clear that mere hydrologic connection is not enough

6    to establish a significant nexus between a wetland and a

7    traditional navigable water.  This is particularly true

8    in a situation like we have here where Stream C south of

9    Copper Park Lane is small, irregularly flowing, and

10   according to plaintiffs' own expert has gaps in it even

11   when it is running.  Nothing about this wetland has been

12   shown to impact Stream C in any significant way, let

13   alone impact the Flambeau River.

14        Regulation of the wetland must be left to the

15   state, which as this Court is well aware, has engaged in

16   constant vigilant oversight of the FMC site for almost

17   20 years.  Plaintiffs have not met their burden of

18   showing that federal laws should intervene here.  Thank

19   you.

20             THE COURT:  Thank you.  And I will continue to

21   take the motion under advisement.  All right.  Then

22   Mr. Van Camp, do you wish to say anything before you

23   start in the way of a statement or do you wish to start

24   with your first witness?

25             MR. VAN CAMP:  No, thank you.  I think that was

1   certainly adequate.  I appreciate the opportunity

2   though.  May we call our first witness then?

3           THE COURT:  Yes.

4           MR. VAN CAMP:  Okay.  At this time Flambeau

5   Mining Company would like to call Ivan Shanks.

6           **IVAN SHANKS, DEFENDANT'S WITNESS, SWORN,**

7                      DIRECT EXAMINATION

8   BY MR. VAN CAMP:

9   Q    Good morning.

10  A    Good morning.

11  Q    I understand you had a long night driving down

12  here.

13  A    That's right.

14  Q    I appreciate it.  Please tell us your name.

15  A    Ivan Shanks.

16  Q    Mr. Shanks, where do you live?

17  A    I live in Cameron, Wisconsin.

18  Q    Could you tell us for the record where that is.

19  A    That's in Barron County.  It's approximately an

20  hour north of Eau Claire, Wisconsin.

21  Q    I'd like to begin your testimony this morning with

22  a history of your employment.  Could you begin with the

23  first employment that you had following -- well, let's

24  start even earlier than that.  Why don't you tell the

25  Court about your education.
                    IVAN SHANKS - DIRECT

1   A     High school graduate, some junior college, and

2   since 1973 it's part of my job and certifications with

3   various states for water and wastewater treatment.  Just

4   ongoing continuing ed every year.

5   Q     Okay.  Well, let's break it down a little further

6   if you would, please.  Beginning in 1973, if you could

7   tell and if you can remember who you were employed by

8   and what the nature of your employment was at that time.

9   A     In 1973 I lived in Illinois.  I started work for

10  the Village of Lake Zurich.  It was a little

11  municipality in Lake County, Illinois, operating a

12  couple different wastewater treatment plants and working

13  on their collection system and some work with their

14  water system.  Just general operations and maintenance.

15  I stayed there until 1980.

16        And at that point I started work for Lake

17  Barrington Shores Homeowners Association.  And that was

18  a pretty large development and we had our own wastewater

19  treatment plant, water system, collection system, lift

20  stations and such, and I operated that until -- from

21  1980 until 1993.  At that point, I left there to come

22  work for Flambeau Mining Company in Ladysmith.

23             THE COURT:  In 1983?

24             THE WITNESS:  1993.

25             THE COURT:  '93.
                    IVAN SHANKS - DIRECT

1          THE WITNESS: '93 I started. I believe it was

2     in January I started with Flambeau --

3          THE COURT: So you were with Lake Barrington

4     until '93?

5          THE WITNESS: That's correct. 1980 until 1993.

6     And I left there to come work for Flambeau Mining.

7     BY MR. VAN CAMP:

8     Q    Are you employed by Flambeau Mining at this time?

9     A    No, sir.

10    Q    By whom are you employed now?

11    A    Now, right now since 2004, I've worked for the

12    St. Croix Chippewa Indians of Wisconsin.

13    Q    What type of work do you do for them?

14    A    I'm a utility supervisor; take care of their water,

15    all their wastewater systems and a lot of monitoring,

16    testing, reporting and general operation maintenance of

17    several systems.

18    Q    I'd like to take you back to your employment with

19    the Flambeau Mining Company if I could.

20    A    Sure.

21    Q    Would you please tell the Court from the time you

22    started working with Flambeau Mining Company until you

23    left the types of work that you did for them.

24    A    Well, I was -- I took care of all the water, was

25    like the Water Treatment Supervisor was the title, and
                    IVAN SHANKS - DIRECT

1   we operated the water treatment plant.  We did a lot of

2   site work.  Took care of vehicles.  Generally anything

3   we needed to do that wasn't really mining.  Somebody

4   else was doing the mining, Ames Construction, but

5   primarily the water treatment.

6   Q    Tell the Court, if you would, what you mean by

7   *water treatment*.  What goes on at the Flambeau or what

8   went on at the Flambeau Mine site regarding water

9   treatment at that time.

10  A    There was a treatment plant designed to treat the

11  Type II wastewater.  It wasn't really like municipal

12  wastewater like people are typical hearing.  Sewage.

13  This was just runoff water from the waste rock

14  stockpiles and then stormwater would come in contact

15  with it and it would get collected in ponds.  We would

16  treat the water and discharge it.

17  Q    And what types of runoff are we talking about?

18  A    What types?

19  Q    Well, I mean where did the water come from?

20  A    Oh, it came from the stockpiles.  The whole site

21  was designed so the water stayed in the mine -- on the

22  mine property.  Everything flowed in, and everything

23  went towards the pit.  We had two ponds:  A runoff pond

24  and a surge pond, and those both had open flows back to

25  the open pit.  And so water was collected in the ponds

                    IVAN SHANKS - DIRECT

1    above the treatment plant, and water from the pit where

2    the mining was going on was pumped up to the ponds.

3    Q    Okay.  And what were the -- what were the ponds

4    kept for?  What was the purpose of the ponds?

5    A    Well, for storage.  To storage.  And they were

6    lined.  They had a HDPE liner in them to protect the

7    ground.

8    Q    Okay.  And after the stormwater runoff went into

9    these ponds or into the pit and then was pumped from the

10   pit to the ponds --

11   A    Um-hmm.

12   Q    -- what was done with the water after it came or

13   where it did go from the ponds?

14   A    From the ponds -- well, we would -- it would pump

15   into the treatment plant from the surge pond and we

16   would forecast all our flows and how we were going to

17   operate.  We could do some startups and shutdowns.

18   Nothing like happened by accident or just start it up

19   and let it go.  We forecast what we were going to do,

20   what flow rate, and how long we were going to run, how

21   many shifts.  So any agency who wanted to sample, plus

22   we were sampling, we had to -- we were sampling

23   continuously while we're running it.  And we would --

24   the water would come in the treatment plant -- do you

25   want me to go through the treatment process?

                  IVAN SHANKS - DIRECT

1           THE COURT:  When you say you were forecasting.

2           THE WITNESS:  Sure.

3           THE COURT:  Let's say it's Monday morning, what

4    are you going to do about forecasting when you get to

5    the plant in the morning?

6           THE WITNESS:  Oh, okay.  Say we didn't run all

7    weekend and we're starting Monday morning, you're going

8    to look at the levels of your ponds.  The surge pond is

9    where the water that you're going to pump into the

10   treatment plant is being stored at and the runoff pond

11   is a place where we can start the plant, and rather than

12   discharge to the river, we can discharge the plant

13   effluent to the runoff pond while we're doing a lot of

14   monitoring to make sure we're in compliance with our

15   permit before we start discharging.  So we've got room

16   to adjust the plant and get the process working real

17   well.

18        Monday morning you'd come in and look at your pond

19   levels and you could look at your pit flows too and see

20   how much water came from the pit, and you would do an

21   inventory what you've got.  You'd look at the level in

22   the gallons and say this is how much water I've got.

23   Then you would factor in how much water is coming from

24   the pit each day total or gallons per minute.  You would

25   look at the weather and get an idea what's happening

                    IVAN SHANKS - DIRECT

1  with the weather, if there's any storm events predicted.

2  And then the opposite of storms, if it was very warm,

3  you may want to conserve water so we could supply road

4  water for dust control.  Because dust was a huge

5  concern.  We made sure we had plenty of water to keep

6  the roads watered, so we didn't want to run out.

7          THE COURT:  And what water would you use for

8  those?

9          THE WITNESS:  Treatment plant effluent.  We had

10 a tank, a fire water tank where we could get some -- we

11 have a big fire pump on it and we would store effluent

12 in there.  Plus there was a device on it where the water

13 truck would pull up and draw water out of that.

14         THE COURT:  So the water came from the pit

15 to --

16         THE WITNESS:  Into the ponds.

17         THE COURT:  -- the runoff pond first?

18         THE WITNESS:  Well, to the surge pond.

19         THE COURT:  It went from the pit to the surge

20 pond.

21         THE WITNESS:  Correct.

22         THE COURT:  And when the surge pond got full,

23 then it would go to the runoff?

24         THE WITNESS:  Actually if the surge pond ever

25 got full and we couldn't treat the water for some reason

                   IVAN SHANKS - DIRECT

1   or it was just -- we were overwhelmed with flow, it

2   would overflow right back to the pit.  And so did the

3   surge pond -- runoff pond.  But that never happened

4   either.  We didn't let that happen.  We got real good

5   at --

6         THE COURT:  So you're working out of the surge

7   pond to treat the water.

8         THE WITNESS:  Correct.

9         THE COURT:  When does the runoff water get

10  treated?

11        THE WITNESS:  The runoff pond, we would

12  discharge to that, like I said, to get the plant started

13  and do the monitoring.  Then we could pump from the

14  runoff pond, that water would be pumped to the surge

15  pond and then into the plant.

16     Now we also had valving and options.  They had

17  everything covered really well there, I thought, where

18  in the event we had to maybe do some work on the pond,

19  we could pump the pit pump directly into the treatment

20  plant and we could pump the runoff directly into the

21  plant.  So that was pretty --

22        THE COURT:  But the water for the roads was

23  treated.

24        THE WITNESS:  It was treated water.  That's

25  correct.

               IVAN SHANKS - DIRECT

1          THE COURT:  And what about the water that you

2     didn't use for fire or for road treatment?  What

3     happened to that water that was --

4          THE WITNESS:  As long as it met the permit and

5     was -- well, we had -- we wouldn't discharge unless we

6     were at half the permit limit.  We wanted some safety

7     built in there, so when we were half the permit limit,

8     we would discharge the water to the Flambeau River.  And

9     there was -- and during the discharging, you would

10    typically get the plant started up and the operator

11    would be discharging to the runoff pond and then he

12    would do some analysis.  You'd look at your pH, our

13    turbidity, look at your copper, and you'd generally do

14    more than one sample.  You didn't look at one sample in

15    the lab and say well, the copper is good.  We're within

16    half the permit limit.  Let's discharge.  You'd probably

17    do another sample or two to make sure you're trending

18    down, make sure it's really steady, and then you'd start

19    discharging.

20          THE COURT:  To the river.

21          THE WITNESS:  To the river, correct.  However,

22    there was also at the -- where you would discharge the

23    effluent, there's turbidity and pH probes and there was

24    some safeguards in there where if the turbidity started

25    changing or the -- and you could find a correlation with

                    IVAN SHANKS - DIRECT

1    suspended solids there.  Or if the pH got out of range,

2    I mean it would still be within permit, but we could see

3    something was changing.  There was an automatic valve

4    that would close and wouldn't allow you to discharge

5    until you corrected the problem.

6            THE COURT:  Was it a direct discharge to the

7    Flambeau River?

8            THE WITNESS:  Yes, it was.  Yes.

9            THE COURT:  Through a pipe?

10           THE WITNESS:  Through a pipe.

11   BY MR. VAN CAMP:

12   Q    So just so that we have a very clear understanding

13   of the flow, first of all where did the flow typically

14   go from the pit?

15   A    Surge pond.

16   Q    And where did the flow go from anywhere on the site

17   where you were storing things that had been taken out of

18   the pit?  If you have runoff from any of the piles that

19   had been excavated from the pit, where did that

20   stormwater runoff go?

21   A    Well, the Type II, that was over one percent, that

22   would go to the surge pond.  And then there was the less

23   than one percent, so if there was some Type I, there was

24   some settling ponds out there at the other side closer

25   to the pit.

                    IVAN SHANKS - DIRECT

1    Q    Describe the difference between Type I and Type II?

2    A    That was the percent sulfur content of the waste

3    runoff.

4    Q    So if it was high enough under the permit, the

5    water didn't run off the property; is that true?

6    A    It just didn't run off the property, period.  You

7    didn't want water running off.

8    Q    Okay.  So when water gets to the surge pond, it's

9    pumped into the treatment plant; correct?

10   A    Correct.

11   Q    Why don't you tell us what happened in the

12   treatment plant.  How did that function?

13   A    Okay.  That would go back -- we'd have our forecast

14   and determine we're going to treat this much water every

15   day at this flow rate, work this many hours.  That's all

16   established.  Then we'd set our flow rate.  The water

17   would come in.  It'll go into a neutralization and mix

18   tank was the first step.  You're doing some pH

19   adjustment there with some lime.  We had a lime slaker

20   and a lime tower.  We add the lime, adjust the pH, and

21   we bring the pH up, and then we'd add some polymer.  All

22   of this was based on tests the operators would do and

23   establish the exact pH, the exact dose of polymer to get

24   the ultimate, the best treatment.  And there were probes

25   in that neutralization mixed tank to give us our
                         IVAN SHANKS - DIRECT

1   information and confirm it with the lab.  And it's

2   basically just a huge tank, it's taking all the

3   particles, the solids and the water, and making them

4   into really bigger pieces so you could separate them

5   from the water.  It wasn't just like a muddy mire that

6   just sits there and stays dirty, you're making particles

7   that you can remove.

8       So go into that tank, get mixed up with that lime

9   and polymer, then it would leave the tank and go outside

10  to another tank called a *clarifier* that does just what

11  the name suggests.  The water would go in the mixture we

12  made and it would have time to settle to the bottom of

13  the clarifier.

14      All the solids that settled on the bottom, there's

15  a big collection system on the bottom of the clarifier

16  that collected that and put a portion of it back into

17  the neutralization and mix tank to mix with new water

18  coming in.  If the solids got excess solids, there was a

19  wasting tank we sent it to for disposal.  The clear

20  water then from that clarifier would go over a weir,

21  come back into the treatment plant, and we would adjust

22  the pH again.  We'd adjust the pH down.

23      It's like a polishing step.  We'd add some sodium

24  sulfite, which would help remove some more copper, and

25  then it would go through some filters, dual media

                    IVAN SHANKS - DIRECT

1  filters, sand and anthracite.  That flow with the lower

2  pH would go through the sand filters and then get

3  collected and the pH would be adjusted again with

4  clarified milk of lime to raise the pH up between 6 and

5  9.  And then it would go to the final effluent tank and

6  the sample would be collected there automatically every

7  thousand gallons.  PH was monitored and the turbidity,

8  and that's where the automatic valve was.  And if that

9  pH -- our limit was between 6 or 9 for pH.  We'd

10  probably have it set like six-and-a-half to

11  eight-and-a-half.  So if the pH got anywhere near there,

12  that valve would close and we're not discharging.

13       You'd check your lime to make sure that's running

14  properly; have your instrument tech check your probes

15  and make sure everything is right and keep your pH in

16  line or you couldn't discharge.

17  Q    Okay.

18  A    Now the effluent, too, was diverted to the fire

19  water tank as the level called for it.  You'd be

20  discharging to the river, but if a bunch of road water

21  starts getting drawn out of the tank and the level would

22  drop, the water would keep the fire water tank filled

23  rather than go to the river.

24       THE COURT:  And is this all computerized I

25  assume?

                    IVAN SHANKS - DIRECT

1          THE WITNESS:  Yes, it's all -- there's a SCADA

2     System.  Supervisor Controls And Data Acquisition.  And

3     it's got an operator interface.  The operator can put in

4     set points for his additions to help the treatment.  He

5     can monitor his tank levels, his pumps, and set flow

6     rates and control everything.

7          THE COURT:  So if you see that something is

8     off, like the pH or something, you don't have to do that

9     calculation in your head each time to figure out how

10    much more you have to do --

11         THE WITNESS:  Oh, no.  There were duplicate pH

12    probes in each tank, and the operator could see the

13    probes on the screen.  It would say you want to run the

14    neutralization mix at 9.5.  It would vary a little bit,

15    but you'd say -- and 9.5 is working well with this

16    water.  You'd do your set point and if -- and then we

17    had some -- in the PLC, Programmable Logic Controller,

18    our instrument person, we had some controls in there

19    where if the probes get maybe like half a pH unit apart,

20    they need some maintenance.  We wanted them probes to be

21    -- it would tell us something is off somewhere.  And we

22    kept it really, really tight.

23         So there was a lot of maintenance on the probes.

24    And I said we had duplicate probes.  We weren't

25    depending on one probe because it's giving you a number.

                    IVAN SHANKS - DIRECT

1  You want to confirm it and make sure it's a good number.

2  And so we spent a lot of time doing that.

3      The probes were also giving information to the

4  valves that would put the lime addition in.  A valve

5  would open and close at different speeds.  If the pH

6  started dropping with the water coming in, the valve

7  would open and let a little more lime in.  As the pH got

8  stable, the valve would close and put less lime in just

9  to try and keep -- you wanted to keep a real steady

10  state of everything.  You didn't want it drifting all

11  over.

