UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * *

WISCONSIN RESOURCES PROTECTION
COUNCIL, CENTER FOR BIOLOGICAL
DIVERSITY and LAURA GAUGER,


      Plaintiffs,
  -vs-                       Case No. 11-CV-45-BBC

FLAMBEAU MINING COMPANY, INC.,  Madison, Wisconsin
                              May 25, 2012
      Defendant.         9:00 a.m.

* * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF FIFTH DAY OF COURT TRIAL
   HELD BEFORE DISTRICT JUDGE BARBARA B. CRABB,


APPEARANCES:

For the Plaintiffs:  McGillivay, Westerberg & Bender
                  BY:  ATTORNEYS PAMELA MCGILLIVAY,
                  JAMES SAUL and DAVID BENDER
                  211 South Paterson Street, Ste. 320
                  Madison, Wisconsin  53703

                  Pacific Environmental Advocacy
                  Center - East
                  BY:  ATTORNEY KEVIN CASSIDY
                  P.O. Box 445
                  Norwell, Massachusetts  02061

                  Pacific Environmental Advocacy
                  Center - West
                  BY:  ATTORNEY DANIEL MENSHER
                  10015 SW Terwilliger Blvd.
                  Portland, Oregon  97219

Lynette Swenson   RMR, CRR, CBC
Federal Court Reporter
U.S. District Court   120 N. Henry St., Rm. 520
Madison, WI  53703    (608) 255-3821
Continued appearances:

```
 1   For the Plaintiffs:  Center for Biological Diversity
                          BY:  ATTORNEY MARC FINK
 2                        209 East Seventh Street
                          Duluth, Minnesota  55805
 3
     For the Defendant:   DeWitt Ross & Stevens, S.C.
 4                        BY:  ATTORNEYS HARRY VAN CAMP
                          and SCOTT PALER
 5                        Two East Mifflin Street, Ste. 600
                          Madison, Wisconsin  53703
 6
                          Susan George - Paralegal
 7
     For the State        Wisconsin Department of Justice
 8    of Wisconsin:       BY:  AAG THOMAS J. DAWSON
                          17 West Main Street
 9                        Madison, Wisconsin  53703

10   Also present:        Fred Fox

11                           * * * * *

12

13                       I-N-D-E-X

14   DEFENDANT'S WITNESSES           EXAMINATION        PAGES

15   GLEN BURTON           Direct by Mr. Van Camp        6-21
                           Cross by Ms. Westerberg      21-30
16                         Redirect by Mr. Van Camp     30-31
     ANNE FAIRBROTHER      Direct by Mr. Van Camp       32-68
17

18                       E-X-H-I-B-I-T-S

19   EXHIBITS                            IDENTIFIED/RECEIVED
```

| EXHIBITS | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| Exhibit 17 | Photo | 28 | --- |
| 78 | Photo | 28 | --- |
| 82 | Photo | 29 | --- |
| 83 | Photo | 29 | --- |
| 84 | Photo | 30 | --- |
| 573-576 | Day exhibits | --- | 6 |
| 587 | Fairbrother report | 33 | --- |
| 588 | Burton report | 7 | --- |
| 661 | Burton resume | 9 | 21 |
| 662 | Fairbrother resume | 55 | 56 |
| 1025 | Figure 3 | --- | 61 |
| 1032 | UW-Stevens Pt. report | 24 | --- |

```
20
21
22
23
24
25
```

1

2          THE CLERK:   Case Number 11-CV-45-BBC.

3  *Wisconsin Resources Protection Council, et al v.*

4  *Flambeau Mining Company* is called for fifth day court

5  trial.  May we have the appearances, please.

6          MS. MCGILLIVAY:  Morning, Your Honor.  Pam

7  McGillivay and the same cast at counsel table.

8          THE COURT:  Thank you.

9          MR. VAN CAMP:  Good morning.  Harry Van Camp

10  representing Flambeau Mining, with Scott Paler also

11  representing Flambeau Mining Company.  Mr. Fred Fox from

12  Flambeau Mining Company, and we're assisted by Susan

13  George.  Thank you.

14          THE COURT:  Thank you.  Anything you wish to

15  take up before we start calling witnesses this morning?

16          MR. VAN CAMP:  I have -- I'm sorry.

17          MS. MCGILLIVAY:  I was just going to say no,

18  Your Honor.  Thank you.

19          THE COURT:  Did you talk to the court reporter

20  about when the transcripts would be ready for your use?

21          MS. MCGILLIVAY:  Yes, and the date that came up

22  on ECF for our deadline is fine.  There won't be a

23  delay.

24          THE COURT:  Which is what?

25          MS. MCGILLIVAY:  I think it was the 21-day

1  automatic notice for motion to dismiss would put it at

2  June 13th.

3          MR. VAN CAMP:  Oh.

4          THE COURT:  All right.  And then you would have

5  five days from then to --

6          MS. MCGILLIVAY:  I believe the automatic date

7  that came up for the reply for defendant was June 20th,

8  seven days.

9          THE COURT:  Okay.

10         MR. VAN CAMP:  Your Honor, may I speak to that

11 issue?

12         THE COURT:  You may.

13         MR. VAN CAMP:  I understood yesterday from

14 conversations with the court reporters that the

15 transcript, at least at the level that I have it, which

16 is very good, but it's still nonetheless a dirty copy,

17 could be available for them this morning and it seems to

18 me it's in everybody's best interest to move this

19 forward and not wait until --

20         THE COURT:  Oh, I would far prefer to do that.

21 If you had --

22         MR. VAN CAMP:  They can get that from the court

23 reporters so -- and they could get that today or

24 tomorrow or whatever.  I mean very quickly.  At least

25 I've been assured of that.  Because what they've done

1  for me they already have and so they could get that

2  immediately and then we can move this forward.

3          MS. MCGILLIVAY:  Your Honor, I didn't -- that's

4  exactly true.  That's why I thought that the automatic

5  deadlines, we didn't need to ask to postpone those at

6  all.  There isn't going to be a delay in the transcript.

7          THE COURT:  Oh, good.  So you could have it in

8  in a week.  So Monday the -- let's see, Monday is the

9  28th.  Monday the 4th of June.  Right, Monday the 4th.

10         MS. MCGILLIVAY:  Thank you, Your Honor.

11         THE COURT:  That would be good or all of our

12 memories would be a lot crisper.

13         MS. MCGILLIVAY:  Your Honor, can we clarify if

14 there's a reply deadline on that motion?

15         THE COURT:  I wasn't really planning to have

16 one.

17         MS. MCGILLIVAY:  Okay.  Thank you, Your Honor.

18         MR. VAN CAMP:  I have one matter.  The -- I'm

19 not quite sure what happened with the Betsy Day

20 transcript.  I'm glad we didn't sit and watch it.  I

21 understand the Court is going to read it.

22         THE COURT:  Right.

23         MR. VAN CAMP:  But I didn't, as a result, move

24 to enter the nonnarrative exhibits attached to her

25 report.

1          THE COURT:  Okay.

2          MR. VAN CAMP:  Those are Exhibits 573, 574, 575

3  and 576.  And I would move for their admission.

4          THE COURT:  Any objection to those exhibits?

5          MS. MCGILLIVAY:  No, Your Honor.

6          THE COURT:  Okay.  They're received.

7          MR. VAN CAMP:  Thank you, Your Honor.

8          THE COURT:  Anything else?

9          MR. VAN CAMP:  Nothing further.

10          THE COURT:  All right.  You may call your first

11  witness.

12          MR. VAN CAMP:  Thank you, Your Honor.  At this

13  time Flambeau Mining Company will call Dr. G. Allen

14  Burton.

15      **G. ALLEN BURTON, DEFENDANT'S WITNESS, SWORN,**

16                  DIRECT EXAMINATION

17  BY MR. VAN CAMP:

18  Q    Good morning, Dr. Burton.

19  A    Good morning.

20  Q    Would you please state your name for the record.

21  A    Glen Allen Burton, Junior.

22  Q    And where do you reside Mr. Burton or Dr. Burton.

23  Sorry.

24  A    Andover, Michigan.

25  Q    You've been retained in this case by the defendant

1  to prepare an expert report; correct?

2  A    Right.

3  Q    And there is a copy of that expert report on the

4  witness stand beside you, which is exhibit -- has been

5  marked as Exhibit 588.  I'd like to begin your testimony

6  this morning by asking you to review with the Court your

7  education first.  That's post-high school education.

8  A    I got my bachelor's in biology and chemistry at

9  Ouachita Baptist University in Arkadelphia, Arkansas.

10 Then I went on and got a master's at Auburn University

11 in microbiology; then went to the University of Texas at

12 Dallas and got a Ph.D. in environmental science,

13 specializing in aquatic toxicology.  And then a post-doc

14 at the Cooperative Institution for Environmental

15 Research in Environmental Sciences at the University of

16 Colorado in Boulder.

17 Q    And then if you --

18              THE COURT:  What's the name of the institution?

19              THE WITNESS:  CIRES.  Cooperative Institute for

20 Environmental Research -- I don't know.

21              THE COURT:  Whatever.

22              THE WITNESS:  It's in the record.

23 BY MR. VAN CAMP:

24 Q    Do you want to take a look at the -- I think it's

25 the second page of Exhibit 588.  In that first paragraph

1  under qualifications and experience there's a reference.

2  A    CIRES.  Cooperative Institute for Research and

3  Environmental Sciences.  I live by acronyms.  Sorry.

4  Q    Why don't we have the acronym then.

5  A    CIRES.  C-I-R-E-S.

6  Q    Okay.  Thank you very much.  And then would you

7  please describe your employment history since that time.

8  A    Since then I went from there to being an Assistant

9  Professor at the Wright State University in Dayton, Ohio

10 and I stayed there for 23 years.  And four years ago, I

11 took a position at the University of Michigan in the

12 School of Natural Resources and Environmental Sciences

13 and have a dual appointment in the Department of Earth

14 and Environmental Sciences.

15 Q    Have you ever had any work related to the EPA

16 speaking of...

17 A    My funding, research funding started as an

18 Assistant Professor with the US EPA and has continued

19 since.

20 Q    And what types of courses do you teach in your

21 position?

22 A    Well, my areas focus on water quality and

23 environmental risk assessment, so I teach courses

24 related to that.  Right now the only courses I'm

25 teaching is ecological risk assessment and a seminar on

1  Great Lakes stressors.

2  Q    I'd like to draw your attention to approximately

3  the sixth page where you have your vitae.

4  A    Okay.

5       MR. VAN CAMP:  I will note for the Court that

6  Dr. Burton's vitae is 45 pages long and I don't intend

7  to walk him through all of the vitae, but we will offer

8  it.

9       THE COURT:  And that's 588?

10       MR. VAN CAMP:  The entire report is 588.  What

11  I would like to do is mark his resume as Exhibit 661 so

12  that it becomes a part of the record without having to

13  go through everything.  We'll go through some of it.

14       THE COURT:  All right.

15  BY MR. VAN CAMP:

16  Q    Would you please provide a summary of the

17  qualifications and experiences that appear in your

18  resume attached to your expert report.

19  A    Well, I began really getting into sediments during

20  my Ph.D. and my research has focused a lot on sediments

21  and how they relate to overlying waters and how they

22  affect biological quality.  I also worked for the US EPA

23  while I was doing my Ph.D. and I was in charge of the

24  five states in Region 6 and their Toxics Monitoring

25  Strategy and helped them develop ways to determine if

1  toxics were an issue or not.  That was a long time ago.

2      But since then, my work has really focused at every

3  level of the ecosystem from the bacterial all the way up

4  to fish and amphibians, trying to understand what the

5  major stressors are affecting them.  It's very

6  complicated because it's not just the chemistry that's

7  going on, it's the habitat and the flow and the

8  nutrients and all of those things that obviously aquatic

9  organisms are exposed to.

10      So I really try to tease out what the dominant

11  factors are that are affecting the ecosystem, and that

12  is a very applied application because you can't really

13  go in and fix an ecosystem, restore it, remediate it in

14  an efficient way unless you know what the major

15  stressors are.  For example, you know, chemistry, you

16  wouldn't want to get in and spend 10 million dollars

17  dredging a harbor if that wasn't the real problem that

18  was affecting the ecosystem.

19  Q    Let me back up just for a moment before we go to

20  the Flambeau Mine site in Ladysmith.  Are you a member

21  of any professional or academic associations?

22  A    A number, but the one I've been more active in is

23  the one that I just returned from, the Society of

24  Environmental Toxicology and Chemistry.  It's a

25  international organization, over 6,000 members from 85

1    countries, and I served as the president of that

2    organization about four or five years ago, and that's

3    where I've spent most of my professional time in a

4    service capacity.

5    Q    As I understand, you flew in from there yesterday

6    from Berlin?

7    A    Yes.  Long day yesterday, and we're happy that

8    we're testifying in the morning.

9    Q    Do you have any publications?

10   A    Yes, a few.  Probably 155 or 60 that are

11   peer-reviewed publications, and over -- well over 200,

12   including the technical reports.  Two or three books.

13   And I now serve as the editor-in-chief for the journal

14   Environmental Toxicology and Chemistry.

15   Q    Could you give us just some examples of the areas

16   in which you have publications.

17   A    The two most recent big publications I did in the

18   last few months were dealing with contaminated sediments

19   in the context of multiple stressors.  That was a large

20   review article.

