UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

WISCONSIN RESOURCES
PROTECTION COUNCIL, CENTER
FOR BIOLOGICAL DIVERSITY,
AND LAURA GAUGER,

                Plaintiffs,      Case No. 11-CV-045-BBC

    vs.

                              Madison, Wisconsin
FLAMBEAU MINING COMPANY,     May 24, 2012
                              1:30 p.m.
           Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF FOURTH DAY OF COURT TRIAL
AFTERNOON SESSION
HELD BEFORE THE HONORABLE BARBARA B. CRABB

APPEARANCES:

For the Plaintiff:  McGillivray, Westerberg and Bender
                  BY:  PAMELA R. MCGILLIVRAY
                     JAMES N. SAUL
                     DAVID C. BENDER
                     CHRISTA OLIVER WESTERBERG
                  211 South Paterson Street, Suite 320
                  Madison, Wisconsin  53703

                  Pacific Environmental Advocacy
                  Center-East
                  BY:  KEVIN M. CASSIDY
                  P.O. Box 445
                  Norwell, Massachusetts  02061

CHERYL A. SEEMAN, RMR, CRR
Federal Court Reporter
United States District Court
120 North Henry Street
Madison, Wisconsin  53703
1-608-255-3821

```
APPEARANCES:    (Continued)

For the Plaintiff:   Center for Biological Diversity
                     BY:  MARC FINK
                     209 East Seventh Street
                     Duluth, Minnesota  55805

For the Defendant:   DeWitt Ross & Stevens S.C.
                     BY:  HARRY E. VAN CAMP
                          SCOTT M. PALER
                     Two East Mifflin Street, Suite 600
                     Madison, Wisconsin  53703


                     Susan S. George, Paralegal

For the State of
Wisconsin:           Wisconsin Department of Justice
                     BY:  THOMAS J. DAWSON
                     P.O. Box 7857
                     Madison, Wisconsin  53707-7857

Also Present:        Fred Fox, Flambeau Mining
```

                              ***

### I-N-D-E-X

| DEFENDANT'S WITNESSES | EXAMINATION | PAGES |
|---|---|---|
| JACK CHRISTMAN | Direct by Mr. Van Camp | 3-8 |
| FRED FOX | Direct by Mr. Van Camp | 8-35 |
| | Cross by Mr. Cassidy | 35-42 |
| LAWRENCE LYNCH | Direct by Mr. Van Camp | 43-92 |
| | Cross by Ms. Westerberg | 93-97 |
| | Redirect by Mr. Van Camp | 98-99 |
| BRUCE MOORE | Direct by Mr. Van Camp | 100-104 |
| PHILIP FAUBLE | Direct by Mr. Van Camp | 104-115 |
| | Cross by Ms. Westerberg | 115-117 |
| JAMES BERTOLACINI | Direct by Mr. Van Camp | 117-135 |
| | Cross by Mr. Saul | 135-137 |

### E-X-H-I-B-I-T-S

| EXHIBITS | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| Ex. 4 | - 2005 Audit | 39 | 42 |
| Ex. 35 | - 3/20/98 Letter | 96 | 98 |
| Ex. 554 | - Aerial Photo | 5 | 8 |
| Ex. 589 | - FMC Financials | 22 | - |

1                    **E-X-H-I-B-I-T-S**

2  <u>EXHIBITS</u>                        <u>IDENTIFIED</u>   <u>RECEIVED</u>

3  Ex. 590   - FMC Financials            26          -
   Ex. 591   -     "                     27          -
4  Ex. 635   - Aerial Photo               4          8
   Ex. 1000  - Mining Permit             48         50

5

6                         ***

7        (Called to order.)

8            MR. VAN CAMP:  If it pleases the Court, I would

9   like to put Mr. Christman on.  It will just be momentary.

10  And then he and Mr. Christianson can begin their trek

11  back to Ladysmith.  And I have talked to plaintiffs'

12  attorneys.  I don't believe they have an objection.

13            MS. MCGILLIVRAY:  That's true.  That's fine.

14            THE COURT:  That's a good idea.

15            MR. VAN CAMP:  Thank you.

16       **JACK CHRISTMAN, DEFENDANT'S WITNESS, SWORN**

17                  <u>DIRECT EXAMINATION</u>

18  BY MR. VAN CAMP:

19  Q.   Good afternoon, Mr. Christman.

20  A.   Good afternoon.

21  Q.   Would you please state your name for the record?

22  A.   My name is Jack Christman.  I live at W --

23  Q.   Can I put the microphone over?

24            THE COURT:  Yeah.  That's best if you just

25  scooch your chair up close.  That's good.

1   A.   My name is Jack Christman.  I live at W-11123

2   Highway 8; Bruce, Wisconsin.

3   Q.   Where is Bruce?

4   A.   About seven and-a-half miles straight west of

5   Ladysmith right on Highway 8.

6   Q.   I'd like to first show you an aerial photograph.

7   There's a picture of it on the easel beside you, but I'm

8   going to also put it on that screen that's right beside

9   you --

10   A.   Mm-mm.

11   Q.   -- Exhibit 633.  Is there a photograph -- wouldn't

12   you know it.  Let's go to 635.  I've got an exhibit

13   sticker right on top of it.  I would like to draw your

14   attention to the exhibit on the screen, which is Exhibit

15   635.  Do you recognize the area shown in that aerial

16   photograph?

17   A.   Yes.

18   Q.   What is it shown in that photograph?

19   A.   It shows the house that I built.

20   Q.   Okay.  If you take your finger and you actually push

21   on the screen --

22   A.   Yeah.

23   Q.   -- you can draw a circle right around the house that

24   you're talking about and it should come up in a color.

25   So just put your finger on the screen and draw a circle

JACK CHRISTMAN - DIRECT

1   right around it.  Do you see the circle on that screen?

2   A.   Yeah.

3   Q.   Okay.  Is that a house that you built?

4   A.   Yes.

5   Q.   When did you build that house?

6   A.   Oh, it was in the late 50's.

7   Q.   And how long did you live in that house?

8   A.   I built -- I moved out because of my option on my

9   land and I built another house where I'm living now in

10  1968, I think.

11  Q.   Okay.  When you lived in that house, what was on the

12  property immediately to the north of your house?

13  A.   Immediately to the north?

14  Q.   Yes.

15  A.   It was a line fence between me and my neighbor,

16  Stanley Mazinski.  He had a farm there.

17  Q.   Okay.  I would like to show you now another

18  photograph, Exhibit 554.  Can you move that up so we can

19  see?  Do you see a photograph?  We have moved it up on

20  your screen so you can see the lower right-hand corner of

21  that?

22  A.   Yes.

23  Q.   Do you see buildings down in the corner?

24  A.   Yes.

25  Q.   Can you tell us what those buildings are?

JACK CHRISTMAN - DIRECT

4-P-6

1    A.   Well, the first building right here, that's where my

2    driveway came in and I had a shop there.  And then right

3    to the north of that, that was a machine shed.  And then

4    of course it was my neighbor's barn and his garage is up

5    here.  His house was over here.  And the line fence that

6    I had talked about was right through there, right on this

7    tree line, just this side of his machine shed and just

8    north of my garage.

9    Q.   Okay.  And how long was that farmyard on the

10   property north of yours and what happened to it and when

11   did that happen?

12   A.   The buildings?

13   Q.   Yes.

14   A.   They were destroyed when the mine bought that option

15   of that land.

16          THE COURT:  And when you say you optioned it,

17   was that the same thing as selling all of it?

18          THE WITNESS:  Well, they put an option when they

19   came in, they put an option to buy.

20          THE COURT:  Mm-mm.

21          THE WITNESS:  And when they started mining or

22   when they started in the construction, on the north side

23   of this line fence divided -- this was my woods in here

24   and of course this was Stanley's farm and the mine

25   naturally was up in this area.  And his buildings were

JACK CHRISTMAN - DIRECT

1    tore down because they didn't want them.  And that's

2    where they put Copper, oh, just inside of the line here,

3    Copper Lane, within there.

4              THE COURT:  Oh, Copper Park Lane?

5              THE WITNESS:  Copper Park Lane, yeah.

6    BY MR. VAN CAMP:

7    Q.   Did you draw a line where Copper Park Lane is now?

8    A.   Oh, it's approximately.  I got it kind of a

9    ziggy-zag there.

10   Q.   Okay.  Did you ever work for Flambeau Mining

11   Company?

12   A.   Yes.

13   Q.   Okay.  And during what period of time?

14   A.   I started part time with them helping a fellow that

15   I had worked for him for several years and that would

16   have been in the late 60s, early 70s.

17   Q.   And how long did you work for them?

18   A.   Well, I worked for them part time.  And then after

19   they got -- they started in the mining operations, I got

20   a full-time job with them.  I mean, if I call my

21   part-time years.  I mean, it was, you know, just hit and

22   miss.  But when I started -- I can't just remember the

23   year that they opened the mine.  What was it, '60 -- or

24   '80, somewhere in the early 80s -- I went full time with

25   them.  No, no, late 80s.

1  Q.    And then how long did you stay working with them?

2  A.    Well, I stayed working with them to when the mine

3  was reclaimed in '97.  I stayed on with them for, oh,

4  probably -- I can't remember exactly.  It's a long time

5  ago -- six, seven years.

6           MR. VAN CAMP:  Okay.  Your Honor, I have no

7  further questions for this witness.

8           MS. MCGILLIVRAY:  No questions, Your Honor.

9           THE COURT:  Thank you.

10           MR. VAN CAMP:  Thank you, very much.

11           THE WITNESS:  Thank you.

12           MR. VAN CAMP:  And I assume he can be excused?

13           THE COURT:  Yes.  You are excused.

14           THE WITNESS:  Thank you.

15           MR. VAN CAMP:  I would like to offer 635 and

16  554.

17           THE COURT:  Any objection?

18           MS. MCGILLIVRAY:  No.

19           THE COURT:  Received.

20           MR. VAN CAMP:  I would like to recall Mr. Fox.

21           THE COURT:  All right.

22                    DIRECT EXAMINATION

23              (Continued from recess.)

24  BY MR. VAN CAMP:

25  Q.    Could you tell us whether or not Flambeau Mining

JACK CHRISTMAN/DIRECT - FRED FOX/DIRECT

1  Company would have requested the reclamation modification

2  if it hadn't been for requests by the local community for

3  the use of those buildings?

4  A.   They would not have.

5  Q.   Did the mining company continue to use any of those

6  industrial buildings after the industrial outlot was

7  created?

8  A.   Not that I know of.

9  Q.   The only building -- now, do you know what's being

10  done with the house that Mr. Christman built back in the

11  50's?

12  A.   It is the environmental reclamation manager's

13  office.

14  Q.   And whose office would that be?

15  A.   Ms. Murphy's.

16  Q.   Okay.  And that's -- is that north or south of

17  Copper Park Lane?

18  A.   It would be south.

19  Q.   In the oversight you had of the Flambeau Mine site

20  in Ladysmith, did you ever conduct any studies or audits

21  of that property?

22  A.   I can recall two audits that were conducted during

23  my tenure as the director of Health Safety Environment

24  Reclamation.

25  Q.   And when were those audits?

FRED FOX - DIRECT

1  A.   My recollection would be 1997, just as the backfill

2  process was finishing up, and 2005 after reclamation was

3  complete and we were looking forward to -- I think we

4  already received a notice of completion and looking

5  forward to obtaining a certificate of completion from the

6  project.

7  Q.   Okay.  What is that certificate of completion that

8  you just mentioned?

9  A.   It is a, I think, a major milestone in the

10  reclamation progress of the site.  It's a -- by law, it's

11  a -- first of all, you reclaim the property.  And when

12  you feel you have stabilized the ground and the

13  revegetation is following suit with what your plans are,

14  you apply for a notice of completion, which means

15  basically what it states -- you notice the state that

16  you're complete with your reclamation.

17      Then there's a four-year, from the time you -- if

18  it's granted, which it was, and I can't remember the

19  exact date that that happened, but it did happen, so we

20  obtained the notice of completion accepted by the

21  Wisconsin Department of Natural Resources.  And then it's

22  four years of monitoring of the site conditions,

23  reporting with the reports that you heard about to the

24  Department of Mining.

25      And once you can prove that the -- nothing has

FRED FOX - DIRECT

1  changed, you know, since -- within that four-year period,

2  you can apply for a certificate of completion, with I

3  guess I compare it to the equivalent of getting a

4  diploma.  But it's a certificate notifying you that you

5  have completed what you intended way back when you

6  drafted up your reclamation plan.

7  Q.   And what property or what area was included within

8  the area covered by that certificate of completion?

9  A.   The entire reclaimed mine site, which would have

10  been 181 acres, which did include at that time the 32

11  acres that is now called the *industrial outlot*, so we

12  were looking for the certificate of completion for the

13  entire 181 acres under permit.

14  Q.   Okay.  And something happened along the way so that

15  that was changed, correct?

16  A.   Correct.

17  Q.   And what happened and what was changed?

18  A.   During the hearing, I believe that was a contested

19  case hearing which addressed the obtaining the

20  certificate of completion, there were objections, if you

21  will, from some of those in the audience, including one

22  of the plaintiffs, that the certificate of completion

23  should not include the 32-acre industrial outlot due to

24  the fact that there were -- which has been, you know,

25  discussed during the trial -- copper concentrations in

1   the influent and outfluent or effluent of the storm water

2   management structure.

3          And also at that time -- I can't remember the date,

4   but prior to the certificate of completion -- you'll

5   remember John Coleman and GLIFWC, *Great Lakes Indian Fish*

6   *and Wildlife Commission*, had noticed the Department that

7   there were copper concentrations in Stream C, which I

8   can't define at this time, that exceeded the state's

9   fresh water quality standards and he was demanding that

10  the Department of Natural Resources take some action.

11         And because of all this going up to obtaining the

12  certificate of completion, the company decided to listen

13  to those concerned about the outlot and to get in a room

14  and we drafted up a stipulation to obtaining the

15  certificate of completion.  And that carved out the 32

16  acres from the 181 acres, meaning that we then were at

17  the hearing to apply for the certificate of completion

18  for a major portion of the reclaimed mine site, but not

19  the industrial outlot, which we're talking about this

20  week.

21  Q.   Just generally, who were the parties in these

22  discussions or negotiations that you just described?

23  A.   This is -- I can recall, you know, from what I can

24  recall, it would be of course Flambeau Mining Company

25  represented by myself, attorneys, and I can't remember if

4-P-13

1   Ms. Murphy was part of that.  I believe the Department of

2   Natural Resources, if it was their attorney represented

3   there.  The parties who were concerned were in the room.

4   I can't remember if there was anybody else, but that's

5   basically -- you know, Flambeau Mining Company, its

6   attorneys; I'm sure there was an attorney, and I don't

7   know if there was a technical rep, for DNR; and the

8   plaintiffs, whoever they were represented by at that

9   hearing.

10  Q.   Okay.  When you say "the plaintiffs," you mean the

11  plaintiffs in this lawsuit?

12  A.   It would be Ms. Gauger.  And I don't think any of

13  the other groups here were even part of the deal at that

14  time.

15  Q.   And what do you recall being discussed at the

16  negotiation, you know, around the COC or the certificate

17  of completion, what was actually involved in those

18  negotiations?

19  A.   Well, I don't think the reclaimed mine site was of

20  issue at that time.  Everyone seemed to agree, you know,

21  that certificate of completion should apply to the site

22  that has been reclaimed back to its original condition.

23  But certain concerns over the industrial outlot were

24  identified and specifically where the concentration of

25  copper were coming from.  I think there also were

FRED FOX - DIRECT

1    concerns maybe there's other areas in the reclaimed mine

2    site that might have some copper concentration.

3        So those issues were discussed and the stipulated

4    order basically identified those areas of concern.  They

5    weren't specific sample points.  For example, for

6    whatever reason, the H&H building seemed to keep coming

7    up.  Someone had a concern that there was some soil

8    contamination around the H&H building.  Well, part of the

9    stipulation was to sample soils within the area of the

10   H&H building.  There wasn't a plan or anything; there was

11   this general concept.

12       I believe Intermittent Stream or drainage area now A

13   and B, which were drainages within the reclaimed mine

14   site, were part of that concern.  Maybe a wetland I

15   believe was part of -- you know, the water quality in one

16   of the wetlands was a concern.  Definitely the biofilter

17   above and below and Stream C were of a concern, so all of

18   those things were part of that stipulation.

19   Q.   Okay.  Was there a discussion at all about the water

20   treatment facility?

21   A.   Which one?

22   Q.   The one at the mine site, the water treatment

23   facility that was decommissioned.

24   A.   Yeah, it was already -- it was gone at that time, so

25   I don't believe, except for, you know, I guess

FRED FOX - DIRECT

1    reminiscing back to why we got to a biofilter, et cetera,

2    I really don't recall.

3    Q.    Okay.  And in the testimony that you've heard in

4    trial, there was some discussion about the stipulated

5    monitoring of water, of surface water and ground water.

6    Specifically regarding surface water, what happened in

7    these negotiations that led to a stipulation about

8    surface water sampling?

9    A.    Well, like I've mentioned in general terms, these

10   areas were discussed and then put into the stipulation, I

11   believe, that these areas will be sampled, probably even

12   the frequency of sampling, and in what period they will

13   be sampled over.  I believe it was maybe up to four years

14   you will do this, you will sample this area.

15        And then that's where Foth would be commissioned to

16   develop a plan to go and present to the Department of

17   Natural Resources and as part of the stipulation to get

18   approval to go sample, you know, specific points that

19   were in that plan.

20   Q.    Okay.  And was that plan then agreed to by the

21   parties?

22   A.    I believe it was, yes.

23   Q.    And after that, was a certificate of completion

24   received for everything except this industrial outlet?

25   A.    Yes.  The drafting the plan, getting it approved and

1    all that, I believe the certificate of completion was

2    actually granted at that hearing.  But it was

3    stipulated -- you know, the stipulation came out of that

4    and then went forward addressing the industrial outlet.

5    That's my recollection of it.

6    Q.   Okay.  Now, let me take you back to the audits that

7    brought us to the certificate of completion discussion.

8    Tell us about the audits.  What's involved in one of

9    these annual audits?  I don't mean annual audits; the

10   audits that you talked about that you participated in.

11   A.   Oh, yeah.  These audits were not just for Flambeau.

12   Part of the corporate environmental management system and

13   our policies say that we will insure that there's

14   compliance and that there's, you know, adherence to the

15   standards and procedures for health, safety and

16   environment.  So the auditing system was sort of a

17   program at the corporate office which dealt with all of

18   the operating and closed properties and Flambeau was part

19   of that auditing process as one of the sites.