12      We had a full-time instrument and control

13  technician that that's all he did was -- because they

14  was so important.  He watched over all of that.

15  BY MR. VAN CAMP:

16  Q   I'd like to go back to the pit for a moment.  Could

17  there be an issue as to whether there was too much water

18  in the pit?

19  A   Well, from the miners, yes, they would say there's

20  too much water in the pit.  But say we had a big storm

21  event, remember we talked about the forecasts we would

22  do, and a lot of rain coming down, runoff coming in the

23  surge pond, runoff pond from the stock piles, you can't

24  control that.  It's coming in.  Whatever it is it is.

25  It's coming in.  But we can control the pit pump, the

                    IVAN SHANKS - DIRECT

1  pit flow coming into the surge pond.

2      As part of this doing this forecasting or these

3  storm events once they would start, we would look at the

4  rate it's coming in, we'd look at how much runoff is

5  coming into the pond, and long before it had a chance to

6  get ahead of us, we'd say well, it looks like this

7  runoff is going to be happening for a long time.  The

8  surge pond is filling at this rate.  I'm going to shut

9  the pit pump off, leave that water down there because I

10  don't want to deal with it up here.

11      And if you did keep pumping it up and you neglected

12  to do that, all that was going to happen, it's going to

13  go back into the pit anyhow.  You can only take so much

14  water in that pond and it's gonna -- there's a huge line

15  running right back to the pit.  It's all going to go

16  back there anyhow.

17      So rather than have that overflow happen through

18  the pipe into the pit, we just shut the pump pit off.

19  You would go out there and put a lock on it.  We had a

20  real strict safety policy.  We'd put a lock on it and it

21  had a tag with your picture on it.  I did on several

22  times, I'd go down there and lock the pump out so the

23  contractor can't run it.  Nobody can turn that pump on

24  except me or whoever put their lock on rather.  It's

25  locked out.  Nobody is going to run it.  And the water
                    IVAN SHANKS - DIRECT

1  would just sit in the pit.

2  Q     And would that affect mine operations?

3  A     Sure.  Shut it right down.

4  Q     So did you get complaints from people in the pit

5  that they wanted some of the water out of there?

6  A     Sure.  They want to work.  But that didn't matter.

7  They understood that that was the policy; that's the

8  rule.  You know, it would just be a course of work, hey,

9  when are you going to get the pump on?  What's going on?

10 And we would explain well, we need to have room for the

11 runoff water.  We can't take the water from the pit now.

12 Q     Okay.  So if somebody from the mine, the pit,

13 called you and said you know, we've got too much water

14 down here.  We can't mine.  Pump it out.  If you

15 couldn't handle the water, what would you do?

16 A     Just leave it locked up and wouldn't pump it.  It

17 would stay there.

18 Q     Okay.

19 A     There was no question about it.  That was first.

20 The mining was -- the order of the things there, the way

21 it had to be done was you had to do it safely.  I mean

22 if there was a big huge storm and a safety issue, we

23 wouldn't even be allowed to go out there.  I mean it was

24 really -- if you couldn't do it safe, you didn't do it.

25       The next step was you've got to protect the
                      IVAN SHANKS - DIRECT

1   environment.  And then if all that's dealt with and it's

2   good and everything is according, then you could go

3   ahead and do the mining.  That's just the way it worked.

4   Q    Few minutes ago you mentioned at one point if you

5   were approaching half of your permit limit.

6   A    Okay.

7   Q    Do you recall that testimony just a few minutes

8   ago?

9   A    Well, it wasn't if we were approaching it, but we

10  put a policy in place to discharge -- we wouldn't

11  discharge until we were half our permit limit or less.

12  Q    Okay.  I want to get some terms just clarified.

13  A    Okay.

14  Q    When you talk about *discharge* --

15  A    Um-hmm.

16  Q    -- what are you talking about?

17  A    Letting treatment -- water treatment plant effluent

18  go down the pipe and out to the Flambeau River.

19  Q    Okay.  And then the other term I want to make sure

20  we have a clear understanding about is *effluent*.  Tell

21  me what the effluent was from this water treatment

22  facility.

23  A    Effluent is just -- you could have effluent from

24  individual units.  Like the clarifier, there could be

25  clarified effluent.  That's the water that's leaving the

                    IVAN SHANKS - DIRECT

1  clarifier.  But to be more specific, I should say final

2  effluent.  That's what we were discharging.  It was the

3  final effluent from the treatment plant.

4  Q    Okay.  And the final effluent from the treatment

5  plant that was pumped out went out to the Flambeau River

6  in what sort of a conveyance?

7  A    A pipe.  And then there was some rip -- down below

8  the river there was like an outfall with some -- a lot

9  of riprap.

10 Q    And when you were operating the plant, were you

11 aware of the type of permit that you had for that

12 discharge?

13 A    Oh, sure.

14 Q    And what type of a permit was it?

15 A    WPDS permit.

16 Q    Now let's go back to the testimony about half of

17 the permit level.  Tell me -- just tell us first of all,

18 what do you mean by half of the permit level?

19 A    Well, for instance, our copper was 50 parts -- it

20 was 50 parts per billion micrograms per liter.

21 Q    What does that mean exactly?  If your permit was 50

22 parts per million, what does that mean?  What can you

23 do?

24 A    That means we wouldn't discharge if it was over 25

25 parts per billion.

IVAN SHANKS - DIRECT

1   Q    Okay.  And the 25 is the half that you were

2   working --

3   A    That's half the permit limit.

4   Q    Okay.  And whose decision was that?

5   A    I don't recall an individual, but I know the people

6   that were involved in making the decision.  We all had

7   input into it.  And John Murphy, Environmental Director,

8   definitely had a hand in it; the general manager, the

9   operations manager.

10  Q    And what was the decision that was being carried

11  out by the water treatment facility as it relates to

12  this 50 percent of the permit limit?

13  A    I don't understand exactly what the question is.

14  Q    Okay.  Earlier in your testimony you indicated

15  something about discharging at 50 percent of the permit

16  limit.

17  A    Um-hmm.

18  Q    And I'm asking you what decision was made regarding

19  discharges at 50 percent of the permit.  What did you

20  understand that decision to be?

21  A    Well, we wanted to have some, I guess some cushion

22  or -- we wanted to make darn sure there wasn't a mistake

23  in the lab, maybe the independent lab we're sending the

24  samples out to or maybe the state's lab or our lab.  We

25  didn't want to have a problem with an instrument or

                    IVAN SHANKS - DIRECT

1  something and think we're discharging -- say our limit

2  is 50 and we're discharging 40 and it turns out gee, it

3  was really 51, 52.  We just didn't want that.  That was

4  just absolutely not going to happen.

5       So a decision was made -- and I think there was

6  some discussions with the lab people about the accuracy,

7  how close they could analyze these samples.  And there

8  was just a general consensus about we wanted to be at

9  half that permit limit just so we'd feel real good about

10 it.  I think we ended up averaging a lot less than that.

11 Q    Okay.

12 A    I mean we didn't --

13 Q    That's what I was just about to ask you.

14 A    Oh, okay.  Guys would -- you wouldn't be running at

15 25 parts per billion, maybe 20.  Maybe when you're

16 starting up.  Sometimes it was a lot lower when you'd

17 start up.  It depended on what the conditions were.  But

18 a guy -- you wouldn't just sit there and watch it run

19 out and go wow, we're at half the permit limit.  There

20 was like always a continuous improvement mode we had to

21 be in and it was -- it was just what you did.  It was

22 like part of the culture there.  I never seen it like

23 anywhere else.  It's just you automatically did it.

24      Operators would go down and do some testing and try

25 different pHs, different polymers, different flow rates,

                    IVAN SHANKS - DIRECT

1  and different backwash rates and just try a lot of

2  different things to keep getting that number down.  And

3  that's what they'd do their whole shift, try to get it

4  as low as possible.  It cost a lot more and it took a

5  lot more time, but you just did it because you could do

6  it.

7       The facility was -- it was a beautiful facility,

8  state of the art, so -- and that's what the guys -- you

9  were there to operate that plant, so you might as well

10 do it the best you can.

11 Q    And so if you folks worked at that, what kind of

12 levels were you able to reach?

13 A    Oh, geez.  We would definitely -- we could

14 definitely get like, I don't know, probably 4 to 5 range

15 parts per billion.  I think if I remember -- I don't

16 know if I can tell you exactly.  I think we averaged

17 around 12 or 13, through the whole project, parts per

18 billion.

19 Q    And that would be under a permit that permitted how

20 much?

21 A    Fifty.

22 Q    Were you aware while you worked there of other

23 efforts at the mine site to protect the environment?

24 A    Well, with the water or anything?

25 Q    Anything.

                    IVAN SHANKS - DIRECT

1    A    Anything.  There was -- let's see, what was the big

2    concern.  Spills was a big concern.  You didn't want to

3    spill anything onsite.

4    Q    Like what?

5    A    Well, you had a lot of equipment running in and out

6    of the pit:  Haul trucks, and dozers, water truck,

7    grader, you had a lot of equipment, a lot of pickup

8    trucks.  Any equipment like that, them big trucks, maybe

9    a hydraulic hose could break or an oil leak or

10   something.  They're driving up from the pit.  There were

11   a lot of instances they'd have a hose break and they'd

12   lose some fluid.  What everybody had to do was you had

13   to come to a stop -- the operator of course instantly

14   would see a problem and he'd want to drive up to the

15   shop and then they'd try and pull that, they'd face the

16   rapid -- the Environmental Department didn't care for

17   that.  And he wanted them to stop and then we'd get

18   people out with shovels and it's something that -- what

19   I would think most people would just consider a little

20   incidental spill, a few drops of fluid, they wouldn't

21   think about it, but we'd get out there with shovels and

22   our Environmental Department and shovel up the little

23   strip of fluid that leaked and get it in a barrel and

24   inspect the area and make sure it's in order, tag that

25   equipment out, get some pads underneath it so it can't

                    IVAN SHANKS - DIRECT

1    leak anywhere, and minimize the amount that hit the

2    ground.

3         If there was equipment at night, somebody would go

4    by and inspect it too.  They'd put pads underneath the

5    equipment.  You know how you'll see parking lots with

6    big oil spots and the gas station and all that, you

7    didn't see that there.  Just didn't happen.

8         You didn't kick some dirt over something if you saw

9    it.  Nobody would even consider anything like that.  You

10   took care of it.

11        Dust was a big control.  I guess like I said we

12   used the water for dust suppression.  We were doing some

13   site stabilization, and our department had to get hay

14   bales.  At final stages when we were stabilizing the

15   site for the winter, this was a -- we would -- the

16   contractor would, say, get finished with the dozer and

17   the grader and get it to a certain grade, areas of the

18   site, and then our job was to go through, my department,

19   because the water was winding down, we would go out and

20   disk the area up, put some seed in it, and then we would

21   take bales and put them through this large machine and

22   blow mulch all over and another person would crimp it.

23   And we had a real system going with all this

24   equipment --

25             THE COURT:  What's crimping?
                     IVAN SHANKS - DIRECT

1      THE WITNESS:  Crimping is just something you

2  run over the straw when you put it down.  You blow all

3  the straw out on the ground and you run a little -- you

4  just drag another piece of equipment over.  It sort of

5  mashes the straw into the ground so the wind won't blow

6  it all away.  You want it to stay where you placed it.

7  So that would get done.

8      And what I remember is we used to have to plan this

9  real careful because we would get zero dust outside our

10  fence.  We don't want any dust getting anywhere close.

11  So we'd have to work in conjunction with the contractor

12  real close that's doing the final grading and make sure

13  that we had different areas prepared to work that day

14  because if the wind changed, you didn't want to be

15  blowing that straw out and have the wind come.  If

16  you're working in an area near the fence, we would watch

17  it real close and if it looked like it was going to blow

18  any hay towards the fence or sometimes the winds change

19  directions, we wanted another area to go work in so we

20  wouldn't be blowing things out.

21      You know, maybe there were monitors around and the

22  highway was there, and you just didn't want to be a

23  nuisance to people or have dust out blowing around.  So

24  we didn't do it.

25  Q    While you worked for Flambeau Mining Company, did

                    IVAN SHANKS - DIRECT

1  you have an idea whether they were concerned about the

2  Wisconsin environment?

3  A    That was pretty much the focus.  We had to get

4  reminded all the time.  We did everything safely;

5  protect the environment.  It was like I said before, the

6  mining was almost secondary to all that.  All we talked

7  about was safety and environment, protecting the

8  environment.  And you would -- you would get to where

9  you would anticipate things.  You just -- maybe a

10  maintenance guy, I mean we were all pretty much, most of

11  us, new to the mining.  I had never worked in a mine

12  before.  We were treating water in a mine.  It just --

13  but you got to where you just started thinking a lot

14  more.  There was a real awareness of it and you wouldn't

15  -- a guy would go out and maybe he's going to work on a

16  piece of equipment, any maintenance person, maybe

17  they'll have a can of oil sitting there.  They're going

18  to pour in something and a little bit will drip.  Our

19  maintenance guys didn't do that.  They've been doing it

20  their whole lives, but they didn't do it there.  They'd

21  put pads around and they'd be careful and they'd dispose

22  of it properly.  Just little incidental things people

23  started doing a little extra all the time.

24  Q    And was that the culture there while you were

25  there?

                    IVAN SHANKS - DIRECT

1    A    Yeah, that's what -- it got to where it wasn't --

2    and it started from day one when we all started.  And

3    you know, we were all sort of taken aback a little bit

4    going geez, what did we get into here.  This isn't the

5    way we did it.  But after awhile, it's just automatic.

6    It was a real good habit to learn.  But when you leave,

7    it's a problem sometimes because it's not like that

8    everywhere else.  And when you take that with you,

9    sometimes people look at you and wonder why are you

10   doing this this way.  We learned a lot there.

11           MR. VAN CAMP:  I have no further questions for

12   this witness.  Thank you.     (9:40 a.m.)

13           MR. MENSHER:  Thank you, Your Honor.  I'm going

14   to have a couple quick questions if you don't mind.

                    CROSS-EXAMINATION

16   BY MR. MENSHER:

17   Q    Mr. Shanks, my name is Dan Mensher.  I haven't had

18   a chance to meet you or see your lovely mine site in

19   northern Wisconsin.  I'm from Portland, Oregon, but I

20   lived here for quite a couple years, so... in northern

21   Wisconsin.  Quite a big fan.

22       Now Mr. Shanks, you said that you started working

23   at Flambeau Mining Company in 1993, I think; is that

24   right?

25   A    I believe it was January of '93.
                    IVAN SHANKS - CROSS

1   Q     Okay.  And how long did you work there?

2   A     I think I was there -- I didn't -- it was some time

3   in the early summer of '98.

4   Q     Okay.  And why was that the end of your employment

5   there?

6   A     Well, I actually probably could have stayed a

7   little longer but we all had -- it was pretty much

8   wrapped up then.

9   Q     Because this was an active mining phase --

10  A     That was done.  Most of the reclamation, it was

11  pretty much into it.  And then we had the opportunity --

12  I found another position open that I wanted to take

13  advantage of and the mine was real good about letting us

14  interview --

15  Q     That's great.

16  A     -- and let us relocate.

17  Q     That's terrific.  So in other words, all of your --

18  the discussion about the treatment and sampling,

19  et cetera, that was during the active mining phase

20  here --

21  A     Yes.

22  Q     -- at Flambeau Mine.  Okay.  So your description of

23  the things that you did at the mine are pretty

24  impressive.  It sounded like this was a lot of work.

25  A     It was -- I've never worked harder.
                    IVAN SHANKS - CROSS

1   Q     Sounds like there was lots and lots of things like

2   sampling; right?  You guys did a lot of sampling in and

3   around the mine?

4   A     Well, no, I didn't do sampling.  They kept that

5   separate.  We were operating it.  Somebody else would

6   collect the sample.  We wanted to keep it all spread out

7   a little bit there.

8   Q     Sure.  It sounds like you were doing a lot -- you,

9   I mean Flambeau Mining Company, the environmental team

10  at Flambeau Mining, were doing a lot of sampling.  A lot

11  of monitoring.  Sounds like there was a lot of the

12  treatment as well that was going on of the wastewater --

13  A     Sure.

14  Q     -- that was coming out of the pipes into the

15  Flambeau Mining.  And you talked a lot about, as I

16  recall, the levels that you were trying to meet, so the

17  effluent limitations; is that right?  And you talked

18  about how you'd try to have a 50 percent margin of

19  error.

20  A     Sure.

21  Q     And so again, for the Court, that -- that -- that

22  discharge you were talking about, the effluent discharge

23  is coming out of pipes into the Flambeau River; is that

24  right?

25  A     Right.

                    IVAN SHANKS - CROSS

1    Q     And how many outfalls were there at the mine site?

2    A     From the water treatment?

3    Q     Yeah.  From the water treatment plant.

4    A     There was one outfall.

5    Q     There was one outfall from the treatment plant.  So

6    do you -- you talked a little bit about where those

7    limits came from and I think you said that it was from a

8    WPDES permit.  Can you tell me a little bit about the

9    WPDES permit?  Do you know where it came from?

10   A     That's from the state.

11   Q     Okay.

12   A     It's a Wisconsin Pollutant Discharge Elimination

13   System.

14   Q     Got it.

15   A     You either have that or you have a National

16   Pollutant Discharge Elimination System.

17   Q     Okay.  So in other words, the mine had a Clean

18   Water Act permit it's your understanding; right?  And so

19   that permit was what established those limits that you

20   were trying to reach?