21        Another article I just published was *It's Time For

22   an Ecosystem Reality Check*, which is getting at the

23   approach of the idea that our assessments of what's bad

24   in the ecosystem have been too chemocentric and haven't

25   considered all of the issues and weight of evidence kind

12

1   of approach.

2   Q    In connection with the Flambeau Mining case, did

3   you review any documents?

4   A    Yes.  I reviewed a number of documents provided to

5   me that included the Flambeau Mining Company monitoring

6   results from the studies that they have done and the

7   studies that the Wisconsin DNR has done there.  These

8   were, I think, as exhibits from Craig Roesler's

9   depositions; looked at the State of Wisconsin's

10  guidelines for aquatic life use designations that were

11  appropriate, and some memos from Lynch and Hammer that

12  were related to designations.  I believe that's most of

13  it.

14  Q    If you don't mind looking at the second page of

15  your qualifications, which is about the fourth page of

16  your report, there are some references to some

17  Peerenboom memorandum.  Do you see those?

18  A    Yes, they're all there.

19  Q    If you would review the --

20  A    Yeah.  The Peerenboom memorandum from Waterworks to

21  Ken Markart 2006; several from Roesler; the Chambers

22  expert report; Wisconsin DNR's Laura Gauger v. FMC

23  complaint; monitoring Fleming.  That looks like most of

24  it.

25  Q    Did you have an opportunity to visit the Flambeau

1  Mine site?

2  A    Yes.  I went there in late October last year and

3  spent the day there.

4  Q    Could you tell us what you did while you were

5  there?

6  A    I took a tour of the site, looked at upstream,

7  downstream, the biofilter area, walked Stream C, down in

8  the river and looked up upstream/downstream of the mouth

9  of Stream C, and went over and looked as best I could at

10  the reference stream that's south of there that's being

11  used.  A lot of that was private property.

12  Q    Okay.  Have you reached any opinions in this case?

13  A    Certainly.  The stream when I was there was

14  essentially dry.  There was a small --

15  Q    Let me stop you --

16          THE COURT:  You're talking about the stream

17  below?

18          THE WITNESS:  Stream C.

19          THE COURT:  South of Copper Park Lane.

20          THE WITNESS:  Well, I walked the whole part,

21  but there was very little water in the biofilter, and in

22  Stream C there was a small pool about ten meters long,

23  five centimeters deep, just south of Copper Lane 50

24  yards or so.  And then I walked the rest of the stream

25  down to the mouth and there was no water.  It actually

1   didn't look much like a stream, it looked more like a

2   swale until we got down to the lower end where the

3   gradient was actually steep and there was, you know,

4   some erosion that had occurred down there at the mouth.

5        The mouth of Stream C was actually the back water

6   of the Flambeau, which went about a meter into the

7   stream itself.  And then I looked -- well, I obviously

8   looked for life in the little pool and then down at the

9   mouth and turned over rocks.  It was a very qualitative,

10  not quantitative kind of assessment.  And there was

11  nothing in the little pool that I could find.

12       I also got into a little pool that was at the

13  culvert that's at the road.  It's Highway 23?

14  Q    27.

15  A    Yeah.  It was there and actually saw nothing in any

16  of those areas.

17            THE COURT:  When you say *nothing*, are you

18  talking just about water?

19            THE WITNESS:  I'm talking about aquatic life.

20  I saw no fish.  I saw no invertebrates.  When I got down

21  to the mouth, there were a few invertebrates in the

22  Flambeau, but virtually nothing.  So it was nice being

23  able to get the report that the University of

24  Wisconsin-Stevens Point did where they were able to

25  sample the invertebrates.  But what surprised me of

1  course was the -- it just didn't look like a stream, it

2  looked more like a drainage that was occasionally wet.

3      And then when I drove down to the reference stream,

4  it was flowing.  It was full of water through the field

5  that I could actually see.  And that, right off the bat,

6  really raised the question to me whether it was an

7  appropriate reference.  When I looked at the aerial

8  photographs, the exhibits that were provided, the site,

9  you can see that the reference watershed is a lot more

10 open.  It's got maybe half of it is forested roughly,

11 which would allow for more runoff.  It's very flat,

12 contrary to what's said in the report.  I'm sure there's

13 a gradient that's down by the river like there is at

14 Stream C.  But the fact that there's water in it and

15 it's sunny automatically makes it an inappropriate

16 reference to a stream where there's no water and it's

17 shaded.

18 BY MR. VAN CAMP:

19 Q    And after the documents that you reviewed and your

20 visit to the site, would you please tell the Court what

21 opinions you reached regarding aquatic life in Stream C.

22 A    Well, my opinions are based on a huge wealth of

23 literature.  If you go back to the classic publication

24 by Hynes in 1970, *The Ecology of Running Water*, where he

25 has a thousand references that really document the

1  importance of flow.  And then in my report I cite three

2  well-known publications that have happened in recent

3  years up to last year that again document the incredible

4  importance as being the most important factor in a

5  stream for aquatic life.

6      So if that is the major stressor, then it really

7  raises the question of how you assess a stream that has

8  no water in it for extended periods.  Wisconsin DNR's

9  guidelines in 2004 on aquatic life used designations,

10  how to set those; sets out the fact that this stream, as

11  agreed by Wisconsin's Hammer and Lynch, should be in a

12  limited aquatic life designation, and they note in those

13  reports correctly that the kinds of organisms that live

14  in these ephemeral intermittent streams are typically

15  very, very tolerant organisms, tolerant of stress, as

16  they would have to be, because there's no water part of

17  the time.

18      So you're going to expect very different

19  communities than you would find like in the reference

20  stream where you have the water.

21          THE COURT:  When you say *reference stream*, are

22  you referring to Stream C, below Copper Park?

23          THE WITNESS:  The reference street is the one

24  designated by the State is the reference which is south

25  of Stream C.

1          THE COURT:  South of Stream C?

2          THE WITNESS:  Right.

3          THE COURT:  I'm not following what -- what do

4    you call the reference stream?

5          THE WITNESS:  The same one that the Wisconsin

6    DNR is calling the reference stream.  It doesn't have a

7    name I don't believe.  I'm not sure how else to call it.

8    It's just referred to in the exhibits as the reference

9    stream, and we have some very good pictures of it in the

10   exhibits also.

11         MR. VAN CAMP:  All of the studies of Stream C

12   have been comparing it to a separate stream that has

13   been referred to by Roesler and by others from the State

14   of Wisconsin as a reference stream.  It's an entirely

15   separate stream.

16         THE COURT:  That hasn't been identified, has

17   it?

18         MS. WESTERBERG:  I'm going to object to the

19   testimony by counsel.

20         THE COURT:  I agree, but I'm really -- I don't

21   know what this stream is, whether it's been identified.

22   So I would appreciate some help on that.

23         MR. VAN CAMP:  Okay.  Just let me ask the

24   witness where it is with reference to Stream C and how

25   you got there and so forth.

1          THE WITNESS:  Well, I took the aerial

2    photograph that was provided in the Roesler report that

3    had a road and I went down there, and with the help of

4    the state policeman that stopped me for speeding, I

5    found the stream and it's just south of the property, I

6    believe about two miles.  And this is the one that for

7    aquatic life and for chemistry the comparisons are being

8    made to Stream C with this stream.  So that's -- and

9    they're calling it the reference.  That's why I -- so to

10   determine if something is impacted, you have to have a

11   base.  What are you comparing to.  Hence the reference.

12          THE COURT:  Okay.  It has no other name.

13          THE WITNESS:  None that I'm aware of.

14   BY MR. VAN CAMP:

15   Q   Going back to Stream C, you have identified what

16   you've said was the major stressor and I understand that

17   that's the flow issue.  What does that tell you about

18   the organisms that you would find beyond the fact that

19   they are tolerant but as it relates to copper and zinc?

20          MS. WESTERBERG:  Objection to leading.

21          THE COURT:  Overruled.

22          THE WITNESS:  Tolerant is used in a very broad

23   sense and always has been by aquatic biologists.  That

24   means just what it is, tolerant of their environmental

25   conditions.  So those can be physical, chemical

1   conditions.  So here we're pointing out flow.  It also

2   means these tolerant organisms are usually tolerant to

3   chemical stressors such as copper and zinc.

4       And so when you put on top of that the life cycle

5   requirements for organisms that live periodically

6   without water, you end up with things like Chironomidae,

7   the midges, which were identified as being in Stream C.

8   While these tend to be tolerant species, they're very

9   short life cycles, so if there's water for a period of

10  time, they can proliferate.  So it's not surprising you

11  find these organisms there.  You wouldn't expect to find

12  the other species they refer to:  Hyalella azteca, which

13  is a small amphipod which has a longer life cycle and

14  needs to have water to survive.

15      But you find those, the amphipods in the reference

16  stream because there's water there more.  Plus it's

17  sunny, and amphipods like to feed on the algae that

18  grows in the sunlight that's on the bottom, it's on the

19  rock, it's on the limbs, wherever.  They feed on

20  vegetation.  So you'll find better conditions from them

21  in that reference stream than you would find.

22      They also tend to be a little more sensitive to

23  metals than the midges are.  So you could say well,

24  they're not in Stream C because of the metals, but

25  they're probably not in Stream C for other reasons.

1   There's not any water a lot of the time and the food

2   supply is not as good for them possibly.

3       So we've got different populations living there.

4   Yet when you go -- oh, and the other thing that's

5   interesting about the midges and the amphipods, that the

6   US EPA chose to pick those organisms as the surrogate

7   species to protect aquatic life.  So they developed

8   standard toxicity tests with those species.  So they can

9   be very sensitive to metals and very good indicators,

10  and the idea being with EPA, like it is for ceriodaphnia

11  and the fathead minnow and the algae, which you'll hear

12  more about from Dr. Fairbrother, is if these species are

13  doing well, 95 percent of the other species will be

14  doing well.  That's why EPA picked them to be surrogate

15  species.

16  Q    So based on what you read about Stream C and what

17  you observed when you observed Stream C, did you come to

18  any opinions regarding the fact that the water quality

19  standards for zinc and copper may be exceeded in those

20  -- in Stream C?

21  A    Well, I couldn't draw any of those conclusions from

22  my site visit.  I had to rely on the monitoring reports

23  that had been done.  But what that showed is that there

24  was -- when you got to the mouth of Stream C where there

25  actually was water continuously, there was no impact to

1  the benthic invertebrates there, upstream or downstream

2  of the mouth where the discharge was.

3  Q    When you say there was no impact, what are you

4  speaking about impact that is a result of?

5  A    As a result of outflow of Stream C and the elevated

6  levels of copper that they were reporting.

7  Q    Dr. Burton, have you expressed those opinions today

8  to a reasonable degree of scientific certainty within

9  your field?

10  A    Yes.

11         MR. VAN CAMP:  I have no further questions for

12  this witness.

13         THE COURT:  Ms. Westerberg.

14         MR. VAN CAMP:  I just wanted to move Exhibit

15  661 into evidence, which is Dr. Burton's resume.

16         MS. WESTERBERG:  No objection, Your Honor.

17         THE COURT:  Received.

18                    CROSS-EXAMINATION

19  BY MS. WESTERBERG:

20  Q    Morning, Dr. Burton.  I'm --

21  A    Good morning.

22  Q    -- Christa Westerberg, one of the attorneys for

23  plaintiffs.  You said you visited the site once on -- in

24  late October of 2011; correct?

25  A    Correct.

1    Q    Okay.  That's not a high flow time of year for

2    streams.  Would you agree?

3    A    Agree.

4    Q    Okay.  Not a time when events like spawning

5    typically occur; correct?

6    A    No.  Usually springtime, except for some of these

7    small fish species will spawn throughout the summer.

8    Q    But you weren't there in the summer either; right?

9    A    Correct.

10   Q    And spring also would be at a higher flow time of

11   year; correct?

12   A    Yes.

13   Q    Do you know how long Stream C flows in the spring?

14   A    No.  I really haven't seen any data that shows

15   that.

16   Q    Okay.  You haven't been provided with any data

17   showing that.

18   A    No.

19   Q    Would you agree that providing a spawning location

20   is a service even an intermittent stream can provide if

21   there's flow?

22   A    Certainly.

23   Q    So just because it's intermittent, it doesn't mean

24   there's not services it can provide to a receiving

25   water; correct?

1  A    Correct.  But as I said, they're usually very

2  tolerant species.

3  Q    So you said you don't know how long Stream C flows

4  in the spring.  Do you know how often it flows at all?

5  A    Certainly I don't.  I haven't seen the flow data.

6  But just by looking at the stream, it actually doesn't

7  look like a stream, it looks like a swale.  And if you

8  have flow over large periods of time, you get bank

9  erosion, you get channelizations form instead of slight

10 depressions.

11 Q    Was there debris in the stream when you visited it?

12 A    There was leaf litter primarily.

13 Q    It was fall obviously.

14 A    Right.

15 Q    Did -- so you didn't return this spring to see if

16 Stream C was flowing; correct?

17 A    No.

18 Q    The data you reviewed, you mentioned reviewing

19 exhibits to Craig Roesler's deposition; correct?

20 A    Yes.

21 Q    And that deposition was taken prior to your report

22 being drafted obviously.

23 A    Right.

24 Q    Okay.  And your report is dated early November

25 2011?

1   A    Correct.

2   Q    Have you reviewed Craig Roesler's final report that

3   was published since your report was drafted?