20        What would happen, and I generally was the lead

21   auditor, I had the certification under ISO 14001 as an

22   auditor and I would call together a team.  And we did

23   them more frequently on operating properties, probably

24   every three years.  But here at Flambeau, I mentioned

25   1997 I think and 2005, so there was a gap there, but the

FRED FOX - DIRECT

1   reason was because we were just beginning the reclamation

2   phase in 1997.  We were going through the notice of

3   completion, et cetera.  We were waiting for time, but we

4   were heading into this certificate of completion.  It

5   seemed like a good time to pull together an audit of

6   where we were in 2005 before we applied for this

7   certificate of completion, so that's the rationale for

8   the dates.

9       And because it was reclaimed property, usually at an

10  operating property we would pull together a team of just

11  maybe five people that had expertise in a different area,

12  one area like maybe air, another area solid and hazardous

13  waste, another area would be reclamation; another area

14  would be water, surface and ground water expertise, that

15  kind of thing.  And those people would go out, and if

16  they felt comfortable with their assignments, would go

17  out and audit those particular areas.

18      Now, at a reclaimed property, you didn't have that

19  much activity going on.  So we had, in this case I can't

20  remember the number of people in the '97 audit, but I'll

21  guarantee it was more than the two people, myself and an

22  attorney I hired to be the auditors of Flambeau in 2005.

23  That's the process.

24      Now, what we did is we split up.  In terms of the

25  specific to Flambeau in 1997, I'm not clear, but there

FRED FOX - DIRECT

1  were different areas.  The backfill was a big issue then,

2  so we had a geochemist on that.  And we had other people

3  looking at different areas in 1997 and 2005, two people,

4  myself and this attorney.

5      I directed, by activities, to the health, safety and

6  communities, because we did have a communities function

7  in these audits.  And the attorney, who had experience in

8  the Clean Water Act and water issues, was assigned to

9  look at, like, I think things like the spill prevention

10  control plans.  He'd look at surface water monitoring,

11  those types, and the ground water I'm pretty sure he

12  looked at.  So that's how we kind of divvied them up and

13  kind of performed the auditing.

14  Q.   What was the purpose, what was the sort of overall

15  objective, of these audits?

16  A.   First and foremost, it was compliance in the sense

17  to insure the operations were operating in compliance

18  with our corporate -- first of all, our policy and then

19  our standards and procedures.  And part of that would be

20  compliance with regulatory requirements to bring back to

21  the corporate office an assurance that the operations are

22  complying with what we expected and in terms of our

23  policies, standards and procedures.

24      When we found, let's say, noncompliance -- and that

25  doesn't mean in the regulatory sense, but that there were

FRED FOX - DIRECT

 1   issues with policies and standards and practices -- we

 2   would put findings down.  And if it was a regulatory

 3   compliance, we would put findings, and we classified the

 4   findings.  And all of this is under Rio Tinto

 5   environmental guidelines, so there's guidelines that

 6   spell out all of the areas I'm covering.

 7        And that's why we get to the point where if we had a

 8   finding, it was a high finding, and that's subjective, it

 9   would be written up as a high finding.  If it was sort of

10   something that could be addressed within -- and the high

11   finding would, you know, we would require it to be

12   addressed immediately.

13        With a moderate finding, it would be something, you

14   know, maybe within one or two years this is an issue that

15   should be fixed, but it's not of critical importance.

16        And then there were low, which kind of dragged

17   along.  And a lot of them that did pertain to the low

18   issues were closure issues, something that's going to

19   come back and needs to be addressed, you know, within a

20   one to five-year period, if that makes any sense.

21   Q.   Okay.

22   A.   And with the findings, if you want me to continue,

23   the findings were then tabulated.  And this is generally,

24   you know, within a form.  And they were identified in

25   this form to be addressed by the site, obviously, with an

FRED FOX - DIRECT

1  action plan, how are they going to address this

2  particular finding -- high, medium or low.

3       And that then became the audit report, which the

4  distribution was very limited: it was to the site

5  manager, it was to myself; it was to people who were

6  working on -- you know, should be working on -- these

7  action plans, the environmental staff at the different

8  properties; and sent to my boss.

9       And it was recorded also on a system that ended up

10 in London, so we had it tracked by our corporate owner,

11 Rio Tinto.  They were involved in tracking these issues,

12 insuring that they would not just hang out there and not

13 be addressed because frankly, it's a corporate

14 reputational issue as well if you have certain things

15 that aren't getting addressed.

16      And you heard the culture, you know, that I was

17 proud to listen to with a few of the witnesses earlier.

18 That's embedded in all these policies, standards,

19 practices and procedures.  You heard about how up and

20 foremost would be the health and safety.  That's obvious.

21 We don't want injuries to our employees.  We want happy

22 employees.  We want people who want to work for Kennecott

23 Minerals and different operations.  And the environment

24 was right up there in terms of priorities, so this is how

25 we prioritized things.

1   Q.   Thank you.  Did you have any responsibilities

2   regarding review of financial information regarding

3   operations at Flambeau Mine site?

4   A.   Certainly not the accountant-type financials, I

5   wasn't involved in that, but I was involved in helping

6   prepare annual.  And we went out to five-year-plan

7   budgets for every one of our properties, including

8   Flambeau, in addressing, you know, what issues need to be

9   addressed, how much is it going to cost, and then you

10  project out the cost and put it into your budget.

11       It's either, you know, obviously these critical or

12  what I call *high issues* were going to be addressed

13  immediately.  Everything cost money.  So we budgeted

14  those issues and got approval for it overall; health,

15  safety, environmental quality budget; for the -- by

16  department.

17       And then I was, when, in the case of Flambeau, when

18  Ms. Murphy's supervisor on site left, retired, and she

19  was basically left alone there, she would present an

20  annual budget to me and that's how it filtered into the

21  corporate budget.

22       And, also, she would submit expenditures that she

23  had to, you know, write checks for or however.  She

24  basically sent the bills to me.  She didn't write the

25  checks, but she sent the bills to me with her approval.

FRED FOX - DIRECT

1   And then I looked them over and I approved them and I

2   sent them into our accountants, so whatever the vendor

3   would get paid.  So that's kind of -- I did oversee the

4   expenditures of Flambeau environmental safety and health

5   expenditures since the direct supervisor left, retired.

6   Q.   Okay.  I would like to show you an exhibit.  This is

7   Exhibit 589.

8   A.   It's got these wiggly lines.

9   Q.   Exhibit 589.

10  A.   Okay.

11       MR. VAN CAMP:  Your Honor, these are financial

12  records of Flambeau Mining Company and we would request

13  that they be introduced in confidence and ask --

14       THE COURT:  How do you want to do that?

15       MR. VAN CAMP:  Well, I hate to say it, but I

16  think --

17       THE COURT:  Clear the courtroom?

18       MR. VAN CAMP:  -- I need to clear the courtroom.

19  I will make this as quick as I can.

20       THE COURT:  All right.

21       MR. VAN CAMP:  And we will invite people in

22  after that, but I'm afraid I have to maintain the

23  confidentiality of these documents.

24       THE COURT:  That's fine.

25       MR. VAN CAMP:  And I think, because Jana is part

FRED FOX - DIRECT

1   of this, maybe she can stay.  I will let that be up to

2   the judge.

3           THE COURT:  That would be fine.  Is there any

4   reason why Ms. Murphy should leave the room?

5           THE WITNESS:  I don't know what he's going to

6   show.  I don't think so, no.  She has been privileged to

7   every --

8           MR. VAN CAMP:  Well, we can -- do you mind

9   stepping out?

10           MS. MURPHY:  I don't mind.

11           MR. VAN CAMP:  Then we don't even have to

12   address that issue.

13           THE WITNESS:  Maybe I shouldn't even see them.

14   I don't know.

15   BY MR. VAN CAMP:

16   Q.   Okay.  Would you take a look, please, at Exhibit

17   589?

18           THE COURT:  Just a minute.  I will just note

19   that the court reporter will just note this portion of

20   the transcript will be filed under seal.

21           MR. VAN CAMP:  Thank you, very much.

22

23

24       (SEALED)

25

FRED FOX - DIRECT

1          (SEALED)

2

3

4

5

6

7

8

9

10

11

12

13

14

15          (SEALED)

16

17

18

19

20

21

22

23

24

25

FRED FOX - DIRECT

1          (SEALED)

2

3

4

5

6

7

8

9

10

11

12

13

14

15          (SEALED)

16

17

18

19

20

21

22

23

24

25

FRED FOX - DIRECT

1          (SEALED)

2

3

4

5

6

7

8

9

10

11

12

13

14

15          (SEALED)

16

17

18

19

20

21

22

23

24

25

FRED FOX - DIRECT

1          (SEALED)

2

3

4

5

6

7

8

9

10

11

12

13

14

15          (SEALED)

16

17

18

19

20

21

22

23

24

25

                    FRED FOX - DIRECT

1          (SEALED)

2

3

4

5

6

7

8

9

10

11

12

13

14

15          (SEALED)

16

17

18

19

20

21

22

23

24

25

FRED FOX - DIRECT

1        (SEALED)

2

3

4

5

6

7

8

9

10

11

12

13

14

15        (SEALED)

16

17

18

19

20

21

22

23

24

25

FRED FOX - DIRECT

1          (SEALED)

2

3

4

5

6

7

8

9

10

11

12

13

14

15          (SEALED)

16

17

18

19

20

21

22

23

24

25

FRED FOX - DIRECT

1           (SEALED)

2

3

4

5

6

7

8

9

10

11

12

13

14

15          (SEALED)

16

17

18

19

20

21

22

23

24

25

FRED FOX - DIRECT

1        (SEALED)

2

3

4

5

6

7

8

9

10

11

12

13

14

15        (SEALED)

16

17

18

19

20

21

22

23

24

25

FRED FOX - DIRECT

1      (SEALED)

2

3           THE COURT:  So can we bring everybody else back

4    in the courtroom?

5           MR. VAN CAMP:  Sure.

6           THE COURT:  Okay.

7    BY MR. VAN CAMP:

8    Q.   Mr. Fox, in addition to the things that we've

9    already heard -- you've been sitting in court, you've

10   heard the testimony of other individuals -- are you aware

11   of other contributions that haven't been mentioned that

12   Flambeau Mining Company made to the local community?

13   A.   I know there have been a number of them.  But one

14   that stands out most to me that hasn't been mentioned was

15   a contribution, basically a commitment, by the president

16   of the company written to the Department of Natural

17   Resources that Flambeau Mining Company would keep the

18   river bank properties that they owned -- and this

19   wouldn't just be within the active mining site, but

20   within the entire property package which goes both north

21   and south of the areas that you see where the mine was

22   located -- to keep the river bank properties in an

23   undeveloped state.  In other words, we wouldn't carve it

24   out and sell it off as prime real estate, which was

25   going.

FRED FOX - DIRECT

 1        And the whole idea there was to protect the stream

 2   bank and the water quality of the Flambeau River.  That's

 3   one contribution that hasn't been mentioned.  I can't

 4   put, you know, a value on it.  I know there's a social

 5   value alone, let alone a monetary value.

 6        THE COURT:  Well, that raises a question:  Does

 7   Flambeau still own that piece of property that's been

 8   reclaimed, the 140 acres or whatever it is now?

 9        THE WITNESS:  Definitely.  We own that plus

10   there's a property package that some of it goes north and

11   some of it goes south of that area that you're familiar

12   with with the mine.  We own or Flambeau still owns that

13   land and pays property taxes on it.

14        THE COURT:  And the agreement to keep the banks

15   free from development is in perpetuity or for --

16        THE WITNESS:  Yes.

17        THE COURT:  As long as Flambeau owns it?

18        THE WITNESS:  Well, it's that we won't sell it.

19   It's to keep that land in ownership in perpetuity.  And

20   the idea there is to look long range with the city of

21   Ladysmith and possibly Rusk County to extend the city's,

22   they call it, the *River Trail*, the River Trail that they

23   already -- is existing in the city of Ladysmith and

24   extend it down and around and have a dedicated trail

25   system for people to enjoy forever.  It's, like, to me,

FRED FOX - DIRECT

1    it would be like a state park or something like that.

2    There's others but, that one stands out that hasn't been

3    mentioned.

4    Q.    And does Flambeau Mining Company, do you know

5    whether or not they still pay real state taxes on that

6    property?

7    A.    Absolutely.

8          MR. VAN CAMP:  I have no further questions for

9    this witness.

10         THE COURT:  Mr. Cassidy.

11         MR. CASSIDY:  Thank you, Your Honor.

12                   CROSS-EXAMINATION

13   BY MR. CASSIDY:

14   Q.    Just since we're talking about Flambeau pays real

15   estate taxes on that property, do you know the

16   approximate value of the property?

17   A.    I do not.

18   Q.    And I think you just told the Court that that --

19   that the agreement was to keep that property in tact and

20   not be sold and that is in perpetuity?

21   A.    This would be the river bank property.  Now, is that

22   defined, no, but it's the property Flambeau owns along

23   the river to keep that out of development, to protect the

24   river bank itself and the quality of the Flambeau River

25   forever.  The commitment is to do that.

                    FRED FOX - DIRECT/CROSS

1  Q.   And what -- how is that commitment memorialized?

2  A.   In a letter from the president of Kennecott Minerals

3  to someone in the Department of Natural Resources.

4  Q.   And when did that -- when was that letter sent?

5  A.   I don't know the exact date.  I could guess.

6  Q.   What year?

7  A.   I would guess -- I've got to think here.

8  Q.   Approximately.

9  A.   Yeah.  Oh, I'll bet -- I'll say 2000 -- probably

10 2005.  2004 to 2006 period, something like that.

11 Q.   You're not sure though?

12 A.   No.

13 Q.   And the property that's actually referenced in that

14 letter has not been defined?

15 A.   It's defined as -- I don't know the exact definition

16 either, so it has not been plotted out, surveyed or

17 defined in that means.  It was a narrative commitment.

18 Q.   So it was a narrative letter to DNR saying, "We

19 promise not to develop this property," essentially?

20 A.   Yes.

21 Q.   So it's not a binding commitment on Kennecott

22 Minerals?

23 A.   It's -- I think from what we see, it would not be

24 very good to retract from it, let's put it that way.

25 Q.   So the answer is yes, it's not a binding commitment?

FRED FOX - CROSS

1   A.    I don't know.

2   Q.    You raised it in response to Mr. Van Camp's

3   question.  So you don't know whether it's a binding

4   commitment or not; is that right?

5   A.    It's a written letter to the Department of Natural

6   Resources with the president's signature on it committing

7   to not develop -- that Flambeau will not develop its

8   river bank property; that's what it is.

9   Q.    Okay.  Does Kennecott Minerals own the property or

10  does Flambeau Mine own the property?

11  A.    We can go through the ownership I guess structure,

12  but Flambeau Mining Company was a wholly-owned subsidiary

13  of Kennecott Minerals Company, which is a wholly-owned

14  subsidiary of Rio Tinto, PLC.

15  Q.    So does that mean Rio Tinto owns the property?

16  A.    Ultimately the ownership is Rio Tinto.

17  Q.    And where is Rio Tinto located?

18  A.    It's headquartered in London, UK.

19  Q.    And where is Kennecott Minerals located?

20  A.    Kennecott Minerals Company was located in Salt Lake

21  City, like I said, Utah.  Right now I don't know the

22  legalities, but I don't believe Kennecott Minerals

23  Company is an entity anymore.

24  Q.    You mentioned you're a consultant now for Flambeau

25  Mine Company?

FRED FOX - CROSS

4-P-38

 1  A.   Yes.

 2  Q.   And you're being paid for your testimony here today?

 3  A.   Yes, I am.

 4  Q.   What's your rate?  What rate are you being paid?

 5  A.   $2,000 a day.

 6  Q.   And that's what you've been being paid this whole

 7  time you've been here for the trial?

 8  A.   Yes.

 9  Q.   I think you mentioned earlier in your testimony

10  before lunch, BMPs.  Do you remember talking about BMPs?

11  A.   I do, best management practices.

12  Q.   And you talked about best management practices

13  coming into effect after the WPDS permit was terminated,

14  right?

15  A.   They had been in practice within the reclamation

16  plan for other portions of the reclaimed property.  But

17  they, once the treatment plant was taken out and there

18  was no more method to treat storm water in the industrial

19  outlet, then they applied to the industrial outlot.

20  Q.   Okay.  So before that, there were actually numeric

21  effluent limits that applied to that area for discharges,

22  correct?

23  A.   What area?

24  Q.   Well, that applied to the mine.  That's what the

25  permit said?

FRED FOX - CROSS

4-P-39

1   A.   Yes, when the treatment plant existed, yes.

2   Q.   And best management practices are not the same as

3   numeric effluent limits; is that right?

4   A.   That's correct.

5   Q.   Okay.  Mr. Van Camp asked you some questions about

6   audits; do you remember that?

7   A.   Yes, I do.

8   Q.   And he asked you a question about an audit -- he

9   asked you some questions about an audit you did in 2005?

10  A.   I think I mentioned, you know, that an audit was

11  done in 2005.

12  Q.   Okay.  I'm going to show you what's marked Exhibit

13  4.  Do you see that on your screen?

14  A.   Yes.

15  Q.   And do you recognize that document as the 2005 audit

16  you were discussing with Mr. Van Camp?

17  A.   I guess you can just turn it over to the next page

18  and it will tell you.  Okay.  Yeah, maybe the next page

19  because somewhere it will just say that's where the --

20  yeah, July 30th.  That's the audit, yes.

21  Q.   And one of the issues in that audit was Intermittent

22  Stream C water quality, correct?

23  A.   I remember, yes.

24  Q.   And you had talked about sort of a ranking of

25  issues -- high, medium, low -- and what those

FRED FOX - CROSS

1  designations meant.  What did high mean?  I think you

2  said that was something we were going to take care of

3  immediately?

4  A.   Address, yes.

5  Q.   So --

6  A.   That helps.

7  Q.   I'll show you page 1 of the audit of Exhibit 4.

8  Does this indicate -- the area we're talking about here

9  is Intermittent Stream C water quality and you identified

10  it as a regulatory issue of high importance?

11  A.   Yes.

12  Q.   And what did you mean by "regulatory issue?"

13  A.   Well, there are two categories, regulatory or

14  management.  And this pertained to the regulatory issue

15  because it involved the input to the biofilter, being

16  there's copper levels indicated, you know, high levels,

17  areas of concern.  It was part of the reclamation plan

18  regulatory-wise, so it's a regulatory issue.

19  Q.   Okay.  And under the *Comments and Recommendations*

20  down at the third paragraph it says, "Flambeau should try

21  to address the Intermittent Stream C issue with the DNR

22  prior to asking the DNR to issue a Certificate of

23  Completion and reduce the Mine's reclamation bond.

24  Flambeau also needs to insure that storm water discharge

25  into Stream C continues to be authorized by the Mine's

FRED FOX - CROSS

1   Reclamation Plan since the Reclamation Plan requirements

2   are likely more favorable to the Mine than what would be

3   contained in a WPDES permit."  Did I read that correctly?