21   A     Correct.

22   Q     Okay.

23   A     Then we had internal limits also.

24   Q     Got it.  So you had some internal limits that were

25   driven to meet and make sure that you had sort of that
                    IVAN SHANKS - CROSS

1  safety margin to the permit.

2      Do you know if you, in your course of work,

3  et cetera, with that permit, did you often review the

4  WPDES permit and some of the requirements in it?

5  A    Well, for all of the operators that went to take a

6  Special K certification test with the Wisconsin

7  Department of Natural Resources, it's an operator

8  certification for the plant.  Part of that -- it was --

9  it's specific for industrial plants.  So it's mostly

10  essay and you would draw a flowchart of the plant, and

11  part of that test was to write your permit from memory.

12  Q    Interesting.  So in other words, you had to become

13  pretty familiar with the contents of that WPDES permit.

14  A    Sure you did.

15  Q    Well, that's interesting to know.  And in that

16  permit, do you remember are there not just sort of

17  numeric limits, but there are other sort of actions

18  that --

19  A    Oh.

20  Q    -- narratives and things you had to do with the

21  permit at the site to comply with the permit?

22  A    Um-hmm.

23  Q    Yeah.  So what kinds of things were in the permit

24  that you had to do, if you can remember any of them.  I

25  know the class, it sounds like it was a while ago.
                    IVAN SHANKS - CROSS

1  A     There were certain -- there was a whole list

2  besides copper of other elements you would test for.

3  Q     Um-hmm.

4  A     And then there were some -- can't tell you exactly,

5  there were some conditions, based on your results, how

6  your frequencies could change.  You had to monitor for a

7  certain amount of time, then the frequencies could

8  change.

9  Q     Right.

10  A     It talked about maintaining -- general like most of

11  the permits do to maintain the system properly.

12  Q     Got it.  So in other words, this was a pretty

13  comprehensive permit; right?  It really sort of

14  comprehensively set --

15  A     Oh, they are.

16  Q     -- get set how you were going to be monitoring and

17  running your stormwater or your waste water treatment.

18  A     And then it had how, if there should be any kind of

19  event outside the permit, there was some conditions on

20  doing the proper notifications and --

21  Q     Got it.  So I guess it would be fair to say that

22  your WPDES permit was really important in directing how

23  the treatment facility was run.

24  A     Oh, sure.  Yes.

25  Q     So without that permit, you would have had maybe

                    IVAN SHANKS - CROSS

1  internal guidelines, but there wouldn't have been that

2  sort of highly regulated structured system; right?

3  A    With those numbers that was in there, there was a

4  lot of study.

5  Q    Got it.

6  A    They just weren't grabbed out of the air.  They

7  were --

8  Q    Sure.  So again, the WPDES permit, the Clean Water

9  Act permit is sort of fundamental in making sure that

10 this plan is being a good neighbor it sounds like is the

11 goal.

12 A    Um-hmm.

13 Q    Do you -- did you have any familiarity at all with

14 any of the discharges from the biofilter that we've been

15 talking about here for the last few days?

16 A    No.

17 Q    No?  That all sort of post-dated what you're doing?

18 And do you know if the biofilter has a WPDES permit for

19 the discharges?

20 A    I have no idea about the biofilter.

21 Q    Got it.  And so I --

22      MR. MENSHER:  I think that's all, Mr. Shanks.

23 I hope you have a less trip hope and less hectic

24 tonight.  Thank you, Your Honor.

25      THE COURT:  Mr. Van Camp.
                    IVAN SHANKS - CROSS

1          MR. VAN CAMP:  Nothing further.

2          THE COURT:  Is Mr. Shanks free to leave?

3          MR. VAN CAMP:  Yes.

4          THE COURT:  You're free to leave.  You're done.

5          THE WITNESS:  Okay.  Thank you.

6       (Witness excused at 9:47 a.m.)

7          MR. VAN CAMP:  Al Christianson, please.

8     **ALAN CHRISTIANSON, DEFENDANT'S WITNESS, SWORN,**

9                   DIRECT EXAMINATION

10   BY MR. VAN CAMP:

11   Q    Good morning.

12   A    Good morning.

13   Q    Please tell us your name.

14   A    Alan Christianson.

15   Q    Where are you from, Mr. Christianson?

16   A    Ladysmith, Wisconsin.

17   Q    Are you employed in that area?

18   A    I'm the City Administrator at Ladysmith.  I've been

19   in that position since January 1, 1986.

20   Q    Are you familiar with an operation known as the

21   Ladysmith Community Development Corporation?

22   A    Yes.  I've been the Secretary for probably 20 plus

23   years.

24   Q    Okay.  How did you first become familiar with what

25   has become the Flambeau Mine at Ladysmith?
                   ALAN CHRISTIANSON - DIRECT

1   A    I heard about it when I was a high school student

2   about the discovery of the ore body.

3   Q    And have you had any involvement since then?

4   A    Considerable.

5   Q    If you don't mind going back to the beginning of

6   your involvement, at least in your position as a City

7   Administration for the City of Ladysmith, can you take

8   us back to the first involvement that you had in that

9   mining project.

10  A    Okay.  In the mid 80s, the City of Ladysmith, which

11  was located directly adjacent to the project site,

12  formed a committee with the abutting Town of Grant and

13  also the County of Rusk and began having discussions

14  with Flambeau Mining about the proposed project.  That

15  went on into a formal process of negotiating, what was

16  called the *local agreement*, the first done in the State

17  of Wisconsin under current law.  In fact, we had started

18  that process just as something that we felt made sense

19  internally before it was legitimized by the enabling

20  legislation that the State of Wisconsin adopted.

21  Q    Typically who were the people who were committee

22  members?

23  A    I believe for the County of Rusk, it was the County

24  Board Chairman and the vice chair; for the Town of

25  Grant, the Town Board Chair and one of the side board

                ALAN CHRISTIANSON - DIRECT

1  members; the Mayor of Ladysmith, and I as Administrator

2  served for the City.

3  Q    Okay.  And you talked about a local agreement.  Can

4  you describe for the Court what that evolved to?

5  A    It really encompassed anything and everything that

6  we could imagine that would involve interaction between

7  the mine and the community, considering the three

8  governments collectively as community; anything from

9  zoning regulations to taxation issues and anything in

10 between.

11 Q    Okay.  And presumably the local community had its

12 goals and objectives?

13 A    Yes, it did.

14 Q    Okay.  Can you tell the Court what some of those

15 goals and objectives were for this local agreement that

16 you've referred to?

17 A    Firstly it would have been things like noise and

18 vibration, concerns about well contamination,

19 maximization of revenues, those types of things.

20 Q    And what was the involvement that this local

21 community had with Flambeau Mining people?

22 A    During formulation of the local agreement, I

23 believe we held 19 negotiating sessions.  During the

24 course of those we would ask questions that we had, not

25 being familiar with mining, wasn't in Ladysmith's

ALAN CHRISTIANSON - DIRECT

1   history, not in the area's history.  So we would ask

2   questions and Flambeau Mining was very good about

3   bringing in experts to testify on various aspects of

4   mining or taxation.

5        If we had a concern about blasting noise, they'd

6   bring in someone involved in that sector to talk to us

7   and bring us up to speed, as it were.  There was

8   somewhat of a learning curve that occurred over those 19

9   sessions to the point where the community became

10  relatively comfortable with what was proposed.

11  Q    Over what period of time did these 19 meetings take

12  place?

13  A    I believe it was no less than eight months; eight,

14  nine months.  Might have even been longer than that.

15  Q    Did you get a feel for, at that time, Flambeau

16  Mining Company's willingness to deal with the local

17  community?

18  A    Yes.  It was excellent.  I thought they went out of

19  their way constantly and in every manner to meet our

20  needs.

21  Q    What did that series of meetings between the local

22  community and the mining company result in?

23  A    It resulted in a document referred to as the *local*

24  *agreement* which incorporated by reference a conditional

25  use permit, which contained essentially the local zoning

              ALAN CHRISTIANSON - DIRECT

1   authorization to proceed with the project.

2   Q    And did you understand that the local community had

3   any, shall we say, power to require some sort of a

4   permit?

5   A    Yeah, absolutely.  Without the zoning, the project

6   simply wouldn't have gone ahead.  And without zoning,

7   the state permits couldn't have been achieved, so we

8   knew we had that power and we felt we had even more

9   power by working together as a collective community

10  unit.

11  Q    And with that power and with the zoning, were the

12  zoning laws changed to permit this project?

13  A    Anyone that works with or in or about local

14  government would recognize that a conditional use permit

15  is usually a tailor-made zoning document tailoring the

16  zoning to the specific project, and that's what this one

17  did.

18  Q    After this permit, if you will, existed and the

19  local agreement existed, you understood, did you not,

20  that the State of Wisconsin entered into a permit with

21  Flambeau Mining Company?

22  A    Yes.

23          MR. BENDER:  Objection.  Leading.

24  BY MR. VAN CAMP:

25  Q    Are you aware -- I mean were you involved in that
                    ALAN CHRISTIANSON - DIRECT

1    process at all?

2    A    I attended several of the permit hearings, yes.

3    Q    And you did that in an official capacity?

4    A    Yes.

5    Q    As a result of Flambeau Mining Company mining in

6    the area, did it have any effect on the local Ladysmith

7    community?

8    A    Positive or negative or both?

9    Q    Positive or negative or both.

10   A    It certainly had positive ones.  I'm not aware of

11   any negative effects.

12   Q    Would you tell us from the Ladysmith community

13   perspective what those effects were.

14   A    I would say that during the time it was in

15   operation certainly, and to an extent before and after,

16   Flambeau Mining Company was our leading corporate

17   citizen, bar none.  They were involved in anything the

18   community was doing hand in hand, supporting community

19   efforts, things of that sort.  Anything from sports

20   broadcasts to environmental awareness initiatives, and

21   bigger projects.  Flambeau Mining gave a key gift of

22   $500,000, which we matched with $500,000 of their own

23   taxes, and $350,000 of other community donations to

24   construct a new community library, for example.

25   Q    What about tax revenue?  Was there any effect on
                    ALAN CHRISTIANSON - DIRECT

1   tax revenue as a result of Flambeau Mining Company

2   operating in the area?

3   A    Yes.  Certainly.  During the period of mining, the

4   County of Rusk, Town of Grant and City of Ladysmith

5   realized probably nearly 10 million dollars in

6   mining-related taxes that wouldn't have been available

7   before or since.

8   Q    Were there any particular protections that you felt

9   were put in place specifically because of the mine to

10  protect the local community?

11  A    Yes.  Certainly.  Components of the local agreement

12  included things like limitations on blasting hours,

13  although as it turned out I don't recall anybody ever

14  hearing a blast.  But ahead of time we didn't know that,

15  so we built in these concerns.  Limit it to daylight

16  hours.  Security fences.  On and on and on.  As

17  Mr. Shanks testified, concerns about dust control, those

18  types of things were all addressed in that document.

19  Q    What about job opportunities?

20  A    The local agreement required that 75 percent of the

21  jobs at the mine, whether direct employees of Flambeau

22  Mining Company or their contractors, that 75 percent of

23  those employed would be hired from among local

24  residents, people who had been in place living there for

25  at least one calendar year, and in fact, they did

                 ALAN CHRISTIANSON - DIRECT

1  achieve that.

2  Q    How did that affect the local economy?

3         MR. BENDER:  Objection.  Foundation.

4         THE COURT:  Overruled.

5         THE WITNESS:  From one standpoint I guess there

6  may have been a concern about a lot of outsiders coming

7  in, being there for a short period and leaving because

8  most of the employees were, in fact, local folks.  There

9  really were only about 25 people that came in from the

10 mining industry from the outside and left afterwards.

11 So from that particular standpoint, there was very

12 little impact.

13 BY MR. VAN CAMP:

14 Q    Were the -- how is unemployment or how was it at

15 the time that the mining company moved in in that area?

16 A    Rusk County has been chronically distressed and,

17 probably since the 1970s at least, has typically ranked

18 about number three in economic distress in the state,

19 typically referring to measures like per capita income

20 and unemployment.  Fairly high.  High unemployment, low

21 per capita.

22 Q    So how did the community look at the prospect of

23 having another major employer in the area?

24 A    Well, we certainly recognized the Flambeau Mining

25 as being something that could help economically.  We
              ALAN CHRISTIANSON - DIRECT

1    didn't want to realize a boom-and-bust type of scenario

2    as might have been associated with that kind of industry

3    in decades past.  So we invested some of the mining tax

4    revenues in manners that we felt would avoid that and I

5    think were fairly successful in that regard.

6    Q    So do you think it's had a long-term effect as a

7    result of that?

8    A    Yes, absolutely.  We, in fact, invested in economic

9    development projects that I believe created in excess of

10   600 permanent jobs.

11   Q    Just give us examples of the types of investments

12   you're talking about.

13   A    We actually constructed industrial buildings and

14   were able to lease or sell those to companies that

15   either expanded or located into the area, and then in

16   fact through the sale or lease of those facilities, were

17   able to recycle those funds and carry that same program

18   on yet today so that we avoid that bust cycle that would

19   occur afterward.

20   Q    Just before I leave the local community agreement

21   entirely, as the City Administrator you were probably in

22   a position to sort of monitor the activities.  Would

23   that be true or not?

24   A    Yes.

25   Q    And how did Flambeau Mining Company do in terms of
                    ALAN CHRISTIANSON - DIRECT

1  complying with the conditions of that local agreement?

2  A    I'm not aware of any noncompliance whatsoever.  The

3  local agreement provided, for example, that they would

4  pay the maximum allowable taxes.  I know that that

5  happened.  Folks in local communities with distressed

6  economies want to get every cent they're due, and we

7  indeed did.

8  Q    It's hard for me to believe that throughout the

9  mining operation issues didn't come up at some point in

10 time during that process.  Is that true or not?

11 A    Are you talking about environmental issues?

12 Q    Any issues that needed to be discussed between the

13 community and the mine.

14 A    There were certainly things that came up.  I don't

15 know if I can put my hands on any specific one at the

16 present time.  I do know when I heard Mr. Shanks testify

17 to the culture of environmental protection, I witnessed

18 some of that as well.  I can't say that my city

19 employees were as good about oil spills as the mining

20 company.

21 Q    But did you feel as sort of responsible in some

22 respects for at least the City activities that the

23 Flambeau Mining Company was approachable if during the

24 mining operation there were issues that needed to be

25 discussed, did you feel like they were approachable?

ALAN CHRISTIANSON - DIRECT

1  A    Absolutely.  There was no problem at all.  You

2  could go -- as a local official, I'm sure that I

3  probably contacted the mine manager or somebody else on

4  the staff once a month or so.  Not usually big items,

5  but if I didn't get through immediately, I usually got a

6  call back within the day.

7  Q    There came a time when mining operations were

8  beginning to wind down and the reclamation process was

9  beginning.  Do you recall the local community

10 identifying some assets at the Flambeau Mining Company

11 that they would like to use?

12 A    Certainly.  There were assets in place that we

13 couldn't begin to replicate because of the money that

14 had gone into constructing them.  I know that the water

15 treatment plant that Mr. Shanks operated had cost in

16 excess of two-and-a-half million dollars.  There was a

17 mile-and-a-quarter of rail spur, some industrial sites,

18 and the actual mine administration building.  We did

19 whatever we could to retain those facilities and put

20 them to adaptive reuse for economic gain.

21 Q    Before we get to your adaptive reuse of those

22 facilities, did you understand or what was your

23 understanding about the -- what was going to happen to

24 those buildings and things under the original mine

25 permit in terms of reclamation?
               ALAN CHRISTIANSON - DIRECT

1    A    I believe that the mining permits required that all

2    of those onsite assets be removed and the site be

3    restored to approximately its pre-mining state.

4    Q    Okay.  Now have you been out to the Flambeau Mine

5    site since it has been at least shall we say 90 percent

6    reclaimed?

7    A    Many, many times.

8    Q    Would you describe for the Court what the reclaimed

9    mine -- the reclaimed portion of the mine site looks

10   like.

11   A    I would say that other than the so-called

12   Industrial Outlot, the balance of the site was returned

13   to its pre-mining state.  There are now some

14   recreational trails and those sort of amenities on the

15   site, but other than that I believe it's largely like it

16   was before mining occurred.

17   Q    And what types of recreational opportunities are

18   there on that site now?

19   A    There are several types of recreational trails.

20   There are equestrian trails in one location, hiking,

21   biking, cross-country ski trails in two different

22   locations either side of the Flambeau River, several

23   miles of trails.

24   Q    And if you're on those trials, what does the

25   environment look like around you?
              ALAN CHRISTIANSON - DIRECT

1  A    Looks like it does anywhere else in Rusk County,

2  maybe more attractive.  It was restored to prairie,

3  which is interestingly not native to the Rusk County

4  area in human history.  So it's kind of a unique

5  environment that way.  It's a prairie environment that a

6  lot of people use every day for walking their dogs or

7  jogging themselves, whatever it might be.