4   A    Yes.  I just reviewed the one that came out recent.

5   April?

6   Q    Is that your testimony?  April?

7   A    I don't recall.  It's the most recent one as I

8   understand.

9   Q    Okay.  And you didn't review, at the time of your

10  report, the DNR's proposed listing for Stream C on the

11  State's 303(d) list of impaired waters; right?

12  A    I don't believe so.

13  Q    Now you mentioned that since you had only visited

14  the site once, the document or the documentary evidence

15  or materials you reviewed were important, especially I

16  think the UW-Stevens Point report?

17  A    Yes.

18  Q    If you want to look at your screen, I'm showing you

19  what's been marked Joint Exhibit 1032.  Is this the

20  UW-Stevens Point report?

21  A    I don't have anything on my screen.  Sorry.  Right,

22  yes.

23  Q    I'll page through it here.  It's about a six-page

24  report.  Is that consistent with your memory?

25  A    Yes.

1    Q    Now isn't it true the author of this report noted

2    that there were -- let me back up one minute.  When

3    Mr. Van Camp asked you moments ago about -- right at the

4    end of your direct testimony -- about impacts on

5    macroinvertebrates, you were referring to impacts in the

6    Flambeau River and not Stream C; correct?

7    A    Correct.

8    Q    Now isn't it true, Mr. -- I'm going to say Dimick,

9    the author of this UW-Stevens Point report, concluded

10   that there were differences in these macroinvertebrate

11   communities above and blow the mouth of Stream C;

12   correct?

13   A    Yes.

14   Q    Okay.

15   A    Which I was attributing --

16   Q    I'm sorry, there's no question pending.  Isn't it

17   true at the end of his report he says, "Further study is

18   needed to determine if those changes are due to metal

19   inputs or some other factor"; correct?

20   A    Correct.

21   Q    But you were able to draw the conclusions in your

22   report without further study; correct?

23   A    The data at the mouth of the river, there was -- to

24   me -- for the reasons I stated earlier about the

25   differences between the reference and Stream C, it's

1   inappropriate to draw any conclusions.  You've got a

2   seasonal water supply and you would expect to have

3   Chironomidaes there, which are more tolerant, which the

4   State acknowledges in their aquatic use designations.

5   At the mouth of the river, there are no impacts

6   according to his data.

7   Q    The mouth of the reference stream or Stream C?

8   A    Right.  Stream C.

9   Q    Okay.  So you're talking about the differences he

10  notes in macroinvertebrates at the reference stream

11  compared with the mouth of Stream C and you're saying

12  it's inappropriate to compare those.

13  A    No.  In that particular -- I'm talking about

14  upstream and downstream of the mouth, about a meter or

15  so up Stream C.  And at the main, up in the stream

16  higher up, comparing Stream C with the reference.

17  Q    You wouldn't disagree that he says there are

18  differences in the macroinvertebrate populations

19  upstream and downstream of the mouth of Stream C in the

20  Flambeau River; correct?

21  A    No.  They're basically insignificant differences.

22  Q    That's your opinion.

23  A    Well, he kind of states that, as does Craig

24  Roesler.  There's very little effect there.

25  Q    But --

1   A     There's different -- I believe he said there are

2   different species of Hyalella.  Has no affect.

3   Q     There's different species, and the UW-Stevens Point

4   report concluded that further study was needed to see if

5   those were due to metal inputs; correct?  Yes or no.

6   A     That's what the report stated.

7   Q     Okay.  The -- you say in your report because of or

8   in your testimony today because of Stream C's

9   intermittent nature already in Stream C, in Intermittent

10  Stream C as you called it, there are more tolerant

11  species of aquatic life; correct?

12  A     Correct.

13  Q     So because Stream C happens to be intermittent,

14  they would also be more tolerant to copper and zinc; is

15  that right?

16  A     Likely.

17  Q     You said you wouldn't expect to see, because of the

18  intermittent nature of Stream C, you wouldn't expect to

19  see long life-cycle species in the stream; correct?

20  A     Correct.

21  Q     But that's not to say that long life-cycle species

22  can't use the stream such as fish that may use it for

23  spawning that come from the Flambeau River; correct?  If

24  there's flow.

25  A     That would be possible.

1  Q    I'm just going to show you a few pictures.  This

2  one has been marked as Exhibit 16.  Do you recognize

3  that waterway?

4  A    This is Stream C from Roesler's exhibit?

5  Q    I'm asking you if you recognize it.

6  A    Well, I can't -- that looks like a million streams,

7  so you're going to have to give me more information than

8  that.

9  Q    Okay.  Fair enough.  Is it fair to say you haven't

10 seen this photo before I've shown you just now; right?

11 No one has provided it to you?

12 A    All I've seen are the exhibit materials I've

13 mentioned.  I don't know if you're pulling this from

14 that or not.

15 Q    You don't recognize it though, this photo; right?

16 A    I cannot tell you what that is, no.

17 Q    Showing you what's been marked as Exhibit 17, have

18 you seen that photo before?

19 A    If it was in Roesler's exhibit I have.

20 Q    You just don't remember?

21 A    I don't remember.

22 Q    And regardless of whether you've seen the photo

23 before, do you recognize this waterway?

24 A    It looks like a million streams I've seen.

25 Q    Showing you what's been marked Exhibit 78, have you

1   seen that photo before?

2   A    I'd like to repeat my earlier answer.

3   Q    So that would be -- you haven't seen the photo

4   before that you recall?

5   A    I may have seen it.  If it was in his exhibit, I

6   saw it, but that was back in November when I wrote my

7   report.

8   Q    Okay.  So you haven't reviewed the exhibits to

9   Mr. Roesler's deposition since November.

10  A    I haven't looked at the pictures, no.

11  Q    Okay.  Have you seen this waterway before

12  regardless of whether you've seen the picture?

13  A    I don't know.

14  Q    Showing you what's been marked Exhibit 82.  Have

15  you seen that photo before?

16  A    Perhaps.

17  Q    Regardless of whether you've seen the photo, do you

18  recognize this waterway?

19  A    Perhaps.

20  Q    Is perhaps another way of saying I don't know?

21  A    I may have seen this waterway.

22  Q    Showing you what's been marked as Exhibit 83.  Have

23  you seen this photo before?

24  A    Yes.

25  Q    When did you see it?

1    A    In the exhibits, I believe.

2    Q    To Mr. --

3    A    From Roesler.

4    Q    Okay.  Do you know what that depicts?

5    A    Yeah, that's the culvert leading into the biofilter

6    or just down -- yeah, I think that's the biofilter.

7    Q    Last one.  Exhibit 84.  Have you seen that photo

8    before?

9    A    I don't recall.  It looks like the drainage from

10   the biofilter.

11         MS. WESTERBERG:  I have nothing further.  Thank

12   you.

13         THE COURT:  Mr. Van Camp, anything?

14                   REDIRECT EXAMINATION

15   BY MR. VAN CAMP:

16   Q    I believe you were attempting to answer a question

17   more extensively than you were permitted to as it

18   related to what you attributed the difference in

19   macroinvertebrates between -- that is the species of

20   macroinvertebrates between the two bodies of water.

21         MS. WESTERBERG:  Objecting to form.  Leading.

22         THE COURT:  Overruled.

23         THE WITNESS:  The reports that were provided me

24   talked about the differences and attributed them to

25   possible metal influence, and what my experience has

1   been is perhaps, but it's very likely that the flow

2   differences are the major stressor, as has been reported

3   in all the literature I was citing.  And the differences

4   shown between some Hyalella upstream and downstream of

5   the mouth of Stream C are really ecologically

6   insignificant.  There's still a lot of disagreement

7   among benthic taxonomists about Hyalella in its

8   speciation.  We know that Hyalella is a very sensitive

9   species, whether it's multiple species or not, it's a

10  very sensitive species to metal exposures.  And it is

11  living upstream and downstream of the mouth of Stream C.

12          MR. VAN CAMP:  Thank you.  I have nothing

13  further.

14          THE COURT:  Ms. Westerberg, anything else?

15          MS. WESTERBERG:  No.  Thank you.

16          THE COURT:  Then you may step down.

17      (Witness excused at 9:47 a.m.)

18          MR. VAN CAMP:  Your Honor, as we are

19  responsible for maintaining our own exhibits, I assume

20  you don't want to see the resume at this time; is that

21  correct?

22          THE COURT:  Isn't it in as 55 something?

23          MR. VAN CAMP:  661 I offered --

24          THE COURT:  You put it in as 661, but you were

25  referring to it as 553 or something.

1          MR. VAN CAMP:  Right.  His report, including

2   the resume, is 588.

3          THE COURT:  Oh, okay.

4          MR. VAN CAMP:  Perhaps I mis --

5          THE COURT:  And that includes his resume.

6          MR. VAN CAMP:  That's correct.

7          THE COURT:  I can see it in there.

8          MR. VAN CAMP:  Okay.  Thank you.  Thank you,

9   Your Honor.  At this time I would like to call

10  Dr. Fairbrother.

11        **ANNE FAIRBROTHER, DEFENDANT'S WITNESS, SWORN,**

12                      DIRECT EXAMINATION

13  BY MR. VAN CAMP:

14  Q    Good morning, Dr. Fairbrother.

15  A    Morning.

16  Q    Would you please tell us your name.

17  A    Anne Fairbrother.

18  Q    And where are you from, Dr. Fairbrother?

19  A    From -- I live in Issaquah, Washington, which is

20  right by Seattle.  Work in Bellevue.

21  Q    You have been hired to prepare an expert report in

22  this case, have you not?

23  A    Yes, I have.

24  Q    And you were hired by Flambeau Mining Company to do

25  that?

1    A    That is correct.

2    Q    And did you prepare a report?

3    A    Yes, I did.

4    Q    And do you see the document sitting beside you on

5    the witness stand?

6    A    Yes.

7    Q    It's been marked -- it's been marked as Exhibit

8    587, I believe?

9    A    That's correct.

10   Q    And is that your expert report?

11   A    Yes, it is.

12   Q    Okay.  I'd like to begin your testimony as well

13   this morning with your educational background.  Would

14   you please tell us about your educational background.

15   A    Assuming starting post-high school?

16   Q    Yes, please.  Thank you.

17   A    I attended University of California at Davis and

18   got an undergraduate Bachelors of Science degree in

19   Wildlife Biology.  I stayed on there for another four

20   years and went to the School of Veterinary Medicine and

21   got my Doctor of Veterinary medical degree.

22       After that in 1980 I moved here to Madison,

23   Wisconsin and went to graduate school at the University

24   and got a master's degree in 1982 and a Ph.D. in 1985

25   from the Department of Veterinary Science.  That was

1  prior to when the veterinary school was built here

2  onsite, and basically did a degree in what we called at

3  that time *Wildlife Disease Ecology*.

4  Q    And what have you been doing since that time?

5  A    After I got my Ph.D., I accepted a position at the

6  US EPA and went to work for them as a research scientist

7  in their laboratory in Corvallis, Oregon.  I worked

8  there until 1984 as a scientist and then also as a

9  branch chief, managing a number of projects that were

10 going on in the laboratory, and left and went to work in

11 consulting.  Also stayed in Corvallis, Oregon; joined a

12 company called *Ecological Planning & Toxicology.*  I

13 worked for them for six years, and then I went to work

14 for another company called Parametric and opened an

15 office for them in Corvallis.

16     In 2002, I went back to work for the US EPA, still

17 at the same laboratory there in Corvallis as a Branch

18 Chief and then as Associate Director for Science in the

19 laboratory.  In 2007, I left the agency and moved up to

20 Seattle and I went back to work for Parametric for about

21 a year-and-a-half.  And then for the last

22 three-and-a-half years I've been working for a company

23 called *Exponent* in Bellevue, Washington.

24 Q    Could you tell us briefly the types of work that

25 you were doing at each of those employments.

1    A     With the EPA in my first stint with them as a

2    research scientist, I was primarily looking at the

3    intersection of chemical exposure and disease exposure

4    and basically trying to understand how chemicals might

5    affect the immune system of animals and then also

6    eventually the endocrine system, primarily looking at

7    wild birds.

8         Also did manage programs and what was just getting

9    started then in biotechnology and also the beginnings of

10   how we do side assessments for contaminated sites under

11   the CERCLA, under the Superfund Program.

12        And then when I went to work in consulting, I

13   continued to do work related to pesticide work, but also

14   began to do a lot more work in the mining sector and

15   looking at how mines, both large and small, impact both

16   terrestrial and aquatic animals and their habitats.  Did

17   work in the western U.S. in several of the mines in

18   California, in Utah, in Nevada, various places, as well

19   as some mines overseas.  And continued to do that

20   while -- throughout my consulting time.

21        When I went back to EPA again, we had some programs

22   that were then looking at some of the larger scale

23   issues about how different types of impacts affect the

24   to ecosystem; starting to get into some of the questions

25   about ecosystem services; what it is that the different

1 parts of the systems can provide, both to people as well

2 as to the ecosystem themselves; and also a fair amount

3 more work with looking at ecological impacts of

4 genetically-engineered crops.

5     And in the five years since I've been back in

6 consulting, I've done quite a bit more work in

7 contaminated site assessments, some more metals and

8 mining kinds of work, as well as other types of organic

9 compounds that contaminate sites.

10 Q    Are you or do you participate in any professional

11 organizations?