4   A.   Yes.

5   Q.   And by more "favorable to the Mine," you meant less

6   stringent, correct?

7   A.   Well, first of all, that's not my words in that

8   audit.  That was co-authored by -- I think I mentioned

9   there was an outside attorney and he did the commenting

10  and recommendations for the environmental side of the

11  auditing and I did the health, safety and community side.

12  So it's not my -- those are not my words, although they

13  are in the audit.

14  Q.   They are Flambeau's words?

15  A.   They are words of an audit -- a co-authored auditor.

16  They're not Flambeau's words.

17          MR. VAN CAMP:  Your Honor, at this time I would

18  like to renew the request of Flambeau Mining Company to

19  claw this document back.

20          THE COURT:  I'm sorry.  What?

21          MR. VAN CAMP:  Claw the document back.  This has

22  been the subject of briefing and so forth.  The testimony

23  makes it clear that this is language of a

24  privately-engaged attorney and I would ask that it be

25  reconsidered at this time and that Flambeau be permitted

FRED FOX - CROSS

 1   to claw it back.

 2           THE COURT:  Well, I'm not going to change that

 3   ruling, but I certainly will take into account the fact

 4   that this was written by somebody who was an outsider for

 5   the purposes of the audit.

 6           MR. VAN CAMP:  Thank you, very much, Your Honor.

 7   BY MR. CASSIDY:

 8   Q.   And that person who wrote this was retained by

 9   Flambeau to do this work?

10   A.   He was retained by Kennecott Minerals Company to do

11   the work, the corporate office.

12   Q.   The parent company to Flambeau?

13   A.   Yes.

14           MR. CASSIDY:  Your Honor, we move Exhibit 4 into

15   evidence.

16           MR. VAN CAMP:  I have the same objections.

17           THE COURT:  Overruled and received.

18           MR. CASSIDY:  Thank you, Your Honor.  Nothing

19   further of this witness.

20           THE COURT:  Mr. Van Camp, anything else?

21           MR. VAN CAMP:  Nothing further.  Thank you.

22           THE COURT:  You may step down.

23           THE WITNESS:  Thank you, Your Honor.

24           MR. VAN CAMP:  Mr. Lynch.

25           THE COURT:  Mr. Van Camp.

                      FRED FOX - CROSS

1          **LAWRENCE LYNCH, DEFENDANT'S WITNESS, SWORN**

2                      DIRECT EXAMINATION

3    BY MR. VAN CAMP:

4    Q.    Good afternoon.  Would you please introduce

5    yourself?

6    A.    My name is Lawrence John Lynch.

7    Q.    And where do you live Mr. Lynch?

8    A.    I live in Madison, Wisconsin.

9    Q.    How are you employed?

10   A.    I am currently a hydrogeologist with the Wisconsin

11   Department of Natural Resources.

12   Q.    How long have you been employed by the Wisconsin

13   Department of Natural Resources?

14   A.    I started with the Department in the fall of 1980 as

15   a limited-term employee for one year and I became

16   permanent in the fall of 1981.

17   Q.    Since 1980, what types of work have you done with

18   the Wisconsin Department of Natural Resources?

19   A.    From 1980 until early 2006 I was in the metallic

20   mining program in the Department.  I started out as an

21   environmental specialist, which then transformed into a

22   hydrogeologist position, and in the mid 90's I was made

23   the mining team leader.

24   Q.    Just --

25   A.    Well, then since February of 2006 I have been a

                    LAWRENCE LYNCH - DIRECT

1    hydrogeologist in the Department's drinking water and

2    ground water program.

3    Q.    From 1980 until 2006, when you say you were in the

4    metallic mining program department, what types of things

5    were you responsible for in that position?

6    A.    Well, at that time we had a number of permitted

7    mining sites in the state, so I was responsible for

8    conducting inspections and surveillance of those sites.

9    I was also responsible for reviewing mining proposals.

10        At the time when I started with the Department there

11   was a large underground mining proposal in the northeast

12   part of the state.  So it was reviewing proposed mines

13   for compliance with the mining rules and laws,

14   determination of environmental impacts, preparing

15   portions of environmental impact documents and, as I

16   said, conducting surveillance at active mines.

17   Q.    What did the surveillance involve?

18   A.    It would mainly involve conducting site inspections

19   to determine compliance with permit conditions on

20   reviewing monitoring data, primarily ground water and

21   surface water monitoring data.

22   Q.    And then when you moved into hydrology, what was

23   involved in that change?

24   A.    I was doing hydrogeology all along.  It was just a

25   matter of the state civil service classifications changed

LAWRENCE LYNCH - DIRECT

1  and they developed a formal classification for

2  hydrogeologist sometime in the late 1980s, so my

3  classification became hydrogeologist.  So the duties

4  really didn't change; it was just the classification

5  changed.

6  Q.   And then I believe you indicated that there was a

7  more substantial change in 2006; is that correct?

8  A.   In 2006 I actually transferred programs when -- and

9  I think you might be referring to 1996 or the mid 90s I

10 became mining team leader.  Again, there was a

11 reorganization effort in the Department in that the early

12 to mid 90s and one of the upshots of that reorganization

13 was formation of different teams.  And there was a mining

14 team formed and I was designated as mining team leader.

15 Q.   What were the responsibilities of the mining team?

16 A.   The mining team was a group of people who worked on

17 mining issues from different aspects.  We had reclamation

18 people.  We had people who worked on mining waste issues.

19 We had the review engineer, another review

20 hydrogeologist.  We had a staff attorney.  And it was

21 basically the core of people who worked on metallic

22 mining issues in the Department.

23     And we were charged with work planning, for one, how

24 we apportion time among the staff to work on mining

25 issues; we worked on guidance development, policy issues.

LAWRENCE LYNCH - DIRECT

1  It was basically, again, a core that worked on mining

2  issues and I was the leader of the team.

3  Q.   How many were people involved in that team?

4  A.   I want to say there were -- there were either six or

5  seven, if I had to make a guess today.

6  Q.   Okay.  And where was your office located during this

7  period of time?

8  A.   I have been located in Madison the whole time.

9  Q.   I would like to digress just a moment and back up

10 prior to your WDNR employment and ask you about your

11 educational background.

12 A.   I have a bachelor's degree in geology and geophysics

13 from the University of Wisconsin at Madison and a

14 master's degree in geology from Northern Illinois

15 University.

16 Q.   And just roughly, when did you get those degrees?

17 A.   My bachelor's degree in 1978 and master's degree in

18 1980.

19 Q.   Did your responsibilities at the WDNR bring you in

20 contact with the Flambeau Mining project?

21 A.   Yes, it did.

22 Q.   When did that first occur?

23 A.   Actually, I think my first site visit to the

24 Flambeau Mine site was in the early 1980s.  It was just

25 a -- we were looking at potential mining sites at the

LAWRENCE LYNCH - DIRECT

1    time and we visited the site in around 1982, '83,

2    somewhere in there.  First formal involvement with the

3    Flambeau Mining project started when the company

4    reapplied for a permit in the late 1980s.

5    Q.   Okay.  And how were you involved in the fact that

6    Flambeau reapplied for a mining permit at that time?

7    A.   At that time I was the main staff person in the

8    mining program and so I was charged with again reviewing

9    the mining permit application, the notice of intent to

10   collect data, the scope of study, the mining permit

11   application; all geared again at determining possible

12   compliance with the state's mining laws and rules as they

13   existed at that time; prepared portions of the

14   environmental impact statement documents.

15        There was mining rule development going on at the

16   time that was related to this project and I was charged

17   with taking the lead on the mining rule development.

18        As it progressed, I became the -- in my role I was

19   the person who drafted the mining permit.  At the time of

20   the contested case hearing, we had draft permits that we

21   presented to the hearing examiner.  The hearing examiner

22   actually put out the final permits, but we had draft

23   permits and I was the staff person responsible for

24   drafting that permit.  Do you want me to continue?

25   Q.   I'm going to ask you a question.  I'm just going to

LAWRENCE LYNCH - DIRECT

 1  get a document up.  I'm sorry.  What was the -- what

 2  position were you in at the time that you began reviewing

 3  this renewed mine permit application?

 4  A.   At that time I would have been either environmental

 5  specialist or hydrogeologist.  That was around the time

 6  that that classification changed.

 7  Q.   Okay.  And at the point in time when the mining

 8  permit was actually granted to Flambeau Mining Company,

 9  what was your position?

10  A.   Hydrogeologist.

11  Q.   I'm going to show you a document that has been

12  marked as Exhibit 1000 and ask you if you are familiar

13  with this document.

14  A.   Yes, I am.

15  Q.   This is -- you're looking at the first page of about

16  200 pages I think of documents.  Why don't you tell us

17  what it is.

18  A.   Well, this is the cover page of the decision

19  document as a result of the contested case hearing on the

20  Flambeau Mining Company application for permits to

21  operate the mine.  It was issued in January of 1991.  It

22  includes all of the permits and approvals that the

23  Department issued at that time; so there's a mining

24  permit, an air permit, the various Chapter 30 permits,

25  solid waste permits, WPDES permit and whatever other

LAWRENCE LYNCH - DIRECT

1  permits were issued.

2  Q.   Okay.  And you mentioned Chapter 30 permits.  Just

3  for the record, what are Chapter 30 permits?

4  A.   Chapter 30 permits are those permits issued under

5  Chapter 30 of Wisconsin Statutes that deal with

6  construction activities in and around navigable

7  waterways.

8  Q.   Throughout the course of this trial, various people

9  have referred to the mining permit.  Could you tell us

10  whether or not this is the cover page of the document

11  that is sort of colloquially referred to as the *mining*

12  *permit*?

13  A.   The mining permit is included in this document.  But

14  the way it's structured is there are general findings

15  that are part of this document and then there are

16  separate permits.  So there's a separate mining permit, a

17  separate air permit, a separate WPDES permit, et cetera,

18  which have -- the general findings are incorporated into

19  that permit and then there are specific findings and

20  conditions related to that specific permit.

21      So again, this relates to the mining permit in that

22  some of the findings of fact and conclusions of law that

23  are at the beginning of the document apply, but the

24  mining permit is a stand-alone document.

25  Q.   Okay.  You don't want to watch the screen here

LAWRENCE LYNCH - DIRECT

1    because I'm going to move through it.  But actually, you

2    could look back at it now just to make sure at the bottom

3    of that first page it's been marked Exhibit JE 1000.  Do

4    you see that?

5    A.    Yes.

6    Q.    Okay.  And then there is an index.  Do you see that?

7    A.    Yes, I do.

8    Q.    And the things that you just mentioned, are those

9    things that are listed on this index?

10   A.    Yes.

11   Q.    And are they all basically different permits related

12   to this one mining project?

13   A.    Yes, they are.

14          MR. VAN CAMP:  Okay.  Move for the admission of

15   Exhibit 1000.

16          MS. WESTERBERG:  No objection.

17          THE COURT:  Received.

18   BY MR. VAN CAMP:

19   Q.    During the permitting process, what were your

20   activities?

21   A.    Primarily it was review of the application and all

22   supporting documents, as I've said, to determine

23   compliance with our laws and rules and insure that that

24   compliance would continue during the operation.  So I

25   conducted technical reviews of documents that were

LAWRENCE LYNCH - DIRECT

1  submitted, conducted site inspections, attended public

2  meetings and hearings and prepared, as I said, prepared

3  portions of the draft and final environmental impact

4  statement and ultimately, as we got towards the end of

5  the process, drafted the mining permit and my testimony

6  for the public hearing or the contested case hearing.

7  Q.    Okay.  Why don't you describe what you mean by the

8  contested case hearing in this specific instance.

9  A.    Under Wisconsin's mining law, the regulatory

10 process, as you see, there are a number of different

11 permits that could apply and there's actually more that

12 could apply for a larger project.  But under Wisconsin

13 mining law, our statutes indicate that there should be

14 one, it's called a *Master Hearing*, on all DNR-issued

15 permits and approvals and it's conducted as a contested

16 case hearing.

17     And by statute, it's to include all -- any permit or

18 license or approval that's necessary for operation of the

19 mining project that the Department issues.  It's also

20 intended to cover the adequacy of the environmental

21 impact statement and compliance with our WEPA law,

22 Wisconsin Environmental Protection -- or Policy Act law.

23     So it's a contested case hearing on all aspects of

24 the project.  Also, by law, there's to be a noncontested

25 case portion.  So the hearing opens up with public

LAWRENCE LYNCH - DIRECT

1   testimony, you know, similar to any informational hearing

2   that the Department or other agencies conduct.

3       Following that informational portion of the hearing,

4   and in this case I believe that lasted -- I think we took

5   33 hours of public testimony or something in that range,

6   then we started the contested case portion of the hearing

7   in which each party -- and there were a number of

8   parties.  There was the company, the Department, the

9   city, the town, the county and a number of environmental

10  groups.  One of the tribes was represented.  So each

11  party can put on witnesses and witnesses are under oath

12  and subject to cross-examination.

13      Following the contested case portion of the hearing,

14  there was another informational portion of the hearing.

15  And that entire record is compiled by the hearing

16  examiner.  And there were court reporters recording

17  everything and transcriptions were prepared.  And then

18  the hearing examiner has I believe 90 days after the

19  close of the briefing period following the hearing in

20  which to issue the decision.  And the decision was issued

21  in January of '91.

22  Q.   And did you participate throughout that process?

23  A.   I did.

24  Q.   And did you participate as parts of both the public

25  hearing and the private closed hearing?

LAWRENCE LYNCH - DIRECT

4-P-53

1   A.    We attended most of the public hearing portion.   The

2   hearing was held in Ladysmith and DNR staff tended to

3   come and go.   Myself and a couple other staff were there

4   probably for 90 percent of it.   The same with the

5   contested case portion of the hearing.   Obviously our

6   attorney was there the entire time and I was there

7   probably 95 percent of the time.

8   Q.    And I think we probably all understand what you mean

9   by a *contested case hearing*, but what was contested?

10  What were the issues that were being contested, that you

11  recall?

12  A.    Frankly, it was just about everything, so pretty

13  much any aspect of the project.   I can't think of a

14  witness that wasn't subject to cross-examination by the

15  parties.   So it's getting to the adequate -- in the case

16  of the department personnel, it was getting to the

17  adequacy of our evaluation and getting to the adequacy of

18  our draft approvals and whether or not the approvals with

19  the conditions that we proposed would be sufficient for

20  protecting the environment, you know, whatever the permit

21  was, whether or not you were protective of the navigable

22  waterways, the ground water, air, resources, whatever.

23      And certainly the company witnesses, you know, it

24  was getting down to the voracity of their analyses and

25  the studies and their technical work, whether or not it

4-P-54

1  was adequate and whether or not it followed accepted

2  protocol, just the general acceptability of the technical

3  work that went into this decision document.

4  Q.   Okay.  Now, drawing your attention back to the

5  screen beside you, there are a number of permits listed

6  there.  They're -- under No. 3 there's something called a

7  *Mining Permit*.  Who is the issuing authority for that

8  mining permit?

9  A.   Well, again, all of the permits were issued by the

10  Division of Hearings and Appeals, but that's just the

11  process.  I mean, they're issued under the authority

12  of -- at that time it was Chapter 144 of the statutes,

13  which is the Metallic Mining Reclamation Act, it was

14  called when it was first passed.  So they're issued under

15  the authority of the Department, the DNR.

16  Q.   Okay.  And would that also be true for the remaining

17  permits that are listed there?  There's a WPDES permit,

18  water regulatory permit, air pollution permits, so forth.

19  Are all of those issued by the same authority?

20  A.   They all have separate statutory authority, but they

21  are all issued by the Department of Natural Resources.

22  Q.   After the permit was issued permitting the Flambeau

23  Mining operation just outside of Ladysmith, did you have

24  any ongoing responsibilities as it relates to the

25  Flambeau Mining project?

LAWRENCE LYNCH - DIRECT

1  A.    I was -- I mean, during the permitting phase, we had

2  a project coordinator and that project coordinator was --

3  his main charge was coordinating all of the permitting

4  activities and the development of the EIS.  Following

5  issuance of the permits, I overtook -- I took over the

6  coordinative function for the Department, so I

7  coordinated the mining permit, which is viewed as kind of

8  an umbrella permit because it encompasses the entire site

9  and, you know, relates to essentially all of the other

10 permits in one manner or another.

11      And so I was essentially the Department's

12 coordinator for the Flambeau project.  So I coordinated

13 the monitoring activities of department staff and

14 surveillance activities and basically was the lead

15 department person on the mining project starting from

16 permit issuance and the various activities that were

17 required under the permits before they could actually

18 start construction until the time I left in 2006.

19 Q.    We never did hear where you went in 2006.  Why don't

20 we put that in the record now.

21 A.    I'm still at the DNR.  I'm in a different program,

22 the drinking water and ground water program.

23 Q.    Okay.  So after the permit was issued, did you have

24 occasion to interact directly with Flambeau Mining

25 Company personnel?

LAWRENCE LYNCH - DIRECT

 1  A.    Yes.   I conducted frequent site inspections.   We had

 2  meetings.   They were, under the permits, were required to

 3  submit various reports and monitoring data.   That all

 4  came to me primarily.   Yes, I had very

 5  frequent interaction.

 6  Q.    What about direct contact with contractors or

 7  consultants, if you will, that Flambeau Mining Company

 8  employed?

 9  A.    We had, similarly, very frequent correspondence with

10  Foth & Van Dyke, who was the main environmental

11  contractor for Flambeau Mining Company.   They prepared

12  many of the plans that were required as conditions of the

13  approvals.

14  Q.    How many times do you think you visited the Flambeau

15  Mine site in or near Ladysmith?

16  A.    It would be difficult without going over my date

17  books for that 15-year period or whatever it was, but I

18  would estimate well over a hundred.

19  Q.    Okay.   And what were your typical activities when

20  you visited the Flambeau Mine site?

21  A.    Sometimes it would be just for going to a specific

22  meeting.   But typically when we went on a site

23  inspection, it would include walking or driving the

24  entire site; or if there was a particular area of

25  construction or some activity going on, we would focus on

1    that.  But generally, when we made the trip up there, we

2    would inspect the entire site.

3    Q.   Okay.  You mentioned the statutes under which the

4    mining permit was issued.  How many mines have been

5    permitted under Wisconsin's modern mining statutes?

6            MS. WESTERBERG:  Object to form of the question,

7    *modern mining statutes*.

8            THE COURT:  Give us a clue.

9    BY MR. VAN CAMP:

10   Q.   Have you heard that term before?

11   A.   Yes.

12   Q.   What does that term mean to you?

13   A.   They're not all that modern anymore.  The mining law

14   was, basically the current iteration of the mining law,

15   was passed in 1978.  Since 1978, and as a condition of

16   that first law, we had to issue permits for some existing

17   mines at the time.  So we have issued permits for mines

18   that were in existence when the mining law was passed.