8  Q    As an individual having an interest in the welfare

9  of the community, would you consider that an asset of

10  Ladysmith at this time?

11  A    Absolutely.

12  Q    Let's go back to the Industrial Outlot and the

13  buildings that are there.  What interest did the local

14  community have in retaining those buildings?

15  A    We had had some success making adaptive reuse of

16  other industrial-type buildings in the past and felt

17  confident that we could market those buildings if we

18  were able to retain them, and in fact, have done so.

19  Q    Okay.  So what did you -- what were you involved in

20  to bring about the reuse of those buildings on behalf of

21  the community?

22  A    At the time they were being vacated, I was aware

23  that the Department of Natural Resources statewide was

24  making some changes in its, what they used to call a

25  series of ranger stations around the state, and they

              ALAN CHRISTIANSON - DIRECT

1   were going to a new format called *service centers*, which

2   were covering larger areas, multi-county areas

3   typically, and that there was at least a danger that the

4   Ladysmith ranger station would be phased out entirely;

5   that there would be no immediate DNR presence there.  So

6   in fact we marketed the former mine administration

7   building as a potential site for a DNR Service Center

8   and were successful in that, and it continues to operate

9   there today right on top of the mine site.

10  Q    And do you know what that building is used for by

11  the DNR?

12  A    Yeah.  It's a regional service center.  It houses

13  probably 12 administrative staff of various specialties.

14  Q    What was the arrangement that was reached between

15  Flambeau Mining Company and the local community with

16  regard to the leaving the buildings for the community?

17  A    Because the company had anticipated just

18  dismantling the building and selling it for scrap, they

19  had no particular need for any economic gain from it, so

20  agreed to lease it to the community for $10 annually.

21  Q    Is the community able to lease those facilities to

22  others for more than $10 a year?

23  A    Yes.  The Ladysmith Community Industrial

24  Development Corporation is actually the entity that

25  leases them from Flambeau Mining, and in turn, subleases

ALAN CHRISTIANSON - DIRECT

1    to the State of Wisconsin for DNR's use, and I believe

2    we realize about $50,000 annually from that lease.  The

3    corporation didn't have a lot of capital to work with

4    prior to that lease.  It currently represents in excess

5    of 90 percent of our annual operating income.

6    Q    Are there other tenants at that facility other than

7    the DNR?

8    A    Yeah.  Xcel Energy, the local power provider, is

9    also housed there.

10   Q    And is there a rental arrangement for them as well?

11   A    Yes, there is.

12   Q    And does that benefit the local community?

13   A    Yes, it does.

14   Q    And could you just tell us how?

15   A    Again, it's a source of revenue, and again, it

16   assured their continued presence in the community.

17   Q    Are there any other tenants there?

18   A    Not at this time.

19   Q    At the time that the request was made by the local

20   community to retain the buildings, what buildings and

21   facilities was the local community interested in

22   retaining.

23   A    There were three buildings on site.  One was the

24   administrative building that presently houses DNR; one

25   was the water treatment plant that Mr. Shanks operated

                    ALAN CHRISTIANSON - DIRECT

1  with others, and there was a truck garage, but that was

2  owned by Ames Construction, so it was not available to

3  us and was indeed dismantled and removed.

4  Q    What happened to the water treatment facility?

5  A    Per terms of the mining permits, it was gutted and

6  the treatment equipment dismantled and sold for scrap.

7  Q    Was the local community interested in gutting the

8  water treatment plant and dismantling it?

9  A    No, we would have certainly preferred to have

10 retained it and tried to market it for what it was built

11 for.  That was certainly its highest and best use.

12 Q    And why didn't that happen?

13 A    I believe that there was mining opponents who

14 wanted anything removed that could possibly be available

15 to allow a revisitation of the mine in the future.

16        MR. BENDER:  Your Honor, objection.  Lack of

17 foundation.  We'd move to strike that testimony about

18 what other people wanted or didn't want.

19        THE COURT:  Sustained.

20 BY MR. VAN CAMP:

21 Q    Were you personally aware -- I mean were you

22 interested in retaining it at that facility?

23 A    Absolutely.

24 Q    Did you express that interest?

25 A    Yes, we did.
              ALAN CHRISTIANSON - DIRECT

1   Q    And were you aware of the people who were

2   expressing contrary interests?

3   A    Yes.

4   Q    And who -- do you know who any of those individuals

5   actually were?

6   A    I know one gentleman who is now deceased that

7   expressed that type of opinion to me personally, yes.

8   Q    And who was that?

9   A    Rosco Churchill.

10  Q    Do you know whether any of the plaintiffs in this

11  lawsuit were among the group that were expressing that

12  interest to gut and get rid of the water treatment

13  facility?

14  A    I don't know that for certain.

15  Q    Okay.  Would the local community like to have that

16  water treatment facility today if they could?

17  A    Yes, along with the 25 acres of HDPE-lined ponds.

18  Q    And why is that?

19  A    Those could have been converted to aqua culture,

20  fish farming as it were, and been another economic

21  benefit to the community.

22  Q    And what happened to those?

23  A    Those were also similarly removed and landfilled.

24  Q    And whose idea was that?

25  A    It was required in the mining permits.
                    ALAN CHRISTIANSON - DIRECT

1   Q    What about the availability of rail service to that

2   location?  Was that of interest to the local community?

3   A    Yes, it was.

4   Q    And why is that?

5   A    The only interest that -- only significant interest

6   we had seen in the community in major industrial

7   expansion had been in rail-served sites because we're in

8   a Canadian National mainline that connects its

9   trans-Canada system with its U.S. system that runs

10  essentially from the Canadian border down through

11  Chicago to New Orleans, so it's a very heavily used

12  track.  So if we were to get an inquiry about an

13  industry locating into the area, they typically were

14  wanting access to that rail service.

15       So the availability of a spur served from that line

16  was significant.  And in fact, we have since then

17  invested about 1.8 million dollars in duplicating the

18  facility that we lost.

19  Q    When you say duplicating the facility that you

20  lost, just tell us what you lost and what you

21  duplicated.

22  A    Well, we have constructed a 140-acre industrial

23  park, rail-served industrial park, and if we had been

24  able to keep the spur into the Flambeau Mine,

25  theoretically we would have had a facility larger than

                   ALAN CHRISTIANSON - DIRECT

1  that without having to invest those kinds of dollars.

2  We were, in fact, actually able to keep a portion of the

3  spur that was off the active mine site and were

4  successful in attracting a 20 million dollar investment

5  into a wood pellet plant located on that site a few

6  years back.

7  Q    With regard to the local community, you have

8  referred to a $500,000 gift that apparently led to the

9  construction of a local library.  Do you recall other

10 things that the mining company did to benefit different

11 aspects of local community life?

12 A    Yeah.  There were things both small and large.  The

13 small things seemed endless.  I only know that it seemed

14 like every time I turned on the radio with the local

15 news, Flambeau Mining was sponsoring something.  But I

16 can tell you for a fact that we were able to use mining

17 grant revenues to build a new visitors center for the

18 community.  We had a facility that dated back to the mid

19 60s that was not at all handicap accessible.  It was on

20 a limited site where it couldn't be expanded.  We built

21 a new one as a replicate railroad depot from about 100

22 years prior that was about three times the size of the

23 old facility; used mining grant revenue to do that.

24 Built a new county airport with the same funding source.

25 Q    Those are some of the larger projects I would
                    ALAN CHRISTIANSON - DIRECT

1  assume.

2  A     Yes.

3  Q     What were some of the smaller projects that you can

4  think of?

5  A     Those get a little bit harder to remember.  But

6  again, the recreational facilities that we talked about.

7  Another area that struck me was Flambeau Mining was

8  never wanting people to hunt on their property for

9  safety reasons, but I know that they made it available

10 for special population hunts, elderly hunts, disabled

11 youth.  Special groups like that have been allowed to

12 hunt on the property under very controlled situations,

13 usually under the watchful eye of the Department of

14 Natural Resources staff in the area.

15 Q     Are you aware of any gifts or contributions to such

16 things as schools or various municipal departments?

17 A     Yes.  I know the City of Ladysmith partnered with

18 the Ladysmith School District some years back on a

19 project to update and enlarge the playground at our

20 local elementary school.  It was about a $90,000

21 project.  We were able to attract state grant funding

22 for 50 percent of that and Flambeau Mining provided the

23 local matching funds of 50 percent.  That would be just

24 another example.  So that would have been in the order

25 of 45/$50,000.  And there were lots of those things.

ALAN CHRISTIANSON - DIRECT

1    And they continue to this day.  Maybe not so

2 frequently as in the past, but they still continue some

3 sponsorships to this day; as recently as last week made

4 a small donation towards some display cases for a local

5 museum.

6 Q    Are there local activities that are -- like school

7 groups or anything can participate in on the mine site

8 facility?

9 A    Yes.  I know that probably in several instances

10 over the years local high schools, particularly their

11 science or environmental-type classes would do field

12 work on the site and did things like raise plant

13 materials and so on.  Some were used to revegetate the

14 site, but they were brought in and allowed access to the

15 site and to follow the progress and understand the

16 purpose of the revegetation.  So it enhanced their

17 educational experience I believe.

18 Q    Did the fire department benefit in any way that

19 you're aware of?

20 A    Yes.  One of the -- one of the water trucks that

21 was used to suppress dust on the site was given over to

22 the Ladysmith Fire Department as a tanker to provide

23 water supply for rural fires.

24 Q    Do you understand that the plaintiffs in this

25 lawsuit are complaining about a specific area of the

ALAN CHRISTIANSON - DIRECT

1   mine site?

2   A    Yes.

3   Q    What's your understanding of the area that they are

4   complaining about?

5   A    I believe it's stormwater that falls on the

6   Industrial Outlot, which the community wanted to retain

7   for the benefits it was expected to provide us and has.

8   Q    Do you know whether the plaintiffs in this case are

9   local Ladysmith people?

10  A    None that I'm aware of.

11  Q    On the monitor next to you is -- is there a picture

12  on the monitor next to you?

13  A    Yes.

14  Q    Have you had an opportunity to look at that

15  document?

16  A    Scroll up some.  I haven't seen the bottom of that.

17  Q    We've shown you now the second page of that

18  document.

19  A    Okay.

20  Q    Do you happen to recognize a signature on there?

21  A    Yes.

22  Q    Your own signature?

23  A    Yes.

24  Q    What can you tell us about this document?

25  A    Looks like one that I probably drafted some years

                    ALAN CHRISTIANSON - DIRECT

1    back.

2    Q    And what is it?

3    A    It's a -- it provides for a lease of the Flambeau

4    Mine's industrial facilities to the Ladysmith Community

5    Industrial Development Corporation.

6    Q    And has it occurred?

7    A    No.

8    Q    In other words, that agreement has been fulfilled?

9    A    Yes.

10            MR. VAN CAMP:  Move to admit Exhibit 642.

11            THE COURT:  Any objection?

12            MR. BENDER:  No objection.

13            THE COURT:  Received.

14            MR. VAN CAMP:  Thank you very much.  I have no

15   further questions for this witness.

16            THE COURT:  Oh, no.  That doesn't mean you can

17   leave.

18            THE WITNESS:  Wasn't quick enough.

19                    CROSS-EXAMINATION

20   BY MR. BENDER:

21   Q    Mr. Christianson, I have just a few questions.  I

22   promise it won't be much longer.

23   A    Okay.

24   Q    Mr. Christianson, you mentioned a couple of gifts

25   that the mining company made over the years.  The
                     ALAN CHRISTIANSON - CROSS

1   largest you mentioned was a half a million dollars; is

2   that correct?

3   A    Yes.

4   Q    Do you know how much the money made from the ore

5   deposit?

6   A    I do not.  I've heard speculation, but I don't know

7   that I've ever heard of an absolute figure.

8   Q    You also mentioned concern in the area that it was

9   economically distressed.  Do you recall that?

10   A    Yes.

11   Q    Would you say that the area is still economically

12   distressed?

13   A    Yes, but I would add that today that's a result of

14   the recent recession and the fact that our industrial

15   base was heavily in the housing industry.  Our two

16   largest manufacturers by far are window and door makers

17   that between them cut 8- to 900 jobs in late 2008, which

18   have not come back yet.  I don't think that has anything

19   to do with Flambeau Mining.

20   Q    How many employees are there at Flambeau Mining --

21   A    Were there?

22   Q    -- today?  How many are there?

23   A    Today?

24   Q    Yes.

25   A    One.
                    ALAN CHRISTIANSON - CROSS

1   Q    Has that been the same number since about 1998?

2   A    Yes.

3   Q    You also discussed the rail spur that was removed?

4   A    Yes.

5   Q    Do you know why that was removed?

6   A    We were allowed a short period of time to try to

7   find an end-user on it.  I believe the biggest reason

8   was that the site that was immediately available with it

9   was not very large, it was only about nine acres.

10  Typically the rail users that we see are looking for 1

11  to 200 acre-type sites, very large facilities.

12  Typically because there's a lot of outdoor facilities

13  involved with the types of operations they would have.

14  Q    Are you aware of whether the rail spur ballast was

15  removed because of copper contamination found there?

16  A    I'm not intimately knowledgeable about that.

17          MR. BENDER:  No further questions, Your Honor.

18          THE COURT:  Anything else, Mr. Van Camp?

19          MR. VAN CAMP:  Nothing further.

20          THE COURT:  Now.

21      (Witness excused at 10:24 a.m.)

22          THE COURT:  You may call your next witness.

23          MR. VAN CAMP:  Jack Christman.

24      **JACK CHRISTMAN, DEFENDANT'S WITNESS, SWORN,**

25          MS. MCGILLIVAY:  Your Honor, this witness was
                    ALAN CHRISTIANSON - CROSS

1   not given to us on our list yesterday.  This is an out

2   of order -- out-of-order witness that we weren't

3   provided any notice of.

4           MR. VAN CAMP:  He's the second one on my list.

5   I believe that I put him on the list.

6           MS. MCGILLIVAY:  Maybe, but that's not what you

7   communicated to us yesterday in your lineup for today.

8   We have Al Christianson, Fred Fox, Jim Hutchison in the

9   order that you provided yesterday.

10          MR. VAN CAMP:  Well, I provided a lot more than

11  that.

12          MS. MCGILLIVAY:  I'm sorry, I just was starting

13  with the first three.  And I can tell you what you told

14  us yesterday.  It was Al Christianson, Fred Fox, Jim

15  Hutchison, Bruce Moore, Steve Donohue, Phil Fauble,

16  Larry Lynch, Jim Bertolacini, and Ivan Shanks for today.

17          MR. VAN CAMP:  Well, I thought I had indicated

18  that Mr. Christman would be testifying.  His testimony

19  is going to be very short.  He's come down from

20  Ladysmith to testify.

21          THE COURT:  Could he wait until after lunch and

22  that would give the plaintiffs an opportunity to prepare

23  for cross-examination?

24          MR. VAN CAMP:  Absolutely.

25          THE COURT:  Would that work?
                    ALAN CHRISTIANSON - CROSS

1           MS. MCGILLIVAY:  Yes, Your Honor.  Thank you.

2           THE COURT:  Sorry, Mr. Christman.  I'm going to

3  ask you to wait until after lunch to testify.

4           MR. CHRISTMAN:  Okay.  Thank you.

5           THE COURT:  Thank you.

6      (Witness excused)

7           MR. VAN CAMP:  I'd like to call Jim Hutchison.

8      **JAMES HUTCHISON, DEFENDANT'S WITNESS, RECALLED,**

9           THE COURT:  You're still under oath.

10          THE WITNESS:  Okay.

11                    DIRECT EXAMINATION

12  BY MR. VAN CAMP:

13  Q    Welcome back.

14  A    Thank you.  It's great to be back.

15  Q    Mr. Hutchison, in your prior testimony you

16  indicated that you had been working on projects

17  involving the Flambeau Mining Company for quite some

18  time.  Just remind us what year it was that you think

19  you started working on Flambeau Mining Company projects.

20  A    1990.  And initially it was work in the office

21  regarding fulfilling the requirements of the mine

22  permit.  That was received literally months before I

23  started working from the regulatory agency to the

24  Flambeau Mining Company.

25  Q    Okay.  I'd like to draw you to a period beginning
                    JAMES HUTCHISON - DIRECT

1  in approximately 1997.  Do you recall what was going on

2  at the Flambeau Mining Company in the late 1996/1997

3  time period?

4  A    That was a period of optimum operation and movement

5  in terms of plans, in terms of activity on the mine

6  site, in terms of equipment moving.  It was -- the pit

7  was as deep as it was going to get.  There were plans

8  that were being generated for reclamation.  There were

9  handling -- it was the time frame when maximum use of

10  management tools were needed to treat and -- to capture

11  and treat discharge water; as has been brought up

12  earlier this morning, to make sure safety was maintained

13  onsite, and then it was just a very -- probably the

14  densest work time during the whole project.

15  Q    Okay.  When you say that the pit was as deep as it

16  was going to be, what are we talking about?

17  A    It was 225 feet approximately deep on the southwest

18  end and it was -- it was a long hole in the ground and

19  they were actually, in '96, excavating on one end and

20  the waste rock they were filling on the other, and then

21  they were getting ready and testing their methods that

22  they were going to use for pit backfill compaction and

23  also amendment with limestone.  They were doing that in

24  the pit at that time, as well as mining and performing

25  other operations.