12 A    Yes.  I've been fairly active in three different

13 professional organizations:  The Wildlife Disease

14 Association was the first organization that I joined and

15 that's actually been around for quite some time; has

16 probably about 1200 people worldwide.  And in 1993 to

17 '95, I was the president of that association after

18 having served on council for quite a few years.

19     I also helped start the American Association of

20 Wildlife Veterinarians and served as their president

21 from 1991 to 1993, and have been active since my

22 graduate years in the Society of Environmental

23 Toxicology and Chemistry, served on council there and

24 was also president in 2002 and 2003.

25 Q    Have you been the recipient of any awards in your

1  fields?

2  A     Yes.  I received a gold medal award from EPA for

3  some of the research that I've done there and a bronze

4  medal as well.  I received the Distinguished Service

5  Award from the Wildlife Disease Association in

6  recognition of the types of research information I've

7  conducted to the wildlife disease field.

8  Q     Do you have any publications?

9  A     I have around -- I think I'm up to about 90 or so

10  now in terms of peer-reviewed publications, books, and

11  book chapters, as well of course quite a few technical

12  reports.

13  Q     Could you give us an idea of the areas in which you

14  have published.

15  A     A number of different areas.  Of course as I've

16  looked at different aspects from pesticides to metals in

17  minings, work -- published a lot of work related to

18  avian immunology and immunotoxicology; work in

19  endocrinology.  Also a number of papers on risk

20  assessment methodology; how to do these kinds of

21  contaminated site assessments, taking into account

22  weight of evidence and a number of different stressors

23  that I get pulled into those types of things.

24        And in the last five years that I was working at

25  EPA, I was one of the primary authors of the EPA's

1  framework for risk assessment of metals in the

2  environment for both human health and environmental

3  assessment.  That provides the guidance for EPA for how

4  you do these types of assessments.

5  Q    I'm sure I'm going to destroy this acronym, but it

6  looks like HAZWOPR.  H-a-z-w-o-p-r.  Is that a

7  certificate that you hold?

8  A    Yes.

9  Q    Could you tell me what HAZWOPR is.

10  A    Hazardous waste operator.  What this is is it's an

11  initial 40 hours of training followed by annual 8-hour

12  updates for understanding safety and health issues for

13  working at contaminated sites.

14  Q    Do you hold any other certificates?

15  A    I'm a certified wildlife biologist.

16  Q    How long have you held that certificate?

17  A    Since 1995.

18  Q    In connection with the work that you've done in

19  this case, did you review any information and consider

20  any written documentation?

21  A    Yes, I did.  I reviewed a number of pieces of

22  information, most notably a lot of the data that had

23  been collected by the Flambeau Mining Company on the

24  concentrations of the copper and zinc in the water over

25  the years, and that information was provided.

1        I also looked at the Roesler deposition, his

2    testimony -- his deposition testimony, as well as a

3    number of exhibits that were associated with that.

4    There was also a couple of internal DNR memos related to

5    the Flambeau Mining site and that was the Peerenboom

6    memos that were dated 2001 and 2006.

7    Q    Are those -- I'm sorry.  Go ahead.

8    A    And I also did review the expert reports from

9    Dr. Chambers and Robert Nauta.

10   Q    I'd like to ask you what work you have done

11   involving copper and zinc in the environment.

12   A    Well, I've done a fair amount of work related to

13   contaminated sites in trying to assess whether copper,

14   zinc and other metals in the environment are the cause

15   of any decline in services of those different

16   environments.  So at specific mining sites primarily.

17   Q    Okay.  So drawing your attention to number four,

18   item four in your expert report, you discuss copper and

19   zinc in the environment?

20   A    Um-hmm.

21   Q    Could you describe what you have addressed there.

22   A    Yeah.  So what I was pointing out here are a couple

23   things.  First is that we know that copper and zinc are,

24   like many of these other elements, naturally occurring

25   in the environment and that organisms actually require

1  copper and zinc in order to have optimal health.  They

2  are what we call *required micronutrients*, so you have to

3  have a certain amount of those elements present in the

4  environment.

5       Now of course as with all things, the dose makes

6  the poison and so although we need to have some copper

7  and zinc, there could also be too much copper and zinc

8  in the environment that would result in adverse effects

9  and what we call *toxicity*.  However, because these are

10 naturally occurring organisms -- elements, the organisms

11 have developed ways of being able to accommodate

12 differing amounts of the elements.  And different

13 organisms have different tolerances.  So although we do

14 have some organisms like the ceriodaphnia that are very

15 sensitive to copper, just a little bit of extra copper

16 in the environment could be detrimental to them.

17      There are other organisms that are very tolerant of

18 copper.  And so if you kind of lay out like in a range

19 of tolerance all these organisms, it can range anywhere

20 from about five micrograms per liter, or what's known as

21 parts per billion of copper, up to over a thousand parts

22 per billion of copper can be in the environment without

23 causing any effects.

24      So the environment in which the copper issue is

25 being addressed is very important because not all

1   organisms live in all environments.  So we have to

2   understand which organisms are likely to be in the

3   environment, and based on that, which are the ones that,

4   you know, of those that are likely to be there, do we

5   have those that are tolerant or do we have those that

6   are sensitive-type organisms.

7   Q    Drawing your attention to the number 5 issue in

8   your expert report, you discuss bioavailability --

9         MR. VAN CAMP:  I'm not quite sure why I'm

10  ringing now.  It seems like I'm got some feedback.

11        THE COURT:  I thought I was too.

12        MR. VAN CAMP:  I'll try to speak from back

13  here.  We'll try this.

14  Q    Drawing your attention to the fifth item in your

15  resume, it talks about bioavailability of metals in

16  aquatic systems.  Can you tell us what you're trying to

17  relate there?

18  A    Um-hmm.  Certainly.  So metals exist in the

19  environment in many different ways.  We have to

20  understand a little bit about environmental chemistry in

21  order to understand how organisms then become exposed to

22  the metals that are in the environment.  So when we have

23  a metal like copper or zinc, it's what we call a

24  divalent cation and essentially the molecule is

25  positively charged, okay?  So it has two pluses on it.

1  It's divalent.  It's charged in that way.

2      So as we know, opposites attract, and anything

3  that's negatively charged is going to attract this

4  positively charged ion and they'll bind together.  So,

5  for example, if we have sulfates in the water or

6  chlorine in the water, those are negatively charged and

7  you'll get the copper binding to the chlorine.  You'll

8  have copper chlorates and copper nitrates and different

9  types of binding.

10     Copper also really likes to bind to organic matter.

11 There's a lot of negative charge in a lot of places for

12 copper to bind to organic matter.  And copper also then,

13 and zinc and the other metals, got bound up into what we

14 call the *crystal lattice* of particles, like sediment

15 particles and soil particles and it gets to be inside

16 those particles.  So that's what copper does when it's

17 in the environment.

18     Now, how does it then affect the fish and the

19 invertebrates that are in the water?  It will affect

20 them, if the copper is not bound to something else, then

21 it can bind to the fish or the invertebrate gills,

22 because those gills are negatively charged.  They're

23 negatively charged because they really want to attract

24 calcium or sodium in order to maintain osmatic balance

25 and other kind of physiological parameters in the

1   organisms, and calcium and sodium are also positively

2   charged.  So when you have copper, it sees this negative

3   charge on the gill, and then it has to kind of compete

4   with calcium and sodium for binding to the gill.

5       So we have two things going on.  We have what's

6   called *complexation in the environment* where the copper

7   or zinc binds with things in the environment and so it's

8   not around to be available to the organism, and then we

9   have competition between copper, zinc, calcium, sodium,

10  and the other ions on the gill.  And the various

11  relationships between those things will determine how

12  much then is available for binding -- for causing

13  toxicity to the organism.

14      Obviously these kind of ratios differ in different

15  environments.  So what happens in one place may be

16  different somewhere else.  And when we, as chemists, go

17  out and say so, how much copper is in this water or how

18  much zinc is in this water, what the chemist can do is

19  they can take and pull really strong acid in the water

20  and they can pull all of that copper off of these

21  negatively charged ions and out of the particles and

22  they can say the total amount of copper in the water is

23  this, and they'll give you that number.  That's what's

24  happened here in the water monitoring that's been done

25  at the Flambeau Mine.

1   So we know the total amount of copper that's there,

2   but what we don't know is of that total amount, how much

3   is bound up into all these other things and therefore

4   what's left over to be available to cause toxicity to

5   the organism.  Now typically this kind of thing has been

6   known about for quite some time, and initially the way

7   aquatic toxicologists took this into account would be to

8   say well, we know if it's bound to the particles, it's

9   not going to be available.  So let's take this water and

10  we're going to filter it first before we do the analysis

11  of how much copper is in there.  We typically filter

12  through a .45 micron filter.  That takes out most of the

13  big particles, and what's left has been called the

14  *dissolved metal*.  It's not truly dissolved, there's

15  still small amounts of organic matter in there and some

16  of these other ions for the copper or zinc to bind to.

17      So knowing that that's the case, there's always

18  been a hardness adjustment, and that hardness takes into

19  account some of those other ions, but not all of them.

20  And that's how -- we see this translated in the water

21  quality criteria by taking a standard number and

22  adjusting it for the hardness that's in that water in

23  that particular site.  So that gets us closer to kind of

24  taking into account site-specific chemistries that

25  change how much is actually available for binding on the

1  gills of these animals.

2  There's now a more complex model called the *Biotic*

3  *Ligand Model* that was developed about a decade ago.  It

4  was originally published by Di Toro, et al. in 2001.

5  And the Biotic Ligand Model then takes into account all

6  these other aspects that can pull the copper in and bind

7  it and keep it from being available for causing

8  toxicity.  EPA has adopted that in their latest version

9  of the water quality criterion for copper.  That Biotic

10  Ligand Model is available for zinc, but EPA has not

11  adopted it in their criterion yet.

12  So the kind of take-home message from all of this

13  is that just measuring total amount of copper or total

14  amount of zinc in the water does not really tell us for

15  a particular site whether toxicity is going to occur or

16  not.  So if you're using totals, even when you do the

17  hardness adjustment and compare it to the

18  hardness-adjusted criteria, you can say whether, you

19  know, those criteria are protective, but they're not

20  predictive.  If you're below those levels, you know that

21  you're not going to have an effect.  If you're above

22  those levels, you really can't say whether it's going to

23  be toxic or not because you still have not really

24  identified what the bioavailable fraction is; how much

25  of that copper or zinc is available to cause toxicity.

46

1    Q    When you're talking about the levels of toxicity,

2    would acute or chronic toxicity be the levels that

3    you're referring to?

4    A    Yes.

5    Q    And just stepping back for a moment, remind us what

6    was the data that was gathered relative to the Flambeau

7    Mine site.  What was actually measured?

8    A    What was measured were total concentrations of

9    copper and zinc.

10   Q    With regard to that, was there any filtering that

11   you were aware of through this .45 micron filter that

12   you saw?

13   A    No.

14   Q    I'd like to take you then to Item 6 of your report,

15   discussing water quality standards for metals, which

16   maybe I was jumping ahead a little bit, but could you

17   please -- I think I'm ringing again.

18        Could you please tell us what you are expressing

19   about water quality standards for metals.

20   A    Right.  And I think I probably jumped ahead a

21   little bit as well.  What this section is talking about

22   is the points that I was making that the water quality

23   criterion are developed based on studies that are done

24   in relatively pure water in the dissolve fraction.  And

25   so when we have a water quality criterion at the state

1  level, which kind of builds off of what happens from the

2  federal criteria, that is then hardness adjusted to take

3  into account some of the issues related to

4  bioavailability.

5      There is an adjustment that can be done to try to

6  take into account if you only have total what might be

7  the dissolved versus total, but there's a fair amount of

8  uncertainty when you do that type of approach.  So

9  again, we have a criterion that tells us that if you are

10 below this number, you'll be protecting -- protective of

11 the organisms in the water body.  You will not expect

12 any affects.  If you're above that criterion number,

13 then you need to do further work in order to ascertain

14 whether there is actually a biological consequence of

15 that.

16 Q    When you're referring to being below certain

17 criterion --

18 A    Um-hmm.

19 Q    I'm sorry.  Must be electric today or something, I

20 don't know.  When you're below, when you speak of being

21 below a specific criterion, once again in this case

22 we've talked about toxic levels, say acute toxicity or

23 something.  Tell us with regard or -- and if you would,

24 use the words *acute toxicity* or *chronic toxicity*, if

25 you're above or below that, how would that be

1  considered?  Do you follow my question?

2  A    I think so.  Let's see if I answer what it is

3  you're trying to get at.  So an Acute Toxicity Criterion

4  is based on mortality in a very short period of time.

5  So if you have a concentration that's at that criterion

6  or above that criterion and you have a sensitive

7  organism, it should die very quickly.  So acute means

8  very short or very quickly.

9      Chronic is an exposure that occurs over a longer

10  period of time and we usually measure in points such as

11  growth or reproduction when we're talking about chronic

12  toxicity.

13  Q    When you were speaking about certain things being

14  predictive of something, would you relate predictive to

15  either acute or --

16  A    Chronic.

17  Q    -- chronic -- thank you.

18  A    Yes.

19  Q    Toxicity.  Thank you.

20  A    Yes.  So predicting, what you want to try and do

21  then is to say can I use these data to predict whether

22  the concentration is at such a level that it would

23  acutely affect the organisms.  Would it kill the

24  organisms right away if they were in that water.  That's

25  what the acute criteria would be.  If an organism comes

1    into the water or water is discharged at that

2    concentration or above that concentration, you should

3    see that they die right away.