19   Flambeau Mine is the only new mine that was permitted

20   under the current mining laws.

21           THE COURT:  Since 1978?

22           THE WITNESS:  Yes.

23           MR. VAN CAMP:  I've got a light that is blowing

24   us away at this time.  Do you mind if I put that down?

25           THE WITNESS:  That's supposed to be shining on

LAWRENCE LYNCH - DIRECT

1  me.

2          MR. VAN CAMP:  Thanks.  Sorry.  So I missed your

3  answer.  Really, I'm seeing dots right now.

4          THE COURT:  I have the same problem for a

5  minute, so I can sympathize.

6          MR. VAN CAMP:  If I move around trying to find

7  you among my dots, bear with me.

8  BY MR. VAN CAMP:

9  Q.   Did you -- are you aware of any other mines that

10  have been permitted, metallic mines that have been

11  permitted, under that statute in the state of Wisconsin?

12  A.   As I said, and you weren't paying attention.

13  Q.   I'm sorry.  I was trying.

14  A.   -- we did issue permits to mines that were existing

15  at the time that had to get permits.  But the Flambeau

16  Mining Company mine is the only mine that -- new mine

17  that was permitted that wasn't in existence when the law

18  was passed, so it's the only one that's started up since

19  the law was passed.

20  Q.   Okay.  Did your activities on behalf of DNR include

21  the period of time when Flambeau Mining Company was

22  actively engaged in mining?

23  A.   Yes.

24  Q.   And what typical activities did you have during that

25  mining phase?

LAWRENCE LYNCH - DIRECT

1  A.    Again, it was reviewing monitoring data as it came

2  in, reviewing annual reports.  They were required to

3  submit two separate annual reports, one a general annual

4  report which reported or recounted all of the monitoring

5  results for the year, discussed trends that were seen in

6  any of the monitoring data.  It included discussion of

7  any minor deviations that may have come up.

8       Under the permit, they were allowed to have some

9  minor flexibility in how they ran the project and so they

10  had to account for all of those in annual reports.  They

11  had to document any issues that they had with liners in

12  the various facilities.  So they had that annual report

13  and then there's also a separate annual reclamation

14  report which documented the various reclamation

15  activities that took place during the life of the mine.

16       In addition to that, I was responsible for, you

17  know, any correspondence that came in regarding the mine.

18  Inquiries from the public, legislators, whoever had an

19  interest, generally came to me and I would respond to

20  those; conducting my own site inspections, as I said, and

21  coordinating other staff who conducted frequent site

22  inspections as well.

23  Q.    Okay.  In talking about this other staff that were

24  involved in the Flambeau Mining Company, why don't you

25  tell us a little bit about the different WDNR employees,

LAWRENCE LYNCH - DIRECT

1  other than yourself, that were involved in that project.

2  A.   Well, again, for each of these permits that were

3  issued, there was a staff person assigned and they had

4  their own requirements for monitoring and determining

5  permit compliance.  So they would go out, not all that

6  often, maybe a couple times a year.

7       But from the mining permit program or the mining

8  program, we had three people who made frequent site

9  inspections.  Besides myself, we had our reclamation

10  expert who would go on a number of site visits.  More

11  importantly, we had a staff person stationed in

12  Rhinelander, Wisconsin and he would go to the site

13  routinely a couple of times a week, particularly during

14  the operating phase of the project.  He would go on

15  weekends.  He'd go at night occasionally, you know,

16  surprise inspections, announced inspections.  He made

17  very frequent site visits.

18  Q.   Okay.

19  A.   Again, he was also the staff person who generally,

20  you know, oversaw the monitoring activities.  So when

21  they were collecting ground water samples, he would be in

22  the field with them watching their procedures and he

23  would actually split samples with the company to verify

24  the monitoring data.

25  Q.   Okay.  And just so the record is complete, what are

LAWRENCE LYNCH - DIRECT

4-P-61

1   split samples?

2   A.   Split samples are when you collect a sample and

3   basically the company gets half of the water and we get

4   half of the water and we send it to different labs and

5   compare the results.

6   Q.   Okay.  And over what period of time did this occur?

7   A.   He did that from the time construction began; so,

8   you know, 1991 into 1992; through the time he retired

9   in -- I think he retired in 2006, shortly after I left

10  the program.

11  Q.   And when you say you sent samples to different labs,

12  what do you mean by that?

13  A.   We would send our labs to the Wisconsin State Lab of

14  Hygiene and the company had their samples analyzed by

15  another lab.  And I can't recall which one it was

16  offhand.  I don't know.  Go ahead.

17  Q.   I'm sorry.

18  A.   No, I'm just not sure which lab it was.  I don't

19  know if Foth & Van Dyke did the analyses or they sent it

20  to another lab.

21  Q.   Northern Lakes?

22  A.   Could be.

23  Q.   Then after the samples that were kept by Flambeau

24  Mining Company were sent to the labs, did DNR get copies

25  of those sample results as well?

LAWRENCE LYNCH - DIRECT

1   A.   Yes.  They would come in quarterly.

2   Q.   Do you recall approximately when the -- well, let

3   me -- while mining was going on, you said you also had a

4   reclamation expert from the Department going up to make

5   visits.  What types of reclamation were going on during

6   the time that the active mining was taking place?

7           MS. WESTERBERG:  Your Honor, we just want to

8   object to relevance on the line of questioning during

9   active mining.  I don't know that that's really the

10  period of time in dispute here.

11          MR. VAN CAMP:  Well, actually, the reclamation

12  activities that began back then are very relevant to, you

13  know, the whole reclamation.

14          THE COURT:  I think they are relevant.  Why

15  don't you just get some specific dates, if you can.

16          MR. VAN CAMP:  Okay.

17  BY MR. VAN CAMP:

18  Q.   Do you know when the reclamation activities, not for

19  the overall reclamation, but when any reclamation

20  activities began at the Flambeau Mine site?

21  A.   Well, really, reclamation begins with construction.

22  Q.   And why was that?

23  A.   Well, part of reclamation is managing the site

24  during construction to minimize runoff and erosion.  So

25  during the construction phase, for example, the company

LAWRENCE LYNCH - DIRECT

1  salvaged wetland soils.  There were little pockets on the

2  site of hydric soil, so they would -- and this was all

3  part of the reclamation plan -- so they would excavate

4  that hydric soil and move it to what's called the *hydric*

5  *soil stockpile.*

6      And then there were other things that went into

7  stabilizing that stockpile.  They had to scrape the top

8  soil off and put that in a separate topsoil stockpile.

9  And then once the pile was in place, then there was

10 revegetation.  The entire pile was revegetated to

11 stabilize the soil.

12     When the waste rock was being generated, the

13 external berms of the waste rock, if they weren't going

14 to be disturbed anymore, had to be stabilized and

15 revegetated.  Somebody mentioned earlier today the test

16 plots.  That was a big part of reclamation in that when

17 the reclamation plan was developed, you have an idea of

18 what you intend to plant on the site when you're done.

19     But the idea of the test plots is to test whether or

20 not that, those seed mixes, would actually work on the

21 materials that you have.  So they had test plots with

22 different types of treatments, different fertilizers,

23 different soil amendments, different seed mixes, they

24 would have them facing different slopes; again, all

25 intending to reduce the uncertainty when you come to

LAWRENCE LYNCH - DIRECT

1  final reclamation so that you have some idea, okay, this

2  seed mix will work with this particular soil amendment

3  and this fertilizer best on slopes or on flat areas, so

4  that was all part of reclamation.  They salvaged trees

5  when they were constructing the site.  They dug them out

6  and they had a separate nursery on the site.

7      So, I mean, as I said, reclamation really begins

8  with construction.  And actually, the first thing they

9  had to do on the site was construct certain soil erosion

10 or put certain soil erosion mechanisms in place, so straw

11 bales, silk fence, before they actually started

12 disturbing the site.

13         THE COURT:  All right.  I think this is a good

14 time for a recess.  We will take 15 minutes.

15     (Recess at 3:15 until 3:30 p.m.)

16         THE COURT:  Mr. Van Camp.

17         MR. VAN CAMP:  Thank you, very much, Your Honor.

18 BY MR. VAN CAMP:

19 Q.  Just before the break, we were talking about the

20 salvaging of trees and so forth in the reclamation part

21 of this project and how it began.  We have I think sort

22 of gone through the time period up to and including some

23 of the active mining.

24     What I would like to do before I take down the

25 document that is on the screen next to you, which was the

LAWRENCE LYNCH - DIRECT

1  list of permits and things, I would like to take you to

2  the WPDES permit, which I believe is on, what was it,

3  page 132, 132nd page of that document.  Could you tell us

4  what this is?

5  A.   That's a WPDES permit issued by the Department of

6  Natural Resources.

7  Q.   Okay.  And were you familiar with that as part of

8  the permitting process in this case?

9  A.   I was.  I wasn't responsible for drafting this

10  permit, but I was familiar with it.

11           MR. VAN CAMP:  Okay.  And that's -- what's that

12  a part of, Exhibit --

13           MR. GEORGE:  1000.

14           MR. VAN CAMP:  -- 1000?  Okay.

15  BY MR. VAN CAMP:

16  Q.   There came a time when the mining was beginning to

17  wind down and the reclamation efforts were winding up.

18  Do you recall about what that time period was?

19  A.   Yes.  In the range of 1996 to 1998, the mining

20  activity was slowly diminishing.  They reached a point

21  where they were no longer mining, but they continued

22  shipping ore.  And then once the ore was completely

23  shipped off site, they went into full-scale reclamation.

24  Q.   Let's just talk briefly about shipping ore off the

25  site.  What was done with the ore once it was taken out

1  of the ground?

2  A.   It was transported by truck to an ore stockpile on

3  the west end of what we'll call now the *industrial outlot*

4  *area*.   Then it went -- it was run through a crusher and

5  loaded onto railcars.   And the railcars would sit on the

6  rail spur on the east end of the site until they were

7  shipped by the rail spur out to the main line.

8  Q.   Okay.   Where was that ore processed, do you know?

9  A.   It went to a couple of different places, depending

10 on the grade of the ore, but both sites were in Canada.

11 Q.   So as the mining operation started to wind down and

12 the reclamation activities began, what was your role

13 during that period of time?

14 A.   Well, again, it was similar to the earlier parts of

15 the project in that I was responsible for coordinating

16 any department activity related to reclamation.   I wasn't

17 the reclamation expert, but in my role as a project

18 coordinator, I needed to understand what they were doing,

19 any issues that may have come up, and in this case

20 process the reclamation plan modification.

21 Q.   Do you recall who the reclamation expert was during

22 that period of time?

23 A.   I do.

24 Q.   Who was that?

25 A.   Tom Portal.

LAWRENCE LYNCH - DIRECT

1  Q.   Okay.  Now, the pit was filled at some point,

2  correct?

3  A.   Yes.

4  Q.   Do you recall approximately when that occurred?

5  A.   I think pit-filling was completed in 1997.

6  Q.   And what was involved in the reclamation activities

7  after that?

8  A.   Well, pit-filling was actually part of reclamation.

9  I mean, it was covered under the reclamation plan.  So

10 the next phase would have been -- again, it's kind of

11 hard to separate things.

12 Q.   Okay.  Why don't we start with the pit-filling.

13 A.   The pit-filling was very prescribed.  Certain

14 materials had to go in the bottom of the pit and then

15 sequentially went up with different materials.  Once all

16 the waste rock was in the pit, then they applied glacial

17 till, which was just glacial overburden, graded the site

18 to a rough grade and then eventually put topsoil on it

19 and then the revegetation process.

20      Throughout that process there was also creation of

21 the drainage features, so part of the grading process is

22 establishing the permanent drainage on the site.  And

23 again, that was all part of final reclamation.  The final

24 step is revegetation.

25 Q.   What types of contouring are we talking about for

LAWRENCE LYNCH - DIRECT

1   the water drainage, and so forth, on the site?

2   A.   Well, on the main part of the site, again as part of

3   the modified reclamation plan, there's a wetland area

4   that was reconstructed.  And so the water enters the

5   site, and again, this is the main part of the mining

6   site, not the outlot.  But water comes in from the east

7   side of Highway 27, runs into this constructed wetland.

8   And then it's channelized on the site, flows down and

9   kind of meanders around the site into another wetland

10  area -- another biofilter, if you will -- and that's one

11  portion of the site.

12       It's broken down into separate watersheds and so

13  each watershed has different drainage features.  For the

14  most part, it's grassy swales that direct the water, the

15  surface water, around the surface site.  It bends on the

16  swales through the drainageways there's riprock to

17  protect the soil so that you don't get excessive erosion

18  on the outside of the meanders.

19       But it's basically configuring the surface so that

20  water runs into these drainageways and ultimately to a

21  large biofilter on the main part of the site and then

22  from there flows on to the Flambeau River.

23  Q.   You've spoken about the modification of the original

24  reclamation.  Were you involved in that at all?

25  A.   Yes.

LAWRENCE LYNCH - DIRECT

1  Q.   What was your involvement in that?

2  A.   Again, it was to review the plan and coordinate the

3  Department response.

4  Q.   Okay.  And what did you understand the reason for

5  the modification request to be?

6  A.   Well, again in regard to the biofilter.  I mean,

7  there were a couple of different parts of the

8  modification, but the biofilter or the industrial outlot

9  portion was to maintain -- retain buildings for use by

10  the community.

11      We were told that the Ladysmith Industrial

12  Development Corporation had interest in trying to attract

13  clients to use the buildings and other facilities on the

14  site and we were asked whether or not we would agree to

15  that.  And ultimately we did and we put a four-year time

16  limit on it in which they needed to have definitive uses.

17  If they didn't have a use defined for any portion of that

18  outlet, then they had to reclaim the site consistent with

19  reclamation of the remainder of the site.

20      In addition to the outlet, the modification also

21  included some other aspects of reclamation on the main

22  part of the mine site.  One was moving that main wetland

23  that I mentioned earlier from kind of the -- I don't

24  know, what direction would that be -- the northwest

25  corner of the mine site up to the northeast corner of the

LAWRENCE LYNCH - DIRECT

1   mine site.  Some of the internal drainage on the site was

2   also affected by the modification.

3   Q.    Okay.  To the extent that the modification request

4   involved local community interest to use some of the

5   buildings that had been constructed by Flambeau Mining

6   Company, did the Department have a position on that?

7   A.    Well, the mining law allows for that.  The ultimate

8   goal of reclamation is to return the site to close to or

9   to the similar premining condition or close to it or if

10  that's physically or economically or socially

11  undesirable, to something else.  There's also provision

12  in the law that allows for retention of facilities if

13  they're to be used for another beneficial use.

14        So under the mining law, that was acceptable to

15  consider that type of a change.  And so when we got the

16  request from the company, we also -- they also submitted

17  information from the Ladysmith Industrial Development

18  Corporation in which they expressed that interest saying

19  that these facilities are only six years old and they

20  think they could put them to another use.  And so we

21  entertained that thought and we allowed it and put a

22  four-year time limit on it.

23  Q.    Do you know what one of the buildings is used for on

24  that outlet?

25  A.    I do now, yeah.  I mean, that actually came up

LAWRENCE LYNCH - DIRECT

1   during the whole process of the modification, I learned

2   that we were considering leasing that property from the

3   Ladysmith Industrial Development Corporation.

4           THE COURT:  You didn't mean to say that the

5   buildings could only be used for four more years.

6           THE WITNESS:  No, that they had to have use

7   within -- they didn't have specific uses.  They didn't

8   have anything specified.  So, for instance, the area

9   where the equestrian area is now, that got right up to

10  the four-year point.  We were about at the time saying,

11  okay, you haven't designated a use for that, so you have

12  to reclaim it consistent with the rest of the site.

13      The other -- I mean, the building sites, they did

14  identify clients much sooner than that, so they were able

15  to keep the buildings.

16  BY MR. VAN CAMP:

17  Q.   Were you aware of, when the modification or the

18  application for the modification was first submitted,

19  what was going to happen with the water treatment

20  facility?

21  A.   When the modification request came in in either late

22  1997 or January of '98, there was -- the water treatment

23  facility was going to remain in place.

24  Q.   And with it remaining in place, was there an

25  understanding at that time of what was going to happen

LAWRENCE LYNCH - DIRECT

1  with storm water runoff?

2  A.   The plan for storm water runoff, again, are you

3  talking just in the industrial outlot area?

4  Q.   I'm sorry.  Yes.

5  A.   In the industrial outlot area, storm water would be

6  collected through a manipulation of the topography so it

7  all drained to the former surge pond which became the .9

8  acre biofilter.  The biofilter is constructed in a way

9  that flow would come in on the northwest end and have

10  kind of a sinuous path through it to encourage settling

11  of sediment and then it would exit on the northeast

12  corner.

13  Q.   Okay.  And do you know, during this period of time,

14  what decision was made regarding the decommissioning or

15  plugging up or tearing apart, or whatever you want to

16  call it, the water treatment plant?

17  A.   Yes.

18  Q.   What was that about?

19  A.   Well, when the -- when we received the modification

20  request, we completed our review and we were prepared to

21  issue or approve the modification.  As part of our

22  process we found that the requested -- again, by law --

23  we found that the requested modifications were

24  substantial, which meant that we had to public notice the

25  modification.

LAWRENCE LYNCH - DIRECT

1          And so we issued a public notice disclosing that the

2     company wanted to retain these facilities, the Department

3     was intending to approve it.  If anybody objected or

4     wanted to request a hearing, they could.  By law, if we

5     receive five requests or requests from five individuals,

6     we have to hold a contested case hearing.

7          We received 12 petitions for a hearing shortly after

8     the public notice was issued.  And it was clear, in

9     discussions with the petitioners, that -- I mean, by law,

10    it would be a contested case hearing process, which means

11    everybody is represented by attorneys.  Not that there's

12    anything wrong with attorneys.

13              THE COURT:  But they're expensive.

14              THE WITNESS:  But they're expensive.

15    A.   It's was a very involved process.  What people

16    really wanted, after discussion with some of them, was an

17    opportunity to have more or less of an informational

18    meeting to discuss the issues and try to understand

19    things and perhaps address some of their concerns, so we

20    agreed to have a meeting.

21         It wasn't a public notice informational hearing or

22    meeting; it was an open meeting with the petitioners.  I

23    presided over the meeting.  The Flambeau Company or

24    Flambeau Mining Company personnel was there.  There was

25    people from Foth & Van Dyke, you know.  The legislator

LAWRENCE LYNCH - DIRECT

4-P-74

1    from the area was there.  I believe the mayor was there;

2    people from the city, the town, the county.  But the main

3    participants were the Department, Flambeau Mining Company

4    and the petitioners.