               JAMES HUTCHISON - DIRECT

1   Q    You mentioned backfill had begun during that period

2   of time.  Over what period of time did the backfilling

3   continue?

4   A    At the end of '96, I believe they started

5   backfilling internally, meaning it was the first time

6   waste rock was developed and then placed after it was

7   amended within the pit itself at the end of '96.  Tests

8   were performed and we were documenting what was

9   happening, what was acceptable.

10       Then in the spring of '97 is when backfilling in

11  earnest began and amendment of stockpiled materials

12  began just immediately prior to that material being

13  placed in the trucks and then transported to the pit and

14  then compacted in place by the very trucks that

15  transported it.

16  Q    At what point in time would you say reclamation

17  began?

18  A    Well, actually reclamation was project long.  There

19  were plans in place for test plots to be developed at

20  the very early stages of the operation, and in these

21  test plots, seeding -- there were quadrants developed

22  and there were plans made to seed and then monitor the

23  seeding and see what practices worked on this particular

24  site using these particular soils and what seeds and

25  what methods didn't work.  And so you could literally

                JAMES HUTCHISON - DIRECT

1  say reclamation began right away.  But in the true terms

2  of reclamation, I would say reclamation occurred

3  starting at the end of 1996 with that first placement of

4  waste rock physically onsite.

5  Q    And where did the requirements for reclamation come

6  from?

7  A    There were requirements set forth within the mine

8  permit that was issued.  That was the Bible used to

9  develop any plans, any guidelines that we were using

10 onsite.  We had to refer to the mine permit to make sure

11 any of our plans met those requirements.

12 Q    So you became familiar with the mine permit, is

13 that --

14 A    Pretty much.

15 Q    Okay.  But when you say that that was the Bible

16 that you had to refer to for matters related to

17 reclamation, were you familiar with that?

18 A    Yes.

19 Q    Okay.  Originally as it existed within the permit

20 issued by the State of Wisconsin for the mine, what was

21 the plan for reclamation?

22 A    The plan as described in the mine permit

23 application which was approved by the mine permit was to

24 take everything on site, remove it, either place it in

25 the pit or place it in the construction landfill,

                    JAMES HUTCHISON - DIRECT

1  regrade the entire site, and place the entire site into

2  an approximate grade that it was before and general use

3  that it was before.

4  Q    You referred a couple of times to *entire site*.

5  Would that entire site that you referred to include the

6  area that is at issue in this case that involves the

7  Industrial Outlot?

8  A    Yes.

9  Q    And what was the reclamation plan originally for

10  the area that is currently the Industrial Outlot?

11  A    That whole area was going to be dismantled,

12  regraded, surface soils placed and amended and placed

13  back into the pit.  The topsoil stockpile that was

14  onsite was going to be spread over the top of that and

15  it was going to become planted and seeded and placed

16  back into approximate preexisting conditions.

17  Q    Why didn't that happen?

18  A    It didn't happen because of the request from the

19  local authorities wanted to make use of the facilities

20  and the mining company entertained that, that thought.

21  Q    And what were the changes to the reclamation plan

22  or changes to the mining permit, which included the

23  reclamation permit, as a result of that?

24  A    There was a Supplemental Reclamation Plan that was

25  developed that outlined the specific area that has come

JAMES HUTCHISON - DIRECT

1    to be known as the Outlot where everything else was

2    going to be reclaimed as it was stated in the mine

3    permit application.  But within that designated area

4    called the Outlot, things were going to not be as

5    described in the mining permit application.  There was

6    changes.  And those changes included keeping structures

7    in place, keeping the rail in place, and basically use

8    the existing techniques of erosion control and best

9    management practices that were used on the other parts

10   of the site within this area for surface water control.

11   Q    About when did that occur?

12   A    That occurred in 1997 during the hectic time of pit

13   backfilling.

14   Q    When that occurred or at that time, were you aware

15   of any decisions that were made with regard to the water

16   treatment facility?

17   A    I thought it was my -- you could get a sense of the

18   Flambeau Mining Company's routine emphasis on safety,

19   and I think the initial thought, if I remember

20   correctly, was the mining company had a desire to keep

21   the water treatment plant there for potential treatment

22   of surface water.  It would be the ultimate best

23   management practice, if you will, for surface water

24   treatment.  And so initially I think that was the

25   desire.

                    JAMES HUTCHISON - DIRECT

1  Q    What happened to that desire by Flambeau Mining

2  Company?

3  A    I believe there were comments from opposition that

4  did not want that water treatment plant to remain in

5  place, and so it did not.

6  Q    What happened to the water treatment facility as a

7  result of those comments by other people?

8  A    The water treatment plant was gutted.

9  Q    If the water treatment plant had existed to handle

10  stormwater runoff, something had to be done to change

11  what was going to happen; correct?

12  A    That changed the whole thing.  If we could have

13  kept the plant there, we had two existing ponds that

14  were lined that could have been used just as they had

15  been before.  They had actually -- were large enough to

16  treat the whole site.  We're talking probably in the

17  nature of maybe 20 percent of that whole site is the

18  outlot.  That's give or take some percentage.  But the

19  Industrial Outlot is just a fraction of the whole site.

20      So the water treatment plant and those two ponds

21  could have easily handled any surface water that would

22  have been generated by those areas left in place.

23          MR. CASSIDY:  Your Honor, I'm going to object.

24  He's giving his opinion about how much those -- that

25  treatment plant could have handled.  It's an undisclosed

JAMES HUTCHISON - DIRECT

1  expert opinion.

2          MR. VAN CAMP:  Well, Your Honor, I think that

3  we're talking about familiarity with the Modification

4  Plan and how the facility was to be used under the

5  Modification Plan to keep the Industrial Outlot.  I

6  believe that's what he's described.

7          THE COURT:  But he never was disclosed as an

8  expert on that point, so I'll sustain the objection.

9          MR. VAN CAMP:  I'll ask the Court to let me

10  know, if she would, please, what part of that is being

11  excluded because much of it was not --

12          THE COURT:  Just the last sentence about the

13  ponds and the treatment plant would have been sufficient

14  to cover any problem with surface water.

15  BY MR. VAN CAMP:

16  Q    Was this treatment plant that you're referring to

17  the same treatment plant that had been handling all of

18  the water for the entire mine operation?

19  A    Yes.

20  Q    And under the proposed modification, what water

21  would that same plan have been required to handle?

22  A    It would have been required to handle surface water

23  that was generated by the area that drained to that

24  area, to the Outlot area.

25  Q    Okay.  Now, after the modification, were you aware
                    JAMES HUTCHISON - DIRECT

1  that an application was filed for modification?

2  A    Yes.

3  Q    Okay.  And was that approved?

4  A    Yes.

5  Q    After that was approved, what was essentially

6  retained as the Industrial Outlot?

7  A    It was approximately 32 acres, I believe, including

8  the rail spur that extended out, and so it was basically

9  the facilities that were in place during the mine and a

10 little area called the *Equestrian Trail Head*.  That's

11 what it's called now.

12 Q    And just describe what the Equestrian Trail Head

13 looks like now.

14 A    Well, it's a graveled road in an oval shape that

15 equestrian people use to bring their trailers and horses

16 and back into slots and they can park their vehicles.

17 It looks like a racetrack made out of gravel.

18 Q    Where does the runoff from that area that is the

19 equestrian trail go?

20 A    It goes -- now today?

21 Q    Yes.

22 A    It goes --

23 Q    Not actually today.  Let's say six months ago.

24 A    Okay.  The surface flow of water would ultimately

25 end up in the biofilter, the 0.9 acre biofilter we've
                   JAMES HUTCHISON - DIRECT

1  been talking about all week.

2  Q    And let's talk about the period of time between the

3  modification of the permit to allow for the retention of

4  the Industrial Outlot area and discuss projects that you

5  worked on from that time to present for Flambeau Mining

6  Company.  So will you begin back in about 1998, I guess

7  it would be, and come forward.

8  A    Okay.  Pursuant to the revised Reclamation Plan,

9  activities were performed onsite.  Basically the whole

10 site was -- that was under the original Reclamation Plan

11 was topsoil seeded and then the Outlot was developed

12 according to the new revised Reclamation Plan.  That

13 meant that there were some areas that were dismantled

14 approximately, and what I mean is there was a

15 possibility that the rail spur would be used, but it

16 wasn't known if it was really going to be used, but we

17 had to leave it in place.  So that was left in place.

18      There was very little grading that was done around

19 the structures because those structures were going to be

20 revamped into a new use.  And we didn't know what that

21 would be until the tenants arrived.  What happened

22 immediately was the surge pond was basically emptied of

23 all water and the liner was spray washed, then that

24 water decanted out and treated at a local treatment

25 plant.
                    JAMES HUTCHISON - DIRECT

1    The surge pond was filled, backfilled with soil to

2    a certain elevation and that design was in the revised

3    Reclamation Plan.  So there were construction details

4    that were associated with the Revised Reclamation Plan

5    that were followed to revamp that surge pond into the

6    0.9 acre biofilter.

7    I believe at the top of the biofilter, the liner

8    was actually cut, so it remained in place at depth, but

9    at the top of the berm it was just cut to allow

10   regrading of the berm around the outside of it.

11   So then there was a perimeter berm constructed

12   around the biofilter.  The biofilter was designed to

13   allow through put of water, meaning as rainfall fell, it

14   was collected and ultimately brought into the biofilter

15   at the northwest corner.  The biofilter was designed to

16   allow water to pass through it and then discharge at the

17   biofilter lower spot in the berm on the northeast corner

18   of the biofilter where it overflowed and flowed to the

19   east.  The biofilter was planted -- the soil was planted

20   with wetland plants and they thrived.

21   One aspect of that biofilter that a lot of people

22   don't realize is when you've got six inches down in from

23   the surface of the water in the biofilter, when you've

24   got a couple inches down into it, there was a mesh of

25   roots and the reason I know this is through the course

JAMES HUTCHISON - DIRECT

1   of the years I had to take sediment samps, and in order

2   to take sediment samples within the biofilter, the first

3   thing you do is you put a flat plate down that's a foot

4   by a foot so you can measure the depth of water at the

5   location where you're taking the sample so then when you

6   push the sample, you keep that depth of water and record

7   it and then you keep the depth that you push recorded so

8   you know exactly how far you pushed it into the

9   underlying material so you can see how much recovery

10  you've got.

11       It's a technical thing, but what happened was when

12  I tried to push that one foot plate, which is attached

13  to a bar, down into the biofilter, I couldn't get it

14  through easily because there was so much root material

15  in there.  So I had to fight --

16            MR. CASSIDY:  Your Honor, I'm just going to

17  object at this point to the narrative.  Nonresponsive.

18            THE COURT:  Sustained.  Actually we'll take a

19  break at this time.  Take 15 minutes.

20       (Recess          10:46-11:00 a.m.)

21            THE CLERK:  This Honorable Court is again in

22  session.  Please be seated and come to order.

23            THE COURT:  Mr. Van Camp.

24            MR. VAN CAMP:  Yes.  Thank you.

25  BY MR. VAN CAMP:
                  JAMES HUTCHISON - DIRECT

1  Q    I believe when we broke you were describing a test

2  facility and you mentioned something about some weeds or

3  some roots in the biofilter.

4  A    Right.

5  Q    Okay.  Let me just take you from there, okay?

6  A    Okay.

7  Q    After the construction, if you will, of the

8  biofilter or was there more that you wanted to refer to

9  about the construction of the biofilter?

10 A    About the only thing other than redoing the

11 biofilter and removal of the other pond on the other

12 side is there was a berm, east/west berm that was

13 installed to convey water from the west side of the

14 Outlot area eastward to the biofilter.

15 Q    And prior to that, where would that water have

16 gone?

17 A    Prior to this work?

18 Q    Yes.

19 A    It would have gone ultimately to the water

20 treatment plant.

21 Q    Okay.  Now after the biofilter was constructed,

22 what was the next project that you worked on for

23 Flambeau Mining Company after that?

24 A    Well, every year there's an annual report, so it

25 would have been the generation of the annual report

                JAMES HUTCHISON - DIRECT

1  where we provide input in terms of maps.  But the next

2  real task would have been in the 2003/2004 time frame --

3  Q    Let me stop you for just a second.

4  A    Sure.

5  Q    Sorry.  You mentioned the annual reports and you

6  spoke about them the other day.  Have you been involved

7  yourself in these annual reports?

8  A    I'm involved managing the people who draw the

9  figures and look at the data and get the data and there

10  are subcontractors that do trend analysis that I hire

11  through Foth that put appendices to the annual report

12  that we provide to Flambeau for the ultimate generation

13  of the report each year.

14  Q    So is this a report that you've been involved in in

15  more than one year?

16  A    Oh, yes.  Initially Foth & Van Dyke prepared the

17  annual report the first years, I believe it would have

18  been '91, '92, '93, and then after some period of time

19  Flambeau began managing that task.

20  Q    Give us an idea of the types of information that

21  was disclosed in these annual reports.

22  A    The annual reports -- there's four sections and

23  these are dictated by the mine permit itself that be

24  reported and there's a list upfront in the annual report

25  that clearly shows what the requirements are verbatim in

JAMES HUTCHISON - DIRECT

1  the permit and where you can locate them within the

2  annual report.  The basic gist of the annual reports are

3  to describe what's happened during the year at the site,

4  to disclose and summarize data that was collected at the

5  site, disclose any communications with the regulatory

6  agency that occurred during the year, disclose what

7  happened with the community and the Flambeau Mining

8  Company during the year, were there any special projects

9  or activities.  Basically just to give a description of

10 what happened at the mine site during that year.

11 Q     Okay.  I'm going to show you a document that has

12 been marked as Joint Exhibit 104 -- I'm sorry 1004.  Can

13 you tell me what that is?

14 A     That's the 2010 annual report.  So it would have

15 been the annual report for 2010.

16 Q     Were you involved in that?

17 A     Yes.

18 Q     In the same capacity that you had been before?

19 A     Yes, in the -- yes.

20 Q     You mentioned that there is a table of contents or

21 something; correct?

22 A     Correct.

23 Q     Drawing your attention to the third page of the --

24 I'm sorry, the fifth page of the 2010 annual report,

25 does this appear to be typical of annual reports
                    JAMES HUTCHISON - DIRECT

1    prepared by Flambeau Mining Company?

2    A    It looks like the typical format, yes.

3    Q    And the things that you were describing are listed

4    here and identify the pages and so forth where they are?

5    A    Correct.

6    Q    And then typically in addition to a narrative, are

7    there things attached to annual reports?

8    A    Yes.  There's the -- tables that are shown here are

9    typical.  There's the location information key and then

10   that's the key I was talking about where it shows what

11   the requirement is in the mine permit and where you'll

12   find it in the text.  And then there's the milestone

13   table.

14       There's also two figures that are included with

15   every annual report.  I'm pretty sure they're always

16   labeled 4-1 and 4-2, as they are here, which show the

17   groundwater potentiometric surface contour maps for that

18   year, usually measured in October of that year at the

19   groundwater wells across the site.  And then there's a

20   mine pit cross section A-A, which is also included as a

21   figure.  And then these appendices are typical

22   appendices.  The stipulation monitoring submittals, of

23   course, occurred after 2007 they started appearing once

24   that agreement was there.  The other appendices A and B

25   are also in the annual report.
                    JAMES HUTCHISON - DIRECT

1   Q    And again, these are public documents?

2   A    Yes.

3          MR. VAN CAMP:  I'd like to move admission of

4   1004.

5          MR. CASSIDY:  No objection.

6          THE COURT:  It's received.

7   BY MR. VAN CAMP:

8   Q    These are fairly voluminous; correct?

9   A    Yes.

10  Q    And just give us an idea typically how big they

11  are, just in inches.

12  A    Oh, I would guess on a lean year it would be an

13  inch-and-a-half.  On a thick year, it would be

14  two-and-a-half to three inches.

15  Q    And there are such reports that people can look at

16  through the entire history of the mine?

17  A    Yes.

18  Q    And I'm assuming that depending upon the activities

19  of the mine, would those -- what they say in them and

20  what the appendices and different tables and things

21  show, would those differ?

22  A    They may differ a little bit.  There's an ongoing

23  conversation where we add to the text in some of the

24  sections where you can read what happened previously and

25  then the last part of the section is what just happened.

                JAMES HUTCHISON - DIRECT

1   So there are -- there's always new text for each annual

2   report.  You can read some of what happened in the text

3   also previously.

4   Q    Let me take you back then to the time period that

5   you were discussing.  We had, I think, completed the

6   construction of the biofilter.  The outlot was retained

7   by the local community.  Now what was the next project?

8   I think you said something about 2003 or -4 or something

9   like that.

10  A    Right.  There were ongoing monitoring activities

11  onsite that allowed grab samples to be sampled to

12  determine surface water conditions or soil conditions.

13  I think generally surface water was monitored.  And

14  during the course of the time frame between 2008 and

15  2002 or 2003, it was determined that there may be an

16  issue with the rail spur material because we had waited

17  to see if the rail spur was going to be used by the

18  municipality, and these are the local entities who are

19  leasing the site, and at some point there was a decision

20  made that the rail spur was not going to be used.

21  Q    Let me stop you for a second if you don't mind.

22  You used a term *grab samples*.  Just tell us what grab

23  samples are.