4        For chronic toxicity, if you're at levels that are

5    chronically toxic, the organisms will still be alive,

6    but they may not grow properly.  They may not reproduce

7    either at all or maybe just not as much.

8    Q    So if those levels -- if levels are copper or zinc,

9    for example, are below the acute toxicity level, I

10   believe you said that that would be sort of a

11   conservative approach; is that correct?  And tell us why

12   that is.

13   A    Okay.  Yes, it would be a conservative approach if

14   the concentration in the water body is below the Acute

15   Toxicity Criterion.  You would not expect any of the

16   organisms to die or to have an adverse affect.  Again,

17   because what we're assuming is in the -- using this type

18   of water quality criterion that we have is that all of

19   that concentration is available to kill the organism,

20   and we know that that's not really true, so it's an

21   overly conservative type of assumption.

22   Q    Drawing your attention to Item 7 in your expert

23   report.  It's talking about impacts of copper and zinc

24   discharge on the Flambeau River.  Could you describe for

25   the Court, please, what you have considered in that.

1  A    So I considered the totality of the weight of

2  evidence that we have available when addressing the

3  question as to whether the concentrations of the metals

4  in Stream C are likely to be toxic to those organisms.

5  And we typically look at evidence, three different types

6  of evidence, and that's generally done in a particular

7  order, which I believe was actually done here by

8  reviewing Craig Roesler's work.

9       So first we ask this question:  Is the

10 concentration of the metals in the water above the Acute

11 Toxicity or Chronic Toxicity Criterion?  And if no, then

12 we're done, because as we were just talking about,

13 that's a good conservative estimate and we feel

14 confident that there's no effects.

15      If yes, if you exceed those criteria, then you have

16 to take the next step which says I can't say for sure

17 that it's not toxic, but I don't know yet if it is.  So

18 let's go and look at what the organisms in the stream

19 are telling us.  Now this is pretty standard practice

20 for how you do a contaminated site assessment.  It's

21 also part of the guidance that the State of Wisconsin

22 has that they use for when they try and determine

23 whether a stream should be listed on the 303(d) Rule --

24 303D list.  And that's in their consolidated assessment

25 and listing methodology.  So they take these same three

1   steps that I'm going to tell you about.

2          So we've already talked about the water quality

3   criterion number.  The next step is to do an assessment

4   of what organisms are present in the stream.  This is

5   the work where Craig Roesler went out and he used some

6   kick nets to be able to get up all of the invertebrates

7   that are in Stream C and looked at the invertebrates at

8   the mouth of Stream C and also did some electroshocking

9   in order to collect fish that were in the stream.

10         As pointed out, in order to do that, you need to

11  know what is normal, what you might expect, and that's

12  based on two things:  One is the knowledge of the

13  ecology of those types of streams that you just heard

14  Dr. Burton talk about, and the other is if there's

15  another stream nearby that's real similar in everything

16  but for the contaminates that you're dealing with, you

17  can look at that as a reference stream.

18         So if we look at the data that came out of this

19  exercise, the invertebrate analysis was done by

20  Mr. Jeffrey Dimick at the University of

21  Wisconsin-Stevens Point and he pointed -- he used a

22  couple of standard indices:  One called the IBI, the

23  other called the HBI, and these are indices that have

24  been developed by scientists and adopted by the EPA and

25  also by the State as indicative of what is to be

1   expected of an invertebrate community.

2       He found that the invertebrate community in Stream

3   C, in the areas of Stream C and the mouth of the river

4   that he looked at, were fair to good in the Flambeau.

5   In some cases it was excellent.  He also, as was pointed

6   out, looked at -- pointed out the differences in

7   Hyalella species above and below the mouth of Stream C,

8   suggesting that those differences were probably due to

9   the extra organic matter coming out of Stream C and

10  causing a bloom of what we call *periphyton* on the rocks

11  and cobbles and sediments in the Flambeau River just

12  below the mouth of Stream C.  Periphyton is kind of that

13  green slime that you see on rocks and things when you're

14  looking in the water and is basically algae and bacteria

15  and things like that.  And so there are different types

16  of Hyalella that can take advantage of that by having

17  scraping mouth parts so they can scrape it off the

18  rocks.

19      If you look at the weight of evidence there between

20  that type of description and also the fact that the

21  copper and zinc concentrations are really no difference

22  below the mouth and above the mouth of the stream, that

23  it's a reasonable explanation for why there are

24  differences there.

25      Beyond that, the kinds of invertebrates that were

1  found in the stream appear to be appropriate for that

2  type of ephemeral stream.  So that's the second of the

3  three steps that we take in developing the weight of

4  evidence for whether there's an effect.

5       The third step, and it is actually the most

6  definitive, is to do some toxicity testing.  And Craig

7  Roesler collected water and he sent that to the state

8  laboratory for doing both acute and chronic, so

9  short-term and longer life-cycle studies with the

10 standard test species that we use for looking at water

11 toxicity.

12      Ceriodaphnia is an invertebrate and is one of the

13 more sensitive invertebrates to copper.  Fathead minnow

14 is a standard warm water fish that was studied and is

15 moderately sensitive to copper, and then selenastrum is

16 an algae.  And we all know that copper is a good

17 algaecide because we use it to put into our fish tanks

18 when we have aquariums at home, and use it in other way

19 of taking care of algae.  So algae are particularly

20 sensitive to copper.  And in both the acute, the

21 short-term studies as well as the life cycle studies,

22 there were no effects on these organisms.  So the test

23 waters gave the same results as expected control waters.

24      So based on these three lines of evidence of

25 looking at the concentrations of the copper and zinc in

54

1   the water, then looking at the animals that are in

2   Stream C and around the mouth of Stream C, and looking

3   at the toxicity study results, it's my opinion that

4   there is no effect of the copper or zinc on the aquatic

5   biota in Stream C or its confluence with the Flambeau

6   River.

7   Q      During your observations at the Flambeau Mine site,

8   you indicated that there was a strong smell of decay at

9   one point during your examination, and how might that

10  affect any of the things you've just described?

11  A      Yes, there was, and also noted a lot of litter

12  fall.  Of course it was in October, so there was some

13  new litter fall, but there was also an obvious amount of

14  old forest duff of litter from previous years and

15  there's a fair amount of what looked like organic

16  sediment in the stream.  And so that brings up again,

17  taking us back to the discussion about bioavailability

18  and what copper binds to.  Copper likes to bind to

19  organic matter and there certainly appeared to be a lot

20  of organic matter in the stream and in that area, and

21  the smell of decay kind of also brings that out, as well

22  as the potential for sulfides and for some anoxic

23  sentiments to be there.  So not having oxygen.

24       And when you have that condition of the sulfides

25  and lack of oxygen, you get what's called a *reducing*

1    *environment*, and again, it causes the copper, the zinc,

2    the metals to be more tightly bound and to stay bound to

3    sediments and other particles rather than being

4    available for binding to gills of fish and

5    invertebrates.

6    Q     Have you, Dr. Fairbrother.  Have the opinions --

7               MR. VAN CAMP:  Oh, boy.  I don't know what's

8    going on.

9               THE COURT:  I'll try to have somebody look at

10   it over the break.

11              MR. VAN CAMP:  Okay.  I can't imagine what that

12   is.

13   Q     Have the opinions that you have expressed here

14   today been expressed by you to a reasonable degree of

15   scientific certainty within your fields?

16   A     Yes, they have.

17              MR. VAN CAMP:  I have no further questions for

18   this witness.  Thank you very much.   (10:25 a.m.)

19              THE COURT:  Did you have something to move in?

20              MR. VAN CAMP:  Yes.

21              THE COURT:  And that is?

22              MR. VAN CAMP:  I will be marking the resume,

23   that is the back part of Exhibit 587 as Exhibit 662 and

24   ask that that be received.

25              THE COURT:  Any objection?

1          MR. BENDER:  No objection, Your Honor.

2          MR. VAN CAMP:  Do you mind if I go through that

3    quickly?

4          MR. BENDER:  Are you asking me?

5          MR. VAN CAMP:  Yes.

6          MR. BENDER:  I don't mind.

7          MR. VAN CAMP:  You looked like you were ready

8    to go.

9          THE COURT:  That's received. Mr. Bender.

10                    CROSS-EXAMINATION

11   BY MR. BENDER:

12   Q    Morning, Dr. Fairbrother.  My name is David Bender.

13   I'm one of the attorneys for the plaintiffs in this

14   case.  I believe, if I followed correctly, some of your

15   testimony this morning was or much of it was that total

16   recoverable copper is not the same thing as the toxic

17   copper in a water body.  Is that fair?

18   A    That's correct.

19   Q    And the reason is because only a part of what would

20   be within the category of total recoverable copper is

21   available to have toxic effects on aquatic life; is that

22   correct?

23   A    That's right.

24   Q    And does the portion of copper that has the

25   potential for toxic effects, does it have a name?

1  A    Bioavailable copper.

2  Q    Okay.  How does that relate, if at all, to

3  dissolved copper?

4  A    It's a portion of the dissolved copper, but not all

5  of it.

6  Q    So there is total recoverable copper, and then

7  within that category there are additional categories

8  including dissolved copper?

9  A    That's right.

10  Q    And then within the category of dissolved copper is

11  the potentially toxic copper; is that fair?

12  A    Okay.  That's a good way to put it.

13  Q    Okay.  And you also discussed calcium and sodium

14  concentrations that have an effect on whether copper can

15  be toxic; is that true?

16  A    Yes.

17  Q    And those are ions like copper can be; is that

18  correct?

19  A    Right.

20  Q    And one of the reasons that copper can be toxic is

21  because it competes with those elements; is that

22  correct?

23  A    Well, that's not why copper is toxic.  Copper will

24  substitute for calcium on the gills and one of the

25  reasons why the amount of copper that it takes to be

1   toxic might be reduced from the amount, the total amount

2   in the dissolved fraction is because sometimes that

3   copper -- excuse me, the calcium has already bound to a

4   site on the gills.  So that binding site is then not

5   available for copper.

6   Q    Okay.  And where there is more calcium in the

7   water, there is less potential for copper to attach to

8   the gills; is that correct?

9   A    To some extent, yeah.  But you also have to

10  understand sort of the relative binding strength of the

11  two and which one would outcompete the other for binding

12  on the gills.  So they can kind of knock each other off

13  sometimes.

14  Q    And the amount of calcium in water is otherwise

15  referred to as hardness; is that correct?

16  A    It's part of what's in hardness.  So hardness can

17  be measured as calcium carbonate.  It's kind of a

18  surrogate for all of the other ions that are there.

19  Q    Okay.  And do you know whether the Wisconsin water

20  quality criteria for copper accounts for water hardness?

21  A    There is a hardness adjustment that you can do to

22  that, yes.

23  Q    Okay.  Do you know whether that has been done for

24  streams such as Stream C?

25  A    Well, I'm not exactly sure what you mean has been

1  done, but those -- if you look at the interpretation of

2  whether the concentration in Stream C and comparing it

3  like to the Acute Toxicity Criterion; for example, Craig

4  Roesler and others did do the hardness adjustment before

5  making that comparison.

6  Q    Okay.  So you understand that that was done.

7  A    Yes.

8  Q    Okay.  Did you do any analysis of hardness of the

9  water in Stream C?

10  A    No.

11  Q    Did you do any samples of the amount of biological

12  material in the water in Stream C?

13  A    Biological material.  Can you explain what that is?

14  Q    I thought you testified about biological material

15  earlier today.

16  A    I did not do any sampling in Stream C.  Maybe I can

17  just say that.

18  Q    Okay.  Did you ask for data of sampling in Stream C

19  that may have been more specific to what we discussed as

20  the potentially toxic amounts of copper?

21  A    Yes.  I did ask if there's information on dissolved

22  fraction that had been filtered, and I asked if there

23  was any information on measurement of any of the other

24  ions that had been in the water or if there's any

25  measurement of dissolved or total organic carbon.

1   Q    And what were you told in response to those

2   questions?

3   A    No.  At the time when I was -- wrote my report,

4   there were no information.  I was told that all of the

5   concentrations that were measured were on total and that

6   there had not been any filtered data, and that did not

7   at that time have information on amount of organic

8   carbon.

9   Q    Who did you ask those questions to?

10  A    Of Flambeau Mining Company.

11  Q    Who specifically?

12  A    You know, I don't remember specifically which

13  person I asked that for, but it was when I was given all

14  the information, I looked through that and asked if

15  there was more.

16  Q    It was some time after November 2011; is that fair?

17  A    But before -- it was before I wrote my report.

18  Q    Which is in March 2012?

19  A    Yeah.

20  Q    I believe one of the things that you cite in your

21  report is something you refer to as Figure 3 --

22  A    Um-hmm.

23  Q    -- done by Foth --

24  A    Um-hmm.

25  Q    -- Company?

1    A    Right.  Right.

2    Q    Can you see your screen?

3    A    Yep.

4    Q    Is that what you referred to in your report as

5    Figure 3 from Foth?

6    A    Yes.

7    Q    Okay.  And this is a part --

8             MR. VAN CAMP:  Excuse me, Your Honor.  Could we

9    get an exhibit number on that if it's been --

10            MR. BENDER:  I'm about to tell you.

11            THE COURT:  That's a good point.

12            MR. BENDER:  This is Exhibit 1025, Your Honor.

13            THE COURT:  Okay.  Thank you.

14   BY MR. BENDER:

15   Q    So these are the data that you used for copper

16   concentrations for your analysis; is that correct?