5        The petitioners outlined what their main issues were

6    and one of their main issues was retaining -- the

7    retention of the wastewater treatment plant as an

8    operational facility.

9            THE COURT:  They were opposed to it?

10           THE WITNESS:  They did not want the treatment

11   plant to be used again, as it was conveyed to me at the

12   meeting.  The concern was, they didn't want another user

13   or industry coming in who would continue to have a

14   discharge to the Flambeau River and that was the concern.

15   They didn't want there to be a continued industrial

16   wastewater discharged to the Flambeau River, and so they

17   objected to retaining the workings of the wastewater

18   treatment plant.

19       And as a result of that meeting and the discussions

20   we had, the company agreed to basically gut the treatment

21   plant and just leave the building so that at least the

22   building could be used for storage and maintenance and

23   other activities, but it wouldn't be a wastewater

24   treatment plant.

25   Q.   Just staying with the wastewater treatment plant for

LAWRENCE LYNCH - DIRECT

1  a moment, what was the DNR's role in the monitoring of

2  the operation of the wastewater treatment plant up to the

3  point that it was decommissioned?

4          MS. WESTERBERG:  Object to relevance.

5          THE COURT:  Overruled.

6  A.   Well, again, it was regulated in a manner similar to

7  the way that we regulate all industrial facilities, and

8  that is, we generally rely on self-monitoring.  So the

9  company was responsible for monitoring operation of the

10 treatment plant, conducting the various chemical analyses

11 and reporting those results to the Department according

12 to a schedule in the wastewater -- or in the WPDES permit

13 that was issued.

14      In addition to that, we had staff from our northern

15 region who would conduct audits or inspections of the

16 facility and he would also collect split samples in a

17 manner similar that I discussed on the ground water

18 sampling.  He would collect samples of the effluent.

19 Basically, they had a sampling port where we could go and

20 fill up his sample bottles, and then he would have them

21 analyzed by the state lab again to verify the analytical

22 results that the company was producing.

23 Q.   Throughout the operation of the Flambeau Mining

24 facility up to the point in time where that water

25 treatment facility was decommissioned, are you aware of

LAWRENCE LYNCH - DIRECT

1  any violations of the permit limitations?

2  A.   There weren't any violations of numerical effluent

3  limits.   There were a couple of instances where they

4  failed, what's called, *bioassay tests.*  And they were --

5  so what that then triggered was additional testing and

6  the company had to try to figure out why the bioassay

7  test failures occurred.  And that led to the company

8  actually coming up with some fairly unique and inventive

9  ways of dealing with that.

10      And basically the ultimate decision was the water

11  was essentially too clean, that there wasn't anything for

12  the organisms to live on.  So they ended up adding citric

13  acid I believe to it to kind of chelate things.  I'm not

14  a chemist.  So anyway, after they had those couple of

15  failures, they adjusted their treatment process and they

16  didn't have any other issues.

17  Q.   Okay.  When those issues came up, was enforcement

18  action required to come to a solution?

19  A.   No.

20  Q.   Okay.  Let's go back now to the meeting that you

21  chaired.  What other things do you recall being issues in

22  the discussions at that time regarding the modifications

23  that were being requested?

24  A.   The most significant issues again were the water

25  treatment facility.  There was concern over the way in

LAWRENCE LYNCH - DIRECT

1   which the site would be maintained.  The ecological

2   consultant that Flambeau hired was proposing to

3   incorporate mowing as a prairie maintenance technique.

4   And the people who were opposed to the modification

5   wanted to insure that there would be prescribed burning

6   on the site to maintain prairie vegetation.

7        There was opposition, as Mr. Fox testified, to

8   retention of the fence, retention of the electrical

9   supply facilities on the end of the pit.  There was some

10  discussion about certain species in the seed mixes, if I

11  recall.  But again, the biggest concerns were the fence,

12  the mowing versus burning, and the water treatment

13  facility.

14  Q.   Okay.  And you presided over those meetings.  What

15  was the outcome?

16  A.   Well, the outcome was what happened.  I mean, I left

17  the meeting and I told -- there was one individual who

18  was kind of coordinating on behalf of the petitioner, so

19  I dealt primarily with him.

20  Q.   Who was that individual?

21  A.   His name was Tom Wilson.  He was with an

22  environmental group from Northern Wisconsin.  But the way

23  it was left was, I mean, the company, you know, left the

24  meeting and there were certain things that the

25  petitioners wanted and the company knew that and they

LAWRENCE LYNCH - DIRECT

1   essentially agreed to it.

2       And so there was some correspondence between me and

3   Mr. Wilson in which I laid out what the agreement would

4   be, how we would deal with it in the modification

5   approval, and indicated to him that if we had enough of

6   the petitioners withdraw their requests for a contested

7   case that we wouldn't have to go to a contested case

8   hearing.

9       So ultimately I guess I crafted conditions of

10  approval for the modification and shared them in essence

11  with the petitioners.  And they agreed that they

12  addressed their concerns and enough of the petitioners

13  withdrew their requests for a hearing, so we issued the

14  approval.

15  Q.   Do you recall what modifications had to be made to

16  the, shall we say, the *approval* that was ultimately

17  granted from the one that was initially requested?

18  A.   I don't remember all of them.  But again, we dealt

19  with the retention of the wastewater treatment facility

20  in dismantling it.  That was a condition of the approval

21  of the modification.  The fence removal, the electrical

22  supply removal, insuring that prescribed burning would be

23  the method of prairie maintenance; those were the main

24  ones.

25  Q.   Then did the modification go forward and the

LAWRENCE LYNCH - DIRECT

1   industrial outlot was retained?

2   A.    Yes.

3   Q.    With the industrial outlot, without the wastewater

4   treatment facility, came a concern about -- there came a

5   concern about how to deal with storm water, correct, in

6   that modification discussion?  If they couldn't use the

7   wastewater treatment plant, how were they going to do it?

8   A.    That wasn't part of the discussion.

9   Q.    Okay.

10  A.    So, no, there wasn't any discussion of treating

11  storm water.

12  Q.    Okay.  At what point in time then, from your

13  perspective, was a decision made to utilize a biofilter

14  for storm water treatment?

15  A.    Well, that was part of their modification request in

16  early 1998, but there wasn't any treatment beyond, you

17  know, kind of a passive treatment in the biofilter.

18  Q.    Okay.  And at the time the modification was

19  requested, was there a design for the biofilter?

20  A.    Yes.

21  Q.    And did that design at the time of the modification

22  include an overflow?

23  A.    Yes.

24  Q.    As the treatment of water from the mine site wound

25  down through the water treatment facility, the WPDES

LAWRENCE LYNCH - DIRECT

1    permit was also winding down, correct?

2    A.    Yes.

3    Q.    Could you tell the Court about that process?

4    A.    When the site was being reclaimed and after the main

5    pit-filling had occurred and the site had been topsoiled

6    and final graded, we had a discussion with the company.

7    So it was mining staff with the company, along with our

8    storm water staff or wastewater staff at the time,

9    talking about what would happen to storm water on the

10   site relative to the existing WPDES permit.

11         It was decided that we would regulate storm water on

12   the site through the mining permit.  And we had

13   correspondence with the company indicating that at the

14   time they were pumping water around the site from one

15   spot to another because certain parts of the site weren't

16   yet stabilized and they didn't have all of their final

17   erosion control and drainage features in place.  But once

18   they started pumping water from one site to another, what

19   we indicated was storm water management would fall under

20   the mining permit rather than WPDES permit.

21   Q.    Who was involved in that decision?

22   A.    It was myself and our wastewater staff at the time.

23   Q.    Okay.  And why was that decision made?

24   A.    We -- the storm water program -- and again, this was

25   in early 1998 -- was relatively knew at the time and

LAWRENCE LYNCH - DIRECT

1  storm water staff were basically swamped with permit

2  applications, so that was one factor.

3      The other factor was, we looked at it in that there

4  was a provision in our storm water code that basically

5  gave us the authority to regulate storm water using a

6  different regulatory mechanism than a formal storm water

7  approval as long as, you know, we had similar protection.

8  So it was our feeling that it was -- we had basically a

9  functional equivalence from the mining permit to the

10 storm water permit at the time; that we could have equal

11 protection, if not greater protection, under the mining

12 permit.

13     And ultimately the storm water management on the

14 site was going to come down to best management practices,

15 so making sure that site -- that slopes were stable, that

16 any erosion control features were in place and well

17 maintained, that you weren't getting scouring or erosion

18 of drainage features.  In order to do that, you needed to

19 have a presence on the site.

20     As I said, we had a mining person staff in

21 Rhinelander who would visit the site a couple times a

22 week, I was on site, our reclamation person was on site.

23 So we simply felt we were better positioned to keep an

24 eye on the site and insure compliance, you know, with

25 what was required than our storm water people who might

LAWRENCE LYNCH - DIRECT

1   be there once or twice a year.

2   Q.   I believe you indicated that storm water people were

3   involved in that decision?

4   A.   Yes.

5   Q.   What were the other alternatives that you saw at

6   that time to regulating it under the mining permit?

7           MS. WESTERBERG:   Object to leading.

8           THE COURT:   Overruled.

9   A.   I believe the other alternative was to require the

10   company to get a specific storm water permit for the

11   site.

12   Q.   Another PDES permit?

13   A.   Yes.

14   Q.   What sort of staffing did the storm water people

15   have at that time to monitor the Flambeau Mine site?

16   A.   I'm not sure, but my understanding was, it was part

17   of -- they had regional staff who would inspect

18   industrial facilities and they rolled storm water into

19   that I believe in the early parts of it.   I think now

20   they have different staffing, but at the time I think it

21   was just part of the regional wastewater staff.

22   Q.   You referred to that "We had regulatory authority

23   under the mining permit to deal with storm water."

24   A.   Mm-mm.

25   Q.   What was that that you're referring to?

LAWRENCE LYNCH - DIRECT

1  A.   Well, as part of the mining permit, the company

2  already was required to develop a surface water

3  management plan so that the surface water management plan

4  was part of the permit that you had up earlier and that

5  dealt with how they're going to manage surface water on

6  the site.  That was in place from prior to construction

7  and continued through operation and into reclamation, so

8  we had that mechanism already in place.  Again, our staff

9  was familiar with what was required on the site and how

10 you maintain it and what was important and what wasn't.

11      Under the mining law, there are also specific

12 provisions in the mining law talking about management of

13 water on the mining site, ground water and surface water,

14 so we had authority under the mining law to deal with

15 surface water.

16 Q.   Okay.  Were you familiar with any provisions under

17 the storm water code that gave the mining permit people

18 authority to do that?

19 A.   Yes.

20 Q.   And what was that?

21 A.   Well, again, the actual provision was somewhere in

22 NR 216.  I think it might have been 216.21, but I'm not

23 sure.  Generally, it provides that in lieu of a specific

24 storm water permit, the Department can regulate storm

25 water on a site under another regulatory authority

LAWRENCE LYNCH - DIRECT

1  provided the requirements are similar or as stringent.  I

2  don't recall the language, but that was the general crux

3  of it, and that's why we did what we did.

4  Q.   Okay.  After the storm water -- well, let's speak in

5  terms of after the WPDES permit was terminated.  At that

6  point in time what discharge was there from the mine site

7  that was being regulated under the mine permit?

8  A.   Really there were two: one, it was the discharge out

9  of both biofilters, the biofilter on the main part of the

10 mining site which collects drainage from the former pit

11 area and one of the waste rock areas and topsoil area;

12 and then the biofilter on the industrial outlot.

13 Q.   And what monitoring occurred after the WPDES permit

14 was terminated of the storm water discharges from the

15 biofilter?

16 A.   Initially there was none.  But once the biofilters

17 were created, the company did monitor water quality in

18 the various wetlands that were created on the site, so

19 they monitored both biofilters and the other wetland just

20 for quality.

21 Q.   At that time when the Flambeau Mining Company was

22 monitoring them, were there any requirements by the DNR

23 to do that?

24 A.   It was part of the monitoring plan.

25 Q.   And what was that monitoring plan being -- what was

LAWRENCE LYNCH - DIRECT

1  that controlled by, if you would?

2  A.   The monitoring plan was part of the -- the mining

3  permit, which we talked about, was made up of the mining

4  plan approval, the reclamation plan approval,

5  monitoring -- and the monitoring plan approval.

6  Q.   Okay.

7  A.   They were separate plans that were all approved

8  within the mining permit.

9        THE COURT:  So was it your view that when you

10  did this monitoring after the biofilter was built that

11  you were still carrying out the terms of the original

12  permit?  Maybe that wasn't --

13        THE WITNESS:  Well, the biofilter was a result

14  of a modified -- the modification to the reclamation

15  plan.

16        THE COURT:  Right.  So in your view, you were

17  still doing what you had committed to do on the part of

18  the DNR?

19        THE WITNESS:  Yes.

20        THE COURT:  So when you said to your boss, I

21  need to pay for these people to go out and monitor, that

22  was okay because it was part of this whole plan, even

23  though there was no permit in effect at that time?

24        THE WITNESS:  No.  The permit continues in

25  effect.

LAWRENCE LYNCH - DIRECT

1          THE COURT:  Oh, it does.

2          THE WITNESS:  Yeah.

3          THE COURT:  Then I misunderstood something.

4          THE WITNESS:  The mining permit continues in

5    effect until basically the certificate of completion

6    process.  And then even after that, we still have

7    monitoring and various reporting requirements.

8          THE COURT:  Thank you.

9    BY MR. VAN CAMP:

10   Q.   And under the mining permit, how long will that go

11   on?

12   A.   I'm not exactly -- I wasn't part of the program when

13   they issued the certificate of completion, so I don't

14   know the details of what is required currently.

15   Q.   And is that where in the certificate of completion

16   the continuing activities would be found?

17   A.   Again, frankly, I haven't even looked at their

18   certificate of completion.  Again, by law, there is --

19   the company has to maintain a portion of their bond for

20   an additional 10 to 20 years depending on what type of a

21   mine it is.

22   Q.   Okay.  At the time the decision was made to regulate

23   the storm water runoff from the industrial outlot under

24   the mining permit, did you believe that that was a good

25   decision for the DNR to make?

LAWRENCE LYNCH - DIRECT

 1          MS. WESTERBERG:  Object to relevance.

 2          THE COURT:  Overruled.

 3   A.   Yes, I believed it was the right approach to take,

 4   again, for the reasons I laid out earlier: primarily we

 5   were the staff that were on the site the most often; we

 6   were in the best position to monitor the condition of the

 7   site.

 8   Q.   From the standpoint of protecting the public; the

 9   Wisconsin population, if you will; could you tell us

10   whether or not you believe that this was the best thing

11   to do to monitor discharges from that, I mean, from the

12   biofilter?

13          MS. WESTERBERG:  Same objection.  Irrelevance

14   and speculation.

15          THE COURT:  Overruled.

16   A.   Again, yes.  Technically, could the storm water --

17   had we required a storm water permit, could they have

18   gotten the same thing as far as design and, you know,

19   kind of the nuts and bolts of surface water management

20   and storm water management?  Yes.

21          But I'll go back to what we saw as most important

22   was, you can have a great plan and you can construct the

23   things to implement that plan, but we've always stressed

24   surveillance and monitoring to insure that the plans are

25   being met.  And that was the biggest factor in our

                    LAWRENCE LYNCH - DIRECT

1  decision was, we had the staff and time to keep an eye on

2  the site and make sure that the various elements of the

3  plan were being maintained and that it was functioning

4  the way it was intended.

5  Q.   Did you do that?

6  A.   Yes.

7  Q.   Now, after that modification of the regulation from

8  the WPDES permit to the mining permit for the storm water

9  runoff, how much longer did you remain involved in

10  activities with Flambeau Mine site?

11  A.   Well, modification was issued in 1998 and I left the

12  program in 2006.

13  Q.   Okay.  Between those two times there were some

14  concerns raised at different times about some of the

15  storm water, correct?

16  A.   Yes.

17  Q.   Could you tell the Court about what concerns were

18  raised and what was done about that?

19          MS. WESTERBERG:  Object to leading.

20          THE COURT:  Was there an objection?

21          THE WITNESS:  Yes.

22          MS. WESTERBERG:  I will withdraw it.

23          THE COURT:  Okay.

24          MR. VAN CAMP:  Go ahead.

25  A.   Again, it really started when the company started

4-P-89

1   sampling water quality in the wetlands.  And some of the

2   first -- the first samples that we received, and I don't

3   remember the year, it was either 1999 or 2000, showed

4   elevated copper in the biofilter.  Along with that, in

5   the course of conducting our inspections, primarily our

6   northern region staff noted, what he called, *mineral*

7   *blooms* on the rail spur.  So if you get copper and other

8   minerals on the surface and you get certain chemistry

9   going on, you can get minerals precipitating on the

10  surface and you can tell that they're not supposed to be

11  there, basically.

12      So he noted the presence of mineral blooms and we

13  said, well, you know, this is -- it looks like it could

14  be a problem, so the company continued monitoring,

15  stepped up the frequency of monitoring.  We continued to

16  notice increased precipitation of secondary minerals on

17  the surface.

18          THE COURT:  And this was the surface of --

19          THE WITNESS:  The rail spur on the mine site.

20          THE COURT:  I'm sorry?

21          THE WITNESS:  The rail spur on the mine site.

22          THE COURT:  So it was on --

23          THE WITNESS:  On the surface, on the rocks.

24          THE COURT:  -- ground water, essentially?

25          THE WITNESS:  No.  It was on the -- it was on

LAWRENCE LYNCH - DIRECT

4-P-90

1   the gravel.

2           THE COURT:  Oh, it wasn't on water?

3           THE WITNESS:  No.

4           THE COURT:  Oh.

5           THE WITNESS:  No.  It was on the rock.

6   A.   So eventually, you know, based on our observations

7   of mineralization in the ballast and on the rail spur and

8   water quality results in the biofilter, it led to the

9   soil sampling and the ultimate excavation of the rail

10  spur.  That was the initial activity in 2003-2004.

11          Sampling continued.  And as was testified earlier

12  today I think by Jim Hutchison, we kept stepping further

13  upstream, if you will, to identify additional source

14  areas.  And as those source areas were identified, the

15  company proposed methods to mitigate or remediate those

16  source areas.

17  Q.   Okay.  And again, did the remediations that ensued

18  come about because of enforcement action?

19  A.   No.

20  Q.   How did they come about?

21  A.   It came about really, we had a fairly collaborative

22  approach with the company.  If we saw an issue in the

23  field, you know, whether it was straw bales, you know,

24  deteriorating or disintegrating needing to be replaced or

25  bare spots in vegetation, we would bring it to their

LAWRENCE LYNCH - DIRECT

1   attention and they would fix it.  So it was part of that

2   whole process, in the course of us doing inspections in

3   surveillance work, identifying an issue, bringing it to

4   their attention and they would respond.