24  A    A grab sample is a sample that's taken out of the

25  blue at a location that may not have been ever sampled

                JAMES HUTCHISON - DIRECT

1  before and it's just to determine what's the status of

2  that material, if it's soil or surface water at that

3  location at that time during this day.  What's going on

4  there.

5  Q    And what would it typically involve?  I think you

6  mentioned soil and water.

7  A    Surface water.

8  Q    Is that what it basically involves or are there

9  other things?

10  A    It could entail air, it could entail groundwater,

11  it all depends on what matrices you have available to

12  you.  I think at this time the air monitoring was not

13  occurring anymore because production was ceased, so on

14  this site what we're talking about is either soil,

15  groundwater, surface water.

16  Q    All right.  And then as a result of the samples you

17  just described, you said there was some concern about

18  the rail spur?

19  A    Yes.  Because we had left the rail spur in place,

20  thinking it might be used, and then when the decision

21  came that we're not going to use it, then there was what

22  are we going to do with the rail spur.  And then the

23  thought processes started, and I don't know what time,

24  if it was 2001, 2000, 2002, but somewhere it was like

25  well, we may want to excavate.  And so before we do

JAMES HUTCHISON - DIRECT

1   anything, and again this is the mindset, the mindset

2   that was established earlier today regarding safety and

3   environment was still in place after production.  So

4   anything we did onsite, there was an emphasis on safety

5   and the environment.  And so before we -- we wanted to

6   characterize the rail spur material before we excavated

7   it.

8   Q     Could I stop you for just a second before we get to

9   the excavation of that?

10  A     Sure.

11  Q     Under the original Reclamation Plan before the

12  modification, before the City asked for use of the

13  buildings, what would have happened to the rail spur in

14  the original reclamation?

15  A     The rail spur would have been completely removed

16  and placed -- amended and placed back into the pit.

17  Q     And what would then happened over the place where

18  the rail spur had been?

19  A     There would have been an -- the rail spur was kind

20  of a bermed-up area, so that the ballast which exists

21  right beneath the rails and the subgrade beneath the

22  ballasts would have been excavated.  And so the

23  remaining material, the subgrade, would have been

24  sampled and tested, and then if everything was found to

25  be in order, meaning no areas of concern, it would have
                 JAMES HUTCHISON - DIRECT

1  been regraded, topsoiled, seeded, and it would have

2  looked like the rest of the reclaimed mine area.

3  Q    Okay.  So now let me take you back to where I

4  interrupted you regarding the -- you were thinking about

5  excavating the rail spur.

6  A    Right.  And so we needed to know what we could do

7  with the material.  If we were going to move it offsite,

8  we needed to characterize it.  So there was an initial,

9  if I remember correctly, there were surface samples

10  obtained and it was found that there was concern of the

11  surface ballast material because there were high copper

12  levels in the ballast on the west side of Highway 27.

13  Q    Okay.  That's on the mine property?

14  A    Yes.

15  Q    And that's within or right near the Industrial

16  Outlot?

17  A    Right.  It's within it.

18  Q    And so what did you do when that was discovered?

19  A    Well, then we developed sampling plans; made

20  submittals to the Department of Natural Resources for

21  their review and comment to sample and then we sampled

22  on an approved sampling Plan.  We received results back

23  that indicated yes, indeed, there's an area of concern.

24  We identified then the depth and breadth of the area of

25  concern.  We then came up with a plan on how to deal
              JAMES HUTCHISON - DIRECT

1  with it and then we submitted that to the Department of

2  Natural Resources.  They came back with comments, and I

3  believe whatever comment they came back with, we

4  accepted and then we performed the -- at the approval of

5  the Department and then we excavated the material.

6  Q    When you say you *excavated the material*, just tell

7  us what happened.

8  A    Well, basically the rails were removed -- the rails

9  could have been removed independently because they sit

10 on the ballasts and they're relatively free of any

11 contact because they're laying basically on large stone

12 and they could have been removed and reused or removed

13 from the site.  So we no longer had rail.  We had to get

14 rid of or excavate and properly dispose of the ties and

15 the material beneath it.  So we got -- we sent the

16 results, the characterization work to the local landfill

17 and they approved receiving that material.

18     So then using conventional equipment:  Backhoes,

19 front-end loaders and dump trucks, we excavated the

20 material concerned and basically landfilled that

21 material and regraded the -- then we sampled the

22 subgrade where we excavated, documented those areas.

23 The concern was no longer there.  Then we topsoiled or

24 regraded and topsoiled and seeded that area.

25 Q    And what time period does this bring us up to at

                    JAMES HUTCHISON - DIRECT

1  this point?

2  A    Oh, middle to late 2004.  And we start -- we then

3  began a program of monitoring to assess what's going on

4  because we had this area of concern.  Again, we have a

5  mindset where we're not going to -- it wasn't -- the

6  Flambeau Mining Company was very -- they were very

7  adamant in let's get to the heart of the problem and

8  deal with it in a straightforward fashion.  And so we

9  began -- we submitted a Monitoring Plan to the

10  Department of Natural Resources and got approval and

11  started monitoring surface water at the site.  And

12  unfortunately, we noticed that the water, surface water

13  entering the biofilter was higher than what we expected,

14  so we knew that we had to investigate further.  It

15  became obvious the fact that the surface soils that were

16  left in place around the buildings may be a potential

17  source of concern for us.  So then we --

18  Q    Let me stop you again just for a second.  When you

19  say the *surface soils* around the building -- buildings,

20  what are we talking about?

21  A    We're talking about those buildings that were left

22  in place so they could be reused by the local

23  communities.

24  Q    And what surface soils are around those buildings?

25  A    Well, there were -- there was a gravel parking lot
                    JAMES HUTCHISON - DIRECT

1   that was around each of the buildings.  There may have

2   been an asphalt parking lot on one side of the eastern

3   most building that the DNR now inhabits.  But generally,

4   the surface soils that were existing in 2004 were the

5   same -- generally the same soils that were there during

6   operation.

7   Q    And so when you started doing sampling of those,

8   what was discovered?

9   A    Well, after submitting the -- and getting approval

10  from the Department, we sampled in kind of a shotgun

11  fashion across the whole parking lot area in those areas

12  that had potential for something, contacting either a

13  former truck excavator, whatever that was related to

14  operations.  We went to those areas and concentrated

15  surface sampling of the soil.

16       We did it also to depth, meaning it could be a 12

17  -- obtain a sample from 0 to 6 and then 6 to 12 just to

18  make sure if there was something encountered, we got to

19  kind of the -- we also determined how deep it was of

20  concern.  So we did the sampling and then we found some

21  spots of concern that we knew we had to deal with across

22  the site.  So then we made -- developed a plan to

23  address those concerns that was performed.  The

24  construction was performed in the 2005/2006 time frame.

25  Q    Was there any communication during that period of
                  JAMES HUTCHISON - DIRECT

1   time with the DNR about those concerns?

2   A    Constant communication.  As soon as we -- as soon

3   as we got results back, it wasn't long, and I mean

4   either days or weeks, maybe a month, and sometimes we

5   had to run verification of a sample result meaning we

6   have to -- we asked the lab are you sure and they sent

7   us back yeah, we are; no, we're not, whatever.  But it

8   was literally in a short time frame that we would

9   communicate with the Department because we knew, and it

10  was the tact of the company to keep the Department

11  informed, address the situation with a plan that was

12  based on data, and then effectively address the issue

13  that we were concerned with.

14  Q    And after concerns were handled in that matter

15  regarding the parking lot areas around these buildings,

16  what was done?

17  A    We submitted a plan and it was commented and

18  approved by the Department and there were areas where

19  excavation occurred across the gravel parking lot to

20  depth, meaning it could have been 18 inches or 20

21  inches.  We had key locations where we knew it was

22  deeper and what we did was we would sample and then we

23  would sample after we were done, to get a confirmatory

24  sample that we had gone deep enough.

25       When we addressed those areas, we basically took
                    JAMES HUTCHISON - DIRECT

1    six inches across the whole site off, regardless if it

2    tested an area of concern or not, we just took it off.

3    We brought in clean limestone material as a base and we

4    asphalted the whole parking lot area.

5         And then we also addressed the ditch, that

6    east/west ditch I talked about.  That ditch was

7    conveying all the surface water from this area and sent

8    it eastward to the biofilter.  That ditch was completely

9    excavated and new limestone riprap was brought in place

10   to facilitate that because it's hard to sample riprap,

11   we just as soon we had to deal with it.

12        So then we documented that work, and then we

13   monitored and the results after that work indicated an

14   immediate effect on the water going into the biofilter

15   where it dropped 90 percent in copper immediately.

16   Q    And about what time was that project completed?

17   A    I think it was completed in about 2006.

18   Q    Did you work on any other projects, Flambeau Mining

19   Company, after that?

20   A    There was one more location that we excavated.  We

21   determined the north side of Copper Park Lane, between

22   the biofilter and Copper Park Lane there's a ditch that

23   flowed east directly into the culvert, the north culvert

24   of the culvert that goes underneath Copper Park Lane,

25   and so we sampled surface water of water coming from
                    JAMES HUTCHISON - DIRECT

1  that short ditch.  It's only about 400 feet long or so,

2  and we sampled that surface water and it indicated --

3  this is an area of concern, that whole ditch.

4      So what we did was excavated that ditch.  Again, we

5  took samples beneath the exposed surface, backfilled

6  with clean material and seeded that area, and this was

7  done in 2008.  And that was -- I would call it the last

8  remediation effort before the regrading that was done,

9  started last year.

10 Q    Would you tell us whether or not that last ditch

11 that you were talking about, did -- did that water flow

12 or water that collected in that ditch -- first of all,

13 where did the water come from, if there was runoff water

14 going into that ditch?

15 A    It a very small area of capture.  It would capture

16 like the north half of Copper Park Lane right there,

17 that would runoff into the ditch, and the

18 southward-facing slope of the biofilter berm would flow

19 down into that, and so that area, that's it.  So for

20 that length, it was a very -- probably one of the

21 smallest areas of capture on the whole site.

22 Q    Did that water go into the biofilter?

23 A    No.

24 Q    After that, what projects did you work on related

25 to the Flambeau Mine site?
                    JAMES HUTCHISON - DIRECT

1    A    Then we kind of had addressed the site.  And again,

2    because of the overriding Flambeau Mining Company desire

3    for safety and environment, we were constantly thinking

4    of what could we do to further improve the site.  And

5    the last thing that was thought of was replacing the

6    biofilter with infiltration basins.

7    Q    When do you recall discussions about replacing the

8    biofilter with infiltration basins beginning?

9    A    It began some time after the last remediation

10   effort, probably 2009, 20 -- early 2010.

11   Q    And tell us what those discussions began about.

12   A    Well, there was a desire how can we -- how can we

13   address site surface water in the best way and use

14   onsite materials that doesn't require a lot of

15   maintenance and that will work, and so the infiltration

16   basins, three infiltration basins, were proposed.

17   Q    Okay.  Is there a picture on your monitor?

18   A    Yes.

19   Q    What does that -- what is that document?

20   A    It's a report.  The Copper Park Business and

21   Recreation Area Work Plan.

22   Q    And what's the date of that?

23   A    May 2011.

24   Q    And what is the subject matter of that Copper Park

25   Business and Recreation Area Work Plan?
                JAMES HUTCHISON - DIRECT

1   A    The subject matter is the construction of the

2   infiltration basins.

3   Q    Why don't you describe what -- first of all, what

4   an infiltration pond is and tell us how that differs

5   from a biofilter pond -- I'm sorry, an infiltration

6   basin versus a biofilter pond.

7   A    An infiltration basin is designed with the source

8   of surface water in mind.  It takes the area of

9   collection and the types of material that comprise the

10  vegetation and surface of that area and it addresses

11  collection of the water, surface water that would be

12  expected from that area, and it holds that water for a

13  given design rainfall event and allows the water to

14  percolate in at its base over time.  And then -- so you

15  have to know the size and the vegetation and surface

16  conditions and size of your ponds that way because it

17  allows percolation.

18       A biofilter allows -- this biofilter allowed flow

19  through of rainfall during a rainfall event.  It slowed

20  it up and it filtered the water.  An infiltration basin

21  doesn't allow any water to go over the rim of it.

22            THE COURT:  So it eventually empties by going

23  into the ground?

24            THE WITNESS:  Yes.  We --

25  BY MR. VAN CAMP:
              JAMES HUTCHISON - DIRECT

1  Q    I'm going to try to get a figure -- okay.  We've

2  placed a figure on the monitor.  Can you tell us what

3  that figure shows?

4  A    The figure shows the three infiltration basins that

5  were proposed.  There's a west one on the left that just

6  disappeared.  There's a west infiltration basin and then

7  a north infiltration basin and then the east

8  infiltration basin.  Together these three infiltration

9  basins collect and handle the water from the drainage

10 area for the outlot area --

11 Q    Now --

12 A    -- and beyond.  Whatever drains to this, these were

13 designed to handle.

14 Q    Beginning with the west, which is I think the one

15 on the left as we're looking at this photograph; is that

16 correct?

17 A    Correct.

18 Q    Where would the water come from that would go into

19 the west infiltration pond?

20 A    The water would come from an area approximately

21 like this.  (Indicating)  It's all dependent upon the

22 topography map and that area servicing about that much

23 land.  There's a divide here, right here.  (Indicating)

24 We resloped this east/west.  This is that east/west

25 trench that I talked about earlier.  We made a high

                    JAMES HUTCHISON - DIRECT

1  point here, and this flows this way and everything else

2  here flows towards it like this.  (Indicating)

3  Q    Okay.  And once the water from the area that you

4  have just described flows into that infiltration basin,

5  what is the infiltration basin designed to do with that

6  water?

7        MR. CASSIDY:  Your Honor, we'd object at this

8  point to undisclosed expert testimony.  This is

9  information that certainly requires specialized and

10 technical knowledge.  We filed a motion in limine here;

11 Your Honor ruled on it.  The defendant may not introduce

12 expert testimony on the subject of infiltration basins

13 that's not contained in 26(a) disclosures and there was

14 no such disclosure for this witness.

15       MR. VAN CAMP:  Your Honor, I think that this

16 witness is testifying about a plan that was put together

17 that he participated in; that he is telling what the

18 plan was designed to do.  I believe he can be permitted

19 to testify about that design and about what the design

20 was designed to do since he worked on it.

21       THE COURT:  Well, as long as he doesn't speak

22 as an expert, he can do that.

23       MR. VAN CAMP:  Okay.

24 BY MR. VAN CAMP:

25 Q    And so when this design was put together, what was
                   JAMES HUTCHISON - DIRECT

1   -- what was the design intended to do with the water

2   that was flowing into that pond?

3   A    To hold the water and to allow it to percolate into

4   the ground.

5   Q    Okay.  On this figure, you have drawn a line across

6   that blue ditch indicating that that was a high point.

7   What happens to water to the right of that in this

8   figure?

9   A    That water heads east and it's delivered to the new

10  east infiltration basin that is in the same area that

11  the former 0.9 acre biofilter was located.

12  Q    Okay.  Now were there any excavations or anything

13  done to change the -- what used to be a biofilter into

14  an infiltration pond?

15  A    Yes.

16  Q    What were those?

17  A    The biofilter had a liner underneath it which had

18  been filled with soil.  That material was sampled and

19  tested above the liner last year, found to be soil of

20  not concern except for the very surface of that soil a

21  couple inches right on the very surface.  Those couple

22  of inches were removed and placed into a local landfill

23  during this grading work.

24          The remainder of the soil was excavated and the

25  liner was punctured and removed as much as possible.  It
                    JAMES HUTCHISON - DIRECT

1  was down about nine to ten feet below the existing grade

2  and we have documented on a grid where we removed and

3  saw pieces of the plastic.  So we obliterate the liner,

4  which we must do if we want the water to infiltrate into

5  the underlying soil.  We had to obliterate that.  So we

6  documented that during construction.

7      So then we backfilled with material to design

8  grades, and those design grades were set by looking at

9  recent groundwater data and establishing at least three

10 foot of separation between the water table and the

11 bottom of our infiltration basin.

12 Q   And so is the water that goes into -- what is that,

13 the east?  Or is that the south?

14 A   That's the east.

15 Q   East infiltration basin, where would the water that

16 is designed to go into that infiltration basin be coming

17 from?

18 A   Well, it comes immediately from this parking lot

19 area and this area here is going there.  (Indicating)

20 There's a north infiltration basin that's collecting

21 water from the north, and if this gets filled, it

22 overflows into the east infiltration basin.

23 Q   I notice that you drew a blue line coming down from

24 the upper right of that figure.  If we move this down

25 and a little bit to the left, there are some lines up in
                    JAMES HUTCHISON - DIRECT

1   the area -- let me -- do you see on there the area where

2   the Equestrian Center is?

3   A    Yes.

4   Q    And could you circle that for us now?

5   A    Right here.  (Indicating)

6   Q    And where would the water go according to this

7   design from that area?

8   A    This water goes down here and this water goes into

9   here.  (Indicating)

10  Q    Okay.  Is there an area of the Industrial Outlot

11  that does not flow into these infiltration basins?

12  A    I don't think so.

13  Q    Okay.  And now when this design was being done, how

14  was it determined how large these infiltration basins

15  should be?

16  A    A 100-year 24-hour storm event was used to size,

17  give us a minimum volume required for each basin.