17   A    Yeah, these were.  Um-hmm.

18   Q    And do you understand where these -- where this

19   figure came from?

20   A    From the sampling that had been done during the

21   time that -- on the dates that these were related to.

22   Q    That was what was represented to you?

23   A    Yeah.

24   Q    Was this a part of a larger document?

25   A    It was -- no, I didn't see additional kind of

1   written information related to these.  There's just

2   additional data in terms of concentrations of copper and

3   zinc in different places.

4   Q    Were there additional figures?  I mean this is

5   labeled Figure 3.  Do you see that?

6   A    Right.

7   Q    Were there Figures 1 and 2?

8   A    Not that I recall.

9   Q    Okay.  Do you recall if there was a Figure 9?

10  A    No.

11  Q    And you asked someone at Flambeau for any

12  information about dissolved copper; is that right?

13  A    Yes.

14  Q    And that would have been helpful for your analysis?

15  A    Yes.

16  Q    Showing you first what's marked as Figure 8.  Have

17  you seen that document before?

18          THE COURT:  Is this Plaintiffs' Exhibit 8?

19          THE WITNESS:  This is Figure 8, which is

20  another piece of the same Exhibit 1025, Your Honor.

21          THE COURT:  Oh.

22          THE WITNESS:  Could I see a copy of my expert

23  report again, please?

24  BY MR. BENDER:

25  Q    Would that help you answer my question?

1  A    Yes.  Um-hmm.  To answer your question, yes, I saw

2  Figure 1, but I did not see Figure 9.

3  Q    What about Figure 8?

4  A    No.

5  Q    Are you able to read the screen?  Should I focus it

6  further?

7  A    That's good right there.

8  Q    Okay.  Do you see for some of these samples there

9  are two columns?

10  A    Um-hmm.

11  Q    One for total and another one that says d-i-s-s

12  period.  Do you see that?

13  A    Yes.

14  Q    Do you understand that to be *dissolved*?

15  A    I do.

16  Q    And I guess this says copper concentrations in

17  surface water monitoring 2006 through fall 2011.  Do you

18  see that?

19  A    Yep.

20  Q    And you recognize the map on which this is overlaid

21  as the Flambeau Mine site?

22  A    That's true.

23  Q    So fair to say you did not take into account this

24  figure or the data contained in it in your analysis?

25  A    Yes, that's true.

1    Q    Would it change your opinions at all if the

2    dissolved fraction of copper were high compared to the

3    total?

4    A    Looking at that, the dissolved fraction cannot be

5    higher than the total amount of copper.  Total is total.

6    That's everything.  That's the dissolved plus the

7    particulate copper.  If you look on that figure, you'll

8    see the dissolved fraction is higher than the total

9    fraction, which leads me to believe that there's

10   something incorrect about the analysis that was done.

11   Q    So if the dissolved fraction is higher than the

12   total fraction, there's something wrong with the

13   sampling?

14   A    Either the sampling or the filtering or the

15   analysis or somewhere along the line, it's just not --

16   by definition it's not possible for dissolved to be

17   greater than total.

18   Q    The total has to be the sum of its parts?

19   A    Yes.

20   Q    Do you understand where or do you know where the

21   data you relied on came from?

22   A    Beyond saying it came from this figure?

23   Q    Correct.

24   A    No.

25   Q    Do you know who did the sampling?

1   A    I don't.

2   Q    Do you know whether there was any quality control

3   of that sampling?

4   A    I have not seen any of the laboratory information

5   related to sampling.

6   Q    Would it be fair to say that if the sampling had

7   dissolved fractions higher than the total fractions,

8   that you would be suspect of some of that sampling?

9   A    I would certainly ask to see some of the quality

10  assurance data.

11  Q    Did you ask to see any quality assurance data of

12  the data you relied on for your report?

13  A    No, I did not, neither from the Flambeau work or

14  from Craig Roesler's work.

15  Q    Do you know how hardness in Stream C can change

16  from season to season?

17  A    Yes, it can change from season to season if that's

18  the question.

19  Q    Do you know whether it does?

20  A    It appears that it might.  There was a couple of

21  seasonal samplings that Craig Roesler did, like in April

22  and September, and there's -- not unexpectedly there's

23  some differences.  That type of variation is pretty

24  normal in the environment.

25  Q    And can it change from year to year?

1   A    Yes.

2   Q    And does the amount of copper sampled in Stream C

3   change from year to year?

4   A    Yes, it does.

5   Q    Does the amount of biological material in Stream C

6   change from year to year?

7   A    Yes.

8   Q    And does it change from season to season?

9   A    Yes, it would.

10  Q    And the biological toxicity testing that Craig

11  Roesler did that you relied on for your opinions, do you

12  know whether that testing accounted for variations from

13  year to year?

14  A    He only did it once.

15  Q    So it can't account for that variation; correct?

16  A    Correct.

17  Q    And do you know whether it accounted for any

18  variations at all?

19  A    Only in terms of some minor spatial variations

20  because he collected the samples over a finite area of

21  space, yeah.

22  Q    So he collected multiple samples from in Stream C;

23  correct?

24  A    Um-hmm, yeah, but --

25  Q    But they happened on one day.

1  A     Correct.

2  Q     So they're representative of what the copper,

3  hardness, biological material, and other factors were on

4  that specific day; correct?

5  A     That's correct.

6  Q     And there's no other data or you're not aware of

7  any other toxicity testing from that stream; correct?

8  A     I'm not aware of any.

9  Q     And your opinion was based on that one day of

10 analysis; correct?

11 A     That's correct.

12 Q     You also testified that you did not believe that

13 there were any effects on the daphnia, fathead minnow,

14 and the algae?

15 A     Ceriodaphnia, which is different from daphnia.

16 So --

17 Q     I understand that.

18 A     -- I did not --

19 Q     I prefer not to have to --

20 A     Ceriodaphnia, algae and the fathead minnow.

21 Q     Thank you.  I'll refer to daphnia and you'll know

22 which species I'm talking about?

23 A     No.  I would prefer we refer to ceriodaphnia,

24 because daphnia as a genus has a different sensitivity

25 to copper than ceriodaphnia does.

1   Q      Ceriodaphnia.

2   A      Yes.

3   Q      Am I pronouncing it right?

4   A      That's correct.

5   Q      So those are the three species or the three

6   subjects of sampling; is that correct?

7   A      Of testing.

8   Q      Of testing.

9   A      Yes.

10  Q      Was there an effect on the algae growth between the

11  sample from Stream C and the control sample at the lab?

12  A      The lab reported there was about a 21 percent

13  decrease in alga growth in the Stream C sample.

14  Q      Okay.  So decrease meaning there's less plant

15  growth in the Stream C sample; correct?

16  A      That's correct.

17  Q      And as I think you mentioned before, algae is

18  sensitive to copper and that's why we use it to clean

19  our fish tanks; correct?

20  A      Yes.

21          MR. BENDER:  No further questions, Your Honor.

22          THE COURT:  Mr. Van Camp, anything else?

23          MR. VAN CAMP:  I have nothing further.  Thank

24  you very much.

25          (Witness excused at 10:40 a.m.)

1      THE COURT:  All right.  Why don't we take a

2  15-minute recess at this time.

3      (Recess        10:40-10:55 a.m.)

4      THE CLERK:  This Honorable Court is again in

5  session.  Please be seated and come to order.

6      THE COURT:  Mr. Van Camp, you may call your

7  next witness.

8      MR. VAN CAMP:  At this time Flambeau Mining

9  Company rests.

10     THE COURT:  Oh, all right.  Mr. Cassidy, are

11 you going to call the next witness or a witness?

12     MR. CASSIDY:  Your Honor, we have no witnesses

13 to call in rebuttal.  We're prepared to give a

14 summation.

15     THE COURT:  I'm sorry?

16     MR. CASSIDY:  We have no witnesses to call in

17 rebuttal, Your Honor, so we're --

18     THE COURT:  So you're resting.

19     MR. CASSIDY:  -- prepared to go ahead.  We're

20 resting, yes.

21     THE COURT:  All right.  Well, we got the

22 microphone fixed.

23     MR. CASSIDY:  We are prepared to give a short

24 summation to the Court.

25     THE COURT:  Do you want to do that?

1          MR. VAN CAMP:  Sure.  I'd be happy to do that.

2     Also I would like to renew the motion that has been

3     previously filed, simply indicating that it be

4     considered at this time as well.

5          THE COURT:  All right.  Good.  Mr. Cassidy,

6     I'll hear you.

7          MR. CASSIDY:  Thank you, Your Honor.  I'm

8     taking a chance by moving the microphone, but may it

9     please the Court.  I'd like to first commend opposing

10    counsel on a well tried case.  It doesn't mean we agree

11    and --

12         THE COURT:  I understand that.

13         MR. CASSIDY:  -- I just have a short summation

14    for the Court.  I understand the Court is going to

15    review briefing shortly.

16       The plaintiffs in this case have presented

17    substantial evidence to show and meet our burden on at

18    least three ways, Your Honor.  I just would start with

19    the Court's summary judgment order where the Court

20    determined or the only reason this Court didn't rule for

21    the plaintiffs on summary judgment was there was a

22    declaration by Elizabeth Day that indicated there was

23    some issue of fact about whether Stream C existed north

24    of Copper Park Lane.  Ms. Day went out on one day in

25    October of 2011 and couldn't find a channel, and as a

1   result of that, the Court determined there was an issue

2   of fact that would require a trial.

3        Your Honor, for three reasons, the plaintiffs have

4   met their burden.  First, Stream C is one stream.  It

5   exists south of Copper Park Lane.  It exists north of

6   Copper Park Lane.  It exists north of the biofilter.  It

7   flows down from Highway 27.  It goes under a culvert

8   there, it proceeds slightly west, goes under two more

9   culverts going southwest, two culverts that are three

10  feet in diameter side by side.  It comes down past the

11  biofilter on the east side, goes under another culvert,

12  the farmer's culvert, the stub road, and then continues

13  on down to Copper Park Lane.  It's not a long distance

14  and it's one stream, and for that reason alone, and it

15  discharges when the biofilter enters that stream, it's

16  the same below and above Copper Park Lane.  There's no

17  reason, and the evidence clearly shows that there's no

18  reason to distinguish between the two.

19       And how do we know that?  We have eyewitnesses who

20  testified about the channel that Ms. Day couldn't find

21  above Copper Park Lane.  I'm just going to show quickly

22  two photos that serve to illustrate this point.  This is

23  a photo, as you know, Your Honor, taken from Copper Park

24  Lane looking north.  It's in 2004, and you can clearly

25  see Stream C flowing down through there.  This is the

1  channel that Ms. Day couldn't find during her visit.

2  And in case there was any question about whether that

3  channel still exists or did exist throughout the whole

4  time we've been talking about for the last five days,

5  here it is again in April of 2011, seven years later.

6  If you superimposed these two pictures on top of one

7  another, you could tell there's more flow in 2011.

8  There's a little less flow, maybe that's moderate flow

9  in 2004, but you can even see the wet ground around the

10 stream in that picture.  It is identical to what we see

11 seven years later, almost exactly in 2011.

12      We -- so we have photographs showing the channel.

13 We have it in the spring.  You saw the photograph.  We

14 have in the winter showing that channel.  How else do we

15 know that Stream C is just -- starts above the biofilter

16 and continues down south of Copper Park Lane?  There are

17 culverts designed to transfer -- transport water.

18 There's called the railroad culverts I already

19 mentioned, the farm road culverts.  All these are

20 designed to transport water.  There's a culvert under

21 Copper Park Lane.  There's no difference between that

22 culvert or any of the culverts north of there.

23      Your Honor, I said we didn't agree all the time

24 with counsel, but interestingly we agree with a lot of

25 what their consultants and their employees say up until

1   this litigation began.  You've heard from their

2   consultants and you've seen their maps that represented

3   Stream C; called it an intermittent stream for years and

4   years until this litigation.  And the Court can take

5   that into consideration when weighing the testimony of

6   the witnesses who came in here and all of a sudden

7   decided that the blue line wasn't on the map but was

8   actually only in their head.

9        We know where the samples were taken.  There is --

10  there are sample points that go up and go by the

11  biofilter.  They're north of the biofilter.  And they

12  follow the same blue line.  That's where the water was.

13  That's where the water was running.  That's where they

14  were taking their samples with scoopers.

15       When Ms. Murphy, who has been out there probably

16  more than anyone to take samples testified about seeing

17  flow, she drew it on a map.  We have that and we marked

18  it as Exhibit 88, and it's the same map that she says

19  she saw flow at this point, at this point, at this

20  point, and then further south of the biofilter here down

21  here.  It's not a coincidence that all those places that

22  she saw flow match up with the blue line that is Stream

23  C north of Copper Park Lane.

24       When Ms. Murphy testified about where she went to

25  look for flow to determine where she would go take

74

1   samples north of Copper Park Lane, she said she went to

2   Copper Park Lane and if she saw flow coming there, she

3   knew it was a good day to take samples.