5   Q.   Over the period of time that you worked with

6   Flambeau Mining Company, how did you find them in terms

7   of openness and willingness to work with the Wisconsin

8   DNR?

9   A.   Generally, they were very open and, you know,

10  responsive.  Again, as we found issues, they would

11  generally take care of them.

12  Q.   Are you aware of any instances where that wasn't the

13  case?

14  A.   We had some personality issues at times with their

15  staff.

16  Q.   Without mentioning personalities, just --

17  A.   It came down to an issue of our staff was on site

18  during construction and there was an activity going that

19  shouldn't have been going on.  And there wasn't company

20  personnel on staff and so our regional person talked

21  directly to a contractor and that didn't go over well

22  with the project manager at the time, but we straightened

23  it out.  So as a result of that, there was always a

24  company staff person on site whenever there was any

25  construction activity.

1  Q.    During what time period was that?

2  A.    That would have been 1992 or so.

3  Q.    After that personality issue, how did things go?

4  A.    Things actually worked pretty well.

5  Q.    And after the reclamation of the rail spur or the,

6  if you will, enhancement of reclamation involving the

7  rail spur, what other activities were there while you

8  were still involved with Flambeau Mining Company?

9  A.    Again, it was continued monitoring, so they

10 continued ground water sampling, quarterly sampling and

11 surface water sampling.  At the time I think they were

12 still conducting fish and macroinvertebrate sampling in

13 the Flambeau River, biofilter sampling and sampling

14 various wetlands on the site.

15     I should say, from 1998 through the time I left, a

16 big part of it was revegetation and augmentation of

17 revegetation to get to a point where they could submit

18 their notice of completion.  There were very specific

19 standards that had to be met regarding the vegetation.

20 And so much of the activity on the site at that time was,

21 you know, if something was failing, they'd go in and

22 reseed or they'd irrigate or augment with some soil

23 supplements, or whatever, to insure that the site was

24 being revegetated properly.

25 Q.    Then were you involved in the certificate of

LAWRENCE LYNCH - DIRECT

1  completion process?

2  A.   I was not.  That all happened after I left.

3         MR. VAN CAMP:  Okay.  All right.  Thank you,

4  very much.  I have no further questions for this witness.

5                   CROSS-EXAMINATION

6  BY MS. WESTERBERG:

7  Q.   Good afternoon, Mr. Lynch.  I'm Christa Westerberg,

8  one of the attorneys for the plaintiffs.  I want to turn

9  your attention back to your monitoring.  This is the

10 mining permit we were discussing before -- not the mining

11 permit; the decision that contained the mining permit and

12 other approvals issued to Flambeau Mining Company in

13 1991, correct?

14 A.   Yes.

15 Q.   And I believe you said before, the mining permit was

16 issued under the authority of the state mining laws which

17 were then in Chapter 144 of the Wisconsin statutes; is

18 that right?

19 A.   Yes, that's correct.

20 Q.   And even though Flambeau Mining Company had a mining

21 permit, it was still responsible for getting all of their

22 applicable permits, whether state, federal or local,

23 correct?

24 A.   Yes.

25 Q.   And in fact that understanding that Flambeau Mining

1  Company was still responsible for getting all their

2  applicable permits was reflected in the mining permit;

3  itself.   Specifically one place at paragraph 1 at the

4  bottom of page WRPC 120?

5  A.   Yes.   And that simply says that the mining permit is

6  limited to the authority under 144.80 to 94.

7  Q.   And then it goes on to say, "Facilities and

8  activities regulated under other permits, licenses and

9  approvals, shall comply with" --

10  A.   Mm-mm.

11  Q.   Okay.   You see that understanding reflected in other

12  places, such as paragraph 1 of page WRPC 000140 of the

13  mining permit as well, correct?

14  A.   Yes.

15  Q.   The mining permit wasn't issued under the authority

16  of the WPDES program, correct?

17  A.   That's right.

18  Q.   And the mining permit was not issued under Section

19  402 of the Clean Water Act, correct?

20  A.   Correct.

21  Q.   And the mining permit itself did not contain

22  numeric limits on water discharge effluent for things

23  like copper and zinc, correct?

24  A.   That's right.   You mean surface water?

25  Q.   Correct.   In 1991 Flambeau Mining Company was issued

LAWRENCE LYNCH - CROSS

1  a WPDES permit for discharges through three specific

2  outfalls, correct?

3  A.    Yes.

4  Q.    And you see that reflected on the index of the

5  mining permit shown on the monitor, correct?

6  A.    Yes.

7  Q.    The WPDES permit was renewed in 1996; is that

8  correct?

9  A.    Yes.  They are issued for five years.

10  Q.    You mentioned when the decision was made in

11  approximately early 1998 to regulate storm water

12  discharge from the industrial outlet through the mining

13  permit.  Did the mining permit, as modified, contain any

14  effluent limits --

15  A.    No.

16  Q.    -- for the storm water discharges?

17  A.    No, it didn't.

18  Q.    It had no numeric limits such as, you know, five

19  parts per million for copper or anything on that order?

20  A.    No.

21  Q.    And I think you said before, the primary means of

22  regulating the storm water discharges were through best

23  management practices or BMPs?

24  A.    Yes.

25  Q.    And you said your approach -- the DNR's regulatory

LAWRENCE LYNCH - CROSS

1  approach at that time was to stress surveillance and

2  monitoring after -- in and after 1998, correct?

3  A.   Yes.

4  Q.   So that would be surveillance and monitoring of the

5  BMPs, correct?

6  A.   Yes.

7  Q.   It wouldn't be surveillance and monitoring of

8  numeric limits on discharge, correct?

9  A.   That's right.

10 Q.   Because there were no such requirements; is that

11 right?

12 A.   Right.

13 Q.   Okay.  And it wouldn't be surveillance and

14 monitoring of any effluent limits, correct?

15 A.   Right.  There were no effluent limits.

16 Q.   You've never been a member of the program staff in

17 the DNR's WPDES program, correct?

18 A.   I have not.

19 Q.   Showing you what's been marked Exhibit 35 in this

20 case, it's a two-page letter.  Is that your signature on

21 the second page?

22 A.   Yes, it is.

23 Q.   It's a letter dated March 20th, 1998, correct?

24 A.   Yes.

25 Q.   And that's the letter where -- is that the letter

1  where you notified Flambeau Mining Company that the DNR

2  would be regulating storm water discharges from the

3  industrial outlot through the mining permit?

4  A.   Yes, it is.

5  Q.   And you had mentioned that it was your understanding

6  that the Department could regulate discharges under

7  Section NR 216 of the State Administrative Code, correct?

8  A.   Yes.

9  Q.   Is NR 216 mentioned anywhere in this letter?

10  A.   Not on the first page and it's not on the second

11  page either.

12  Q.   Are you aware of any correspondence the DNR issued

13  to Flambeau Mining Company in 1998 that specifically

14  referenced that provision of the Administrative Code,

15  NR 216?

16  A.   It's not in anything that I wrote.  I don't believe

17  it was in any correspondence from our wastewater staff

18  either.

19  Q.   Now, earlier this year you signed an affidavit for

20  this case; is that correct?

21  A.   Yes.

22  Q.   Okay.  And that affidavit was drafted by attorneys

23  at Flambeau Mining Company based on your discussions you

24  had with them, correct?

25  A.   That's right.  With -- I reviewed it and made

LAWRENCE LYNCH - CROSS

4-P-98

1  revisions and they were incorporated.

2  Q.   Sure.   And prior to that affidavit, you had never

3  prepared an affidavit in a case where the DNR was not a

4  party, correct?

5  A.   Not that I recall.

6          MS. WESTERBERG:  I'd like to move admission of

7  Exhibit 35.

8          MR. VAN CAMP:  No objection.

9          THE COURT:  35 is received.

10          MS. WESTERBERG:  Nothing further.  I didn't have

11  anything further.

12          THE COURT:  Thank you.  Mr. Van Camp, anything

13  else?

14          MR. VAN CAMP:  Just one moment, Your Honor.

15       (Discussion held off the record.)

16                    REDIRECT EXAMINATION

17  BY MR. VAN CAMP:

18  Q.   Counsel mentioned the fact that the mining permit

19  did not have specific effluent limitations as it related

20  to copper or zinc; do you recall that testimony?

21  A.   Yes.

22  Q.   During the time that Flambeau Mining Company did

23  have a WPDES permit, do you recall what the effluent

24  limitations were that they were permitted to pump with a

25  pipe directly into the river?

LAWRENCE LYNCH - CROSS/REDIRECT

1  A.    For --

2  Q.    Copper.

3  A.    -- copper specifically?  It started I believe at 50

4  and it was revised after some additional information

5  became available to the Department.  I think it was

6  lowered to 42.

7  Q.    And are you aware of any records reflecting

8  discharges even close to that from the biofilter?

9          MS. WESTERBERG:  Object to foundation.

10          THE COURT:  Overruled.

11  A.    I haven't reviewed the monitoring data since I left

12  the program.  I don't recall the specific numbers.

13          MR. VAN CAMP:  Okay.  Nothing further.  Thank

14  you.

15          THE COURT:  Ms. Westerberg, anything else?

16          MS. WESTERBERG:  No, Your Honor.

17          THE COURT:  You may step down.  Mr. Van Camp,

18  you may call your next witness.

19          MR. VAN CAMP:  At this time I would like to call

20  Bruce Moore.

21          THE COURT:  And this is just for making your

22  offer of proof, right?

23          MR. VAN CAMP:  Yes.

24          MS. MCGILLIVRAY:  Thank you, Your Honor.

25          **BRUCE MOORE, DEFENDANT'S WITNESS, SWORN**

LAWRENCE LYNCH - REDIRECT

4-P-100

1          MS. MCGILLIVRAY:  Your Honor, could I just ask

2   for clarification, I understand this is an offer of

3   proof, but do we need to make our continued objection or

4   further objection on this witness?

5          THE COURT:  No, no.

6          MS. MCGILLIVRAY:  Thank you.

7          THE COURT:  They are of record.

8          MS. MCGILLIVRAY:  Thank you.

9          THE COURT:  Mr. Van Camp.

10          MR. VAN CAMP:  Thank you.

11                     DIRECT EXAMINATION

12   BY MR. VAN CAMP:

13   Q.    Please tell us your name.

14   A.    My name is Bruce Moore.

15   Q.    Mr. Moore, where do you reside?

16   A.    I live in Bayfield, Wisconsin.

17   Q.    Are you currently employed?

18   A.    I am.  I work for the Department of Natural

19   Resources as a water resources engineer.

20   Q.    Please give us a brief post high school education.

21   A.    I hold graduate degrees in civil and environmental

22   engineering and also in environmental monitoring.

23   Q.    What position do you hold with the Wisconsin

24   Department of Natural Resources?

25   A.    I currently work as a water resources engineer in

1   the Department storm water program.

2   Q.   And where is your office; where do you typically

3   operate out of?

4   A.   My office is in Ashland, Wisconsin.

5   Q.   What are your typical duties with the WDNR?

6   A.   Within the storm water program, I'm responsible for

7   making recommendations on implementing the storm water

8   program for Wisconsin's 18 counties in the north.

9   Q.   Are you familiar with the Flambeau Mining Company?

10  A.   I am.

11  Q.   Are you familiar with the Flambeau Mine site?

12  A.   Yes.

13  Q.   When is the last time you visited that location?

14  A.   The last visit was on April 24th, 2012.

15  Q.   What was the purpose of that visit?

16  A.   The purpose of the visit was to view the

17  recently-built infiltration ponds that were part of a

18  retrofit effort.

19  Q.   Prior to visiting the site, were you familiar with

20  plans related to the infiltration facility?

21  A.   Yes.

22  Q.   Describe to the Court what your familiarity with

23  that was.

24  A.   There were plans that had been prepared under the

25  site restoration plan that included retrofitting an

BRUCE MOORE - DIRECT

1  existing bioretention pond to an infiltration basin.

2  That also included the two additional infiltration basins

3  to be constructed.

4  Q.   When did you review those plans?

5  A.   Those plans were reviewed between the period of my

6  first site visit, which was on June 27th, 2011, and this

7  past fall.

8  Q.   And what's your understanding of the difference

9  between an infiltration basin and a biofilter?

10 A.   At this site the bioretention device is a lined

11 feature.  Its intention is to retain water and to

12 minimize ground water interaction with surface runoff

13 that enters the device.  In contrast, an infiltration

14 basin, as designed for this site, is one where you want

15 to promote infiltration of runoff into the underlying

16 soil.

17 Q.   In your review of the plans for the infiltration

18 basins at the Flambeau Mine site, did it appear to you

19 that this would be the case?

20 A.   Yes.

21 Q.   What did you find when you went to the Flambeau Mine

22 site on April 12th?

23 A.   At that point in time the -- all three infiltration

24 basins had been constructed.  The banks had been

25 prepared.  An erosion control mat had been placed on the

 1   surfaces.  There were some issues with the type of

 2   erosion mat that was used on the surface in that there

 3   was the potential for entrapment of amphibians, turtles

 4   and snakes.  In fact we had encountered one snake that

 5   had been entangled.  The overall construction of the

 6   design of the ponds was complete at that time.

 7   Q.   And when you studied the design, what was your

 8   understanding regarding the capacity for the infiltration

 9   basins that had been designed?

10   A.   The infiltration basins were to retain, at a

11   minimum, the 100-year storm event, which would be

12   approximately six inches in a 24-hour period, six inches

13   of rainfall.

14   Q.   Okay.  And did you believe that that was adequate?

15   A.   Yes.

16   Q.   Would you expect any runoff, any overflow, from

17   those infiltration basins?

18   A.   It is unlikely, based on this measure of a

19   statistical 100-year storm event.  In the event that

20   there were a major atypical storm event, it's conceivable

21   that there could be overtopping, but it is highly

22   unlikely.

23   Q.   Are you familiar with other infiltration basins?

24   A.   Yes.

25   Q.   What capacities are they normally designed for?

1    A.    Typically they are designed to retain something less

2    than a hundred-year storm event.   Oftentimes the

3    hundred-year storm event is used in a zine criteria to

4    insure that you don't have major structural failure if

5    you had a major storm event.

6    Q.    Do you know whether or not the DNR approved the work

7    plan for the infiltration basins?

8    A.    Any approval was done through our mining program in

9    that that was the regulatory permit that was in place.

10            MR. VAN CAMP:  Okay.  I don't have anything

11   further for this witness.  Thank you.

12            THE COURT:  All right.  You may step down.  Do

13   you have any other witnesses?

14            MR. VAN CAMP:  Do I have other witnesses?

15            THE COURT:  Mm-mm.

16            MR. VAN CAMP:  Yes.  I would like to call Phill

17   Fauble.

18        **PHILIP FAUBLE, DEFENDANT'S WITNESS, SWORN**

19                  <u>DIRECT EXAMINATION</u>

20   BY MR. VAN CAMP:

21   Q.    Good afternoon.

22   A.    Good afternoon.

23   Q.    Please tell me your name.

24   A.    My name is Philip Fauble.

25   Q.    Where are you from, Mr. Fauble?

1   A.    Currently I reside in Verona, Wisconsin.

2   Q.    Are you employed?

3   A.    Yes.  I'm employed by the Wisconsin Department of

4   Natural Resources.

5   Q.    How long have you been employed by the DNR?

6   A.    I have been employed by the DNR since September of

7   1990.

8   Q.    What positions have you held with the DNR?

9   A.    Beginning in -- beginning with my employment, I was

10   hired as a hydrogeologist for the waste and materials

11   management section.  I continued on in that capacity

12   until 2006.

13   Q.    And what happened in 2006?

14   A.    In 2006 I was appointed to be the mining coordinator

15   again for the waste and materials management section.

16   Actually, it was a combined position.  It was both to be

17   the mining coordinator and the beneficiary use

18   coordinator.

19   Q.    Could you tell me what the position of mining

20   coordinator involves?

21   A.    Yes.  Basically, I kind of picked up where Larry

22   Lynch left off.  My responsibility was for the metallic

23   and nonmetallic mining program.  And so my job duties

24   would include enforcing any of the metallic or

25   nonmetallic laws as they apply to any sort of facilities

PHILIP FAUBLE - DIRECT

1  within the state of Wisconsin, to inspect these set of

2  facilities to make sure they were again in compliance

3  with the laws, and also to review any other new projects

4  that might come along related to mining, metallic or

5  nonmetallic mining.

6  Q.   I would like to back up for a moment.  Could you

7  tell the Court what your education is?

8  A.   Oh.  I am -- I have an undergraduate degree,

9  bachelor's degree, in geology from Eastern Illinois

10 University and I did graduate studies at Northern

11 Illinois University.

12 Q.   In your employment with the DNR, have you had

13 occasion to become involved with the Flambeau Mining

14 project?

15 A.   Yes, I have.

16 Q.   When did that first occur?

17 A.   In a formal sense, it began as soon as I took my new

18 position as the mining coordinator in 2006.

19 Q.   In an informal manner, what involvement did you have

20 before then?

21 A.   Prior to that I had visited the site on at least two

22 occasions when it was operating.  Those were not really

23 in an official capacity.  It was more I was tagging along

24 with some inspectors just to have a look at the site and

25 see the operations.  Several other different staff had

PHILIP FAUBLE - DIRECT

1   done that just to get a familiarity with the project.

2   Q.   Okay.  So beginning in 2006, what was your

3   involvement with the Flambeau Mine site?

4   A.   As I described, essentially what I did is I took

5   over for Larry Lynch, so any of the activities that he

6   had been involved in then became transferred over to me.

7        As I recall, at the time there was a biofilter

8   management plan which needed to be reviewed and finally

9   approved and, also, any of the other inspection duties

10  that we had to do, reviewing the annual report and

11  preparing for an anticipated certificate of completion

12  which we anticipated would be coming in fairly soon.

13  Q.   And what did the biofilter management plan involve?

14  A.   The biofilter management plan basically, as the name

15  would imply, was just a plan of how the Flambeau Mining

16  Company would, on an ongoing basis, manage the biofilter.

17  So it had things in there about monitoring, continuing

18  monitoring of it, and the maintenance and the continuing

19  maintenance of the biofilter area.

20  Q.   And what was your involvement in that?

21  A.   It was already ongoing when I was hired I think in

22  August of 2006.  And so basically then my involvement in

23  that was resigning it again for a second time and then

24  actually issuing an approval in 2007 for that management

25  plan.

PHILIP FAUBLE - DIRECT

1  Q.    Okay.  And have you had occasion to monitor that or

2  to observe the compliance with that plan?

3  A.    Yes, I have.

4  Q.    And what have you found?

5  A.    That FMC has complied with the conditions of the

6  biofilter management plan.

7  Q.    Have you been aware of any other enhancements of the

8  reclamation at the mining site since you became -- since

9  your position changed in 2006?