18  Q    And were you aware of any effort made to determine

19  what the largest storm over the last 100 years or so had

20  been?

21  A    We were concerned because we had heard stories that

22  there were 100-year storm events happening all the time,

23  so we did research into how often they actually did

24  occur.  There were three locations in the county that

25  had records.  One of them went back to 1906.  And we

JAMES HUTCHISON - DIRECT

1    looked at the highest rainfall event at each of those

2    three locations and found that our design rainfall

3    event, which is 5.98 inches, has never occurred at any

4    of those three locations that we had seen since 1906.

5    So we were comfortable with using the 100-year 24-hour

6    storm event as a design parameter.

7    Q    Was the design for this modification from the use

8    of a biofilter to the use of infiltration ponds

9    submitted to the Wisconsin Department of Natural

10   Resources?

11   A    Yes, it was.

12   Q    And can you tell us about the process involved

13   between the design and any communications with the

14   Wisconsin Department of Natural Resources?

15            MR. CASSIDY:  I'll object to the extent it

16   would involve hearsay, Your Honor.

17            THE COURT:  Sustained.

18   BY MR. VAN CAMP:

19   Q    Did you have communications with the DNR about

20   this?

21   A    Yes, I did.

22   Q    And what were the nature of the communications that

23   you had with the DNR about this?

24            THE COURT:  Without going into the details,

25   just the nature.
                    JAMES HUTCHISON - DIRECT

1           THE WITNESS:  Okay.  The nature was where is

2    the groundwater table and specific -- what were the --

3    what's the site geometries; what were our areas of

4    concern; how did you address them.

5    BY MR. VAN CAMP:

6    Q    And was there any sort of a permit involved with

7    the DNR for the work that involved these infiltration

8    basins?

9    A    The only permit I'm aware of was to fill in the

10   wetland, we had to get a permit for that.

11   Q    Okay.  Now after the permit was developed, was

12   there construction done and what is the status of that?

13   A    The permit was received last -- it was last year in

14   the fall, and so we immediately started construction of

15   the west basin.  It was constructed by November.  It

16   functioned through the winter.  It's functioning today.

17   There have been no issues with it.  It's functioning as

18   designed.  The --

19   Q    I'm sorry.

20   A    The other two were constructed during March of this

21   spring and they are currently in place, graded and

22   seeded.

23           MR. CASSIDY:  Your Honor, just object and move

24   to strike the testimony that's "functioning as designed"

25   as an expert opinion.
                 JAMES HUTCHISON - DIRECT

1          THE COURT:  Sustained.

2          MR. CASSIDY:  Thank you.

3          THE COURT:  Sustained.

4    BY MR. VAN CAMP:

5    Q    Are you aware of whether or not the water from the

6    areas that were designed to flow into the basins, is, in

7    fact, flowing into the basins?

8    A    It appears that the water -- I observed myself

9    water flowing from those areas; we thought would flow,

10   are flowing where they're supposed to go.

11   Q    And since the time that that has happened, are you

12   aware of any overflows from the water that's gone into

13   those basins?

14   A    No.

15          MR. VAN CAMP:  I believe 1002 is already

16   admitted, so I won't -- I believe that's accurate.  If

17   it isn't I would move for admission of --

18          THE COURT:  It is.

19          MR. CASSIDY:  I'm sorry, Harry.  We're looking

20   at Defendant Exhibit 628?

21          MR. VAN CAMP:  Right.

22          MR. CASSIDY:  Is that part of 1002?

23          MR. VAN CAMP:  No, it was the one I just

24   finished, they were drawings of infiltration basins.  It

25   was the Copper Park Business Plan.  I just wanted to
                    JAMES HUTCHISON - DIRECT

1  make sure that that had been admitted before I left

2  that.

3  BY MR. VAN CAMP:

4  Q    Drawing your attention to the screen beside you

5  there's a photograph, it's Defendant's 628.  Can you

6  tell me what that's a photograph of?

7  A    That's a photograph of the north infiltration basin

8  near.  There's a little channel that we're facing down

9  and then the east infiltration is beyond.  We're looking

10  south.

11        THE COURT:  What is the white that we're

12  looking at?

13        THE WITNESS:  White is a protective matting

14  that was placed over topsoil that was seeded and it's

15  for erosion control.

16        THE COURT:  But plants will grow.

17        THE WITNESS:  Yeah.  It's like a mesh that

18  plants can grow through.

19  BY MR. VAN CAMP:

20  Q    So as we're looking south here, this would be the,

21  for lack of a better term, the long narrow infiltration

22  basin that is furthest north on the diagram that we were

23  look at earlier?

24  A    Right.  Correct.

25  Q    I believe you indicated when we were talking about

                    JAMES HUTCHISON – DIRECT

1   that that there was a possibility that if this one were

2   to fill, that it would flow somewhere else?

3           MR. CASSIDY:  Leading.  Objection.

4   Q    Is that accurate?

5           MR. CASSIDY:  Objection.

6           THE COURT:  Objection is overruled.

7           THE WITNESS:  That's accurate.

8   BY MR. VAN CAMP:

9   Q    And can you see in this photograph the area where

10  that would occur?

11  A    Yes.  It's this channel right here.  It would head

12  away from us.  (Indicating)

13  Q    Okay.  Looking at the second image in Exhibit 628,

14  could you tell us what we're looking at here?

15  A    We're standing about where we were before.  Right

16  in front of us is the north infiltration basin.  The

17  former biofilter is to our right, which is now the east

18  infiltration basin.  The Wetland 7, which we had talked

19  about earlier this week, is right on the other side of

20  the water and right in here.  (Indicating)

21  Q    Okay.  Then let's take a look at the third

22  photograph in Exhibit 628.  Can you tell us what we're

23  looking at here.

24  A    Again, this is the near water is the north

25  infiltration basin.  Now we're kind of almost looking

                    JAMES HUTCHISON - DIRECT

1    east.  We're looking southeast.  The former biofilter is

2    to the upper right, and so we're kind of on the

3    northwest corner of the north infiltration basin looking

4    southeast.

5    Q    Okay.  And the fourth picture.  What is that?

6    A    Okay.  We're in the same location and we've turned

7    and we're looking straight south with the near water and

8    the north infiltration basin on its west end and we're

9    looking south over the top of the east infiltration

10   basin that's a little bit beyond.

11   Q    Okay.  And the fifth, what is that?

12   A    Okay.  Now we've gone to the east end of the north

13   infiltration basin and we're looking southwest.  So the

14   near water is the north infiltration basin, the former

15   biofilter or east infiltration basin is right there,

16   right here (indicating), and then the former wetland or

17   the -- Wetland 7 is right in there.  (Indicating)

18   Q    And then as we look at the sixth picture, if you

19   could tell us what we're looking at.

20   A    Okay.  I have to gain my bearings here.

21   Q    Do you see the telephone pole on the far left, very

22   far left edge of the photograph?

23   A    Oh.

24   Q    And then there's another telephone pole.  It's a

25   little hard to see, but it's right smack in the middle
                    JAMES HUTCHISON - DIRECT

1   of the photograph.  Do you see those?

2   A    Here?  (Indicating)

3   Q    Right.

4   A    Here.  (Indicating)

5   Q    Right.  Does that give you a bearing which

6   direction you're looking?

7   A    I'm trying to determine what's this white building.

8   Okay.  I know where I am.  I'm on the southwest corner

9   of the former biofilter.  This, I believe, is the H&H

10  building.  It's just that we haven't even looked at that

11  yet this week, the H&H building.  But --

12          THE COURT:  We're talking about the little

13  white spot on the left-hand side of the picture?

14          THE WITNESS:  Yeah.  That building is located

15  way north of the Outlot, so it kind of threw me.  I

16  thought I was looking at the buildings we had been

17  looking at before.  So we're actually looking northeast

18  across the former biofilter.  This is the east

19  infiltration basin.  The north infiltration basin is up

20  here, and the wetland we had been talking about all week

21  is right here.

22          MR. VAN CAMP:  Move for admission of 628.

23          MR. CASSIDY:  No objection.

24          THE COURT:  Received.

25  BY MR. CASSIDY:
                JAMES HUTCHISON - DIRECT

1  Q    Other than the one area that you circled where

2  there was sort of a low area between the north

3  infiltration basin and the east infiltration basin, you

4  know what I'm referring to?

5  A    Yes.

6  Q    Where there might be an overflow from the north to

7  the east, other than that, is there anything in the

8  design of these designing an overflow into them?

9  A    No.

10        MR. CASSIDY:  Objection.  Calls for expert

11 testimony.

12        MR. VAN CAMP:  Your Honor, I asked about the

13 design.

14        THE COURT:  The objection is overruled.

15        THE WITNESS:  No.

16 BY MR. VAN CAMP:

17 Q    Tell us whether or not these infiltration basins

18 were actually constructed to contain a 100-year storm.

19 A    We performed surveys once they were constructed and

20 determined they at least had the minimum volume and they

21 had some extra volume at each of the three infiltration

22 basins to actually hold a volume greater than the

23 100-year 24-hour storm.

24        MR. CASSIDY:  Object.  Calls for expert

25 testimony.  Move to strike.
                    JAMES HUTCHISON – DIRECT

1          THE COURT:  Sustained.

2    BY MR. VAN CAMP:

3    Q    At a minimum, were they constructed the way they

4    were designed?

5          MR. CASSIDY:  Objection.  Leading.

6          THE COURT:  Overruled.

7          THE WITNESS:  Yes.

8    BY MR. VAN CAMP:

9    Q    You have described in the period from the time when

10   the Industrial Outlot was initially conceived and

11   permitted to present a number of remediation or

12   additional efforts made by Flambeau Mining Company to

13   detect problems and to attempt to remedy them.  Tell us

14   whether or not any of those actions or construction

15   projects required enforcement action by DNR.

16         MR. CASSIDY:  Objection.  Relevance.

17         THE COURT:  Overruled.

18         THE WITNESS:  No.

19   BY MR. VAN CAMP:

20   Q    Were you involved in any of the contracting work

21   for the infiltration basins?

22   A    You mean contract negotiations with subcontractors?

23   Q    Right.

24   A    Yes.

25   Q    Do you know how much it cost Flambeau Mining
                    JAMES HUTCHISON - DIRECT

1  Company to create the infiltration basins?

2  A    The actual construction cost itself?

3  Q    Yeah.

4  A    The actual construction costs I believe are around

5  350 to $400,000.

6  Q    And prior to that time, obviously they paid for all

7  of the work for the design; correct?

8  A    Correct.

9  Q    Do you know what the total cost of that was?

10  A    Design I think was another 100 to 150,000.

11  Q    And this was a volunteer project?

12  A    Yes.

13         MR. VAN CAMP:  May I have one moment, Your

14  Honor?

15       (Pause at 11:55 a.m.)

16         MR. VAN CAMP:  Thank you very much, Your Honor.

17  I have no further questions for this witness.

18         THE COURT:  Mr. Cassidy.

19         MR. CASSIDY:  Thank you, Your Honor.

20                 CROSS-EXAMINATION

21  BY MR. CASSIDY:

22  Q    Good afternoon, Mr. Hutchison.

23  A    Hello.  Good mor --

24  Q    Yeah, almost.  Can you -- I'm actually going to go

25  back to your -- to sort of the beginning of your
                JAMES HUTCHISON - CROSS

1  testimony and when you were describing -- strike that.

2  You just talked -- you just testified about how much the

3  infiltration basin costs.

4  A    The construction costs and the design costs, yeah.

5  Not all costs.

6  Q    Okay.  And also -- and that was 350 to $400,000; is

7  that right?

8  A    For the approximate construction cost, yeah.

9  Q    How much did the biofilter cost to design and

10 construct?

11 A    It wasn't broken out that way, but roughly you

12 could take a third -- oh, you mean the biofilter.  I'm

13 sorry.  I misunderstood your question.  You mean the

14 actual biofilter?  I was not involved with the biofilter

15 design.

16 Q    You were working closely with Flambeau Mining

17 Company at that time?

18 A    Yes.

19 Q    Actually I think you testified pretty extensively

20 just a minute -- a few minutes ago about when that was

21 built and how it was built.

22 A    Correct.

23 Q    And you don't know how much it cost?

24 A    That's a completely different question.

25 Q    So the answer is no, you don't know how much it
                    JAMES HUTCHISON - CROSS

1  cost.

2  A    Correct.

3  Q    Did it cost more than the infiltration basin?

4        MR. VAN CAMP:  Objection.  Foundation.

5        MR. CASSIDY:  I'll withdraw the question.

6        THE COURT:  Sustained.

7  BY MR. CASSIDY:

8  Q    So when you were working back in 1997 I believe is

9  when you first started going up to the Flambeau Mining

10 Company?

11 A    No.

12 Q    1990.  I'm sorry.

13 A    Correct.

14 Q    And 1997 was the time period where there was a lot

15 of activity going on there?

16 A    Correct.

17 Q    And then at some point the mining operation closed

18 or ceased to be active; correct?

19 A    Correct.

20 Q    Now there was a Reclamation Plan developed?

21 A    With the mining permit application, yes.

22 Q    Okay.  And what is the Reclamation Plan designed to

23 do?

24 A    The Reclamation Plan submitted with the mine permit

25 application was designed to reclaim the site.

              JAMES HUTCHISON - CROSS

1   Q    And by *reclaim the site*, the plan is designed to

2   put the site back into generally its original condition.

3   A    Correct.

4   Q    So when that -- were you involved in that original

5   Reclamation Plan?

6   A    Yes.

7   Q    And what year did that come into being?

8   A    That was submitted as part of the mine permit

9   application in the '89 -- I believe it was 1989 mine

10  permit application.

11  Q    Okay.  And when you and Flambeau Mining Company

12  designed that Reclamation Plan, at the time it was

13  presumably submitted as the Plan to do what it was

14  intended to do; correct?

15  A    Yes.

16  Q    Which was reclaim the whole mine site.

17  A    Correct.

18  Q    And I believe you testified that that Plan had to

19  be revised?

20  A    Yes.

21  Q    And when did the revision occur?

22  A    I believe it was submitted in 1997.

23  Q    So from 1989 to 1997 there was an original

24  Reclamation Plan in place; is that right?

25  A    Correct.
                    JAMES HUTCHISON - CROSS

1   Q    And then in 1997, what was the necessity for the

2   revision?

3   A    The necessity was the desire for local communities

4   to use the existing buildings on site and the Flambeau

5   Mining Company agreeing to do it.

6   Q    Okay.  And that resulted in various changes to the

7   Plan?

8   A    Yes.

9   Q    Okay.  And then you testified that there were

10  issues of concern and areas of concern that sort of

11  cropped up after that point as well?

12  A    Correct.

13  Q    And I think you used different words:  Spots of

14  concern, areas of concern.  All those areas and spots of

15  concern were all caused by the original disturbance that

16  had occurred from the mine activity; correct?

17  A    I guess what do you mean by original disturbance?

18  Q    Well, by the mine activity.

19  A    Right.  Correct.

20  Q    By the mine being active there, those were areas

21  and issues of concern that were caused by the mine

22  operation.

23  A    Correct.

24  Q    Okay.  So one of those happened in 2003/2004.  That

25  was the rail spur?

                    JAMES HUTCHISON - CROSS

1    A    Correct.

2    Q    So at that time there was a change and you decided

3    there needed to be -- you may have to excavate and you

4    initiated -- there was a project initiated to

5    characterize the soils there.

6    A    Correct.

7    Q    So that was another -- essentially another revision

8    to the reclamation.

9    A    Yes.

10   Q    Okay.  And then in 2008 there was another project,

11   you mentioned the north side ditch of Copper Park Lane?

12   A    Yes.

13   Q    So there was another area or source of concern that

14   had to be dealt with?

15   A    Correct.

16   Q    And then there was 2009/2010 you just discussed the

17   infiltration system; correct?

18   A    Correct.

19   Q    That was just another, you know, example of

20   additional reclamation that needed to occur.

21   A    Correct.

22   Q    So is it fair to say when you have a plan that's

23   designed to do something, that that plan doesn't always

24   work out the way you think it's going to work out?

25              MR. VAN CAMP:  Objection.  Calls for
                    JAMES HUTCHISON - CROSS

1   speculation.

2           THE COURT:  Seems to me to be a fairly

3   straightforward question, but one that I think all of us

4   could answer.

5   BY MR. CASSIDY:

6   Q    Is it fair to say?

7   A    Fair to say.

8   Q    Okay.  So -- and the original Reclamation Plan you

9   said was put in place in 1989 and it's been revised and

10  issues of concern have continued to come up until the

11  present time; right?

12  A    Primarily because of the change, the revised

13  Reclamation Plan, yeah.

14  Q    But not totally because of that?

15  A    No.  Totally because of that.

16  Q    Totally because of that.

17  A    Totally because of that.

18  Q    Okay.  And that change led to further reclamation

19  activities?

20  A    Yes.

21  Q    Okay.  That you didn't anticipate when you did the

22  original Plan.

23  A    Correct.

24  Q    Okay.  And that Plan has been -- being implemented

25  for approximately how long?
                    JAMES HUTCHISON - CROSS

1        MR. VAN CAMP:  I'll object to the form of the

2   question.  What Plan?

3        MR. CASSIDY:  The original Reclamation Plan.

4        THE COURT:  You may answer that.  Do you

5   understand the question?