4       Finally, Your Honor, we have Ms. Murphy's logbook.

5   I won't go through -- and I won't go through all the

6   evidence because this is going to be a short summation,

7   but -- I can't go through all the evidence.  But in her

8   logbook, which is Exhibit 8, she talks repeatedly about

9   seeing the biofilter flowing into Stream C; about flow

10  observed in Stream C above Copper Park Lane.  And

11  finally on April 25, 2009, she talks about the low flow

12  across the outlet of the biofilter into Stream C and she

13  makes an interesting note.  She notes that there is a

14  tree cut upstream that has fallen across the channel.

15  That's channel north of the biofilter.  It's north of

16  Copper Park Lane and it's north of the biofilter.  She

17  identified it as a channel in a contemporaneous note

18  when she was there.  When I asked her about it, she

19  didn't want to call it a channel, but eventually she

20  agreed that it was a channel.

21      The testimony that you heard from some of the

22  defendant's witnesses is simply revisionist history,

23  Your Honor.  You heard downstream become downgradient.

24  You heard upstream become upgradient.  You heard Stream

25  C become a topographical feature.  These are their words

1   that they used all the way up until this litigation were

2   the words -- are the words that should be given the most

3   weight, because now there is an interest in not calling

4   this a stream when they did for years and years.

5       So the plaintiffs have presented more than ample

6   evidence to show that this is simply one stream.  If the

7   Court does not find that Stream C exists north of Copper

8   Park Lane and it's all one stream, the plaintiffs

9   secondly would also win because there is an indirect

10  discharge into this area that they call the Stream C

11  Watershed or the Wetland 7.

12      You heard the defendant's consultant, Mr. Donohue,

13  testify about copper that got from north of the

14  biofilter all the way through that drainageway, all the

15  way down Stream C, all the way down that blue line,

16  north to south.  That shows the conveyance of water

17  through that short area.  It flows south.  That's a

18  topographical truth.

19      We heard some questions about whether or not you

20  measured the direction of flow.  All the witnesses said

21  the water came out of the biofilter to the east and then

22  turned south.  There is no dye test needed, Your Honor,

23  to show water flowing from the distance from you to me.

24  There was a gradient there.  There were sampling sites.

25  And this is what the biofilter was designed to do.  It

1  was put there to gather stormwater from this Industrial

2  Outlot, to passively treat it, and then to discharge it

3  into that area so it would flow downstream.

4       Again, Exhibit 1009, Jana Murphy's letter to the

5  Department of Natural Resources, talks about flow coming

6  out of the biofilter to Stream C and eventually to the

7  Flambeau River.  Ms. Murphy also talked about channels

8  running from the biofilter heading east to Stream C.

9  And the caveat most of the witnesses wanted to give was

10 with sufficient flow.  And we of course agree with that.

11 This is an intermittent stream we're talking about.  It

12 doesn't flow all the time.  But when there's sufficient

13 flow, pollutants are transported, water is transported,

14 and it all comes out, goes into that watershed, goes

15 into the wetland, whatever you want to call it, and

16 makes its way down to Copper Park Lane to a water that

17 Your Honor has already found to be a water of the United

18 States.  So there is an indirect discharge if the Court

19 does not find that Stream C simply exists all the way

20 north to Highway 27.

21      Third, Your Honor, there is a significant nexus

22 between the area that is east of the biofilter and the

23 Flambeau River.  Mr. Paler in his argument the other day

24 for the motion to dismiss talked about *Rapanos* and I'm

25 just going to briefly recite the facts of *Rapanos*

1    because it's important to distinguish this case that

2    we've heard about all week from *Rapanos*.

3        In *Rapanos*, there was static fill in wetlands, so

4    we're not talking about flowing water carrying

5    pollutants.  We're not talking about stormwater.  It was

6    fill put in a wetland that was attached to an irrigation

7    ditch that flowed into another irrigation ditch, that

8    went into a tributary, and then into a traditional

9    navigable water.

10        The distance was somewhere between 12 and 20 miles,

11   Your Honor.  Here we have about a half a mile to the

12   Flambeau River.  If there's a spectrum of cases where

13   there's federal jurisdiction, *Rapanos* is over here on

14   the spectrum.  Our case is on the other side.  It isn't

15   even close on the facts.  There is direct adjacency from

16   the watershed and the water body north of Copper Park

17   Lane with Stream C south of Copper Park Lane.  Ms. Day,

18   as you'll see in her testimony, admits that.

19        So for all the facts and all the reasons you've

20   already discussed in your summary judgment order, the

21   short distance, the obvious flow, the pollutant

22   transport, and also the biological connection.  We heard

23   testimony from the defendants again -- again, the

24   defendant's own consultant, who said there is no reason

25   to believe, and this is the Blue Iris report, there is

1   no reason to believe that during periods of high flow,

2   fish will not migrate upstream to the biofilter, and

3   during periods of high flow, fish will not migrate

4   downstream to the biofilter.  So there is a physical

5   hydrologic connection.  There is a chemical connection

6   of copper and pollutants getting downstream, and there

7   is a biological connection of fish migrating upstream

8   and downstream.

9        So for all those reasons, Your Honor, or for any

10  one of those reasons, the plaintiffs have presented more

11  than ample evidence to carry their burden on liability.

12  I understand the defendants have the burden on the

13  penalty phase.  I can address that quickly rather than

14  have us both --

15           THE COURT:  Why don't you do that.

16           MR. CASSIDY:  Okay, Your Honor.  As Your Honor

17  has already ruled, the defendants have the burden.  In

18  terms of penalties, the penalties should start at the

19  maximum and then it's the defendant's burden to bring

20  those down.  The plaintiffs have -- I'll talk about

21  penalties first.  As this Court has already acknowledged

22  or found, penalties serve a purpose.  We've heard some

23  testimony in the penalty phase of this case about the

24  infiltration basins and that they've been installed and

25  that they've been working for a few months.  That is not

1    a sufficient period of time to know whether they will

2    work into the future, whether there will be discharges

3    into Stream C.  The penalties will help ensure the

4    pollution control that the company has put in place as a

5    result of all -- everything that's led up to this case.

6    They put it in place.  It's worked for a few months;

7    will continue to work; will continue to -- they'll

8    continue to maintain it.  It will continue to be

9    effective to protect Stream C from further discharges,

10   toxic metals.

11       There have been a lot of false starts since 2004.

12   There are -- so there's reason to believe that those

13   penalties are necessary to keep the company motivated,

14   to keep the company vigilant about their control.

15       Your Honor, we acknowledge there were some facts

16   that were presented yesterday that may serve to mitigate

17   some of the penalties.  We're not asking for the

18   maximum.  We think there are some -- there may be some

19   mitigation based on some of the things we've heard.  But

20   I would say, Your Honor, nothing we heard this morning

21   is really, should go to mitigating those penalties.

22   Very little weight I think should be given to any of the

23   testimony we heard simply because it became clear that

24   the experts were testifying on limited knowledge.  They

25   were not given all the materials that they needed to

1  really make an informed decision.

2      Mr. Burton was shown a number of pictures of Stream

3  C that he didn't recognize but was able to say it looked

4  like about hundreds of other streams he had seen over

5  the course of his career.  Ms. Fairbrother clearly did

6  not receive all the data she needed to make a totally

7  informed decision.  So to the extent the Court is going

8  to consider the testimony this morning, we believe it

9  should be given little weight with regard to mitigation

10 of any penalties.

11     With regard -- and then finally with regard to the

12 penalties, we understand that there was a position by

13 DNR regarding the mining permit and whether or not that

14 was sufficient.  But the company -- this is not a

15 mom-and-pop company that is not sophisticated.  They had

16 lawyers.  They had people as early as -- lawyers as

17 early as 2005 telling them that they should not -- that

18 they should continue to be covered under the mining

19 permit, even though they may be covered under a WPDS

20 permit because the mining permit was going to be less

21 stringent.  And that's -- so they knew as early as 2005

22 that there was a possibility that maybe they should get

23 a Clean Water Act permit.

24     You heard testimony that they never approached DNR,

25 despite a lot of testimony about openness and

81

1   collaboration.  They never went to DNR with that advice

2   and they never sought a permit, even though they were

3   told they might need one.  And the reason they didn't

4   was because they knew -- they knew they were operating

5   under a less stringent permit.

6        That's important, Your Honor.  A Clean Water Act

7   permit is not a paper exercise.  It involves compliance

8   with water quality standards.  That --

9        THE COURT:  Is there anything about the Clean

10  Water Act permit that would make it anything that

11  defendant was doing improper that wouldn't also have

12  been improper as far as the DNR was concerned under the

13  arrangement that it had?

14       MR. CASSIDY:  It has different requirements,

15  Your Honor.

16       THE COURT:  But I'm -- it may, but I want to

17  know is there anything specific that you're pointing to

18  that defendant did or did not do that would make it

19  liable under the Clean Water Act permit that wouldn't

20  also make it liable under the arrangement with the DNR.

21       MR. CASSIDY:  Well, if I understand your

22  question, Your Honor, the compliance with water quality

23  standards is an important one.  There was no such

24  requirement under the mining permit.  That requirement

25  exists under every Clean Water Act permit.  And the

1  water quality -- there are two bedrock pieces of Clean

2  Water Act permits:  One, numeric limits; one, compliance

3  with water quantity standards.  You need both.  So

4  that's one requirement.

5      Secondly, there are monitoring reporting

6  requirements that come under the Clean Water Act permit

7  that weren't necessarily included in the mining permit.

8  The Clean Water Act permit is a five-year permit, Your

9  Honor.  It's designed that way to be renewed every five

10  years as things change, as more monitoring results come

11  in, and this permit has been in place -- mining permit

12  had been in place, you know, for several years longer

13  than that.  So there's checks and balances along the

14  way.

15     And finally, Clean Water Act permits allow --

16  inform EPA and inform citizens and citizens may enforce

17  them.

18         THE COURT:  I'm not sure you're answering my

19  question.  What exactly are you saying -- what specify

20  acts or omissions are there of defendants that would

21  have violated the Clean Water Act permit that were --

22  well, that were overlooked by the DNR or didn't have any

23  application to the DNR arrangement?

24         MR. CASSIDY:  Well, Your Honor, the specific

25  acts are the requirements of the permit and so their

83

1   discharges into Stream C --

2          THE COURT:  So essentially any discharges into

3   Stream C that went on into the Flambeau are violations

4   of the Clean Water Act and they wouldn't have bothered

5   the DNR, is that what you're saying, if it had any

6   consequence from the DNR?

7          MR. CASSIDY:  Well, they're violations because

8   there was no permit.  Depending on what that permit --

9   what the requirements of the permit were and what they

10  were established as water quality standards and what

11  requirements they were designed to meet under that

12  permit would determine whether they'd be violations

13  under that permit.  But that's the whole point of

14  getting the permit and that's the reason as for

15  injunctive relief, we've asked the Court to order the

16  company to get a Clean Water Act permit to cover any

17  discharges, any future discharges into Stream C, and

18  those requirements would go forward with the company.

19     We'd also ask the Court, as far as injunctive

20  relief, that there would be continued monitoring of

21  Stream C and the Flambeau River downstream of the

22  confluence of where Stream C comes into the Flambeau

23  River for at least three years.  The monitoring of

24  testing and monitoring to ensure that they've really

25  solved the problem of discharges into Stream C is

84

1  critical moving forward.

2      For all those reasons, Your Honor, we believe

3  penalties are appropriate in this case and the

4  injunctive relief of applying for a permit they should

5  have had many years ago to comply with the Clean Water

6  Act and continued monitoring would be the proper remedy

7  in this case.

8              THE COURT:  Thank you.

9              MR. CASSIDY:  Thank you.

10             THE COURT:  Mr. Van Camp.

11             MR. VAN CAMP:  Thank you, Your Honor.  Counsel.

12 There's a very clear and easy path to a determination

13 regarding the evidence that was presented at trial, and

14 perhaps the plaintiffs and the defendants are in

15 agreement about this, and that is that a summary

16 judgment in this case was issued and it was a summary

17 judgment that considered mountains of evidence and

18 documents and briefs and issues and things like that.

19 But the measurement of what happened here in this trial

20 is a measurement to determine whether or not the

21 plaintiffs added any credible evidence at trial that

22 would be beneficial to a determination of the issues

23 left open by the Court at summary judgment.

24     It's not going to be the stipulated facts because

25 those weren't disputed in the summary judgment motion,

1   and it isn't going to be the responses to the Requests

2   to Admit because those were considered in the summary

3   judgment as well.  The test is going to be whether the

4   plaintiffs, before they rested their case, added any

5   evidence in response to the open questions left in the

6   summary judgment decision.  And they did not.

7        If we look briefly at the individuals who testified

8   on behalf of plaintiff before the plaintiff rested,

9   there was Dr. Coleman, and his evidence and statements

10  were considered in the summary judgment.  But there was

11  a distinct difference between the evidence at trial and

12  the evidence that was offered at summary judgment.

13  Dr. Coleman testified at trial that there were three

14  observations that he had of the biofilter overflowing.

15  Those were all in 2004 prior to the five-year statute of

16  limitations that is relevant to things in this case.