10  A.    Could you be more specific about --

11  Q.    Right.  Do you recall any submissions for work plans

12  or for activities to address issues that had come up at

13  the mine site?

14  A.    Okay.  Specific to the industrial outlot?

15  Q.    Yes.

16  A.    Okay.  Yes.  There were several.  Mr. Lynch had

17  mentioned that there was a railroad spur in which they

18  had identified some elevated levels of copper due to some

19  spillage and ancillary things during the mining operation

20  which needed to be remediated.  That had been done by the

21  time I took my position, but there were still some other

22  areas which were under investigation besides the

23  railroad spur.

24      FMC then investigated other areas.  This was an

25  ongoing process to see if there were additional areas

PHILIP FAUBLE - DIRECT

1   that had elevated levels of copper besides just the rail

2   spur.  There was a comprehensive -- they did a fairly

3   comprehensive testing of the area in 2008 which -- excuse

4   me.  There was one that was actually even earlier than

5   that.

6       They found a hot spot.  An area where they had

7   loaded out some of the railcars had been found to have

8   elevated levels of copper.  So they came in with a work

9   plan then to address those areas, which were actually in

10  the parking lot of the -- near the former administration

11  building.  And that proposal came in, we reviewed it, we

12  had some comments on it and then that was implemented and

13  there was a removal that was done there.

14      Then again, like I said, there were some further

15  studies.  Some further monitoring had gone on, then there

16  was a series of things that went on again.  And then in

17  2008 there was a large study that was done and they found

18  one more area which needed to be remediated and that was

19  along Copper Park Lane.  It was a ditch which had

20  elevated levels of copper.  So FMC again submitted

21  documentation or submitted a plan to remediate that area

22  and that was also done.

23  Q.   Now, you indicated that investigations were done.

24  Who actually did the investigations?

25  A.   The investigations were done by the Flambeau Mining

PHILIP FAUBLE - DIRECT

1   Company.

2   Q.   And when they completed an investigation, did they

3   share it with the DNR?

4   A.   Yes.

5   Q.   And how was a plan developed then once an

6   investigation was completed?

7   A.   Once an investigation was completed, they would

8   inform us that they were conducting an investigation,

9   they would submit the results.  And generally then, as

10  they submitted the results, they would also submit a

11  recommendation for a potential remedial action to address

12  any concerns which had been identified within that

13  report.

14  Q.   What would the DNR do with that?

15  A.   We would review that report and then we would

16  comment on it.  If we felt that there might be some

17  additional measures which needed to be taken or if we

18  suggest -- if we had any other comments regarding

19  additional monitoring that should be done or anything of

20  that nature, then we would respond with a formal sort of

21  review of what we did and make recommendations.

22  Q.   Okay.  How did you find Flambeau Mining Company when

23  you submitted, say, comments or additional requirements?

24           MS. WESTERBERG:  Objection.  Form.

25           THE COURT:  Overruled.

PHILIP FAUBLE - DIRECT

1   A.    I found the Flambeau Mining Company to be

2   cooperative in their efforts.

3   Q.    In taking over the job that Larry Lynch had, did

4   that involve reviewing mining permits that the company

5   had?

6   A.    In the course of my job, of course I had to review

7   and familiarize myself with the permits that had been

8   issued previously so that I knew exactly what conditions

9   we needed to be enforcing and what our authorities were.

10  Q.    And to the extent that you became familiar with

11  those permits and things, did you ever find Flambeau in

12  violation of any of those permits?

13  A.    No.

14  Q.    Were you involved at all in the decision made in

15  1998 to regulate storm water discharges through the

16  mining permit?

17  A.    No.

18  Q.    When you took over did you understand that the storm

19  water was being managed under the mining permit?

20  A.    Yes.

21  Q.    So when about did you become aware of that?

22  A.    Probably soon after I took the position in 2006, I

23  was briefed on it by our attorney, Chuck Hammer, who

24  basically then sat down and we went through the mining

25  permit and if we had any questions.  And he kind of

PHILIP FAUBLE - DIRECT

1   explained to me some of the history since he had been

2   involved in that and how we regulated the mine.

3   Q.   And did it continue after you took over, that is,

4   did the discharges from the biofilter continue to be

5   regulated after you sort of took charge of the Flambeau

6   Mine project under the mining permit?

7   A.   Yes.  It continued again in the same fashion that it

8   had been regulated before.

9   Q.   And was that satisfactory to you?

10  A.   I'm not quite sure how to answer that.  That's the

11  law.  That's the way we were interpreting it and that's

12  the way we were doing it.

13  Q.   Okay.  And did you believe that that was complying

14  with Wisconsin law?

15  A.   Yes.

16  Q.   Are you familiar with Wisconsin NR 216?

17  A.   Yes, I am.  I'm not -- I'm not an expert on it.  I

18  couldn't tell you exactly the wording, but I am familiar

19  with it, yes.

20  Q.   Are you aware of any other facilities, other than

21  Flambeau Mining Company, that's regulated under NR

22  216.21?

23  A.   The reason I was familiar with it was in my previous

24  position as a hydrogeologist with the waste and materials

25  management system, I regularly was in charge of

PHILIP FAUBLE - DIRECT

1   permitting municipal landfills, municipal solid waste

2   landfills.  Under our permitting authority under NR 500

3   for the siting and the permitting of municipal solid

4   waste landfills, they also were considered to fall

5   underneath that section of NR 216.

6       So for municipal solid waste landfills, when we were

7   doing a feasibility approval or a plan of operation, we

8   would, when we got the plans in, we would share them with

9   the storm water staff.  They would look over those plans,

10   they would give us a recommendation for conditions or

11   approvals and then we would incorporate those into our

12   plan of operation approvals for municipal solid waste

13   landfills.  They did not get a separate storm water

14   permit.

15   Q.   And by "a separate storm water permit," what are you

16   referring to?

17   A.   Any conditions in order to address storm water

18   management on a solid waste disposal facility would be

19   incorporated into our plan of operation for that facility

20   and would be enforced through that mechanism so that

21   there would not be a standalone storm water permit.

22   Q.   And when you're talking about a standalone storm

23   water permit, you're talking about some sort of a PDS

24   permit?

25   A.   Yes.

1  Q.   And so these waste facilities would have storm water

2  discharges, correct?

3  A.   Yes.

4  Q.   And those would be permitted, if I understood you,

5  under NR 216?

6  A.   They would be permitted under our authorities under

7  NR 500.  What I'm saying is, under 216 then, that would

8  be considered an equivalent as long as it was as

9  protective and as stringent as it would be for the

10  requirements under 151.  Then we would incorporate those

11  and we would regulate those through authority through the

12  plan of operation.

13  Q.   During what period of time or is it continuing today

14  that you have responsibilities with regard to Flambeau

15  Mining Company?

16  A.   I have -- I currently do have responsibility for

17  overseeing the Flambeau Mine permit.

18  Q.   Okay.  And so have those basically been the same

19  since 2006?

20  A.   Yes.

21  Q.   During that time has it been necessary for the DNR

22  to bring any enforcement actions against the mining

23  company?

24  A.   No.

25  Q.   During that period of time did you find that they

PHILIP FAUBLE - DIRECT

1  were complying with the permits that they had?

2          MS. WESTERBERG:  Object.  Asked and answered.

3          THE COURT:  Overruled.

4  A.   Yes.

5  Q.   Is it fair to say that the Flambeau Mining Company

6  cooperates with the Wisconsin DNR, as far as you are

7  aware?

8  A.   I found them to be cooperative, yes.

9          MR. VAN CAMP:  No further questions for this

10 witness.

11         THE COURT:  Ms. Westerberg.

12         MS. WESTERBERG:  Thank you, Your Honor.

13                    CROSS-EXAMINATION

14 BY MS. WESTERBERG:

15 Q.   Good afternoon Mr. Fauble I'm.  Christa Westerberg

16 one, of the attorneys for the plaintiffs.

17 A.   Good afternoon.

18 Q.   In your checking compliance, Flambeau Mining

19 Company's compliance with applicable permits, one of the

20 major sources that you rely on is Flambeau's annual

21 reports, correct?

22 A.   That is true.

23 Q.   As well as Flambeau's own reclamation annual

24 reports, correct?

25 A.   Yes.

1   Q.   You've done periodic site visits, correct?

2   A.   Yes.

3   Q.   In so far as the outlot goes, you're checking to see

4   if they're complying with BMPs, correct?

5   A.   Yes.

6   Q.   Not any sort of numeric effluent limits on storm

7   water discharges, correct?

8   A.   No.

9   Q.   Did anyone from Flambeau ever inform you that they

10  thought they might require any sort of WPDES permit for

11  discharges to Stream C?

12  A.   I'm guessing -- are you asking me, did FMC ever

13  approach me and say -- and ask that they -- did they need

14  a permit; is that what you're saying, basically?

15  Q.   Yes.

16  A.   Okay.  No.

17  Q.   Do you know if the U.S. EPA has approved how the DNR

18  regulates storm water runoff from landfills?

19  A.   No.

20  Q.   You have never worked in the DNR's WPDES permit

21  program, correct?

22  A.   No.

23  Q.   Those are --

24          MR. DAWSON:  Point of clarification.  The last

25  word in the question was the word *correct*.  Mr. Fauble

1  said, "No."  Could we have clarification?  Did you mean

2  to say no, it is not correct, or it is correct?

3          THE COURT:  You may have clarification

4  Ms. Westerberg, would you frame the question again?

5          MS. WESTERBERG:  I will, Your Honor.

6  BY MS. WESTERBERG:

7  Q.   Have you ever worked in the DNR's WPDES permit

8  program?

9  A.   No, I have not.

10  Q.   Thank you.  You've submitted three declarations in

11  this case; is that correct?

12  A.   Yes.

13  Q.   And those are on behalf of Flambeau Mining Company,

14  correct?

15  A.   Yes, they were.

16          MS. WESTERBERG:  Nothing further, Your Honor.

17          THE COURT:  Thank you.  Anything else,

18  Mr. Van Camp?

19          MR. VAN CAMP:  Not for this witness.  Thank you.

20          THE COURT:  You may step down.  And he's free to

21  leave, I assume?

22          MR. VAN CAMP:  I'm sorry.  Yes.

23          THE COURT:  He is free to leave?  Okay.

24          MR. VAN CAMP:  Call Mr. Bertolacini.

25      **JAMES BERTOLACINI, DEFENDANT'S WITNESS, SWORN**

4-P-118

DIRECT EXAMINATION

1

2  BY MR. VAN CAMP:

3  Q.   I understand I may have mispronounced your name.

4  Could you please pronounce your name?

5  A.   I pronounce it James Bertolacini.

6          THE COURT:  Let's hear you do that.

7          MR. VAN CAMP:  Pardon me?

8          THE COURT:  Let me hear you do that.

9  BY MR. VAN CAMP:

10 Q.   Bertolacini.  Close?

11 A.   That's how we pronounce it, yes.

12 Q.   Mr. Bertolacini, tell me, first of all, where do you

13 live?

14 A.   I'm lucky enough to live in the Marquette

15 neighborhood on Madison's east side.

16 Q.   And are you employed?

17 A.   Yes, I am.  I'm employed with the Wisconsin

18 Department of Natural Resources.

19 Q.   What is your position with the Department?

20 A.   I am currently the soil and water program

21 coordinator, a position I've held since 2006.

22 Q.   Did everybody in the Department change positions in

23 2006?  Sorry.

24 A.   Just the ones in the mining, I'm assuming.

25 Q.   Okay.  I would like to back up.

1  A.    Sure.

2  Q.    And, if you would, please tell the Court what your

3  educational background is, please.

4  A.    I have a Bachelor of Arts degree from Indiana

5  University in biology and a Master of Science in

6  environmental science from Indiana University, 1990.

7  1994 on the bachelor degree.

8  Q.    And what employment have you had since you received

9  your master's degree?

10 A.    For a time I lived in Chicago.  I worked for a

11 couple of environmental consulting firms.  One was called

12 *Ecology & Environment*.  The other one was Harza

13 Engineering.  And then that would have been for, like, I

14 think 1990 to '92.  And then I moved to Madison and

15 started my employment with the Department of Natural

16 Resources.

17 Q.    What type of work did you do with those firms in

18 Chicago?

19 A.    For the Ecology & Environment, we looked at -- we

20 did, like, preliminary assessments on potential Superfund

21 sites.  At Harza Engineering I worked in their

22 environmental permitting section.

23 Q.    And was it after that that you began working with

24 DNR?

25 A.    Yes.  I started working with the Department of

JAMES BERTOLACINI - DIRECT

1  Natural Resources in November of 1992 initially as a

2  limited-term employee in the recycling program, getting

3  that program up and running.  And then in 1994 I

4  transferred to the storm water program helping to begin

5  implementation of the -- specifically the construction

6  site permit program.

7      And then in -- I was, what we like to term, *reorged*.

8  we went through reorganization in the late 90s, 1998 or

9  so.  I started working at the DNR South Central Office,

10  our regional office in Fitchburg, as a storm water

11  management specialist.

12  Q.  So is it fair to say that you've been involved, in

13  one way or another, in storm water management since 1994?

14  A.  Yes.

15  Q.  And in the various positions you've described, what

16  was your -- what were your responsibilities regarding

17  storm water management?

18  A.  In 1994 to 1998, again I was in the Central Office

19  in Jeff 2.  I was brought on to help get the construction

20  site permit program off the ground as far as beginning

21  implementing that new program at that time.

22      In 1998, again there was reorganization where the

23  idea was to get more people out into the field, so I took

24  a position in Fitchburg to be the regional storm water

25  specialist to implement the program in the eleven-county

1  area at that time in Southern Wisconsin.

2  Q.   When you say that there was a new program that you

3  were getting off the ground involving storm water, what

4  was that about?

5  A.   The new program in the sense of 1994 is when the

6  state's storm water regulations under NR 216 first went

7  into effect.

8  Q.   Tell us, just generally, what is NR 216 about.

9  A.   NR 216 is an Administrative Code that spells out the

10  requirements for application and the permit requirements

11  for storm water discharges, specifically certain

12  municipalities, industrial facilities and construction

13  sites.

14  Q.   And then, as I understand it, after you began

15  working to get the NR 216 program up and running, in 1998

16  you began working in a different position that involved

17  construction sites?

18  A.   Not just construction sites.  In 1998 my position in

19  the Fitchburg office was dealing with all three of those

20  programs I mentioned -- municipal, industrial and

21  construction.

22  Q.   Okay.  Could you describe how, generally, storm

23  water runoff is regulated in the state of Wisconsin?

24  A.   Well, again, there's the three subchapters in NR

25  216.  Under state law, the Department was required to

1   develop administrative rules to regulate certain storm

2   water discharges.  In the municipal subchapter, a

3   municipality that's identified as needing a permit needs

4   to develop certain programs and implement certain

5   processes and procedures in their operations of their

6   municipality to regulate discharges of storm water to

7   their municipal storm water system.  And that's done

8   either through individual permits or general permits.

9       Industrial storm water, depending on the type of

10  industrial activity identified by the Standard Industrial

11  Classification Code, NR 216 identifies the types of

12  industries that do need storm water permits and are

13  divided up into two different tiers, Tier 1 and Tier 2;

14  Tier 1, heavy manufacturing; and Tier 2, facilities are

15  considered light manufacturing for the purposes of NR

16  216.

17      And that subchapter on industrial facilities spells

18  out the requirements for applying for a permit in

19  developing a storm water prevention plan and what kind of

20  best management practices or what kind of considerations

21  for addressing potential contamination of storm water

22  should occur at the facility.  And those, Tier 1 and --

23  the Tier 1 and Tier 2 permits are general permits.

24      Subchapter 3 involves construction.  Currently, any

25  land disturbance affecting one or more acres requires a

JAMES BERTOLACINI - DIRECT

1  storm water permit and the developer is required to have

2  erosion control and a storm water management plan to meet

3  certain standards in the NR codes.

4  Q.   What is the relationship between the Wisconsin

5  regulation of storm water and the federal regulation of

6  storm water?

7  A.   Well, under the Clean Water Act, the entities I just

8  mentioned -- certain municipalities, industrial

9  facilities and construction sites -- are required to get

10  a storm water permit, so that's parallel there.   And

11  states that are delegated to administer WPDES permits on

12  behalf of the federal government are required to

13  implement the procedures in the Clean Water Act to

14  address storm water discharges from the same kind of

15  facilities.

16  Q.   Now, we've been talking in this case about either

17  PDES permits or WPDES permits.   And what do they have to

18  do with storm water?

19  A.   Well, NPDES stands for *National Pollutant Discharge*

20  *Elimination System*.   WPDES stands for *Wisconsin Pollutant*

21  *Discharge Elimination System*.   Those are programs that

22  have been developed to regulate the discharge of

23  wastewater from certain facilities.

24      And there's what's somewhat termed *traditional*

25  wastewater, things like discharges from wastewater

JAMES BERTOLACINI - DIRECT

1  treatment plants that have been regulated for many years.

2  In the late 80s, the Clean Water Act was amended to

3  include storm water discharges as regulated, under

4  certain circumstances, as regulated wastewater

5  discharges.

6  Q.   So how long have you been involved in either

7  reviewing applications -- well, let's say -- just let's

8  start with that, reviewing applications from various

9  entities for PDES permits or WPDES permits.

10  A.   I don't review applications too much anymore.  But

11  when I first started in the program in 1994, and during

12  my time in the Fitchburg office from '92 to 2006, I

13  reviewed applications under all three of those

14  subchapters.

15  Q.   And tell us what you do in your position now.

16  A.   Well, as program coordinator, I'm responsible for

17  coordinating the implementation of the Wisconsin storm

18  water program.  I help or I develop guidance and policy

19  and training materials for both internal and external

20  parties.  I consult with the Environmental Protection

21  Agency on storm water issues and I answer a lot of

22  questions about storm water from the public.

23  Q.   With regard to NR 216, are you familiar with NR

24  216 -- I'm sorry -- NR 216.21?

25  A.   Yes.

1  Q.    What can you tell us about NR 216.21?

2  A.    Well, NR 216.21 specifies the types of facilities

3  that need, based on their SIC code, that need storm water

4  permits.  There are also some other facilities that are

5  listed in that section.  It also includes the, for Tier 1

6  and Tier 2, it also includes the -- currently includes

7  the language for getting what's called a *no exposure*

8  certification.  It also contains the language that was

9  referred to about other environmental programs.

10 Q.    Okay.  And what does that -- what does that mean,

11 that you referred to in other environmental programs;

12 what are you referring to there?

13 A.    There is a provision in NR 216, NR 216.214, that

14 permits the Department to cover a discharge, a storm

15 water discharge, under some other environmental program

16 if the activity is -- if it's being handled in a manner

17 similar or more stringent than a storm water permit.