6        THE WITNESS:  No.

7        THE COURT:  I think it got a little confused.

8   BY MR. CASSIDY:

9   Q   The original Reclamation Plan has been implemented

10  for how long?

11       MR. VAN CAMP:  I'll object to the form of the

12  question.  I'm not sure what *implemented* means.  When it

13  was originally designed or when it was built or --

14       THE COURT:  Rephrase it.

15  BY MR. CASSIDY:

16  Q   You said the original Reclamation Plan was put in

17  place in 1989?

18  A   Yes.  It was submitted, yes.

19  Q   Yes.  And that Plan -- the property is still

20  operating underneath that Plan?

21  A   Portion of it, yes.

22  Q   Portion of it.  So we're talking about over 20

23  years?

24  A   Yes.  Since the permit application, yes.

25  Q   Okay.  And the infiltration system you just
                    JAMES HUTCHISON - CROSS

1    described, how long has that been in operation?

2    A    The west infiltration basin has been in existence

3    since November 2011 and the other two infiltration

4    basins since -- I'm not sure, but April some time of

5    2012.

6    Q    So they've been operating for a few months?

7    A    Yes.

8    Q    Are you familiar with -- well, let me ask this:

9    You said -- Mr. Van Camp asked you about enforcement,

10   whether or not the activities that were undertaken were

11   done -- required any enforcement by DNR and you answered

12   no.

13   A    Correct.

14   Q    Were the -- and some of those -- some of those were

15   environmental issues; you said issues of concern, spots

16   of concern?

17   A    Yes.

18   Q    Were those -- were cleaning up those spots of

19   concern required by the Reclamation Plan?

20   A    Not necessarily.

21   Q    So if you hadn't cleaned up the rail spur area,

22   would that have been a problem for the Reclamation Plan?

23            MR. VAN CAMP:  I'll object to the form of the

24   question.

25            THE COURT:  Sustained.
                JAMES HUTCHISON - CROSS

1  BY MR. CASSIDY:

2  Q    How, when that project came into place, how was

3  that -- how did the Reclamation Plan affect that, if at

4  all?

5        MR. VAN CAMP:  I'll object to the form of the

6  question.  That Plan.

7        THE COURT:  Sustained.

8  BY MR. CASSIDY:

9  Q    When the railroad spur project that you described

10 in 2003 and 2004, did the Reclamation Plan have any

11 effect on that project at all?

12 A    The original one?

13 Q    No.  Whatever Plan was in place at that time.

14 A    No.

15 Q    It didn't.

16 A    No.

17 Q    Can you explain that?

18 A    Well, during the revised Reclamation Plan that was

19 being used to cover that area, the rail spur, it wasn't

20 known if that rail spur was going to be used or not used

21 during the development of that revised Reclamation Plan,

22 so we did not remove it as a feature.  We were

23 anticipating using that rail spur in place as it was.

24 Q    Okay.  And is there a bond associated with the

25 reclamation?

                    JAMES HUTCHISON - CROSS

1   A     I believe there is, yes.

2   Q     And what was the original bond?

3   A     I don't know off the top of my head.

4   Q     Do you know if that -- the original bond was

5   altered at any point?

6   A     I think it must have been affected by the

7   certificate of completion.

8   Q     For one part of the site?

9   A     Correct.

10  Q     Okay.  And is there still an outstanding bond?

11  A     I would believe so.

12  Q     Is that typically the case?

13  A     I think it's typically the case.

14  Q     And you don't know whether there's a bond

15  outstanding for this property?

16  A     I am assuming there is.  That's not what I'm tasked

17  to do.

18  Q     And if there's a bond, that bond would be held

19  until the property is totally reclaimed and then

20  returned to the mine company; correct?

21  A     That's the concept of the bond, yep.

22  Q     Do you know how much that bond is for currently?

23  A     No.

24  Q     Even though there was no DNR enforcement related to

25  those projects, would you say there was DNR oversight of

                    JAMES HUTCHISON - CROSS

1 those?

2 A    Yes.

3          MR. CASSIDY:  One moment, Your Honor.

4       (Pause at 12:11 p.m.)

5          MR. CASSIDY:  That's all I have, Your Honor.

6          THE COURT:  All right.  Anything else,

7 Mr. Van Camp?

8          MR. VAN CAMP:  No, Your Honor.

9          THE COURT:  You may step down.

10          THE WITNESS:  Thank you, Your Honor.

11          THE COURT:  Might this be the last time

12 Mr. Hutchison has to testify?

13          MR. VAN CAMP:  I can probably think of

14 something, but I think he's free to leave.  Thank you.

15       (Witness excused at 12:12 p.m.)

16          THE COURT:  You may call your next witness.

17          MR. VAN CAMP:  Mr. Fred Fox.

18          **FRED FOX, DEFENDANT'S WITNESS, SWORN,**

19                    <u>DIRECT EXAMINATION</u>

20 BY MR. VAN CAMP:

21 Q    Please state your name for the record.

22 A    Frederick, D for Douglas, Fox.  F-o-x.

23 Q    Mr. Fox, I'd like to ask you to please describe the

24 employment that you've had over the years with Flambeau

25 Mine Company.
                    FRED FOX - DIRECT

1    A    Okay.  Well, I retired from Kennecott Minerals

2    Company, which is the corporate headquarters and parent

3    company of Flambeau, in January 2008, and I currently

4    own and manage and work part-time for a consulting

5    company called Trapper Consulting located in Park City,

6    Utah.  And I do some work just basically here today or

7    the whole week for Flambeau Mining Company.  And then

8    when I was with Kennecott Minerals Company, I was the

9    Director of Health Safety Environment and Reclamation,

10   and I held that position from 1996 to when I retired in

11   2008.  And I periodically worked for or on Flambeau

12   Mining Company issues.

13   Q    Prior to your employment with Flambeau Mining

14   Company, what employment did you have?

15   A    Okay.  I still -- I worked for Kennecott

16   Corporation, which was before they had formed Kennecott

17   Minerals Company, from about 1994 to 1996.  And that was

18   a corporate office located in Salt Lake City.

19       Prior to that I was with Kennecott Utah Copper from

20   1991 to about 1994.  And that was one of the operations,

21   the main operation of Kennecott, and that also was

22   located in Salt Lake City.

23   Q    Prior to that how were you employed?

24   A    I was employed as the Environmental Director at

25   Homestake Mine located in Lead, South Dakota, and that

                    FRED FOX - DIRECT

1  was owned by Homestake Mining Company located in

2  San Francisco, California.  And that was from -- it was

3  1979 to 1991 when I joined Kennecott Utah Copper.

4       Prior to that, I was with American Nuclear, located

5  in Casper, Wyoming, and that was about 1970 -- 1976 to

6  1979.  There I was an environmental technician and an

7  environmental engineer.  And keep going?

8  Q    No, that's --

9  A    Okay.

10  Q    Would you tell the Court about your education.

11  A    Okay.  I received an associate's and applied

12  science degree in biology from a community college

13  located in Jamestown, New York.  And the major there was

14  biology.  I received a bachelor of science degree in

15  environmental resource management from the State

16  University of New York Environmental Science and

17  Forestry School at Syracuse, New York.  And a dual

18  degree, I say dual degree because it was the same time,

19  a BS in Forestry from Syracuse University located in

20  Syracuse, New York.  And both those degrees were, I

21  think, 1975.

22  Q    Just by way of background, what did your employment

23  with Homestake as its Environmental Director typically

24  involve?

25  A    At Homestake I had a variety of duties as

                    FRED FOX - DIRECT

1    Environmental Director, but basically managing the

2    environmental systems in place.  Ensuring compliance.

3    This was a mine that started back in 1876 and operated

4    over 124 years, so it had, let's say, historical

5    environmental issues that needed to be addressed.

6              MR. CASSIDY:  Your Honor -- I'm sorry, Mr. Fox.

7    I would object at this point, the relevance about work

8    at another mine.

9              MR. VAN CAMP:  I'm just trying to provide this

10   witness's background.

11             THE COURT:  You can speed it up a bit.

12             THE WITNESS:  I'll do my best, Your Honor.

13   Anyway I could go on and on, but you had the mine

14   management, environmental management issues.  Superfund

15   site, that was remediated and it was the first site

16   taken off the national priorities list by the way, and

17   basically that's kind of it.  It was all related to the

18   environment and it was for the Homestake Mine

19   operations.

20   BY MR. VAN CAMP:

21   Q    And then after you began working for various

22   Kennecott Mining companies in 1991, what positions did

23   you hold?

24   A    I started at Utah Copper as manager of solid waste.

25   I dealt with solid waste issues, PCB detection and

                    FRED FOX - DIRECT

1   removal, we had demolition going on; those types of

2   solid and hazardous waste issues.  Remediation of acid

3   spills, things like that.  And then I -- well, I went on

4   -- well, within six months I was Director of

5   Environmental Affairs there and I just managed the

6   Environmental Department.  It had 28 -- it was a very

7   large facility with a smelter; huge mine, concentrated

8   refinery.  So just managed all the environmental issues

9   at Utah Copper for that period of time from 1991 to

10  1994.

11  Q    After that what position?

12  A    After that I went to the corporate office, was a

13  Director of Environmental Management, Resource

14  Management, and I worked on corporate issues involving a

15  number of mines that Kennecott owned, including

16  Flambeau, but also included a number of operating mines

17  in hard rock and coal all related to environmental

18  issues.

19       And from there, that's when I joined Kennecott

20  Minerals Company in 1996 and was Director of Health

21  Safety Environment and later Reclamation was added to

22  the title.  So filled up my business card.  And ever

23  since until I retired.  And worked on a number of

24  operating mines and reclaimed mines because closure was

25  one of our biggest, not biggest, but it was one of the

FRED FOX - DIRECT

1   very important issues for the company.

2   Q    Where did you work from 1996 or where was your

3   place of employment in 1996?

4   A    It was Kennecott Minerals Company and it has its

5   own office near the Salt Lake City airport.

6   Q    Did there come a time when you had direct

7   responsibilities with regard to the Flambeau Mining site

8   in Ladysmith?

9   A    I was thinking about that and I became -- as the

10  mine progressed and the general managers left and Jeff

11  Ernshaw (ph) was the last general manager, I believe he

12  left in April of 2002, then my responsibilities became

13  more direct with the Flambeau Mining Company in terms of

14  environmental compliance and oversight from a corporate

15  standpoint.

16  Q    In your position as the Director of Health Safety

17  Environment, and I think by then maybe Reclamation, what

18  were your responsibilities with regard to the

19  reclamation of the Flambeau Mine site?

20  A    It was general oversight from a corporate

21  standpoint:  Ensuring a lot of things you heard today;

22  that the health and safety and the environment, any of

23  those issues were being noticed, you know, identified

24  and if there were issues, managed basically; to ensure

25  that the systems we had in place, starting with our

FRED FOX - DIRECT

1   environmental policy standards, procedures, et cetera,

2   were being followed and complied with from a corporate

3   perspective.

4   Q    Are you familiar with PDES permits?  Do you know

5   what those are?

6   A    Yes, I do.

7   Q    And were you aware of whether or not the Flambeau

8   Mine site at one point in time had a WPDES permit?

9   A    I was well aware of that, yes.

10  Q    Did there come a time when that permit was

11  terminated?

12  A    Yes, it did.

13  Q    Could you describe for the Court what was going on

14  at the point in time when the WPDES permit that they had

15  under the original mining operation came to an end?

16  A    My understanding when the Supplemental Reclamation

17  Plan was submitted or drafted, it went through, because

18  it was a change to the Reclamation Plan and it was

19  considered significant by the Department of Natural

20  Resources, it went to -- out for public notice and

21  public review.  There were some concerns from some

22  citizens, I think it took just a number of concerns to

23  trigger, this would be a Wisconsin law, a hearing, a

24  contested case hearing or just a hearing on the issue.

25            THE COURT:  And this was to accommodate the
                       FRED FOX - DIRECT

1  idea that Ladysmith was going to be using the buildings

2  and the outlot was not going to be part of the

3  reclamation?

4          THE WITNESS:  Yes.  The Supplemental

5  Reclamation Plan then went again to public review.

6  There were a number of concerns that triggered what you

7  would call a contested case hearing, and going through

8  the original mining permit contested case hearing, that

9  was not an easy task.  A number of hearings, a number of

10 disclosures, similar to a trial here this week, and the

11 company said well, what are the concerns of these

12 people?  We've got a list of concerns, and we went to

13 deal with those concerns through a informational meeting

14 that was called by the DNR.

15     This is my understanding.  I wasn't there.  I

16 believe it was in March of 1998 or something like that.

17 But the outcome of that were a number of concessions to

18 allow us to obtain the approval of the Supplemental

19 Reclamation Plan.  And those reclamations was with one

20 plaintiff -- one of your plaintiffs anyway, and a number

21 of other people.  And those concessions were built into

22 the Reclamation Supplemental Plan.

23     One of them was to completely take out the internal

24 workings of the water treatment plant for whatever

25 reason and plug the discharge pipe that flowed to the

                        FRED FOX - DIRECT

1  Flambeau River.

2      Another one, just for example, take out the further

3  security fence.  Don't know why, but that was of

4  interest to the people that were reviewing the

5  Supplemental Reclamation Plan.  There was taking the

6  tower out from the irrigation pump used to supplement

7  water to some of our reclamation plantings.  I guess

8  they didn't like electricity down there, but it required

9  us to haul fuel for a portable pump, which now we're

10 storing fuel right next to the Flambeau River, which we

11 didn't like.  But that was one of the concessions.

12     So there was a number of concessions the company

13 went through just to streamline the process to get the

14 supplemental approval of the supplemental reclamation

15 permit.

16 Q    And you were aware or were you aware that a

17 modification was made to the permit?

18 A    The modification was to include the 32-acre

19 Industrial Outlot and to make all these concessions that

20 I just went through.  I'm aware of that, yes.

21 Q    And did you understand that these concessions were

22 something that Flambeau Mining Company had agreed to?

23 A    We did to streamline the permit.

24 Q    And what was your understanding about what the

25 people who had complaints that were requesting a

                    FRED FOX - DIRECT

1   contested case hearing agreed to at that time?

2   A    I felt we were satisfying their concerns.

3   Q    Now after the permit was modified, what happened to

4   the WPDES permit?

5   A    There was language, you know, in the supplemental

6   reclamation permit that indicated that when the

7   reclamation was complete, that that treatment plant

8   would be -- the internal workings of the treatment plant

9   would be eliminated and we would have to use whatever

10  means, and it would be best management practices, to

11  control runoff from mainly the Industrial Outlot because

12  during this time the reclamation was taking place and we

13  were using best management practices throughout the

14  whole other reclaimed mine area that was disturbed,

15  about 141 acres or so.  So my understanding, the

16  treatment plan is out.  We used best management practice

17  to go forward to control stormwater management, and that

18  was our understanding under our Reclamation Plan.

19  Q    What did Flambeau Mining Company understand the

20  permit would be after the WPDES permit terminated to

21  handle stormwater discharges from the property?

22  A    Yes.  It would be a authorization, lawful

23  authorization to collect and control stormwater through

24  best management practices.

25  Q    What permit was that under?
                    FRED FOX - DIRECT

1    A     That was under the rec -- the Supplemental

2    Reclamation Plan.

3    Q     Which was part of the mining permit?

4    A     Yeah, part of the mining permit.  It's all part --

5    it's all tiered into the "mining permit."  All of the

6    permits or plans we have, like I mentioned best

7    Management Plan, Reclamation Plan, Erosion Control Plan,

8    all kinds of plans like that are all tiered and part of

9    the mining permit.

10   Q     Did Flambeau Mining Company believe that they had

11   the permits that they needed to have after the WPDES

12   permit was terminated?

13   A     Absolutely, or we wouldn't operate without lawful

14   authorization.

15   Q     If any regulatory agency had requested Flambeau

16   Mining Company to get either a WPDES permit or NPDES

17   permit, would they have done it?

18   A     It's my understanding they would.  I mean --

19          MR. CASSIDY:  Objection, Your Honor.

20   Speculation about what they would have done or if they

21   would have done it.

22          THE COURT:  Overruled.

23          THE WITNESS:  The answer is yes.

24   BY MR. VAN CAMP:

25   Q     Pardon me?
                    FRED FOX - DIRECT

1    A    Yes.  Any permit required would have been obtained

2    and complied with.

3             THE COURT:  All right.  This is a good time to

4    break.  We'll take a lunch break of one hour.  Resume at

5    1:30.

6         (Noon recess 12:30 p.m.)

7

8                         *  *  *  *  *

9         I, LYNETTE SWENSON, Certified Realtime and Merit
     Reporter in and for the State of Wisconsin, certify that
10   the foregoing is a true and accurate record of the
     proceedings held on the 24th day of May 2012 before the
11   Honorable Barbara B. Crabb, District Judge for the
     Western District of Wisconsin, in my presence and
12   reduced to writing in accordance with my stenographic
     notes made at said time and place.
13   Dated this 10th day of September 2012.

14

15                    /s/_____

16                    Lynette Swenson, RMR, CRR, CBC
                          Federal Court Reporter

17

18

19   The foregoing certification of this transcript does not
     apply to any reproduction of the same by any means
20   unless under the direct control and/or direction of the
     certifying reporter.

21

22

23

24

25
                     FRED FOX - DIRECT