17       As to the one observation that he claims that he

18  had in 2007, he was noncommittal.  He backed off of the

19  statement that well, maybe I wasn't at the biofilter

20  that day.  So after January of 2006, Dr. Coleman had

21  absolutely no observations regarding discharges from the

22  biofilter.  He also critically admitted most of his

23  observations were made from Copper Park Lane.  I'm going

24  to get into the vegetation in a moment, but I think --

25            THE COURT:  Not literally.

1          MR. VAN CAMP:  Well, no, we've been in the

2     vegetation, but we'll discuss it at more length.  But

3     the one thing that is painfully clear is that this is a

4     very vegetated area; that the biofilter outlet is

5     overgrown and choked with plants and there are rocks all

6     over the place and there is absolutely no possibility

7     that a discharge from the biofilter could be viewed from

8     Copper Park Lane.

9          Now Mr. Roesler testified and he testified about a

10    series of things that he did, tests that he conducted,

11    information that he obtained and he admitted that it had

12    nothing to do with trying to determine significant nexus

13    or connection or flow directions or transport.  It was

14    tests at specific locations to determine for those

15    specific times whether there were copper concentrations

16    at that specific location and whether or not there were

17    zinc concentrations at that location.

18         I find it interesting that the plaintiffs have

19    criticized Dr. Fairbrother for considering a limited

20    amount of evidence and not considering all of the

21    evidence and I find it interesting because the

22    plaintiffs are attempting to make their case on that

23    same exact limited evidence.  So while they criticize

24    her for considering that limited evidence, if it is

25    subject to criticism, that same criticism applies to

1    them.

2        Mr. Roesler did not express any opinions in this

3    case.  He did not express any opinions, much less

4    express opinions to a reasonable degree of certainty

5    within any science.  He denied impact of the one thing

6    the plaintiffs spent a great deal of time trying to

7    demonstrate involving dissolved oxygen.  When the Court

8    asked him about it, he said it had no impact.  So

9    nothing he did connected any discharges from the

10   biofilter to anything.

11       So again, Mr. Roesler added nothing to the record

12   that existed on summary judgment.  At absolute best, he

13   identified a few observations and contended in a very

14   general way that he saw discharges to Stream C.

15   Mr. Roesler did not get down on his hands and knees and

16   separate weeds and grasses the way that Mr. Hutchison or

17   Dr. Day did.  It was a general comment, nothing more.

18       I think that the photographs are illustrative of a

19   couple of things.  The plaintiffs showed you two

20   photographs of water flowing in their closing argument.

21   They were years apart.  Both of them were from April.

22   The point is that this is an intermittent stream.  It is

23   a very intermittent stream; that there may be flow on

24   occasion infrequently, but there is no evidence in the

25   record of flow through the wetland or out of the

88

1   biofilter through month after month after month.

2          Out of the biofilter the flow was stipulated as

3   part of the summary judgment motion.  So the flow we

4   would be looking at in trial would be flow that somehow

5   would connect anything coming out of the biofilter with

6   any flow that was described above the wetland, in the

7   wetland, below the wetland.  And there absolutely isn't

8   any evidence that was introduced that can connect that

9   flow.

10         And one of the reasons for that is because many of

11  the witnesses agreed that volume of flow would be

12  indicative of where the flow might go.  What evidence is

13  there in the record of the volume of flow?  There is

14  absolutely none.  There is no evidence of the volume of

15  flow out of the biofilter.  There's no evidence of

16  volume of flow coming into the wetland from the north.

17  There's no evidence of flow within the wetland.  And

18  there's absolutely no evidence of volume of flow going

19  south out of the wetland.  There's no evidence of flow

20  even in Stream C, south of Copper Park Lane.

21         Frequency is another issue.  What is the evidence

22  that was introduced at trial that added anything to the

23  record on summary judgment about the frequency of flow

24  at any of these locations?  Other than the stipulated

25  facts which were part of the record in the summary

1  judgment motion, no evidence was introduced about

2  frequency.

3       So, we get to the issue of significant.  Are the

4  only occasions when there is flow the photographs that

5  the plaintiffs have introduced that were available to

6  them at the time of the motion for summary judgment that

7  were included?  Is it only a few days in April?  Is it

8  more days?  When is it?  What is it?  What does it

9  include?  How much of the water flowing out of the

10  biofilter made it even to the bottom of the berm?

11      If it made it to the bottom of the berm, there

12  cannot be any dispute that it went into a wetland.  If

13  it went into the wetland, what happened to it?  Where

14  did it go?  Did it go into the ground?  Did it go into

15  the air?  There is no evidence that connects any of that

16  flow to any of the evidence that's been presented at

17  trial.

18      What is the effect of that wetland, Wetland 7, on

19  anything?  What is the effect of that on Stream C?

20  What's the effect of that on Stream C, whether it is

21  above or below Copper Park Lane?  What is the effect of

22  that wetland to the Flambeau River?  There is no

23  evidence in this record, and especially before the

24  plaintiffs rested, about what effect that wetland might

25  have.

1    Mr. Nauta was not helpful.  Mr. Nauta agreed that

2   he based his -- much of his opinion about the flow on a

3   cartoon.  And by the way, if you look at that evidence,

4   that cartoon is a cartoon in the documents related to

5   the infiltration basins.  Mr. Nauta didn't even know

6   where he was when he was out there, how far he walked,

7   how far -- how much further he would have to walk, how

8   much more he would have to observe to determine anything

9   about Stream C and its effect on the Flambeau River.

10    What he saw when he went out there was depicted in

11   his photographs.  He didn't see any flow.  He saw snow

12   and ice, except for a few feet within a couple of

13   hundred yards south of Copper Park Lane.  There was no

14   indication of what it was doing.  There were no tests

15   taken.  No idea where it came from.  And if it wasn't

16   frozen, it was almost certainly groundwater.

17    Judge, I think that the plaintiffs clearly

18   understood that the trial in this case was going to be

19   about the issues remaining after the summary judgment

20   decision.  I believe they understood that they have the

21   obligation to connect the dots.  I believe they had the

22   obligation to demonstrate what that wetland was doing,

23   why it was doing it, how it was doing it, and how any

24   nexus that existed was significant.  And nobody

25   testified about anything of significance.

1     Addressing a few of the comments of counsel, I

2 think that what they have demonstrated was available in

3 the documents that were shown to the Court in summary

4 judgment.  Those documents had the topography of the

5 area, and what they have shown is that water flows

6 downhill.  I do not believe that the pages and pages and

7 pages of *Rapanos* are about whether water flows downhill.

8 I don't believe that Justice Kennedy, in his concurring

9 opinion, intended to say that if water flows downhill,

10 there's a significant nexus.

11     As the plaintiffs reminded this Court, it is not

12 about what it is called, so whether it is called Stream

13 C, whether it is called that blue line, whether it is

14 called those blue arrows, whether it is called

15 downgradient or upgradient, that's not the issue.  Water

16 does flow downhill.  But there is a biofilter and this

17 is a point source case and there has not been any

18 connection tied to anything that came out of that

19 biofilter and Stream C or the Flambeau River.

20     Interestingly, the plaintiffs agreed that with

21 sufficient flow, there would be pictures like the

22 pictures you saw.  What they don't do at all is tell you

23 when or how often there is sufficient flow.  They don't

24 tell you what sufficient flow is.  They have absolutely

25 no information about sufficient flow.  They talk to you

1  about the need for a PDES permit, but they can't explain

2  to you what would be gained by a PDES permit over

3  anything that exists.

4      I think it's interesting that Jim Bertolacini, who

5  has spent 20 plus years with the Department of Natural

6  Resources, would tell clients in Flambeau's situation

7  that they don't even need one of those permits.  Nothing

8  would be gained by that.  They say that they would have

9  monitoring if this Court concluded that penalties or

10  injunctive order were in place.  If this Court heard

11  anything about the processes that were instituted by

12  Flambeau Mining Company, by the Department over the

13  entire period of time that Flambeau has been in

14  Wisconsin, is they have monitored everything.  And when

15  they weren't monitoring it, they added monitoring.  And

16  they remonitored it.  And they shared their monitoring.

17  And they shared their information with the plaintiffs,

18  they shared their information with the DNR, they shared

19  their information with anybody that wanted to see it.

20  They have hidden nothing, which I think takes us to the

21  liability section of this case.

22      I told you when I made my opening statement that

23  when Flambeau came to Wisconsin, they intended to do it

24  as a good neighbor.  And they did.  They instituted

25  policies and procedures to protect Wisconsin's

1   environment.  On the 80 percent or more of their site

2   that was reclaimed, they achieved the promise and

3   objective that they set out.  They reclaimed it.

4       We're not here about that.  We're here because some

5   local people asked Flambeau to give them, to donate, to

6   make something available to them that became very

7   valuable to them.  Flambeau did it.  Flambeau went to

8   the trouble to ask the DNR if they could modify their

9   plan which would have avoided all of this, to modify

10  their plan so that they could then give this to the

11  community so that the community could use it for

12  revenue, for future industrial growth.

13      You heard about the operation of the company.  I

14  mean Ivan Shanks is not employed by them any longer, but

15  he came all the way down here to testify, to tell you

16  about the culture, about how far they go to make sure

17  they don't harm the environment; about how he could shut

18  down a mining operation by locking them out if they

19  couldn't handle the water; how they operated at one-half

20  of their permitted level; how they put pads under trucks

21  so that they wouldn't drip oil.  They were a good

22  neighbor.

23      You heard the community leader, Al Christenson,

24  testify they built a library.  They gave them all kinds

25  of money for other facilities, and how they have now an

1    industrial area that they can use for development and

2    that they have a development committee and 90 percent of

3    the funding for that comes from this.

4        And then you heard from a lot of regulators.  And

5    in the summary judgment decision, Larry Lynch was

6    considered.  But Larry Lynch was here and he testified

7    and he was a very, very credible witness.  He was very

8    knowledgeable.  He understood what went on.  And he

9    built a relationship with this company and they worked

10   together to do what needed to be done to complete their

11   work, including reclamation.

12       You heard many times from Jim Hutchison.  There are

13   very capable consultants at Foth that were hired to do

14   virtually everything: design the monitoring, design the

15   plans, do the things that needed to be done and do them

16   right.

17       You heard from Phil Fauble, who took over from

18   Larry Lynch who said never saw them in violation.  Found

19   them cooperative to work with.  The DNR never over 20

20   years had to take enforcement action to get something to

21   happen.  It happened.  Penalties would be

22   counterproductive.  We don't want to send a message to a

23   company that was willing to change their plan which

24   would have gotten them probably out of the state

25   entirely, by being a good neighbor, to give something to

1   the community, and then penalize them for that.

2       Because as that happened, in short order in order

3   to continue to work with the environmental interests and

4   to continue to work with the local interests, if there

5   were shortcomings, and we're talking about a very small

6   area here, this Industrial Outlot, if there were

7   shortcomings, they dug up the parking lots and redid

8   them and covered them.  If there was copper in a ditch,

9   they dug it out and covered it up so it wouldn't be a

10  problem again.  If there was copper someplace else that

11  was discovered, they took out the rail spur and they

12  covered it up and they planted it.  All of the

13  information about toxicity is taken as an average over

14  time by the plaintiffs' experts in this case when, in

15  fact, the toxicity went down continuously over this

16  period to the point where it didn't most recently exceed

17  the levels that had been complained about by the

18  plaintiffs in this case.

19      The import of the final witnesses was to bring

20  highly educated, capable people to this court to say

21  that they have looked at the data, they have looked at

22  the information, they have examined the property, unlike

23  Nauta who wrote his report and then decided to go see

24  it.  They examined it and they determined that there

25  absolutely was no damage.

1      Judge, I think if we go back to the summary

2  judgment decision and we look at whether or not the

3  plaintiffs have contributed any additional evidence upon

4  which this Court can determine that under Kennedy and

5  *Rapanos* there is a significant nexus, there's no

6  alternative but to say they haven't done it.  Thank you.

7            THE COURT:  Thank you.  Mr. Cassidy, did you

8  wish to say anything further?

9            MR. CASSIDY:  No, Your Honor.

10           THE COURT:  Okay.  Thank you very much.  I

11 really appreciate the civility that you all have shown

12 to each other and your cooperation with the Court and

13 the schedule.  And we're decided now that you will have

14 something in in response to the motion for judgment as a

15 matter of law by June 4th; right?

16           MR. CASSIDY:  Yes, Your Honor.

17           MS. MCGILLIVAY:  Yes, Your Honor.

18           THE COURT:  Okay.  Anything else hanging up?

19           MS. MCGILLIVAY:  No, Your Honor.

20           THE COURT:  All right.  Court will adjourn.

21           MS. MCGILLIVAY:  Thank you, Your Honor.

22       (Proceedings concluded at 11:47 a.m.)

23

24                     *  *  *  *  *

25

1        I, LYNETTE SWENSON, Certified Realtime and Merit

2   Reporter in and for the State of Wisconsin, certify that

3   the foregoing is a true and accurate record of the

4   proceedings held on the 25th day of May 2012 before the

5   Honorable Barbara B. Crabb, District Judge for the

6   Western District of Wisconsin, in my presence and

7   reduced to writing in accordance with my stenographic

8   notes made at said time and place.

9   Dated this 11th day of September 2012.

10

11                    /s/_____

12                    Lynette Swenson, CRR, RMR, CBC
                            Federal Court Reporter

13

14

15

16  The foregoing certification of this transcript does not
    apply to any reproduction of the same by any means
17  unless under the direct control and/or direction of the
    certifying reporter.

18

19

20

21

22

23

24

25