18 Q.    Okay.  Are you aware of any examples of that?

19 A.    I'm aware of the situation that Mr. Fauble

20 explained, the solid waste landfills and the Flambeau

21 Mine.

22 Q.    Have you had any direct involvement in reviewing the

23 permits regulating the Wisconsin -- I'm sorry -- the

24 Flambeau Mining Company discharges from the biofilter?

25 A.    I have never looked at that document.

JAMES BERTOLACINI - DIRECT

1   Q.    Okay.   You described Tier 1 and Tier 2 general

2   permits.

3   A.    Right.

4   Q.    Could you tell us what those are?

5   A.    Well, we broke our program up into tiers in the

6   first part of the -- when the program was first under

7   development.   We were developing the general permits.

8   The Tier 1 permit again is what we apply to what we term

9   *heavy industry*.   It has the same requirements as the

10  Tier 2 as far as a storm water pollution prevention plan,

11  but it requires chemical monitoring for the first two

12  years of permit coverage and it requires the submittal of

13  a report the first two years of permit coverage.

14       The Tier 2 permit is for what is considered light

15  manufacturing.   They don't have the sampling, the

16  two-year sampling, or the report submittal, but they

17  are -- permittees under that permit are required to have

18  a storm water pollution prevention plan.

19  Q.    Are the Tier 1 and Tier 2 permits considered WPDES

20  permits?

21  A.    Yes.

22  Q.    And who has the authority to issue those permits?

23  A.    The Department of Natural Resources.

24  Q.    Here in the state?

25  A.    Yes.

JAMES BERTOLACINI - DIRECT

1  Q.   And how is it determined whether a pier one -- I'm

2  sorry -- a Tier 1 or a Tier 2 permit is issued, say, for

3  a particular facility?

4  A.   It's based on the language in the code and where

5  they fit into the program.

6  Q.   Okay.  And with regard to the Flambeau Mine site,

7  you are probably familiar by now with the fact that there

8  is something called the *industrial outlot* in that,

9  correct?

10 A.   After being here for a few days, yes, I'm familiar

11 now, yes.

12 Q.   And your understanding of that is what?  Just give

13 me your general understanding of what was involved in the

14 industrial outlot.

15 A.   Okay.  My general understanding, based on what I've

16 heard, is that there is an area of the Flambeau Mine

17 property where there were some buildings that were built

18 during the course of operating the mine that are still

19 remaining, I believe at the southern end of the property,

20 that either are empty or are being leased to other

21 parties.  There's a parking lot associated with it and

22 there is a, or at least what used to be, a biofilter that

23 accepted and treated runoff from that area.  I hope

24 that's a good characterization of what is occurring.

25 Q.   Given your work with the DNR in the storm water

JAMES BERTOLACINI - DIRECT

1  program, given the description that you have just told

2  us, what type of -- if the Department were going to be

3  issuing that facility some sort of a WPDES permit, what

4  type of WPDES permit would be required?

5  A.   Are you asking about the outlot that currently

6  exists or --

7  Q.   Yes.

8  A.   -- the whole sited when it was --

9  Q.   No.  There's a certificate of completion for the

10  rest of the site.

11  A.   Okay.

12  Q.   I'm only talking about the industrial outlot?

13          MR. SAUL:  Your Honor, I'm going to object.  It

14  calls for speculation and calls for a legal opinion.

15          THE COURT:  Well, he can say what he would do in

16  his position and I think that's -- that's appropriate.

17          THE WITNESS:  Your Honor, we are, as staff, we

18  are asked quite often to advise people on whether they

19  need permits or not.  So I feel I can say that, you know,

20  based on what I know about what is occurring at this

21  area, I haven't heard anything that suggests that there's

22  any mining activity still occurring.  We permit

23  industrial facilities based on the kind of activity

24  that's occurring in that facility.

25      For example, a cheese manufacturing facility, based

JAMES BERTOLACINI - DIRECT

4-P-129

1  on their SIC code, they are brought into the permit

2  program based on that activity.  So if they're

3  manufacturing cheese or, you know, some other type

4  product, then if they're required to get a storm water

5  permit under our code, then we, you know, cover them

6  under that permit.

7          THE COURT:  I'll let Mr. Van Camp ask the

8  question then.

9  BY MR. VAN CAMP:

10  Q.  Okay.  We will be even more specific.  One of the

11  major tenants in a building at this site is the DNR.

12  A.  Unless the DNR is manufacturing something or listed

13  in the code in some way, we would not issue a permit to

14  the DNR for that facility.

15  Q.  Okay.  So for the entire industrial outlot and for

16  this biofilter that used to exist wherein storm events

17  there could be a discharge, based on your experience with

18  the DNR, what type of permit, if any, would be required

19  under -- what type of WPDES permit, if any, would be

20  required for that facility?

21  A.  Well, based on what I know about the current

22  tenants, I can't name any of the -- either the Tier 1 or

23  Tier 2 that would be -- that would receive a permit.  I

24  think I've heard the DNR and then a municipal facility

25  and then an empty wastewater treatment plant is what I've

JAMES BERTOLACINI - DIRECT

1   heard is occurring there.

2   Q.   So if they -- if Flambeau Mining Company came to you

3   for advice about whether or not they would require for

4   this facility, including storm water running off into

5   this biofilter which occasionally discharged, what would

6   you tell them about whether they needed to apply for and

7   obtain a WPDES permit?

8   A.   Well, I would ask -- I would want to first know what

9   specific industrial activity is occurring in that area or

10  in those facilities.

11  Q.   I'm going to ask you to assume that there is no

12  manufacturing going on.

13  A.   Then I can't think of a storm water permit that

14  would apply to the current situation there.

15  Q.   Under that circumstance, since a storm water permit

16  wouldn't apply to that circumstance, what effluent limits

17  would there be on discharges from the runoff that went

18  into the biofilter and occasionally overflowed?

19          MR. SAUL:   Objection.   Lack of foundation and

20  calls for a legal conclusion.

21          THE COURT:   Overruled.

22  A.   What effluent limits?

23  Q.   Yeah.

24  A.   Numeric effluent limits?

25  Q.   Yes.   Would there be any?

JAMES BERTOLACINI - DIRECT

 1  A.    We don't have numeric effluent limits in our storm

 2  water permits -- industrial storm water permits.

 3  Q.    So if you don't have effluent limits in your storm

 4  water permit program, what process is followed to control

 5  or to regulate storm water runoff?

 6  A.    As I mentioned earlier, there's the requirement to

 7  develop a storm water pollution prevention plan that

 8  requires the permittee to develop drainage maps, to

 9  identify potential sources of contamination, to identify

10  the best management practices that would be used to treat

11  storm water.  There are situations where things could be

12  more complex for the facility where they might need to do

13  something more than just BMPs and housekeeping, but

14  that's the typical situation for a permitting.

15  Q.    From what you've heard about the regulations in the

16  Wisconsin mine permit, would you say that that is at

17  least as equivalent to any permit that would be needed

18  about storm water from NR 216?

19        MR. SAUL:  Objection.  Lack of foundation.

20        THE COURT:  Overruled.

21  A.    Well, Mr. Van Camp, as I said earlier, I have not

22  reviewed the mining permit.  I don't know exactly what's

23  in that permit.  But based on what I heard from both

24  Mr. Lynch and Mr. Fauble, I'm not sure what the storm

25  water general permit would require beyond that permit

JAMES BERTOLACINI - DIRECT

1   that they have from the state already.

2   Q.    Okay.   Now, as I understand it, the state of

3   Wisconsin is today a fully -- has responsibility, a fully

4   delegated state, by the -- under the Clean Water Act from

5   the EPA; is that correct?

6   A.    As far as fully, I can't speak for the other WPDES

7   programs that I don't work in.   But for the storm water

8   program, EPA recognizes the state of Wisconsin, the

9   Department of Natural Resources, as the permitting

10  authority for storm water.

11  Q.    Are you aware of a letter or a submission for

12  approval of NR 216 to the EPA?

13  A.    I am not.

14  Q.    Are you aware of a letter sent by the EPA commenting

15  on NR 216?

16  A.    A letter?   I'm aware of documents that we have where

17  they have commented on NR 216.

18  Q.    Okay.   And what is that?   What is involved in that

19  process?

20  A.    Well, when the NR 216 was first being drafted, we

21  have what's called a *Green Sheet Package.*   It's only

22  referred to as a *Green Sheet Package* because the front

23  page is on green paper so that our Natural Resources

24  Board knows that it's a document requiring some kind of

25  action on an administrative rule.

JAMES BERTOLACINI - DIRECT

1        That is -- and that Green Sheet Package outlines --

2   is a manner of presenting either a draft rule or a rule

3   that is being proposed for final adoption to the Natural

4   Resources Board.  That document needs to address some of

5   the fiscal impacts of the rule.  It needs to document

6   what kind of public comments were received on the rule.

7   It needs to have a draft of the rule that's being

8   proposed attached to it.  And that is signed by the

9   secretary of the agency.

10  Q.   And then when you received documents from the EPA

11  with comments about that rule, what is done at the

12  Department level with those comments?

13  A.   Well, we usually receive comments from a lot of

14  different interests, you know, business interests,

15  concerned citizens.  But we are required to signet those

16  rules to EPA to look -- at least rules that are based on

17  a federal program.  And what we do is we consider those

18  comments, we might do some back and forth on what their

19  comments might be, but we attempt to satisfy their

20  concerns and -- prior to finalizing the rule.

21  Q.   Okay.  During that back and forth process that you

22  just described, does the DNR continue to be the delegated

23  authority in the state of Wisconsin?

24         MR. SAUL:  Objection.  Calls for a legal

25  conclusion.

JAMES BERTOLACINI - DIRECT

4-P-134

```
 1            THE COURT:  Sustained.

 2  BY MR. VAN CAMP:

 3  Q.   Does -- okay.  That comment period is going on now,

 4  correct, or that back and forth?

 5  A.   Well, the rule is not -- there's a draft rule out

 6  there right now for comment.  What I meant was when

 7  NR 216 was first promulgated, it went through that

 8  process.  And then there were some amendments made in the

 9  early 2000s, it went through that process again.

10  Q.   And between -- well, when did the WDNR first begin

11  issuing WPDES permits?

12  A.   Storm water permits?

13  Q.   Yes.

14  A.   In 1994.

15  Q.   And has the authority of the state of Wisconsin to

16  issue those permits been taken away anytime since then?

17            MR. SAUL:  Objection.  Calls for a legal

18  conclusion.

19            THE COURT:  Overruled.

20  A.   Not that I'm aware of.

21  Q.   Have they continuously done it since that time?

22  A.   "They" being the --

23  Q.   The Department.  Has the Department, since that

24  time, continuously issued WPDES storm water permits?

25            MR. SAUL:  Objection, vague.  Objection, assumes
```

JAMES BERTOLACINI - DIRECT

1   facts not in the record.

2        THE COURT:  Sustained.

3   BY MR. VAN CAMP:

4   Q.   Is the Wisconsin DNR issuing WPDES permits today?

5   A.   You've got to be a little careful.  Issuing is --

6   like, a general permit is issued when it's written and

7   finalized and it becomes the general permit that applies

8   to a broad -- different categories of discharges.  What

9   is occurring probably today as we speak, we confer

10  coverage to facilities and construction sites, whoever is

11  required to get a permit.  Yes, we do that on a daily

12  basis.

13       MR. VAN CAMP:  Okay.  Thank you, very much.  I

14  have no further questions for this witness.

15       THE COURT:  Mr. Cassidy.

16            CROSS-EXAMINATION

17  BY MR. SAUL:

18  Q.   Good afternoon Mr. Bertolacini.  My name is James

19  Saul.  I'm one of the attorneys for the plaintiffs.

20  During your testimony you described the federal-state

21  relationship and you were talking about implementation of

22  federal Clean Water Act requirements.  And I believe your

23  testimony was that the state is required to implement the

24  federal Clean Water Act requirements; is that accurate?

25  A.   I did not say that.

JAMES BERTOLACINI - DIRECT/CROSS

1  Q.   Do you know if EPA has approved the use of Wisconsin

2  state mining permits in lieu of NPDES permits?

3  A.   I don't know whether they ever looked at that

4  permit.

5  Q.   Do you know if they have expressly approved the use

6  of non-NPDES permits for municipal landfills?

7  A.   I don't know whether they have looked at that

8  decision.

9  Q.   Have you reviewed Flambeau Mining Company's

10  discharge monitoring data from the biofilter?

11  A.   I have not.

12  Q.   So you don't know if those discharges comply with

13  water quality standards?

14  A.   What water quality standards are you referring to?

15  Q.   The water quality standards that would apply to the

16  receiving waters; for example, standards for copper or

17  for zinc.

18  A.   I don't know that, no.

19  Q.   Would that be something that would be relevant to

20  your consideration of what type of WPDES permit would be

21  appropriate for that type of discharge?

22  A.   Based on what I know about the kind of activity and

23  the kind of permits we have, the appropriate permit would

24  be a Tier 2 industrial storm water permit, general

25  permit.  That's what the code says.

JAMES BERTOLACINI - CROSS

1   Q.   Does the Wisconsin DNR issue individual storm water

2   WPDES permits?

3   A.   I know that there's -- obviously there's the

4   provision in our code for that to occur.  But whether we

5   do that on a regular basis, I'm not aware that we do.

6   Q.   Are you aware of any industrial facility that has

7   received an individual storm water WPDES permit?

8   A.   Not just for storm water, no.

9   Q.   Are you aware that -- well, first of all, are you

10  familiar with Stream C at the Flambeau Mine site?

11  A.   No.

12  Q.   How long does it take to process an application for

13  a storm water WPDES permit?

14  A.   Industrial?

15  Q.   Yes.

16  A.   It takes a matter of just a day or two.  It can

17  take, you know, longer, depending on the issues with the

18  facility.  It's industry specific.  It's specific to the

19  situation.

20          MR. SAUL:  No further questions, Your Honor.

21          THE COURT:  Thank you.  Anything else,

22  Mr. Van Camp?

23          MR. VAN CAMP:  Nothing else for this witness.

24          THE COURT:  You may step down.  We will adjourn

25  for the evening, but before we do, I want to get some

JAMES BERTOLACINI - CROSS

1    sort of idea about how close we are to the end.

2              MR. VAN CAMP:  I have three witnesses.

3              THE COURT:  Do you think they will be fairly

4    brief or extended?

5              MR. VAN CAMP:  In the general scheme of things,

6    they will be fairly brief.

7              THE COURT:  All right.

8              MR. VAN CAMP:  One of them will be a bit longer

9    than the others, but I would expect that I will be

10   finished before noon tomorrow.

11             THE COURT:  And have you told Ms. -- I can tell

12   by the way you're -- what three are you calling tomorrow?

13             MR. VAN CAMP:  I will be calling

14   Drs. Fairbrother and Burton and I will probably be

15   calling Jana Murphy.

16             THE COURT:  All right.  And, Ms. McGillivray,

17   how many witnesses do you expect to put in tomorrow

18   afternoon?

19             MS. MCGILLIVRAY:  Your Honor, depends on how

20   tomorrow goes, but at this point I should probably confer

21   with counsel.  Depends how tomorrow goes, as I was

22   saying.  At this point, we don't think that we will have

23   a need to call any additional witnesses in the penalty

24   phase.  I did want to clarify, Mr. Van Camp had put

25   Mr. Donohue on his list for today and we didn't get to

 1   him and I'm wondering if that's three plus Mr. Donohue

 2   for tomorrow.

 3          MR. VAN CAMP:  We have Mr. Donohue *in pocket*,

 4   shall we say, but I am not expecting to need to call him

 5   unless an issue arises on cross-examination related to

 6   the wells or the -- something related to the site.

 7          MS. MCGILLIVRAY:  Thank you.  Your Honor, one

 8   other matter that counsel just reminded me of.  I just --

 9   I said we weren't calling any additional witnesses, but I

10   just want to clarify, our understanding is that our

11   liability evidence can be used also in the penalty phase

12   to the extent relevant.

13          THE COURT:  Absolutely.  Yes.  We don't need to

14   hear those witnesses all over again.

15          MS. MCGILLIVRAY:  That's why I didn't want to

16   recall them on those same issues.

17          THE COURT:  All right.

18          MS. MCGILLIVRAY:  Okay.  I'm getting some more

19   motion from the back.  Your Honor, because this is a

20   court trial, will you be asking for post-trial briefing

21   or should we be prepared to give closing argument

22   tomorrow at the end of -- after defendants rest?

23          THE COURT:  I don't think that I need any

24   post-trial briefing.  There have been extensive briefs at

25   earlier stages of this case.  If you wanted to give a

1   short summation at the end of the evidence, that would be

2   fine.   And I also have the briefs on the motions for

3   judgment as a matter of law.

4           MS. MCGILLIVRAY:  I was going to ask, Your

5   Honor, also about that if we were to do post-trial

6   briefing if we could combine those into one.  But if

7   we're just responding to that, I see that in defendant's

8   motion they had an opportunity to cite to the transcript

9   because they have realtime transcripts, and I'm wondering

10  if we could begin our responsive time from the date in

11  which the public transcript is available.

12          THE COURT:  Your responsive time?

13          MS. MCGILLIVRAY:  We received a scheduling order

14  on the brief on the motion to dismiss.

15          THE COURT:  Oh, I thought you had filed

16  something in response to that already.

17          MS. MCGILLIVRAY:  Well, if we did -- I'm not

18  sure we did, since we're all here.

19          MR. VAN CAMP:  We've filed that, also.

20          THE COURT:  I thought I had seen something.

21  Yes.  You can talk to the court reporter about when those

22  will be ready, but it will be a very short time after

23  that.

24          MS. MCGILLIVRAY:  That's fine.  Thank you, Your

25  Honor.

1          THE COURT:  We can talk about that tomorrow.

2    Okay.  Anything else?

3          MS. MCGILLIVRAY:  No.  Thank you, Your Honor.

4          THE COURT:  Court will adjourn.

5          MR. VAN CAMP:  Thank you.

6       (Adjourned at 5:35 p.m.)

7                          ***

8          I, CHERYL A. SEEMAN, Certified Realtime and

9    Merit Reporter, in and for the State of Wisconsin,

10   certify that the foregoing is a true and accurate record

11   of the proceedings held on the 24th day of May, 2012,

12   before the Honorable Barbara B. Crabb, of the Western

13   District of Wisconsin, in my presence and reduced to

14   writing in accordance with my stenographic notes made at

15   said time and place.

16   Dated this 11th day of September, 2012.

17

18                        _____
                                    /s/

19                        Cheryl A. Seeman, RMR, CRR
                          Federal Court Reporter
20

21

22

23   The foregoing certification of this transcript does not
     apply to any reproduction of the same by any means unless
24   under the direct control and/or direction of the
     certifying reporter.

25